# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

G.K., by their next friend, Katherine Cooper;
C.I., by their next friend, Christine C. Wellington;
T.L., by their next friend, Christine C. Wellington;
R.K., by their next friend, Katherine Cooper;
for themselves and all others similarly situated,

**Plaintiffs,**

v.

CHRISTOPHER SUNUNU, in his official capacity as the Governor of New Hampshire; LORI SHIBINETTE, in her official capacity as the Commissioner of the New Hampshire Department of Health and Human Services; JOSEPH RIBSAM, in his official capacity as the Director of the Division for Children, Youth and Families; HENRY LIPMAN, in his official capacity as the Director of New Hampshire Medicaid Services; and CHRISTOPHER KEATING, in his official capacity as the Director of the Administrative Office of the Courts,

**Defendants.**

Case No. _____

## PLAINTIFFS' CLASS ACTION COMPLAINT

## I.   INTRODUCTION

1.     This Class Action Complaint concerns ongoing violations of the federal constitutional and statutory rights of older youth who are in the New Hampshire foster care system.

2.     Specifically, Named Plaintiffs G.K., C.I., T.L., and R.K.[1] file this lawsuit on behalf of themselves and the following class of "Plaintiff Youth": all children ages 14 through 17 who:

---

[1] All Named Plaintiff initials used throughout this Complaint are pseudonymous initials to protect the identities of Named Plaintiffs. A Motion and Memorandum of Law to Proceed Under Pseudonymous Initials is filed along with this Complaint. Shortly after filing, Counsel for Plaintiff Youth will provide a proposed Protective Order to Counsel for Defendants and the Court and upon issuance of a protective order, would release the names and identities of Named Plaintiffs to Defendants.

(1) are, or will be, in the legal custody or under the protective supervision of the Division for Children, Youth and Families ("DCYF") under New Hampshire Revised Statutes Annotated ("RSA") 169-C:3, XVII and/or XXV; (2) have a mental impairment that substantially limits a major life activity, or have a record of such an impairment, or are regarded as having such an impairment; and (3) currently are, or are at risk of being, unnecessarily placed in congregate care settings.

3.     All older youth in New Hampshire foster care have experienced the trauma of removal from their home. As older youth are moved through New Hampshire's foster care system, they experience severe emotional, psychological, and physical harms and are exposed to risks of harm. Many older youth are unnecessarily warehoused in institutional and group care (together, called "congregate care") facilities; experience frequent moves among unstable placements; and face grave outcomes upon exiting or aging out of the system at age 18. These grave outcomes include homelessness, unemployment, and lack of educational attainment.

4.     Older youth with disabilities such as Plaintiff Youth are even more likely to be harmed and exposed to risks of harm by specific structural failures of the New Hampshire foster care system. These include:

    a.  The placement of Plaintiff Youth, who have not had the benefit of legal counsel during proceedings under RSA 169-C (called "dependency proceedings"), in congregate care facilities where their liberty is significantly restricted;

    b.  The failure to provide and implement adequate written case plans—mandated plans that provide a roadmap for housing, mental health services, opportunities for a permanent home, and transitional services to help older youth live independently as young adults;

c.   The placement of Plaintiff Youth in restrictive congregate care facilities, denying those children care in the most integrated setting appropriate to their needs; and

d.   The administration of programs, services and benefits in a manner that results in the discrimination of Plaintiff Youth and precludes them from living and receiving mental health services in the most integrated setting appropriate to their needs.

5.      Defendants, all sued in their official capacity, include Christopher Sununu, Governor of New Hampshire; Lori Shibinette, Commissioner of the New Hampshire Department of Health and Human Services ("DHHS"); Joseph Ribsam, Director of DCYF; Henry Lipman, Director of the New Hampshire Division of Medicaid Services (the "Medicaid Agency"); and Christopher Keating, Director of the Administrative Office of the Courts (the "AOC").

6.      Plaintiff Youth bring claims under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution; the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 622, 671 *et seq*. ("AACWA"); Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* (the "ADA"); and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* (the "Rehabilitation Act").

7.      Plaintiff Youth seek declaratory and injunctive relief to ameliorate the specified structural failures and the resulting harms and risks of harm, and to stop ongoing violations of their federal constitutional and statutory rights.

## II.      JURISDICTION AND VENUE

8.      This class action for declaratory and injunctive relief is brought under 42 U.S.C. § 1983 to redress the ongoing deprivation, under color of state law, of rights guaranteed by the United States Constitution and federal law. This Court also has jurisdiction under the ADA and the Rehabilitation Act.

9.      Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(3).

10.     Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

11.     Venue is proper in the District of New Hampshire under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims herein occurred in this district and because Defendants maintain offices in this district.

### III.   PARTIES

### A.  PLAINTIFFS

12.     Named Plaintiff G.K. is fourteen years old and is in DCYF custody. G.K. has a mental impairment that substantially limits a major life activity. G.K. is unnecessarily in, and/or is at risk of being unnecessarily placed in congregate care settings. G.K. appears through their next friend, Katherine Cooper, who resides in southern New Hampshire. Ms. Cooper has worked in the criminal justice system for 25 years as a public defender, a private attorney, an assistant attorney general, and more recently doing policy work and education in her role as executive director of the New Hampshire Association of Criminal Defense Lawyers. She is familiar with the harms and substantial risks of serious harm that G.K. has suffered in Defendants' custody. Ms. Cooper is fully capable of and committed to representing G.K.'s interests as their next friend.

13.     Named Plaintiff C.I. is sixteen years old and is in DCYF custody. C.I. has a mental impairment that substantially limits a major life activity. C.I. is unnecessarily in, and/or is at risk of being unnecessarily placed in congregate care settings. C.I. appears through their next friend, Christine C. Wellington, a retired attorney, who resides in southern New Hampshire. Ms. Wellington dedicated her legal career to representation of victims of housing discrimination and immigrant victims of violent crime and human trafficking, including child victims. She has served

as a volunteer team member of the greater Derry Juvenile Diversion Project and continues to volunteer for the New Hampshire Immigrant Rights Network. Ms. Wellington previously served as a foster parent in Massachusetts. Ms. Wellington is familiar with the harms and substantial risks of serious harm that C.I. has suffered in Defendants' custody. Ms. Wellington is fully capable of and committed to representing C.I.'s interests as their next friend.

14.    Named Plaintiff T.L. is fourteen years old and is in DCYF custody. T.L. has a mental impairment that substantially limits a major life activity. T.L. is unnecessarily in, and/or is at risk of being unnecessarily placed in congregate care settings. T.L. appears through their next friend, Christine C. Wellington. Ms. Wellington is familiar with the harms and substantial risks of serious harm that T.L. has suffered in Defendants' custody. Ms. Wellington is fully capable of and committed to representing T.L.'s interests as their next friend.

15.    Named Plaintiff R.K. is fourteen years old and is in DCYF custody. R.K. has a mental impairment that substantially limits a major life activity. R.K. is unnecessarily in, and/or is at risk of being unnecessarily placed in congregate care settings. R.K. appears through their next friend, Katherine Cooper. Ms. Cooper is familiar with the harms and substantial risks of serious harm that R.K. has suffered in Defendants' custody. Ms. Cooper is fully capable of and committed to representing R.K.'s interests as their next friend.

**B.  DEFENDANTS**

16.    Christopher Sununu is the Governor of New Hampshire and is sued in his official capacity. The executive power of the state is vested in the governor, who shall be responsible for the faithful execution of laws. N.H. Const. Part II, Art. 41. The Governor is responsible for seeking funds from the legislature to implement New Hampshire's Medicaid and other programs. He is responsible for appointing the Commissioner of DHHS and has the authority to appoint four

members of the advisory board to DCYF. Governor Sununu has exercised his authority over and taken responsibility for New Hampshire's foster care system in multiple ways. These include, for example, setting specific DCYF and DHHS priorities; setting agency funding and staffing levels, including specific programming related to mental health services; advancing New Hampshire's use of congregate care facilities to house vulnerable youth; and appointing the first and current Director of the Office of the Child Advocate, responsible for overseeing the child welfare system. Governor Sununu, personally or through the actions of his agents, acted under color of state law at all times relevant to this action.

17.     Defendant Lori Shibinette is the Commissioner of DHHS, and is sued in her official capacity. Defendant Shibinette provides executive direction to DHHS, which provides a comprehensive and coordinated system of health and human services as needed to promote and protect the health, safety, and well-being of citizens of New Hampshire. RSA 126-A:4, I; RSA 126-A:5. Commissioner Shibinette is responsible for seeking funds from the legislature to implement New Hampshire's child protection and Medicaid programs and ensuring that DHHS complies with all applicable federal and state laws. Commissioner Shibinette, personally or through the actions of her agents, acted under color of state law at all times relevant to this action.

18.     Joseph Ribsam is the Director of DCYF and is sued in his official capacity. DCYF is a division of DHHS and assumes and administers all of the responsibilities and duties relative to child welfare services, including services provided to children, including Plaintiff Youth, in the legal custody or under the protective supervision of the State. RSA 170-G:4, XIII. In addition, DCYF, as the agency that administers child welfare services under Title IV-E of the Social Security Act ("Title IV-E"), may receive federal funds for the purpose of providing independent legal representation by an attorney for children in dependency proceedings. *See* 42 U.S.C. § 674(a)(3);

45 C.F.R. 1356.60(c).[2] Director Ribsam is responsible for ensuring that DCYF complies with all applicable federal and state laws. Director Ribsam, personally or through the actions of his agents, acted under color of state law at all times relevant to this action.

19.      Henry Lipman is the Director of the Medicaid Agency, and is sued in his official capacity. The Medicaid Agency is a division of DHHS and is responsible for, among other things, administering New Hampshire's Medicaid program. Director Lipman is responsible for ensuring that the Medicaid Agency complies with all applicable federal and state laws. Director Lipman, personally or through the actions of his agents, acted under color of state law at all times relevant to this action.

20.      Christopher Keating is the Director of the AOC and is sued in his official capacity. The AOC is responsible for handling administrative matters related to the New Hampshire Judicial Branch, including preparing the biennial budget and overseeing several departments including finance, human resources, information technology, and security. Additionally, the AOC is designated as the entity that provides funding for any attorneys who represent youth in dependency proceedings. Director Keating, personally or through the actions of his agents, acted under color of state law at all times relevant to this action.

## IV.      CLASS ACTION ALLEGATIONS

21.      This action is properly maintained as a class action under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

22.      The Class is defined as all children ages 14 through 17 who: (1) are, or will be, in the legal custody or under the protective supervision of DCYF under RSA 169-C:3, XVII and/or

---

[2] *See also Child Welfare Policy Manual, Section 8.1B (Question 30)*, CHILDREN'S BUREAU, ADMIN. FOR CHILDREN & FAMILIES, https://www.acf.hhs.gov/cwpm/public_html/programs/cb/laws_policies/laws/cwpm/policy_dsp.jsp?citID=36 (last visited Dec. 28, 2020).

XXV; (2) have a mental impairment that substantially limits a major life activity, or have a record of such an impairment, or are regarded as having such an impairment; and (3) currently are, or are at risk of being, unnecessarily placed in congregate care settings.

