**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 10-11-2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
G.K., BY THEIR NEXT FRIEND,         *
KATHERINE COOPER, ET AL.            *   21-cv-04-PB
                                    *   June 8, 2021
            v.                      *   2:00 p.m.
                                    *
CHRISTOPHER SUNUNU, IN HIS OFFICIAL *
CAPACITY AS GOVERNOR OF NEW         *
HAMPSHIRE, ET AL.                   *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:


For the Plaintiffs:        Nicole Taykhman, Esq.
                           Shereen White, Esq.
                           Children's Rights




For the Defendants:        Anthony Galdieri, Esq.
                           Jennifer Ramsey, Esq.
                           Nathan W. Kenison-Marvin, Esq.
                           Attorney General's Office




Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

P R O C E E D I N G S

1

2          THE CLERK:  The Court is in session and has for

3    consideration a motion hearing in G.K., et al. versus the

4    Governor of the State of New Hampshire, et al., civil case

5    number 21-cv-4-PB.

6          THE COURT:  All right.  So I have a few interns

7    here that are listening in and for their benefit just to make

8    clear what the case is about, this is a class action case in

9    which the plaintiffs seek to represent a class of children

10   between 14 and 17.

11         I would ask everyone to be careful --

12         THE CLERK:  Judge, you're muted.

13         THE COURT:  All right.  Can you hear me now?

14         THE CLERK:  Yes.  Thank you.

15         THE COURT:  So if you're not a designated speaker,

16   please keep your microphone on mute, okay?

17         So this is a class action.  The plaintiffs seek to

18   represent a class of children between 14 and 17 who have a

19   mental impairment that substantially limits a major life

20   activity or are regarded as having such an impairment or --

21   and who are either in congregate care or at risk of being in

22   congregate care unnecessarily.

23         The plaintiffs have what I would characterize as

24   three types of claims.

25         The first is a constitutional claim that they are

1  entitled to be represented by counsel in dependency

2  proceedings brought under RSA 169-C.

3          The second claim is a claim under the Child Welfare

4  Act.  I'll oversimplify it perhaps, but essentially a claim in

5  which they are seeking to require the defendants to provide

6  them with adequate case plans.

7          And the third set of claims arise under the

8  Americans with Disability Act and the Rehabilitation Act, and

9  they rely in particular on two regulations, a regulation known

10  as the integration regulation and a related regulation that

11  they call a method of administration regulation.

12          The defendants have challenged the complaint in a

13  motion to dismiss pursuant to Rule 12(b)(6), and I want to

14  explain how I want to hold the hearing.

15          The defendants have challenged the sufficiency of

16  each of the plaintiffs' claims.

17          In addition to that the defendants have argued for

18  dismissal in part by claiming that this is not an appropriate

19  case for class certification under Rule 23(b)(2).

20          They also claim that the relief the plaintiffs are

21  seeking are not within the Court's power to grant.

22          As to those two arguments, I'm going to deny the

23  motions to dismiss on those grounds without prejudice to the

24  defendant's rights to raise those arguments at a later point

25  in the proceedings.  I agree with the plaintiffs that those

1    arguments are premature and really not best addressed on the

2    present motion.  So I'm denying those from the bench without

3    prejudice.  We'll take them up as necessary at a later stage

4    of the proceedings.

5            So I want to focus on the defendant's challenges to

6    each of the plaintiffs' claims.  I would like to take them up

7    one at a time.

8            So I'll start with the right to counsel argument

9    and then take up the challenges to the Child Welfare Act claim

10   and then conclude with the defendant's challenges to the ADA

11   and Rehabilitation Act claim.  I'll hear the defendant's

12   argument and the plaintiffs' response, and if the defendant

13   needs a chance to reply, I'll give that opportunity.

14           All right.  So with that background, let me turn to

15   the defendants.  Whoever is going to speak for the defendants

16   identify yourself and explain to me why I should dismiss the

17   right to counsel claim.

18           MR. GALDIERI:  Thank you, your Honor.

19           This is Attorney Anthony Galdieri for the

20   defendants.

21           Just so you're aware, I will speak to the right to

22   counsel claim, and my co-counsel, Attorney Kenison-Marvin,

23   will speak to the remainder of the claims that the Court

24   wishes to hear on today.

25           As to the right to counsel claim, your Honor, we

1   think as a matter of law that claim is deficient.  There is no

2   categorical Fourteenth Amendment right to appointed counsel

3   particularly in this case under the analysis set forth in

4   Mathews versus Eldridge and as further expounded upon in the

5   Lassiter case out of the United States Supreme Court.

6           We believe the plaintiffs would essentially have to

7   prove that everyone in their case, regardless of their

8   individual circumstances or the individual uniqueness of their

9   dependency proceeding, that their private interests are very

10  high, that the erroneous risk -- the risk of erroneous

11  deprivation of their liberty interest is very high and

12  outweighs the state's interests, and not only that, then

13  overcomes the federal presumption against the appointment of

14  counsel outside of the class of cases where one's personal

15  freedom will be lost.

16          THE COURT:  Let me interrupt you though and try to

17  get a couple things out of the way that I don't think should

18  be a problem for you.

19          I assume you agree that the class the plaintiffs

20  are seeking to represent and the children who the plaintiffs

21  are -- the named plaintiffs are representing directly have a

22  protected liberty interest when they're involved in dependency

23  proceedings.  Do you agree with that?

24          MR. GALDIERI:  I think that's true, your Honor,

25  yes.

1          THE COURT:  I assume you also agree that there are

2     cases in which an individual child who falls within this class

3     might well have a constitutional right to counsel in a

4     particular dependency proceeding.  Do you agree with that?

5          MR. GALDIERI:  I think that is also correct, your

6     Honor.

7          THE COURT:  So as I understand your position, it's

8     not that children don't have a right to counsel.  It's that

9     they don't have a categorical right to counsel and that this

10    is not really a matter that can be determined in the

11    categorical way that the plaintiffs seek to have it

12    determined.  Instead, it's your view that each judge who is

13    assigned a case involving a child within this group has a

14    responsibility to determine whether that child has a right to

15    counsel in those proceedings, and it's your view that 169-C

16    gives that child an opportunity to request counsel and to have

17    the judge evaluate that request under the Eldridge factors.

18          Do you -- am I accurately characterizing your

19    position?

20          MR. GALDIERI:  Yes, your Honor.  The statutory

21    regime under 169-C provides ample protection and opportunity

22    to the interests of those children through the participation

23    of parents, the participation of DCYF, the participation of

24    the CASA who is independently charged with identifying the,

25    you know, expressed interests of the child and reporting those

1    to the Court, particularly if they conflict with the

2    recommendation of the CASA, and under those circumstances and

3    under this statute they have -- the Court has the discretion

4    to appoint counsel and I would believe that any party to those

5    proceedings would have the ability to request counsel be

6    appointed for one of those individual children.

7           So the right is there.  On a case-by-case basis the

8    trial judge is equipped to assess it and to apply the Mathews

9    factors and perhaps even apply them in a state court

10   proceeding without the federal presumption in <u>Lassiter</u> to the

11   extent that would or would not be recognized under New

12   Hampshire law or the New Hampshire Constitution.

13          THE COURT:  There's no -- there's nothing in the

14   text of 169-C that limits the judge's discretion to appoint

15   counsel to the circumstances where it is federally required,

16   but the judge would have a constitutional duty to appoint

17   counsel where it is required under the Eldridge factors.

18          In addition to that, because of the way the statute

19   is worded, it's quite possible that a judge has broader

20   discretion to appoint counsel even in cases where the

21   constitution doesn't demand it, right?  That's your position?

22          MR. GALDIERI:  That's our position.  Yes, your

23   Honor.

24          THE COURT:  All right.  Can you -- help educate me

25   about exactly the way children are represented in a dependency

1  proceeding.

2          I'm particularly interested in understanding the

3  way the CASA appointment system works, what kind of background

4  and training CASA people have.

5          I recognize this is 12(b)(6) motion, but I do

6  believe that I should be able to take notice of certain basic

7  aspects of the way the CASA works, the way guardian ad litems

8  are selected, and then if you could tell me specifically what

9  the statute says about the discretion the Court has to appoint

10 counsel in individual cases.

11         MR. GALDIERI:  Sure, your Honor.

12         So the way the statutory scheme, if we start there,

13 operates, 169-C -- if you start with the way these proceedings

14 sort of began and unfold, you go to 169-C:15 which deals with

15 the preliminary hearing.  And at the preliminary hearing

16 there's going to be an evaluation as to whether reasonable

17 cause exists to believe that a child was abused and neglected,

18 and if reasonable cause exists, then the Court has to do a

19 number of things.

20         And the first thing it has to do upon a finding of

21 reasonable cause is appoint a CASA or other approved program

22 guardian ad litem or an attorney to represent the child

23 pursuant to RSA 169-C:10.

24         And that statute, 169-C:10, entitles the child to

25 the appointment of a CASA or a guardian.  If a CASA or a

1    guardian is not available, can't be found, there can be

2    appointment of an attorney.

3         What also happens after that finding occurs is that

4    there is a date set for an adjudicatory hearing and that

5    hearing then occurs swiftly but at a later date.  Within 60

6    days from the date that the petition is filed with the court.

7         So then there come out of that a series of

8    proceedings where once the CASA is appointed there are a

9    whole -- there's a series of regulations that 169-C requires

10   the New Hampshire Supreme Court to put into place, and there

11   contained in New Hampshire Admin Rules GAL -- and GAL part 500

12   really sort of outlines the duties of the CASA and the

13   guardian ad litem, outlines the obligations of the CASA and

14   the guardian ad litem, and the ethical standards, and all sort

15   of the requirements that the CASA and guardian have to meet.

16        THE COURT:  I haven't reviewed those regulations

17   yet.  Are there any type of qualification standards

18   established for CASA?  Do they have to have certain kinds of

19   training?  Do they have to abide by certain obligations as to

20   how they carry out their responsibilities once they are

21   appointed?

22        MR. GALDIERI:  So these regulations are fulsome.  I

23   believe the CASA is a board of volunteers.  I believe they are

24   trained.  I'm not sure these regulations address the training,

25   but they are required to do certain things and have knowledge

1    of certain things as related in the regulations.  And if they

2    do not, they are expected to find persons who can educate them

3    on those issues to become knowledgeable or report essentially

4    I believe to the Court that they are not knowledgeable and

5    those issues go beyond their abilities or their

6    understandings.

