UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

G.K., by their next friend,
Katherine Cooper et al.

     v.

Christopher Sununu, Governor
of New Hampshire et al.

Case No. 21-cv-4-PB
Opinion No. 2021 DNH 143

MEMORANDUM AND ORDER

Plaintiffs in this class action are minors with mental disabilities who have been placed in the legal custody of the New Hampshire Division of Children, Youth and Families ("DCYF") due to parental abuse or neglect.  They have sued New Hampshire Governor Christopher Sununu and other State officials arising out of the operation of the State's foster care system. Plaintiffs seek declaratory and injunctive relief on behalf of themselves and a putative class on the ground that defendants are violating their federal constitutional and statutory rights by unnecessarily placing them in institutional and group care facilities without the benefit of an attorney or adequate case planning.  Defendants have moved to dismiss the complaint for failure to state a claim upon which relief may be granted.  For the following reasons, I grant the motion in part and deny it in part.

## I.   BACKGROUND

### A.   New Hampshire Dependency Proceedings

New Hampshire has in place a judicial process through which a child may be removed from the home of an abusive or neglectful parent.  The key features of that process, commonly referred to as dependency proceedings, are set forth in the State's Child Protection Act.  See N.H. Rev. Stat. Ann. § 169-C.

Dependency proceedings typically begin with the filing of a petition alleging that a child has been abused or neglected, which is filed in the family division of the New Hampshire circuit court.  See § 169-C:7, I.  Although any person may file such a petition, DCYF is usually the petitioner.  See id.  The filing of a petition sets into motion a series of hearings that determine the child's placement and legal custody.  "The best interest of the child" is the court's "primary consideration" in these proceedings.  § 169-C:2, I.

A preliminary hearing is held shortly after a petition is filed to determine if reasonable cause exists to believe that the child has been abused or neglected.  § 169-C:15, I.  If the court finds reasonable cause, it may temporarily place the child with DCYF.  See §§ 169-C:15, III(c), 169-C:16, I(c), 169-C:3, XXV.

Within sixty days of the filing of the petition, the court must hold an adjudicatory hearing on the merits of the petition.

§ 169-C:15, III(d).  At that hearing, the petitioner has the burden to prove the allegations by a preponderance of the evidence.  § 169-C:13.  The parents "have the right to present evidence and witnesses on their own behalf and to cross-examine adverse witnesses."  § 169-C:18, III.  The court is not bound by the technical rules of evidence and may admit any evidence that it considers relevant and material.  § 169-C:12.  If the court makes a finding that the child has been abused or neglected, the court can make a "preliminary disposition" for the protection and placement of the child, such as ordering a transfer of legal or protective supervision of the child to DCYF.  See §§ 169-C:18, V, 169-C:16, I.

The court must hold a dispositional hearing within thirty days of the adjudicatory hearing.  § 169-C:18, VII.  At that time, the court determines the appropriate final disposition, which may include transferring legal custody of the child to DCYF.  See § 169-C:19, III(a).  Such transfer vests DCYF with "[t]he right to determine where and with whom the child shall live."  § 169-C:3, XVII(a).

Once a child is in DCYF's legal custody, the court will not transfer custody back to the parents unless they demonstrate, among other things, that a return of custody is in the child's best interest.  See § 169-C:23, III.  The parents generally must make that showing at a permanency hearing, which must be held

within a year of the adjudicatory hearing.  See § 169-C:24-b, I.
If the parents do not meet their burden at the permanency
hearing, the court must identify permanent plans for the child
other than parental reunification.  See § 169-C:24-b, II.  Such
plans may involve adoption, guardianship with an appropriate
party, or some other permanent living arrangement.  See id.  At
least annually thereafter, the court must review the steps DCYF
has taken in furtherance of finalizing the plan that is in
effect for the child.  See § 169-C:24-c.

**B.    Court-Appointed Representatives**

In all dependency proceedings, the court must appoint an
attorney to represent an indigent parent who has been accused of
abusing or neglecting the child.  N.H. Rev. Stat. Ann. § 169-
C:10, II(a).  Counsel may be appointed for an indigent parent
not accused of abuse or neglect "if the parent is a household
member and such independent legal representation is necessary to
protect the parent's interests."  Id.

A child involved in a dependency proceeding is entitled to
the appointment of a Court Appointed Special Advocate ("CASA")
or "other approved program guardian ad litem" to function as the
child's guardian ad litem ("GAL").  § 169-C:15, III(a); see
§ 169-C:10, I.  If there is no GAL available for the
appointment, the court may appoint an attorney to represent the
child.  § 169-C:10, I.

