*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO MARCH 28, 2022

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
G.K., BY THEIR NEXT FRIEND,         *
KATHERINE COOPER, ET AL,            *
                                    *
                Plaintiffs,         *  1:21-cv-4-PB
                                    *  November 30, 2021
                v.                  *  11:40 a.m.
                                    *
CHRISTOPHER SUNUNU, GOVERNOR OF NEW *
HAMPSHIRE, ET AL,                   *
                                    *
                Defendants.         *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE MAGISTRATE JUDGE ANDREA K. JOHNSTONE

Appearances:

For the Plaintiffs:          Michelle Wangerin, Esq.
                             NH Legal Assistance

                             Nicole Taykhman, Esq.
                             Children's Rights

                             Gilles Bissonnette, Esq.
                             ACLU of New Hampshire

                             Jennifer Aimee Eber, Esq.
                             Disability Rights Center - NH


For the Defendants:          Jennifer Ramsay, Esq.
                             Nathan W. Kenison-Marvin, Esq.
                             NH Attorney General's Office


Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             U.S. District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603) 225-1442

1                    P R O C E E D I N G S

2            THE CLERK:  This court is now in session and has

3    before it for consideration a motion hearing in 21-cv-4-PB,

4    G.K., et al vs. Governor, State of New Hampshire.

5            Could I please have counsel identify themselves for

6    the record, starting with counsel for the plaintiff.

7            MS. WANGERIN:  Good morning, your Honor.  I'm

8    Michelle Wangerin.  I represent the plaintiffs in this matter

9    and I'm an attorney at New Hampshire Legal Assistance.

10            With me is Nicole Taykhman from Children's Rights,

11    Gilles Bissonnette from ACLU New Hampshire, and Jennifer Eber

12    from Disabilities Rights Center of New Hampshire.

13            THE COURT:  All right.  So, Attorney Wangerin, are

14    you going to be the spokesperson for the plaintiffs today?

15            MS. WANGERIN:  I am, your Honor.

16            THE COURT:  All right.  Excellent.  Thank you.

17            And good morning to all of the other counsel for the

18    plaintiff.  It's good to see all of you.

19            MS. RAMSEY:  Good morning, your Honor.  I'm Jennifer

20    Ramsey with the Attorney General's Office, here representing

21    the defendants today.  With me is Nathan Kenison-Marvin.  And I

22    will primarily argue, but I may turn to Nathan for some of the

23    legal issues.

24            THE COURT:  All right.  That's fine.  And I will

25    extend the same courtesy to the plaintiffs.  If there's

1    something that lead counsel wants someone else to chime in on

2    and I mean lead counsel for today's motion, obviously, please

3    feel free to do that.

4              MS. RAMSEY:  Thank you, your Honor.

5              THE COURT:  All right.  You're very welcome.

6              I'm going to start by seeing whether or not we are

7    in agreement as to what the universe of the dispute is.  I

8    thought I was clear on what the universe of the dispute was and

9    then as I reread everything in preparation for today, it wasn't

10   so clear.

11             So here's what I'm going to do.  I'm going to start

12   with the plaintiffs, since it's the plaintiff's motion, to

13   explain to the Court from your perspective what the universe of

14   dispute is as it relates to what are the documents or materials

15   we're talking about.  And I'll try to inform that for you just

16   a little further.

17             There are a number of attachments that have been

18   provided to the Court of materials that are redacted.  I also

19   read about the possibility of files being segregated, in other

20   words, materials that were once in one file and having things

21   perhaps pulled out of those files.

22             I also note that there were some remarks made about

23   a universe of documents that were the documents of all files of

24   children in DCYF custody or care versus the four named

25   plaintiffs.  And so that's why I'm asking the question in the

1      manner that I'm asking it.

2              So I'm going to start with the plaintiffs and we'll

3      see if the defendants agree and, if not, the defendants can

4      clarify.

5              Please proceed.

6              MS. WANGERIN:  Yes, your Honor.  So we had initially

7      filed this motion when we understood that there were two

8      categories of redaction.  And so those initial two categories

9      of redaction that we sought disclosure of were, first, what the

10     defendants have in their objection as the category 6 documents

11     which are documents they're seeking to protect based on the

12     best interest of the -- of the plaintiffs and then also there

13     were large swaths of redactions of sibling records that were

14     contained within the file.  So when we received the initial

15     batch of documents, we understood that those were the two

16     primary bases for redaction.

17             The sibling records sort of had two different types

18     of redactions.  There were, you know, entire pages of

19     redactions which, you know, we now know may have been

20     evaluations or court orders or other types of information.  We

21     haven't seen them, so we don't know what all is in them.  And

22     then there were also sort of these more piecemeal redactions,

23     where redactions within communication logs and records

24     regarding the plaintiffs had, you know, sentences and words

25     redacted.  And I think you probably saw that in the exhibits

1    attached to our reply brief.

2            And so we had initially understood those two primary

3    categories of redaction, but then when we ultimately received

4    the redaction log with defendant's rejection -- or objection --

5            THE COURT:  Was that Exhibit Number 1?

6            MS. WANGERIN:  Yes.

7            THE COURT:  Okay.

8            MS. WANGERIN:  That's Exhibit Number 1.

9            THE COURT:  All right.  Thank you.

10           MS. WANGERIN:  Yup.

11           So that's a -- and then also, you know, set forth on

12   pages 5 and 6 of defendant's objection, they set forth

13   additional categories of documents.

14           So there were the category 1 documents, which they

15   label as nonresponsive, completely unrelated or probably

16   misfiled, and we have some legal issues with that that I'm

17   happy to go forward, but when we're talking about the universe,

18   so there's those, there -- there are information tangentially

19   related to third parties.

20           So we understand these category 2 redactions to

21   apply to information beyond just the siblings, but potentially

22   to, you know, other children in the foster homes or, you know,

23   foster parents or so forth.  So we understand that that

24   category includes kids beyond -- or individuals beyond just the

25   siblings and family members.

1          There's the category 3 work product privileges and

2     attorney-client.  We do not dispute that.  That's -- there is

3     no dispute over the category 3 privilege.

4          THE COURT:  All right.  So anything that's in

5     Exhibit 1 to the defendant's objection or response to the

6     motion to compel.  What you're saying is that those items are

7     not items that are in dispute.

8          MS. WANGERIN:  So -- so in Exhibit 1, there are a

9     couple of places where they do identify the attorney-client and

10    work product privileges.

11         THE COURT:  Yes.

12         MS. WANGERIN:  Those are not in dispute.

13         THE COURT:  Okay.  All right.

14         MS. WANGERIN:  Yes.  And then there's also the

15    confidential -- so category 4, confidential report of abuse and

16    neglect, that's in dispute --

17         THE COURT:  Okay.

18         MS. WANGERIN:  -- as well as category 5, the

19    siblings' foster parents' contact information.

20         THE COURT:  Okay.  All right.  Okay.  And let me ask

21    you this.

22         Exhibit 1, as I understand it, is limited to

23    documents that are in either the individual file or the family

24    file of one of the four named plaintiffs, correct?

25         MS. WANGERIN:  That's right.  So exhibit --

1    Exhibit 1 relates -- so there -- there are -- it encompasses

2    all four of the named plaintiffs --

3                 THE COURT:  Okay.

4                 MS. WANGERIN:  -- but yes.  So the dispute that

5    we've filed relates only to the files of the four named

6    plaintiffs.

7                 THE COURT:  Okay.  All right.  So clarify one other

8    thing for me before I turn it over to the defendants to see if

9    they are in agreement that this is the universe.

10                I'm looking at the plaintiffs' reply in further

11   support of the motion to compel.  It's document number 58.  And

12   I have a question about a statement that's on page 4.  And,

13   again, I may simply be reading this incorrectly.  It's in the

14   argument that starts in bold Third --

15                MS. WANGERIN:  Uh-huh.

16                THE COURT:  -- underscored, comma, and in the one,

17   two, three -- the fourth line it says:  Defendants seek

18   heightened protection for only eight documents and 24 pages out

19   of 600 documents and more than 16,000 pages produced.

20                I'm confused.

21                MS. WANGERIN:  So those -- those documents

22   specifically relate to the category 6 best interest documents.

23                THE COURT:  Okay.

24                MS. WANGERIN:  So we had understood -- when we

25   initially filed our motion to compel, we understood that

1    these -- that this best interest category was really sort of

2    the holdup in production of records.  And so that's -- that's

3    one of our concerns is that by permitting defendants to

4    selectively redact these documents that we think are very

5    responsive to our request and necessary to litigate the issues

6    in this case, by holding up this entire production over those

7    records we thought was unreasonable.

8              We, you know, as you know, we now know that there

9    were many other categories, but we understood category 6

10   documents to be sort of the crux of the holdup in the

11   production.

12             THE COURT:  Okay.  And as to category 6 redactions,

13   that's the eight documents in 24 pages.

14             MS. WANGERIN:  That's right.

15             THE COURT:  All right.

16             MS. WANGERIN:  And so we had initially received --

17   so we -- we'd initially received more documents than that that

18   had been redacted.  So we had initially received evaluations of

19   our own plaintiffs that were almost completely redacted and

20   then defendants eventually produced an amended batch of

21   redacted documents where they almost completely unredacted

22   those plaintiff evaluations, but not completely.

23             THE COURT:  Okay.  So let me ask you this then.  One

24   of the things that was attached to the motion to compel or that

25   was sealed is an evaluation.  It says neuropsych eval and there

1    are a bunch of redactions and the attachment.  Has that

2    document since been produced with fewer redactions.

3            MS. WANGERIN:  So that was in the -- that was the

4    one in the original motion?

5            THE COURT:  I'm looking at sealed Document 45.

6            MS. RAMSEY:  Is there a Bates number to that, your

7    Honor.

8            THE COURT:  Yes.  DCYF-GK0478.  And it goes on.

9            MS. WANGERIN:  Yes, your Honor.  So that document

10   has been almost wholly unsealed except --

11           THE COURT:  You mean unredacted?

12           MS. WANGERIN:  I'm sorry, yes, unredacted, except

13   for there is -- there are a few words in this document which --

14   I don't -- so there were -- there was one line of just a few

15   words regarding -- regarding this named plaintiff that were

16   not -- that are still redacted, but, quite frankly, those words

17   were unredacted in a separate document which is one of the

18   documents that we produced to this Court in our reply brief as

19   well.

20           So -- so even the redacted words in that evaluation

21   have been produced separately and we know what they are.

22           THE COURT:  Okay.  So here's -- here's what I'm

23   going to ask that we do unless the parties tell me -- I'll get

24   to you, Attorney Ramsey, I promise.

25           MS. RAMSEY:  No problem.

1          THE COURT:  But I'm questioning from the plaintiff's

2    perspective whether the right way to start to figure out what

3    the universe of documents are that we need to talk about today

4    is by working off of Plaintiff's -- excuse me, Defendant's

5    Exhibit 1 and having you identify for me item by item the

6    things that are still in dispute as opposed to me trying to

7    guess.

