## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| _____ | ) | |
| G.K, by their next friend, Katherine Cooper, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Case No. 1:21-cv-0004 |
| | ) | |
| Christopher Sununu, in his official capacity as the Governor of New Hampshire, et al. | ) ) | |
| | ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF FOSTER YOUTH CASE FILES

Plaintiffs have moved to compel Defendant Lori Shibinette, Commissioner of the New Hampshire Department of Health and Human Services ("DHHS"), to produce thousands of documents (if not more) containing extraordinarily sensitive information about approximately 180 children who are not party to this case. Such a production would require DHHS and its counsel to spend hundreds of hours (if not more) searching for, gathering, and reviewing documents from bureaus and district offices throughout DHHS, including many documents that exist only in paper form. Accordingly, Plaintiffs' request is overbroad, unduly burdensome and not proportional to the needs of the case, and their motion to compel should be denied.

## BACKGROUND

This dispute involves Request Number 1 in Plaintiffs' Third Set of Requests for Production of Documents to DHHS (hereafter "Request No. 1"), which seeks:

> all documents, regardless of time period, relating to each Older Foster Youth in the legal custody or under the protective supervision of [the Division for Children, Youth, and Families] as of April 26, 2022, including but not limited to their Case Files, information

1

> relating to each child that is contained in Bridges, and written and
> electronic communications concerning each child, their Case Plan,
> or their care.

Doc. No. 91-2.  Plaintiffs define "Older Foster Youth" as foster youth aged 14 through 17, *see id.*,

and DHHS estimates that there are approximately 180 such youth in the Division for Children,

Youth, and Families' ("DCYF") custody or protective supervision, *see* Ex. A, ¶ 9.

Request No. 1 seeks several categories of documents.  First, it seeks foster care "Case

Files," which DCYF defines as all of the child's "information and official records," including court

reports, medical records, educational records, photographs, recordings, intake and assessment

reports, and contact logs and other documents maintained in the "Bridges" system.  DCYF Policy

Manual, *Policy No. 2765 Division Case Records and Files* (June 2022),

https://www.dhhs.nh.gov/sites/g/files/ehbemt476/files/documents2/dcyf-policy-2765.pdf.

Accordingly, each child's Case File includes hundreds of pages documents, at a minimum.  Ex. A,

¶ 4.  The "Bridges" system is New Hampshire's Statewide Automated Child Welfare Information

System ("SACWIS"), which is used as the electronic case management system by DHHS

employees.  Bridges stores information and documents related to a child's case that is manually

entered or uploaded by DHHS employees.

Second, since all foster youth are also enrolled in DHHS's Medicaid program, Request No.

1 seeks all information related to medical claims and service data stored electronically in the

State's Medicaid Management Information System ("MMIS"), as well as Medicaid eligibility

forms, service assessments and evaluations, and provider enrollment documentation.[1]

---

[1] Plaintiffs appear to have limited the scope of Request No. 1 to exclude "records maintained by
DHHS outside of the foster care and Medicaid systems that are not relevant to the issues in this
case."  *See* Doc. No. 91-1, at 4.  However, Plaintiffs still appear to seek "all documents" relating
to each of the 180 children maintained in "the foster care and Medicaid systems."

Third, Request No. 1 seeks all "[c]ommunications concerning each child, their Case Plan, or their care." This would include, among other things, internal DHHS communication about each child, as well as e-mails and other communications between DHHS staff and mental health and other medical providers, child abuse-and-neglect reporters, biological parents, foster parents, potential foster parents, and law enforcement.

Many of these documents – e.g., the Case Files, the information in the Bridges system, communication about individual children – are likely to contain sensitive information related to the child and other family members. For example, these documents often include detailed descriptions of physical and sexual abuse suffered by the child, and specific information about the child's medical and mental health conditions. *See* Ex. A, ¶¶ 4-5.

Defendants have already produced these "Case Files" for the Named Plaintiffs in this case, and Defendants now seek the Case Files and all other documents relating to approximately 180 additional children who are not party to this case.

