## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**G.K., by their next friend,
Katherine Cooper et al.**

     v.

                                  Case No. 21-cv-4-PB
                                  Opinion No. 2024 DNH 050

**Christopher Sununu, Governor
of New Hampshire et al.**

### MEMORANDUM AND ORDER

The plaintiffs in this putative class action have moved to supplement the reports of four experts who filed declarations in support of the plaintiffs' motion for class certification. The defendants object, arguing that the untimely supplemental declarations should be excluded under Federal Rule of Civil Procedure 37(c)(1). Based on the totality of the circumstances, I conclude that preclusion is unwarranted and therefore grant the plaintiffs' motion.

## I.    BACKGROUND

### A.   Procedural History

Four adolescents in the legal custody of the New Hampshire Division of Children, Youth, and Families (DCYF) filed a putative class action complaint against several state officials challenging the state's operation of its foster care system. Doc. 1 at 1-3. The complaint alleged that the defendants are

violating Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 et seq., and section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by unnecessarily placing older foster youth with mental impairments in congregate care facilities rather than community-based foster homes. Doc. 1 at 52-57. The complaint further alleged that the defendants are violating the Adoption Assistance and Child Welfare Act (AACWA), 42 U.S.C. §§ 671 et seq., by failing to comply with federal case planning requirements.[1] Doc. 1 at 51-52. The named plaintiffs seek to represent a class of:

> All children, ages 14 through 17, who:
>
> (1) are, or will be, in the legal custody or under the protective supervision of DCYF under N.H. Rev. Stat. Ann. § 169-C:3 (XVII) and/or (XXV);
>
> (2) have a mental impairment that substantially limits a major life activity, or have a record of such an impairment; and
>
> (3) currently are, or are at serious risk of being, unnecessarily placed in congregate care settings.

Doc. 152 at 2.

Following a partially successful motion to dismiss and a preliminary pretrial conference, the court approved a joint discovery plan in March 2022. Doc. 83 at 2. In that plan, the parties agreed to proceed with merits and class

---

[1]     The plaintiffs also brought a claim under the Due Process clause of the Fourteenth Amendment, which I dismissed. Doc. 49 at 18-19.

certification discovery simultaneously and the plaintiffs expressed their intent to "file a motion for class certification as soon as is practicable[.]" Doc. 77 at 9-10, 14.

Discovery disputes began almost immediately, requiring the court to rule on multiple motions to compel as well as several motions to continue and extend the deadlines outlined in the initial discovery plan. See, e.g., Doc. 91; Doc. 120; Doc. 138; Doc. 190. Consequently, the plaintiffs were unable to obtain all requested discovery before filing their motion for class certification in March 2023.

For example, due to the volume of material and the relatively disorganized nature of their records, the defendants were unable to produce the case files of all putative class members until May 2023—five months after the court's initial production deadline and two months after the plaintiffs had filed their motion for class certification. Doc. 163 at 4; see also Doc. 119 at 13 (ordering the defendants to produce the putative class files by December 2022). Similarly, the defendants did not produce accurate data reflecting the placement histories of older foster youth (referred to by the parties as "Interrogatory 1.2 data") until nearly three months after the plaintiffs' experts had submitted their declarations analyzing an earlier, and admittedly flawed, dataset. Doc. 176-14 at 20 n.8.

The defendants also redacted some discovery materials and withheld others. For example, the defendants initially produced a redacted "CAT dataset," which detailed the level-of-care recommendations from the CAT assessment tool that the defendants use to guide their placement decisions, but did not produce an unredacted version of the dataset until November 2023. Doc. 281-27 at 2-3; Doc. 281-28 at 2. The defendants also withheld certain electronically stored information (ESI) production after the plaintiffs refused to agree to a clawback provision. Doc. 225-3 at 2-3.  Production of the withheld ESI discovery did not begin until October 2023 and is still ongoing today. Doc. 249 at 2.

