**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

G.K., et al.,

               Plaintiffs,

v.

                                           Case No. 21-CV-4-PB

CHRISTOPHER SUNUNU, et al.,

               Defendants.

**PLAINTIFFS' OBJECTION AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SECOND MOTION TO EXCLUDE PLAINTIFFS' SUPPLEMENTAL EXPERT TESTIMONY**

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................ 1

**ARGUMENT**...................................................................................................... 1

I.      **Legal Standard** ................................................................................... 1

II.     **Dr. Victor Offers Reliable Opinion Testimony Relevant to Understanding Defendants' Case Planning and Placement Practices.** ................................. 2

    a.   **Dr. Victor's First Supplemental Declaration Regarding Older Foster Youth Placement Data Is Reliable and Relevant.** ................................. 4

    b.   **Dr. Victor's Second Supplemental Declaration Regarding Older Foster Youth Case Planning Data Is Reliable and Relevant.** ................................. 8

III.    **Ms. Chansuthus Offers Reliable Opinion Testimony Relevant to Understanding Defendants' Case Planning Practices.** ............................. 12

    a.   **Ms. Chansuthus Is Qualified to Provide Her Opinions.** ........................... 13

    b.   **Ms. Chansuthus's Opinions Are Reliable.** ............................................ 14

    c.   **Ms. Chansuthus's Opinion Is Relevant to Class Certification.** ................ 17

IV.     **Ms. Feild Offers Reliable Opinion Testimony Relevant to Understanding Defendants' Child-Welfare Systems-Level Practices.** ............................... 20

    a.   **Ms. Feild's Expert Opinion on Defendants' Failure to Recruit and Retain Kinship Caregivers Is Admissible under Rule 702.** ................................... 21

    b.   **Ms. Feild's Expert Opinion on Defendants' Failure to Recruit Enhanced-Support and General Foster Homes Is Based on Good Grounds.** ........................... 24

    c.   **Ms. Feild's Expert Opinion on Defendants' Disproportionate Funding of Congregate Facilities Rests on a Reliable Methodology.** ........................... 26

    d.   **Ms. Feild's Expert Opinion on Defendants' Reliance on a Flawed CAT Process Is Admissible.** ................................................................................... 30

    e.   **Ms. Feild's Expert Opinions on Defendants' Practice of Unnecessarily Placing and Retaining Older Foster Youth with Mental Disabilities in Congregate Facilities Is Reliable.** ........................................................................... 31

V.      **Dr. Cross Offers Reliable Opinion Testimony Relevant to Understanding B.D. and D.M.'s Mental- and Behavioral-Health Needs.** ................................... 32

**a.** **Dr. Cross's Opinions Are Reliable.**................................................................. 33

**b.** **Dr. Cross Is Qualified to Opine on Appropriate Placements and Services.** ........... 34

**CONCLUSION** ................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Adams v. New England Scaffolding, Inc.*,
  No. 13-12629-FDS,  2015 WL 9412518 (D. Mass. Dec. 11, 2015) ........................................ 18

*Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*,
  721 F.3d 871 (7th Cir. 2013) ....................................................................................................... 6

*B.K. by next friend Tinsley v. Faust*,
  No. CV-15-00185-PHX-ROS, 2020 WL 2616033 (D. Ariz. May 22, 2020).................... 18, 31

*Carrier v. Am. Bankers Life Assurance Co. of Fla.*,
  No.05-CV-430-JD,  2007 WL 3124653 (D.N.H. Oct. 25, 2007) .............................................. 18

*Casey v. Ohio Medical Products*,
  877 F. Supp. 1380 (N.D. Cal. 1995) ........................................................................................... 6

*Cipollone v. Yale Indus. Prod., Inc.*,
  202 F.3d 376 (1st Cir. 2000) ....................................................................................................... 3

*Commodores Entm't. Corp. v. McClary*,
  879 F.3d 1114 (11th Cir. 2018) ................................................................................................. 18

*Cortes-Irizarry v. Corporacion Insular de Seguros*,
  111 F.3d 184 (1st Cir. 1997) ....................................................................................................... 1

*Crowe v. Marchand*,
  506 F.3d 13 (1st Cir. 2007) ......................................................................................................... 1

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) .................................................................................................................... 2

*Doe v. Trustees of Dartmouth Coll.*,
  699 F. Supp. 3d 171 (D.N.H. 2023) ..................................................................................... 7, 16

*First Marblehead Corp. v. House*,
  541 F.3d 36 (1st Cir. 2008) ....................................................................................................... 30

*Fitzmorris v. New Hampshire Dep't of Health & Human Servs. Comm'r Lori Weaver*,
  No. 21-CV-25-PB, 2023 WL 8188770 (D.N.H. Nov. 27, 2023)...................................... passim

*G v. Fay Sch., Inc. by & through its Bd. of Tr.*,
  282 F. Supp. 3d 381 (D. Mass. 2017) ....................................................................................... 16

*Gaston v. LexisNexis Risk Sol., Inc.*,
  483 F. Supp. 3d 318 (D. N. C. 2020) ........................................................................................ 20

*Graystone Funding Co., LLC v. Network Funding, L.P.*,
  598 F. Supp. 3d 1228 (D. Utah 2022) ....................................................................................... 10

*Harris v. Koenig*,
  815 F. Supp. 2d 6 (D.D.C. 2011) .............................................................................................. 10

*Hostingxtreme Ventures, LLC v. Bespoke Grp., LLC*,
  No. 3:14-CV-1471-M, 2016 WL 3551628 (N.D. Tex. Jun. 30, 2016) ........................... 7, 16, 28

*Iconics, Inc. v. Massaro*,
  266 F. Supp. 3d 461 (D. Mass. 2017) ................................................................................... 8, 16

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
  644 F.3d 604 (8th Cir. 2011) ...................................................................................................... 2

*Issokson v. Ins. Co. of N. Am.*,
  No. 3:18-CV-30070-MGM, 2023 WL 4195941 (D. Mass. May 4, 2023) ................................. 2

*Kay v. Lamar Advert. of S. Dakota, Inc.*,

No. CIV 07-5091-KES, 2009 WL 2606234 (D.S.D. Aug. 21, 2009) ............................................ 5

*Kenny A v. Perdue*,
No. 1:02-CV-1686-MHS, 2004 WL 5503780 (N.D. Ga. Dec. 13, 2004) ................................ 18

*Kudabeck v. Kroger Co.*,
338 F.3d 856 (8th Cir. 2003) ........................................................................ 5, 12, 26

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) .................................................................................................... 1

*Lawes v. CSA Architects & Eng'rs LLP*,
963 F.3d 72 (1st Cir. 2020) ................................................................ 21, 24, 34

*Levin v. Dalva Bros.*,
459 F.3d 68 (1st Cir. 2006) ......................................................................... 1

*M.D. v. Perry*,
294 F.R.D. 7 (S.D. Tex. 2013) ................................................................. 25

*Manpower, Inc. v. Ins. Co. of Pennsylvania*,
732 F.3d 796 (7th Cir. 2013) ................................................................. 5

*Marrero-Rolon v. Autoridad de Energia Electrica*,
No. CV 15-1167 (JAG), 2018 WL 8805485 (D.P.R. Sept. 10, 2018) ........................ 2

*Milward v. Acuity Specialty Prod. Grp., Inc.*,
639 F.3d 11 (1st Cir. 2011) ................................................................ passim

*Nieves-Villanueva v. Soto-Rivera*,
133 F.3d 92 (1st Cir. 1997) ......................................................................... 18

*Pelletier v. Main St. Textiles*, LP,
470 F.3d 48 (1st Cir. 2006) ......................................................................... 18

*Reed v. Royal Caribbean Cruises Ltd.*,
No. 19-24668-CIV, 2021 WL 2592888 (S.D. Fla. May 3, 2021) ............................. 6

*SiteLock LLC v. GoDaddy.com LLC*,
562 F. Supp. 3d 283 (D. Ariz. 2022) .................................................... 7, 10

*Total Control, Inc. v. Danaher Corp.*,
338 F. Supp. 2d 566 (E.D. Pa. 2004) ................................................... 3, 7

*United States v. Blount*,
502 F.3d 674 (7th Cir. 2007) ......................................................................... 18

*United States v. Encaracion*,
26 F.4th 490 (1st Cir. 2022) ......................................................................... 35

*United States v. Mooney*,
315 F. 3d 54 (1st Cir. 2002) ......................................................................... 32

*United States v. Philip Morris USA Inc.*,
No. 99-2496, 2022 WL 1101730 (D.D.C. Apr. 2022) ......................................... 9

*Wyatt B. v. Brown*,
No. 6:19-CV-00556-AA, WL 3445767 (D. Or. Aug. 17, 2022) ............................. 18

*Wyatt B. v. Kotek*,
2024 WL 20249565 (D. Or. May 8, 2024) ...................................................... 25

## FEDERAL STATUTES

42 U.S.C. §§ 675(1)(A)-(G), (5)(A)-(I) ........................................................................ 19

## FEDERAL RULES

Fed. R. Civ. P. 26(b)(4)(C)(iii) ................................................................................................. 10

Fed. R. Evid. 702 ................................................................................................ passim

**INTRODUCTION**[1]

The opinions of Plaintiffs' four highly qualified experts all meet the threshold for admissibility under Federal Rule of Evidence 702. They have extensive experience in their relevant fields. Each relied on their professional experience and employed reliable methodologies to explain Defendants' documents and data, and to analyze and opine on Defendants' policies and practices. Nevertheless, Defendants' motion spends 39 pages mischaracterizing the experts' opinions under the guise of challenging admissibility, and consists largely of repeated unpersuasive arguments against class certification. Defendants' motion also tries to rely on evidence never produced in discovery, and on unattributed, unsupported, and improper lay opinion testimony. Defendants' misleading arguments should be rejected and their motion to exclude Plaintiffs' expert testimony should be denied.

**ARGUMENT**

### I.   Legal Standard

"The touchstone for the admission of expert testimony in federal court litigation is Federal Rule of Evidence 702." *Crowe v. Marchand*, 506 F.3d 13, 17 (1st Cir. 2007). Experts must be qualified, assist in determining a fact in issue, rest their opinions on sufficient facts or data, and utilize reliable methods. Fed. R. Evid. 702. Rule 702 should be "interpreted liberally in favor of . . . admission." *Levin v. Dalva Bros.*, 459 F.3d 68, 78 (1st Cir. 2006); *see also Cortes-Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("A trial setting normally will provide the best operating environment for the triage which *Daubert* demands."). The "test of reliability is flexible," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), focusing

---

[1] All capitalized terms carry the same meaning as in Plaintiffs' prior submissions.