23.     The Class is sufficiently numerous to make joinder impracticable. As of September 30, 2019, there were at least 94 Class members with a diagnosis under the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"). Only 9.6% of these Class members with a DSM-V diagnosis were placed in a foster home, while 89.4% of Class members with a DSM-V diagnosis were placed in a congregate care setting.

24.     Moreover, youth who have not yet been diagnosed with a DSM-V diagnosis may still be members of the Class as they have been subjected to the known trauma associated with removal from their home and communities. This trauma substantially limits their functioning. Over the course of Fiscal Year 2019, approximately 545 children ages 14 through 17 were in the legal custody or protective supervision of DCYF. At least 70.3% of these youth had a current or most recent placement setting in congregate care.

25.     The questions of fact and law raised by Named Plaintiffs' claims are common to and typical of those of each member of the Class whom they seek to represent, because each Plaintiff Youth is in the legal custody or under the protective supervision of DCYF; has a mental impairment that substantially limits a major life activity, or has a record of such an impairment, or is regarded as having such an impairment; is currently, will be, or is at risk of being unnecessarily placed in congregate care; and relies on Defendants for their safety, health and well-being. Each Plaintiff has also been subjected to significant known harms and/or the serious risk of known harms as a direct result of the continuous and systemic legal deficiencies of New Hampshire's child welfare system alleged in this Complaint on behalf of the Class.

26.     Defendants have acted or failed to act on grounds generally applicable to all members of the Class, necessitating class-wide declaratory and injunctive relief.

27.     Common questions of fact presented by Named Plaintiffs (and members of the Class they seek to represent) include: (1) whether the Governor, DHHS, DCYF, and AOC maintain a policy, practice, pattern, and/or custom of failing to ensure that Plaintiff Youth receive legal representation in dependency proceedings; (2) whether the Governor, DHHS, and DCYF maintain a policy, practice, pattern, and/or custom of failing to provide and implement timely, accurate, and complete case plans; (3) whether the Governor, DHHS, DCYF, and the Medicaid Agency maintain a policy, practice, pattern, and/or custom of failing to develop and maintain an adequate array of programs and services to enable Plaintiffs to receive foster care placement services in the least restrictive and most integrated setting appropriate to their needs; and (4) whether the Governor, DHHS, DCYF, and the Medicaid Agency maintain a policy, practice, and/or custom of administering New Hampshire's foster care and Medicaid systems in a manner that denies Plaintiffs the benefits of the state's services, programs, or activities in the most integrated setting appropriate to their needs.

28.     Common questions of law presented by Named Plaintiffs (and members of the Class they seek to represent) include: (1) whether the Governor's, DHHS's, DCYF's, and AOC's policy, practice, pattern, and/or custom of failing to ensure that Plaintiff Youth receive legal representation in dependency proceedings violates Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution;  (2) whether the Governor's, DHHS's, and DCYF's failure to provide and implement timely, accurate, and complete case plans violates Plaintiffs' rights under AACWA; (3) whether the Governor's, DHHS's, DCYF's, and the Medicaid Agency's policy, practice, pattern, and/or custom of denying foster care placement and mental health services in the

most integrated setting appropriate violates Plaintiffs' rights under Title II of the ADA and Section 504 of the Rehabilitation Act; and (4) whether the Governor's, DHHS's, DCYF's, and the Medicaid Agency's methods of administration violate Plaintiffs' rights under Title II of the ADA, Section 504 of the Rehabilitation Act, and their implementing regulations.

29.     Plaintiffs will fairly and adequately protect the interests of the Class that they seek to represent. Plaintiffs' counsel know of no conflicts between or among members of the Class.

30.     Each Named Plaintiff appears by a Next Friend under Federal Rule of Civil Procedure 17(c), and each Next Friend is sufficiently familiar with the facts of the child's situation and dedicated to fairly and adequately representing the child's best interests in this litigation. Plaintiffs are unaware of any conflicts between or among the named Plaintiffs and/or Plaintiff Youth in the Class they seek to represent.

31.     Plaintiff Youth are represented by attorneys who are competent and experienced in class action litigation, child welfare litigation, disability rights law, and complex civil litigation.

32.     Plaintiffs' counsel have identified and thoroughly investigated all claims in this action, have relevant expertise, and have committed sufficient resources to represent the Class through trial and any appeal.

### V.      BACKGROUND

33.     All older foster youth in New Hampshire are brought into the custody of DCYF having already experienced the trauma of being separated from their families and removed from their homes.

34.     This action focuses on specific structural failures that are causing further harm to these young people once they are in the custody or under the supervision of DCYF, in violation of their federal rights.

35.     As set forth above and described more fully in Section VI below, Defendants perpetuate these structural failures by 1) denying Plaintiff Youth attorney representation while they are placed or at risk of being placed in restrictive congregate care settings; 2) failing to adequately and timely provide and implement critical case plans; and 3) discriminating against Plaintiff Youth, both by failing to ensure that Plaintiff Youth receive placements and services in the most integrated setting appropriate to their needs and by utilizing methods of administration that result in the unnecessary institutionalization of Plaintiff Youth.

36.     Due to these systemic failures, as older youth with mental health disabilities move through New Hampshire's foster care system, they suffer additional harms and risks of harm. They are unnecessarily warehoused in congregate care facilities, and are frequently shuttled from one unstable placement to the next. As a result of these harms and the systemic failures of New Hampshire's foster care system, older youth experience and risk experiencing grave outcomes upon exiting or aging out of the system at age 18.

A. **NEW HAMPSHIRE FOSTER YOUTH ARE HARMED THROUGH UNNECESSARY WAREHOUSING IN CONGREGATE CARE FACILITIES.**

37.     Plaintiff Youth experience harm and are exposed to risk of harm as they are unnecessarily warehoused in congregate care facilities.

38.     New Hampshire policies list the availability of an array of placements for youth in DCYF custody. This array includes less restrictive options like relative or kinship homes and foster family homes. But DCYF can also place Plaintiff Youth in more restrictive congregate care settings, as well as juvenile justice settings.

39.     Despite this array of placement options, Defendants routinely deny older youth in DCYF custody placements in foster home and family-based settings, instead limiting their placement options to restrictive congregate care facilities.

40.     Many of New Hampshire's congregate care facilities house both youth involved in dependency proceedings and youth involved in juvenile delinquency proceedings.

41.     Defendants also routinely place older youth in congregate care facilities out of state, even farther from their home communities. Of the residential treatment programs certified by DHHS for placement as of June 2020, well over half were located out of state. Older youth may be placed in restrictive settings in neighboring states or as far away as Arkansas, Missouri, Tennessee, Iowa, Virginia, Florida, Oklahoma, and Arizona.

42.     According to 2019 data that New Hampshire reported to the federal government, 70.3% of youth in DCYF care ages 14 through 17 were housed in congregate care facilities, compared to the national average of 31.2% for this age group.

43.     Congregate care placement rates are even higher for New Hampshire older youth in DCYF care with a DSM-V mental health diagnosis. In Fiscal Year 2019, 90.5% of older youth with a DSM-V diagnosis had a current or most recent placement setting in a group home or institution, compared to the national average of 39.8%. During this same period, only 7.7% of New Hampshire's older youth with a DSM-V diagnosis were placed in a family foster home, compared to 47.2% of the nation's older youth with a DSM-V diagnosis.

44.     Unnecessary institutionalization—the housing of youth in non-family congregate care settings due to a lack of family-based housing in communities—subjects children to severe restrictions of their fundamental physical liberty interests, unnecessarily segregates them from their communities, and denies children the opportunity to live in a safe family home.[3] As a result,

---

[3] *See, e.g.*, *Kenny A. ex rel. Winn v. Perdue*, 356 F. Supp. 2d 1353, 1360-61 (N.D. Ga. 2005) (recognizing the fundamental physical liberty interests implicated by institutional placements for children in foster care); *E.C. v. Sherman*, No. 05-0726-CV-C-SOW, 2006 WL 6358376, at *37 (W.D. Mo. Aug. 4, 2006) (same).

unnecessary institutionalization is known to have a profoundly negative impact on children's social, emotional, and physical development.[4]

45.     Placement in congregate care prohibits traumatized foster children from forming meaningful relationships with "buffering" adults, leading to toxic stress.[5] Toxic stress is associated with physical effects on children's neural structures, compromised brain development and behavioral functioning, and related psychological adjustment problems.[6]

46.     Further, children placed in congregate care facilities, compared to children placed in family-based settings, spend more time in foster care overall, are less likely to be placed with their siblings, and are less likely to be placed in or near their home communities. In addition, children placed in congregate care facilities are more likely to experience maltreatment in care and less likely to have the chance to develop a close relationship with an adult. Finally, children placed in congregate care facilities are less likely to achieve permanency, a safe and legally permanent family, and therefore more likely to "age out" of the foster care system without community-based supports to facilitate their successful transition to adulthood.[7]

47.     Because of these known harms, children should only be placed in congregate care when they have specialized mental health needs that cannot be met while living in a family-like setting and require specialized treatment that can only be delivered within a group facility. And

---

[4] *See, e.g.*, Richard P. Barth, *Institutions vs. Foster Homes: The Empirical Base for a Century of Action,* BETTER CARE NETWORK (June 17, 2002),
https://bettercarenetwork.org/sites/default/files/Institutions%20vs%20Foster%20Homes.pdf.
[5] *See* Mary Dozier et al., *Consensus Statement on Group Care for Children and Adolescents: A Statement of Policy of the American Orthopsychiatric Association*, 84 AM. J. ORTHOPSYCHIATRY 219, 221-22 (2014),
https://www.apa.org/pubs/journals/features/ort-0000005.pdf; *see also Adverse Childhood Experiences and the Lifelong Consequences of Trauma*, AM. ACAD. OF PEDIATRICS (2014), at 2, https://www.aap.org/en-us/Documents/ttb_aces_consequences.pdf.
[6] *Adverse Childhood Experiences and the Lifelong Consequences of Trauma*, AM. ACAD. OF PEDIATRICS (2014), at 2, https://www.aap.org/en-us/Documents/ttb_aces_consequences.pdf.
[7] Allen D. DeSena et al., *SAFE Homes: Is it worth the cost? An evaluation of a group home permanency planning program for children who first enter out-of-home care,* 29 CHILD ABUSE & NEGLECT 627, 643 (2005).

even then, these placements should be used only for as long as needed to stabilize the child so they can return to a family home.[8]

48.      DHHS and DCYF systematically harm children by routinely and unnecessarily placing older youth with mental impairments in congregate care facilities.

B.  **NEW HAMPSHIRE YOUTH ARE HARMED BY PLACEMENT INSTABILITY WHILE IN THE FOSTER CARE SYSTEM.**

49.      Youth in New Hampshire experience significant harm through high levels of placement instability, or moving frequently from housing placement to placement, while in foster care.

50.      In 2018, older youth in DCYF custody in New Hampshire were moved with alarming frequency. New Hampshire's placement stability rate for older youth in foster care for less than 12 months averaged 14.4 moves per 1,000 days in foster care, which is more than three times higher than the national standard of 4.44 moves per 1,000 days. In 2019, New Hampshire's placement stability rate for the same age group climbed to 15.2 moves per 1,000 days in foster care.