7                  THE COURT:  169-C sort of speaks to the concept of

8    a CASA and the concept of a guardian ad litem as alternatives.

9                  Are there different requirements and different

10   obligations for a CASA-appointed person and a guardian ad

11   litem?

12                 MR. GALDIERI:  That, your Honor, I'm not entirely

13   sure.  I mean, I know CASA is a separate program of

14   volunteers.  There may be in the finer points of that

15   different requirements, but I think they're effectively

16   interchangeable for the purposes of this regime and for the

17   purposes of the regulations.  The regulations apply both to

18   the CASA and the guardian ad litem and that they effectively

19   -- the CASA functions as a guardian ad litem.

20                 What I'm not sure of is when you talk about the

21   finer point of CASA is sort of separate from a guardian and

22   they're talked about separately, is there a meaningful

23   difference there.  I'm not sure I've seen something to that

24   effect or have the knowledge base about CASA to know that.

25                 THE COURT:  All right.  Although some CASA are in

1  fact lawyers, it's my -- you know, I don't have knowledge of

2  that from the complaint.  That's just -- I know people who are

3  volunteers who aren't lawyers, but a CASA/child relationship

4  differs from an attorney-client relationship regardless of the

5  degree of training of the CASA at least in part because there

6  isn't an attorney-client relationship and a privilege between

7  the CASA and the child.

8           Have I got that right?

9           MR. GALDIERI:  That's correct, your Honor.

10          The GAL regulations in part 500 do protect to a

11  certain degree the confidentiality of communications between

12  the guardian ad litem and the child and requires the guardian

13  ad litem to maintain the confidentiality except when they're

14  needed to be conveyed as permitted by law.

15          So there is some protection, but it's not

16  attorney-client privilege.  It's not an attorney-client

17  relationship.

18          THE COURT:  A case that looms large here in your

19  view I believe is the MSR and TSR Washington Supreme Court

20  decision.  The Washington statutory regime envisions that the

21  child is informed -- at least older children are informed of

22  the ability to request counsel if they need to be represented

23  individually.

24          I didn't see anything like that in the New

25  Hampshire statute.  Is there something like a corresponding

1    provision in the New Hampshire statute, and if so, does that

2    -- in either way does that affect the analysis that the

3    Washington State Supreme Court used?

4              MR. GALDIERI:  I don't see anything like that in

5    our statute, your Honor, any sort of a notice provision.

6              I don't think that affects the analysis.  I think

7    the analysis turns on application of the factors and the

8    uniqueness of the dependency proceeding itself and how in some

9    cases there may not be a transfer of legal custody.  In other

10   cases there may be a transfer of legal custody to another

11   parent who is not subject to the petition and then there may

12   be agreement to remediate certain issues and restore the child

13   to their former placement.  All various unique circumstances

14   where an automatic right to counsel wouldn't kick in or

15   wouldn't be --

16             THE COURT:  One case where it would seem

17   particularly strong for there to be an argument for

18   appointment of counsel would be a case in which -- a

19   hypothetical case in which a guardian ad litem or a CASA

20   believed that placement in a congregate facility was in the

21   child's best interest but a child within the class age group

22   here, 14 to 17, wanted to have a foster care placement.  In

23   that circumstance wouldn't you agree that there's a

24   particularly strong argument for appointment of counsel so

25   that at least there is a voice for the child's interest?

1      MR. GALDIERI:  I would agree that that may be a

2  stronger case.  I have some knowledge that such a case may

3  presently exist, and I believe in that case the CASA has

4  requested appointment of counsel to the Court through a motion

5  to the Court.  So there are ways to animate that, and I think

6  that CASA would have an obligation to bring that information

7  forward to the Court and the trial judge would have an ability

8  to review it.  And if somebody didn't independently make a

9  motion, the judge would be able to assess that issue and that

10  interest and say I think I'm going to appoint counsel in this.

11      THE COURT:  Is there something you can point to in

12  the regulations that would obligate a CASA or a guardian ad

13  litem to bring that kind of disagreement to the attention of

14  the presiding judge?

15      MR. GALDIERI:  Yes.  So in the regulations it would

16  be part GAL 504, and it's titled Obligations in Particular

17  Kinds of Cases; 504.01, Specific Duties in Abuse and Neglect

18  Cases; and sort of the fourth point, (d) states that, "If a

19  guardian ad litem is aware that a recipient of services

20  disagrees with a recommendation being made by the guardian ad

21  litem, the guardian ad litem shall fully advise the appointing

22  court of this fact."

23      Another regulation under GAL 503.11 entitled

24  Gathering and Reporting Facts and Other Information, the

25  guardian ad litem is required to gather such facts and

1   information regarding the family history, background, current

2   circumstances, concerns and wishes of the recipient of

3   services from the recipient of services.  And this regulatory

4   regime appears to use the frame recipient of services to refer

5   to the child.

6          So the CASA in performing these duties is gathering

7   all this information, is putting together a report to convey

8   it to the Court of this information, and in particular where

9   whatever the CASA might recommend diverges with what the

10   interests of the child might be that has to be brought to the

11   attention of the Court.  And that gives the Court I think an

12   ample opportunity to determine should counsel be appointed and

13   to apply the appropriate test and factors.

14          THE COURT:  The complaint alleges that this

15   virtually never happens in state court.  Again, this is a

16   12(b)(6) motion.  I have to credit that for purposes of

17   evaluating the motion.

18          Do you have any explanation for why that is so if

19   indeed it is in fact the case that courts never -- almost

20   never appoint counsel?

21          MR. GALDIERI:  That's the allegation.  I don't know

22   much beyond that allegation.  I don't know if there are -- I

23   don't know that that's reflective of the amount of requests or

24   assessments that are occurring or if those numbers are

25   reflective of something else.

1    　　　　　To the extent plaintiffs claim this to be an issue,

2    it could be -- I think that is information that they allege

3    from the past year.  I don't know what other years might look

4    like or if you are able to sort of open these cases, what that

5    information looks like.  I don't know that we would get to do

6    that ultimately and I'm not sure how the statistic is reached

7    other than through an assumed payment of money, but I'm not

8    sure that statistic standing alone means that the trial court

9    is ill-equipped in this process to assess the constitutional

10   due process rights and determine whether there's a need for

11   appointed counsel for a child in a given case.

12   　　　　　THE COURT:  Right.  And it doesn't tell us how many

13   times counsel was requested and denied.  It doesn't tell us

14   how many times the CASA or GAL's views are in conflict with

15   the child's views.  It doesn't tell us how frequently the CASA

16   or GAL expresses a view that the issues at stake are legally

17   complex and would benefit from the appointment of counsel.  I

18   understand all of that.

19   　　　　　On the other hand, I do want to be clear that this

20   is a 12(b)(6) motion.  Pleadings by the plaintiff are entitled

21   to be credited and construed in the light most favorable to

22   the plaintiff at this stage of the proceedings.

23   　　　　　All right.  So you're basically -- I've read your

24   brief which -- I have to say I really appreciate the quality

25   of the briefing done by the parties in this case which is

1    really quite high, and I do feel I have a pretty good

2    understanding.

3            Your basic argument which follows, as I understand

4    it, essentially that <u>Lassiter</u> makes clear that the

5    determination of right to counsel in civil cases and in

6    proceedings such as the ones that we're dealing with here

7    ordinarily have to be done on an individualized basis in your

8    view.

9            I think you take the approach that the Washington

10   Supreme Court took in the case I previously mentioned as a

11   good way to analyze that particular issue and that you believe

12   that that case and <u>Lassiter</u> support the idea that the Eldridge

13   factors have to be ordinarily done on an individual -- an

14   individual basis and that the party best equipped to do -- the

15   entity best equipped to do that is the judge assigned in that

16   case that has available to that judge all of the relevant

17   information that will allow that judge to make an

18   individualized assessment of how the Eldridge factors bear on

19   the question of whether counsel should be appointed, and

20   therefore this isn't an appropriate cause of relief for the

21   plaintiffs to come to federal court and seek a class

22   certification.

23           Is that a fair summary of your position?

24           MR. GALDIERI:  Yes, your Honor.

25           THE COURT:  All right.  Do you want to add anything

1    to that?

2            MR. GALDIERI:  I don't, your Honor.

3            I will add I received some information from my

4    client, and I know this goes, as you stated, beyond the motion

5    to dismiss standard but it is responsive to one of your

6    questions, but I have information that I understand relates

7    that CASAs undergo a 40-hour training provided by an entity

8    that DCYF contracts with and that GALs are occasionally

9    appointed who are not CASAs but that CASAs are generally

10   preferred because of that training.

11           THE COURT:  I doubt that the plaintiffs will really

12   dispute that.  If they do, that's fine.  It is what it is.

13   I'm sure at some point it will be determined what if any

14   training they're required to have.  It just interested me in

15   trying to get a sense of -- while I have great respect for my

16   colleagues who have all passed the bar, they don't all have

17   great, and I'm one of them, does not have a great deal of

18   training and experience in working with children and trying to

19   understand and advocate for their best interests.  Certainly

20   there are some lawyers who are highly skilled at that, but

21   that you are an admitted member of the bar doesn't necessarily

22   equip you to deal with that child's interests in a way that's

23   superior to a CASA or a guardian ad litem who has had specific

24   training on that particular issue.

25           All right.  Let me hear from the plaintiff, and

1    then I'll give you a chance to respond if you want.

2              MS. TAYKHMAN:  Thank you, your Honor.

3              Good afternoon.  Nicole Taykhman for the

4    plaintiffs, and I'll be addressing the Fourteenth Amendment

5    due process claim today.

6              Your Honor, the fundamental flaw with defendant's

7    motion is that it is premised on the wrong question.  The

8    question is not whether there is some categorical right for

9    all children in all proceedings under any facts to have

10   counsel.

11             The question is whether this group, youth ages 14

12   to 17 with mental health disabilities who face this

13   extraordinary risk of physical liberty deprivation during New

14   Hampshire dependency proceedings state that --

15             THE COURT:  I'm sorry to interrupt, but can you

16   help me clarify that?  Because that's what I've been kicking

17   around with my law clerks, exactly what you are each saying.

18             I get your point that you are not making the kind

19   of categorical claim that says all children in dependency

20   proceedings always have a right to counsel.  You're not saying

21   that.

22             To the extent that the defendant might have

23   misconstrued you in suggesting that, I agree absolutely you're

24   right about that and I get your point.

25             But you're making -- it seems to me you're making a

1    different kind, a more narrow but still categorical claim.