The New Hampshire Supreme Court has promulgated rules that delineate the duties and ethical standards required of GALs. See N.H. Code Admin. R. Gal 501.01—505.02.  A GAL must act in the best interest of the child.  Gal 503.02(a).  To form a good faith conclusion about the child's best interest, the GAL must "gather such facts and information regarding the family history, background, current circumstances, concerns and wishes of the [child], from the [child] and from other sources."  Gal 503.11(a).  The GAL must make recommendations to the court consistent with the GAL's independent assessment of the child's best interest.  See Gal 503.02(d).  The GAL also must independently assess DCYF's recommendations.  Gal 504.01(b). When directed by the court, the GAL must prepare a report with recommendations, including for dispositional, permanency, and post-permanency hearings.  Gal 504.01(c).  Prior to making a final recommendation to the court, the GAL must meet with the child on at least one occasion and inform the child about the status of the case.  Gal 503.12(a)-(c).

If the GAL becomes aware that the child disagrees with a recommendation being made by the GAL, the GAL "shall fully advise the appointing court of this fact."  Gal 504.01(d).  In the event of such a conflict, the court has the authority to appoint an attorney to represent the child.  See N.H. Rev. Stat. Ann. § 169-C:10, II(a).  The attorney's representation "may

include counsel and investigative, expert and other services, including process to compel the attendance of witnesses, as may be necessary to protect" the child's rights.  § 169-C:10, II(b).

## C.   **The Complaint**

The four named plaintiffs, G.K., C.I., T.L., and R.K. (collectively, "Named Plaintiffs"[1]), are children aged fourteen to seventeen who have been placed in DCYF's legal custody as a result of dependency proceedings.  Each has at least one mental disorder recognized by the American Psychiatric Association. DCYF has placed Named Plaintiffs in institutional or group care (collectively, "congregate care") facilities.[2]

G.K. was removed from their mother's home about two years ago based on allegations of abuse.  Initially, G.K. was placed in the care of their grandfather, but after two months DCYF placed G.K. in a congregate care facility where they remain today.  This facility is punitive, routinized, and regulated by

---

[1] Named Plaintiffs proceed using pseudonymous initials to protect their identities.  The complaint uses the pronouns "they" and "their" when referring to G.K., C.I., T.L., and R.K. individually.  I adopt this usage in this Memorandum and Order.

[2] Under New Hampshire law, a "child care institution" is a "residential child care agency where more than 12 children are received and maintained for 24-hour care for the purpose of providing them with care or training, or both."  N.H. Rev. Stat. Ann. § 170-E:25, III.  A "group home" is a "child care agency which regularly provides specialized care for at least 5 but no more than 12 children who can benefit from residential living either on a short-term or long-term basis."  § 170-E:25, II(b).

strict and impersonal rules, resulting in G.K.'s inability to fully integrate within their community.

C.I. was first placed in DCYF's custody about twelve years ago in response to allegations of parental abuse.  A reunification effort a little over ten years ago failed, and C.I. has been in DCYF's custody ever since.  During that time, C.I. has been placed with eight different foster families and three congregate care facilities.  C.I. is currently residing in an out-of-state congregate care facility, where they have been unable to participate in any community activities.

T.L. was placed in DCYF's care roughly two years ago based on abuse and neglect allegations against their mother.  DCYF initially placed T.L. in the residential program at the special education school they were already attending at the time. Several months later, DCYF placed T.L. in a congregate care facility outside of New Hampshire where they continue to reside. They are prevented from having regular visits with their family and from making or visiting friends outside of the facility.

R.K. was placed in DCYF's custody over two years ago due to allegations of neglect.  Thereafter, DCYF placed R.K. in three different congregate care facilities in New Hampshire.  Based on conduct R.K. engaged in at their third placement, they were charged with and convicted of various delinquency offenses and committed to the Sununu Youth Services Center.

Named Plaintiffs would prefer to live in a family setting or with a family member.  None have had counsel appointed to represent them in their dependency proceedings.  They do not recall participating in their case planning or having an adequate case plan prepared for them, as required by federal law.

Named Plaintiffs seek declaratory and injunctive relief based on alleged "continuous and systemic legal deficiencies of New Hampshire's child welfare system."  Compl. ¶ 25.  They assert six claims, both as individuals and on behalf of a putative class ("Class Plaintiffs") pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).  The class that Named Plaintiffs seek to represent includes all children who are, or will be, in DCYF's legal custody and: (1) are between fourteen and seventeen years old, (2) have a mental impairment that substantially limits a major life activity, a record of such an impairment, or are regarded as having such an impairment, and (3) are currently placed, or are at risk of being placed, in a congregate care facility that is not the least restrictive setting appropriate to their needs.  The claims can be grouped into three categories: (1) violation of the due process right to have counsel appointed in all dependency proceedings (Count 1); (2) failure to comply with the case planning requirements of the Adoption Assistance and Child Welfare Act of 1980 ("CWA"), 42

U.S.C. §§ 671 et seq. (Count 2); and (3) violations of Title II
of the Americans with Disabilities Act ("ADA"), 42 U.S.C.
§§ 12131 et seq., and Section 504 of the Rehabilitation Act, 29
U.S.C. §§ 794 et seq., based on defendants' alleged failure to
administer the foster care system in a manner that enables
plaintiffs to live in the most integrated settings appropriate
to their needs (Counts 3-6).  Defendants have challenged the
sufficiency of plaintiffs' allegations and moved to dismiss the
complaint in its entirety.