8          MS. WANGERIN:  So, your Honor, to be very clear,

9    I -- I'm happy to do that.

10          So there -- so all of the documents from G.K.'s

11    file, on page 10 of the document, so 10 of Document 50.  So

12    going through that, so all of the documents on page 10 are in

13    dispute.  And that's page 1 of the exhibit.

14          Page 2 of the exhibit, we do not dispute the first

15    three that are based on attorney --

16          THE COURT:  Are you looking at document number?

17          MS. WANGERIN:  Document number 50.

18          THE COURT:  All right.  I need to open up the --

19          MS. WANGERIN:  I apologize.

20          THE COURT:  Hold on.  Because I don't have that

21    document.  I have document number 63.  Hold on.

22          MS. WANGERIN:  Oh, I -- yeah, there was a refiling

23    of this document.  So it's the same -- it should be -- if you

24    look at Exhibit 1 on Document 63 and we look at the bottom page

25    numbers as opposed to the top ones, I think we're on the same

1    page.

2              THE COURT:  All right.  Give me a minute.

3              MS. WANGERIN:  Document 50 probably no longer

4    exists.

5              THE COURT:  Okay.  So I am looking at something

6    that's been filed on 1/5/2021, document number 62.

7              MS. WANGERIN:  Yeah.

8              THE COURT:  It has no page numbers at the bottom.

9              MS. WANGERIN:  So page 1 --

10             THE COURT:  It has a 2 at the bottom.

11             MS. WANGERIN:  Page 2 -- is page 2 there or no?

12             THE COURT:  Okay.

13             MS. WANGERIN:  Okay.  So page 1 that does not have a

14   page number, we -- all of those documents are in dispute.

15             THE COURT:  Okay.  So 1 through 6.

16             MS. WANGERIN:  Yup.

17             THE COURT:  Okay.

18             MS. WANGERIN:  Page 2, the first three documents, 1

19   through 3, are not in dispute.  The remainder are.

20             THE COURT:  All right.  So on the next page, 1 and

21   2, those -- there are three, work product.

22             MS. WANGERIN:  Yes, there are three, 1, 2 and 3.

23             THE COURT:  All right.  So 4, 5, 6, 7, 8 and 9 are

24   in dispute?

25             MS. WANGERIN:  Yup.

1          THE COURT:  All right.  And then on page 3?

2          MS. WANGERIN:  On page 3, 10 through 19 are in

3  dispute.

4          THE COURT:  All right.

5          MS. WANGERIN:  Page 4, 20 and 21 are in dispute.

6          THE COURT:  All right.

7          MS. WANGERIN:  And then from T.L., 1 through 5 are

8  in dispute.

9          THE COURT:  Okay.

10          MS. WANGERIN:  Next page, 6 through 14 are in

11  dispute.

12          Page 6, 15 through 23 are in dispute.

13          THE COURT:  All right.

14          MS. WANGERIN:  Page 7, 24 through 33 are in dispute.

15          THE COURT:  All right.

16          MS. WANGERIN:  On page 8, 34 through 41 are in

17  dispute.

18          THE COURT:  Okay.

19          MS. WANGERIN:  From R.K., one is in dispute on page

20  8 and on page 9, 2 through 11 are in dispute.

21          THE COURT:  All right.  Thank you.

22          All right.  And other than the things that are

23  listed here, are there any other documents or redactions or

24  removals in dispute?

25          MS. WANGERIN:  That's right.  And -- and, your

```
1   Honor, also, these are all documents relating to redactions.
2   And on page 1 of the document, which is the unnumbered pages,
3   it clarifies that these are redactions other than to segregate
4   sibling files.  Those sibling files which the defendants are
5   calling family files are in dispute.
6              THE COURT:  Okay.  But we don't have any
7   documents -- Bates numbers or anything else to identify how
8   many pages have been segregated.
9              MS. WANGERIN:  No, that's just sort of a more
10  categorical dispute --
11             THE COURT:  Okay.
12             MS. WANGERIN:  -- is my understanding.
13             THE COURT:  All right.  So -- and I see here that
14  Document 62 is entitled redactions other than segregate sibling
15  files.
16             MS. WANGERIN:  Yes.
17             THE COURT:  All right.  And my understanding, if I
18  understand correctly, is that three of the four named
19  plaintiffs had family files.
20             MS. WANGERIN:  That's right.
21             THE COURT:  Okay.  All right.  So thank you very
22  much, Attorney Wangerin.
23             I'm going to turn it over to you, Attorney Ramsey,
24  to see if you are in agreement with the universe of documents
25  that the Court is being asked to try to address.
```

1          MS. RAMSEY:  Thank you, your Honor.  And that was

2     helpful to me as well to hear that.

3          You listed at the beginning of our discussion

4     attachments, segregated sibling files, and then all files in

5     DCYF.  I am not hearing that all files in DCYF custody are in

6     issue here today although obviously some of your rulings may

7     impact how we handle future requests for other files.  But it's

8     my understanding that we're here today on the agreement to

9     produce only the named plaintiffs' files and so that is what I

10    understand to be in issue.

11         I think that working from the log is a good exercise

12    in how to approach this.  I don't believe that the attachments

13    are in any way the universe of all of the documents that are

14    redacted.  We've not been taken up on our offer to sit down

15    with the files and go through page by page and redaction by

16    redaction and talk about them, so we're not in a position

17    necessarily to understand today document by document what the

18    issues are.

19         We've described them categorically and explained to

20    you our thought process in why we withheld what we withheld and

21    explained that to the -- the plaintiff as well through our

22    filings and also in conferences.

23         I think you can certainly go through this log

24    document by document if you want, but if you give us guidance

25    about the specific categories, that may be the -- the thing we

1    can accomplish today.

2              If -- there was one -- so also you -- you said three

3    of the four children have siblings and their files were

4    contained as family files originally.  That is true with

5    respect to the population of documents in general.  There was

6    one child whose file was partially contained as a family file

7    and then some children's records were -- some siblings' records

8    were also in segregated files.  So that's the one thing that

9    you do not have on your log is there are some entire files that

10   we did not Bates number and produce only to black out every

11   single page.

12             So where the files were already segregated and

13   siblings had separate files, I have -- I apologize that I don't

14   remember off the top of my head, but I think it was R.K. that

15   was in that situation.  So there are a handful of files that

16   pertained only to a sibling that are not in the records set

17   that you have at issue before you right now.

18             Where there were sibling redactions made to family

19   files, you have that in this log that is Exhibit 1 that we're

20   working from.

21             THE COURT:  All right.  So let me just make sure I

22   understand that.

23             For files that were not segregated before you or

24   DCYF made adjustments to the file, the plaintiffs understand

25   that those were family files, for lack of a better word, and

1    then there's another category of files where there were sibling

2    files that were not mixed.

3          MS. RAMSEY:  In the case of one of the children --

4    it's not really another category.

5          So we received from DCYF the files related to all

6    four of the families.  One child has no siblings.  That's why

7    there were only three files that this pertains to.

8          THE COURT:  Yeah.

9          MS. RAMSEY:  Right.  So with respect to one of those

10   three, DCYF had created a handful, not a complete set, of

11   separate files for each child, but there were a handful of

12   portions of the file where they had segregated.  And so rather

13   than produce -- and I'm going to guess we may be talking about

14   another couple hundred of pages.

15         Rather than Bates stamp and produce a whole bunch of

16   black pages, we did not do that.  So there are a few sibling

17   records that were segregated.  That's why it says other than to

18   segregate sibling files.  Where there were redactions to a

19   specific page of a family file, those are logged.  But there

20   are a handful of documents that were already segregated that

21   are not on your log.

22         THE COURT:  Because that's the way you received them

23   from DCYF or that's how they kept them in the ordinary course?

24   That's what I'm asking.

25         MS. RAMSEY:  Both.

 1                    THE COURT:  Okay.  All right.  All right.  So thank

 2        you.

 3                    Attorney Wangerin, anything about the universe of

 4        documents that you want to address with the Court before I go

 5        on to my next question?  I promise I will give you all time to

 6        argue whatever you want to argue, but I definitely need to make

 7        sure we're all on the same page about the landscape here.

 8                    MS. WANGERIN:  No, that makes perfect sense, your

 9        Honor.

10                    The only thing I would add is that I don't think we

11        understood that there were these files that were maintained

12        separately and I think we would agree that this pre -- to the

13        extent they were maintained separately in the ordinary course

14        that that prediscovery agreement would not necessarily, you

15        know, require compulsion of those documents under that

16        agreement.

17                    But to the extent that now that we are in formal

18        discovery and we have served requests for production of

19        documents, to the extent that the privacy concerns remain

20        vis-a-vis those files, I think that that remains a live issue

21        although I would agree that it's not teed up for today.

22                    THE COURT:  Okay.  All right.  So, Attorney Ramsey,

23        just as a practical matter, is there a plan to let the

24        plaintiffs know which siblings had files that were maintained

25        in the ordinary course of DCYF's file-keeping system that were

1    separate.

2              MS. RAMSEY:  It would be just the one child that I

3    just described.  I think it was R.K.  I hadn't --

4              THE COURT:  That's all right.

5              MS. RAMSEY:  I didn't have a plan, but I'm certainly

6    happy to --

7              THE COURT:  All right.

8              MS. RAMSEY:  -- to make -- to confirm that.

9              THE COURT:  I think we probably just need to do

10   that --

11             MS. RAMSEY:  Sure.

12             THE COURT:  -- so we can keep understanding where we

13   are.

14             MS. RAMSEY:  Yup.

15             THE COURT:  Okay.  Thank you.  That's very helpful.

16             So we're in an interesting place here procedurally

17   from the Court's perspective because we are -- have not set

18   forth a scheduling order, but the parties agreed in advance of

19   that scheduling order to exchange some documents.  And my

20   understanding is that there was an agreement that was reached

21   by the parties and so that's the next place that I want to go

22   and I want to hear from the defendants.  And I'm going to refer

23   to the plaintiffs' original motion to compel.  That's document

24   number 44.

25             And in that document it lays out in the memorandum,

1   I believe, let me just see if I can find it.  I'm looking for

2   the itemization of the agreement.  It may be in the memorandum

3   and not in the motion.  Hold up.  I believe that it is.

4           All right.  It is.  It's in the plaintiff's

5   memorandum of law.  I apologize.  It's document number 44-1.

6   And on page 2 there are eight paragraphs or points that set

7   forth what the plaintiff claims was the agreement that was

8   reached.

9           Is the -- does the defendant agree that that was

10  the -- those are the terms of the agreement that were reached?

11  It doesn't appear that in any of the briefing there were any

12  disputes.

13          MS. RAMSEY:  What I would say is to the extent that

14  the agreement -- that this is intended to be a complete

15  recitation of the agreement, no, I think there are some

16  important pieces left out.