## **ARGUMENT**

### I.    **Producing Documents Responsive to Plaintiffs' Request is Unduly Burdensome and Not Proportional to the Needs of the Case.**

A party need not produce documents, even relevant documents, if doing so would be unduly burdensome or not proportional to the needs of the case. *See, e.g., FERC v. Silkman*, 2017 WL 6597510, at *7 (D. Me. Dec. 26, 2017) (unpublished) (noting that the 2015 amendments to Rule 26 "crystaliz[ed] the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality"); *Elisa W. v. City of New York*, 2018 WL 6695278, at *2 (S.D.N.Y. Dec. 20, 2018) (unpublished) ("[T]he fact that particular information is relevant does not mean that its production will always be proportional to the needs of the case."); *Echols v. Pilgrim's Pride Corp.*, 464 F. Supp. 3d 1340, 1346 (M.D.

3

Ga. 2020) ("Authorizing the search for the proverbial needle in the haystack is inconsistent with the proportionality considerations underlying Rule 26.").

That is, a party need not produce even relevant documents when "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the projected discovery in resolving the issue." *Cox v. Mass. Dep't of Corrections*, 2015 WL 13681741, at *2 (D. Mass. June 15, 2015) (unpublished) (citing Fed. R. Civ. P. 26(b)(2)(C)); *accord Sustainable Sourcing, LLC v. Brandstorm, Inc.*, 2017 WL 217747, at *2 (D. Mass. Jan. 18, 2017) (unpublished) ("The concepts of relevance and proportionality dictate limits on the discovery to which Plaintiff is entitled.").

In this case, the burden on DHHS to produce Case Files and other documents for 180 foster youth significantly outweighs the need for the information sought by Plaintiffs.

### a. Producing Documents Responsive to Request No. 1 Would be Extraordinarily Burdensome.

Producing all of the documents in the Case Files alone for approximately 180 children would be time-intensive and costly, *even if* DHHS does not redact any identifying information from those Case Files.  DHHS does not have a mechanism to electronically retrieve the Case Files, and therefore producing them would require DHHS personnel to manually search for, gather, review, and copy electronic and paper files in district offices and electronic systems for each of the approximately 180 children at issue.  More specifically, because the Case Files for each child are maintained in paper form by each child's caseworker, DHHS staff and/or counsel would need to, among other things, locate all of the physical paper that is part of each child's Case File; manually scan those thousands-upon-thousands of paper documents; generate an electronic copy of case contact logs from the Bridges systems; cross reference the compiled records with

documents stored electronically on the caseworker's network drive and in the Bridges system; and supplement the Case File with any documents found in the network drive or the Bridges system that were not in the original set of paper documents. Ex. A, ¶ 6. DHHS estimates that this process would require between three and nine hours per child, depending on the volume and organization of the Case File. *Id.* at ¶ 7. As a result, gathering and producing the Case Files responsive to Request No. 1 would take between 540 and 1620 hours of work, *not including* any redactions that would have to be made.[2] *Id.* at ¶ 7.

But Request No. 1 does not stop at just the Case File:[3] Request No. 1 seeks "all documents" in DHHS's possession relating to approximately 180 foster children, *see* Doc. No. 91-2, which would include, among other things, all "written and electronic communications concerning each child, their Case Plan, or their care," *id.*, and all data and information relating to each child maintained by DHHS's Medicaid program. The universe of information Plaintiffs seek is so broad that it is challenging for DHHS to determine how many additional hours it would take to search for, gather, and produce these documents. However, DHHS's counsel estimates it would require at least hundreds of hours of work from staff and/or counsel to manually search for, gather, and review the tens of thousands of e-mails and Medicaid documents maintained by DHHS relating to these 180 children, *in addition to* the hundreds of hours of time it would take to search for, gather,

---

[2] Due to state law confidentiality protections of the requested records, *see infra* Section II, and the privacy concerns implicated by the vast disclosure of personal and sensitive information relating to these 180 youth, DHHS would need to manually review all of the requested Case Files and redact personal identifying information of all foster children who are not represented by Plaintiffs' counsel (*i.e.*, all foster children who are not Named Plaintiffs). DHHS's counsel estimate that this process would add at least another one hundred hours of work from staff and/or counsel.