Although the plaintiffs were aware of these discovery deficiencies, they did not seek to extend the class certification briefing deadlines. Rather, the plaintiffs opted to move forward on an expedited basis out of concern that the named plaintiffs' claims would become moot if they were to exit DCYF custody before the court ruled on class certification. Doc. 137 at 3-4. The motion for class certification became fully ripe in August 2023 and the court held a motion hearing in November 2023.

At the hearing, the plaintiffs argued that the commonality requirement of Rule 23(a)(2) was satisfied because the plaintiffs' claims challenged three "well-defined common practices" of the defendants: the use of congregate care as "default placements;" the use of congregate care as "long-term housing;"

and the systematic failure "to provide and maintain timely, accurate, and legally sufficient case plans." Plfs. Ex. 1 to November 14, 2023, Motion Hearing at 3 (recorded at Doc. 256). The plaintiffs identified various underlying causes of these practices, including (1) the disproportionate funding of congregate care placements over community placements; (2) the failure to adequately recruit and train qualified foster parents; (3) the failure to identify and utilize kinship placements; and (4) reliance on a flawed CAT assessment tool to guide placement decisions. Id. at 9; see also Doc. 258 at 19-20. I expressed some skepticism as to whether the three alleged practices were truly "common driver[s]" sufficient to satisfy commonality, as opposed to recharacterizations of the claimed legal violations, and questioned whether the asserted "underlying causes" would constitute more appropriate drivers. Doc. 258 at 18, 20. See Parent/Pro. Advoc. League v. City of Springfield, 934 F.3d 13, 29-31 (1st Cir. 2019) (noting that, in order to establish commonality, plaintiffs must ordinarily point to a "common driver" behind the alleged class harm).

Immediately after the hearing, the parties agreed to stay litigation in order to pursue mediation. Doc. 259. While mediation was ongoing, the last of the named plaintiffs exited DCYF custody and the plaintiffs amended their complaint to add a fifth named plaintiff, D.M. Doc. 263 at 2; Doc. 273. The

parties were ultimately unable to reach a resolution, and mediation came to a close in April 2024.

Two weeks later, the plaintiffs filed the instant motion to supplement the record with additional reports from their four experts. Doc. 277. The plaintiffs argue that, pursuant to Federal Rule of Civil Procedure 26(e), they should be permitted to supplement the class certification record with the additional expert declarations and supporting exhibits in order to incorporate and respond to evidence provided by the defendants after the initial expert reports were submitted in March 2023. The defendants assert that the supplemental declarations do not merely incorporate new evidence, but rather substantially expand upon the experts' initial reports and should be excluded under Federal Rule of Civil Procedure 37(c)(1) as untimely expert disclosures.

## B.  Expert Reports

The plaintiffs' motion seeks to supplement the reports of Bryan Victor, Tracey Feild, Daryl Chansuthus, and Theodore Cross, all of whom filed expert reports under Federal Rule of Civil Procedure 26(a) in support of the plaintiffs' motion for class certification.

### 1.  Bryan Victor

Victor is a professor of social work retained by the plaintiffs to perform data analysis of the defendants' placement and case planning practices. Doc.

152-15 at 1-2. In his initial declaration, Victor analyzed data collected by the federal government to determine what percentage of older foster youth with mental health diagnoses in DCYF custody were placed in congregate care. Id. at 3.

The plaintiffs now seek to supplement the record with two supplemental declarations from Victor. Victor's first supplemental declaration analyzes (1) the updated Interrogatory 1.2 data to determine the frequency and duration of putative class members' placement in congregate care and (2) the recently unredacted CAT data. Doc. 281-3 at 2. Victor's second supplemental declaration analyzes the putative class members' case files to determine the percentage of individuals with federally compliant case planning forms. Doc. 281-12 at 3.