"on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 580 (1993). "So long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process, rather than excluded . . . ." *Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) (citations omitted).[2]

## II. Dr. Victor Offers Reliable Opinion Testimony Relevant to Understanding Defendants' Case Planning and Placement Practices.

Defendants do not challenge Dr. Victor's expertise as an expert in child welfare systems data analysis. *See* Defs.' Suppl. MOL in Supp. of their Mot. to Exclude Pls.' Expert Testimony, ECF No. 319 ("Defs.' Mot. to Exclude"), at 4-15. Nor could they.[3]

Dr. Victor's supplemental reports are the product of transparent, well-defined, and accepted analytical principles and tools applied to Defendants' own child welfare records and data, which they produced in at least four separate data sets comprising thousands of data points. *See* Suppl. Decl. of Bryan G. Victor, Ph.D. in Supp. of Class Cert., ECF No. 281-3 (May 1, 2024) ("Victor Suppl."), at 3-6 (describing methodology); Second Suppl. Decl. of Bryan G. Victor, Ph.D., in Supp. of Class Cert., ECF No. 281-12 (May 1, 2024) ("Victor Second Suppl."), at 3-6

---

[2] Some courts, including district courts in the First Circuit, have applied less stringent analyses to *Daubert* challenges at the class certification stage. *See* Issokson v. Ins. Co. of N. Am., No. 3:18-CV-30070-MGM, 2023 WL 4195941, at *1 (D. Mass. May 4, 2023) ("[A]t the class certification stage . . . the concerns put forth in Daubert are not as salient." (quoting *Marrero-Rolon v. Autoridad de Energia Electrica*, No. CV 15-1167 (JAG), 2018 WL 8805485, at *2 (D.P.R. Sept. 10, 2018)); *see also* In re Zurn Pex Plumbing Prod. Liab. Litig., 644 F.3d 604, 613 (8th Cir. 2011) ("[A]n exhaustive and conclusive Daubert inquiry before the completion of merits discovery cannot be reconciled with the inherently preliminary nature of pretrial evidentiary and class certification rulings."). Regardless of the standard applied, Defendants' motion fails.

[3] *See also* March 2023 Declaration of Victor in Supp. of Pls.' Class Cert., ECF No. 152-15, at ¶¶ 4-6; Resume of Dr. Bryan G. Victor, ECF No. 152-16; *see also* Excerpts from 2023 Victor Tr., ECF No. 204-3.

(describing methodology). Attached as exhibits to both supplemental reports are nearly 100 pages of computer code used to generate his analyses written in the programming language R, which Dr. Victor explains is "an open-source statistical software program commonly used by social science researchers." *See* Victor Second Suppl. at 6; *see also* ECF No. 281-6; ECF No. 281-10 (analytic scripts for placement data); ECF No. 281-15 (analytic scripts for case plan data). Courts routinely accept expert opinions that, like Dr. Victor's, are "ab[le] to present a vast quantity of calculations derived from disparate sources in an understandable format." *See Total Control, Inc. v. Danaher Corp.*, 338 F. Supp. 2d 566, 569 (E.D. Pa. 2004).

Defendants do not offer any qualified child welfare data expert to challenge Dr. Victor's methodology or opinions. Instead, Defendants try to rely on inadmissible and improper "reviews" of child welfare administrative data by their own counsel, and other layperson theories on how child welfare data analysis "should" or "could" be conducted. *See* Rosenberg Decl., ECF No. 319-15. These attempts to pass off Defendants' own counsel's lay opinions on child welfare data analysis as valid methodological challenges should be disregarded, and certainly do not provide any basis for the exclusion of Dr. Victor's opinions under Rule 702.

Defendants also do not, and cannot, dispute that Dr. Victor's analysis satisfies "the ultimate purpose of the *Daubert* inquiry" by being "helpful . . . in resolving a fact in issue." *See Cipollone v. Yale Indus. Prod., Inc.*, 202 F.3d 376, 380 (1st Cir. 2000). For example, Defendants acknowledge that a key issue before the Court is Plaintiffs' claim that Defendants' CAT assessment practice is a driver of Defendants' unnecessary and inappropriate placement of Older Foster Youth in congregate care. Dr. Victor's CAT analysis addresses that key issue, finding that according to Defendants' own data, 94% of CAT assessments for Older Foster Youth with per se mental disabilities recommended congregate placements over family-like placements. *See* Victor

Suppl. at 6. Defendants' criticisms of Dr. Victor's placement data and case plan analyses are better understood as complaints that those analyses are not helpful *to Defendants*. As discussed further below, none of Defendants' various grievances about Dr. Victor's supplemental reports amount to cognizable reasons to exclude them under Rule 702.

### a. Dr. Victor's First Supplemental Declaration Regarding Older Foster Youth Placement Data Is Reliable and Relevant.

Dr. Victor analyzed Defendants' own level-of-care recommendation data to find that 94% of CAT assessments for Older Foster Youth with per se mental disabilities recommended congregate placements over family-like placements.[4] *See* Victor Suppl. at 6. He also analyzed Defendants' own placement and custodial history data to find that Older Foster Youth with per se mental disabilities spent 61% of their bed days in congregate settings. *See id.* at 5. Defendants offer no critique of the methodology outlined in Dr. Victor's report, nor any critique of the R-code attached to his report. Rather, Defendants argue that Dr. Victor did not utilize *their* methodology— one not grounded in any particular child welfare expertise, but seemingly used without any explanation by Defendants' counsel. However, "the existence of an alternative methodology" does

---

[4] Defendants claim that "Dr. Victor's written report concludes that 94 percent of the 135 Older Foster Youth with per se mental impairments were recommended for congregate care" and then feign shock that at his deposition, "Dr. Victor conceded that this was not true." *See* Defs.' Mot. to Exclude at 12-13. But Dr. Victor's report never concluded that; to the contrary, it clearly indicates that *of all CAT assessments conducted on the 135 Older Foster Youth with per se mental disabilities*, "the assessments overwhelmingly (in 94% of cases) recommended congregate placements." *See* Victor Suppl. at 6. And Dr. Victor then testified, plainly and clearly, that because he analyzed *all* CATs conducted on the relevant population (*i.e.*, all Older Foster Youth in Defendants' custody on April 26, 2022, with a per se mental disability)—rather than, say, a random sample of CATs conducted on that relevant population—one *could* use those data to describe the population as a whole *without any further inferential statistical analyses*. *See* 2024 Victor Dep. Tr. 106:23-109:7. Defendants' argument to the contrary, *see* Defs.' Mot. to Exclude at 13, ignores and mischaracterizes Dr. Victor's testimony and statistical methods.

not render Dr. Victor's "chosen methodology unreliable." *See* *Kay v. Lamar Advert. of S. Dakota, Inc.*, No. CIV 07-5091-KES, 2009 WL 2606234, at *4 (D.S.D. Aug. 21, 2009).

    1.  <u>CAT Analysis</u>

        Defendants argue that Dr. Victor's CAT analysis should be excluded, but offer no reason to do so under Rule 702. Instead, they just claim that Dr. Victor "knew nothing about the CAT process in New Hampshire," and "did not consider any alternative approaches to reviewing the data." *See* Defs.' Mot. to Exclude at 11-12. What Defendants mean is that Dr. Victor did not write a report utilizing *their* "alternative" approach, addressing whether or not Older Foster Youth with mental disabilities are more or less likely to be recommended for residential treatment than children not even in DCYF foster care custody—which is a completely different and wholly irrelevant question. Defendants' argument does not amount to grounds for exclusion. *See Kudabeck v. Kroger Co.*, 338 F.3d 856, 861 (8th Cir. 2003) ("Simply because [the expert] did not conduct his [study] in the manner [Defendant] preferred, does not render [the expert's] testimony unreliable."); *see also Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 807 (7th Cir. 2013) ("the selection of data inputs to employ in a model is a question separate from the reliability of the methodology").

        Defendants' counsel opines that Dr. Victor could have used "a 'control group' or 'reference' point to understand relevant data," and that Dr. Victor's "control group" or "reference point" should have been children not in DCYF foster care custody. *See* Defs.' Mot. to Exclude at 12. But absent from Defendants' argument is any support for this new methodology from an actual child welfare data expert, let alone one with the knowledge of "the CAT process in New Hampshire" that Defendants proclaim is essential. And in a misguided attempt to discredit Dr. Victor's findings, Defendants go so far as to submit their own purported "control group" child

welfare study consisting of a single, unattributed page. *See* Defs.' Suppl. MOL in Opp'n. to Class Cert., ECF No. 317 at 19 ("Defs.' Suppl. Class Cert. Opp."); *see also* Defs.' Review of CAT Assessment Recommendations, ECF No. 317-34. Nowhere on that single page do Defendants clarify *who* performed their child welfare data analysis—let alone that the person(s) conducting the analysis is a qualified child welfare data expert with any specialized knowledge of "the CAT process in New Hampshire," as they claim is required by Rule 702. Defendants' "review" is also based on inscrutable assumptions and methods. *See id.* (two-sentence "notes on methodology"). It should be stricken from the record or, at a minimum, given no weight.

Defendants further fail to offer any legal authority supporting their proposed "alternative" child welfare data analysis.[5] To the contrary, Defendants' fixation with including children not in DCYF foster care custody as a "control group," besides being completely unfounded, is also a waste of time. This Court itself has recognized that *Olmstead* concerns the "undue institutionalization of disabled persons, no matter how anyone else is treated." *See* ECF No. 49 at 29 (citing *Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013)). Any analysis of CAT data for youth not in DCYF's foster care custody, whether hypothetical or performed by Defendants' counsel, "is unhelpful because it is irrelevant to the issues in this case." *See* *Reed v. Royal Caribbean Cruises Ltd.*, No. 19-24668-CIV, 2021 WL 2592888, at *6 (S.D. Fla. May 3, 2021); *see also* 2024 Feild Dep. Tr. 58:19-59:12 (finding control group analysis irrelevant).