51.      Neuroscientists have highlighted the impact of early childhood experiences on the formation of the developing brain. For children in foster care, a lack of predictability as to where a child lives can "fundamentally and permanently alter the functioning of key neural systems involved in learning, memory, and self-regulation and the complex networks of neuronal connectivity among these systems."[9] For these children, frequent movement among placements

---

[8] *A National Look at the Use of Congregate Care in Child Welfare,* CHILDREN'S BUREAU, ADMIN. FOR CHILDREN & FAMILIES (May 13, 2015), https://www.acf.hhs.gov/sites/default/files/cb/cbcongregatecare_brief.pdf.
[9] Philip A. Fisher et al., *A Translational Neuroscience Perspective on the Importance of Reducing Placement Instability among Foster Children*, 92 CHILD WELFARE 9, 11 (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4396742/pdf/nihms676322.pdf.

negatively affects the ability to form secure attachments or enduring emotional bonds with caregivers.[10]

52.     In addition to harming children's developing brains, extreme housing disruption through frequent placement moves leads to an increased risk of mood disorders, anxiety disorders, and behavior problems, including substance use and disruptive behavior disorders. Studies show that children with multiple placements experience a 63% increase in behavior problems compared to children who experience stability while in foster care.[11] Thus, multiple moves cause and exacerbate mental health problems and trauma.

53.     Older youth with disabilities in DCYF custody are frequently moved by DCYF between and among family foster care settings and more restrictive congregate settings. For example, DCYF frequently moves older youth with disabilities from less restrictive placements, to more restrictive placements, where increased behaviors lead to involvement with the juvenile justice system.

54.     The detrimental consequences of placement instability for older youth in DCYF care are attributable in significant part to the structural failures described below, including Defendants' failure to guarantee counsel for youth at risk of being placed in a congregate care facility; failure to ensure timely and accurate case planning; and failure to provide programs and services to enable Plaintiffs to receive foster care placement services in the least restrictive and most integrated setting appropriate to their needs.

---

[10] Sonya J. Leathers, *Foster Children's Behavioral Disturbances and Detachment from Caregivers and Community Institutions*, 24 CHILD. AND YOUTH SERVICES REV. 239, 259 (2002).

[11] David M. Rubin, *The Impact Of Placement Stability on Behavioral Well-Being for Children in Foster Care*, 119 PEDIATRICS 336, 341-42 (2007), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2693406/pdf/nihms-92063.pdf. *See also* Rae R. Newton et al., *Children and youth in foster care: Disentangling the relationship between problem behaviors and number of placements* 24 CHILD ABUSE & NEGLECT 1363, 1371-72. (2000); Joseph P. Ryan & Mark F. Testa, *Child maltreatment and juvenile delinquency: Investigating the role of placement and placement instability*, 27 CHILD. AND YOUTH SERVICES REV. 227, 230, 244-5 (2005).

C. **NEW HAMPSHIRE'S ONGOING SYSTEM FAILURES CAUSE POOR OUTCOMES FOR YOUTH AGING OUT OF FOSTER CARE.**

55.     Older youth who exit New Hampshire's foster care system when they reach age 18 often "age out" without permanent homes and experience particularly grave outcomes.

56.     Data from the National Youth in Transition Database ("NYTD"), which collects information on youth in foster care and outcomes for youth transitioning out of foster care, shows New Hampshire youth who age out of foster care experience homelessness by age 21 (33%); lack of educational attainment (only 59% graduated from high school or earned a GED by age 21; and only 27% were enrolled in and attending high school, GED classes, or postsecondary vocational training or college by age 21); and unemployment (only 54% had full or part-time employment by age 21).

57.     These harms and risks of harm experienced by older youth in New Hampshire foster care are, in significant part, the result of the structural failures by Defendants alleged below, each of which violates federal law.

## VI.     FACTUAL ALLEGATIONS

A. **NAMED PLAINTIFFS G.K., C.I., T.L., AND R.K.**

   i.     **G.K.**

58.     G.K. is fourteen years old. They have been in DCYF custody since age twelve. They were removed from the home of their mother due to allegations of abuse.

59.     G.K. has been diagnosed with depression, anxiety disorder, and Attention Deficit Hyperactivity Disorder ("ADHD"), each of which substantially limits their ability to function.

60.     After two months of G.K. residing in the approved home of their grandfather and his partner, DCYF removed G.K. and placed them at a congregate care facility in New Hampshire. G.K. has resided in this facility for almost two years.

61.     G.K. is receiving some mental health services in the community and attending a public school and cannot understand why they cannot live in the community with a family. G.K. desires to live in a family setting but has been on a list for a foster home placement for at least one year. DCYF has told G.K. that no one wants them.

62.     G.K. has a volunteer Court Appointed Special Advocate ("CASA") but believes an attorney could more persuasively make their requests known to the dependency court, submit evidence, and file motions as necessary.

63.     G.K. has not been an integral part of their case planning and does not recall having participated in any team case planning meetings.

64.     G.K.'s experience in the congregate care facility has been abnormal for a teenager.

65.     The facility G.K. resides in is often punitive in nature, with many arbitrary rules that children would not experience in a family environment. For example, there is a rule against singing in parts of the facility and if a youth is caught singing, the youth may be subjected to discipline. Being in the facility has harmed G.K.'s self-esteem.

66.     In the facility, G.K. cannot do normal things that other teenagers regularly do and that foster independence. For example, in G.K.'s congregate care facility, older youth are forbidden from doing laundry because they are not trusted to touch the laundry detergent.

67.     Rather than treating each youth as an individual, the facility puts youth on a level system, according to age. G.K. remains on level 2, which means they do not have free access to a telephone and are denied other privileges.

68.     During their time in DCYF custody, G.K. has never been appointed an attorney to represent them in their dependency proceedings. Despite receiving some mental health services in the community and attending a public high school, G.K. has been denied the opportunity to live in

a family community-based setting and has instead been unnecessarily segregated in a facility. G.K., despite their wishes, has not been afforded an opportunity to participate in team case planning meetings and have a voice in planning for their services, placement, and future.

    **ii.**   **C.I.**

69.    C.I. is sixteen years old. They were first removed from their home at the age of four due to allegations of abuse. Following a brief attempted reunification with their family when they were about six years old, they were removed from their home again. C.I. has continuously been in the legal custody of DCYF since 2010.

70.    C.I. has been diagnosed with ADHD, depression, anxiety, and post-traumatic stress disorder ("PTSD"), each of which substantially limits their ability to function.

71.    Between the ages of four and fifteen, C.I. resided with eight foster families and in three congregate care facilities.

72.    When C.I. was about twelve years old, DCYF placed C.I. and their sibling in an adoptive home out-of-state. Upon information and belief, that family agreed to adopt C.I., but not their sibling. Rather than allow the family to pursue adoption of C.I., DCYF removed both children from the family and placed them at Nashua Children's Home, a congregate care facility in southern New Hampshire.

73.    C.I. stayed at Nashua Children's home for almost three years before DCYF transferred them to Chase Home, another congregate facility, away from their sibling.

74.    After several months, DCYF placed C.I. in a new foster home. While there, C.I. experienced school difficulties and was informed that they would transfer, at least temporarily, to a congregate care facility. That information triggered a mental health crisis resulting in their

hospitalization. Once stabilized, their DCYF case worker informed them that they were ineligible to return to the family foster home.

75.     Rather than securing a therapeutic foster home that could meet their needs, DCYF placed C.I. at Mount Prospect Academy's Enhanced Residential Treatment ("ERT") Program, the state's alternative to incarceration for juveniles.

76.     While residing at ERT, C.I. was initially required to attend Mount Prospect Academy, a private special education school. C.I.'s coursework primarily consisted of packets of worksheets that lacked the rigor of public school.

77.     Initially, C.I. understood they would stay at ERT for the weekend. The weekend turned into the summer, which turned into a year without C.I. having any prospects of returning to a family. C.I.'s depression worsened, primarily manifesting as school refusal.

78.     ERT moved C.I. to the most restrictive housing unit and required them to attend ERT's on-grounds school.

79.     C.I.'s time at ERT was extremely unpleasant and depressing. They found staff uncaring and hostile, especially as staff regularly relied upon physical restraints to assert power and control over them.

80.     C.I.'s last day at ERT began with staff yelling at them for not attending school. They threw a water bottle, frustrated by their circumstances. They were restrained by multiple staff, resulting in an altercation that led to C.I.'s first ever delinquency offenses for assault and criminal threatening. C.I. became dually involved with the child protection and juvenile justice systems and was quickly committed to the Sununu Youth Services Center ("SYSC").

81.     C.I. was placed at SYSC for six months. Rather than pursuing a therapeutic foster home, upon C.I.'s release DCYF removed them to yet another congregate care facility, this time out-of-state.

82.     C.I. is isolated at their current congregate care placement. Even if they could earn privileges to go into the community, they do not have friends or family in that community.

83.     During the approximately ten years that C.I. has been in DCYF custody, C.I. has never had legal representation in their dependency case, despite being placed in restrictive congregate care environments. They believe that an attorney would have prioritized their desire to live with a family, even at the expense of separation from their sibling. Instead, they were repeatedly told that they were too young to make that decision and left without an effective mechanism for expressing their desires to the state court in the dependency proceedings.

84.     C.I. does not recall ever participating in their case planning and is not aware of an adequate case plan that has been prepared for them. C.I. currently attends one-on-one counseling and Dialectical Behavior Therapy, both services that should be available in the community. C.I. could have been placed in a family setting. Instead, C.I. has been unnecessarily forced to live and receive their services in restrictive congregate settings.

**iii.     T.L.**

85.     T.L. is fourteen years old. They were removed from their mother's care by DCYF nearly two years ago due to allegations of abuse and/or neglect. At all times since T.L.'s removal from their home, they have remained in the legal custody of DCYF.

86.     During the removal, DCYF was accompanied by the police. A police officer grabbed T.L.'s arm and pulled them into the car.

87.     As a result of the removal, T.L. was separated from their mother, their siblings, and their service dog they had for years to help manage their anxiety and panic attacks.

88.     T.L. experienced a significant traumatic event when they were four years old. T.L. has been diagnosed with anxiety, ADHD, Attention Deficit Disorder ("ADD"), Bipolar Disorder and Schizophrenia, each of which substantially limits their ability to function, including making it difficult to control their behaviors at times, interrupting their ability to sleep, and negatively affecting their ability to focus and pay attention in school and complete school work. T.L. has been prescribed medication.

89.     At the time of T.L.'s removal from their mother's care, T.L. was attending Crotched Mountain School, a special education school, as a day student. Rather than place T.L. in a foster home or with relatives or other kinship caregivers, DCYF placed T.L. in the residential program at Crotched Mountain—a congregate care facility in Greenfield, New Hampshire.

90.     In September 2019, for reasons unknown to T.L., DCYF moved them to an out-of-state congregate care facility.

91.     At the out-of-state facility, T.L. usually sees a clinician via video once per week, during a family session with their mother. Sometimes, they also see their clinician for an individual session.