2    You are saying that there is a category of people.  They are

3    children between 14 and 17, children who have a mental

4    impairment, children who are in congregate care or at risk of

5    congregate care.  And when those children, that category of

6    child of which the plaintiffs are speaking on behalf of two of

7    those children, that category of children always have a right

8    to counsel in dependency proceedings when you use the Eldridge

9    factors.

10             That is a type of categorical claim as I understand

11   it.  It's just not the broad categorical claim that all

12   children in dependency proceedings are entitled to a right to

13   counsel.

14             Do you agree with that?

15             MS. TAYKHMAN:  Yes.  I think that's right.

16             We're bringing this claim on behalf of this class

17   in all New Hampshire dependency proceedings specifically

18   because, as we allege in the complaint, in 2019 90 percent of

19   those youth were placed in the congregate care setting.  So

20   maybe to use the word categorical is, you know, it's a bit of

21   semantics, but it's a narrow class based on the facts that we

22   allege in the complaint about the extremely high risk of

23   physical liberty deprivation which is precisely the types of

24   facts that Lassiter contemplated.

25             THE COURT:  Okay.  So I agree with you.  As I said,

1    it's a narrower category, but it is a category.

2           Another way to conceptualize your claim, and I'll

3    state it to you this way, and if you don't like it, you can

4    tell me, is to say that our named plaintiffs, the children who

5    these named plaintiffs represent, and the entire class of

6    people all have certain conditions, there are certain

7    circumstances that they are living under, and it is our view

8    that if you apply the Eldridge factors to that group, it will

9    always require the appointment of counsel no matter what the

10   circumstances of the dependency proceeding.

11          That is your position in this case, right?

12          MS. TAYKHMAN:  Yes.  That's correct.

13          THE COURT:  Okay.  Good.  That's important to get

14   out because I want to be very clear there's no question in my

15   mind that say, for example, your named plaintiffs might well

16   have a right to counsel under certain circumstances, but -- so

17   this isn't about whether they have a right to counsel or not.

18   It's whether this subcategory of people automatically qualify

19   without individualized Eldridge assessment or whether there

20   has to still be individualized Eldridge assessment.  That's

21   what your complaint -- this count of your complaint brings

22   into focus.

23          You say we don't have to have each presiding state

24   court judge do this analysis.  You can do it for everybody in

25   all cases in New Hampshire of people who fit this category,

1    right?  That's your position?

2                   MS. TAYKHMAN:  Yes.  That's correct.  I think we've

3    included in the complaint classwide facts that meet the three

4    prongs of the Eldridge analysis, and I'm happy to walk through

5    that if that would be helpful to the Court.

6                   THE COURT:  Well, we definitely should get to that,

7    but I just wanted to be clear because one thought I had when I

8    read your complaint was to say, hey, the defendant's argument

9    is really better suited for is this an appropriate case for

10   class certification than it is 12(b)(6) dismissal, because

11   even if it would be inappropriate to certify a class say

12   because of lack of commonality, these individual named

13   plaintiffs might still have a right to counsel, but you don't

14   allege any facts about them other than the facts that put them

15   in this subcategory that you're creating.  So there really

16   isn't any basis to draw that distinction.

17                   For example, you don't allege that either of the

18   children involved here ever had an interest that was adverse

19   to the interests of the GAL or the CASA.  You don't allege

20   that the parents had interests that were adverse to them.  You

21   don't allege that they ever sought counsel.  You don't ever

22   allege that they sought to avoid a congregate placement.  You

23   don't allege any of those kind of facts which would -- the

24   usual way the Eldridge factors are applied look at those kinds

25   of considerations, and you say they don't matter at all.  It

1    doesn't matter.  Even if the plaintiff child wants to go to

2    congregate care, even if they don't want counsel, even if the

3    CASA can adequately represent their interests, they have a

4    right to counsel, right?  I mean, that seems to be what you're

5    saying.

6              MS. TAYKHMAN:  Well, I think it's because the

7    complaint is so full of facts about the harms of congregate

8    care.  So the idea that any --

9              THE COURT:  I completely get -- your view is

10   congregate care is uniformly bad, damaging.  You've alleged

11   that very, very clearly and expressly so I completely get it.

12             MS. TAYKHMAN:  Well, I want to make sure I answer

13   your earlier question about class certification, and obviously

14   we haven't moved for class certification.

15             THE COURT:  Right.

16             MS. TAYKHMAN:  But I think your Honor's point gets

17   at really the heart of the issue.  That defendant's motion

18   nowhere addresses the well-pleaded facts in the complaint

19   about these risks that this class faces as a class, yet their

20   only argument is failure to state a claim.

21             But the plaintiffs allege ample facts to state a

22   claim even under governing Supreme Court precedent, including

23   Lassiter.  And so we're dealing with this 12(b)(6) motion

24   here, and I can't help but notice the earlier discussion about

25   the facts about whether the CASAs, you know, adequately

1    represent the interests of the children in the class, but we

2    allege in the complaint that they may not have any particular

3    professional experience, they don't have sufficient training,

4    and most importantly it's not their role to protect the legal

5    rights of the children in the class.

6              THE COURT:  With respect to -- again, I want to not

7    be implying any criticism of lawyers as a group, but we

8    lawyers do not have any required training for dealing with

9    children, understanding the harms of congregate care,

10   understanding how to develop the kind of personal rapport with

11   children that a skilled CASA would hopefully have some special

12   training in.

13             And so the idea that uniformly a lawyer is better

14   equipped to protect a child than a CASA really kind of

15   diminishes what a CASA really is all about, doesn't it?  It

16   seems to say, hey, those people are amateurs, you know,

17   they're just volunteers.  CASAs are highly skilled people who

18   care enough about kids that they're willing to volunteer their

19   time to try to see that their interests are protected.

20             So I'm a little bit concerned that you're sort of

21   suggesting that it would always be the case that a lawyer can

22   better represent the child than a CASA.

23             MS. TAYKHMAN:  I definitely don't mean to disparage

24   CASAs in any way, but I think the important point is that the

25   role is not for them to protect or advocate for the youth's

1    legal rights.  They might seek to advocate for the youth's

2    best interests, but that's not sufficient for this group of

3    youth.

4              For example, the Court in <u>MSR</u> actually, one of the

5    Washington state cases, actually pointed out that older youth

6    would be more likely to benefit from an attorney-client

7    relationship, including privilege, in older children.

8              THE COURT:  Than a younger child.  I agree.  That's

9    again sort of a common sense idea that the closer children get

10   to adulthood the better able they are to engage with someone

11   like a lawyer and express their views and have a lawyer help

12   them frame those views and press those particular views.  So I

13   agree with that as a basic proposition.

14             The challenge for me, I just need you to really

15   focus on this, is that <u>Lassiter</u> requires individualized

16   assessments, and a lot of the -- the person that's in the best

17   position to see what are the underlying issues in this case.

18   Is there even a dispute about congregate care or no congregate

19   care?  Although you allege, and my own common sense suggests,

20   that in general a good foster care placement is probably

21   better for many children than a good congregate care

22   placement.  That seems like a reasonable proposition.  That

23   certainly is your view.

24             Notwithstanding that, it may matter whether there

25   are issues about that.  Is there going to be a need for expert

1    testimony where a skilled examiner could develop

2    cross-examination of an expert better?  I would agree a lawyer

3    would be much better prepared to deal with that.  Are there

4    complicated constitutional or regulatory questions?  Lawyers

5    are highly skilled at doing those kinds of things.

6            But certainly not every case in this category

7    you've identified is going to involve those kinds of issues,

8    and arguably most would not.

9            So Lassiter seems to require individualized

10   assessment.  The Washington State Supreme Court case is a very

11   carefully reasoned case that purports to apply the Eldridge

12   factors and reaches essentially the same conclusion.  Why

13   shouldn't I follow the Washington Supreme Court analysis?

14           MS. TAYKHMAN:  Sure.  So I think the Washington

15   state cases are -- neither one of them really say much about

16   these facts in these types of circumstances that this class

17   faces.

18           As your Honor pointed out, the statutory scheme was

19   of course different, and one of the important distinctions was

20   that older youth were advised of their right to counsel and

21   re-advised annually.  It was important enough that that state

22   took that approach to ensure that older youth got that

23   notification and advice every year.

24           But beyond that basic distinction both of those

25   cases, MSR and EH, the other Washington state cases, both of

1   those truly involved a sort of universal claim that the

2   defendants I think were characterizing this claim as rather

3   than this narrow class that really faces physical liberty

4   deprivations in all of their dependency proceedings.

5           None of the cases at issue in MSR or EH involved

6   placement decisions yet alone harm of congregate care.  There

7   was no class that was asserting a 90 percent rate of placement

8   in these restricted congregate care settings.

9           As just an example, EH.  That case involved

10  visitation and reunification and the Court said there's no

11  placement decisions at issue, and that's one of the reasons

12  why we're comfortable not requiring counsel.

13          It also involved -- both of those cases involved

14  younger children, and MSR took pains to distinguish older

15  children from younger.

16          But I think also both of those courts had an

17  extensive factual record before them and were able to get into

18  these particularities of exactly the types of risks that were

19  or were not at issue for those litigants at issue.

20          And the EH dissent is particularly interesting

21  because it gathered all of the empirical evidence that was put

22  before the Court about the classwide risks and harms.

23          Of course we don't have that, and I think a lot of

24  the questions that you've posed really get at some of that

25  empirical evidence about what do CASAs do in New Hampshire on

1  a daily basis when they're representing older youth.  Are they

2  just -- how close is their role to that of an attorney's and

3  how wide is that gap?  And I think that that is the type of

4  question that discovery, including expert discovery, might be

5  very helpful for in this case.

6          THE COURT:  Well, yeah, I definitely prefer -- if I

7  had a choice to make decisions after having evidence or not

8  having evidence, I would much rather make decisions after

9  having evidence.  Rule 12(b)(6) is what it is and it does

10  allow for testing of pleadings based on the sufficiency of the

11  pleading.

12          Again, I want to be sure though I'm not missing a

13  kind of claim that I don't think you're asserting, but I

14  wanted to be sure I'm ruling it out.