## II.   STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss for failure to
state a claim, a plaintiff must make factual allegations
sufficient to "state a claim to relief that is plausible on its
face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting
Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This
standard "demands more than an unadorned, the defendant-
unlawfully-harmed-me accusation." Id.  A claim is facially
plausible if it pleads "factual content that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged." Id.

In testing a complaint's sufficiency, I employ a two-step
approach.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1,
12 (1st Cir. 2011).  First, I screen the complaint for
statements that "merely offer legal conclusions couched as fact

or threadbare recitals of the elements of a cause of action."
Id. (cleaned up).  A claim consisting of little more than
"allegations that merely parrot the elements of the cause of
action" may be dismissed.  Id.  Second, I credit as true all
non-conclusory factual allegations and the reasonable inferences
drawn from those allegations, and then determine if the claim is
plausible.  Id.  The plausibility requirement "simply calls for
enough fact to raise a reasonable expectation that discovery
will reveal evidence" of illegal conduct.  Twombly, 550 U.S. at
556.  The "make-or-break standard" is that those allegations and
inferences, "taken as true, must state a plausible, not a merely
conceivable, case for relief."  Sepúlveda-Villarini v. Dep't of
Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010).

### III. ANALYSIS

Defendants contend that each of plaintiffs' three sets of
claims fails to state a claim upon which relief may be granted.
First, the right to counsel claim fails, defendants argue,
because it requires an individualized assessment of each child's
dependency proceeding, as opposed to the categorical approach
proposed by plaintiffs.  Second, defendants maintain that there
is no private right of action to enforce the case planning
requirements of the CWA.  Third, the disability discrimination
claims are allegedly deficient because the State is not

segregating disabled children from non-disabled children in its custody.  I address these arguments in turn below.

**A.   <u>Right to Counsel in Dependency Proceedings</u>**

The complaint alleges that a category of children in DCYF's legal custody – children between the ages of fourteen and seventeen with mental disabilities who are currently placed, or are at risk of being placed, in congregate care settings – have their federal procedural due process rights violated when counsel is not appointed to represent them in all dependency proceedings.  The premise of this claim is that plaintiffs, as a class, have a categorical right to court-appointed counsel in every dependency proceeding regardless of the circumstances of their individual cases.

Defendants acknowledge that all children in dependency proceedings have a right to counsel.  But, they argue, this right is conditional: it requires a case-by-case assessment of the factors that the Supreme Court identified in Matthews v. Eldridge, 424 U.S. 319 (1976), which balance competing public and private interests.  Defendants maintain that those factors must consider the particular features of each dependency proceeding and cannot be determined on a group-wide basis.

The question, then, is not whether plaintiffs have a right to counsel – it is uncontested that they do.  Nor is there a claim that Named Plaintiffs are entitled to counsel based on

individualized assessments of their dependency proceedings under Eldridge.  Rather, the sole issue is whether the State is under a constitutional duty to provide counsel for Class Plaintiffs in all dependency proceedings because the Eldridge factors, applied on a class-wide basis, inevitably require appointment of counsel irrespective of the individual circumstances of each child's case.  I agree with defendants that the decision as to the need for appointed counsel must be made in the context of each dependency proceeding.

"Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances."  Eldridge, 424 U.S. at 334 (cleaned up).  Rather, "due process is flexible," which is "necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error." Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 12-13 (1979) (cleaned up).  Evaluating what process is due requires balancing the Eldridge factors, which are:

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Eldridge, 424 U.S at 335.

The Supreme Court applied this framework in an analogous context in Lassiter v. Department of Social Services, 452 U.S. 18 (1981).  The issue in Lassiter was whether indigent parents involved in termination of parental rights proceedings have a right to court-appointed counsel.  The Supreme Court held that the appointment of counsel in such proceedings must be determined on a case-by-case basis applying the Eldridge factors.  Id. at 31-32.  As the court reasoned, "in a given case [where] the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the Eldridge factors did not overcome the presumption against the right to appointed counsel."  Id. at 31.  But, the Court added, "since the Eldridge factors will not always be so distributed . . . neither can we say that the Constitution requires the appointment of counsel in every parental termination proceeding."  Id.