17          THE COURT:  All right.  What's left out?

18          MS. RAMSEY:  The agreement to withhold personally

19  identifying information and personal health information of

20  persons other than the child; the agreement to produce -- not

21  to produce any things which DCYF discovers in the files upon

22  review that it believes would be harmful to disclose to the

23  child.

24          THE COURT:  Isn't that in paragraph 7?  And number 3

25  says redactions were to occur only as necessary to protect

1  personally identifiable information/personal health information

2  of private individuals.

3          MS. RAMSEY:  Yeah, I -- I hear you.

4          So, yes, they -- they've mentioned them there.  I

5  guess my concern is that where they describe paragraph 2, all

6  records as detailed by plaintiffs' March 18th, 2021, letter,

7  I -- that wasn't the date that we reached our agreement and

8  the -- the descriptions in 3 and 7 seem much more restrictive

9  than they are in the actual agreement that as I understand it

10 is -- it's a lengthy email chain and I gather we have not

11 provided that in response to the motions -- in response to the

12 motion to compel.

13         THE COURT:  All right.  But is this still -- is this

14 still part of what we're arguing about or are we past this

15 agreement?

16         MS. WANGERIN:  Your Honor, I agree that it's

17 complicated.

18         THE COURT:  No, no, I just -- I just want to know

19 what you're asking me to enforce as part of the motion to

20 compel.

21         MS. WANGERIN:  Right.  So when we filed, we were

22 under this agreement.  We are now past that agreement.

23         THE COURT:  Okay.

24         MS. WANGERIN:  We have now served formal discovery

25 requests at this point.

1          THE COURT:  All right.

2          MS. WANGERIN:  And so, you know, to the extent that

3    the -- you know, the issues under that agreement remain live,

4    we think this remains a live issue.

5          Now, if defendants are saying that now that we have

6    served a request for production and they intend to provide us

7    these files, which we have not heard at this point, then I

8    think that we are in a -- in a much better place.

9          But my understanding from our communications with

10   defendants, and they can certainly correct me if I'm wrong, is

11   that in order -- you know, given the state confidentiality laws

12   at play, you know, in order to provide these files to us, they

13   need that court order indicating that they can do that.  And,

14   you know, they have arguments on why they do not think that

15   that court order should issue, but we disagree with that.

16         THE COURT:  All right.  Okay.  Does the defendant

17   agree that the Court shouldn't be guided by the original

18   agreement at this point and that I should be focused instead on

19   Rule 26 discovery requirements and parameters and the

20   objections as they relate to state law privacy concerns.

21         MS. RAMSEY:  I think that you should still be

22   instructed by Rule 26.  I don't think that we're beyond this

23   agreement.  We haven't even responded to a request for

24   production and, candidly, I don't think we'll be changing what

25   we produce because I think all of the same objections will

1    apply when we -- when we get to --

2                THE COURT:  Okay.

3                MS. RAMSEY:  If we were to reproduce the same files,

4    I think we would produce them the same way.

5                There was one other part of the agreement that I

6    wanted to highlight for the Court that's not included at all --

7                THE COURT:  All right.  Sure.

8                MS. RAMSEY:  -- and that is as long as redactions

9    don't include the name of state employees, agents, and

10   contractors, they agree that we don't need to produce a

11   redaction log with the initial production.

12               THE COURT:  Right.  But now we have a redaction log.

13               MS. RAMSEY:  Yup.  Yup, we do.

14               THE COURT:  Okay.  Which was extremely helpful.  So

15   thank you.  I found that to be really important for us to move

16   forward.

17               MS. RAMSEY:  And I'm happy to have produced it.  I

18   guess that what I think is the case about this agreement is

19   that it was intended to be and there are other provisions in

20   the emails that suggest that to the extent we have

21   disagreements, we will talk about things that we'll make things

22   available for attorneys' review before getting to this stage

23   and, unfortunately, that just hasn't been how this has turned

24   out.

25               THE COURT:  All right.  So let me ask you both the

1   next question, because I did see something in paragraph 7 of

2   page 2 of Document 44-1 that relates to the best interests of

3   the child or redactions on the basis that production would be

4   harmful to the child and it indicates that you would establish

5   an *in camera* review protocol.  Did that happen, and if it

6   didn't happen, why didn't that happen?

7            MS. WANGERIN:  Yes, your Honor.  So there actually

8   is a little bit of context to that protocol which was in an

9   email on March 31st, where --

10            THE COURT:  Do I have that --

11            MS. WANGERIN:  No --

12            THE COURT:  -- in my materials?

13            MS. WANGERIN:  -- you don't.

14            THE COURT:  Okay.  Well, it's a little hard for me

15   to take it into consideration if I don't have it.  Is that what

16   you're asking me to do, to make the defendants participate in

17   an *in camera* review protocol?

18            MS. WANGERIN:  No, your Honor.  Because what the *in*

19   *camera* review protocol was, it was -- it was sort of defined to

20   be, you know, if there is a dispute over -- it -- it's so that

21   if we disagree that certain records are not in the best

22   interest of our clients to review, it says we might be able to

23   let you review them, the records, *in camera* to see if you still

24   feel you should have them; we might be able to enter into an

25   agreement that you can have the records, but the child may not

1    see them; you might persuade us that we're being overly

2    cautious and we should release the records; and if we do,

3    however, find ourselves in disagreement we can have the Court

4    decide.

5           And so I think that's where we are.  And what we --

6    and so --

7           THE COURT:  But did any of those happen?  Did you

8    get invited to look at the documents?

9           MS. WANGERIN:  So we were provided descriptions of

10   the documents and what they were and what they were were parent

11   evaluations, children's evaluations, information that goes

12   directly to the heart of the claims at issue.

13          So to the extent that they now argue that we should

14   be able to look at them first, we think that the description

15   was sufficient and that regardless of what is in the actual

16   documents, we disagree that -- that we should not receive

17   these.

18          And to the extent that they believe that it's

19   appropriate for this attorneys' eyes only protocol, we just

20   fundamentally disagree with that.  First of all, in these types

21   of cases, courts widely disfavor that type of attorneys' eyes

22   only review and when we're talking about information that is

23   directly relevant to the decisions that DCYF made about where

24   to place these children, what contact that these children

25   should have with their siblings, whether these children should

1  be placed together or apart, we need to have the flexibility to

2  speak with our clients, if necessary.

3          Now, we have said repeatedly that if the caseworkers

4  have concerns that particular information may be very sensitive

5  and hard for the -- the plaintiffs to hear, we absolutely will

6  consider that information and work with the next friends to

7  make sure that we talk to them in a very sensitive way, if we

8  even need to do that.  But we're working under a protective

9  order in this case that limits us from disclosing information

10  even to our own clients unless it's necessary to conduct the

11  litigation.

12          So to the extent that defendants say that we need to

13  come back and ask permission to have conversations with our

14  client that we've determined is necessary to conduct the

15  litigation, that's just a gross interference with the

16  attorney-client relationship.  And it not only requires us to

17  divulge the substance of the communications with our clients,

18  but also requires us to tip them off to our litigation

19  strategy.

20          So we think that the protective order is incredibly

21  protective of these clients and we already can't divulge any of

22  this information even to them unless it's necessary.

23          THE COURT:  All right.  So let me see if I

24  understand what you're saying.  I think the first thing I'm

25  hearing you say is from your perspective, the protective order

1   addresses the concerns as they relate to any confidentiality

2   concerns, any privacy concerns, even any concerns that relate

3   to the best interest of the child because of the way that the

4   protective order is drafted.

5          MS. WANGERIN:  That's correct.

6          THE COURT:  And you're saying that the obligation or

7   the duty to assess or evaluate the method, the manner, and

8   whether or not certain materials that might be sensitive are

9   even communicated to the named plaintiffs, that's what the --

10  one of the functions of the next friend counsel is.

11         MS. WANGERIN:  That's correct, your Honor.

12         THE COURT:  All right.  And I think I also heard you

13  say that if a caseworker or, really, anyone at DCYF has a

14  concern about information that may currently be redacted on the

15  theory that it's in the best interest of the child for that

16  material not to be made known to counsel or made known to the

17  named defendant -- the named plaintiffs, excuse me, that a way

18  that they could do that would be to highlight or flag that

19  information in some other manner, not by redacting it, but

20  either by providing a narrative or color-coding it --

21         MS. WANGERIN:  Yes.

22         THE COURT:  -- or telling you on paragraph -- here's

23  the list of information that we think could be harmful --

24         MS. WANGERIN:  Yes.

25         THE COURT:  -- and deal with it that way.

1          MS. WANGERIN:  That's right, your Honor.  We're all

2     trying to work in the best interest of the kids here and we

3     have no intention of harming the children in any way through

4     the course of this litigation and causing them any -- any

5     further unnecessary harm.

6          THE COURT:  Okay.  So let me ask you this.  In the

7     protective order there is a provision that allows the

8     defendants to seek heightened protection.

9          MS. WANGERIN:  Yup.

10         THE COURT:  Is that where we are procedurally?

11         MS. WANGERIN:  I think it is.  I think that, you

12    know, to the extent -- and I think they raise that in their

13    objection as well, that to the extent that the Court is

14    inclined to make this determination that it asked them -- it

15    asks the Court to treat their request as a category 7 -- a

16    paragraph 7 request.

17         THE COURT:  All right.  And are you agreeable to

18    having the Court do that?

19         MS. WANGERIN:  To treat it -- to determine whether

20    or not this material is subject to heightened protection?

21         THE COURT:  Yes.

22         MS. WANGERIN:  We think it should not be subjected

23    to heightened protection.

24         THE COURT:  I understand.  But procedurally -- I

25    mean, I think when this was drafted, you tell me if I'm wrong,

1    the response was either supposed to be here are the documents

2    as I read the protective order or we have withheld the

3    following categories of information and we are going to be

4    moving the Court for heightened protection.

5              MS. WANGERIN:  Yeah.

6              THE COURT:  That's not what happened here.  You

7    filed a motion to compel.

8              MS. WANGERIN:  Correct.

9              THE COURT:  And in their reply they're saying, oh,

10   please convert this, Judge, to a motion for heightened

11   protection.

12             So I'm asking you if you are prepared to go forward

13   in that manner.

14             MS. WANGERIN:  I think -- I think that's fine in

15   this instance because we were -- we were noticed on that in

16   their objection and I think we are prepared to go forward, but

17   in the future we would ask that if rather than just redacting

18   documents, if there are documents that they wish to redact that

19   they follow the protocol set forth in the protective order.

20             THE COURT:  Okay.

21             THE COURT:  And I'm sure the parties appreciate that

22   the Court could have very easily said that's not where we are

23   and folks need to do this a different way.  I'm trying to be

24   practical.

25             MS. WANGERIN:  Yes.

1          THE COURT:  So I appreciate that and I'm sure the

2   defendants do, too.  But normally when you file a reply you

3   can't ask for relief.  It's not a motion.  It's a reply.