[3] *See* DCYF, *Standard Operating Procedure 2765.4 Record Release-CPS* (June 2022), https://www.dhhs.nh.gov/sites/g/files/ehbemt476/files/documents2/dcyf-sop-2765-4.pdf (describing Child Protective Services records that are ordinarily released as part of a record request).

review, and produce the approximately 180 Case Files.

Finally, and importantly, the burden of Request No. 1 must be considered in the context of all the information and data that DHHS has already produced to Plaintiffs in this litigation.  DHHS and its counsel have already devoted thousands of hours to searching for, reviewing, and producing over 230,000 pages of documents, including the Named Plaintiffs' Case Files, reports and assessments of agency performance in all areas relevant to foster care, over 30,000 pages of emails and attachments relating to subject areas requested by Plaintiffs, and DCYF and DHHS policies for at least the five years preceding the commencement of this action through the present date.  Meanwhile, the parties are presently negotiating the scope of an e-mail production, which will undoubtedly result in DHHS and its counsel spending hundreds of additional hours reviewing and producing tens of thousands of additional documents.[4]

### b. The Burden of Producing Responsive Documents Outweighs the Plaintiffs' Need for the Information.

To prevail on a motion to compel, the court must find that the information sought is relevant and "proportional to the needs of the case," *and* that "the burden or expense of the

---

[4] Discovery is not bifurcated in this case, and DHHS does not object to Request No. 1 on the ground that is it unduly burdensome and not proportional to the needs of the case unless and until a class is certified.  However, as explained in Section II, DHHS does object to the request on the grounds that N.H. Rev. Stat. Ann. § 170-G:8-a prohibits it from disclosing individual identifying information about the 180 children whose documents Plaintiffs seek, because Plaintiffs' counsel do not represent those 180 children unless and until a class is certified.  Doc. No. 91-4, at 5 ("Defendant would oppose any effort to seek an order requiring Defendant to provide individual identifying information about over 200 children, unless and until Plaintiffs' motion for class certification is granted (which Defendant will oppose).  It is contrary to the best interests of the foster children for Defendant to disclose their personal information – much of which relates to traumatic life events and mental health treatment – to attorneys who do not represent those children.")  The redactions that DHHS and its counsel would need to undertake to produce this information in compliance with N.H. Rev. Stat. Ann. § 170-G:8-a increases the burden of production, but Defendants would object to Request No. 1 on burden grounds even if a class had already been certified and redactions were not necessary.

proposed discovery" does not "outweigh[] its likely benefit."  Fed. R. Civ. P. 26(b)(1); *see, e.g.*, *Cox*, 2015 WL 13681741 at *2.  In this case, the enormous burden of producing approximately 180 Case Files and other documents is *not* "proportional to the needs of the case" and "outweighs its likely benefit."

Plaintiffs articulate two reasons that they claim justify the extraordinary burden of producing documents responsive to Request No. 1.

First, Plaintiffs argue that a review of all documents contained in every Case File is necessary "to prove numerosity at the class certification phase."  Doc. No. 91-1, at 2.  But DHHS already produced data that shows the number of children ages 14 through 17 who are in the legal custody or under the protective supervision of DCYF and have a mental health diagnosis recorded in the Bridges system, *see* Doc. No. 91-8, which are the key features of Plaintiffs' class definition, *see* Compl. ¶ 22.  Further, at Plaintiffs' request, DHHS has agreed to produce additional data from the Bridges system that Plaintiffs believe may show additional mental health diagnoses of children ages 14 through 17 not recorded in the mental health diagnosis field in the Bridges system.  *See* Doc. No. 91-1, at 8.  The data produced by DHHS does not show whether these youth "are at risk of being[] unnecessarily placed in congregate care settings," which is also a requirement for Plaintiffs' class definition, but that aspect of the class definition is an impermissible effort to make the class a "fail-safe" class, *i.e.*, a class in which the class is defined to include only members whose claims would be successful on the merits, *see, e.g.*, *Randleman v. Fidelity Nat'l Title Ins. Co*., 646 F.3d 347, 352 (6th Cir. 2011) (fail-safe class definition was one of two grounds for decertifying class).