2. Tracey Feild

Feild, an expert in child welfare systems management, was asked to evaluate New Hampshire's use of congregate care placements for older foster youth with mental health diagnoses. Doc. 154-3 at 1-2. Feild's first declaration analyzed the flawed Interrogatory 1.2 dataset that was initially produced by the defendants to determine the frequency and duration of congregate care placements for older foster youth with mental health diagnoses. Id. at 8-12. Feild then discussed the defendants' expansion of its congregate care capacity as well as New Hampshire's shortage of community-

based mental health services and foster placements, which Feild opined

contributed to the defendants' overreliance on congregate care. Id. at 12-18.

Feild concluded by providing recommendations for steps that the defendants

could take to rectify the identified deficiencies, including (1) recruiting

specialized foster homes for older foster youth and (2) increasing the use of

relative and fictive kin caregivers. Id. at 18-20.

In August 2023, after the defendants produced the corrected

Interrogatory 1.2 data, Feild submitted a supplemental declaration that

updated her prior calculations but did not otherwise alter her conclusions.

Doc. 207-1 at 1-2. This supplemental declaration was filed along with the

plaintiffs' reply brief in support of their motion for class certification.

The plaintiffs now seek to file a second supplemental declaration from

Feild. Feild's second supplemental declaration proceeds in two parts. The

first part conducts another analysis of the frequency and duration of

congregate care placements using the updated Interrogatory 1.2 data, but

this time limits the analysis to data from "per se" putative class members;

that is, older foster youth with specific mental health diagnoses that

necessarily qualify as a disability under the ADA. Doc. 277-2 at 8. The second

part collects and analyzes evidence of various alleged practices by the

defendants that, in Feild's opinion, contribute to the defendants' overreliance

on congregate care placements. Id. at 10. Specifically, Feild discusses

evidence that the defendants (1) underutilize kinship care and do not provide sufficient reimbursement rates for such care; (2) do not adequately recruit and support foster homes that could care for older foster youth with mental health diagnoses; (3) disproportionately fund congregate care facilities rather than community-based placements; and (4) rely on a CAT assessment process that, according to Victor's data analysis, overwhelmingly and unnecessarily recommends congregate care placements. Id. at 10-28.

      3.    <u>Daryl Chansuthus</u>

Chansuthus is a child welfare case management expert retained to analyze the defendants' case planning practices. Doc. 154-1 at 1. In her initial declaration, Chansuthus reviewed the four initial named plaintiffs' case files to determine whether they contained federally mandated case planning documents. Id. at 10. Chansuthus concluded that none of the named plaintiffs' case planning documents were compliant and opined that the omissions were likely the result of systemic, rather than isolated, failures. Id. at 23, 26. Chansuthus then recommended several actions that the defendants could take to address those failures, including (1) implementing a system to notify caseworkers when case or transition plans are overdue; (2) ensuring that caseworkers receive regular feedback from their supervisors on their case planning compliance; and (3) assigning older foster youth with mental

health diagnoses to caseworkers with specialized knowledge and training. Id. at 26.

Chansuthus' proffered supplemental declaration makes three contributions to her previous declaration. First, Chansuthus evaluated D.M.'s case file to determine whether it complied with federal case planning requirements. Doc. 279 at 12-25. Second, Chansuthus considered Victor's recent analysis of the putative class members' case files and opined that the defendants' failure to provide federally compliant case plans "prolongs [foster youth's] confinement to congregate facilities." Id. at 26-29. Finally, Chansuthus elaborated on her previous recommendations and provided some new recommendations as to how the defendants can improve their case planning. Id. at 29-44. Specifically, Chansuthus recommended that, in addition to the steps identified in her initial declaration, the defendants could (1) implement a so-called "Family Team Decision-Making" case planning model; (2) develop a "continuous quality improvement" process to oversee caseworkers' case planning activities; and (3) ensure that case plans are "rooted in a thorough and comprehensive assessment of the family's strengths and needs." Id.

4.    Theodore Cross

Cross is a psychologist who was charged with evaluating the named plaintiffs' disabilities and placement needs. Doc. 154-2 at 1, 4. Cross' first

declaration rendered this evaluation for the initial four named plaintiffs and

his supplemental declaration does the same for the newly-added plaintiff. Id.

at 4-5; Doc. 281 at 1-2.