---

[5] The only support Defendants provide for their new proposed child welfare study involving "control groups" comes from a 1995 products liability case involving reliable scientific evidence on the causes of chronic active hepatitis. *See* Defs.' Mot. to Exclude at 12 (quoting *Casey v. Ohio Medical Products*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995)). Their claim that this supports exclusion of a child welfare data expert's review of Defendants' data is spurious.

Finally, throughout their motion, Defendants conflate Dr. Victor's reliance on counsel's *assumptions* with reliance on counsel for his data *conclusions*. *See, e.g.,* Defs.' Mot. to Exclude at 10-11. There is nothing improper about an expert relying on counsel's assumptions or instructions. *See SiteLock LLC v. GoDaddy.com LLC*, 562 F. Supp. 3d 283, 329 (D. Ariz. 2022) (rejecting argument that expert's reliance on "assumptions…instructions or requests" from counsel rendered opinions unreliable given his role "as an expert who was hired to respond to [counsel's] inquiries"). And Defendants offer no evidence for their suggestion that Dr. Victor "accept[ed] without scrutiny the conclusions given to him by Plaintiffs' lawyers," *see* Defs.' Mot. to Exclude at 11, because there is none. (That Plaintiffs' counsel "directed [Dr. Victor] not to answer" Defendants' questions calculated at discovering privileged information does not constitute such evidence. *See* Defs.' Mot. to Exclude at 11).

2. Placement Data Analysis

In characterizing Dr. Victor's analysis of Defendants' placement data as mere "math," *see* Defs.' Mot. to Exclude at 13, Defendants concede its reliability. *See Total Control*, 338 F. Supp. 2d at 570 (mathematics "of course, cannot be considered an unreliable method"). Defendants only argue that his analysis "should be given no weight" because Dr. Victor does not "say anything about *why*" those Older Foster Youth experienced longer or more frequent stays in residential care, or explain "*how*" his report "fits into Plaintiffs' theories of the case." *See* Defs.' Mot. to Exclude at 13, 15. By so doing, Defendants acknowledge that their argument goes to the weight of Dr. Victor's placement data analysis rather than its admissibility. *See Doe v. Trustees of Dartmouth Coll.*, 699 F. Supp. 3d 171, 178 (D.N.H. 2023) ("factual inputs [expert] did or did [not] include in conducting her analysis" not grounds for exclusion); *see also Hostingxtreme Ventures, LLC v. Bespoke Grp., LLC*, No. 3:14-CV-1471-M, 2016 WL 3551628, at *3 (N.D. Tex. Jun. 30, 2016)

(argument that expert's "opinions should have included additional information and considerations" did not go to "admissibility of this evidence"). Moreover, Dr. Victor offers reliable child welfare data analyses which another expert, Tracey Feild, utilized in support of Plaintiffs' motion for class certification. *See Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 461, 469 (D. Mass. 2017) ("an expert may rely on other witness's testimony or other expert conclusions to form an opinion.").

Defendants also critique Dr. Victor's placement analysis to the extent it relates to members of the current putative class. *See* Defs.' Mot. to Exclude at 15. As an initial matter, because Dr. Victor analyzed point-in-time data, his placement data findings represent *the entire population*— not merely a sample of that population. Moreover, Dr. Victor relied on the *most recent data that Defendants provided*. *See* Victor Suppl. Table 1. Conspicuously absent from Defendants' many filings is any claim that Dr. Victor's placement analyses are no longer accurate.

### b. Dr. Victor's Second Supplemental Declaration Regarding Older Foster Youth Case Planning Data Is Reliable and Relevant.

Dr. Victor analyzed the DCYF case files of Older Foster Youth that Defendants themselves identified in December 2022 as putative class members. *See* Victor Second Suppl. at 2.[6] The results

---

[6] Defendants point to 13 case files that they produced between March and May 2023, which Dr. Victor did not consider for his case plan analysis data, as evidence of a "significant error rate" in Dr. Victor's analysis. *See* Defs.' Mot. to Exclude at 14; *see also* Rosenberg Decl. But they do not explain how Plaintiffs' counsel's inadvertent error in not downloading a random batch of files (based, in any event, on Defendants' prior representation they would be producing 184 files) would materially bias Dr. Victor's results. Dr. Victor's methods and results as to those 184 youth remain sound, and Defendants offer no argument otherwise. Tellingly, Defendants did not offer the Court their own report containing case plan data analysis from a qualified child welfare data expert. Instead, Defendants offered a hodgepodge of "reviews" from unattributed sources based on inconsistent methodological choices that make comparison impossible. For example, Defendants' case plan "analysis" included case plans outside the period under review, subverting the purpose of Dr. Victor's analysis, and included plans contained an incorrect (older version) of case plan forms—essentially rewriting the research question itself. To the extent Defendants identify a few missed case plans within the 184 case files Dr. Victor reviewed, they do not show that those missed plans are of an unacceptable error rate or otherwise undermine Dr. Victor's overall finding that

of his analysis yielded a number of key findings, including that 66% (122 of 184) of those older foster youth lacked a single case plan dated during his fifteen-month period under review ("PUR"). *See* Victor Second Suppl. at 9. Defendants do not point to any unreliability in Dr. Victor's methodology as laid out in his supplemental report, *see id.* at 2-5, nor do they point to any unreliability in the R-code attached to his supplemental report that he used to generate his analysis. *See* ECF No. 281-15. They raise only two challenges: that Dr. Victor relied on instructions and assumptions from counsel, *see* Defs.' Mot. to Exclude at 5-6, and that the assumptions he relied on were "generally wrong," *see id.* at 6. Neither is a cognizable reason to exclude his analysis under Rule 702.

First, Defendants again assert that Dr. Victor's methodology is unreliable because he relied on assumptions and instructions for his analysis from counsel, which "made him merely a conduit for the opinions of counsel." *See* Defs.' Mot. to Exclude at 6. Defendants' argument misunderstands and misstates both the law and the record. Experts are "conduit[s] for the attorney's opinion" when they offer "[e]xpert testimony consisting of *legal conclusions*." *See United States v. Philip Morris USA Inc.*, No. 99-2496, 2022 WL 1101730, at *8 (D.D.C. Apr. 2022) (emphasis added). Dr. Victor's conclusions, though, are based on his own professional experience and the results of case plan data analysis conducted under the specific steps laid out in his supplemental report. *See* Victor Second Suppl. at 2-5. Plaintiffs' counsel never dictated his conclusions, and Defendants do not and cannot point to any evidence suggesting otherwise. In fact, Dr. Victor testified based on his experience as a statistician and data analyst that if he were to design a similar study, he would "use the methodology outlined in the [Second Supplemental]

---

well over half—66% (122 of 184)—of Older Foster Youth lacked a single case plan dated during his fifteen-month period under review. *See* Victor Second Suppl. at 9.

Declaration," and that this methodology was "fairly standard within social science research." 2024 Victor Deposition Transcript, ECF No. 319-2; 226:13-227:18 ("2024 Victor Dep. Tr.").

Moreover, it is unremarkable that Dr. Victor relied on assumptions and facts from counsel given his role "as an expert who was hired to respond to [counsel's] inquiries." *See SiteLock LLC, 562 F. Supp. 3d* at 329. An expert's reliance on assumptions from counsel is, in fact, expressly contemplated by the Federal Rules. *See* Fed. R. Civ. P. 26(b)(4)(C)(iii). And using counsel's instructions based on transparent assumptions does not render an analysis unreliable under Rule 702.

Defendants' remaining challenges are variants of the same theme: that Dr. Victor's methodology was "premised entirely on assumptions…which were generally wrong."[7] *See* Defs.' Mot. to Exclude at 6. But when Defendants claim Dr. Victor's analysis relied on a "flawed reading of federal law," *see id.* at 22, they simply mean assumptions that "comport[] with Plaintiffs' theory of the case. " *See Harris v. Koenig*, 815 F. Supp. 2d 6, 10 (D.D.C. 2011). "Defendants may disagree with that legal theory," but it is not a basis for exclusion under Rule 702. *See id.*; *see also SiteLock LLC*, 562 F. Supp. 3d at 329.

For example, Defendants call Dr. Victor's methodology "plainly intended to skew the results provided" because it excluded case plans dated before or after the PUR. *See* Defs.' Mot. to Exclude at 7. While Dr. Victor's methodology does not follow Defendants' view of the case, his supplemental report makes clear that the purpose of his analysis was to examine the number of Older Foster Youth with mental disabilities who received required case planning forms and case

---

[7] To the extent Defendants disagree with any of the factual assumptions underlying Dr. Victor's analysis, that is plainly not a valid basis for exclusion. *See Graystone Funding Co., LLC v. Network Funding, L.P.*, 598 F. Supp. 3d 1228, 1237 (D. Utah 2022) ("For Rule 702 purposes, the accuracy of the factual and casual assumptions underlying an expert's testimony is not at issue.").

planning updates during the most *recent* fifteen-month period in the files produced by Defendants. *See* Victor Second Suppl. at 2. And as Defendants themselves acknowledge, a key issue before the Court on class certification is Defendants' compliance with federal case planning requirements, which include the requirement to provide six-month case plan updates. *See* Defs.' Suppl. Class Cert. Opp. at 26; *see also* Pls.' Obj. and MOL in Opp'n. to Defs.' Mot. to Dismiss Count I as to All Pls. and Counts II-V as to All Pls. Except B.D. ("Pls.' Obj. to Defs.' Second Mot. to Dismiss"). at 21-22.

Defendants criticize Dr. Victor for not "distinguish[ing] between youth entering care for the first time…and youth who had long been in care." *See* Defs.' Mot. to Exclude at 7. Defendants assert that doing so "would have shown Defendants' *success*" in complying with their interpretation of federal case planning requirements. *See id.* But again, this attack amounts to a complaint that Dr. Victor's analysis strengthened Plaintiffs' case rather than Defendants'. *See also id.* at 9 (complaining that "Dr. Victor's methodology also obscures Defendants' success"). Similarly misplaced is Defendants' criticism of Dr. Victor's Forms 1695 and 1552 analysis, which argues that Dr. Victor again should have assumed *Defendants'* interpretation of federal law in his analysis. *See id.* at 12-13; *see also* Pls.' Suppl. Reply in Further Supp. of Pls.' Mot. for Class Cert. ("Class Cert. Reply") at 15 n.21 (noting "Forms 1550, 1552, and 1695 meet unique requirements of AACWA . . . ").