92.     The facility is often punitive in nature and T.L. perceives staff as uncaring and inattentive. Basic needs, such as food and clothing are regarded as privileges. Youth are not permitted to go into the refrigerator or have an evening snack. T.L. does not have winter boots, snow pants, or clothes that fit them properly.

93.     T.L. is not permitted to have toiletries in their room. They are also not permitted to purchase or use their own preferred, personal toiletries, including shampoo or perfume. They are required to use the toiletries provided.

94.     T.L. has been put in painful restraints while at the facility. T.L. has also witnessed staff put other resident youth in restraints, which is upsetting and anxiety-provoking. This harsh treatment by staff has harmed T.L.'s self-esteem.

95.     T.L. does not have any friends outside of the facility.

96.     T.L. is not aware of any CASA or guardian ad litem ("GAL") appointed to them; they are only aware of their mother's representation in court. T.L. wishes they had an attorney to represent them in court, advocate to get them removed from the restrictive facility, and introduce supporting evidence.

97.     T.L. has two younger siblings who have been placed in a foster home. They requested to live with their siblings in the foster home but DCYF denied the request.

98.     T.L. does not recall participating in any meetings to prepare their case plan. T.L. has not heard of a case plan or a Family Assessment and Inclusive Reunification ("FAIR") meeting. They do not recall any team meetings with their DCYF case worker.

99.     T.L. does not wish to reside in a restrictive congregate care facility. T.L. desires placement in the community, in a family setting. With the appropriate supports and services in the community, T.L. would be able to live with a family. T.L. has been and continues to be harmed by being forced to live in a restrictive facility. They do not have an attorney to represent them in their dependency proceedings to collect and provide the court with evidence about the harms they have experienced at the facility and their wishes to be integrated into the community.

      **iv.**    **R.K.**

100.    R.K. is fourteen years old. They were removed from their home by DCYF in 2018 due to allegations of neglect. At all times since R.K.'s removal from their home, they have remained in the legal custody of DCYF.

101.    R.K. has been diagnosed with ADHD, which substantially limits their ability to function, including their ability to focus, learn, and control their impulses. While R.K. was prescribed medication for ADHD in the past, it interfered with their ability to sleep and they discontinued its use. R.K. also has experienced significant trauma following the incarceration of their father. R.K. experienced additional trauma when they were removed from their home and family and entered the foster care system.

102.    Upon removal, DCYF separated R.K. from their siblings. DCYF placed R.K. at Webster House.

103.    The Webster House program used an age-based level system for allowing youth in the facility to access certain privileges. Because they were only twelve at the time, R.K. was on the lowest level of privileges while at Webster House.

104.    While at Webster House, R.K. was not permitted to go into the community independently, visit friends at their homes, or even talk to their friends on the phone. They were required to leave their bedroom door open most times of the day and lacked any sense of privacy. They were subject to generalized and often arbitrary rules, such as an 8:00 p.m. bedtime and a rule that barred singing in the residence, an offense that would lead to a fifteen minute time-out. Most importantly for R.K., they were not allowed to participate in team sports. R.K. grew extremely frustrated and lacked a healthy outlet for their frustration.

105.     Following an incident where R.K. responded to their circumstances by throwing items, resulting in damage to a telephone and a washing machine, DCYF transferred them to Mount Prospect Academy's Comprehensive Assessment and Short-term Treatment ("CAST") program in Plymouth, New Hampshire, an hour away from their home community.

106.     As a result of R.K.'s transfer to CAST, R.K. was even farther away from their family. R.K. was also removed from their public school—a school they enjoyed and where they experienced success.

107.     At CAST, R.K. was not permitted to attend any public school. Instead, R.K. was required to attend Mount Prospect Academy's on-grounds school.

108.     While at the CAST program, R.K. was isolated. They did not relate to their peers, many of whom were much older.

109.     During the two months R.K. was at CAST, they saw their mother only once. They did not see their siblings at all during that time.

110.     Following R.K.'s placement at CAST, DCYF transferred R.K. to Mount Prospect Academy's ERT program, a residential placement typically reserved for youth who may have previously been considered for detention or commitment at SYSC.

111.     DCYF placed R.K. at ERT despite the fact that they had no delinquency convictions and were legally ineligible for detention or commitment to SYSC.

112.     For R.K., ERT was a punitive and menacing environment where they continuously experienced harsh treatment and ridicule by a particular staff member. While at ERT, staff threatened to strip R.K.'s room and remove their clothing as a consequence for refusing to take their ADHD medication that interfered with their ability to sleep. Instead, they were put on the

lowest privileges level, red, as a consequence for medication noncompliance. As a result, they were restricted to the residence and denied privileges, such as the opportunity to play video games.

113.    R.K. continued attending Mount Prospect Academy's on-grounds school, where they were frequently physically restrained for minor verbal outbursts, including swearing.

114.    The on-grounds school differed significantly from their public school environment. Teaching staff frequently were not familiar with the subject matter. Academic time typically consisted of packets of worksheets, often significantly below R.K.'s academic level. Upon R.K.'s completion of the packets, most classroom teachers provided nothing for R.K. to do and denied R.K.'s requests for recreational breaks.

115.    After R.K. was confined to their room for drawing on a table in class, they were denied bathroom privileges. When they attempted to force their way to the bathroom, they sustained a head injury that required stitches following physical restraint by two staff members.

116.    There were no formal team sports at Mount Prospect Academy, including R.K.'s favorite sport of football. Outdoor recreational time was restricted based on staff availability and willingness to supervise. Even when staff allowed informal athletic time, the aggressive nature of R.K.'s fellow residents often resulted in physical altercations on the court, rather than meaningful and enjoyable recreational time.

117.    Nearly eighteen months into R.K.'s placement at ERT, they were charged with, and convicted of, their first delinquency charges, all of which were alleged to have occurred on ERT grounds. R.K. was committed to SYSC.

118.    At all times since R.K.'s removal from their home, they have desired to reside with their grandmother, a licensed foster parent in New York State. R.K. also has an aunt residing in

Manchester, New Hampshire, who has expressed willingness and desire to care for them. To date, R.K. does not understand why they never had the opportunity to live with a family member.

119.    From the time of R.K.'s removal from their home through the filing of this Class Action Complaint, R.K. has never meaningfully participated in their dependency case. R.K. has never been to court in their dependency case. R.K. has never been able to advocate in court for their desire to reunify with their family, live in their community, and attend public school with their peers.

120.    R.K. was assigned a volunteer CASA, whom they never met until they were already placed at ERT. R.K. is unaware of any participation by a CASA, in court, on their behalf.

121.    R.K. was never appointed counsel in their dependency case. Upon their removal from home, they did not have counsel to file motions on their behalf or request that DCYF explore their family members as placement options. R.K. did not have counsel before DCYF decided to place them at ERT, the most restrictive unlocked facility available in New Hampshire—a facility specifically designed as an alternative to incarceration.

122.    In the time before R.K. was the subject of a delinquency petition, they did not participate in developing their case plan. R.K. was never made to understand what was required to reunify with their mother or to stay with their aunt or grandmother.

123.    In the two years between R.K.'s removal from home and their placement at SYSC, they had six separate social workers assigned to their case.

124.    R.K. does not recall any participation in their case plan, nor are they aware of the existence of an adequate case plan. R.K.'s ADHD and manifestations of the trauma they have experienced could be appropriately addressed and treated with community-based services. R.K. could have received education services in their community. R.K. also could have been placed in a

family setting. Instead, without the benefit of counsel, R.K. has been unnecessarily forced to live and receive those services in restrictive congregate care settings and remains at risk of placement in these settings.

**B.   THE GOVERNOR, DHHS, DCYF, AND AOC UNCONSTITUTIONALLY FAIL TO ENSURE THE PROVISION OF COUNSEL FOR CLASS MEMBERS.**

125.   Plaintiff Youth have a constitutional right to an attorney, but Defendants fail to ensure that one is provided.

126.    Dependency proceedings involve multiple and complex hearings that impact virtually every aspect of a child's life.

127.   A child's fundamental liberty interests are at stake in New Hampshire dependency proceedings. These include, among others, a child's right to safety, health, and well-being; a child's right not to have their physical liberty restrained in a congregate setting, and experience the stigma associated with such restraint; a child's right to an education; and a child's right to family integrity.

128.   Given the high rates at which DCYF places Plaintiff Youth in restrictive congregate care facilities, fulfillment of these children's right to counsel is essential to protect them from unwarranted deprivations of liberty and the significant associated harms.

129.   Despite the important liberty interests at stake, DCYF continues to place older youth who have had no access to counsel in congregate care facilities. The AOC, in performing its administrative functions, fails to guarantee funding to ensure these youth have access to counsel. This violates the due process clause of the Fourteenth Amendment to the United States Constitution.

i.    **New Hampshire Fails To Provide Older Youth With Counsel in Dependency Proceedings Where Their Liberty Interests Are at Stake.**

130.    The details of New Hampshire's dependency proceedings are set forth in the Child Protection Act (the "Act"), RSA 169-C.

131.    The Act's primary purpose is "to provide protection to children whose life, health or welfare is endangered." RSA 169-C:2, I.

132.    The Act "provide[s] effective judicial procedures through which the provisions of [the Act] are executed and enforced and which recognize and enforce *the constitutional and other rights of the parties* and assures them a fair hearing." RSA 169-C:2, III(c) (emphasis added).

133.    The "parties" in a dependency proceeding include the child. RSA 169-C:3, XXI-a.

134.    Thus, under the Act, New Hampshire's judicial procedures must recognize and enforce the constitutional rights of children. Yet, despite the high-stakes nature of dependency proceedings and the liberty interests at stake, no child, including no Plaintiff Youth, is guaranteed the right to counsel during the proceedings.

135.    At any point during any of the dependency proceedings under the Act, DHHS and DCYF may place a child in a restrictive congregate care placement.

136.    For example, at the hearing that must occur within 48 hours of the child entering the protective custody of DCYF, the child has no statutory right to an attorney. Nonetheless, DHHS and DCYF can keep the child from their home, potentially for the first time in the child's life, including by placing the child in a congregate care facility. RSA 169-C:6, IV.

137.    A child has no statutory right to an attorney at any of the several hearings prior to the final judicial determination of where the child will live and with which family members they may associate. RSA 169-C:6, IV; RSA 169-C:15.

138.    At the first of these hearings, the preliminary hearing, the court may order that the child enter or stay in foster care—including continuing DCYF's placement of the child in a congregate care facility—upon a determination as to whether "reasonable cause" exists to believe that the child has been abused or neglected. RSA 169-C:15. Notwithstanding the risks, New Hampshire fails to provide the child an attorney.

139.    The adjudicatory hearing is a high-stakes, complex, adversarial proceeding akin to a trial. DCYF and the parent(s), each represented by counsel, present witness testimony and evidence, with both parties having the opportunity to cross-examine adverse witnesses. RSA 169-C:18. The outcome determines whether the court will separate (or order continued separation of) the child from their family and whether DCYF will control where and with whom the child lives, including placement in a restrictive congregate setting. Despite these stakes, New Hampshire fails to provide the child an attorney.