15          One kind of claim one might make in this position

16  is that New Hampshire judges are systematically refusing to

17  grant requests for counsel by students within this category

18  you have defined -- children within this category.  You're not

19  alleging that, right, because I couldn't find -- I said, let's

20  look to see if maybe what they're alleging is we're trying to

21  get judges to appoint counsel and they're not doing it.  You

22  don't make any allegations about that.  There isn't one

23  allegation in there that I could find that anyone in the

24  entire class or category has ever sought appointment of

25  counsel and been denied it.  So you're not making any claim

1    like that.  Because that's a kind of claim you might have been

2    able to make, say I'm representing -- my client sought and was

3    denied counsel.  I'm representing a class of people who have

4    been systematically denied their rights under Lassiter and

5    Eldridge to individualized assessment.  You're not making that

6    claim though, right?  I want to be clear about that.

7            MS. TAYKHMAN:  No, we're not.

8            And we did allege that one attorney was appointed

9    in all of 2019 and --

10           THE COURT:  There's a logical problem with that.

11   I'm asking the opposite.  That one attorney was appointed in

12   all of 2019 doesn't tell you whether anybody requested and was

13   denied, and you don't say anything about that so I can't infer

14   anything about that one way or the other.

15           MS. TAYKHMAN:  That's right.  I don't think we know

16   exactly why the discretionary system operated that way in

17   2019.  I definitely think it's something we would be

18   interested in understanding more of why it happened that way,

19   but coupled with the fact that that same year 90 percent of

20   older youth with mental health disabilities had their liberty

21   restricted in these physically restricted settings, I think

22   there is a reasonable inference to be drawn that there's a

23   large group of youth that would have very much benefited from

24   counsel in 2019 that did not have counsel appointed.

25           Just an example of that, our named plaintiffs, some

1     of them didn't even know whether they had a GAL.  We include

2     that in the complaint.  None of them had counsel appointed.

3              It's just one example, but named plaintiff T.L.

4     requested to live with siblings in a foster home.  That

5     request was denied by DCYF.  An attorney could have advocated

6     for that request to be heard or considered, could have figured

7     out what would need to happen to make that happen, and I think

8     that there are --

9              THE COURT:  That isn't so much a legal issue.  A

10    GAL could do that as well.  Do you know whether the GAL

11    refused to inform the Court of the client's wishes?

12             MS. TAYKHMAN:  I don't know that, but as we allege

13    in the complaint, attorneys -- their role is to file motions,

14    develop the factual record.  And very often CASAs, and this is

15    something we do include in the complaint, CASAs are relying on

16    information from DCYF.  So the judges are getting one-sided

17    information rather than having this process where attorneys

18    might be developing the factual record and ensuring that

19    they're advocating for the child's wishes.

20             THE COURT:  So you've done a good job of explaining

21    why the Washington state case might be different from our

22    case.  I appreciate that.

23             Other than the Georgia case you cite, can you cite

24    to me any cases where other courts have found we'll call it a

25    subcategorical right to counsel?  You don't like categorical.

1    It's certainly not individual, so let's call it subcategorical

2    right to counsel without individualized Eldridge factor

3    assessments.  Is there any case other than the Georgia case

4    that you --

5            MS. TAYKHMAN:  I don't believe we found another

6    case.  Part of that has to do with the facts are particularly

7    egregious here in New Hampshire.  There's a reason why we're

8    bringing this claim alongside the other claims in this case.

9            THE COURT:  Your Integration Act claim, you know,

10   goes to this very directly.  That's the direct attack on --

11   the integration clause claim is the -- I view kind of the core

12   claim here.  What you seem to be most concerned about is

13   they're sticking kids in congregate care, warehousing them,

14   when because of their disabilities they are entitled to

15   integration to the maximum extent possible.  So I think we'll

16   get to that issue, and I understand you say there's an

17   interrelationship of all of the claims, but to me that is the

18   case that most -- that set of claims that most directly

19   attacks the problem that you seem to be most concerned about.

20   You don't want kids warehoused in congregate care.  You want

21   them in foster care to the extent that that can possibly be

22   done while still serving their mental health needs, and you're

23   dealing with that directly when you deal with your integration

24   clause -- integration mandate claim.

25            So what else would you like to say in support of

1   the right to counsel argument?

2          MS. TAYKHMAN:  Well, I would like to talk about

3   Kenny A., the Georgia case, just briefly because I know we

4   often talk about it like it's this warning case out there.

5   It's of course nonbinding, but I do think that it's a very

6   persuasive example of why plaintiffs state a claim.

7          THE COURT:  My biggest problem was it didn't

8   discuss Lassiter.  It pretended -- I mean, it was a Georgia

9   constitutional claim, not a federal constitutional claim.  So

10  maybe he didn't have to discuss Lassiter, but Lassiter is the

11  case that's most directly on point, and so that there's not

12  even a reference to Lassiter in the opinion causes me to be

13  somewhat concerned about it.

14         What did you want to say about it?

15         MS. TAYKHMAN:  Sure.  The Court did identify a

16  right to counsel under the Georgia constitution, but also the

17  Georgia constitution was co-extensive, the federal

18  Constitution, and the Court did apply Mathews to get to that

19  conclusion.

20         And I think what is really -- a couple things that

21  are really important about that case.  That case also

22  concerned the types of physical liberty deprivation that we

23  see here, including through unnecessary institutionalization

24  of foster youth, the frequent and harmful placement moves.

25         The class was broader but it also included older

1    youth with mental health disabilities, and the Court applied

2    the Mathews factors and that decision denied summary judgment

3    after discovery.  And I think that that is really important

4    here to show just how fact-intensive this claim is on behalf

5    of -- classwide.

6            THE COURT:  Do you think it affects the analysis at

7    all that the Court didn't cite the most important directly

8    controlling Supreme Court case in its analysis?

9            MS. TAYKHMAN:  I don't because I don't think --

10   this actually gets to something that was discussed earlier,

11   but I don't think taking the Supreme Court precedent together

12   that there's a rule that courts must assess Mathews on a

13   "case-by-case basis."

14           I think if you look at Lassiter, Gagnon versus

15   Scarpelli, which was before Mathews, and then Mathews itself,

16   those three cases show that you look at the type of

17   proceedings, the class of litigants involved, and the risks at

18   issue for the class of litigants involved in the type of

19   proceedings.

20           So Lassiter was about termination of parental right

21   proceedings specifically for parents, not children, and I

22   think that's also important because the interests of parents

23   and children are different in both degree and in kind.  While

24   parents and children will both experience potentially

25   separating the parent/child relationship, again these children

1    are being institutionalized at these extremely high risks --

2    at extremely high rates that parents are not necessarily

3    experiencing.

4            So that holding was about parents, but the Supreme

5    Court made clear in Lassiter that due process concerns are at

6    their highest where there is extremely high risks of physical

7    liberty deprivation, and that's exactly the types of facts

8    that we allege here.

9            So, sure, the judge in Kenny A. might have referred

10   to Lassiter, but I don't think the analysis would be any

11   different.

12           THE COURT:  All right.  I appreciate that.  I mean,

13   I've read the case already carefully.  I'll take a hard look

14   at it again.  I think that's the case that most directly

15   supports the position you're taking, and I think the

16   Washington Supreme Court case is the case that most directly

17   supports Mr. Galdieri's position.  So I'll read both cases

18   carefully.

19           Anything else you wanted to add on this particular

20   argument?

21           MS. TAYKHMAN:  No.  I believe that that is it on

22   that.

23           THE COURT:  All right.  Great.

24           Mr. Galdieri, anything -- just briefly, do you have

25   anything briefly in response?

1          MR. GALDIERI:  Sure, your Honor.  Just a few

2     points.

3          Even the plaintiffs as they categorize it as a

4     narrow claim, it's still a class claim, it's still a

5     categorical claim, and it's still a claim that has no

6     reference to the actual particular circumstances at issue,

7     what kind of proceeding are we looking at and the variances in

8     the proceeding no matter the disability at issue and the

9     nature of the disability at issue, no matter whether the

10    child's interest is adequately covered already, and no matter

11    that it may not even be determined at certain initial phases

12    of the proceeding that congregate care will even occur for

13    this individual, and so all of those individualized reasons

14    suggest that a categorical type approach to this is

15    inappropriate.

16          The next point I would just like to make concerns

17    Lassiter because Lassiter does contain a presumption in

18    federal law that you weigh the Mathews factors and you weigh

19    them against the presumption that counsel is not required in

20    cases where a person may not lose their personal freedom.  And

21    I think if you read Lassiter closely, Lassiter draws the

22    personal freedom line at imprisonment.  Going to a congregate

23    care setting is not the equivalent of imprisonment.  It's a

24    different type of living arrangement for an individual, but it

25    is different in quality than what's being talked about in

1   <u>Lassiter</u>.

2             THE COURT:  I certainly agree it's different, but I

3   think you're going far.

4             I don't know if we can stop the feedback from the

5   mic.  All right.

6             I think you're going too far frankly.  I think that

7   the children at issue in this class all have strong liberty

8   interests that are being affected if they qualify as members

9   of the class.  Not necessarily every proceeding involves an

10  interest, but there's an important liberty interest at stake

11  here and I'm assuming that if counsel is sought in cases --

12  like cases, for example, where there's a substantial

13  disagreement between the CASA and the GAL and the child, that

14  Courts would be quite receptive to arguments for appointment

15  of counsel and might in many cases be required to do it, but

16  the case in front of me doesn't present that issue.  It

17  presents a broader claim.  I won't use the term category

18  because the plaintiffs don't like it, but subcategory,

19  subcategorical approach that seems to be intentioned with

20  <u>Lassiter</u>, but I don't want to imply by my silence that I

21  endorse the view that, you know, oh, this is no different

22  from -- this is vastly different from prison.  It is

23  different, there's no question it's different, but you also

24  have young children and when you restrain their liberty in any

25  way, there are important liberty interests at stake.  And if

1    there's a good reason why the special skills of an attorney

2    should be brought to bear, then I assume that courts are going

3    to carefully weigh the Eldridge factors and should in many

4    cases be appointing counsel.  It's just a question of whether

5    I should be ordering it in all cases without regard to the

6    unique circumstances of each case.

7              MR. GALDIERI:  We agree with all of that, your

8    Honor.  I guess the only part of it is to say that I'm not

9    sure that that presumption can be disregarded in its entirety.

10   It exists in Lassiter as part of the equation.  It is sort of

11   an issue there and sort of the plaintiffs treat it as if it's

12   a nonissue to the analysis, and I think that's just -- to

13   highlight that point, that that exists as another part of the

14   analysis that needs to be over commented and it may need a

15   more individualized inquiry in some of these types of

16   proceedings or cases.  I would just make the point that the

17   Washington state cases arose out of cases, you know, in the

18   trial court where things happened in the trial court or at

19   least happened or were brought to the attention of the Court

20   by the parties to the proceeding.