In adopting a case-by-case approach, the court in Lassiter relied on an earlier case, Gagnon v. Scarpelli, 411 U.S. 778 (1973), which addressed whether due process required the appointment of counsel for indigent probationers in probation revocation hearings.  See Lassiter, 452 U.S. at 31 (citing Gagnon, 411 U.S. at 788).  Endorsing an individualized

assessment in that context, the Supreme Court in Gagnon observed that "[t]he need for counsel at revocation hearings derives, not from the invariable attributes of those hearings, but rather from the peculiarities of particular cases." 411 U.S. at 789. The court suggested that counsel may be required, for example, when a case involves "a disputed set of facts where the presentation requires the examining or cross-examining of witnesses or the offering or dissecting of complex documentary evidence." Id. at 786-87.  In Lassiter, the Supreme Court "adopt[ed] the standard found appropriate in Gagnon" and left "the decision whether due process calls for the appointment of counsel for indigent parents in termination proceedings to be answered in the first instance by the trial court, subject, of course, to appellate review." Lassiter, 452 U.S. at 31-32.

Neither the Supreme Court nor any federal court of appeals has considered whether the same standard should apply to the appointment of counsel for children in dependency or termination proceedings.[3]  The Washington Supreme Court, however, has twice held that due process does not categorically require that

---

[3] The two types of proceedings have distinct purposes.  As the name implies, the purpose of termination proceedings "is to permanently sever the parent-child relationship," whereas the goal of dependency proceedings "is to reunify the family." In re C.M., 163 N.H. 768, 774 (2012).  A dependency proceeding, however, is often "a first step in a process that may ultimately result in termination of parental rights," although "such a result is by no means a foregone conclusion." Id. at 775.

children be appointed counsel in such proceedings.  See In re Dependency of E.H., 427 P.3d 587 (Wash. 2018); In re Dependency of MSR, 271 P.3d 234 (Wash. 2012).  In MSR, the court considered whether due process requires that every child in a termination proceeding be appointed counsel.  271 P.3d at 237.  Relying on Lassiter, the court held that a child's right to counsel in these proceedings "is not universal," and that "the trial judge . . . should apply the [Eldridge] factors to each child's individual and likely unique circumstances."  Id. at 245. According to MSR, "whether any individual child is entitled to counsel must be decided case by case."  Id. at 237.

The Washington Supreme Court reaffirmed this holding in E.H., which considered whether the reasoning in MSR extended to all stages of dependency proceedings.  See 427 P.3d at 591–92. The court concluded that Lassiter, Eldridge, and Gagnon supported the case-by-case approach adopted in MSR.  E.H., 427 P.3d at 593–95.  The court observed:

> Dependency proceedings are not uniform, although each creates a tension between the State's ability to protect children as parens patriae and the fundamental familial rights of the people who are involved in the proceedings.  In some instances, such as when the parents agree to the dependency or when the State does not assume legal or physical custody of the child, this tension will be lessened.  In other instances, where the dependency is contested or when the State assumes custody of a child, the tension may be heightened.  Accordingly, the amount of process due to children in dependency proceedings will vary with each case.

Id. at 589.[4]

I agree with the well-reasoned opinions of the Washington Supreme Court.  As that court recognized, the logic of Lassiter, which makes clear that due process should be assessed on a case-by-case basis when it comes to a parent's right to counsel in a termination proceeding, extends to a child's right to counsel in a dependency proceeding.  Lassiter illustrates that the risk of erroneous deprivation in these proceedings will vary from case to case.  See 452 U.S. at 31-32.

Applying the Eldridge factors here, there is no question that Class Plaintiffs have protected liberty interests, considering they have been, or are at risk of being, placed in congregate care facilities where their physical liberty is restricted.  It is likewise clear that the State has a strong interest both in the welfare of these children and in "an accurate and just decision" in dependency proceedings, as well as "a relatively weak pecuniary interest" in avoiding the cost

---

[4] Plaintiffs have identified one district court case that came to the opposite conclusion.  See Kenny A. ex rel. Winn v. Perdue, 356 F. Supp. 2d 1353 (N.D. Ga. 2005).  In a decision that predates the Washington Supreme Court cases, the court in Kenny A. held that children in Georgia's foster care system have a right to counsel in all dependency proceedings under the state due process clause, which is coextensive with the federal due process clause.  Id. at 1359-61.  The court, however, did not address Lassiter or otherwise explain why a case-by-case assessment of the need for counsel was inadequate to safeguard the children's due process rights.  See id.  Thus, its persuasive value is limited.

of appointed counsel.  See Lassiter, 452 U.S. at 27, 31.  The
last Eldridge factor, which looks to the risk of erroneous
deprivation and the value of the additional procedures sought,
however, depends on the particular case at hand.  This factor
will turn on the factual and legal complexities of individual
cases, see Lassiter 452 U.S. at 28-31, as well as on whether
there is an existing participant in the proceeding who can
"represent the child's interests or whose interests align with
the child's."  MSR, 271 P.3d at 243-44.