4          So I'm not going to be overly fussy about it, but

5   procedurally, that's why I'm asking the question.

6          MS. WANGERIN:  Thank you.

7          THE COURT:  All right.  So that's very helpful.

8   Thank you.

9          MS. WANGERIN:  Thank you.

10          THE COURT:  Before I ask defendants some questions,

11   is there anything that counsel wishes to highlight for the

12   Court before we move on to some other questions that I have?

13          MS. RAMSEY:  If we're still talking strictly about

14   the best interests of the child redactions, then I would say a

15   couple of things.

16          THE COURT:  Okay.  Well, we're talking about the

17   whole universe of documents in dispute, but I'd love to hear

18   about that issue and we can move on from there.

19          MS. RAMSEY:  Okay.  Respectfully, these children are

20   not in the DRC's custody.  They're in the DCYF's custody.  And

21   we have caseworkers and psychologists and parents and teachers

22   that are working with these children on a daily basis, trying

23   to help them.  And I know that DRC has these children's best

24   interests at heart as well, but the idea that a caseworker

25   would simply highlight for a next friend in litigation what

1   they think that the child should not see and then just either

2   trust that that would be honored or maybe it wouldn't.

3          And we would have not only had that information

4   provided, but provided by a party that is not dealing with

5   these children on a daily basis and that is serving in a

6   litigation advocacy role in a lawsuit about systemic problems

7   at DCYF and not pertaining specifically to these children.  And

8   that we should simply allow those decisions to be made by a

9   next friend seems to me like an abrogation of our

10  responsibilities to protect these children.

11         What we have offered is to allow the attorneys to

12  look at the documents; that if the attorneys feel they need to

13  show these documents to the children for some reason, that if

14  they will let us know what those reasons are that we will try

15  to work with them to figure out how to make that happen.  That

16  was not acceptable.

17         I've also offered to have them made available

18  attorneys' eyes only with no -- and if -- and if they let us

19  know that they had decided that they could do that within ten

20  days unless we filed a motion for heightened protection.

21         So I think what's at issue with respect to these

22  best interests records is not anything other than whether or

23  not DCYF could appropriately simply turn that responsibility

24  over to the next friends.

25         THE COURT:  Okay.  Without a court order.

1          MS. RAMSEY:  And the mechanics of how we need to

2  allow the attorneys to see them, I don't think they go directly

3  to the heart of this case, but I also have no problem with the

4  attorneys seeing them to make that determination for themselves

5  and then let me know if they think that they do and work

6  through that.  But we are a little premature on that issue, in

7  my judgment.  And part of that is why we didn't file a motion

8  for heightened protection is because we were trying to work

9  through this.

10          THE COURT:  That's fine.

11          MS. RAMSEY:  And then as you say, a motion to

12  compel --

13          THE COURT:  That's fine.  We're here.  We're going

14  to talk about all of those things.

15          MS. RAMSEY:  Yup.

16          THE COURT:  But I just needed to make sure that

17  everyone was okay with that.

18          MS. RAMSEY:  Yup.

19          Are there other questions that the Court has.

20          THE COURT:  All right.  I'm not limiting this to the

21  best interest of the child designation.  I'm focused on other

22  than the attorney-client privilege objections, for lack of a

23  better word or bases for redaction or failure to produce, the

24  Court understands the following in terms of the defendant's

25  arguments.

1          One is that there are state law privacy protections

2     and other confidentiality provisions that the defendants are

3     asking me to either apply in this case or to engage in a

4     weighing of the need for the information against the rationale,

5     for lack of a better word, that prompted the state statutory

6     protections.  Do I understand that correctly?

7          MS. RAMSEY:  You do, your Honor.

8          THE COURT:  All right.  Are you making any arguments

9     that the information that the plaintiffs seek is not relevant?

10          MS. RAMSEY:  I would say that it -- we would argue

11     that its relevance is nominal and is outweighed by the concerns

12     inherent in the privileges that we're citing.  I would say

13     specifically with respect to the category 1 documents that are

14     completely nonresponsive and probably just misfiled that

15     I -- I can't -- I don't know that I can even see nominal

16     relevance.  But, again, I'm not -- we've not had those

17     discussions.  I don't know why the plaintiffs would think that

18     some of these things are relevant.

19          THE COURT:  Okay.  But they don't know what these

20     things are.  They haven't seen them.

21          MS. RAMSEY:  They've got the redaction logs, which

22     is, you know, the best we can provide without providing the

23     documents or engaging in --

24          THE COURT:  All right.

25          MS. RAMSEY:  -- an *in camera* review protocol.

1          THE COURT:  Okay.  So category 1 documents you say

2   are not relevant.  What about the other categories?

3          MS. RAMSEY:  So category 2 information, which is

4   things that are only tangentially related to the plaintiffs in

5   their files and where someone else is owed a duty of privacy or

6   confidentiality, so personally identifying information and

7   health information of DCYF clients other than the named

8   plaintiffs.

9          THE COURT:  All right.  So you're relying on state

10  law for that.

11         MS. RAMSEY:  Yes, and a federal right of privacy

12  exists with respect to those documents as well.

13         And with respect to the protective order, while I

14  understand that that prohibits use of those documents, it

15  doesn't necessarily answer the privacy concerns of DCYF's

16  clients and these unrelated third parties.

17         So while the protective order would keep the

18  documents from going into the public domain, and we've been

19  able to produce a great deal more than we would ordinarily

20  produce under the statutes because of that, there are some

21  things, including the segregated sibling records as well as

22  this third-party information that just simply needs to be

23  protected, frankly, from DRC and Children's Rights.

24         There's not any reason that I understand why, for

25  example, DRC would need to know if, hypothetically, one of

1    these children's siblings went to the doctor and was diagnosed

2    with gonorrhea or went to a psychologist and made outcry that a

3    grandfather had sexually abused them when they were four years

4    old.  And those are strictly hypothetical.  I'm not proposing

5    anything.

6                  THE COURT:  I understand.

7                  MS. RAMSEY:  But these files, these family files,

8    touch on some of the most private and sensitive family

9    information that exists.  The reason that those state law

10   privileges are in place is because those people talk to DCYF

11   workers about terribly personal and private things.  We're

12   investigating abuse and neglect with respect to these children.

13                  So I could not in good conscience simply agree to a

14   protective order in a federal case and then disclose all that

15   information if it's only tangentially related to the lawsuit.

16                  I think that argument applies to everything but

17   category 5 and 6, frankly.  Those are the sibling foster

18   parents' contact information.  There's primarily a safety

19   concern with that.

20                  THE COURT:  But where is that information going

21   other than to counsel?

22                  MS. RAMSEY:  To their clients, because there's not

23   an agreement that they would keep that information from the

24   children.

25                  THE COURT:  Do you want to respond to that?  Because

1    maybe we can make that a low hanging fruit issue.

2              MS. WANGERIN:  Your Honor, I think that there are a

3    number of things that we want to respond to, but, you know,

4    just -- in terms of the information that -- I think this

5    tangentially related, this protected health information that

6    defendants most recently were describing, again, if that

7    information isn't necessary to -- to -- for us to discuss with

8    our client to conduct this litigation, we will not be sharing

9    that information with them.

10             To the extent that they're worried about us having

11   this information, there is a whole host of reasons why we may

12   need information about the siblings.  I mean, first of all,

13   they maintain these family files because DCYF is tasked to

14   create case plans for the family unit.  They are tasked with

15   creating -- with serving the family unit.  They're tasked with

16   creating -- to figuring out, you know, again, the contact

17   between the siblings, whether they should be together, whether

18   they should be apart, and all of this information that may

19   relate to the sibling or other people may -- may be important.

20   It may not.  But that's not for them to decide.

21             There are a number of cases cited in our reply

22   brief, the *Bartholomew* case, the *Hasbro* case, *Sexual Minorities*

23   *of Uganda*.  All of those cases dealt with confidential privacy

24   information, some of which was not even relevant.  And what

25   those courts found was that it's not for defendants to, you

1    know, go through and unilaterally redact large swaths of

2    otherwise responsive information.  These case files are

3    incredibly responsive.  These case files are -- form the crux

4    of this litigation.

5              In the *Dwayne B.* court, the Court said:  It is

6    difficult to imagine subject matter more relevant to the

7    plaintiff's claims of improper administration of Michigan's

8    Child Protective System than the very records of that system.

9              It went on to say that:  While the child protective

10   law and the other statutes identified by defendants represent a

11   valid and important state interest in confidentiality, their

12   paramount purpose is the protection of children whose interest

13   the department exists to serve.

14             Here the department exists to serve these children

15   as families and all of this information is interrelated.  Even

16   when you're talking about the identity of -- of reporters,

17   which is one of the categories, who -- who made a report of

18   these -- you know, of abuse and neglect is incredibly relevant.

19   It's relevant to whether or not that person is a relative,

20   what -- you know, if somebody makes a report and they're a

21   relative who may be able to provide care and placement for the

22   children, the identity of that person is relevant.

23             If -- if the reporter was a reporter of abuse while

24   the child was in the care and the custody of the department,

25   that report and who made that report is relevant to whether or

1   not the child was harmed and is likely to lead to other

2   discoverable information.

3         And so to say that defendants get to piecemeal

4   decide what's relevant in responsive documents and what may or

5   may not, you know, be important in this case isn't for them to

6   decide.  And there's a litany of case law making very clear

7   that that's not for them to decide and that -- and that a

8   tightly worded, carefully crafted, comprehensive protective

9   order is the -- is the right way to go in those cases.  And

10  that's what we have here.  And it very clearly protects the --

11  the clients.

12        And to the extent that the defendants are arguing

13  that it's -- you know, it's DCYF's job to protect these kids

14  and that -- and that we as their counsel don't have an

15  obligation to them, we're their lawyers.  Defendants assented

16  to appointment of their next friends.  We absolutely have a

17  legal relationship with these clients and are bound to

18  represent their best interest -- to represent their interests

19  and ensure that we do this in a way that does not harm them.

20        And, again, we -- we are willing to take any

21  information that is relevant to that determination to make sure

22  that we are conducting this litigation in a way that doesn't

23  add harm to these plaintiffs, but they asked us to be their

24  lawyers and to represent them in this systemic case.  And we

25  think that the protective order is more than adequate to

1    protect the concerns raised by defendants.

2         THE COURT:  Okay.  So let me ask a question and then

3    I'm going to turn it over to you, Attorney Ramsey.

4         Thank you very much, Counsel.

5         So this is an interesting aspect to the protective

6    order.  It's been approved.  It is the protective order in this

7    case.  And I'm looking on page 4 at Roman lower case or small

8    Roman ii, Parties.  And it says:  Parties and employees of a

9    party to this order, but only to the extent counsel

10   determines -- so it's counsel -- that the specifically named

11   individual party or employees' assistance is reasonably

12   necessary to conduct -- to the conduct of the litigation in

13   which the information is disclosed and only after such persons

14   have completed the certification contained in Attachment A.