Second, Plaintiffs argue that the Case Files and other documents relating to the 180 children include "critical information about Defendants' implementation of DHHS policies,"

including, among other things, "putative class members' access to necessary and legally sufficient assessments, the quality and legal sufficiency of Defendants' case planning practices, putative class members' access to community based services, and Defendants' attempts to integrate putative class members into community-based placements." Doc. No. 91-1, at 2. But Plaintiffs have not identified what specific documents in the Case Files, Medicaid documents, or DHHS communication that they believe is relevant to this analysis or will provide this "critical information." Instead, Plaintiffs have undertaken a fishing expedition by propounding an overly broad document request that seeks "all documents" in DHHS's possession about these 180 children.

Further, Plaintiffs can use data to analyze "implementation of DHHS policies." For example, DHHS has already produced, or agreed to produce in the near future, data about putative class members' placements, medical treatments, and medical diagnoses, which will show the extent to which putative class members are in appropriate placements and receive medically necessary services. *See* Doc. No. 91-8; Doc. No. 91-1, at 8. Additionally, DCYF makes available on its website a host of performance information and data, including annual assessments of outcomes in areas relevant to foster care in compliance with Federal reporting requirements. *See* New Hampshire DHHS, *DCYF Data: Monthly Data Dashboards*, https://www.dhhs.nh.gov/reports-regulations-statistics/dcyf-data (last visited June 21, 2022).

Plaintiffs acknowledge that aggregate data provided by DHHS can be used to analyze Defendants' practices with respect to the putative class members, *see* Doc. No. 91-1, at 12, but assert that DHHS's data is unreliable and incomplete. *Id.* at 4-5. As DHHS has noted in its productions, DHHS data, like all data, is subject to human error in the data entry process, such that some data points may be incorrect or incomplete. Doc. No. 91-4. Case workers enter

extensive information (e.g., addresses, dates of birth, placements, and diagnoses) about thousands of foster children each year, and there are bound to be some errors and omissions in the process of inputting such a large volume of information.  But Case Files are equally subject to human error, and there is nothing to suggest that information in Case Files is more reliable than data entered into the Bridges system – the same caseworkers that enter information in the data system transcribe information into the Case File documents.   Further, the federal government monitors the quality and accuracy of information that DHHS staff enters into the Bridges system through compliance checks of the State's Adoption and Foster Care Automated Reporting System ("AFCARS"), and New Hampshire has passed those compliance checks. For example, for DHHS's October 1, 2020 through March 31, 2021 data submission, AFCARS data elements showing that a child is diagnosed with a disability, and the type of disability, was 96.05 percent compliant.  *See* New Hampshire, *DCYF Annual Program and Services Review 2020*, at 41 (June 31, 2021), https://www.dhhs.nh.gov/sites/g/files/ehbemt476/files/documents/2021-11/dcyf-apsr-2021.pdf.   Finally, the data the Defendants have provided thus far is not "incomplete," *see* Doc. No. 91-4.  Rather, Plaintiffs requested additional data that was not part of their initial data requests, and thus not provided by Defendants in their initial data productions; at Plaintiffs request, Defendants have agreed to produce that additional data.  *See* Doc. No. 91-1, at 8.

In short, Plaintiffs have failed to explain why the relevance of the individualized Case Files and other records of all of these approximately 180 children outweighs the extraordinary burden on DHHS of producing such documents, particularly given all the data that DHHS has been and remains willing to produce about foster children ages 14 through 17.  On this basis alone, the motion to compel should be denied.

## II.     New Hampshire State Law Protects the Confidentiality of Documents Responsive to Plaintiffs' Request.

Even if producing documents responsive to Plaintiffs' request was not overly burdensome and disproportionate to the needs of the case, which it is, *see supra*, the Plaintiffs' motion to compel should still be denied because New Hampshire state law prohibits DHHS from producing the responsive documents, *see* N.H. Rev. Stat. Ann. § 170-G:8-a.