## II.    <u>STANDARD OF REVIEW</u>

Rule 26(a) requires expert witnesses to provide written reports

containing "a <u>complete</u> statement of <u>all</u> opinions [they] will express and the

basis and reasons for them" in accordance with disclosure deadlines

established by the court. (emphasis added). Nonetheless, under Rule 26(e), a

party may "supplement or correct" an expert report if the party learns that

the report is "incomplete or incorrect, and if the additional or corrective

information has not otherwise been made known to the other parties during

the discovery process or in writing[.]"

Although Rule 26(e) allows for the addition of certain opinions that

were not disclosed in the initial Rule 26(a) report, it does not permit a party

to "subvert discovery deadlines by supplementing its expert reports with

entirely new theories or with information that it should have included in the

initial reports." Noffsinger v. Valspar Corp., No. 09 C 916, 2012 WL 5948929,

at *3 (N.D. Ill. Nov. 27, 2012); <u>accord</u> Poulis-Minott v. Smith, 388 F.3d 354,

358-359 (1st Cir. 2004). "Accordingly, a supplemental expert report that

states additional opinions or seeks to strengthen or deepen opinions

expressed in the original report" exceeds the scope of permissible

supplementation under Rule 26(e). 6 Moore's Federal Practice § 26.131[2] (3d ed. 2024).

Opinions that are not adequately disclosed in accordance with Rule 26(a) and 26(e) are subject to exclusion under Rule 37(c)(1). Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 91 (1st Cir. 2020). Rule 37(c)(1) states that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Absent substantial justification or harmlessness, "the baseline sanction for failure to comply with Rule 26 is preclusion[.]" Gay v. Stonebridge Life Ins. Co., 660 F.3d 58, 62 (1st Cir. 2011). Preclusion is not, however, "strictly required," and the district court retains discretion to impose a less severe sanction. Lawes, 963 F.3d at 91.

In exercising this discretion, the "court should consider the totality of events and then choose from the broad universe of available sanctions in an effort to fit the punishment to the severity and circumstances of the violation." Young v. Gordon, 330 F.3d 76, 81 (1st Cir. 2003). Relevant considerations include:

> (1) the history of the litigation; (2) the sanctioned party's need for the precluded evidence; (3) the sanctioned party's justification (or lack of one) for its late disclosure; (4) the opponent-party's ability to overcome the late disclosure's adverse effects—e.g., the

surprise and prejudice associated with the late disclosure; and (5) the late disclosure's impact on the district court's docket.

Esposito v. Home Depot U.S.A, Inc., 590 F.3d 72, 78 (1st Cir. 2009).

"Although analysis of each factor is relevant, the 'focus of a preclusion inquiry is mainly upon surprise and prejudice' to the [opposing party]." Lawes, 963 F.3d at 92 (quoting Thibeault v. Square D Co., 960 F.2d 239, 246 (1st Cir. 1992)).

## III.    ANALYSIS

The opinions in the plaintiffs' proffered supplemental reports, broadly speaking, fall into two categories. Some of the opinions pertain solely to D.M., the newly-added plaintiff, in order to demonstrate that D.M. is an appropriate class representative. The remainder of the opinions analyze the defendants' placement and case planning practices in order to establish the existence of system-wide failures and identify the discrete causes of these failures. I consider each category of evidence in turn.

## A.    Evaluation of D.M.

As an initial matter, it is not entirely clear whether the defendants seek to preclude the experts' opinions on D.M. See Lohnes v. Level 3 Commc'ns, Inc., 272 F.3d 49, 60 (1st Cir. 2001) (noting that Rule 37(c)(1) "places a burden on the objecting party to move for preclusion"). Although the defendants specifically assert that "preclusion is the appropriate remedy with

respect to the Feild and Victor reports, and most of the Chansuthus report,"

they acknowledge that the analysis is "slightly different" with regards to the

Cross report and "the portions of the Chansuthus report which address D.M."