Defendants could have, of course, offered their own child welfare data expert to perform their own preferred case plan data analysis. They did not, and instead offered unattributed case plan data analysis following no discernible methodology, under opaque underlying assumptions

that were not subject to cross-examination.[8] *See* Defs.' PUR Removal Calculations, ECF No. 319-60; *see also* Defs.' Mot. to Exclude at 9-10 (listing analyses that supposedly demonstrate "Defendants' success"). Dr. Victor was not Defendants' child welfare data expert, and did not need to conduct his case plan analysis under Defendants' instructions. That does not mean his case plan analysis was anything less than reliable. *See* *Kudabeck*, 338 F.3d at 861.

### III.   Ms. Chansuthus Offers Reliable Opinion Testimony Relevant to Understanding Defendants' Case Planning Practices.

Ms. Chansuthus reviewed and analyzed over 60,000 pages of the Named Plaintiffs' case files, hundreds of Defendants' own documents and those in her considered materials, and extensive class-wide data regarding case plans across 184 Older Foster Youth. Based on this review and analysis, her conclusions concerning Defendants' systemic lack of compliance with federal case planning requirements satisfy the Rule 702 standard for admissibility. Defendants' mischaracterizations of Ms. Chansuthus's professional experience, methodology, and opinions should be rejected.

---

[8] Attorney Rosenberg's declaration should be stricken from the record or, at a minimum, given no weight. As an initial matter, child welfare data analysis requires specialized expertise. Attorney Rosenberg, as a layperson and attorney-of-record, is plainly not qualified to conduct child welfare data analysis, and Defendants offer no rationale to suggest otherwise. Moreover, because Defendants' declaration lacks any explanation of counsel's methods and assumptions in conducting their various analyses, the conclusions are of no value. For example, according to the declaration, Attorney Rosenberg "reviewed the Youth" and concluded "41 of the 184 youth whose case files Dr. Victor reviewed had a mental health diagnosis code" that did not correspond to a "per se" mental disability. *See* Rosenberg Decl. But exactly how Attorney Rosenberg "reviewed" the youth is a mystery. The declaration is similarly completely silent on the assumptions underlying counsel's "review" and conclusions. Such attorney-conducted child welfare data "analysis" is neither reliable or helpful, and should be afforded no weight if not stricken entirely. There is also some irony in accusing an expert of being a "conduit for the opinions of counsel," *see* Defs.' Mot. to Exclude at 6, while simultaneously *literally using one's own counsel* as a conduit for purported expert opinions.

### a.   Ms. Chansuthus Is Qualified to Provide Her Opinions.

As an initial matter, Ms. Chansuthus is qualified to opine on Defendants' case planning practices and data. As Defendants themselves admit, she "has extensive experience in social work and child welfare generally." Defs.' Mot. to Exclude at 20. She testified about her extensive case planning experience during both depositions, and in her most recent, described reviewing "hundreds" of files as Executive Director for the Office of Performance Management Quality Improvement for Tennessee Department of Children's Services ("TN DCS") (2024 Chansuthus Deposition Transcript, ECF No. 319-20; 123:7-124:12) ("2024 Chansuthus Dep. Tr."), coaching supervisors and workers in TN DCS on case plan development (*id.* at 133:19-21), and her own training on case planning by the Administration for Children and Families ("ACF"), resource centers, national level consultants and experts (*id.* at 131:25-132:4), all together spanning at least seven years of her career. (*Id.* at 117:13–133:25; *see also* Pls.' Obj. and MOL in Opp'n. to Defs.' First Mot. to Exclude Expert Test., ECF No. 204 at 24-25 (further describing her qualifications)). Those experiences combined with her academic studies and decades of child welfare work render her more than qualified to opine on Defendants' compliance with federal case planning requirements. *Fitzmorris v. New Hampshire Dep't of Health & Human Servs. Comm'r Lori Weaver*, No. 21-CV-25-PB, 2023 WL 8188770, at *11-12 (D.N.H. Nov. 27, 2023) (explaining that expert opinions can be based on relevant experience). Defendants' arguments disputing these qualifications lack merit.[9] For example, their argument that Ms. Chansuthus's work in Tennessee's

---

[9] Defendants' claim that Ms. Chansuthus "was unaware" of the new case planning requirements related to qualified residential treatment programs ("QRTPs"), *see* Defs.' Mot. to Exclude at 20, is false and easily disproven. Ms. Chansuthus's Case File Review Instrument *always* has included questions related to QRTP requirements. *See* ECF No. 152-5 (Protocol) at 143-44, 149-50. However, because those requirements did not go into effect until October 2021, *see* March 2023 Declaration of Daryl Chansuthus ("Mar. 2023 Chansuthus Decl."), ECF No.

*Brian A.* case "undermines" her experience appears to stem from a misreading of both her testimony and resume, which show that her role there was to help monitor the state's compliance with a settlement agreement, including developing and implementing case file review protocols to assess the agency's compliance with federal case planning requirements. *See* Mar. 2023 Chansuthus Decl., ECF No. 152-2 at ¶ 4; May 2024 Chansuthus Resume at 2-3, ECF No. 279-1. And Defendants fail to provide any support for their position that her extensive experience, including drafting model case plans in her roles as both the executive director for the Office of Performance Management Quality Improvement for TN DCS and the director for the Tennessee Center for Child Welfare, is insufficient. *See* Defs.' Mot. to Exclude at 19. Nor do Defendants provide any support for their suggestion that experience reviewing case plans from jurisdictions other than Tennessee is a pre-requisite to qualification here, *see* Defs.' Mot. to Exclude at 19, because they cannot.

### b. Ms. Chansuthus's Opinions Are Reliable.

In challenging Ms. Chansuthus's methodology, Defendants reiterate their argument from June of 2023 that she cannot extrapolate from her review of the Named Plaintiffs' files to reach class wide conclusions and that she has failed to consider Defendants' relevant materials. *See* Defs.' Mot. to Exclude at 23. But in doing so, they ignore her entire 2024 supplementation of her

---

152-2 at ¶ 35 & n. 33; ECF No. 175-8 (DCYF Policy 1615.4), and because none of the four original Named Plaintiffs was placed into a QRTP between October 2021 and the end date of their DCYF Case Files, *see* Mar. 2023 Chansuthus Decl. ¶¶ 28, 36, 43, 53 (T.L.'s and C.I.'s files current through January 2022; R.K.'s and G.K.'s files current through July 2022); ECF No. 175-37 (conventionally filed) (G.K. placed into QRTP after October 2022 CAT), Ms. Chansuthus did not *need* to analyze Defendants' compliance with those requirements for purposes of her original declaration. Because, however, D.M.'s and B.D.'s files extend through November 2022 and June 2024, respectively, Chansuthus Suppl. ¶ 17, ECF 279, June 2024 Chansuthus Second Suppl. Decl. ¶ 8, ECF 306-6, and because each experienced a post-October-2021 QRTP placement, *she did analyze* those requirements for those youth.

opinions and Dr. Victor's class-wide data. *See, e.g.,* May 2024 Chansuthus Supplemental Declaration ("Chansuthus Suppl.") ¶¶ 59-64 (describing Defendants' internal emails, memoranda, planning documents, operations assessments, deposition testimony and report by outside consulting group on the need for improved information technology to support case planning), ¶¶ 65-68 (reviewing DHHS standard operating procedures and policies as well as national guidance concerning the need for, and importance of, family and youth engagement in case planning), ¶¶ 69-73 (describing reports and emails on DCYF's past efforts to track case planning compliance and deposition testimony admitting DCYF has no current policies or practices for evaluating caseworker compliance with case planning-related laws and policies), ¶¶74-77 (referencing internal emails, deposition testimony and national studies on specialized adolescent workers), and ¶¶ 78-81 (reviewing DCYF policy and internal emails on stalled plans to implement a comprehensive assessment for Older Foster Youth), ECF No. 279.[10]

Defendants' remaining attacks of Ms. Chansuthus's methodology should also be rejected. First, contrary to Defendants' claim that Ms. Chansuthus "did nothing" to evaluate Dr. Victor's work, Defs.' Mot. to Exclude at 22, she explained that she reviewed his methodology and concluded that it was "consistent with the methodology I have used to identify case plans." 2024 Chansuthus Dep. Tr. 95:25-96:3. She considered "the approach that he used to identify case plan forms, the search terms that he used to try to find those forms, the rationale behind those search

---

[10] In their Supplemental Class Certification opposition, Defendants also claim Ms. Chansuthus "do[es] not know" if any "pattern appears in other DCYF files." Defs' Suppl. Class Cert. Opp. at 29, ECF No. 317. That claim is misleading for two reasons. First, they quote from her 2023 deposition, not her most recent where she had the benefit of Defendants' internal documentation and Dr. Victor's classwide data analysis. Second, even in her 2023 deposition, she testified that the "issues [she] identified in the named plaintiffs' case files with respect to case planning was suggestive of patterns that may be apparent in the case files of other youth with mental impairments in DCYF custody." Chansuthus 2023 Dep. Tr., ECF No. 204-4, 140:8-12.

terms, the process of then[,] once files were identified, reviewing the files, going through the files to actually find those documents and review them." 2024 Chansuthus Dep. Tr. 94:2-9.

Second, Defendants' claim that Ms. Chansuthus served as a "parrot" or "conduit" for Dr. Victor's opinion is belied by the contents of the experts' declarations themselves. *Compare* Victor Second Suppl. (reporting on the presence of required case planning forms and updates within the case files of Older Foster Youth) *with* Chansuthus Suppl. ¶¶ 48-55 (analyzing Dr. Victor's conclusions and their import). In any event, "an expert may rely on other witness's testimony or other expert conclusions to form an opinion." *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 461, 469 (D. Mass. 2017); *see also G v. Fay Sch., Inc. by & through its Bd. of Tr.*, 282 F. Supp. 3d 381, 392–93 (D. Mass. 2017) (explaining that "[a]n expert need not generate the data with her own hands" and rejecting argument to exclude expert testimony based on tests and evaluations performed by others because "this is not a proper grounds to exclude expert opinion").