140.    Through these proceedings, the child has no statutory right to an attorney even in the event of a conflict between the child and their GAL. *See* RSA 169-C:10, II(a). Thus, the child must go through the 48-hour hearing, the preliminary hearing, and the adjudicatory hearing— each an adversarial hearing that may include fact-finding and present serious risks to the child's liberty—without even the guarantee of representation by counsel.

141.    At the next potential hearing, the dispositional hearing, the court renders a final decision regarding the child's placement. This decision includes whether the child will be forced to live or remain in a physically restrictive congregate care facility—including the possibility of an out-of-state facility. This decision also includes what school the child will attend, the nature and frequency of the child's contact with their family, and any conditions that the child and their parents must fulfill in order to be reunified. RSA 169-C:19. While the parent is automatically

provided an attorney in these circumstances, New Hampshire does not guarantee, and almost never provides, counsel for the youth.

142.    While New Hampshire provides the child the right to appeal a decision on the merits, it does not provide the child a statutory right to an attorney to handle the appeal of the final dispositional order. RSA 169-C:28. The child, even if somehow aware of available legal arguments and their right to appeal, is left to navigate that process on their own. Upon information and belief, not surprisingly, this right to appeal is virtually never exercised. Any errors that occurred at the dependency proceedings with respect to the child's rights are left unheard and uncorrected.

143.    Plaintiff Youth continue to be disadvantaged in post-dispositional proceedings without an attorney. At a permanency hearing that must take place within 12 months of the court's adjudicatory findings, the court must determine whether to return the child to their parents. RSA 169-C:18, V-a. If the child is not returned to their parents, DCYF must identify a permanency plan that includes either: (a) termination of parental rights or parental surrender when an adoption is contemplated; (b) guardianship with a relative or other appropriate party; or (c) Another Planned Permanent Living Arrangement ("APPLA")—also known as "aging out" without a permanent home. RSA 169-C:24b, II. DCYF's recommended permanency plan may include placement, or continued placement, in a restrictive congregate care facility.

144.    The permanency hearing sets in motion the real possibility of a permanent end to the child's legal relationship with their parents and initial or continued placement in a restrictive congregate care setting. Without counsel prior to or at the permanency hearing, the child has no assurance that they will be apprised of their options, or that their voice will be adequately presented to the court.

ii.     **Without a Right to Counsel, the Risk of Plaintiff Youth Being Erroneously Deprived of Their Liberty Interests is High.**

145.    As the Supreme Court has acknowledged, "the most informal and well-intentioned of judicial proceedings are technical; few adults without legal training can influence or even understand them; certainly children cannot." *In re Gault,* 387 U.S. 1, 38 n.65 (1967).

146.    New Hampshire dependency proceedings involve witness testimony, cross examination, and presentation of evidence. Without counsel, children cannot successfully navigate the complexity of such proceedings, have their wishes heard, and protect their legal rights.

147.    Without an attorney, Plaintiff Youth have practically no ability to investigate and develop a factual record. Plaintiff Youth have practically no ability to call upon witnesses and experts. They also have practically no ability to appeal key court orders to correct any errors.

148.    Without an attorney, Plaintiff Youth are at great risk of moving through dependency proceedings routinely subjected to erroneous decisions that are harmful to their safety and welfare. The inability to participate in the proceedings through counsel increases the risk of Plaintiff Youth being unable to ensure DCYF has timely provided and implemented an appropriate case plan; ensure they receive necessary mental health services in their community; and ensure their physical liberty is protected and they are not unnecessarily placed in restrictive congregate care facilities.

149.    None of the other participants in the dependency proceedings can adequately protect against the erroneous deprivation of the child's liberty interests.

150.    For example, Plaintiff Youth may be appointed a CASA or other GAL to advocate for the child's best interests—but not the child's express wishes. RSA 169-C:10, I. A CASA need not be an attorney and is not required to have legal training. The CASA need not have any particular professional experience. As a volunteer, a CASA need only complete a short application and pre-service training. CASAs are not trained to, nor is it their role to, protect the legal rights of

the child. CASAs also do not necessarily develop a factual record, relying instead on DCYF to provide them with information.

151.    Attorneys play a role that cannot be filled by a CASA or other GAL. Unlike CASAs, attorneys are held to strict minimum standards for practice. Attorneys are bound by ethical duties, such as the duty to maintain confidential communications under the attorney-client privilege and the duty to zealously advocate for a client. An attorney can provide legal advice and explain to the child the nature of the child's rights. Unlike a CASA or GAL, an attorney representing the child's express wishes would have a duty to articulate the child's perspective to the court.

152.    The other participants in dependency proceedings are similarly inadequate to safeguard a child's liberty interests from erroneous deprivation. For example, a parent's attorney is inadequate, as the interests of the parents can and sometimes do conflict with the child's interests.

153.    The experiences of Plaintiffs G.K., C.I., T.L., and R.K. demonstrate the risks of harm Plaintiff Youth face without the right to counsel in dependency proceedings. Without appointed counsel, G.K., C.I., T.L., and R.K. had no involvement in their case planning or assurance that an adequate case plan had been prepared and implemented. G.K., C.I., T.L., and R.K. were deprived of the ability to receive appropriate community-based services and family placements.

154.    New Hampshire's discretionary appointment process offers no protection against these risks. *See* RSA 169-C:10. The discretionary appointment is rarely, if ever, exercised. For example, in all of 2019, only one attorney was appointed to represent a child in a dependency

proceeding. New Hampshire's discretionary appointment of an attorney to represent a child is tantamount to no appointment at all.

155. Even if it were exercised to any significant extent, the discretionary appointment process would still be inadequate. As Plaintiff Youth who are in congregate care facilities or at risk of being placed in congregate care facilities have fundamental liberty interests at stake in every dependency proceeding, it is vital that they are appointed counsel in every proceeding. Only an unfettered right to counsel would ensure they are properly heard and their liberty interests are protected.

### iii.   Guaranteeing the Right to Counsel Aligns With New Hampshire's Interests.

156. New Hampshire has a strong interest in "provid[ing] protection to children whose life, health or welfare is endangered." RSA 169-C:2, I. Ensuring Plaintiff Youth are represented by counsel promotes that purpose by ensuring zealous advocacy for older youth with mental disabilities whose fundamental liberty interests are at stake.

157. New Hampshire has an equally strong interest in ensuring dependency proceedings "recognize and enforce the constitutional and other rights of the parties," including children, "and assur[ing] them a fair hearing." RSA 169-C:2, III(c). New Hampshire can only realize this interest by guaranteeing Plaintiff Youth the right to counsel at every stage of the proceedings.

158. In addition to New Hampshire's stated interests, a 2017 Information Memorandum by The U.S. Department of Health and Human Services, Children's Bureau and Administration for Children and Families ("ACF") emphasized that providing children with counsel promotes efficient resolution of dependency proceedings, reducing the overall fiscal and administrative burden on New Hampshire and taxpayers.

159.    As the federal government recognized in that same memorandum, high quality legal representation for children is critical, as "[t]he absence of legal representation for any party at any stage of child welfare proceedings is a significant impediment to a well-functioning child welfare system." Legal representation for all parties, including children, serves both the child's and the state's interests by, *inter alia*, increasing party perceptions of fairness; increasing party engagement in case planning, services, and court hearings; contributing to more personally tailored case plans and services; increasing visitation and parenting time; and providing cost savings to state government by reducing the time youth spend in care. For these reasons, "there is widespread agreement in the field that children require legal representation in child welfare proceedings."

160.    Plaintiff Youth have a constitutional right to counsel in New Hampshire dependency proceedings.

## C.  THE GOVERNOR, DHHS, AND DCYF FAIL TO ENSURE PLAINTIFF YOUTH HAVE ADEQUATE CASE PLANS.

### i.    Federal Law Requires Defendants To Ensure the Provision and Implementation of Written Case Plans for All Older Youth in Foster Care.

161.    Under AACWA, Defendants must ensure the timely provision and implementation of written case plans for all children in foster care. *See* 42 U.S.C. §§ 622, 671(a)(16), 671(a)(22), 675(1), 675a. Defendants must create a case plan within 60 days of a child's removal from the home, subject to regular updates throughout the life of the case. 45 C.F.R. § 1356.21(g)(2).

162.    The chief purpose of the case plan is to identify the child's needs and permanency goals. Case plans must also specify the services that will be provided in order to meet the child's needs and achieve permanency. 42 U.S.C. § 675a. Specifically, the case plans must include the following information:

(A)     a description of the youth's placement, including the safety and appropriateness of the placement;

(B)     a plan for assuring the youth receives safe and proper care, and that services are provided for the youth, the youth's parents, and the youth's foster parents;

(C)     health and education records of the youth;

(D)     for youth 14 and over, a description of services that will help transition the youth from foster care to successful adulthood;

(E)     for youth whose goal is adoption or APPLA, a description of the steps the agency is taking to find the adoptive family or permanent living situation;

(F)     for youth whose goal is placement with a relative and the receipt of kinship guardianship payments, information regarding the process for placing the youth with that relative; and

(G)     a plan for ensuring the youth's educational stability while in foster care.

*Id*. § 675(1)(A)-(G).

163.    Case plans must be "developed jointly with the parent(s) or guardian" of the child in foster care. 45 C.F.R. § 1356.21(g)(1). For youth at least 14 years old, the case plan and any revisions to the case plan must be "developed in consultation with the child." 42 U.S.C. § 675(1)(B).

164.    A key structure to the implementation of case plans for all children in foster care is the separately required federally mandated case review system. *See id*. §§ 622, 671(a)(1)(16); 675(5); 675a. The case review system operates as a check to ensure case plans are continuously

updated and properly implemented. Under New Hampshire's case review system, Defendants must:

(A)    Ensure the timely preparation of appropriate case plans and the periodic review of the status of each child in foster care at specific intervals. *Id.* §§ 675(5); 675a.

(B)    Ensure that case plans are "designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child." *Id.* § 675(5)(A).

(C)    Ensure that all children in foster care are provided a transition plan at least ninety days prior to their eighteenth birthday, or the age at which the youth will age out of care. Transition plans must be "personalized at the direction of the child" and include, at a minimum, "specific options on housing, health insurance, education, local opportunities for mentors and continuing support services, and work force supports and employment services." *Id.* § 675(5)(H).

165.    New Hampshire law vests the responsibility to implement the federal case planning requirements with DCYF. *See* RSA 170-G:4, III; N.H. ADMIN. RULES, HE-C 6339.03(r).

166.    DCYF policy recognizes the critical need for timely and ongoing case planning and implementation and the importance of involving children and families in case planning.

167.    Timely, complete, and regularly updated case plans are critical because they guide all of the work by the child welfare agency for a child in foster care, by identifying the goals and tasks needed to achieve a level of safety, permanency, and well-being for Plaintiff Youth and their families.[12]

---

[12] *Case Practice Standards Manual*, ANNIE E. CASEY FOUND. (2012), at 20,
https://www.aecf.org/m/resourcedoc/aecf-LifelongFamiliesCasePracticeStandardsManual-2012.pdf.