21             I think in the first Washington case it was brought

22   up for the first time on appeal.  I believe in the second one,

23   the 2018 Washington Supreme Court opinion, these cases arose

24   from the trial court, and so there's a more robust record, a

25   more individualized record to the individuals involved in

1    those cases.

2           And I would just remark that Kenny A. is deficient.

3    I believe it only addresses an analysis under the Georgia

4    constitution, but it doesn't apply Lassiter, and therefore I

5    think is problematic for that reason.

6           Those are the only comments I have.

7           THE COURT:  All right.  Let's turn to the Child

8    Welfare Act claim.

9           The issue here is whether there's an implied right

10   of action for injunctive relief to enforce the provisions of

11   the Child Welfare Act that the plaintiffs are invoking.

12          I don't know if you can still hear me, Mr.

13   Galdieri, because I've lost your visual.  Are you still there?

14          MR. GALDIERI:  Yes, I am, your Honor.

15          THE COURT:  I think your camera got turned off.

16   I'm not seeing you.

17          MR. GALDIERI:  Yes.

18          THE COURT:  Okay.  So let's get right to the point.

19   We have a First Circuit case that's directly on point, Lynch

20   against Dukakis, it's an older case.  It predates the more

21   recent Supreme Court cases in Blessing and Gonzaga.

22          You don't think I should pay any attention to the

23   First Circuit decision here, and you contend that that

24   decision no longer has any force and effect and should be

25   disregarded because of more recent case law that you think --

```
 1    by the Supreme Court that you think sufficiently changes the

 2    analysis so as to require a different conclusion.

 3              I'm not one to lightly disregard First Circuit

 4    precedent.  Why don't you make your case as to why I should do

 5    so here.

 6              MR. GALDIERI:  Thank you, your Honor.

 7              Attorney Kenison-Marvin was going to address that

 8    for us.  So I will give it to him if that's okay.

 9              THE COURT:  That's fine.  That's why your camera

10    went off.  I got it.

11              MR. GALDIERI:  That's okay.

12              THE COURT:  Okay.  You're off the hot seat.  Let's

13    get the next person up.

14              MR. KENISON-MARVIN:  Good afternoon, your Honor.

15              THE COURT:  So I've asked my question.  What's your

16    answer?

17              MR. KENISON-MARVIN:  My answer is, for the reasons

18    that I articulated in the reply, the First Circuit itself has

19    recognized that circumstances changed after Lassiter and that

20    in looking at Lassiter and comparing it with Gonzaga, Lassiter

21    -- sorry.  I'm saying Lassiter.  I mean Lynch.

22              THE COURT:  Lynch, yeah.

23              MR. KENISON-MARVIN:  Excuse me.

24              Lynch applied a presumption of a private right of

25    action.  When you dig into the language, that's what Lynch is
```

1    doing in that case.

2              Gonzaga requires the opposite.  It requires the

3    Court to -- it requires Congress to unambiguously and clearly

4    provide for a private right of action.

5              And so for the reasons stated in our reply,

6    circumstances changed since the First Circuit decided Lynch in

7    1983.

8              This Court, the District Court of New Hampshire,

9    cited several cases post Lynch that don't -- I would want to

10   review them more carefully, but I don't recall citations to

11   Lynch or a close following of Lynch in those cases.

12   Particularly, Judge Laplante's 2013 decision in BK.

13             THE COURT:  So we've got two District of New

14   Hampshire decisions.  Do you think I have any -- even if I

15   assume that those cases are controlling, that they're all four

16   square on point, am I duty-bound to follow what another

17   district judge in the District of New Hampshire does?

18             MR. KENISON-MARVIN:  Certainly not.  I think

19   they're very persuasive and I think they're well reasoned, and

20   for the reasons again articulated in the reply, I think the

21   reasoning in those cases -- in fact, in the sense that they

22   follow Gonzaga's new prescription to look at the text and the

23   structure and to analyze the statute as a whole to determine

24   Congress's intent, and did Congress intend and did it

25   communicate unambiguously and clearly to create a private

1    right of action.  Gonzaga says --

2          THE COURT:  So let's just take this apart a little

3    bit because the two District of New Hampshire decisions, one

4    by Judge McAuliffe, dealt with the same provision that was at

5    issue in Suter, if I'm remembering, before the Congress

6    essentially eviscerated Suter, and so he was simply following

7    what was then the controlling Supreme Court law on that

8    particular provision.

9          Judge Laplante's decision deals with another

10   section of the act, and the plaintiffs make the argument that

11   applying Blessing and Gonzaga -- that the provision at issue

12   here is quite different causing this case, the Judge Laplante

13   case, to be distinguishable.

14         What do you say to that argument?

15         MR. KENISON-MARVIN:  Sure.  So first I say to that

16   argument that the plaintiffs -- we've got to look at the text

17   of the statutes first, and I understand that in the Eric L.

18   decision that you referred to with Judge McAuliffe it was

19   looking at section 671(a)(15) and the very general reasonable

20   efforts standard.

21         But even though we're dealing with different

22   provisions here, it doesn't prevent us and you are still

23   required to first analyze the language at issue in the statute

24   and then consider the structure of the statute as a whole.

25         And if you look at 671(a), the beginning of that

1    statute part (a) says, before we get into the enumerated

2    numbers, "In order for a State to be eligible for payments

3    under this part, it shall have a plan approved by the

4    Secretary which," and so all of the enumerated provisions

5    following that have to be, I would argue, construed in context

6    with that specific language.  That's part of the material text

7    of this statute, and it's stating that in order for a state to

8    be eligible for payment.  So it's not referring directly to

9    children in that initial declaration of what the statute is

10   meant to address.

11           We then go to the specific provisions at issue, and

12   we'll start with (a)(16).  So in order for a state to be

13   eligible for payments under this part, "provides for the

14   development of a case plan for each child receiving foster

15   care maintenance payments under the State plan and provides

16   for a case review system which meets the requirements

17   described in sections 675(5) and 675a."

18           So there is more specific language there, but for

19   the reasons the cases cited in my reply brief articulate, you

20   don't just look at that specific language.  That has to be

21   read in context with that opening provision of 671(a) which

22   says -- it is addressed to the state, "In order for a State to

23   be --"

24           THE COURT:  I understand your argument, but what do

25   you make of the Ninth Circuit's opinion in Henry A. versus

1    Willden which addressed the same provision that we're dealing

2    with here, the case planning provision, and concludes that,

3    unlike the provisions say that was at issue in Suter, this is

4    a rights-creating provision and can be enforced through an

5    implied right of action.

6              I want to make clear, these cases tend to deal with

7    this issue in the context of a 1983 claim, but my

8    understanding is the Supreme Court has used essentially the

9    same standard to determine when a statute is enforceable under

10   1983 as when it is enforceable through an implied right of

11   action.  So I'm using those standards interchangeably.

12             So the Ninth in 2012 applied Gonzaga and Blessing

13   to the very provision at issue here and reached the same

14   conclusion that the First Circuit did earlier in Lynch.  So at

15   least the Ninth Circuit would disagree with you that Lynch has

16   been undermined by Gonzaga and Blessing.  Don't you agree?

17             MR. KENISON-MARVIN:  I don't agree because the

18   textual analysis is just the start, and I do think -- even on

19   the text alone this statute is addressed by the state, and

20   I've cited a litany of cases that are contrary to the Henry

21   case you're referencing and that have recognized that.  Ashley

22   W. and I believe Carson P. address this.

23             But also the text is not the only factor that the

24   Court needs to look at, and this is I think one of the key

25   issues that I have with the other cases from district courts

1    within the First Circuit, the <u>Connor B.</u> case and the <u>Sam M.</u>

2    case.  They don't go on to look at the structural aspects of

3    the statute that are also important.  Particularly, and as

4    Judge Laplante I think did a good job of articulating in his

5    <u>BK</u> order, section 1320a-2a, Congress has created a substantial

6    compliance requirement.  So it's directing the state to create

7    these plans and it's providing -- the enforcement mechanism in

8    this statute is that the Commissioner of Health and Human

9    Services has to review for substantial compliance of these

10   specific plan requirements.

11          So the statute -- Congress was not telling the

12   states -- they were not setting a mandatory requirement that,

13   you know, this has to be done for every individual.

14          THE COURT:  I'm sorry.  Are you contending that the

15   substantial compliance language qualifies the case plan

16   mandate in the same way that it qualifies the provision that

17   Judge Laplante was dealing with?

18          MR. KENISON-MARVIN:  I am, your Honor.

19          THE COURT:  All right.  I'll have to take a closer

20   look at that.  I didn't necessarily make that out in reading

21   Judge Laplante's decision.

22          MR. KENISON-MARVIN:  Yeah, and I would also note --

23   getting back to the text.  Section 671(a)(18) is unique in

24   this statute because that falls under that section 671(a) in

25   order for the state to be eligible.  So it falls under that

1  general same provision we're talking about.  So on its face

2  you might apply my argument that I initially made and say,

3  well, anything under this statute there's no enforceable

4  right.  Well, Congress has said otherwise with respect to one

5  particular provision, and that's 671(a)(18).  And 674 -- I

6  believe it's 674(d)(38), Congress has said that with respect

7  to 671(a)(18) there is a private right of enforcement under

8  that particular provision of 671(a).

9        So the fact that Congress has done so with one

10  particular provision but not with any of the others is a

11  factor that --

12        THE COURT:  You're not talking about the amendment

13  that overrode Suter, are you?

14        MR. KENISON-MARVIN:  No.  The Suter amendment

15  section 1320a-2 -- my understanding of that amendment is that

16  it said -- Congress said, okay, to the extent the Suter Court

17  said that there's no private right of action when a statute is

18  within a case plan.  If it falls under a case plan, that is

19  not a sufficient basis in and of itself to mean that there's

20  no private right of action.  There has to be something more.

21        And so Gonzaga struggled with this a little bit and

22  then said, well, putting that aside, you look at the text of

23  the entire statute and you look at the structure of the whole

24  statute.  So that's what we're doing here.  My analysis that

25  I'm offering isn't relying on the fact as the Suter amendment

1    prohibits, you know, there's no private right of action

2    because this is a case plan requirement.  That's what the

3    Suter amendment and my understanding of it is meant to

4    address.  That can't be the only factor.