The fact that a dependency proceeding involves an older
disabled child who may be placed in a congregate care facility
does not, by itself, satisfy the last Eldridge factor.  Where
the issues at stake are not complex and the GAL's views are
aligned with the child's, the risk of error and the added
benefit from the participation of counsel appear to be low.  On
the other hand, where the GAL's recommendation goes against the
child's wishes and the case presents complicated legal or
factual issues, the risk-benefit analysis would likely tip the
scales in favor of appointing counsel for the child.  For those
proceedings that fall along this spectrum, the court's
discretionary judgment about the need for counsel is
indispensable.  As these examples illustrate, it cannot be said
that the Eldridge factors mandate the appointment of counsel in
all dependency proceedings involving Class Plaintiffs.

17

New Hampshire's statutory scheme adequately protects children's right to counsel.  The statute gives the trial judge discretion to appoint counsel for a child "where the child's expressed interests conflict with the recommendation for dispositional orders of the [GAL]."  N.H. Rev. Stat. Ann. § 169-C:10, II(a).  Further, the applicable regulations obligate a GAL to become informed about the child's wishes and to inform the court when the child disagrees with the GAL's recommendation.  See N.H. Code Admin. R. Gal 503.11(a), Gal 504.01(d).  This carefully calibrated scheme reserves the appointment of counsel for those children whose interest is not adequately represented in court.  In those circumstances, the court must apply the Eldridge factors to the particular case at hand to determine if due process requires that counsel be appointed to represent the child.[5]

In sum, whether plaintiffs are entitled to counsel in their dependency proceedings must be determined on a case-by-case basis utilizing the Eldridge factors.  Accordingly, plaintiffs'

---

[5] There is no allegation that state courts are failing to comply with these statutory requirements.  Instead, plaintiffs merely allege that only one attorney was appointed to represent a child in 2019 to support their view that the discretionary system is deficient.  Without information about the number of occasions when counsel was requested in the same timeframe and the circumstances of those requests, however, I cannot infer from the single appointment that state judges are systematically refusing to grant requests for counsel where the Eldridge factors would mandate that counsel be appointed.

claim that they have a categorical right to counsel irrespective of the circumstances of their individual dependency proceedings fails to state a claim for relief.

**B.    Case Planning Requirements under the CWA**

Plaintiffs allege that defendants are failing to provide them with timely and accurate written case plans as required by § 671(a)(16) of the CWA.  Defendants do not dispute the sufficiency of plaintiffs' factual allegations in support of this claim.  Instead, they argue that there is no private right of action to enforce the CWA's case planning requirements.

The CWA is a federal statute embedded in the Social Security Act that provides funding to the State for child welfare, foster care, and adoption assistance.  To receive the funding, the State must adopt a plan that meets the CWA's requirements and receive approval from the Secretary of Health and Human Services ("Secretary").  See 42 U.S.C. § 671.  One required component of such a plan is that the State must develop a case plan "for each child receiving foster care maintenance payments."  § 671(a)(16).  A case plan is a written document that must include the child's records and information about the plans for the child, such as the prospective placement, the services the child will receive, and the steps taken toward stability and eventual permanency.  § 675(1).  The Secretary has the authority to withhold funding if the State fails to achieve

substantial compliance with the statutory requirements and fails to implement a corrective plan.  See § 1320a-2a.

Section 671(a)(16) does not explicitly provide for a private right of action.  Plaintiffs argue, however, that this case planning provision is enforceable through a cause of action brought under 42 U.S.C. § 1983.

Section 1983 can be used to enforce a provision of a federal statute only when that provision creates an individual right.  See Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 72-73 (1st Cir. 2005) ("Not all violations of federal law give rise to § 1983 actions: 'the plaintiff must assert the violation of a federal right, not merely a violation of federal law.'") (quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997)) (cleaned up); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 274 (2002) ("It is rights, not the broader or vaguer benefits or interests, that may be enforced [under § 1983].") (cleaned up).  Such a right "must be 'unambiguously conferred' by the statutory provision at issue." Rio Grande, 397 F.3d at 72-73 (quoting Gonzaga, 536 U.S. at 283).  To determine if Congress intended to create a federal right, the Supreme Court has created a three-pronged test that asks whether (1) the statutory provision contains "rights-creating language," (2) the provision has an "individualized" as opposed to an "aggregate focus," and (3) the statute contains another enforcement

mechanism through which an aggrieved person can obtain relief. Gonzaga, 536 U.S. at 287-90; see Blessing, 520 U.S. at 340-41.[6]

In a decision that predates Blessing and Gonzaga, the First Circuit held that the CWA's case planning provision is privately enforceable under § 1983. See Lynch v. Dukakis, 719 F.2d 504 (1st Cir. 1983). The First Circuit acknowledged in Lynch that "[t]here will be no section 1983 remedy when (1) the federal law confers no enforceable right, or (2) Congress has foreclosed the 1983 remedy through the act under consideration." Id. at 510 (citing Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 19 (1981)). Focusing on the latter requirement, the court rejected defendants' argument that Congress intended for the Secretary's authority to withhold or reduce federal funding under § 671(b) to be the exclusive remedy for violations of § 671(a)(16). See id. at 510-11. Although it did not expressly grapple with the issue of whether § 671(a)(16) created an enforceable right, the circuit endorsed the district court's "careful" analysis in that case construing the provision to provide foster children with the right to a case plan. See