15        And the heading to this particular paragraph is --

16   actually, it's part of paragraph 5, protection of confidential

17   material, and it's the Limited Third-Party Disclosure section.

18        And so I guess, as I hear what you're saying is the

19   issue of whether -- if the Court finds that the materials

20   should be provided to you in an unredacted form, what you're

21   saying it is then, per this agreement, the responsibility of

22   counsel to the plaintiffs to make a determination as to whether

23   it is reasonably necessary to share the information with the

24   named parties, the named plaintiffs, and, if so, they're going

25   to be asked to complete an Attachment A.

1          MS. WANGERIN:  That's right, your Honor.  That's --

2          THE COURT:  And so what happens if -- I mean, it

3    sounds like what you're saying is that's where the buck stops,

4    it stops with you; that there isn't an opportunity here unless

5    the defendants seek heightened protection for them to object to

6    or take some action as it relates to information that you deem

7    is reasonably necessary to share.

8          MS. WANGERIN:  And I -- and I want to emphasize that

9    it's reasonably necessary.  It's not that we think it's in

10   their best interest to know about; it's reasonably necessary to

11   conduct this litigation.

12          So certainly if we make a gross error of judgment

13   and were to divulge information to them that -- to the

14   plaintiffs that ends up harming them in the way that defendants

15   fear, we would have to come back and justify that as officers

16   of the court we abided by the protective order in disclosing

17   that information.  I certainly don't want to be in the position

18   of doing that by making an error in judgment on what we

19   disclose to our clients.  And -- which is, again, why, you

20   know, we think it's very important that, you know, if DCYF has

21   these -- these concerns that we know about them and that we can

22   make sure that we are taking extra care with those documents

23   not to divulge this information.

24          THE COURT:  So I'm just going to pick something out

25   of the sky here.

1        One of the documents that -- or things that was

2   redacted is account and routing numbers from a foster parents'

3   personal check.  All right?  Is that relevant to this case?

4        MS. WANGERIN:  It's not relevant, but, you know,

5   under the -- under, you know, *Hasbro*, *Bartholomew*, and -- and

6   *Sexual Minorities of Uganda*, all of those cases say that it's

7   not for defendants to decide.  That information, no, it's not

8   relevant.  But it's responsive to our request for production of

9   documents and it is information that is subject to protective

10  order and that information goes -- goes nowhere.

11        THE COURT:  All right.  Okay.  All right.  So the

12  category 1 materials, the materials that DCYF and/or the

13  New Hampshire Attorney General's Office has concluded are

14  misfiled documents, what -- what's their relevance?

15        MS. WANGERIN:  Well, they -- first of all, if

16  they're probably misfiled, they may have relevance.  We don't

17  know unless we can see them.  And so to the extent that those

18  documents are part of a case file that is responsive to our

19  request, they are responsive documents and they should be

20  provided pursuant to the protective order without redaction.

21        I suppose the other purpose that they would be

22  relevant is, you know, if it is a lot of documents or even if

23  they are important documents, it could go directly to the issue

24  of defendants' file management which potentially could be a

25  systemic issue that is highly relevant to this case and what

1    information they have available to them in determining case

2    planning and placement of these children.  If there are, you

3    know widespread filing issues in these cases, that's highly

4    relevant to our claims.

5              THE COURT:  Okay.  All right.  Thank you.

6              All right.  Attorney Ramsey.

7              MS. RAMSEY:  I don't think there are any allegations

8    in this lawsuit about file management practices.

9              Again, to return to what's at issue, this is a

10   lawsuit that is alleging that the department has not done a

11   good enough job of complying with the integration mandate under

12   the ADA and the Rehabilitation Act.  The allegation is that we

13   need to be putting fewer children into congregate care and

14   moving them more into community-integrated settings; that we

15   need to allocate greater resources for therapeutic foster

16   homes; that we need to provide greater services in the

17   community so that children can move into community residential

18   settings as opposed to congregate care settings.

19             I don't -- I don't think that those are relevant.

20   And there are two, I think, redactions of nonresponsive,

21   completely unrelated, probably misfiled documents in C.I.'s

22   file -- oh, there's one in our case file as well.

23             THE COURT:  You're talking about three documents?

24             MS. RAMSEY:  Yes, three redactions, yup, out of over

25   16,000 pages of files.

1          THE COURT:  Okay.

2          MS. RAMSEY:  So -- so also your example that you

3  extracted from the log I find instructive.  I think those types

4  of determinations should be made on a document by document

5  basis and counsel have -- we all have not yet done the work

6  that we should do to sit down to go through these to see if we

7  can have discussions that would resolve some of this by

8  reviewing the documents on the log, if there are relevant

9  arguments -- relevance arguments, to make them.

10          But, again, the example of needing to see how we

11  make placement decisions makes some sense to me, but I'm

12  hearing that now and I'm not hearing that with respect to a

13  specific document.  I'm hearing that in the hypothetical sense.

14          I am more than willing to continue the dialogue to

15  try to work through those types of issues and would -- would do

16  that.  And I think -- we've already done that ourselves and

17  would share that information, but we just haven't had that

18  opportunity yet.

19          I think the last thing that I heard is that these

20  are responsive to a production request and I again want to

21  bring us back to the fact that all we're here on right now is

22  an agreement to produce the files of these children.

23          THE COURT:  Okay.

24          MS. RAMSEY:  So the discussion about how they get to

25  probe greatly into all of DCYF's --

1           THE COURT:  Well, they're not.  I'm understanding

2    that I'm issuing a ruling as it relates to these four files.

3           MS. RAMSEY:  Yup.

4           THE COURT:  And so when you respond, you may be

5    informed by my ruling, if I make one, when you produce

6    documents going forward, but.

7           MS. RAMSEY:  Yes.

8           THE COURT:  -- I'm not here on a request for

9    production of documents.  I'm here on the agreement that was

10   reached, as I understand it, by the parties back in March, if I

11   recall correctly, when there was a discussion to stay the

12   proceedings pending the motion to dismiss and there was a

13   universe of files that were agreed to.

14          MS. RAMSEY:  Yes, there --

15          THE COURT:  The four named plaintiffs's files.

16          MS. RAMSEY:  Named plaintiffs' files, correct.

17          THE COURT:  All right.  And so what I don't see in

18   the agreement and I haven't heard from either side and I may be

19   remiss because I went down the relevance road, I don't see that

20   relevance was an issue in the agreement.

21          MS. WANGERIN:  I don't believe that it was.  I

22   believe -- we asked for the files and that's what we

23   anticipated receiving.

24          THE COURT:  Okay.  So I'm still struggling with why

25   the protective order doesn't resolve the dispute.  I understand

1    that there's state law and there are privacy considerations,

2    and so we'll talk a little bit about that in just a moment, but

3    other than the state law privacy concerns, doesn't the

4    protective order cover all of the other issues that have been

5    addressed with the Court this morning as they relate to those

6    documents and the interests of third parties or the interest of

7    other individuals, including concerns about the best interests

8    of the child?

9          MS. RAMSEY:  I -- to answer that question, I think

10    we would need to go through the log line by line and it might

11    resolve some of them, but I don't think it resolves all of the

12    issues because the protective order creates a facility for us

13    to produce documents to DRC and allows those -- allows us

14    comfort to know that those documents will not go further than

15    this lawsuit; they're not going to show up in the newspaper,

16    they're not going to show up in the public --

17          THE COURT:  But they can't.

18          MS. RAMSEY:  Of course they can't.  No, they can't.

19    But the protective order does not satisfy our obligation not to

20    provide them to DRC in the first instance if we have a

21    responsibility to do that.  And particularly with respect to

22    the materials that have to do with the best interests of

23    children, while I hear DRC saying you can -- you can trust us

24    to have the children's best interests at heart, the protective

25    order says that they will only produce them if it's necessary

1      to defend the litigation.

2              It doesn't say that they have to make a decision

3      about whether or not defending the litigation by providing a

4      child information is harmful to their overall mental health and

5      well-being.  And the redactions that we've made go to what is

6      in the best interest of the child, which is not the same

7      inquiry as whether or not something is necessary to defend a

8      lawsuit or prosecute a lawsuit.

9              THE COURT:  All right.  So you're saying despite the

10     protective order and despite the agreement, you have some or

11     DCYF has some independent duty to shield that information in

12     the first instance and it's up to me to decide whether to honor

13     that shield or to order that it be turned over.

14             MS. RAMSEY:  And we have -- I would just add to

15     that, your Honor.

16             Based on the protective order, we have produced --

17     probably two-thirds of the material that we have produced is

18     not something we would have produced but for the protective

19     order.  We have produced much more than a plaintiff -- than an

20     individual would be entitled to see of their own file.  We've

21     produced all of the court records, we've produced all of the

22     third-party created records, none of which are defined under

23     the statute as being contained within the case record, which is

24     what a -- an individual or their family members or

25     representative are entitled to see under the statute.

1          So the protective order has been enormously helpful

2   and I would love to have been able to produce all the siblings'

3   files and not spend the hundreds of hours we've had to spend to

4   segregate them, but was unable to get an agreement that the

5   siblings' parents, same parents as the plaintiffs' children,

6   were requesting the files.

7          We -- we started this inquiry when I discovered --

8   so, first of all, we made this agreement at a time when I

9   hadn't seen the files yet.  Once the files came in and I

10  realized that there were sibling issues involved and that these

11  were being kept as family files, we had a discussion about

12  whether we could get the parents to basically sign off and make

13  the requests because the parents -- the siblings are not

14  represented by these attorneys; the siblings still have their

15  parents as their legal guardians and they don't have next

16  friends appointed.

17         And I thought it would be great since they are

18  telling me that they're in contact with the parents, let's get

19  the parents to say that it's okay to produce the sibling files.

20  We weren't able to get there.  And I'm not sure why, but

21  with -- with me having asked for the parents' authorization to

22  produce their other children's files and not being able to get

23  that, I feel an obligation to protect that confidentiality.

24         THE COURT:  Okay.  All right.  I appreciate that.  I

25  appreciate that.

1        I'm not sure we need to go through the redactions

2   item by item and line by line.  I had thought that there was

3   the possibility here that we might be able to shortcut some of

4   this and I will do that if the parties think that that would be

5   helpful.  Otherwise, I really do see this -- the issues here,

6   the dispute here, coming down to the applicability of the state

7   privacy and confidentiality protections that the government or

8   the defendants here are raising as concerns and a basis to

9   redact the information and whether the protective order

10   addresses those things adequately from the Court's perspective

11   on a balancing test, if I even need to reach a balancing test.

12   I'm not persuaded that I do, given broad discovery in federal

13   court under our federal rules.

14        All right.  So I'm going to turn it over to

15   plaintiff's counsel again and then I'll turn it back over to

16   you, Attorney Ramsey.