The First Circuit has established a two-part test for determining whether a federal court should recognize a privilege created by state law: (1) "would the New Hampshire courts recognize the privilege?" and (2) "is the asserted privilege 'intrinsically meritorious' in the federal court's own judgement?"  *Smith v. Alice Peck Day Mem. Hosp.*, 148 F.R.D. 51, 54-55 (D.N.H. 1993) (Barbadoro, J.) (citing *In re Hampers*, 651 F.2d 19, 22-23 (1st Cir. 1981)).

In this case, the privilege would be recognized by New Hampshire state courts, and it is "intrinsically meritorious."  Accordingly, the privilege should apply in this case.

### A.  New Hampshire Courts Would Recognize the Privilege.

N.H. Rev. Stat. Ann. § 170-G:8-a provides that Case Files "shall be confidential," except for certain individuals in certain circumstances not applicable here. § 170-G:8-a, II; *see also* Doc. No. 91-1 (no argument by Plaintiffs that one of the exceptions enumerated in Section 170-G:8-a applies in this case).  Given that this privilege is clearly specified in state law, New Hampshire state courts are bound to recognize it, unless one of the statutory exceptions applies, and Plaintiffs do not argue otherwise or contend that any of the exceptions apply, *see* Doc. No. 91-1.

### B.  The Privilege is Intrinsically Meritorious.

As to the second part of the inquiry, "in determining whether the [state] privilege is 'intrinsically meritorious' to warrant recognition under federal law, a court ordinarily must find the following: (i) the communication must originate in a confidence that it will not be disclosed;

(ii) this confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties; (iii) the relation must be one which ought to be sedulously fostered; and (iv) the harm that would inure to the relation by the disclosure of the communication must be greater than the benefit thereby gained for the correct disposal of the litigation." *Smith*, 148 F.R.D. at 55-56 (internal citations omitted).

In this case, Plaintiffs do not appear to dispute – nor could they – that the Case Files were "originated in a confidence" that is "essential to the full and satisfactory maintenance of the relation between" the State and the foster child (and between the State and biological parents, foster parents, reporters of abuse-and-neglect, and others) that "ought to be sedulously fostered." *See, e.g., Pearson v. Miller*, 211 F.3d 57, 70-71 (3d Cir. 2000) ("[T]he prevention and detection of child abuse are among the most compelling of [a state's child welfare] activities. The need to protect the confidence of the children involved in these programs and proceedings is crucial to their maximal effectiveness."). Instead, Plaintiffs argue that their need for the case files outweighs the privacy concerns underlying Section 170-G:8-a.

Accordingly, the key inquiry is the fourth element of the analysis: whether "the harm that would inure to the relation by the disclosure" is "greater than the benefit thereby gained for the correct disposal of the litigation," *Smith*, 148 F.R.D. at 55-56 (internal citations omitted). In analyzing this question, "courts have basically balanced the interest served by the state privilege against the federal interest in favor of disclosure." *Marshall v. Spectrum Medical Group*, 198 F.R.D. 1, 4 (D. Me. 2000).

Section 170-G:8-a's confidentiality protection of child abuse records serves important private and public interests that weigh heavily in favor of recognizing and applying the state privilege in this case. *See, e.g.*, *DeCosta v. Chabot*, 1994 WL 279739, at *2 (D.N.H. June 9, 1994)

11

(unpublished) ("The statute also facilitates the state's efforts to uncover and treat child abuse by offering both the people who suspect abuse and the children who are victims of abuse the protection of confidentiality.").  The Case Files at issue here contain extraordinarily sensitive information regarding victims of abuse-and-neglect, their families, foster parents, and reporters. For example, DCYF case files include detailed information about, among many other things, physical and sexual abuse of children, as well as the child's medical and mental health diagnoses and treatments.  Ex. A, ¶¶ 4-5.  Accordingly, if Plaintiffs' motion to compel is granted, approximately 180 children who are *not* party to this case would see the most sensitive information about their lives disclosed, without any opportunity for them or their guardians to object to that disclosure.