Doc. 286 at 12, 14.

Regardless, I conclude that the plaintiffs are substantially justified in

supplementing their expert opinions with analysis of D.M.'s ability to serve

as a suitable class representative. The need to add a new plaintiff did not

arise until the last of the original four named plaintiffs exited DCYF custody

in January 2024. Because the plaintiffs could not have foreseen the need for

analysis of D.M. when they filed their initial expert reports in March 2023,

they are substantially justified in supplementing their expert disclosures

with opinions that pertain to D.M.'s ability to serve as a class

representative.[2] <u>See</u> 7 Moore's Federal Practice § 37.62 (3d ed. 2024) ("a party

may be substantially justified in not disclosing evidence if the party could not

have been expected to foresee its relevance.").

---

[2]    The plaintiffs recently moved to amend their complaint to add a new
named plaintiff, B.D., given the likelihood that D.M. will exit DCYF custody
before the court issues a ruling on class certification. Doc. 297. If their motion
is granted, my conclusion that they may supplement their expert reports with
analysis of a new named plaintiff would apply to B.D. as well.

**B.     Opinions on the Defendants' Practices**

The remaining portions of the plaintiffs' supplemental expert declarations present a closer question. The plaintiffs contend that supplementation is appropriate under Rule 26(e) because the experts' opinions simply incorporate and evaluate the defendants' late produced evidence. The defendants do not dispute that at least some of the expert opinions are in response to evidence produced after the plaintiffs moved for class certification, but argue that many of the opinions rely on information that was previously available to the plaintiffs.

If it is true that the supplemental opinions are based solely on evidence that was unavailable when the experts rendered their initial reports, then supplementation would be entirely appropriate. See, e.g., Crawford v. ITW Food Equip. Grp., LLC, 977 F.3d 1331, 1341 (11th Cir. 2020) ("Supplementation is permitted under Rule 26(e) to correct inaccuracies or add information not available when the report was filed."); Luke v. Fam. Care & Urgent Med. Clinics, 323 F. App'x 496, 500 (9th Cir. 2009) (noting that supplementation is appropriate to "fill[] the interstices of an incomplete report based on information that was not available at the time of the initial disclosure") (quoting Keener v. United States, 181 F.R.D. 639, 640 (D. Mont. 1998)); In re Zofran (Ondansetron) Prods. Liab. Litig., MDL No. 1:15-md-2657-FDS, 2019 WL 5423907, at *3-4 (D. Mass. Oct. 23, 2019) (noting that

"experts may 'fill gaps in initial reports when they later learn of the missing information'" and holding that an expert was permitted to supplement his report with evaluation of a study that was "published after his initial report") (quoting Bentley v. Highlands Hosp. Corp., No. 15-97-ART-EBA, 2016 WL 5867496, at *4 (E.D. Ky. Oct. 6, 2016)). However, I am unable to discern from the present record whether the experts' opinions are based solely on information revealed through the defendants' late discovery or incorporate information that was previously made available. While some of the opinions reference concededly late discovery—such as the putative class members' case files or the updated Interrogatory 1.2 data—other opinions rely on internal documents that may or may not have been disclosed at an earlier point. Because the record does not indicate when those documents were produced, I cannot conclude that the plaintiffs' supplementation is warranted under Rule 26(e) or substantially justified under Rule 37(c)(1).

The question then becomes whether, considering the totality of the circumstances, preclusion is an appropriate sanction. In order to guide this inquiry, I consider each of the Esposito factors in turn.

Beginning with the history of the litigation, there is no indication that the plaintiffs have "deliberately and repeatedly disregarded [their] discovery obligations." Lawes, 963 F.3d at 96. To the contrary, this appears to be the

first instance where the plaintiffs have failed to comply with disclosure or discovery deadlines.