Third, Defendants provide no basis for their complaint that Ms. Chansuthus did not review the "adequacy" of case plans class wide and, given the general paucity of case plans in the case files of Older Foster Youth, Chansuthus Suppl. ¶¶ 48-66; Defs.' Mot. to Exclude at 16 (conceding that three of the Named Plaintiffs had no case plans at all), such a resource-intensive exercise was not required for proving that Defendants have at least one well-defined practice or policy driving the alleged case planning violation. *See* Class Cert. Reply at 12-17. Indeed, if Defendants had evidence showing that case plans are adequate class wide that undercut Ms. Chansuthus's opinion, they presumably would have submitted it. They, however, did not submit anything. And, ultimately, this complaint, like many of Defendants' others, goes to the weight of Ms. Chansuthus's opinion, not its admissibility. *See Doe v. Tr. of Dartmouth Coll.*, 699 F. Supp. 3d at 178; *Hostingxtreme Ventures,* 2016 WL 3551628, at *3.

Finally, Defendants' argument that Ms. Chansuthus did not "reconcile" Dr. Victor's analyses with case planning data reported to ACF from fiscal year 2017 is a red herring, as the two data sets differ materially.[11] Dr. Victor analyzed initial case plans and required periodic updates for Older Foster Youth during 2022 and 2021; the ACF data concern initial case plans for foster youth of any age during 2017.[12]

### c.   Ms. Chansuthus's Opinion Is Relevant to Class Certification.

Ms. Chansuthus's opinions concerning Defendants' case planning practices, their consequences, and classwide data analysis will assist the Court in determining whether Plaintiffs' have proven the existence of policies or practices driving Plaintiffs' case planning and *Olmstead* claims, justifying their admissibility. *See Fitzmorris* at *12 (D.N.H. Nov. 27, 2023)* ("All that is required [for admissibility] is that the opinion likely would assist the trier of fact to understand or determine a fact in issue." (cleaned up)); Court's Order Granting Suppl. at 20, ECF No. 303

---

[11] Defendants also cherry-pick the data for this point, avoiding mention of historical DHHS data showing that between December 2017 and October 2020, only 34.48% to 49.78%— never more than half—of Older Foster Youth had timely Transition Plans in place. *See* Mar. 2023 Chansuthus Decl. ¶ 64; *see also* Chansuthus Suppl. ¶ 72 (Jan. 2022 data showing 23% of required Transition Plans up to date). These data comport with Dr. Victor's findings. More to the point, Defendants ignore that because Defendants do not otherwise track case planning data, Ms. Chansuthus has no other data against which to compare Dr. Victor's 2022 and 2023 data. *See Email from Julia Siegenberg, Defs.' Counsel, to Michelle Wangerin, Pls.' Counsel, re: Production Deficiencies* (Aug. 25, 2023), ECF No. 280-5 (in response to Plaintiffs' follow-up request confirming production of "[a]ll aggregate data or reports collected or maintained on the completion and updating of case plans from 2018 to the present, including all aggregate data or reports on compliance with case planning policies . . . ," confirming that Defendants had conducted "a reasonable search" and had "not identified any responsive documents that ha[d] not been produced").

[12] Defendants also have yet to produce information supporting their interpretation of the 2017 data, despite having challenged Ms. Chansuthus's interpretation over a year ago. *See* Defs.' First Mot. to Exclude at 27-28, ECF No. 176-1. At bottom, Defendants' assertion, like many others, is not that Ms. Chansuthus is incorrect, factually speaking, but that she is not interpreting the data in the manner *they* prefer.

(finding the supplemental reports' analysis of case planning across the class to be "highly important, if not entirely necessary, to class certification"). Other courts have admitted similar testimony to help understand issues in child welfare. *See, e.g., Wyatt B. v. Brown*, No. 6:19-CV-00556-AA, WL 3445767, at *3-4 (D. Or. Aug. 17, 2022) (rejecting *Daubert* challenges to child welfare experts who based their expert opinions on professional standards within child welfare); *B.K. by next friend Tinsley v. Faust*, No. CV-15-00185-PHX-ROS, 2020 WL 2616033, at *5 (D. Ariz. May 22, 2020) (same); *Kenny A v. Perdue*, No. 1:02-CV-1686-MHS, 2004 WL 5503780, at *10, 12 (N.D. Ga. Dec. 13, 2004) (same).

Rather than contend with Ms. Chansuthus's expert conclusions, Defendants argue they should be excluded because they are "impermissible legal opinions." *See* Defs.' Mot. to Exclude at 17. While "there is no blanket prohibition on expert testimony concerning the law," *Adams v. New England Scaffolding, Inc.*, No. 13-12629-FDS, 2015 WL 9412518, at *5 (D. Mass. Dec. 11, 2015), Ms. Chansuthus's opinions concern Defendants' *factual compliance* with federal case planning requirements. She does not analyze federal law itself, and the cases Defendants rely on to suggest otherwise are all distinguishable.[13]

---

[13] *See Carrier v. Am. Bankers Life Assurance Co. of Fla.*, No.05-CV-430-JD, 2007 WL 3124653 at *1 (D.N.H. Oct. 25, 2007) (actuary quoted and summarized laws of thirteen states and provided legal interpretations of sample insurance contracts); *Nieves-Villanueva v. Soto-Rivera,* 133 F.3d 92 (1st Cir. 1997) (counsel read legal holdings from cases to expert witness before jury and asked her to interpret the holdings); *Commodores Entm't. Corp. v. McClary*, 879 F.3d 1114, 1128-29 (11th Cir. 2018) (attorney expert in trademark infringement offered legal analyses, including finding that parties owned a trademark as tenants in common); *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007) (case finding that a police officer's factual statement was not a legal conclusion); *Pelletier v. Main St. Textiles, LP*, 470 F.3d 48, 54-56 (1st Cir. 2006) (OSHA expert analyzed whether a safety regulation was or was not *applicable* to a defendant's particular conduct); *Adams*,No. 13-12629-FDS, 2015 WL 9412518, at *6 (finding that OSHA compliance officer analyzed duty, breach, and causation).

Defendants also conflate their strained view of case planning obligations—a question for the merits (Class Cert. Reply at 15)—with assumptions made by Ms. Chansuthus in their *Daubert* challenge. The assumptions Ms. Chansuthus made concerning Defendants' case planning obligations are reasonable and well-grounded in federal and state law and policy and are highly relevant to both the ADA/RA and AACWA claims. *See* Pls.' Obj. and MOL in Opp'n. to Defs.' Mot. to Dismiss at 6-13; *see also* Class Cert. Reply at 15 n.21. And as Ms. Chansuthus explained in her Declarations, case planning updates are essential to address youths' evolving strengths and needs, coordinate care, identify appropriate placements, and prepare youth for adulthood, among other reasons. *See, e.g.*, Mar. 2023 Chansuthus Decl. ¶¶ 17-20.

Finally, Defendants' attempt to discredit Ms. Chansuthus's opinion as "unmanageable" fails. Defendants, in essence, argue that case plans need not be individualized to a child's needs. *See* Defs.' Mot. to Exclude at 21. A case plan that is not individualized, however, is not a case plan at all. *See* 42 U.S.C. §§ 675(1)(A)-(G), (5)(A)-(I); Memorandum and Order on Defs.' Mot. to Dismiss at 25-26, ECF No. 49. Defendants' position reveals the extent to which they continue to dismiss the importance of case planning and likely explains why their rates of compliance are so abysmal.

Plaintiffs present clear evidence of specific policies and practices that drive Defendants' noncompliant case planning, including examples from the Named Plaintiffs' case files, about which Ms. Chansuthus opines on at length in her May 2024 Declaration. *See* Chansuthus Suppl. ¶¶ 59-81; *see also* Class Cert. Reply at 13. Moreover, Ms. Chansuthus's findings that systemic improvements like implementing policies and practices for better supervision, a process for evaluating case planning compliance, automated data-tracking systems, and regular data quality

reports, among others, would *improve* their case planning practices, easily meets the requirements of Rule 702 and supports class certification.[14]

IV.   **Ms. Feild Offers Reliable Opinion Testimony Relevant to Understanding Defendants' Child-Welfare Systems-Level Practices.**

Ms. Feild's expert opinions are grounded in thousands of documents from a myriad of information sources, including state regulations, federal law and regulatory guidance, agency policies, official reports and memoranda, aggregate data, academic publications, contracts with providers, interrogatory responses, internal emails, and deposition testimony of key DCYF decision-makers. *See* App. of Considered Materials, ECF No. 152-13; Suppl. App. of Considered Materials, ECF No. 277-3. Her opinions are further supported by her decades of experience doing exactly what she was tasked with here—analyzing structures in state child welfare systems to identify patterns and trends—which she sufficiently tied together in her declarations and depositions.[15] *See* 2023 Feild Dec., ECF No. 152-11 ("2023 Feild Decl."); 2024 Feild Sec. Supp.

---

[14] Defendants do not dispute Ms. Chansuthus's finding that they lack adequate procedures for tracking case-plan data. Indeed, nowhere do they refute that they do not track, maintain, or otherwise possess, "*any* post-2017 aggregate data on their case planning compliance" and have "only a single report between October 2020 and July 2023" regarding transition plans. Chansuthus Suppl. ¶ 72 & nn.70-72. Not only is Defendants' failure to track case-plan compliance a patent driver of Plaintiffs' AACWA claim, *see* Class Cert. Reply at 13-16, but it also undermines any criticism of the additional data adduced via Dr. Victor's and Ms. Chansuthus's Older Foster Youth Post-2021 Case Plan Review—data that were collected and analyzed using rigorous methodologies and are far more current than anything Defendants have presented. *Cf. Gaston v. LexisNexis Risk Sol., Inc.*, 483 F. Supp. 3d 318 at 334 (D. N. C. 2020) (rejecting argument that Defendants' failures to track certain data defeated certification, explaining that, "[t]o the extent this is true, it is because [the defendants] employ a system that makes it so . . . [and] if Defendants' arguments prevailed no class of clearly wronged individuals could ever be certified").

[15] Ms. Feild's experiences are described in additional detail in Plaintiffs' Opposition to Defendants' First Motion to Exclude, ECF No. 204 at 14-15. Defendants do not dispute Ms. Feild is qualified to render her opinions.

Dec., ECF No. 277-2 ("Feild Sec. Suppl."); 2023 Feild Dep. Tr., ECF No. 176-5 ("2023 Feild Tr."); 2024 Feild Dep. Tr., ECF No. 319-21 ("2024 Feild Tr.") (conventionally filed).