    **ii.**    **Defendants Fail To Ensure the Provision and Implementation of Written Case Plans as Required by Federal Law.**

168.    Despite the fact that effective case planning is legally required and vital to the health and welfare of children in foster care, and to older youth with mental health disabilities in particular, Defendants have an ongoing policy, practice, pattern, and/or custom of failing to ensure that (1) Plaintiff Youth are timely provided with written case plans containing mandated elements; (2) case plans are regularly updated to include accurate and complete information; (3) Plaintiff Youth and their families participate in case planning; and (4) case plans are implemented through the provision of needed services, including transition services for Plaintiff Youth.

    **a.**    **Defendants fail to provide timely case plans.**

169.    DCYF often fails to document the existence of a case plan at all. According to DCYF's own publicly available data in June 2017, only 77% of new cases for children entering foster care in 2016 had case plans documented in DCYF's case management system.

170.    When DCYF does provide case plans, they are often untimely. According to DCYF's 2018 Annual Progress and Services Review ("APSR") (the most recent publicly available DCYF data on case plans), DCYF violated federal law by failing to document a case plan within the required 60 days of a child entering foster care in 21% of new cases.

    **b.**    **Defendants fail to involve youth and families in case planning.**

171.    In addition, DCYF routinely violates AACWA when it fails to involve Plaintiff Youth and their families in creating and updating case plans.

172.    One opportunity for youth and their families' involvement in case planning is the DCYF FAIR meeting, also referred to as the "Case Review." The FAIR meeting is an opportunity to discuss case plans and engage family and youth in decisions about safety, permanency, and well-being.

173.    Despite the intended purpose of FAIR meetings, DCYF routinely holds these meetings without the participation of youth in foster care or their parents. According to the DCYF 2018 APSR, only 66% of youth with a permanency goal of APPLA attended at least one FAIR meeting in 2016. Only 26% of youth with a plan of reunification attended at least one FAIR meeting that year. DCYF's failures to involve parents at FAIR meetings has persisted since at least 2011.

174.    DCYF's failure to ensure that its own case review process is utilized creates a structural barrier to adequate case planning and implementation required by federal law. ACF, in its 2018 evaluation of New Hampshire's Child Welfare System, found that DCYF made "concerted efforts . . . to involve parents and children (if developmentally appropriate) in the case planning process on an ongoing basis" in only 63% of cases. Further, ACF found lack of youth and family engagement and "a true family voice" to be a significant cause of DCYF's use of "generic" case plans. As discussed below, these generic case plans fail to reflect the individual goals and needs of the youth, in violation of federal law.

175.    DCYF's structural failures to involve Plaintiff Youth and families in case planning are not new—they have been identified as key concerns at least since 2011. That year, New Hampshire's Program Improvement Plan ("PIP") documented several deficiencies in the case planning process, including lack of family involvement in case planning. It found that older youth in particular were not engaged in case planning. New Hampshire's 2019 PIP, published in response to the 2018 CFSR, continued to document failures to involve families in case planning. These include DCYF's ongoing failure to use FAIR meetings appropriately to inform case plans.

**c.    Defendants fail to ensure case plans include mandated components and are continuously updated.**

176.    DCYF also routinely fails to ensure that case plans contain all mandated elements and are continuously updated to reflect current permanency goals, needed services, and updated records.

177.    New Hampshire's 2018 CFSR concluded that DCYF failed to provide a statewide case review system that ensures case plans include the required provisions. In 60% of foster care cases reviewed, DCYF failed both to make concerted efforts to assess the needs of children, parents, and foster parents and to identify necessary services, and actually implement the appropriate services. Likewise, DCYF's 2018 Adequacy and Enhancement Assessment found that case planning was "not always customized based on individual and community risk and promotive factors."

178.    Again, this problem is not new and has only worsened over time. In 2016, the New Hampshire Child Welfare Quality Assurance Review observed that DCYF case workers failed to adequately use a "Strengths and Needs Assessment" to inform case plans in over one-third of the cases reviewed.

179.    New Hampshire's 2018 CFSR similarly concluded that DCYF failed to provide a "case review system [that] is functioning statewide to ensure that each child has a written case plan that is developed jointly with the child's parent(s) and includes the required provisions."

180.    These problems continue today. Defendants' failure to ensure that each case plan contains the mandated elements under federal law, and reflects accurate information, results in routinely boilerplate or generic case plans that fail to account for the circumstances of each child's case. Generic plans do not merely reflect poor recordkeeping—they are evidence of Defendants'

systemic failure to identify appropriate goals and plan services that drive the safety, permanency, and well-being of Plaintiff Youth.

> **d.    Defendants fail to provide required transition services.**

181.    Finally, Defendants have a longstanding history of failing to plan for and provide adequate transition services for youth ages 14 and older, as required by AACWA's case planning and implementation requirements.

182.    According to the most recent data from NYTD, in fiscal year 2018, only 6% of eligible transitioning youth participated in educational financial assistance in New Hampshire; only 8% participated in room and board assistance in New Hampshire; and only 54% of transitioning youth in New Hampshire had full- or part-time employment by age 21.

183.    Once again, this problem is not new. New Hampshire's 2011 PIP identified that transitional services for youth aging out of DCYF custody were inconsistent and inadequate statewide. These problems continue today.

> **iii.    Defendants' failure to provide and implement legally sufficient case plans harms Plaintiff Youth.**

184.    Named Plaintiffs G.K., C.I., T.L., and R.K. have not been involved in their own case planning for their own futures. Years after entering DCYF custody, they do not understand why they remain living in congregate care and are at continued risk of placement in congregate care.

185.    Defendants' ongoing failure to provide and implement legally compliant case plans directly contributes to the harmful outcomes routinely experienced by Plaintiff Youth. These include unnecessary housing in congregate care facilities; frequent moves among a multitude of placements; inadequate access to necessary mental health services in the community; inadequate

services to successfully transition to adulthood; and poor outcomes for youth that age out of the foster care system lacking consistent and supportive relationships.

**D.   THE GOVERNOR, DHHS, DCYF, AND THE MEDICAID AGENCY DISCRIMINATE AGAINST YOUTH WITH MENTAL AND BEHAVIORAL HEALTH DISABILITIES.**

     **i.**    **Federal Law Requires States To Administer Services to People With Disabilities in the Most Integrated Setting Appropriate To Meet Their Needs.**

186.    Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

187.    In enacting the ADA, Congress found that, "historically, society has tended to isolate and segregate individuals with disabilities" and that "discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization." 42 U.S.C. §§ 12101(a)(2), (3).

188.    Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Unjustified isolation constitutes a form of prohibited disability discrimination under the ADA's implementing regulations, which provide that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999) ("[u]njustified isolation . . . is properly regarded as discrimination based on disability.")

189.    In addition to requiring public entities to provide services in the "most integrated setting," the ADA's implementing regulations prohibit public entities from using "criteria or

methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; . . . [or t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ." 28 C.F.R. § 35.130(b)(3).

190.    The ADA's regulations also require public entities to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

191.    Similar to Title II of the ADA, Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability, providing, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.

192.    The implementing regulations of Section 504 require that the "[r]ecipients [of federal financial assistance] *shall* administer programs and activities in the most integrated setting appropriate to the needs of [qualified individuals with disabilities]." 28 C.F.R. § 41.51(d) (emphasis added). These regulations also make it a violation of Section 504 to use methods of administration that have the effect of subjecting individuals to discrimination. 28 C.F.R. § 41.51(b)(3).

193.    Defendants are required to provide reasonable modifications to older youth with disabilities, as a failure to do so constitutes unlawful discrimination.

194.    Plaintiff Youth are qualified individuals with disabilities within the meaning of Title II of the ADA and Section 504 of the Rehabilitation Act as each is an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131 and *see also* 28 C.F.R. §35.130(b)(7).

195.    Each Plaintiff Youth has a mental impairment, a record of such mental impairment, or is regarded as having such an impairment that substantially limits one or more major life activities.

196.    The treatment needs of Plaintiff Youth may be met appropriately in community-based settings. Plaintiff Youth qualify for and desire community-based placements and services, rather than isolation in congregate care facilities.

197.    DHHS is a state agency that receives federal financial assistance for its programs and activities directed to meet the needs of children removed from their homes due to allegations of abuse or neglect, including those of DCYF and the Medicaid Agency. Defendants are responsible for ensuring that youth in the child protection system with mental impairments are served in accordance with federal law, including the ADA and the Rehabilitation Act.

198.    Both the Medicaid Agency and DCYF are public entities whose services must be provided in the most integrated setting appropriate to meet the needs of Plaintiff Youth.

199.    Defendants discriminate against Plaintiff Youth and violate the federal integration mandate by (1) unnecessarily segregating Plaintiff Youth in restrictive institutions and (2) failing to maintain an adequate continuum of community-based placements and services for Plaintiff Youth.

ii.     **Defendants Discriminate Against Plaintiff Youth by Segregating Them in Inappropriately Restrictive Institutional Settings, in Violation of the Federal Integration Mandate.**

200.    Federal law, DCYF policy, and accepted professional standards all mandate that foster children be placed in the least restrictive, most family-like setting that is clinically appropriate to meet their needs.

201.    In fact, DCYF's own Policy Manual recognizes that "it is best for children to grow in healthy, nurturing families." Additionally, DCYF's policy is to place youth with relatives and siblings and as close as possible to their home and school community.

202.    However, older youth with mental impairments in New Hampshire's foster care system are not growing up in the least restrictive, family-like settings. Out of 52 jurisdictions, New Hampshire places the highest percentage of 14 through 17 year-olds with a DSM-V diagnosis in congregate care facilities—the worst in the country, with 90.5% of older youth in DCYF custody with a DSM-V diagnosis residing in congregate care.

203.    Between 2016 and 2018, the percentage of older youth in DCYF custody with a current or most recent placement setting in a congregate care facility increased every year and exceeded the national average. Older youth with a DSM-V diagnosis have an even greater likelihood of placement in a group home or institution. The following chart containing data reported by New Hampshire to the federal government, demonstrates New Hampshire's overwhelming and increasing use of restrictive congregate care placements for older youth with a DSM-V diagnosis, compared to the decreasing use of such placements for older youth with DSM-V diagnoses in the United States as a whole:

|  | NH / US | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Older Youth Whose Current or Last Placement Setting Was a Congregate Care Facility | NH | 46.2 % | 48.7% | 71.4% | 70.3% |
|  | US | 35.7% | 34.9% | 33.1% | 31.2% |
| Older Youth With a DSM-V Diagnosis Whose Current or Last Placement Setting Was a Congregate Care Facility | NH | 59.9% | 60.6% | 89.2% | 90.5% |
|  | US | 43.4% | 44.6% | 41.9% | 39.8% |

204.    Contrary to DCYF's own policy and the federal integration mandate, Defendants engage in an ongoing policy, practice, pattern, and/or custom that routinely segregates older foster youth in congregate care based on bed availability, rather than any specialized need, as noted in the 2018 Annual Report of the State of New Hampshire Office of the Child Advocate. This practice contributes to the grave outcomes experienced by youth who age out of New Hampshire's foster care system, who are more likely to lack adult supports and experience homelessness.