5              But under Gonzaga the Court is directed to look at

6    the text and the structure of the statute as a whole.  And

7    I'll note that Gonzaga says there's no private right of action

8    unless Congress has clearly and unambiguously made for one,

9    and you look at the split of authority on the issue and in the

10   law the term ambiguity -- at least in contrast with all

11   statutory interpretation ambiguity usually means it's

12   unambiguous if there's one interpretation that's reasonable,

13   and you've got a split of authority on this issue throughout

14   circuit courts, district courts.  That's -- both sides

15   acknowledge that.  That's I think a sign of ambiguity.

16             And I would just point -- I think the Carson,

17   sorry, not the Carson P. case, the --

18             THE COURT:  Let me just switch gears with you here

19   and just ask -- let's go back to Lynch.  Is it your view that

20   when a judge has what appears to be a controlling precedent

21   from the court of appeals that is old and there have been

22   intervening Supreme Court decisions, that what the judge

23   should do is just disregard the First Circuit opinion and do

24   his or her own analysis of how the rule should apply without

25   giving any deference to the First Circuit's analysis?

1          MR. KENISON-MARVIN:  It's not, and here's -- my

2     reason why is stated on page 7 of the reply where I cite to

3     Long Term Care Pharmacy Alliance versus Ferguson, a First

4     Circuit decision which recognized that time changed after

5     Gonzaga.  I could read the citation and the paragraph if you

6     would like, but I would point the Court's attention to that

7     case because I rely on that case to give the Court license to

8     feel free -- that the First Circuit has itself recognized that

9     these are different times under Gonzaga.

10          Lynch was decided differently than the First

11     Circuit seems to be deciding cases now, and the First Circuit

12     Court of Appeals recognized that in Long Term Care Pharmacy.

13          THE COURT:  All right.  So your view is as a

14     general rule judges shouldn't just disregard circuit court

15     opinions every time the Supreme Court comes out with a new

16     analysis of a relevant provision, but you're saying here

17     because the First Circuit itself has acknowledged that Gonzaga

18     was a change in the law that I should feel free to do my own

19     analysis?

20          MR. KENISON-MARVIN:  Yeah.  And the Long Term Care

21     Pharmacy Court did say, "But Gonzaga which charted a firm

22     course among prior Supreme Court precedents and some tension

23     of one another compels us to reexamine," the decision, that

24     decision are my words.  "An intervening Supreme Court decision

25     trumps the usual rule that a panel decision is to be followed

1  by a successor panel."  So I do rely on that to illustrate

2  that --

3          THE COURT:  With respect to the First Circuit, they

4  enforce the rule of precedent when it comes to district judges

5  being faithful lieutenants to the Court of Appeals.  They are

6  much less rigorous in enforcing the rule that one panel should

7  defer to the rulings of a prior panel.  They're not nearly so

8  clear and consistent in their statement saying that panels

9  should follow what prior panels do.  They're much more willing

10 to reassess.  They don't want district judges going off on

11 their own and reconceiving every issue every time the Supreme

12 Court comes down with a new decision.

13         The Supreme Court has not directly challenged

14 Lynch, nor has any other panel of the First Circuit.  So I

15 agree that I have to analyze that precedent under Gonzaga, but

16 I do believe that I start from the presumption that Lynch is

17 the controlling law even if the reasoning has changed unless

18 Gonzaga and Blessing require a different result.  That's the

19 way I approach it.

20         MR. KENISON-MARVIN:  If I may, I'll make one final

21 response?

22         THE COURT:  Yeah.  Go ahead.

23         MR. KENISON-MARVIN:  Just for your Honor to -- I

24 think the most important thing to look at when looking at

25 Lynch's controlling law is that it is not consistent with

1    Gonzaga.  It applies a standard of presumption of private

2    right to action in the absence of language expressly excluding

3    it.  Gonzaga flips that, and so that is why I think Lynch is

4    problematic as precedent under Gonzaga.

5            THE COURT:  Okay.  Good.  Thank you.

6            Let me hear from the other side, and we'll try to

7    move along and catch the last issue relatively quickly.

8            MS. WHITE:  Good afternoon, your Honor.

9            Shereen White, on behalf of plaintiffs.

10            Your Honor, I just want to sort of dispose of the

11    cases that the defendants have mentioned, and then I'm going

12    to do what defendants have not done which is walk through the

13    Blessing/Gonzaga factors if I may, and I can do that fairly

14    quickly, your Honor.

15            THE COURT:  Yes.  Go ahead.

16            MS. WHITE:  In terms of Lynch, your Honor, I think

17    the defendants have gone through great pains to suggest that

18    neither Lynch or the district court cases within this circuit

19    are good law, and that's just simply wrong, your Honor.

20            Lynch is really important because it's the First

21    Circuit interpreting the very statutory provisions that are

22    before your Honor and its principles of statutory

23    interpretation which have not changed, your Honor.

24            Blessing and Gonzaga merely clarified and refined

25    how Courts use principles of statutory interpretation to

1    assess whether there is a private right of action.

2         THE COURT:  Your colleague has a very different

3    take.  He just closed with a very firm argument that Gonzaga

4    flips the presumption, and that you start from the presumption

5    pre-Gonzaga that there is an implied right of action and now

6    you start from the standpoint that there isn't one.  That's

7    his contention.  I'm not endorsing that view, but what do you

8    say to it?

9         MS. WHITE:  Sure, your Honor.  And respectfully, I

10   disagree with that contention.

11        There are a number of cases post-Gonzaga that

12   continue to cite Lynch as authority for this very statutory

13   interpretation.

14        And we can look to a number of cases on that point,

15   your Honor, including Connor B., Sam A., Henry A.

16        One of the cases defendants focus on, the BK

17   decision, it too cites Lynch, your Honor, in 2011.

18        So there are a number of cases post Gonzaga that

19   continue to cite Lynch and it remains good binding authority.

20        The defendants have alleged -- or have asserted

21   that your Honor should instead look at Long Term Care, and I

22   disagree again.

23        Lynch of course is binding authority and it's

24   directly on point.

25        Long Term Care is completely irrelevant, your

1   Honor.  It's not about a class of foster youth.  It's not

2   about AACWA.  It's not about any provisions within AACWA.

3   It's about reimbursement for Medicaid payments, your Honor.

4         THE COURT:  I get that, but he's saying, Judge,

5   they're inviting you to reanalyze Lynch because they're saying

6   we ourselves agree that Gonzaga and Blessing change the law in

7   substantial ways that require us to reassess our applied right

8   of action jurisprudence.  That's why he's citing that case.

9         Has he got that wrong?

10        MS. WHITE:  Well, your Honor, he -- if we're going

11   to look outside of the cases that are directly on point and

12   that interpret AACWA and case plans and we want to look at

13   something very recent where the First Circuit is applying the

14   Blessing/Gonzaga standard, there's just a far better, more

15   persuasive, more thorough opinion, and that's the

16   Colon-Marrero case, your Honor, where the Court

17   comprehensively applies the Blessing/Gonzaga factors and does

18   a complete full analysis required under that test.

19        THE COURT:  Okay.

20        MS. WHITE:  So, your Honor, the other point I

21   wanted to make is defendants -- they talk about Eric L. and

22   BK, and I just want to mention that for Eric L. obviously it's

23   reasonable efforts.  So it's -- again, it's irrelevant to

24   these particular provisions that plaintiffs' claims are based

25   on, but also that Court really acknowledged that they were

1    constrained by Suter at the time and they acknowledge that the

2    Suter fix was essentially on its way.

3              And so just -- similarly, BK, your Honor, was about

4    reasonable efforts provisions, and that Court specifically

5    distinguished the case planning provisions.  It basically --

6    it held that there was no private right to those reasonable

7    effort provisions but basically said that if you look at the

8    case planning, those are more specific, those are different.

9              So the cases the defendants relied on really leave

10   open this question about case planning provisions and

11   demonstrate how they're different from those reasonable effort

12   provisions.

13             So, your Honor, what defendants also don't do, they

14   don't actually do the analysis.  Not in the briefing and not

15   here today.

16             And so, if I may, I can quickly walk through the

17   Blessing/Gonzaga factors as applied to the case planning

18   provisions.

19             THE COURT:  Go ahead.

20             MS. WHITE:  Sure, your Honor.

21             So first, your Honor, we have to look at the text

22   and look at whether there's rights-creating language.  And if

23   we look at the text, for example, of section 622 --

24   622(b)(8)(A)(ii) to be specific, it talks about and uses

25   language such as, each plan for child welfare services shall

1    provide assurances of the State's operation of a case review

2    system.  And 671(a)(16) similarly, it says, a state shall have

3    a plan which provides for development of a case plan.

4              THE COURT:  What are you saying to your colleague's

5    statement that those specific provisions are modified by a

6    substantial compliance requirement that applies to all of

7    them, including the case planning provision?

8              MS. WHITE:  I think we have pretty solid authority,

9    your Honor, that regardless of the compliance and the fact

10   that these provisions are in this particular, like, spending

11   statute, that doesn't propose a finding of a prior right of

12   action.

13             So this language, your Honor -- and there's more.

14   671(a)(22) also includes this shall language.  It's not --

15   these are requirements, these are mandates, and that's the

16   type of unambiguous mandatory language that Blessing/Gonzaga

17   -- that supports a finding of a private right under

18   Blessing/Gonzaga.

19             So the next part of the analysis, your Honor, is

20   whether the statutory provisions -- whether the text

21   identifies discrete class beneficiaries which shows that the

22   focus is on the need of individual as opposed to the aggregate

23   system, and we would submit that that is the case here, your

24   Honor.

25             If you look at again 622, it talks about that there

1    should be a case review system for each child, your Honor.

2    That's focused on the individual.  That there should be a case

3    plan for each child.

4            622 also focuses on each child receiving foster

5    care under the supervision of the state.  So the benefited

6    individuals are the class of foster youth, and the same thing

7    is true for 671(a)(16), your Honor.

8            So we have mandatory, unambiguous, rights-creating

9    language in these provisions.  We have language that is clear

10   that we're talking about a discrete class of beneficiaries

11   being identified through this language, and the focus is on

12   individuals rather than aggregate.

13           And then, your Honor, a big question, you know,

14   defendants talk about moving beyond the text and that the text

15   isn't the only factor, and they're absolutely right, your

16   Honor.  We have to look at the structure and the purpose in

17   these statutes.