---

[6] Gonzaga revised the test announced in Blessing, which required that (1) Congress intended the provision in question to benefit the plaintiff, (2) the right is not so "vague and amorphous" that its enforcement would strain judicial competence, and (3) the provision is "couched in mandatory, rather than precatory, terms." Blessing, 520 U.S. at 340-41. The First Circuit has applied the revised test as set forth in Gonzaga. See Rio Grande, 397 F.3d at 73.

id. at 510.  As the Sixth Circuit later observed, "[i]mplicit in the Lynch decision was the understanding that the [CWA] bestowed upon children under state supervised foster care the right to an individualized case plan and a system for case review and that those children . . . were free to pursue a § 1983 action which sought to enjoin the state to comply with its mandated system for case review." Scrivner v. Andrews, 816 F.2d 261, 263 (6th Cir. 1987).

Defendants argue that Lynch is no longer good law in light of the intervening Supreme Court case law.  I disagree.  As Lynch recognized, the key question in determining whether a statute creates a federal right was – and remains – one of congressional intent.  See 719 F.2d at 510.  Although the Supreme Court has honed the guidelines that aid that analysis, the holding in Lynch does not rest on an analytical foundation that is insistent with the framework set forth in Blessing and Gonzaga.  Contrary to defendants' suggestion, Lynch did not indicate that a right is presumed to exist unless Congress indicated otherwise.  Instead, the First Circuit held that where a statute creates a right, there is a presumption that the right is enforceable under § 1983.  See id.  That presumption, the court noted, can be rebutted by a showing that Congress has foreclosed the § 1983 remedy by creating a comprehensive enforcement scheme.  See id.  The Supreme Court endorsed the

same presumption in both Gonzaga and Blessing.  See Gonzaga, 536 U.S. at 284 & n.4; Blessing, 520 U.S. at 341.

Defendants' position is also at odds with the view of the Ninth Circuit and several district courts that have recognized the continued viability of Lynch in the aftermath of Gonzaga. See Henry A. v. Willden, 678 F.3d 991, 1006 (9th Cir. 2012); Sam M. ex rel. Elliott v. Chafee, 800 F. Supp. 2d 363, 385, 388 (D.R.I. 2011); Connor B. ex rel. Vigurs v. Patrick, 771 F. Supp. 2d 142, 168, 170 (D. Mass. 2011).  As the court in Sam M. explained, "[t]he First Circuit's analysis and conclusion in Lynch, while it precedes Blessing and Gonzaga, is not inconsistent with either of those cases or their required examination of Congressional intent."  800 F. Supp. 2d at 388.

Applying the Gonzaga test demonstrates the soundness of the holding in Lynch that § 671(a)(16) is privately enforceable. The case planning provision reads:

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . (16) provides for the development of a case plan . . . for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in sections 675(5) and 675a of this title with respect to each such child[.]

42 U.S.C. § 671(a)(16).  Rights-creating language "is readily discernible" in this provision because it "expresses a clear mandate by using the term 'shall'" and "discusses how the state

must distribute benefits to each child." Connor B., 771 F. Supp. 2d at 171. "Plainly, these directives are both couched in mandatory terms and are unmistakably focused on the benefitted class, i.e., foster children." Id.

Defendants counter that these directives must be understood in the context of the prefatory language in § 671(a), which provides that these requirements are imposed "for a State to be eligible for payments," 42 U.S.C. § 671(a), as well as a related provision requiring mere substantial compliance with § 671(a). See 42 U.S.C. § 1320a-2a(b)(3)(A). These provisions, the argument goes, speak to the State as a regulated participant in the CWA and contraindicate the language in § 671(a)(16) that focuses on children as the benefitted class.

Defendants' argument cannot be squared with an amendment to the CWA known as the "Suter fix." In Suter v. Artist M., the Supreme Court held that § 671(a)(15), which requires a state to make "reasonable efforts" to facilitate family reunification, is not privately enforceable in part because the provision is contained in a section that lists the prerequisites of a state plan. See 503 U.S. 347, 359-63 (1992). In response, Congress enacted the Suter fix, which left the ruling as to § 617(a)(15) in place but "expressed Congress's intent not to preclude courts from determining whether other provisions of the [CWA] allowed private enforcement actions." Sam M., 800 F. Supp. 2d at 388.

24

Specifically, Congress directed that a provision of the CWA "is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. § 1320a-2.  In other words, the fact that the case planning provision is a funding condition imposed on the State as a component of the State plan cannot negate the rights-creating language in that provision.  See Henry A., 678 F.3d at 1007.  Thus, the Suter fix precludes reliance on the very language and context upon which defendants base their interpretation of § 671(a)(16).