17        MS. WANGERIN:  Your Honor, thank you.

18        So there's three points I just wanted to make in

19   response to that.  I mean, first of all, in terms of, you know,

20   again, the best interest issue, I just want to remind the Court

21   that the next friends were appointed to represent the best

22   interests of the kids and to ensure that the litigation is

23   conducted with -- in accordance with their best interest.  So

24   we do think that there's adequate protections in place there.

25        Number two, the *Dwayne B.* Court specifically looked

1    at the stage supplementation of records that defendants are

2    proposing here.  So in that case, the defendants had proposed

3    that if they make redactions, then plaintiffs can go -- come

4    back and they can have a discussion about -- about whether or

5    not that information should be produced and then if they can't

6    agree, then they can go back to court.  And what the court

7    determined in *Dwayne B.* is that that would be a colossal waste

8    of resources and that the protective order was adequate to --

9    to manage any of those concerns.

10           Number three, in terms of the sibling records and

11   defendant's request for parental consent, I just want to remind

12   the Court that the parents are not -- are not parties and it

13   would just be fundamentally unfair to make them choose between

14   providing consent and potentially angering the very agency that

15   may be pursuing termination of their parental rights.  And

16   that's just not a fair ask.

17           In terms of the -- you know, the privacy --

18   specifically the privacy concerns and whether or not the

19   federal rules usurp the state privacy laws, we have two cases

20   that we've cited that are directly on point in terms of child

21   welfare cases.  And that's the *Henry A.* case and the *Dwayne B.*

22   case, both finding that all manner of records, including --

23   including sibling records, including non -- nonplaintiff foster

24   youth, including reporters -- I think *Henry A.* included

25   reporters.  All of those types of records were well protected

1    through a robust protective order.

2              In addition, this court has decided in *Moses v. Mele*

3    that state -- that federal rules or that state privacy laws do

4    not usurp the Rule 26(b) discovery practices.  And so this

5    court has made independent decisions that was then recited in

6    other cases in front of this court.

7              So I think that there's adequate support here that

8    the federal rules really are what govern and that there's

9    really no basis to -- to provide protection to these records

10   beyond what the protective order already allows.

11             This -- this protective order already goes well

12   beyond the protective order that defendants cited in the *Soto*

13   case where in that case the protective order allowed the

14   internal police affairs documents to the plaintiff's counsel,

15   to experts, and to the plaintiffs themselves.

16             This protective order goes beyond that by limiting

17   the records even to the plaintiffs themselves and we just see

18   no basis for requiring us to waste resources by coming back

19   again and again, not just with these named plaintiff files, but

20   to the extent we then eventually request putative class member

21   files, we just see this issue as rearing its head again and

22   again throughout this litigation.

23             And if we're required to, you know, discuss every

24   document, whether with defendants or in court, it is just going

25   to consume a tremendous amount of resources moving forward and

1    we would prefer to avoid that.

2              THE COURT:  Okay.  But today we're not talking about

3    that.

4              MS. WANGERIN:  Today we're not talking about class

5    actions.

6              THE COURT:  I really want to make sure we're focused

7    on the agreement and the four files or the family files,

8    however we want to describe them, the files that relate to the

9    four named plaintiffs.

10             All right.  So let me ask you this.  If a sibling

11   file was not integrated, for lack of a better word, with the

12   file of one of the named plaintiffs, that wouldn't be subject

13   to the agreement to produce, correct?

14             MS. WANGERIN:  That would not be subject --

15             THE COURT:  All right.

16             MS. WANGERIN:  -- to the agreement to produce.

17             THE COURT:  Okay.  Thank you.

18             MS. WANGERIN:  Thank you.

19             THE COURT:  All right.  So, Attorney Ramsey, I have

20   a question for you.

21             DCYF integrated files and is the Court correct to

22   assume or to understand that the integrated files were

23   available to the caseworkers or individuals that were working

24   at DCYF for the children that were the subject of that family?

25             MS. RAMSEY:  Where there was a single caseworker for

1   multiple siblings.  Then that caseworker would have access to

2   the whole family file, if that answers your question.

3                THE COURT:  What if there was more than one

4   caseworker?  What if there was more than one caseworker?  Could

5   they access the whole file?

6                MS. RAMSEY:  They probably could walk across the

7   hall and look at it, but it wouldn't be the file that that

8   caseworker created.  There would be separate files created for

9   each kid and to the extent that there was confidential

10  information -- you know what, I'm going to take that back.  I

11  don't think they could walk across the hall and look at it.

12  Because DCYF treats -- where there are conflicts between

13  siblings, DCYF treats information about one child as

14  confidential from another child.  Siblings don't necessarily

15  need to know everything and their caseworkers don't need to

16  know everything --

17               THE COURT:  But then those would be segregated.

18               MS. RAMSEY:  They would be.  I thought that that's

19  what you were --

20               THE COURT:  All right.  But I'm talking about an

21  integrated file.  Where there's an integrated file, if I have

22  the integrated file for the Jones children and you are also a

23  caseworker for the Jones children, you get to access the whole

24  file.

25               MS. RAMSEY:  There wouldn't be an integrated file

1    unless there's one caseworker for the family.

2              THE COURT:  Okay.  And so what's the rationale for

3    having one caseworker for the whole family?

4              MS. RAMSEY:  Because you treat the family as a

5    family unit.  You manage the needs of the family as a family

6    unit, and that's the way DCYF proceeds in most cases.  It's

7    rare to have separate caseworkers for several kids and that

8    happens when there are conflicts between --

9              THE COURT:  Okay.

10             MS. RAMSEY:  -- them.

11             And I wanted -- want to let the Court know how we

12   approach the segregation process, because I don't know that

13   that's been clear and I do think that that's important.

14             So where you're headed is exactly -- where I think

15   you're headed is exactly what our though process was, is that

16   to the extent there was information about one sibling in

17   another sibling's file, that wouldn't necessarily cause a

18   redaction.

19             So references like, you know, all of the children

20   attended a visit with mom and dad on Saturday and this one said

21   this and this one said that, we didn't redact any of that.  All

22   we redacted is information that would only have been in that

23   separate child's file.

24             So court records that pertained exclusively to that

25   child's legal proceeding which, again, there's a statute that

1   requires that proceedings under 169-C be sealed and be

2   confidential, we also redacted things like the hypotheticals

3   that I gave you earlier, but we were --

4            THE COURT:  Sensitive medical information --

5            MS. RAMSEY:  Yes.

6            THE COURT:  -- and mental health information.

7            MS. RAMSEY:  Yup.  We tried to produce as much as

8   could conceivably ever have been in one of the plaintiff's

9   files.  It wasn't -- it was -- it's included unless there's no

10  way this document should ever have been in this child's file to

11  begin with if they were separate files.

12           THE COURT:  But they're not separate files.  This

13  is --

14           MS. RAMSEY:  No --

15           THE COURT:  -- what I'm struggling with.

16           MS. RAMSEY:  No, they're not.  And I didn't know

17  that at the time that we entered into this agreement.  We -- we

18  had -- we had discussed putting a protective order in place to

19  provide a facility to release as much as we could, then we

20  started negotiating an agreement to produce the children's

21  files in exchange for a stay of any other discovery.

22           We talked about --

23           THE COURT:  Okay.

24           MS. RAMSEY:  -- the logistics of that in the context

25  of the protective order, but I didn't have the files in front

1   of me to know that any of these were -- children's files were

2   contained as family files.

3              THE COURT:  Okay.

4              MS. RAMSEY:  So that's the reason that that -- that

5   wasn't addressed at the time.

6              THE COURT:  Okay.

7              MS. RAMSEY:  And then when we realized it, my first

8   proposal was let's just get the parents to consent so that we

9   don't have to redact and when that didn't work out, much to my

10  chagrin, we had to review and make these determinations.

11             THE COURT:  Okay.

12             MS. RAMSEY:  Because in the absence of some reason

13  that I don't have to comply with the state law, DCYF still has

14  to comply with the state law.

15             THE COURT:  Okay.  I understand.  And --

16             MS. RAMSEY:  And I understand that federal court

17  discovery is very broad and that when there's a lawsuit

18  pending, relevance should be stretched as far as it possibly

19  can be.  And I don't think you will see me over here on any

20  discovery disputes because that's how I approach these cases --

21             THE COURT:  I appreciate that.  So I'm not asking --

22  I -- it doesn't surprise me, given the records that are at

23  issue, that we are here.  Okay?  And I think everyone

24  appreciates that.  And that's why I'm asking so many questions,

25  because --

1          MS. RAMSEY:  Sure.

2          THE COURT:  -- I'm trying to understand the universe

3     of documents and the bases for withholding the materials.

4          And what I'm hearing, and this may be a somewhat

5     oversimplified explanation, is there are a variety of

6     obligations under state law that DCYF has and they are

7     observing those restrictions unless the Court orders otherwise.

8          MS. RAMSEY:  I think you --

9          THE COURT:  Even in the face of a protective order,

10    and even in the face of the agreement, because without a court

11    order, they are not comfortable -- and that's my word, you

12    haven't used that word -- sharing this information based upon

13    your review and their review of the materials.

14         MS. RAMSEY:  And I would add one additional thing to

15    that, your Honor, which is we're not just going through the

16    motions to comply with state law until you order us otherwise.

17         THE COURT:  Uh-huh.

18         MS. RAMSEY:  The reason for the protections under

19    state law, the underpinnings of these concerns, is to promote

20    reporting of abuse and neglect by anonymous persons or persons

21    who want their confidentiality protected.

22         THE COURT:  Uh-huh.

23         MS. RAMSEY:  The reason for the privacy concerns is

24    to make sure that families work with the department.  There are

25    policy reasons underlying these protections.  I -- I don't want

1    the Court to think that I'm trying to signal just order me and

2    then we'll be fine.

3              THE COURT:  Yeah.

4              MS. RAMSEY:  If that were the case, we'd have agreed

5    to an order already.

6              THE COURT:  Sure.

7              MS. RAMSEY:  But there are some significant reasons

8    when you dig into the specific documents here why each and

9    every one of these pieces of information was withheld.  We

10   erred on the side of producing everything we could.  We are

11   down to the universe of documents that we think should not fall

12   into the hands of these folks because they're very unrelated to

13   the lawsuit or implicate concerns of the individuals involved

14   that do warrant protection, which is why we're asking you to

15   engage in the balancing, which is why we're asking you to

16   honor, under the federal rules, the concerns that have been

17   alleged in the state provisions.

18             THE COURT:  Okay.  So I have one other question for

19   you, Attorney Ramsey, and that is earlier you said we'd like to

20   have this opportunity to at least have this preliminary

21   attorneys' eyes only exchange.

22             MS. RAMSEY:  (Nods head.)

23             THE COURT:  And you probably know, and most of you

24   probably know, that lots of times I encourage the parties to do

25   that, not as a sort of default, but there are times when I do

1    that.