A number of courts have balanced important privacy interests of non-litigants by granting access to confidential information on a de-identified basis. *See Haus v. City of New York*, 2006 WL 1148680, at *3-4 (S.D.N.Y. Apr. 24, 2006) (unpublished) (collecting cases).  However, given that Plaintiffs' document request at issue here seeks approximately 180 case files totaling thousands of pages of documents, and the voluminous amount of identifying information in those documents, much of which is recorded in narrative form, de-identification of the requested information is unduly burdensome, *see supra* note 2, and it is an insufficient substitute to safeguarding the confidentiality of foster children's records, *see Walker v. City of New York*, 2013 WL 12358693, at *1 (E.D.N.Y. Apr. 8, 2013) (unpublished) (noting that "serious harm to the integrity and confidentiality of the child-abuse investigation system could result from wholesale disclosure of records that could reveal the identifies of persons involved in the investigation*, even if the specific names are redacted*" (emphasis added)).

Further, in addition to the privacy interests of the children, disclosure of approximately 180

unredacted case files, even to counsel, could have serious consequences for the State's efforts to

uncover and treat child abuse.  As the Supreme Court has explained:

> Child abuse is one of the most difficult crimes to detect and
> prosecute, in large part because there often are no witnesses except
> the victim. A child's feelings of vulnerability and guilt and his or
> her unwillingness to come forward are particularly acute when the
> abuser is a parent.  It is therefore essential that the child have a state-
> designated person to whom he may turn, and to do so with the
> assurance of confidentiality.

*Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987).

Plaintiffs argue that the Joint Protective Order ("JPO") entered in this case eliminates the

risk of harm to the approximately 180 children whose personal information would be disclosed.

*See* Doc. No. 91-1, at 11-12.  This is not true.  While the JPO may lessen the harm to some degree,

it by no means eliminates it.  If Plaintiffs' motion to compel is granted, the sensitive information

in the children's Case Files – *e.g.*, detailed information about the physical and sexual abuse, the

medical and mental health conditions and treatments – will be disclosed to the legal teams on both

sides of this case, which includes 16 lawyers on Plaintiffs' side and six (6) lawyers on Defendants'

side (as well as legal support staff, the parties, and next friends).  Not only is there a harm to these

foster children in disclosing information to these 16-plus strangers, but in a small State like New

Hampshire, with many tight-knit communities, there is a real risk that one or more members of the

legal teams, or one or more of the parties or Next Friends, actually knows one or more of the

approximately 180 children whose personal, sensitive information will be disclosed.   Neither the

non-party children nor their guardians have even been asked about – let alone consented to – this

disclosure to these 16-plus individuals.

Further, while Defendants do not doubt Plaintiffs' counsel's diligence and good faith in

protecting the information, every disclosure of protected information increases the risk of an

inadvertent error or mistake that will lead to the children's information being exposed to the wider

public (e.g., a data breach).

While this Court previously found that "the confidentiality provisions and the plaintiffs' attorneys' obligations under the JPO, in combination with the presence of the appointed next friends, will serve the dual interest of appropriately safeguarding the information" contained in the Named Plaintiffs' Case Files, Doc. No. 75, at 13, the privacy implications of providing unrestricted access to the case files of only the four (4) Named Plaintiffs are substantially less than the privacy concerns implicated by Plaintiffs' broad request for Case Files of approximately 180 foster children not party to this litigation. *See Puricelli v. Houston*, 2000 WL 298922, at *5 (E.D Pa. Mar. 14, 2000) (unpublished) (granting motion to compel production of plaintiff's own redacted child abuse records, but denying motion as to records of other children not party to the case).

Plaintiffs also argue that Paragraph 7 of the JPO "prohibits" Defendants from withholding any documents based on N.H. Rev. Stat. Ann. § 170-G:8-a.  Doc. No. 91-1, at 10 (citing Doc. No. 33, ¶ 7).  Again, this is not true.  Paragraph 7 of the JPO reads in full:

> No Greater Protection of Specific Documents. No party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection.