Moreover, the plaintiffs' have at least partially justified their request to supplement their disclosures. Cf. Macaulay v. Anas, 321 F.3d 45, 52 (1st Cir. 2003) (concluding that preclusion was appropriate where the party failed to "advance[] any real justification for [the] tardy emergence" of the expert report). As a result of the significant discovery complications that have plagued this case from its inception, relevant evidence has trickled in before, during, and after class certification proceedings. This has, understandably, presented challenges for the plaintiffs as they attempt to certify their class before the named plaintiffs exit DCYF custody and has resulted in a constantly moving target for the experts.

In the defendants' view, the supplemental opinions are not a result of the late discovery, but rather constitute a last-ditch effort by the plaintiffs to save their claims after my comments at the motion hearing made clear that the plaintiffs' alleged common practices were insufficient to establish commonality. But the defendants' argument ignores the fact that the vast majority of the practices that the experts discuss in their supplemental declarations were identified by the plaintiffs at earlier points in the

proceedings.[3] With the exception of a few practices that were not previously raised by the plaintiffs, the supplemental declarations largely expand upon the plaintiffs' preexisting theories using additional evidence—much of which was not available when the experts issued their initial reports.

But even assuming that the supplemental expert reports were purely driven by my statements at the motion hearing, it does not necessarily follow that the reports should be excluded. "Though no one's fault, evidence is sometimes obtained belatedly when a gap in proof is perceived or a new source is uncovered. Discovery aims only to mitigate surprise, for nothing can eliminate it entirely from trial practice." Williams v. Monarch Mach. Tool Co., 26 F.3d 228, 230-231 (1st Cir. 1994) (finding that it was not an abuse of discretion for a district court judge to permit a late-disclosed expert to testify at trial, even though there were "substantial differences" between his opinion

---

[3]     See, e.g., Doc. 207 at 14-15 (discussing the flaws in the defendants' use of the CAT assessment tool); Plfs. Ex. 1 to November 14, 2023, Motion Hearing at 9-17 (collecting evidence of the defendants' disproportionate funding of congregate care, failure to train and recruit appropriate foster families, underutilization of kinship placements, and faulty CAT assessment practices); Doc. 154 at 18 (noting the lack of policies to ensure that children and their families are involved in the case planning process); Doc. 154-3 at 12-18 (discussing the state's expansion of congregate care facilities, shortage of community-based mental health services and placements, and underutilization of kin placements); Doc. 154-1 at 26 (discussing the lack of supervisory intervention over case planning deficiencies, the need for systemic case planning notifications, and the benefit of utilizing specialized case workers for older foster youth with metal impairments).

and the previously disclosed expert's opinion). While the discovery

complications and my identification of potential issues with the plaintiffs'

arguments do not "excuse" the plaintiffs' late disclosure, such circumstances

nonetheless "reduce[] the likelihood that [the plaintiffs] acted in 'bad faith'"

or engaged in inappropriate gamesmanship by concealing their experts'

opinions. Cf. Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170

F.3d 985, 993 (10th Cir. 1999) (finding that undisclosed testimony "prompted"

by a prior court ruling did not "excuse [the plaintiff] from supplementing its

disclosure," but nonetheless undermined the appearance of bad faith). The

plaintiffs' justification for the late disclosure, combined with the absence of

any evidence of bad faith or gamesmanship, leans in favor of permitting

supplementation.

    The plaintiffs' significant need for the evidence also weighs in favor of

permitting supplementation. Given the "strong policy favoring the disposition

of cases on the merits," courts are reluctant to preclude evidence where doing

so would "carr[y] the force of a dismissal" unless "none of the lesser sanctions

available to it would truly be appropriate." Lawes, 963 F.3d at 91 (cleaned

up); accord 6 Moore's Federal Practice § 26:27[2] (collecting cases and noting

"[t]he reluctance of the courts to exclude important evidence because of a

failure to disclose without indications that the failure to disclose was the

result of willfulness, bad faith, or substantial fault"). The supplemental

evidence here is key to the plaintiffs' motion for class certification and, therefore, the continuing validity of their class claims.