Those sources, collectively, "provide sufficient data from which [Ms. Feild] could reliably opine about" Defendants' practices of unnecessarily segregating and retaining Older Foster Youth with mental disabilities in congregate facilities. *See Lawes v. CSA Architects & Eng'rs LLP*, 963 F.3d 72, 101 (1st Cir. 2020). Although Defendants object to Ms. Feild's opinions based on the "sufficiency" of the evidence considered and the "reliability" of her methodology, *see* Defs.' Mot. to Exclude at 23-37, as shown below, their arguments go squarely to the weight of her opinions, not their admissibility.

### a. Ms. Feild's Expert Opinion on Defendants' Failure to Recruit and Retain Kinship Caregivers Is Admissible under Rule 702.

Ms. Feild considered scores of documents and data in concluding that Defendants' reimbursement rates for unlicensed kin are inadequate; that those rates contribute to Defendants' failure to recruit and retain kinship caregivers for Older Foster Youth with mental disabilities; and that this failure drives the unnecessary segregation and retention of such youth in congregate facilities. *See* Feild Sec. Suppl. at ¶¶ 26-37. Those documents include federal reports describing low kinship utilization in New Hampshire; aggregate data confirming the same; declarations and deposition testimony establishing that Defendants only offer the TANF Child Only Grant ("TANF") to unlicensed kin; documents indicating that at least 90% of kinship caregivers are

unlicensed; and internal emails admitting that Defendants' meager financial support hurts kinship recruitment and retention.[16] *See* *id.*

Ms. Feild contextualized those sources with her extensive knowledge and experience working on kinship issues in child welfare, which she detailed in her declarations and depositions. *See* 2023 Feild Decl. at ¶¶ 4, 52; 2023 Feild Tr. 46:8-46:23; 2024 Feild Tr. 112:12-113:15. And she consulted academic research, child welfare literature, and federal guidance, all of which describe the importance of kinship care and adequate financial support. *See, e.g.*, 2023 Feild Decl. at ¶ 52; Feild Sec. Suppl. at ¶¶ 9, 27, 32. All of this constitutes "good grounds" for her conclusions. *See* *Milward*, 639 F.3d at 15.

Defendants claim that Ms. Feild "ignored" New Hampshire's "significant efforts to increase kinship recruiting, licensing, and in turn, payments," and base their argument on a single declaration from DCYF employee Michael Donati. *See* Defs.' Mot. to Exclude at 25. Mr. Donati, however, admits that unlicensed kin are paid unequal and lower rates; does not dispute that at least 90% of kinship caregivers are unlicensed; and does not dispute that lower foster care payments hinder the number of kin willing and able to care for youth. *See* Decl. of Michael Donati, ECF No. 319-28 ("Donati Decl."), at 11-13.

Moreover, Mr. Donati describes only a few initiatives DCYF claims to be rolling out—many couched as "aims" or "in the early stages"—that may or may not increase the number of kin caring for Older Foster Youth who are licensed and thus may or may not increase the number of such kin who receive full foster care maintenance payments. Ms. Feild considered at least some of

---

[16] The 2022 DCYF Annual Progress and Services Review ("APSR"), rather than the 2023 APSR, was inadvertently appended to Ms. Feild's Second Supplement as Exhibit 5. The 2023 APSR is publicly available via the following link: https://www.dhhs.nh.gov/document/dcyf-annual-progress-and-services-review-2023.

those steps, including the Second Chance Program, and explained why they did not change her opinions. *See* 2024 Feild Tr. 108:16-109:18, 110:6-111:11; *see also* Class Cert. Reply at 9-11 (discussing why Defendants' new kinship statistics are not instructive). At any rate, the "presentation of contrary evidence" does not call for exclusion and "is in the province of the jury." *Milward*, 639 F.3d at 15, 20.

Defendants' remaining critiques similarly go to weight rather than admissibility and are unpersuasive on the merits. Defendants fault Ms. Feild for not considering one document they never produced to Plaintiffs, which purportedly confirms that New Hampshire offers the "highest" TANF rate among the subset of states that only provide TANF to unlicensed kin. *See* Defs.' Mot. to Exclude at 25. But as the document reveals, most states offer financial support beyond TANF, with merely ten states providing TANF as the only financial assistance to unlicensed kinship caregivers. *See* Ex. 6 to Defs.' Mot. to Dismiss, ECF No. 317-14 at 6. That New Hampshire's unequal payment scheme may perform the best *among the worst performing states* does not undermine the weight of Ms. Feild's opinion, much less support preclusion.[17]

To the extent Defendants contend Ms. Feild failed to consider how DCYF can and does "provide additional [financial] assistance to kin who need it," Defs.' Mot. to Exclude at 26, that is at odds with the record. Ms. Feild *did* consider such a possibility and concluded, based on her exhaustive review, that New Hampshire's practice is to offer only TANF support to unlicensed kin and that any additional payments reflect a "limited" exception. *See* 2024 Feild Tr. 135:10-14; *accord* Ex. 12 to Feild Sec. Suppl., ECF No. 277-14 (supplementing TANF has occurred in only

---

[17] As Ms. Feild explained in her deposition, "TANF rates are based on a standard of need that was determined many, many years ago" and in general are "inadequate." *See* 2024 Feild Tr. 120:11-121:3.

a "couple of other cases"); Ex. 62 to Feild Sec. Suppl., ECF No. 278-33 (Q: "Do [relatives] have access to any financial – direct financial resources other than through, like, the TANF program? Would the foster care program provide access to any financial resources for them?" A: "No.").[18]

### b. Ms. Feild's Expert Opinion on Defendants' Failure to Recruit Enhanced-Support and General Foster Homes Is Based on Good Grounds.

Ms. Feild's expert opinion that Defendants have a practice of failing to recruit and retain enhanced-support and general foster families for Older Foster Youth with mental disabilities, forcing Defendants' overreliance on congregate facilities, is likewise based on "sufficient facts or data." *See Lawes*, 963 F.3d 72 at 98. On this point, Ms. Feild considered Defendants' internal emails, deposition transcripts, and reports admitting such failures; their deficient recruitment plans and planning documents; and their own data revealing dire placement shortages. *See* 2023 Feild Decl. at ¶ 47-51; Feild Sec. Suppl. at ¶¶ 39-60. Counsel sent Ms. Feild "everything that had to do with recruitment and retention," which amounted to "thousands of documents."[19] *See* 2024 Feild Tr. 190:4-9.

Ms. Feild employed a reliable methodology in reaching her opinions. She applied her relevant experiences to the information before her and explained how they informed her conclusions. *See* 2023 Feild Decl. at ¶¶ 7, 9, 28 (describing experiences relating to family-based placements); Feild Sec. Suppl. at ¶ 7 (same); 2024 Feild Tr. 160:5-8 (same); *id.* 162:7-164:1; 174:19-175:5; 182:20-183:1; 193:5-15; 205:4-14 (applying those experiences to the documents

---

[18] Defendants' gripes with Ms. Feild's interpretation of two emails that she cited in a footnote, Defs.' Mot. to Exclude at 25, reflect another attack on weight rather than reliability. The documents speak for themselves.

[19] As with her other opinions, Defendants have not pointed to a single document produced during discovery that Ms. Feild should have reviewed, but did not review.

and data); *see also Fitzmorris*, 2023 WL 8188770, at *12 ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion.") (internal citations omitted).[20]

While Defendants maintain that they have addressed Therapeutic Foster Care and ISO Foster Care through "extensive" efforts, Defs. Mot. to Exclude at 27, their claims are belied by their own documents and the lone declaration they proffer in support.[21] For example, as to Therapeutic Foster Care, they rely exclusively on a new request for proposal ("RFP"), released less than two months ago, with no guarantees that—in Defendants' own words—it won't be a "flop" like the last one. *See* Feild Sec. Suppl. at n.43. Even if a contract happens, it will be for a maximum of twenty beds for all foster youth, which even Mr. Donati recognized is low. *See, e.g.*, Donati Decl. at ¶ 68 ("DCYF recognizes that same stakeholders may view twenty beds as insufficient…"). It is precisely for those reasons that Ms. Feild testified the RFP did not change her opinions.[22] *See* 2024 Feild Tr. 161:22-162:11; 171:20-172:2.

---

[20] Defendants' argument that Ms. Feild "worked backward from results" ignores that their data is one of the multitude of sources she considered in formulating her opinions and that data is a source typically relied on for child welfare systems analyses. *See* Feild Sec. Suppl. at 2-6; *see also M.D. v. Perry*, 294 F.R.D. 7 at 36-37 (S.D. Tex. 2013) (admitting systems expert's opinions based in part on review of agency datasets); *Wyatt B. v. Kotek*, 2024 WL 20249565, at *6-7 (D. Or. May 8, 2024) (same).

[21] Defendants do not raise any *Daubert* objections to Ms. Feild's findings regarding Adolescent Foster Care.

[22] Defendants do not dispute that Therapeutic Foster Care and Adolescent Foster Care remain unavailable; that only 82 ISO Foster Care homes—by design available to a single child having enhanced needs absent exceptional circumstances—are available for *all* foster children; that they have failed to undertake any efforts to recruit additional ISO Foster Care providers notwithstanding a critical need; or that they pushed away interested ISO Foster Care providers despite pleas from their own staff. *See* Feild Sec. Suppl. at 15, 17-19.

Defendants' objections to Ms. Feild's opinion on general foster homes, which rest on a single "Diligent Recruitment Plan" similarly prepared less than two months ago (*after* Ms. Feild submitted her report), fare no better. *See* Defs.' Mot. to Exclude at 28 (citing Ex. 1, Attach. A, ECF No. 317-2, at 183-212). Defendants imply that Ms. Feild should have considered this document because it was an "obvious alternative." *See* Defs.' Mot. to Exclude at 28. The absurdity of that suggestion is even more apparent where Defendants had every opportunity to question Ms. Feild about this document at her deposition in early July, which would have at least afforded her an opportunity to explain whether it impacts her opinion. They, however, chose not to do so. All told, Ms. Feild's conclusions are reliable and "based on *what is known*."[23] *Fitzmorris*, 2023 WL 8188770, at *11 (emphasis added); *see also Kudabeck*, 338 F.3d at 861.

### c. Ms. Feild's Expert Opinion on Defendants' Disproportionate Funding of Congregate Facilities Rests on a Reliable Methodology.