205.    G.K., C.I., T.L., and R.K. have suffered by being placed in restrictive congregate settings, segregated from their home communities and their non-disabled peers.

206.    G.K. has been denied a normal teenage life with regular privileges experienced by other youth their age, including the ability to spend time with friends outside of the restrictive facility and the independence of doing routine chores, like learning how to and doing their own laundry. G.K. has not been provided with the supportive adult relationships and supports that they require because they reside in an institution with staff they view as demeaning. G.K. does not wish to live in a punitive, routinized environment regulated by strict and impersonal rules.

207.    C.I. has been denied the nurturing family environment they crave. Instead, they were regularly physically restrained by congregate facility staff. C.I. could not participate freely

in the activities they enjoyed, such as basketball. Ultimately, C.I. was sent out-of-state, even farther away from their community.

208.    T.L. has experienced painful restraints and isolation in the congregate setting, spending much of their time in their room alone. They have not been able to see their siblings on a regular basis or have off campus visits with their mother. T.L. does not have any friendships outside of the facility. The rules at T.L.'s placement are so strict that they cannot even go into the refrigerator and get a snack when they are hungry. T.L. has been denied access to new clothing and is therefore, experiencing discomfort, wearing clothing that does not fit.

209.    While in congregate placements, R.K. was not permitted to go into the community independently or visit friends. They could not participate in activities they enjoyed or relate to their peers. R.K. could not attend public school, where they were showing success. R.K. only saw their mother and siblings rarely while residing in a progression of restrictive congregate placements. R.K. was threatened with having their clothes taken away because of their resistance to taking their medication. R.K. was repeatedly physically restrained, even suffering a head injury at the hands of a congregate facility staff member. Throughout this time, R.K. has been separated from their grandmother, who wishes to care for them.

### iii.    Defendants Deny Older Youth the Right to Live in Integrated Settings by Failing to Maintain Community-Based Placements and Mental Health Services for Older Youth with Disabilities.

210.    DHHS and DCYF are tasked with ensuring the health, safety, and welfare of older youth in DCYF custody. To that end, DHHS and DCYF are obligated to provide the services and supports necessary for older foster youth with disabilities to receive appropriate housing and treatment. The availability of an array of community-based foster family placements and mental

health services—a continuum of care—for Plaintiff Youth, is critical to complying with the integration mandate.

211.    Infrastructure to support a robust continuum of care to support family placements is essential to administer programs and activities in appropriate, integrated settings. However, Defendants have failed to maintain this continuum of care, leading to institutionalization out of necessity, in violation of the federal integration mandate.

212.    According to New Hampshire's own reports and a federal report, DHHS and DCYF have long failed to recruit and retain an adequate number of family foster homes. Some older youth with mental impairments require access to specialized foster homes and services but those too are inaccessible or unavailable to New Hampshire youth. In a 2020 issue briefing, the New Hampshire Office of the Child Advocate highlighted that DHHS itself identified therapeutic foster care— family-based care that can meet the mental and behavioral health needs of youth—as a "significant gap in the array of services meant to best meet the needs of children."

213.    In addition to failing to recruit and support adequate foster homes, including specialized foster homes and failing to provide financial support to kinship caregivers, Defendants maintain a policy, practice, pattern, and/or custom of failing to create, maintain, and make available adequate community mental health services to enable children in DCYF custody to receive services in the most integrated setting.

214.    As found in the 2016 DCYF Quality Assurance Review, and again in the 2018 CFSR and 2019 Program Improvement Plan, "[e]ven when needs and services are appropriately identified, children and families being served by DCYF face a diminished service array. This includes long wait lists, a lack of providers, transportation issues, a lack of drug treatment centers,

a lack of community-based mental health services and psychiatric services, [and] insufficient support to kinship families . . . ." These failings continue today.

215.    New Hampshire's 2016 Report addressing the need for a system of care for children identified specific ongoing shortages in Defendants' mental health system for Plaintiff Youth, including treatment and stabilization services, which leave these youth unnecessarily segregated in institutions, in violation of their rights under the integration mandate. The 2017 and 2019 Reports further identified gaps in mental health services for children, including mobile crisis.

216.    Likewise, intensive home and community services accessible to youth in DCYF custody, such as home-based therapy and individual service options, are limited in frequency, duration and intensity. For example, DCYF policy limits the provision of home-based therapeutic services to 90 days, with a possible 30-day extension. DCYF policy also limits the provision of Intensive Home and Community Services to 180 days per year, with a possible 30-day extension. The limits placed on these community-based mental health services interfere in the potential for appropriately supported family-based community placements for Plaintiff Youth.

217.    Moreover, New Hampshire is experiencing a workforce shortage in the mental health care sector. These shortages further exacerbate Plaintiff Youth's ability to access necessary services. They also make it even more important that Defendants provide adequate case planning and necessary services to Plaintiff Youth.

218.    As a result of these systemic failures, Plaintiff Youth have been denied the opportunity to receive the services they need in the most integrated setting appropriate to their needs.

219.    The services Plaintiff Youth may be receiving in congregate care can and should be provided in the community.

iv.   **Defendants' Methods of Administration Subject Plaintiff Youth to Discrimination on the Basis of Disability.**

220.   Defendants engage in policies, practices, patterns and/or customs that effectively deny Plaintiff Youth an opportunity to participate in programs, activities and services in the most integrated setting appropriate to their needs on the basis of Plaintiffs' disabilities, in violation of the ADA's and Section 504's implementing regulations. 28 C.F.R. §§ 35.130(b)(3), 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

221.   Defendants violate federal law by administering their services, including Medicaid and child welfare programs, services and activities, in a manner that unnecessarily, and disproportionately, funds institutional placements and services over family and community settings.

222.   For example, according to DHHS's own records, in 2018, DCYF spent $22,409,086 on residential services for abused and neglected children in its care, compared to $8,667,868 spent on community-based services that same year. This is an ongoing problem. DHHS and DCYF have continuously spent significantly more on residential services, compared to community-based services, between 2017 and 2020. In 2020, out of all spending on non-Medicaid residential and community-based services, DHHS and DCYF spent 68.7% on residential services, and only 31.3% on community-based services; out of spending on Medicaid residential and community-based services, DHHS and DCYF spent 62.9% on residential services, with only 37.1% on community-based services.

223.   In DHHS's own Adequacy Enhancement Assessment in 2018, Defendants admitted "[t]he current system is skewed to serve children, youth, and families with the most expensive, most restrictive services, rather than with more upstream, preventive services and supports."

224.    Defendants' ongoing policy, practice, pattern, and/or custom of funneling excessive resources into congregate settings, leaving Plaintiff Youth placed away from their communities and segregated in facilities, shows no signs of slowing down.

225.    Defendants continue to rely on restrictive placements out-of-state, routinely sending Plaintiff Youth across the country, far from their home communities and families.

226.    Defendants fail to adequately fund, develop, and ensure access to community-based placements and services necessary for youth with mental impairments. As a result, Plaintiff Youth are denied their right to live in the community with their nondisabled peers and be free from the inherent restrictions of living in congregate care facilities.

227.    Defendants can make reasonable modifications to their programming and accommodate placement of Plaintiff Youth in the community. Defendants can shift resources from expensive institutional placements to prioritize the expansion of foster homes, including kinship homes and specialized foster homes. Defendants can also shift resources from institutional placements to create access to community-based mental and behavioral health services and supports for Plaintiff Youth. Such reasonable modifications would not fundamentally alter the nature of Defendants' services, programs, or activities, and instead would further Defendants' mission. 28 C.F.R. § 35.130(b)(7).

228.    Plaintiff Youth, including G.K., C.I., T.L., and R.K., who are unnecessarily segregated in congregate care facilities, are harmed by broken ties to their home communities, by overly restrictive rules and policies that interfere in their ability to live freely in the community amongst their nondisabled peers, and by the stigma of being unnecessarily institutionalized. Defendants' warehousing of Plaintiff Youth in restrictive congregate care facilities has a known detrimental impact on Plaintiffs' development and violates federal law.

## VII.   <u>CAUSES OF ACTION</u>

**First Cause of Action**
<u>Fourteenth Amendment to the United States Constitution</u>
[Brought by Plaintiffs G.K., C.I., T.L., and R.K. and the Class Against the Governor, DHHS
Commissioner, DCYF Director, and AOC Director]

229.    Plaintiff Youth hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

230.    Plaintiff Youth have a due process right to counsel under the Fourteenth Amendment to the United States Constitution in all New Hampshire dependency proceedings under RSA 169-C.

231.    By failing to guarantee the appointment of counsel to Plaintiff Youth during their dependency proceedings, the Governor, DHHS, DCYF, and AOC have caused and will cause the deprivation of Plaintiffs' fundamental liberty interests without due process of law, in violation of the Fourteenth Amendment.

232.    Plaintiff Youth have suffered irreparable injury as the proximate result of Defendants' failure to guarantee the appointment of counsel during dependency proceedings. Plaintiff Youth are without adequate remedy at law.

**Second Cause of Action**
<u>The Federal Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 622, 671(a)(16),
671(a)(22), 675(1), 675(5), and 675a</u>
[Brought by Plaintiffs G.K., C.I., T.L., and R.K. and the Class Against the Governor, DHHS
Commissioner, and DCYF Director]

233.    Plaintiff Youth hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

234.    Defendants, while acting under color of state law, are engaging in a policy, practice, pattern, and/or custom of failing to comply with AACWA's requirements for case planning, depriving Plaintiff Youth of their federal rights, privileges and immunities.

235.    These rights include, but are not limited to:

    a.   the right to timely, accurate, written case plans that are developed in consultation with the child and their family and contain mandated elements, and to the implementation of these case plans;

    b.   the right to services to facilitate the child's return to their family home or the permanent placement of the child;

    c.   the right to services that protect the child's safety and health;

    d.   the right to transitional services for youth exiting foster care;

    e.   the right to have health and educational records reviewed, updated, and supplied to foster parents or foster care providers with whom the child is placed at the time of placement; and

    f.   the right to a case review system in which DCYF ensures that each child has a case plan designed to achieve placement in a safe setting that is the least restrictive and most appropriate setting available.

42 U.S.C. §§ 671(a)(16), 675(1), 675(5).

236.    Plaintiff Youth have suffered irreparable injury as the proximate result of Defendants' failure to comply with federal case planning requirements. Plaintiff Youth are without adequate remedy at law.

**Third Cause of Action**
Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.* – Integration Mandate
[Brought by Plaintiffs G.K., C.I., T.L., and R.K. and the Class Against the Governor, DHHS Commissioner, DCYF Director, and Medicaid Agency Director]

237.    Plaintiff Youth hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

238.   Plaintiff Youth, due to their mental impairments, which substantially limit one or more major life activities, are individuals with disabilities within the meaning of the ADA. 42 U.S.C. § 12131(2).

239.   Plaintiff Youth reside in or are at risk of placement in congregate care facilities.

240.   Plaintiff Youth are qualified to receive the benefits of New Hampshire's child welfare and Medicaid programs including, but not limited to, receipt of placement and mental health services in community-based settings.