18           The big question is whether there is a common

19   remedial scheme, whether there's a way for an aggrieved party

20   to make the harm heard when they are aggrieved, and the answer

21   is no.  Under these provisions there is no other way for

22   aggrieved persons, for these youth to make the harm and

23   confront the issues with their case --

24           THE COURT:  Write to the federal government and

25   have the federal government withdraw funds from the state of

1    New Hampshire, which obviously is a pretty ineffective remedy

2    if you're an individual wanting to get a case plan at any

3    point before you reach the age of majority.

4            I agree with you that's the remedy basically you're

5    left with is complain to the funding agency that they're

6    not -- the state's not doing its job.

7            MS. WHITE:  Right.  And I don't think that's what

8    Congress intended your Honor.

9            So when we actually apply the Blessing/Gonzaga

10   factors to these case planning provisions, that further

11   supports that there is a private right of action to these

12   provisions consistent with the weight of authority on this

13   issue and pertaining to these particular statutes.

14           THE COURT:  Okay.  Thank you.  I appreciate your

15   arguments.

16           MS. WHITE:  You're welcome, your Honor.

17           THE COURT:  Does the state have any brief response

18   to what you said?  I do want to try to move on and finish up

19   with the last set of arguments.

20           MR. KENISON-MARVIN:  Let me try to make four points

21   very quickly.

22           The first with respect to the Gonzaga, I believe

23   the three factor analysis.

24           Rio Grande, a First Circuit decision, 397 F.3d 56,

25   2005, recognized that the three factor test -- "This test is

1    merely a guide, however, as the ultimate inquiry is one of

2    congressional intent," and recognized that Gonzaga changed the

3    Blessing analysis and doesn't require that walk-through but

4    requires just a general -- Gonzaga tightened up the Blessing

5    requirements and -- where does it say it -- the ultimate

6    inquiry is one of congressional intent.  So it's a statutory

7    analysis, a statutory guide.

8            Second, I don't think I made this point clear

9    before, but it's important I think to recognize the mechanism

10   by which this statute came into being.  It's a spending

11   statute authorized under Congress's spending clause power.

12           And in Gonzaga it recognized it in the 20 years

13   since I think the Pinehurst decision.  Well, 21 years.  The

14   Supreme Court had in two limited circumstances, and only two,

15   said that a piece of spending clause legislation created a

16   private right of action.  And so I've discussed this more in

17   the briefing, I won't go further here, but I think that's a

18   very important context.  This is not some -- I'll leave it at

19   that.

20           We didn't talk about section 622 or any of the

21   other sections specifically.  I just refer the Court to

22   language from many of the cases I cited saying the 675

23   sections are merely definitional.

24           671(22), if you look at that language, is more

25   ambiguous than 671(a)(16).  I think it refers to -- I'm sorry.

1    It's more modeled on 671(a)(15), provides that the state shall

2    develop and implement standards to ensure that children in

3    foster care placements in public agencies are provided quality

4    services.

5             So the specificity of that particular language is

6    less than I would say even the language in (a)(16) which for

7    the reasons I've already discussed there's other qualifying

8    language that makes it not a private right of action.

9             And fourth, I just wanted to quickly address the

10   substantial compliance issue.  Counsel just said that there's

11   pretty solid authority that substantial compliance does not

12   provide a private cause of action.  I would take issue with

13   that and I have in the briefing.

14            I would note that on page 11 of my reply, getting

15   back to Long Term Care, Long Term Care said that -- the First

16   Circuit in Long Term Care said that the equivalent of a

17   substantial compliance provision was a factor -- was a strong

18   factor in meaning that there is no private right of action.

19   The plaintiff in that case, "Long Term suggests that the

20   failure to provide a private right of action would render

21   subsection (30)(A) a nullity," "But in the present case the

22   Secretary has ample authority to enforce this subsection in

23   the ways already described."  "The Secretary can enforce

24   compliance with the provision and implementing regulations

25   already mentioned, in a number of ways -- by disapproving a

1  state plan and by cutting off funds."

2         And that's another thing in the other First Circuit

3  District Court cases cited by opposing counsel's brief, Connor

4  B. and Sam M.  Both of those cases, contrary to Long Term

5  Care, said that there was no enforcement mechanism.  Long Term

6  Care recognized that the substantial compliance -- an

7  executive secretary's ability -- discretion to withhold

8  funding for noncompliance is an enforcement mechanism that the

9  Court should be considering in considering the structure of

10  the statute as a whole.

11         I'll pause there.

12         THE COURT:  Okay.  Good.

13         MR. KENISON-MARVIN:  Thank you.

14         THE COURT:  Are you going to handle the last

15  argument, the integration mandate?

16         MR. KENISON-MARVIN:  I am, your Honor, yes.

17         THE COURT:  Okay.  All right.  So let's dig right

18  into that.

19         I'll have to tell you right off the bat I have

20  substantial problems with your principal argument here.  You

21  seem to be not attending to the language of the integration

22  mandate itself which specifically provides that you -- I'll

23  read it to you.  "A public entity shall administer services,

24  programs and activities in the most integrated setting

25  appropriate to the needs of qualified individuals with

1    disabilities."

2         Your argument seems to be because congregate care

3    includes both people with disabilities and people without

4    disabilities that assigning a disabled person to a congregate

5    care facility can't violate the integration mandate, and I

6    think that can't be squared with the plain language of the

7    regulation which specifically requires integration to the

8    greatest extent appropriate to the needs of qualified

9    individuals.

10         So it's not enough that, yeah, there are

11    nondisabled people in congregate care, so what's the big deal.

12    That seems to be what you're saying.

13         MR. KENISON-MARVIN:  I don't think that's -- that's

14    not my argument.  I'll try to clarify.

15         The integration mandate is enacted under the

16    authority of 12132, the discrimination provision of the ADA,

17    and under the ADA there must be discrimination on the basis of

18    disability.  So you've got to be -- that's what the

19    authority to --

20         THE COURT:  And you could, if you had chosen to,

21    decide to argue to me that the integration regulation is an

22    improper delegation of regulatory authority and is

23    unconstitutional, but you didn't make that argument.  I know

24    why.  Because you would have lost, so you didn't make it, but

25    you're trying to effectively make it by saying read the

1  integration regulation contrary to its plain meaning because

2  to do otherwise would bring it in contention with the ADA

3  itself which only bars discrimination, does not mandate

4  integration, but that's a nonstarter argument as far as I'm

5  concerned.  You're free to argue that I should not -- that the

6  integration regulation is invalid and unenforceable, but you

7  don't want to make that argument because you know you would

8  lose on it.

9          That's my position.  What's your response?

10          MR. KENISON-MARVIN:  Perhaps not as expressly as I

11  could have, but I did attempt to make that argument on pages

12  30 --

13          THE COURT:  Well, that's an argument -- that's a

14  hot button argument these days.  You're really arguing it's

15  unconstitutional.  It means what it says, but it's

16  unconstitutional for the agency to use Title II authority to

17  impose this requirement on entities receiving public funds.

18          That argument might find some support in the

19  current Supreme Court.  Whether it finds majority support or

20  not, I don't know, but it's quite a radical argument that

21  would potentially undermine a substantial quantity of

22  regulations that have been adopted by agencies implementing

23  authority that has been delegated to them by Congress.

24          MR. KENISON-MARVIN:  I would just refer the Court

25  to the litany of case law cited and the fact that the purpose

1    provision of the statute refers to the historical problems

2    with segregation of the disabled and isolation of the disabled

3    and that being Congress's intent to remedy.

4              All of the case law cited -- and there is not one

5    case I've found, and I haven't seen one in any briefing, that

6    involves --

7              THE COURT:  Excuse me just a second.

8              There's a logical problem with what you're doing.

9    You're saying every case I cite involves complete segregation

10   of disabled from nondisabled.  And then you infer from that,

11   accordingly, the regulation only applies when there's complete

12   segregation, but that's just a completely flawed argument.

13   It's contrary to the plain language of the integration

14   regulation, and I couldn't adopt it because I'm bound by their

15   language.  I have to construe the mandate.  The mandate

16   doesn't say it only applies when there's complete segregation,

17   and just because every case you found you say has that in it

18   doesn't mean that I can disregard the plain language of the

19   regulation.

20             MR. KENISON-MARVIN:  And I don't think -- I think

21   the plain language of the regulation considers the fact that

22   there must be discrimination on the basis of disability before

23   integration occurs, and my argument is that on the facts

24   pleaded there is not sufficient facts to support a pleading of

25   discrimination on the basis of disability given the communal

1   nature of nondisabled -- on the facts pleaded I think that --

2   the complaint suggests that the ratio of nondisabled to

3   disabled in residential foster care homes is on the order of 1

4   to 3, one disabled to three nondisabled.

5           And there are parts of the complaint that I think

6   cause issues.  For instance, I'll refer the Court to paragraph

7   I think it's 47 of the complaint where there seems to be a

8   suggestion that all children regardless of disability -- the

9   argument is being made that all children have the right to not

10  be -- under the ADA to not be in congregate care.  So because

11  of these --

12          THE COURT:  I don't -- all I'll say is that if

13  they're making that argument, they should assert it when I

14  give them their turn, but I don't think they're making that

15  argument.  And if they did, I would have a substantial problem

16  with it.  They're representing a class of people that do have

17  qualifying impairments under the ADA and are only seeking

18  relief under that class.  So I don't construe the integration

19  mandate in any way -- I mean, they think -- they would say

20  congregate care equals bad.  I agree that's what they say for

21  everybody.  They would want to do away with congregate care if

22  they could or at least minimize it to a very small subset of

23  people.  That's their position, but that's not their legal

24  argument.

25          Their legal argument is the ADA gives their group,

1  their class certain rights to integration, and it is not a

2  right against complete segregation alone.  It's a right to the

3  most integrated setting appropriate with the needs of

4  qualified individuals with disability.

5          That's a very strong command and you say -- and

6  believe me, I understand your point.  Your point is there's no

7  integration requirement in Title VII for employment

8  discrimination.  All right?  There's no integration

9  requirement in the regular ADA.  Integration mandates do

10  substantially more than simply remedy an existing

11  discrimination.  I understand your point, but the regulation

12  is what it is, it says what it says, and unless it's an

13  unconstitutional regulation I can't ignore the command.

14          You're trying to hint that it's improper to

15  construe it this way or you're saying construe it in light of

16  the statutory grant of authority and therefore construe it

17  very narrowly, and if you construe it very narrowly, we're not

18  violating.  That's really what you're saying, right?  You've

19  got to construe this narrowly --

20          MR. KENISON-MARVIN:  Yes.

21          THE COURT:  -- in order to fit within the statutory

22  grant of authority, and otherwise it would be brought way

23  beyond the power of the agency to adopt.  So when you construe

24  it narrowly, we don't violate.