The second Gonzaga factor likewise weighs in favor of an enforceable right.  By focusing on the needs of "each child" who has been removed from the family home, as opposed to systemwide goals, § 671(a)(16) betrays its "individualized" emphasis.  See Gonzaga, 536 U.S. at 288.  By contrast, provisions with an aggregate focus "speak only in terms of institutional policy and practice" and "are not concerned with whether the needs of any particular person have been satisfied." Id. (cleaned up); see Henry A., 678 F.3d at 1007 ("[T]he reference here to a case plan 'for each child' focuses squarely on the protected individual, rather than an aggregate interest or a regulated entity.").  Further, the commands of § 671(a)(16) are written in clear and specific terms, including the case plan definition in § 675(1) that precisely describes the required contents of each child's

case plan.  Thus, "there is no ambiguity as to what the state is required to do."  Henry A., 678 F.3d at 1007 (cleaned up).

The case planning provision also satisfies the third Gonzaga factor because the CWA provides no alternative mechanism for an aggrieved child to seek relief.  Unlike the statute in Gonzaga, which allowed individuals to file written complaints with a federal review board that would trigger an investigation and potential relief, see 536 U.S. at 289-90, the CWA does not provide any such procedure.

In short, the Gonzaga factors demonstrate that the case planning provision confers an individual right.  This gives rise to a presumption that the right is enforceable via § 1983.  See id. at 284 & n.4.  Defendants have not rebutted that presumption by demonstrating congressional intent to preclude the § 1983 remedy.  See id.  The Secretary's authority to determine whether the State is in substantial compliance with the CWA's requirements, including the case planning provision, does not amount of a comprehensive remedy that is incompatible with private enforcement.  See Lynch, 719 F.2d at 510-11.  Accordingly, I deny defendants' motion to dismiss the CWA claim.[7]

---

[7] Defendants also argue that the existence of an express cause of action to enforce another provision of § 671(a) evinces congressional intent to preclude private enforcement of other provisions of the same section.  See 42 U.S.C. § 671(a)(18) (conferring express private right by stating that "neither the State nor any other entity . . . may . . . delay or deny the

## C.   __Disability Discrimination Claims__

In their third set of claims, plaintiffs allege that defendants are discriminating against them in violation of the ADA and the Rehabilitation Act by failing to ensure that they receive placements and services in the most integrated settings appropriate to their needs.[8]  Plaintiffs base their claims on a regulation known as the integration mandate and a related methods of administration regulation.  Defendants argue that both claims fail because disabled children are not segregated from non-disabled children in DCYF's custody.  Plaintiffs counter that the regulations prohibit unnecessarily isolating disabled children from their communities by placing them in congregate care settings, irrespective of whether non-disabled children are also placed there.

---

placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved").  As the Ninth Circuit has explained, however, "because the express cause of action created for § 671(a)(18) is actually broader than § 1983, it does not suggest an intent to limit § 1983 enforcement." Henry A., 678 F.3d at 1008.

[8] The relevant provisions of the Rehabilitation Act mirror the ADA, and the parties' briefing assumes that the claims under the two statutes are coextensive.  Cf. Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998) ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, and is to be interpreted consistently with that provision.").  For ease of reference, I discuss the claims in terms of the ADA.

**1.   Integration Mandate Claims**

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The Department of Justice ("DOJ") has issued regulations implementing the ADA's proscription, including an integration mandate.  That mandate requires a public entity to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).  The preamble to the regulation defines "the most integrated setting" as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. Pt. 35, App. B.

A public entity must make "reasonable modifications in policies, practices, or procedures" to comply with the integration mandate. 28 C.F.R. § 35.130(b)(7).  That obligation, however, is not absolute.  The regulations "allow States to resist modifications" to the extent such modifications "entail a fundamental alteration" of the offered services and programs.  Olmstead v L.C. ex rel. Zimring, 527 U.S. 581, 603 (1999) (cleaned up); see 28 C.F.R. § 35.120(b)(7).

The integration mandate reflects the DOJ's view "that unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II." Olmstead, 527 U.S. at 596.  The Supreme Court has identified "two evident judgments" in the mandate.  Id. at 600.  The first is that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."  Id.  The second is that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  Id. at 601.  In Olmstead, the Supreme Court concluded that the DOJ's views embodied in the integration mandate "warrant respect" in part because "Congress explicitly identified unjustified segregation of persons with disabilities as a form of discrimination."  Id. at 598-600 (cleaned up). Olmstead ultimately "held that the word 'discrimination' as used in § 12132 includes not only disparate treatment of comparably situated persons but also undue institutionalization of disabled persons, no matter how anyone else is treated."  Amundson ex rel. Amundson v. Wis. Dep't of Health Servs., 721 F.3d 871, 874

(7th Cir. 2013) (cleaned up) (citing Olmstead, 527 U.S. at 597–603).