2             But in this case, based on what I see, it appears

3    that there was a fair amount of back and forth that's already

4    happened and that the parties just simply had to agree to

5    disagree and come here.

6             Am I misunderstanding that?  Are you -- are you

7    representing to the Court that there has not yet been a

8    meet-and-confer that's required under the rules or are you

9    simply saying, Judge, before you issue a ruling, we'd really

10   like to sit down with folks.

11            MS. RAMSEY:  So I'll answer with respect to two

12   different -- but like the answer is different depending upon

13   which --

14            THE COURT:  Okay.

15            MS. RAMSEY:  -- category of documents you're talking

16   about.

17            THE COURT:  Yup.

18            MS. RAMSEY:  With respect to most things I don't

19   think we've had a meet-and-confer like I've engaged in in the

20   past where we sit down with Bates numbered documents and a

21   privilege log and we talk about the items and try to see what

22   we can work out between attorneys.  That just hasn't happened

23   in this case.  Maybe that hasn't happened because -- because of

24   the way we produced the production, plaintiffs can tell that

25   they will not ever be happy receiving anything less than a

1    hundred percent unredacted files.  And if that's the case, then

2    that's why that meet-and-confer hasn't happened.

3            With respect specifically to the best interests

4    information of the children, we have had a ton of

5    back-and-forth on that and I would say that we have offered an

6    agreement that seems like it should take care of the problem.

7    If the need is to have the information in order to prepare for

8    litigation, why not receive it and look at it as the attorneys

9    and then let me know if you think it needs to go to the

10   children.  If you think it needs to go to the children, give me

11   an opportunity to come over here and protect it.  But don't ask

12   me to turn it over and then let -- let you decide what happens

13   to it without having some say in that.

14           So with respect to that particular category, I

15   definitely think that that is ready for you to rule on.  I

16   don't think there could have been any more back-and-forth on

17   that than there has been and, you know, I think the attorneys

18   have -- have talked these issues through in the abstract, but

19   we have not gotten down to specific documents and talked about

20   why are they needed, why are they relevant, are you sure that

21   you really need these, do you want to file a motion to compel

22   about this really or now that you've seen it, do you really

23   need it.  That hasn't occurred --

24           THE COURT:  Okay.

25           MS. RAMSEY:  -- with respect to any of the

1  documents.

2          THE COURT:  All right.  Thank you.  Is there

3  anything else before I turn it back over to counsel for the

4  plaintiff, to Attorney Wangerin, is there anything else you

5  want to highlight for the Court?

6          MS. RAMSEY:  I think we've thoroughly covered it,

7  Judge.

8          THE COURT:  All right.  Excellent.

9          Attorney Wangerin.

10          MS. WANGERIN:  Your Honor, I'll just be very brief

11  because I think we've also covered everything that we wanted to

12  point out.

13          But I do just want to refer the Court to the

14  Exhibits A through C in our reply brief to demonstrate that the

15  redacted records are not just information that was, you know,

16  would only appear in -- in a sibling's file.  There are

17  redactions woven throughout meetings from caseworkers and, you

18  know, observations of caseworkers that make many of these

19  documents completely unusable and just piecemeal redactions of

20  information that we just -- we don't understand why they would

21  be redacted.  But it certainly isn't the same description as

22  what you've just heard.

23          Secondly -- actually, I think -- I think -- so I

24  think the only other -- the only other issue is that -- you

25  know, I think, actually, I'm going to stop there.

1                    THE COURT:  Okay.  Thank you.

2                    MS. WANGERIN:  Thank you.

3                    THE COURT:  Attorney Ramsey.

4                    MS. RAMSEY:  And what I would say is looking at the

5     documents that are attached, some of them are no longer on the

6     privilege log because we went through and evaluated our own

7     redactions and you will find that those have subsequently been

8     produced in response to what we kind of took as specific

9     requests.

10                   The other thing I would say is if you want to know

11    whether or not this information is relevant or usable, come

12    over and sit down with me and look at it.  It -- it's -- I

13    don't think it is.

14                   MS. WANGERIN:  Your Honor --

15                   MS. RAMSEY:  I don't think it makes the universe of

16    16,000 pages of documents unusable because we redacted, gosh,

17    10 of 30 lines of a summary of a note from an interviewer about

18    a group of children when some of those lines have to do with

19    only a specific child and have nothing to do with the plaintiff

20    child whose file we agreed to produce.

21                   THE COURT:  Okay.

22                   MS. WANGERIN:  I just want to clarify that that is

23    in the amended production.

24                   THE COURT:  Pardon me?

25                   MS. WANGERIN:  I just want to clarify that that is

1    the amended production which is indicated at -- in the Bates

2    stamp as well.

3              THE COURT:  So Exhibits A through C are the amended

4    documents?

5              MS. WANGERIN:  They are the amended production.

6              THE COURT:  All right.  As opposed to the first set

7    of production.

8              MS. WANGERIN:  Yes.

9              THE COURT:  All right.

10             So let me just ask you this, Attorney Wangerin.  And

11   I'm not suggesting that I'm inclined one way or another to say

12   you should go look at the documents or not look at the

13   documents, but have the plaintiffs thought about going --

14   taking up the defendants on their offer to at least look at the

15   unredacted documents to decide whether or not the issues can be

16   resolved informally or are we past that, is that no longer an

17   option.

18             MS. WANGERIN:  Well, as far as the best interest

19   information, which is the only offer that we've received to do

20   that --

21             THE COURT:  Uh-huh.

22             MS. WANGERIN:  -- that's where the information,

23   again, goes directly to the heart of the case.

24             And, you know, as I said earlier, you know,

25   regardless of what's actually in those documents, we're not

1    saying that because we want the unredacted file, we're going to

2    run off and show the informs to our plaintiffs.

3              THE COURT:  Yeah.

4              MS. WANGERIN:  What we don't want to have to do

5    anytime that that information is redacted based on best

6    interest, whether now or later on in the case, is come back and

7    ask permission and tell defendants exactly what conversations

8    that we want to have with our own clients.  We don't think

9    that's fair to us.

10              THE COURT:  That's not what I was hearing this time.

11   I was hearing a different invitation.  And perhaps I

12   misunderstood.

13              Attorney Ramsey, what I understand you inviting the

14   plaintiffs to do was to take the entire universe of redactions

15   and materials that were set aside as having been segregated

16   from the file, so all of those pages in total that were set --

17   set aside because they related to siblings, for example --

18              MS. RAMSEY:  Best interest information.

19              THE COURT:  All right.

20              MS. RAMSEY:  The suggestion that where we have a

21   concern that something is not -- should not make its way into

22   the individual children's hands, if the plaintiff would like

23   that information so that they're -- for their case preparation

24   purposes --

25              THE COURT:  Okay.

1          MS. RAMSEY:  -- but would let us know if they

2     decided they needed to show it to the child.  They don't need

3     to tell us the reason, they just need to tell me so that I can

4     decide whether I need to run over here and file a motion for

5     heightened protection.

6          THE COURT:  Okay.

7          MS. RAMSEY:  So that was with respect to the sibling

8     information.

9          And with respect to the remainder of it, where a lot

10    of this has to do with whether or not the documents are of

11    minimal probative value and protected by a privilege, if they

12    would like to come over and sit and look at those documents

13    with me and go through them, I think that they may decide they

14    don't actually need most of this information.

15          (Sealed portion filed under separate cover.)

16          THE COURT:  All right.  So I have one other question

17    for the defendants and that relates to the reliance on the *Soto*

18    case for -- as a basis for the Court to engage in a balancing

19    test.  If I keep reading that case, the Court resolves that

20    issue by saying that we can put a protective order in place and

21    that that will address the privacy considerations and concerns.

22    So I feel like we're back where we started if I use the *Soto*

23    case as guidance for what I should be doing.

24          Go ahead.

25          MS. RAMSEY:  I've said it before and I'll just

1     circle back to what I've said.

2             The -- the protective order can, but does not

3     always, resolve a concern.  In this case, we've felt an

4     obligation to not make this highly sensitive information

5     available even to the Disabilities Rights Center and Children's

6     Rights and the ACLU, given the nature of this lawsuit being one

7     about a systemic policy discretionary decision and why these

8     individuals at this stage of the litigation when we have not

9     had a class certified, and I do not understand why the

10    plaintiffs would need to get this information as it pertains to

11    this case, why this would be critical to their defense.

12            In my mind, balancing the limited probative value of

13    the information that we have withheld against the concerns, the

14    privacy concerns, of this protective order and that no

15    protective order should be needed.  This information just

16    simply shouldn't be responsive and produced in the first

17    instance.

18            THE COURT:  Okay.  But don't the other cases that

19    the plaintiffs cite, don't -- aren't -- isn't the Court

20    confronted with a very similar set of concerns, if not the

21    identical set of concerns, and didn't the Court in each one of

22    those conclude that a protective order is going to adequately

23    protect the privacy and confidentiality interests of siblings,

24    of family members, et cetera?  Very similar.

25            Am I missing something as it relates to the *Henry*

1    case and the Michigan case, if my memory is correct, that are

2    cited by the plaintiffs?

3                MS. RAMSEY:  I think the difference is you need to

4    look at what's at issue in those cases.  If -- if the lawsuit

5    were about an allegation that DCYF is consistently dropping the

6    ball and not making decisions about what's in the best

7    interests of all children in DCYF, then it might be the DRC

8    would be entitled to delve into a great number of children's

9    files.

10               We agreed to produce the named plaintiffs' files

11   because that's their clients, but I don't think this lawsuit

12   really pertains to much about individual case files at all.

13   It's alleged as a (b)(2) class, saying that DCYF has engaged in

14   some systemwide planning and policy decisions that impact

15   everybody the same.  If that -- if they're now going to take

16   the position that they need to look into decisions in

17   individual files, this isn't a class action.

18               THE COURT:  Right, but I'm not in -- we're not in

19   class action discovery.  We're talking about four files.  And

20   I -- I'm not anticipating that my ruling and I'm assuming the

21   plaintiffs aren't anticipating that my ruling is going to

22   necessarily be applicable even to the pending requests for

23   production of documents.

24               As I said, I think it may inform the way that you

25   choose to respond to those, but I don't think they're asking me

1   to issue a discovery order that relates to discovery that

2   hasn't been propounded yet.

3           Am I correct in understanding that, Attorney

4   Wangerin?

5           MS. WANGERIN:  No, your Honor, I think you're

6   correct that it would inform, you know, how those responses

7   ultimately come out, but --

8           THE COURT:  Maybe.

9           MS. WANGERIN:  -- but that's not -- that's not

10  what's teed up for today.

11          THE COURT:  Okay.

12          MS. WANGERIN:  And I do -- I just do want to point

13  out that, you know, defendants keep referencing the ADA and 504

14  claims, but we have case planning claims that go directly to

15  what DCYF does to the family as a unit, which they have

16  acknowledged that they serve the families as a unit.