This paragraph prohibits Defendants from withholding documents on the ground that they "require[] protection greater than that afforded by [the JPO]," but it does not prohibit Defendants from withholding documents on the ground that a privilege or immunity precludes their disclosure entirely.  For example, Paragraph 7 may prohibit Defendants from refusing to disclose documents unless Plaintiffs agree that the documents will be "Attorneys Eyes Only" (unless the Defendant moves for an order for such protection), but it does not prohibit Defendants from refusing to produce a document based on deliberative process privilege, legislative privilege, or any state law that precludes production entirely.  Further, reading Paragraph 7 to have the broad meaning urged

by Plaintiffs would be inconsistent with the purpose of the JPO, which is to creates a process under which confidential information can be safely shared between the parties. *See* Doc. No. 33, ¶¶ 3, 5. The JPO is not an order affirmatively requiring Defendants to produce any documents.

### III.   Maintaining the Confidentiality of the Case Files is Also Supported by Rule 26.

In addition to the state law privilege that should be recognized by the Court, "considerations of the public interest, the need for confidentiality, and privacy interests are relevant factors to be balanced" in the Rule 26 inquiry. *Gill v. Gulfstream Park Racing Ass'n., Inc.*, 399 F.3d 391, 402-3 (1st Cir. 2005); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 n.21 (1984) ("Although the Rule contains no specific reference to privacy or other rights or interests that may be implicated, such matters are implicit in the broad purpose and language of the Rule."); *In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1215-16 (D.C. Cir. 2004) ("[I]n determining which interests to weigh in the Rule 26 balance, courts look to statutory confidentiality provisions, even if they do not create enforceable privileges.").   "In striking this balance, courts have considered the parties' need for the materials at issue and whether a protective order issued by the court can address the purposes underlying the confidentiality statute." *Steinberg v. Mount Sinai Medical Center, Inc.*, 2014 WL 1311572, at *3 (E.D.N.Y. Mar. 31, 2014) (unpublished).

Given that the documents responsive to Request No. 1 are not critical to Plaintiffs' efforts to litigate their claims, *see supra* Sections I, II, and that disclosure of the confidential and sensitive information in the responsive documents would harm the non-party children, *see supra* Section II, the Court should find that Rule 26 also weighs in favor of denying Plaintiffs' motion. *See Steinberg*, 2014 WL 1311572, at *3; *Purcelli,* 2000 WL 298922, at *5.

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion to compel should be denied.

Respectfully submitted,

LORI SHIBINETTE, in her official capacity as Commissioner of the New Hampshire Department of Health and Human Services,

By her attorney,

JOHN M. FORMELLA
NEW HAMPSHIRE ATTORNEY GENERAL

Dated: June 24, 2022                    By: /s/ Nathan W. Kenison-Marvin
                                        Jennifer S. Ramsey, Bar No. 268964
                                        Senior Assistant Attorney General
                                        Nathan W. Kenison-Marvin, Bar No. 270162
                                        Assistant Attorney General
                                        Office of the Attorney General (Civil Bureau)
                                        New Hampshire Department of Justice
                                        33 Capitol Street
                                        Concord, NH 03301-6397
                                        (603) 271-3650
                                        jennifer.s.ramsey@doj.nh.gov
                                        nathan.w.kenison-marvin@doj.nh.gov

                                        /s/ Philip Peisch
                                        Philip J. Peisch
                                        Caroline M. Brown
                                        Julia M. Siegenberg
                                        Brown & Peisch PLLC
                                        1233 20th St. NW, Suite 505
                                        Washington, DC 20036
                                        ppeisch@brownandpeisch.com

16

**CERTIFICATE OF SERVICE**

I, Philip Peisch, hereby certify that I caused a true and correct copy of the foregoing to be filed through the ECF system and served electronically on the registered participants as identified on the Notice of Electronic Filing.

June 24, 2022                                              */s/* Philip J. Peisch
                                                                        Philip J. Peisch