For example, the supplemental reports provide more substance to the alleged practices that support the plaintiffs' theory of commonality, which I have recognized as the "primary issue" in this case. Doc. 258 at 3. This is particularly true for the putative class's AACWA claim, which turns on the existence of class-wide case planning failures. The supplemental expert reports make important contributions to this claim by analyzing case planning across the entire class, rather than just the named plaintiffs. Such evidence is highly important, if not entirely necessary, to class certification. Cf. Esposito, 590 F.3d at 79 (finding that it was an abuse of discretion for a court to impose "a fatal sanction . . . for a single oversight").

Of course, that the plaintiffs' supplemental declarations "might well prove crucial" does not, standing alone, "bar preclusion of expert testimony," particularly where supplementation would result in significant prejudice. Presstek, Inc. v. Creo, Inc., 2007 DNH 044, 2007 WL 983820, at *7 (D.N.H. Mar. 30, 2007). The prejudice here, however, is minimized by the fact that the defendants cannot claim surprise. Macaulay, 321 F.3d at 52 ("surprise and prejudice go hand in hand."). As I explained, the majority of the theories raised in the supplemental opinions were at least foreshadowed by the plaintiffs' previous filings. See Lawes, 963 F.3d at 93 (considering a party's

pre-trial disclosures and expert depositions in evaluating whether an
undisclosed expert opinion was prejudicial). And all of the opinions are based
on the defendants' own documents. See Curet-Velazquez v. ACEMLA de P.R.,
Inc., 656 F.3d 47, 56-57 (1st Cir. 2001) ("appellants cannot claim that the
reference to these new documents was an unfair surprise because they
themselves prepared and disclosed the documents."). Moreover, the plaintiffs
put the defendants on notice of their intent to supplement the expert reports
prior to mediation and filed the supplemental reports without delay once
mediation concluded. Doc. 259 at 2.

To be sure, the supplemental reports could still prejudice the
defendants to a certain extent insofar as the defendants have already
deposed the plaintiffs' experts, produced their own expert reports, and
submitted various motions, all in reliance on the experts' initial reports. This
prejudice, however, can be adequately cured by permitting additional
discovery and providing the defendants with an appropriate opportunity to
respond to the reports with supplemental briefing and evidence. See
Williams, 26 F.3d at 231 (concluding that prejudice from a late disclosure
could be remedied by delaying trial in order to permit additional discovery
and depositions); Gillum v. United States, 309 F. App'x 267, 270 (10th Cir.
2009) (concluding that prejudice from late expert disclosure could be cured by
making the expert available for a second deposition). With these measures in

place, the defendants will not be meaningfully prejudiced by the late

disclosure, which weighs heavily in favor of allowing supplementation.[4] See

Lawes, 963 F.3d at 96 ("we have never affirmed an expert's preclusion when

we were not persuaded by the proffered evidence of surprise or prejudice in

the record . . . . ").

Considering each of these factors under the totality of the

circumstances, I conclude that preclusion is not an appropriate sanction

under Rule 37(c)(1). Rather, the more appropriate course is to allow the

plaintiffs to supplement their expert reports with the supplemental

declarations and accompanying exhibits but provide the defendants with an

adequate opportunity to respond to the new reports.[5]

---

[4]    As both parties recognize, these additional measures will impact the
court's docket by pushing a decision on class certification several months into
the future. This disruption to the docket, while not insignificant, is
nonetheless mitigated by the fact that the case is still in its early stages with
no impending trial. Cf. Primus v. United States, 389 F.3d 231, 236 (1st Cir.
2004) ("evidentiary changes on the eve of trial are much more problematic
and disruptive of trial preparation.").

[5]    A scheduling order that provides further substance as to the steps that
the defendants may take in responding to the plaintiffs' supplemental
disclosures will issue separately. I will consider the defendants' request to
allocate the costs of this additional briefing and discovery to the plaintiffs at
an appropriate time once the merits stage of this litigation concludes.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the plaintiffs' motion for leave to supplement their expert declarations (Doc. 277) is granted.

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

June 14, 2024

cc:    Counsel of record