Ms. Feild's expert opinion that Defendants disproportionately fund congregate facilities over family homes, and that this drives Defendants' unnecessary segregation and retention of Older Foster Youth with mental disabilities in congregate facilities, is based on her relevant experience and review of volumes of information. Among other things, Ms. Feild considered Defendants' data revealing the disproportionately high number of congregate beds and congregate-related expenditures; official reports announcing increases in residential capacity and plans to continue such expansions into the future; and internal emails showing priority for congregate placements. *See* Feild Sec. Suppl. at ¶¶ 61-68; 2023 Feild Decl. at ¶¶ 37-39. In forming her opinion,

---

[23] Even if Ms. Feild could have considered the "Diligent Recruitment Plan," it does not describe any "robust" or "ongoing" strategies "targeting Older Foster Youth" that are "informed by an assessment of Older Foster Youth's needs," *see* Feild Sec. Suppl. at ¶¶ 59, 60, and Defendants have adduced no evidence demonstrating that the number of foster parents willing to take in teenagers has increased.

she drew on her robust knowledge and experience analyzing financial issues in child welfare, reliably applying it to the facts of the case. *See, e.g.*, 2023 Feild Decl. at ¶¶ 4, 6-8 (describing relevant experience); *id.* at ¶ 38 (applying knowledge and experience to documents and data); 2024 Feild Tr. 78:3-13; 81:15-82:10 (same).

Defendants claim that Ms. Feild's opinion on disproportionate funding rests on "her own mischaracterization or misunderstanding of relevant documents and information." *See* Defs.' Mot. to Exclude at 29. But not once do Defendants dispute, much less offer any rebuttal evidence, that there are 82 enhanced support homes versus 468 beds in congregate facilities; that Defendants paid $1.7 million in "immediate financial support" to boost the recruitment and retention initiatives of congregate providers while doing nothing of the sort for ISO Child Placing Agencies; that they spent a total of $16.6 million on congregate placements for Older Foster Youth versus $1.5 million on family homes; or that they entered into 44 contracts for a total of 100 new congregate beds in 2021 alone.[24] *See* Feild Sec. Suppl. at ¶¶ 61-68; *see also* Class Cert. Reply at 11-12 (cataloguing Defendants' admissions on disproportionate funding).

---

[24] That the new congregate beds are available to youth outside of the foster system does nothing to undermine Ms. Feild's opinion that disproportionate funding is a driver of Defendants' unnecessary institutionalization of Older Foster Youth with mental disabilities. As she explained in her initial declaration and repeated at her recent deposition:

> Adding more congregate care beds will only exacerbate New Hampshire's over-reliance on institutions. Based on my years of experience, if more congregate care beds become available, they are likely to be filled. And even if those additional beds are initially intended for youth outside of the child welfare system, in my experience they are still likely to be used by Older Foster Youth. This is because congregate care beds have always been the overflow resource for stressed systems, and younger children will invariably take priority for foster family beds. When foster family beds become scarce, teenagers are relegated to congregate settings.

2023 Feild Decl. at ¶ 38; *see also* 2024 Feild Tr. 81:15-82:10.

Instead, Defendants cobble together excuses as to why congregate facilities needed the funding, *i.e.*, to "comply with significant new quality requirements," and "support workforce capacity," *See* Decl. of Daryll Tenney, ECF No. 317-20, at ¶ 52, ¶ 56. Even if true, that "additional information" does not offer a basis to exclude Ms. Feild's expert opinions, *Hostingxtreme Ventures*, 2016 WL 3551628, at *3, nor does it contradict Defendants' own evidence that ISO Child Placing Agencies also needed support but were left empty-handed. *See* Donati Decl. at ¶ 75 ("ISO agencies have historically identified a number of challenges to recruiting and/or retaining foster homes"); *see also* Feild Sec. Suppl. at ¶¶ 49-60.

Defendants further object to Ms. Feild's methodology comparing "*all* spending on congregate care (for both placements and services) with *only* spending for *placements* for children in foster homes." Defs.' Mot. to Exclude at 30. Ms. Feild, however, drew those figures from Defendants' interrogatory responses identifying the "annual total expenditures (combined federal and state share) for providing to Older Foster Youth" each type of community-based placement and each level of congregate placement. *See* Ex. 50 to Feild Sec. Suppl, ECF No. 278-21. Although congregate facilities' per diem rate includes a board and care portion and a Medicaid (service) portion, that is the case for ISO Foster Care as well, which similarly provides mental health services as part of its placement. *See* 2024 Feild Tr. 79:19-22. Had Therapeutic Foster Care been available, its rate too would include a Medicaid portion. *See id.* at 79:19-22. The analysis is only "lop-sided," Defs.' Mot. to Exclude at 2, because of Defendants' meager spending on enhanced support homes and exorbitant spending on congregate facilities—not because of an unreliable methodology.

Without citing any authority or proffering their own expert, Defendants claim that Ms. Feild should have included in her calculations the expenditures for community-based services

offered outside of placements. *See* Defs.' Mot. to Exclude at 31. Even if such service expenditures were relevant to Ms. Feild's opinion on disproportionate funding of *placements*, Ms. Feild had no way to incorporate those figures into her analysis because Defendants have failed to produce that data notwithstanding Plaintiffs' discovery request, which has been outstanding since November 2022. *See* Ex. 1, Plaintiffs' Fourth Set of Interrogatories ("[T]he annual total Medicaid expenditures (combined federal and state share) for providing to Older Foster Youth each community-based mental and/or behavioral health service."); 2024 Feild Tr. 87:14-21 (the data on community-based services is "very limited" and "did not break down the services provided to younger children versus adolescents"). Defendants cannot have it both ways, failing to produce information and faulting Plaintiffs' experts for not considering it.

Defendants' contention that Ms. Feild should have included general foster homes and kin in her comparison of contracted beds in congregate versus enhanced-support homes similarly misunderstands the purpose of her analysis—to compare the number of homes available to Older Foster Youth *with supportive services. See* 2024 Field Tr. 86:10-19. Whether Ms. Feild believes youth with certain intensive needs can also be served in general foster homes or kinship homes is of no matter when Defendants' own policies instruct otherwise.[25]

Defendants' equally flawed argument that Ms. Feild "ignored" the recent increases in community-based service and placement rates is belied by the record. Ms. Feild was aware of at

---

[25] *Compare* DCYF SOP 1600.2 II(A) (defining general foster care as a "licensed Foster Home providing day-to-day care in a family setting whose needs can be managed in the community and *who do not have the intense needs of a child who qualifies for ISO level care*") (emphasis added), https://www.dhhs.nh.gov/sites/g/files/ehbemt476/files/documents/2021-11/dcyf-sop-1600-2.pdf *with* DCYF Policy 1604 (defining ISO Foster Care as appropriate for children with "chronic mental, emotional, physical or behavioral handicaps"), https://www.dhhs.nh.gov/sites/g/files/ehbemt476/files/documents/2021-11/dcyf-policy-1604.pdf.

least some of those increases, *see* 2024 Feild Tr. 124:17-125:11, but could not have analyzed their import because Defendants have failed to supplement their interrogatory responses on expenditures.[26] *See* Ex. 50 to Feild Sec. Suppl. As before, Defendants cannot move to exclude an expert for not considering the very information they failed to produce and, in any event, "contrary evidence" does not justify exclusion.[27] *Milward*, 639 F.3d at 15.

### d. Ms. Feild's Expert Opinion on Defendants' Reliance on a Flawed CAT Process Is Admissible.

Ms. Feild's opinion that Defendants' reliance on a flawed assessment tool to guide placement decisions drives their overuse of congregate facilities is based on her robust knowledge and experiences developing and studying assessment tools, 2024 Feild Tr. 55:13-58:4; federal law requiring an independent assessor to determine whether a youth referred to congregate can be served in the community; Defendants' documents, including individual CAT assessments, revealing that Maximus does not make such determinations and that "family setting" is only

---

[26] Moreover, Defendants have failed to provide any information on whether rates for congregate facilities have also increased, which could have cancelled out any relative increase in community placement expenditures and maintained the disproportionate ratios. This further underscores the prejudice accompanying Defendants' belated production of cherry-picked evidence.

[27] In a single sentence, Defendants criticize Ms. Feild's opinion regarding disproportionate funding as "unhelpful." *See* Defs.' Mot. to Exclude at 29. Because Defendants have failed to brief that issue, their argument should be waived. *See Fitzmorris*, 2023 WL 8188770 at n.11. Even if that argument was not waived, Ms. Feild's opinion offers helpful insight into "complex or unfamiliar concepts" of the child welfare systems issues at play here. *See First Marblehead Corp. v. House*, 541 F.3d 36, 42 (1st Cir. 2008). Defendants do not dispute that Ms. Feild's remaining opinions are relevant.

recommended for youth with "mild behavioral and emotional needs;" and aggregate data showing that CAT overwhelmingly recommends residential placement.[28] *See* Feild Sec. Suppl. at ¶¶ 69-78.

Ignoring the wealth of information she considered, Defendants argue that Ms. Feild's opinion is "clearly based on unreliable 'facts.'" Defs.' Mot. to Exclude at 34. But as explained in Class Cert. Reply at 3-8, Defendants have failed to offer any evidence countering Ms. Feild's findings that (1) the process only recommends family placements for youth with "mild" behavioral needs and (2) the process is not designed to determine whether a youth's needs can be met in a family home. *See* Feild Sec. Suppl. at ¶¶ 69-78. "[T]he totality of the evidence," therefore, supports "a reliable inference of causation." *Milward*, 639 F.3d at 23.

> **e.   Ms. Feild's Expert Opinions on Defendants' Practice of Unnecessarily Placing and Retaining Older Foster Youth with Mental Disabilities in Congregate Facilities Is Reliable.**

Ms. Feild's opinions that Defendants have a practice of unnecessarily placing and retaining Older Foster Youth with mental disabilities in congregate facilities, and of placing such youth at serious risk of unnecessary institutionalization, are based on a reliable methodology that is described at length in her reports and Plaintiffs' First Opposition to Defendants' Motion to

---

[28] As Ms. Feild explained, individualized analyses of the CAT assessments were unnecessary because she was charged with opining on trends across the system as a whole. *See* 2024 Feild Tr. 66:16-18 ("I'm not a clinical person. I don't look at individual child information or data. I look at patterns across the system."); *B.K.*, 2020 WL 2616033, at *4, 5 (rejecting argument that behavioral health system expert's opinions should be excluded for their "failure to conduct case reviews," explaining that the alleged deficiencies "go to the weight and not the admissibility").