241.   Defendants are officials of public entities within the meaning of the ADA. *Id.* § 12131(1).

242.   Defendants are obligated under Title II of the ADA and its implementing regulations to administer their programs in a manner that enables qualified children and youth with disabilities to live in the most integrated settings appropriate to their needs. *Id.* § 12132; 28 C.F.R. § 35.130(d).

243.   Defendants are required to make reasonable modifications in their policies, practices, and procedures to enable Plaintiff Youth to reside in more integrated settings. 28 C.F.R. § 35.130(b)(7).

244.   It would not fundamentally alter Defendants' programs, services, or activities to provide Plaintiff Youth necessary community-based mental and behavioral health services and placements in a manner that does not result in unjustified institutionalization in congregate care facilities.

245.   Defendants' actions and omissions set forth above deprive Plaintiff Youth of their right to receive necessary services in a manner that does not result in unjustified institutionalization and segregation.

246.    Plaintiff Youth have suffered irreparable injury as the proximate result of Defendants' failure to ensure the provision of services in the most integrated settings appropriate to their needs. Plaintiff Youth are without adequate remedy at law.

**Fourth Cause of Action**
Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.* – Methods of Administration
[Brought by Plaintiffs G.K., C.I., T.L., and R.K. and the Class Against the Governor, DHHS Commissioner, DCYF Director, and Medicaid Agency Director]

247.    Plaintiff Youth hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

248.    Plaintiff Youth reside in congregate care facilities or are at risk of placement in such facilities, and are qualified to participate in more integrated community-based programs suitable to their needs.

249.    Defendants are prohibited under Title II of the ADA and its implementing regulations from discriminating against individuals with disabilities. *Id*. § 12131 and 12132; 28 C.F.R. § 35.130.

250.    Pursuant to the regulations implementing Title II of the ADA, Defendants are prohibited from utilizing criteria or other methods of administration: "(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ." 28 C.F.R. § 35.130(b)(3).

251.    Defendants utilize methods of administration that cause Plaintiff Youth to live unnecessarily in segregated institutions, instead of in the most integrated setting appropriate to their needs.

252.     Plaintiff Youth have suffered irreparable injury as the proximate result of Defendants' failure to utilize methods of administration that facilitate the receipt of services and placement in the most integrated settings appropriate to their needs. Plaintiff Youth are without adequate remedy at law.

**Fifth Cause of Action**
Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.* – Integration Mandate
[Brought by Plaintiffs G.K., C.I., T.L., and R.K. and the Class Against the Governor, DHHS Commissioner, DCYF Director, and Medicaid Agency Director]

253.     Plaintiff Youth hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

254.     Plaintiff Youth have mental impairments that substantially limit one or more major life activities, or have a record of such impairments, or are perceived as having such impairments, which substantially limit major life activities. Plaintiff Youth therefore have a disability under the Rehabilitation Act and its implementing regulations. 45 C.F.R. § 84.3(j); *see also* 29 U.S.C. § 705(20)(B).

255.     Plaintiff Youth are "qualified individuals with disabilities" under the Rehabilitation Act and its implementing regulations. 45 C.F.R. § 84.3(l)(4).

256.     The Governor, DHHS, DCYF and the Medicaid Agency, conduct, operate, or administer the state Medicaid and DCYF programs, which receive federal financial assistance and are programs or activities within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(b), and its implementing regulations, 45 C.F.R. §§ 84.3(f), (h) and (k).

257.     Defendants fail to afford Plaintiff Youth the aids, benefits, and services of the child welfare and Medicaid system in the most integrated setting appropriate to their needs on the basis of their disabilities. These include a failure to arrange for necessary mental health services that encompass intensive, community, and home-based mental health services; and a failure to afford

Plaintiff Youth the right to live in the most integrated setting in family settings or with non-disabled peers.

258.    Defendants' policies, patterns, practices, and/or customs that have the effects of unjustifiably segregating Plaintiff Youth in institutions and congregate care facilities constitute prohibited discrimination under Section 504.

259.    Defendants' actions and omissions set forth above deprive Plaintiff Youth of their rights under Section 504 of the Rehabilitation Act and its implementing regulations.

260.    Plaintiff Youth have suffered irreparable injury as the proximate result of Defendants' unjustifiable segregation of youth with mental impairments in congregate care facilities. Plaintiffs are without adequate remedy at law.

**Sixth Cause of Action**
Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.* – Methods of Administration
[Brought by Plaintiffs G.K., C.I., T.L., and R.K. and the Class Against the Governor, DHHS Commissioner, DCYF Director, and Medicaid Agency Director]

261.    Plaintiff Youth hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

262.    Plaintiff Youth reside in congregate care facilities or are at risk of placement in such facilities, and are qualified to participate in more integrated community-based programs suitable to their needs.

263.    The Governor, DHHS, DCYF and the Medicaid Agency, conduct, operate, or administer the state Medicaid and DCYF programs, which receive federal financial assistance and are programs or activities within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(b), and its implementing regulations, 45 C.F.R. §§ 84.3(f), (h) and (k).

264.     Defendants are prohibited under Section 504 of the Rehabilitation Act and its implementing regulations from discriminating against individuals with disabilities. 29 U.S.C. § 794; 45 C.F.R. §84.4(b).

265.     Pursuant to the regulations implementing Section 504 of the Rehabilitation Act, Defendants are prohibited from utilizing criteria or other methods of administration "(i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped." 45 C.F.R. § 84.4(b).

266.     Defendants utilize methods of administration that have the effect of subjecting Plaintiff Youth to discrimination and cause Plaintiff Youth to live unnecessarily in segregated institutions, instead of in the most integrated setting appropriate to their needs.

267.     Plaintiff Youth have suffered irreparable injury as the proximate result of Defendants' failure to utilize methods of administration that facilitate the receipt of services and placement in the most integrated settings appropriate to their needs. Plaintiff Youth are without adequate remedy at law.

## VIII.     PRAYER FOR RELIEF

268.     WHEREFORE, Plaintiff Youth respectfully request that this Honorable Court:

a.     Assert jurisdiction over this action;

b.     Order that Plaintiff Youth may maintain this action as a class action under Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure;

c.     Declare unlawful under Rule 57 of the Federal Rules of Civil Procedure:

      i.      Defendants' failure to ensure that counsel are provided to Plaintiff Youth throughout their dependency proceedings under the due process clause of the Fourteenth Amendment of the United States Constitution;

      ii.      Defendants' failure to timely provide and implement adequate case plans and case reviews to Plaintiff Youth under AACWA, 42 U.S.C. §§ 622, 671(a)(16), 671(a)(22), 675(1), 675(5), and 675a;

      iii.      Defendants' failure to provide Plaintiff Youth with services in the most integrated setting appropriate to meet their needs under Title II of the ADA, 42 U.S.C. §§ 12131 *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq*., and their implementing regulations; and

      iv.      Defendants' failure to utilize methods of administration that allow Plaintiff Youth to live and receive services in the most integrated setting appropriate to meet their needs under Title II of the ADA, 42 U.S.C. §§ 12131 *et seq*. and Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*, and their implementing regulations, including 28 C.F.R. § 35.130(b)(3) and 45 C.F.R. §84.4(b).

d.      Permanently enjoin Defendants, under Rule 65 of the Federal Rules of Civil Procedure, from subjecting Plaintiff Youth to policies, patterns, practices, and/or customs that violate their constitutional and statutory rights, as set forth in subparagraph (c) above, and order appropriate tailored remedies, included but not limited to:

      i.      **Access to Counsel.** Defendants shall ensure that Plaintiff Youth have access to adequate and effective appointed counsel in all dependency proceedings.

      ii.      **Case and Service Planning.** Defendants shall ensure a process and quality assurance mechanism reasonably calculated to timely provide and implement adequate

case plans and case reviews for Plaintiff Youth as required under AACWA, 42 U.S.C. §§ 622, 671(a)(16), 671(a)(22), 675(1), 675(5), and 675a.

      iii.    **Least Restrictive Placement.** Defendants shall ensure a process and quality assurance mechanism reasonably calculated to ensure the availability of appropriate, community-based services and placements to meet the needs of Plaintiff Youth in the least restrictive, integrated environment, to which they are entitled under Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*

      iv.    **Methods of Administration.** Defendants shall administer their programs, activities, and services in a manner that prioritizes, facilitates and funds the receipt of services in the most integrated setting appropriate for Plaintiff Youth by, for example, ensuring the availability of community-based family settings and services for Plaintiff Youth and shifting resources from segregated congregate care facilities to community-based services and family placements, in compliance with Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*, and their implementing regulations, 28 C.F.R. §§ 35.130(b)(3), 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

      v.    **Monitoring/Enforcement.** The provisions of the Court order entered under Fed. R. Civ. P. 65(d) shall be monitored by a neutral expert monitor appointed by the Court. In addition, the Court shall have continuing jurisdiction to oversee compliance with that order.

e.    Award to Plaintiff Youth the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, under 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

      f.      Grant such other and further equitable relief as the Court deems just, necessary and proper to protect Plaintiff Youth from further harm by Defendants.

DATED:  January 5, 2021

                         Respectfully submitted,

/s/ Michelle Wangerin
**NEW HAMPSHIRE LEGAL ASSISTANCE**
Michelle Wangerin
N.H. Bar No. 17769
Kay E. Drought
N.H. Bar No. 12851
154 High Street
Portsmouth, NH 03801
P: (603) 431-7411
F: (603) 431-8025
mwangerin@nhla.org
kdrought@nhla.org

**AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE**
Gilles R. Bissonnette
N.H. Bar No. 265393
Henry R. Klementowicz
N.H. Bar No. 21177
18 Low Avenue
Concord, NH 03301
T: (603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org

**DISABILITY RIGHTS CENTER-NH, INC.**
Karen L. Rosenberg
N.H. Bar No. 5639
Pamela E. Phelan
N.H. Bar No. 10089
Sarah J. Jancarik
N.H. Bar No. 272310
64 North Main Street, Suite 2
Concord, NH 03301-4913

P: (603) 228-0432
F: (603) 225-2077
karenr@drcnh.org
pamelap@drcnh.org
sarahj@drcnh.org

**CHILDREN'S RIGHTS, INC.**
Ira Lustbader**
NY Bar No. 2516946
Shereen A. White**
PA Bar No. 308118
Nicole Taykhman**
NY Bar No. 5522776
88 Pine Street, 8th Floor
New York, NY 10005
P: (212) 683-2210
F: (212) 683-4015
ilustbader@childrensrights.org
swhite@childrensrights.org
ntaykhman@childrensrights.org

**WEIL, GOTSHAL & MANGES LLP**
Konrad L. Cailteux**
NY Bar No. 2056505
Sudip K. Kundu**
NY Bar No. 5476601
767 Fifth Avenue
New York, NY 10153
P: (212) 310-8000
F: (212) 310-8007
Konrad.Cailteux@weil.com
Sudip.Kundu@weil.com

**Pro hac vice* application forthcoming

**ATTORNEYS FOR PLAINTIFFS**