25          MR. KENISON-MARVIN:  I think that's a good summary

1    of what I did inartfully in our memorandum.

2            THE COURT:  You did a good job with it.  I just

3    think it's a weak argument and I'm not persuaded by the claim

4    that look at all these cases that I found where there was a

5    violation of the mandate and all of those involved complete

6    segregation, and therefore, because there's not complete

7    segregation in our case it doesn't violate the mandate.

8    There's a logical problem with that chain of reasoning that I

9    just don't find works for me.

10           MR. KENISON-MARVIN:  Two thoughts.  I know your

11   Honor probably wants to move along, but two thoughts.

12           First, with respect to just looking at the argument

13   with respect to the ultra vires nature of the regulations

14   under 12132, I would refer the Court -- I cited it on page 32

15   of the memorandum of law.  It's part of the motion.  It

16   discusses the Senate Committee on Labor and Human Resources

17   Report prior to recommending passage about the intent of the

18   legislation being to be construed inconsistently with

19   Alexander versus Choate.  So I would just ask the Court to

20   look at Alexander versus Choate and consider the argument in

21   light of the holding in Choate and the analysis there which I

22   think is consistent with my argument of the narrow reading

23   here and that the integration mandate to be construed as the

24   plaintiffs do is ultra vires.

25           The second point I was going to make has evaded me

1    so --

2              THE COURT:  That's okay.  So you also have the --

3    you also have an argument that the methods of administration

4    claims are entirely duplicative of the integration mandate

5    claims.

6              I'm not sure I'm prepared to dismiss those claims

7    on that basis, but I do have some questions for the plaintiffs

8    about it because it does seem to me that you have at least a

9    superficially valid point that if the integration mandate is

10   construed as broadly as I am implying that it should be

11   construed, you disagree about that broad construction, but by

12   its terms it applies to administration that violates the

13   mandate because it doesn't achieve integration.  If that's

14   true, then there is no method of administration claim that

15   could survive here in the context of the facts pleaded in this

16   case that does not also violate the integration mandate.  So

17   let's recognize that these are essentially duplicative and the

18   case is either going to rise or fall based on whether there's

19   an integration mandate violation.

20             I think superficially that appeals to me.  I want

21   to see what the plaintiffs think.  So you do make that

22   argument, and I'm looking at the text of the two provisions

23   and they seem to support your position.

24             All right.  I appreciate your thoughts on this.

25   I'll read your brief carefully on it, but I did have those

1    concerns with the argument you were presenting.

2              Let me hear from the plaintiffs on this and then

3    we'll wrap up.

4              MS. WHITE:  Sure, your Honor.  Thank you.

5              So, your Honor, I, of course, am prepared to talk

6    about what the integration mandate is, does, and means and

7    says, but I don't think I need to do that, your Honor, based

8    on --

9              THE COURT:  You agree with what I suggested about

10   the language in the mandate is broader than the defendant

11   understands it, and when it's applied more broadly, this is a

12   case that fits within the scope of the integration mandate.  I

13   will read both briefs again carefully before I make a final

14   decision, but my tentative thought is -- I have to apply

15   regulations in accordance with their plain language.  The

16   plain language is inconsistent with the position the defendant

17   is taking.  I don't believe that the defendants have presented

18   a persuasive -- I don't even think they've directly briefed an

19   argument that it is an unconstitutional delegation of power or

20   an exercise of power by an agency that Congress did not grant

21   it.  But I do understand them to make the argument that you

22   should construe the mandate narrowly to conform to the power

23   that Congress granted the agency in Title II and when you do

24   that, it applies integration very narrowly.  I just don't find

25   that argument persuasive because the plain text of the mandate

1    is quite clear that it wants more than just avoid complete

2    segregation and you're okay.  That isn't what it says.

3            I do have a problem with your bringing separate and

4    distinct method of administration claims.  I recognize that

5    some Courts have talked about this, but in the context of this

6    pleading I don't see how you could have a method of

7    administration claim that would succeed if the integration

8    mandate claim failed.

9            I can see cases in which an integration mandate

10   claim could succeed but a method of administration claim could

11   fail, but I can't see any cases in which the integration

12   mandate claim fails but the method of administration claim

13   succeeds on the facts of this case.

14           Because again if you go back to the language of the

15   integration mandate, it speaks broadly to administration, and

16   so it encompasses methods of administration that fail to

17   achieve integration are actionable under the integration

18   mandate.  And if they are, the method of administration claim

19   you're bringing does seem to be substantially duplicative of

20   your integration mandate claim.  The claim can't succeed

21   unless the integration mandate succeeds.  If the integration

22   mandate succeeds, you're entitled to the same relief as if the

23   method of administration claim had succeeded.  Therefore, it

24   doesn't add anything to the case.

25           Why am I wrong in thinking that way about this

1  mandate?

2         MS. WHITE:  Well, your Honor, I agree with your

3  broad interpretation of the language of the integration

4  mandate, and I don't think you're wrong, your Honor.  I think

5  you're absolutely right that the methods of administration

6  claim does overlap with the integration mandate claim.  And if

7  you were to find a narrow interpretation of the integration

8  mandate, then the methods of administration claim could not

9  stand as is.

10         THE COURT:  Okay.  I get it.  Okay.

11         Yeah, I don't know that that technically requires

12  dismissal because you're allowed to plead alternative

13  theories, but I'm not going to -- I don't think it changes the

14  discovery in any way.  I don't think it changes the summary

15  judgment motion practice in any way.

16         If I leave the integration mandate claim, I'll

17  probably leave the method of administration claim for the time

18  being, but I think you've basically acknowledged that the case

19  is really about the integration mandate if it's construed the

20  way I'm suggesting it should be construed, that is, to be

21  broad enough to encompass administration, and that's all I

22  think we need to accomplish for the present purposes.

23         Okay.  I appreciate your response on that.

24         Let me say I appreciate the quality of the

25  arguments.  The briefing is very good in this case.  The

1    issues are quite complex.  It's going to take me a substantial

2    amount of time to get out an order, but I will get one out,

3    and I hope I can give you some guidance as to how to proceed

4    from here.

5            I ask my case manager to come back on.  Did I agree

6    to do a preliminary pretrial now or are we doing it at a

7    different date?  What did we decide?

8            Is my case manager there?  He may have gotten tired

9    of listening to me.

10           I would ask the parties, did I set a preliminary

11   pretrial in this matter yet?

12           MS. WHITE:  It was set, your Honor.  However, it

13   was taken off of the calendar after defendants filed their

14   motion for stay.

15           THE COURT:  All right.

16           THE CLERK:  That's correct, your Honor.

17           THE COURT:  Okay.  Good.

18           My view is it's going to take me probably a couple

19   to three months, because I've got a little bit of a backlog,

20   to get out an order.  I don't want to delay the case

21   unnecessarily.  So my tentative conclusion here is that

22   although I am quite skeptical of the right to counsel claim

23   here because I -- not because I don't think the right to

24   counsel is important but because I think that it's very

25   important to be adjudicated ordinarily in the context of

1    individual cases.

2            I do have -- I think there is at least a

3    substantial and significant argument relying primarily on the

4    Ninth Circuit's reasoning about the case plan requirement,

5    that that is an enforceable and a private right of action.

6    And as I've suggested by my reasoning here, I do think there

7    is a plausible claim under the integration mandate that would

8    survive the defendants' challenge.

9            That's a very tentative take.

10           So given that, it seems like this case is going to

11   continue past my ruling on the motion to dismiss, but I do

12   think the ruling -- I want to treat it seriously, the way

13   you've briefed it, and issue a written decision explaining my

14   views on it, and that's going to take me a couple of months

15   given the backlog that I have.

16           So with that said, are the plaintiffs willing to

17   standby with the stay until the order issues or is there some

18   burning need to get on with discovery while we wait for a

19   ruling on the motion to dismiss?

20           MS. WHITE:  Could I just have a second to confer

21   with my co-counsel?

22           THE COURT:  Yes, you can.

23           MS. WHITE:  Thank you.

24           THE COURT:  Mute your microphones so we don't --

25   okay.

1                      (Attorney White confers with Attorney Taykhman)

2                 THE CLERK:  Sorry for my delayed response, Judge.

3      My mouse disappeared.

4                 THE COURT:  I thought you had fallen asleep

5      listening to me.

6                 THE CLERK:  No.  I'm paying attention.

7                 MS. WHITE:  Your Honor, we've agreed to the motion

8      to stay some limited discovery pending your Honor's order on

9      the motion to dismiss.

10                THE COURT:  Good.  That makes sense to me.  I

11     think -- you know, if you have some not overly burdensome but

12     voluntary efforts at getting at some of this data and

13     background that doesn't overburden the defendants and allows

14     you to position yourself to move ahead once you get a ruling,

15     I think that's a good way to go.

16                So I'll let the stay remain in place.  If something

17     should happen where -- I would urge you to initially seek

18     voluntary discovery from the plaintiff if you need some

19     interim discovery.  And if you can't get that, you can always

20     ask for a status conference to talk to me, okay?

21                MS. WHITE:  Thank you, your Honor.

22                THE COURT:  All right.  So that's all on my end.

23                Is there anything from the state defendants that

24     you need to cover with me that you haven't covered?

25                MR. GALDIERI:  Nothing further, your Honor.

1          THE COURT:  All right.

2          And from the plaintiffs' end we're also good.

3          Again, thank you again for the good quality of the

4    briefs.  Interesting and difficult case.

5          I'll take it under advisement and get a decision

6    out as soon as I can.

7          If you need to get to me in the interim, either

8    party can request a status conference.

9          I'm going to conclude the hearing now.  I have a

10   group of interns who are going to apparently stay on the call

11   to talk to me about some general thoughts I have about motion

12   practice.

13         I would ask everybody else to sign off, and people

14   who are interns that had planned to stay on can stay on and

15   I'll talk to them in a minute.

16         So everybody else, thank you.  You can sign off.

17         MS. WHITE:  Thank you.

18         MR. GALDIERI:  Thank you.

19         (Conclusion of hearing at 3:46 p.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5     foregoing transcript is a true and accurate transcription of

6     the within proceedings, to the best of my knowledge, skill,

7     ability and belief.

8

9

10    Submitted: 7-12-21        /s/    Susan M. Bateman _____
                                SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25