Following Olmstead, the DOJ released informal guidelines "directing that the integration mandate be read broadly." Steimel v. Wernert, 823 F.3d 902, 911 (7th Cir. 2016). The DOJ's guidance specifies that "[i]ntegrated settings are located in mainstream society." U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C. (June 22, 2011).[9] Such settings "offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible." Id.

In line with the DOJ's view, the Seventh Circuit has held that the integration mandate, by its plain terms, must be read broadly and that the DOJ's interpretation is entitled to deference. See Steimel, 823 F.3d at 911. The court reasoned that the mandate is written in "maximalist language" that "demands the most integrated setting appropriate, which it defines as allowing interaction with non-disabled persons to the

---

[9] Available at https://www.ada.gov/olmstead/q&a_olmstead.htm (last visited Sept. 9, 2021).

fullest extent possible." Id. (cleaned up).  The integration
mandate thus "logically applies to all settings, not just to
institutional settings" and "bars unjustified segregation of
persons with disabilities, wherever it takes place." Id.  I
agree with this cogent reasoning.

There can be little question that the plain language of the
integration mandate prohibits the State from providing services
to individuals with disabilities in a setting that is not the
most integrated setting appropriate to their needs.  Unless it
could prevail on a fundamental-alteration defense, the State
must administer its foster care services in a manner that
enables plaintiffs to live in such integrated settings.  Thus,
to the extent congregate care facilities are not the most
integrated settings appropriate to plaintiffs' needs, such
placement runs afoul of the integration mandate.

Defendants respond with a narrow reading of the integration
mandate, arguing that it covers only claims by people who have
been completely segregated from their non-disabled counterparts.
Because both disabled and non-disabled children in DCYF's legal
custody are placed in congregate care facilities based on bed
availability, the argument goes, these facilities are not
isolating the disabled from the non-disabled on the basis of
their disability.  Rather than engaging with the text of the
mandate or the DOJ's interpretation, defendants insist that the

statutory grant of authority to the DOJ to implement the ADA's anti-discrimination proscription limits the scope of the integration mandate.  Specifically, they argue that because the ADA only prohibits discrimination by reason of disability, the integration mandate must be construed to apply only to instances where the disabled are segregated from the non-disabled based on their disability.

Defendants' argument has no merit.  As Olmstead recognized, segregation of the disabled from the community is a core concern that animates both the ADA and the integration mandate.  See 527 U.S. at 600-01.  Further, defendants cite no authority that has endorsed their rationale, and I have found none.  Instead, they merely cite to a litany of cases involving complete segregation of the disabled where courts recognized viable integration mandate claims.  See, e.g., Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan, 293 F.R.D. 254, 259-60 (D.N.H. 2013); Eric L. ex rel. Schierberl v. Bird, 848 F. Supp. 303, 313-14 (D.N.H. 1994).  But the fact that segregating the disabled from the non-disabled formed viable integration mandate claims in other cases does not support defendants' position that the mandate only prohibits complete segregation.  Simply put, that complete segregation is illegal does not mean that a lesser form of segregation, such as isolating disabled children from their

communities by placing them in restrictive congregate care settings, is allowed.  The two are not mutually exclusive.

In light of the plain language of the integration mandate and a lack of authority that supports defendants' narrow reading of the regulation, defendants' challenge to the integration mandate claims fails.[10]

    2.  **Methods of Administration Claims**

In separate counts of their complaint, plaintiffs allege that defendants are utilizing methods of administration that cause plaintiffs to live unnecessarily in institutions, isolated from their communities.  Defendants argue that these claims should be dismissed because they are duplicative of the integration mandate claims.

The regulations implementing the ADA prohibit public entities from utilizing "criteria or methods of administration . . . that have the effect of subjecting qualified individuals with disabilities to discrimination."  28 C.F.R. § 35.130(b)(3). Courts have recognized methods of administration claims as distinct causes of action.  See, e.g., Kenneth R., 293 F.R.D. at 259; Day v. District of Columbia, 894 F. Supp. 2d 1, 22-23 (D.D.C. 2012).  Because the integration mandate speaks broadly

---

[10] To the extent defendants argue that the plain language of the integration mandate is ultra vires, they have failed to sufficiently brief this issue, and I decline to take up the issue on my own.

of administration of services, however, it encompasses methods
of administration that fail to achieve the most integrated
setting appropriate to plaintiffs' needs, which is the core
allegation in this case.  See 28 C.F.R. § 35.130(d).  The
duplicative nature of those claims, however, is not a basis for
dismissal because plaintiffs are entitled to plead alternative
theories of liability.  See Fed. R. Civ. P. 8(d)(2) ("A party
may set out 2 or more statements of a claim . . . alternatively
. . . .").

## IV.   CONCLUSION

For the foregoing reasons, defendants' motion to dismiss
(Doc. No. 29) is granted with respect to plaintiffs' right to
counsel claim (Count 1) and denied with respect to the remaining
counts.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

September 9, 2021

cc:  Counsel of Record