17          So segregating these sibling files, we can't assess

18  our own plaintiff -- our own clients' case files for the case

19  planning claims without understanding what's going on in the

20  family as a unit.  So I just wanted to point that out as well.

21          THE COURT:  Okay.  Thank you.

22          MS. RAMSEY:  So if where this is going to be headed

23  is that these family files are treated as the child's files,

24  then DCYF needs to have an ability, I think, to give the legal

25  guardians of the siblings an opportunity to weigh in on this

1   topic.  I understand if the plaintiff has not been comfortable

2   in doing that, but I think we need to provide that notice and

3   we have not yet done so because we also have an agreement in

4   this case to not disclose, even to our own caseworkers, that

5   these children are, in fact, plaintiffs in this lawsuit.

6           THE COURT:  Uh-huh.

7           MS. RAMSEY:  If the Court is going to be inclined to

8   go down that road, I feel like we need some relief from that

9   agreement in order to make sure that parties in interest have

10  an opportunity to come in and object.

11          MS. WANGERIN:  Your Honor, I wholeheartedly

12  disagree.  We have a confidential -- we have a protective order

13  in place to protect the confidentiality of these clients and if

14  for whatever reason their parents or whoever DCYF decides to

15  notify of the release of these files, their confidentiality

16  could be in jeopardy and I would be very, very concerned about

17  that.

18          THE COURT:  Okay.  Attorney Ramsey, anything

19  further?

20          MS. RAMSEY:  I just want to reiterate that we've

21  produced these children's files, which was our agreement.

22  We've redacted for personally identifying information and

23  personal health information, information for nonrelated third

24  parties, all of which was in our agreement.

25          We've offered to allow the plaintiffs to come look

1    and assess the relevance of the information withheld as it

2    pertains to those children.  The issues that are inherent in

3    this lawsuit don't seem to me to be the same as the ones in the

4    cases the plaintiffs have cited.  At issue in those cases was

5    the administration with respect to individuals.  This is a

6    different kind of lawsuit.

7            I would invite the Court to weigh the purposes

8    behind the privileges that we've asserted against the relevance

9    of this information in this lawsuit.  I remain willing to sit

10   down with the plaintiffs and go through the files, if that's

11   necessary.

12           I think I've probably said to you everything that

13   you wanted to hear and then some, so I will -- I'll leave it

14   there.

15           THE COURT:  Okay.  Anything further, Attorney

16   Wangerin?

17           MS. WANGERIN:  No, your Honor.

18           THE COURT:  All right.  Do you want to check with

19   your colleagues to see if there's anything that they wanted you

20   to raise that you may not have raised?

21           MS. WANGERIN:  We're all set.  Thank you.

22           THE COURT:  All right.  Attorney Ramsey and Attorney

23   Kenison-Marvin, anything further?

24           MS. RAMSEY:  I think we're done as well, your Honor.

25           THE COURT:  All right.  Thank you.

1          All right.  I know you're anxious to get a ruling

2   from the Court and this was very helpful in terms of orienting

3   me.  I want to go back and read those cases again that have

4   been cited by the plaintiff in particular, given the

5   highlighting that you've done, Attorney Ramsey, that somehow

6   the circumstances of the lawsuits there and the -- the

7   circumstances of these pending claims should somehow yield a

8   different result.  I'll tell you that my inclination is

9   otherwise, but that being the case, I want to go back and take

10  a look at that a little more closely.

11         So in the meantime, and this is just a practical

12  matter.  I appreciate very much that the parties are concerned

13  that this is what I'm going to call a precursor to discovery

14  and that I don't think either side, while we're welcoming

15  having this exchange, and I -- and I -- as I said, that's my

16  normal MO.  There are lots of times where I'll tell the

17  parties, I have a conference room; you're going to all come to

18  the fourth floor, bring all of your documents, and I'll be the

19  referee all day at your disposal.

20         This case feels a little different than that.  This

21  doesn't feel like that kind of case that needs that kind of

22  resolution and if there is a class certification, that seems to

23  be an unwieldy process.  That might be where we end up, but I

24  would encourage you perhaps without penalty, so this doesn't

25  become the default position for how we're going to resolve

1    things going forward, but if you have the time and the

2    inclination, I'm not ordering you to do this, to perhaps use

3    this as an opportunity to gather a better understanding about

4    what these files look like and -- or what the either basis for

5    asking that the materials be provided unredacted in your own

6    informal way, without an order, or looking at the materials and

7    saying, oh, yeah, I see now that the check routing number is

8    not really that big a deal and we don't need to fight about

9    that; I can see why you might need to or would want to redact

10   that because of fraud or other things.  Right?  Maybe it's

11   worth having a few moments to explore that informally.

12          As the -- as it relates to the best interests of the

13   child, it sounds like that's pretty much done.  I appreciate

14   the offer to let them come and look at those materials, but as

15   I understand it, they're saying we get -- we should be able to

16   make those decisions and we shouldn't have to explain to the

17   defendants in any way that, hey, we'd like to share information

18   A, B, C, D, and E with one of the plaintiffs.  I don't think

19   that's going to work for the reasons that they described, which

20   is that their decisions, as it relates to sharing that

21   information, are strategic and trial-related.

22          MS. RAMSEY:  May I just request that you put that in

23   your order?  Because if something, God forbid, happened to one

24   of these children, I would appreciate having that in writing.

25          THE COURT:  They're telling me that they're going to

1   make a decision as to whether it's reasonably necessary to

2   share the information.

3           MS. RAMSEY:  And I'm going to comply with your

4   order, Judge, but you have affidavits in front of you that

5   explain the potential consequences.

6           THE COURT:  Right.  And so do they.

7           MS. RAMSEY:  And -- I -- I understand what you're

8   saying.

9           THE COURT:  And if you feel the need to provide them

10  with an affidavit every time you make a production, that's

11  something that you all can do, even though you might not be

12  obligated to do that or you may consider that you're obligated

13  to do that.

14          MS. RAMSEY:  I think --

15          THE COURT:  And it's not the Court that's sharing

16  the information.  It's ultimately the attorneys that are

17  sitting in the chairs to your right that are the ones that are

18  ultimately going to be making the decision about whether or not

19  information that's produced should be disclosed.

20          MS. RAMSEY:  And -- and -- and I'm making the

21  decision to do -- comply with your order and do it as well,

22  which is, you know ...

23          THE COURT:  I appreciate it.  And for all we know,

24  none of that information will get disclosed.  We won't know and

25  we're not going to know if they share it.  It's not something

1    they're going to notify the Court of and it's not something

2    that you're going to get notification of.

3              MS. RAMSEY:  I understand.  And I've -- it would --

4    I would appreciate that rationale being in your order if it so

5    applies.

6              THE COURT:  To the extent that's what I rule, I will

7    be explicit.

8              MS. RAMSEY:  Thank you, your Honor.

9              THE COURT:  And, you know, again, I think that that

10   is going to be a challenge, but I think ultimately there's a --

11   there's an approved protective order that contemplates some of

12   those issues and I understand the timing here.  The protective

13   order came into place first and then this agreement arose.  And

14   I also appreciate that the defendants had not even seen the

15   files at the time that that agreement was reached.

16              So this is not easy, and so I appreciate that

17   everyone has come here today answering all of my crazy

18   questions and just giving me the road map that I need.  So

19   extremely helpful.

20              And before we adjourn, again, I'm just going to say

21   if there's anything else that you want to highlight for me,

22   now's the time to do that.  If there's some reason why you

23   think you need to do some additional briefing because of

24   something that came up today, I'm happy to hear that as well.

25   Otherwise, I'm going to take this under advisement.

1          Attorney Wangerin?

2          MS. WANGERIN:  No, your Honor.  I think the only

3    remaining thing we have is that I think this exercise has just

4    really highlighted the need for having a redaction log at the

5    time that files are produced.  And I assume that, you know, as

6    we enter formal discovery, that will happen.  So that's just

7    something that -- that I think is just -- this has highlighted

8    for us.

9          THE COURT:  All right.  So here's the deal.  Like I

10   said in the beginning, I appreciate all of that.  I'm not going

11   to be issuing orders about how you all are going to work things

12   out going forward.  I'm going to encourage you to work them

13   out.  I think having logs can be very helpful, certainly a

14   privilege log -- and I understand, again, at the time that you

15   reached your agreement and you were doing your redactions you

16   didn't recognize that there might be attorney-client privileged

17   communications, et cetera, but this is discovery like in any

18   other case.

19          And so if you're redacting materials and you don't

20   want to, you know, have a motion to compel filed that you're

21   not going to be able to defend against, you obviously need to

22   express the basis for the redaction.  Right?  There needs to be

23   some basis.  I need to know why -- if the Court's going to get

24   involved, the Court's going to need to know why something was

25   redacted.

1          So it may be helpful to do a log going forward.  I'm

2    not going to order one right now because I think that would be

3    premature.  Let's -- let's let you all respond to the requests

4    for production of documents.

5          I will tell you that I am available to do informal

6    discovery conferences, I didn't convert this to one because we

7    already had a motion to compel.  If you file a motion to

8    compel, I'm not going to have an informal discovery conference.

9          If you want to reach out to the clerk's office and

10   you want to explain to them that you've hit a stumbling block,

11   if you can agree on what the dispute is and agree on what

12   materials you want me to see -- if it's super complicated like

13   this issue, I might say to you, this is too much for us to deal

14   with as an informal discovery conference.

15         Sometimes I'll say it's complicated, but I think we

16   should talk through it and I should give you some guidance.

17   And then from there that conference is going to be to get all

18   of you to agree to something.  You're not going to get a ruling

19   from me.

20         And at the end of the day, if we're not able to

21   resolve it informally -- so, for example, if we'd gone through

22   the exercise that was proposed of going through Exhibit 1 item

23   by item, I might do that in an informal discovery conference

24   and say, do you really need this?  You might say for the

25   purposes of resolving this, we're willing to put those things

1  aside for now, maybe if he produce all the other things that

2  they've promised to produce I won't need to see the routing

3  number from the bank account of the foster parent.  So those

4  kinds of things are out there and we may be able to do that

5  going forward.

6             Or this may simply be a case where it's just too

7  unwieldy.  But let's think about using that process going

8  forward.  And that's not a criticism of anyone.  It's just I

9  wanted to reinforce that it's available.  All right?

10             So I've taken up your lunch hour now.  I apologize

11  for that.  Thank you for walking me through my questions and

12  thank you for very thoughtful briefing in terms of I think

13  you've all hit the highlights in terms of cases and I'll review

14  them again very carefully and issue an order as soon as I can.

15             All right.  Thank you.  It's great to see all of

16  you.

17             THE CLERK:  All rise.

18             (Proceedings concluded at 1:29 p.m.)

19

20

21

22

23

24

25

C E R T I F I C A T E


       I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 12/27/21        */s/  Liza W. Dubois*
                           LIZA W. DUBOIS, RMR, CRR