Exclude. *See* Feild Sec. Suppl. at ¶¶ 6-25; 2023 Feild Decl. at ¶¶ 15-36; Pls.' First Opp. to Defs.'
Mot. to Exclude, ECF No. 204, at 16-20.

Although Defendants take issue with point-in-time data, which, like all datasets, is not
perfect, that does nothing to suggest Ms. Feild's opinions should be excluded or even discredited
where, as here, she "carefully explained" why Defendants' Interrogatory 1.2 Data was the most
valuable and reliable dataset available to her. *See Milward*, 639 F.3d at 23; Feild Sec. Suppl. at ¶¶
6-19.[29] And Defendants have not offered their own expert to explain the utility—or lack thereof—
of Ms. Feild's supplemental analyses, nor have they provided an alternative analysis with a well-
grounded methodology.[30] At bottom, Defendants' arguments "misunderstand[] *Daubert* to
demand unassailable expert testimony." *See United States v. Mooney*, 315 F. 3d 54, 63 (1st Cir.
2002).

**V.    Dr. Cross Offers Reliable Opinion Testimony Relevant to Understanding B.D. and
        D.M.'s Mental- and Behavioral-Health Needs.**

Based on his thorough review of their case files, and his independent analysis grounded in
his decades of clinical and research experience, Dr. Cross made relevant and reliable findings
regarding B.D. and D.M. [31] *See* May 2024 Cross Supp. Dec., ECF No. 281 ("Cross Suppl."); June
2024 Cross Sec. Supp. Dec., ECF No. 306-1 ("Cross Sec. Suppl."); *see also* Ex. 3 to Cross Sec.

---

[29] As the article introduced by Defendants notes, "many [agencies and other groups] use
point-in-time data." *See* Ex. 31 to Defs.' Mot. to Exclude, ECF No. 319-51, at 29.

[30] Defendants claim that Ms. Feild "never discusses" her opinion that Defendants have a
practice of placing youth at risk of unnecessary institutionalization. That is flatly contradicted by
her Original Declaration and merits no further discussion. *See* 2023 Feild Decl. at ¶¶ 26-29; *see
also* 2024 Feild Tr. 10:9-11(affirming that all three reports comprise her opinion on class
certification).

[31] The reliability of Dr. Cross's opinions with respect to the other Named Plaintiffs are
discussed in Plaintiffs' First Objection to Defendants' Motion to Exclude Plaintiffs' Experts,
ECF No. 204, at 4-13.

Suppl., ECF No. 306-4 (Updated CV). As shown below, Defendants' challenges to his expert testimony are baseless.

### a. Dr. Cross's Opinions Are Reliable.

Without any factual or legal support, Defendants claim that Dr. Cross's reports are "fundamentally unreliable" and—despite testimony to the contrary—not reflective of his own review and analysis. Defs.' Mot. to Exclude at 37. To the contrary, Dr. Cross employed a sound and reliable methodology: he co-developed a coding protocol (alternatively known as a data extraction tool) to systematically collect and organize information in the case files and write his own declarations. 2024 Cross Dep. Tr., ECF No. 319-50 ("2024 Cross Dep. Tr.") 10:8-11 ("And that review [was] done in a systematic way using coding protocol provided the information that enabled me to write these declarations"); *see also* Cross Suppl. at ¶¶ 2-7; Cross Sec. Suppl. at ¶¶ 2-7. Dr. Cross then used the completed protocol as a guide to identify key documents and information while also independently reviewing the case files and Medicaid data. 2024 Cross Dep. Tr. 23:20-24:11; Cross Suppl. at 2-3; Cross Sec. Suppl. at ¶¶ 2-7. He reached his opinions on B.D. and D.M. based on that analysis, as well as his extensive knowledge of youth psychology.

Nothing in Dr. Cross's July 11, 2024 deposition suggests otherwise. Indeed, Dr. Cross testified he spent roughly ten to twelve hours reviewing D.M.'s case file alone, 2024 Cross Dep. Tr. 20:8-11, and he had ongoing access to the entire case file for both B.D. and D.M., 2024 Cross Dep. Tr. 23:2-15. He therefore was not simply "fed" documents, as Defendants suggest. *See* Defs.' Mot. to Exclude at 38. At any rate, Dr. Cross's reliance on qualified case readers to gather information from the file, following the protocol that he designed, is not disqualifying. *See G. v. Fay Sch., Inc. by & through its Bd. of Trustees*, 282 F. Supp. 3d 381, at 392-93.

Defendants claim that Dr. Cross's opinions are unreliable because he could not recall certain minor details of his review during his deposition. There, however, is no legal basis to disqualify an expert for caution in answering questions under oath, particularly where, as here, the scale of the review was enormous and his reports set forth the answers to many of the questions asked. *See* *Lawes*, 963 F.3d 72 at 109 (expert's inability to recall details from deposition and report not grounds for exclusion). The small details Defendants point to are a distraction. For example, Dr. Cross's inability to recall ████████████████████████████████████ — two facts cherry picked by Defendants from a 13,000-page case file—does not render his opinions unreliable. Defs.' Mot. to Exclude at 38; 2024 Cross Dep. Tr. 66:8-67:23.[32]

### b. Dr. Cross Is Qualified to Opine on Appropriate Placements and Services.

Defendants summarily argue that Dr. Cross holds "extreme" views and, as such, he is not qualified to offer opinions in this matter. Defs.' Mot. to Exclude at 39. Dr. Cross's views are far from extreme, and he has been contributing to academic literature on topics of child psychology since 1988. Ex. 3 to Cross Sec. Suppl. Dr. Cross relied on his decades of experience, research, and review of relevant literature in forming his supported opinion that "community-based settings are the appropriate standard of care for the vast, vast majority of youth" and that residential placement should be "very rare." 2024 Cross Dep. Tr. 31:8-11; 40:25-41:4; *see also* Ex. 2  to Cross Suppl., ECF No. 281-2; Ex. 3 and Ex. 4 to Cross Second Suppl., ECF Nos. 306-3, 306-4.[33] As explained

---

[32] Defendants also fault Dr. Cross for not recalling the exact nature of minor changes he made to the coding protocol after his original report was signed, *see* ECF No. 152-6; Cross Suppl.; 2024 Cross Dep. Tr. 11:4-6, but these minor edits are specified in Dr. Cross's May 2024 Supplemental Declaration, *see* Cross Suppl. ¶4 n.2.

[33] *See also* Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 40066,Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 40066, 40106 (May 9, 2024) ("[A]ll children with disabilities in foster care are entitled to receive

in Plaintiffs' First Objection to Defendants' Motion to Exclude at 10, Dr. Cross's standard is not so "beyond the pale" as to merit exclusion. *See United States v. Encaracion*, 26 F.4th 490, 505 (1st Cir. 2022).[34]

## **CONCLUSION**

For all of the reasons explained above, the Defendants' motion to exclude the Plaintiffs' four experts should be denied.

---

services in the most integrated setting appropriate to their needs, and congregate care is virtually never the most appropriate long-term setting for children."); ECF No. 153-1 (Office of Child Advocate 2020-21 Annual Report) at 20 ("Use of residential-level care is now expected to be short-term, with rapid and well-supported return home to family or caregivers.").

[34] In a single sentence, Defendants repeat their objection that Dr. Cross is not qualified to opine on which factors place a youth at significant risk of congregate placement. For the reasons set forth in Plaintiffs' First Objection, that has no merit. *See* Pls.' First Obj. to Defs.' Mot. to Exclude at 10.

Dated: August 15, 2024                    Respectfully submitted,

                                          PLAINTIFFS, G.K., et al.,

                                          By their attorneys,


                                          /s/ Michelle Wangerin, Esq.
                                          **NEW HAMPSHIRE LEGAL ASSISTANCE**
                                          Michelle Wangerin
                                          N.H. Bar No. 17769
                                          Kay E. Drought
                                          N.H. Bar No. 12851
                                          154 High Street
                                          Portsmouth, NH 03801
                                          P: (603) 431-7411
                                          F: (603) 431-8025
                                          mwangerin@nhla.org
                                          kdrought@nhla.org

                                          **AMERICAN CIVIL LIBERTIES UNION OF
                                          NEW HAMPSHIRE**
                                          Gilles R. Bissonnette
                                          N.H. Bar No. 265393
                                          Henry R. Klementowicz
                                          N.H. Bar No. 21177
                                          18 Low Avenue
                                          Concord, NH 03301
                                          P: (603) 224-5591
                                          gilles@aclu-nh.org
                                          henry@aclu-nh.org

                                          **DISABILITY RIGHTS CENTER-NH, INC.**
                                          Jennifer A. Eber
                                          N.H. Bar No. 8775
                                          Kayla J. Turner
                                          N.H. Bar No. 270167
                                          64 North Main Street, Suite 2
                                          Concord, NH 03301-4913
                                          P: (603) 228-0432
                                          F: (603) 225-2077
                                          jennifere@drcnh.org
                                          kaylat@drcnh.org

                                          **CHILDREN'S RIGHTS, INC.**
                                          Ira Lustbader

NY Bar No. 2516946
Madeleine MacNeil Kinney
NY Bar No. 5312426, MA Bar No. 690939
Kathleen Simon
NY Bar No. 5682810
Carolyn Hite
NY Bar No. 5677422
Aarti Iyer
NY Bar No. 5367578
Rebecca Ritchin
NY Bar No. 6015069
88 Pine Street, 8th Floor
New York, NY 10005
P: (212) 683-2210
F: (212) 683-4015
ilustbader@childrensrights.org
mkinney@childrensrights.org
ksimon@childrensrights.org
chite@childrensrights.org
aiyer@childrensrights.org
rritchin@childrensrights.org

**WEIL, GOTSHAL & MANGES LLP**
Konrad L. Cailteux
NY Bar No. 2056505
Katheryn Maldonado
NY Bar No. 5926027
Kathleen Stanaro
NY Bar No. 5900410
Sarah Ryu
NY Bar No. 5405642
767 Fifth Avenue
New York, NY 10153
P: (212) 310-8000
F: (212) 310-8007
Konrad.Cailteux@weil.com
Katheryn.Maldonado@weil.com
Kathleen.Stanaro@weil.com
Sarah.Ryu@weil.com