# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

**B.D., by their next friend,**
**Christine Wellington**

       v.

**Christopher Sununu, Governor**
**of New Hampshire et al.**

Case No. 21-cv-4-PB
Opinion No. 2024 DNH 072

## MEMORANDUM AND ORDER

The named plaintiff in this putative class action is seeking to represent a class of adolescent foster children with mental disabilities who are in the custody of the New Hampshire Division of Children, Youth, and Families (DCYF) and either have been unnecessarily placed in a congregate care setting or are at risk of being unnecessarily placed in congregate care. The plaintiff's primary claims are that these congregate care placements violate the Americans with Disabilities Act and the Rehabilitation Act. The plaintiff also asserts that the defendants are violating the Adoption Assistance and Child Welfare Act by failing to provide class members with adequate case plans. The matter is before me on the plaintiff's motion for class certification.

## I.   <u>BACKGROUND</u>

### A.   New Hampshire's Foster Care System

DCYF, a division of New Hampshire's Department of Health and Human Services (DHHS), oversees the state's child welfare services, including its child protection services. Doc. 175-2 at 2. Children who have been removed from their homes as a result of abuse or neglect may be placed under the protective supervision or legal custody of DCYF.[1] Id. at 4-5. DCYF is responsible for arranging placements and supportive services for children under its care, as well as developing a case plan to guide each child's time in foster care. Id. at 5, 7-8.

When determining where to place a foster child, DCYF case workers can choose between a variety of community-based placements or congregate care placements. DCYF Policy 1600.2.[2]  Community-based placements

---

[1]     A child is in "protective supervision" when the child has been placed in DCYF custody before a final finding of abuse or neglect. See N.H. Rev. Stat. Ann. § 169-C:3, XXIV. "Legal custody" refers to a child's status after custody has been granted to DCYF following a final finding of abuse or neglect. See N.H. Rev. Stat. Ann. § 169-C:3, XVII. The parties do not distinguish between the two statuses for present purposes.

[2]     Some, but not all, of DCYF's policies were submitted as exhibits. I take judicial notice of those policies that were not submitted, all of which are publicly available via the DHHS website. See DCYF Policy Manual, https://www.dhhs.nh.gov/programs-services/child-protection-juvenile-justice/dcyf-policy-manual (last visited Sept. 12, 2024); see also Fed. R. Evid. 201; United States v. Garcia, 855 F.3d 615, 621 (4th Cir. 2017); Daniels-Hall

include both kinship and foster home placements. Id. Kinship placements, which include placements with relatives or other individuals who have an existing relationship with a child, are the preferred type of placement. N.H. Rev. Stat. Ann. § 170-E:25, VIII (defining "kin"). Relatives may accept a child placement with or without a license but unrelated kin must be licensed. Doc. 317-1 at 12.

A foster home placement is a placement with a licensed foster family. Doc. 175-2 at 8. Foster home placements can be with either a general foster home or an enhanced support foster home. Id. General foster homes provide "day-to-day care in a family setting for children whose needs can be managed in the community" without the need for specialized supervision or care. DCYF Policy 1600.2. Enhanced support foster homes, on the other hand, are foster homes that are trained and credentialed to offer a heightened level of care for children with specific needs. Doc. 277-2 at 15 n.38.

Currently, the only enhanced support foster care offered in the state is individual service option (ISO) foster care. Id. at 18. ISO foster homes provide care to "children with chronic mental health, emotional, physical, or behavioral needs" who require "intensive supervision and consistent structure." DCYF Policy 1600.2. Although not presently offered, the state's

v. Nat'l Educ. Ass'n, 629 F.3d 992, 998-999 (9th Cir. 2010).

regulations and policies provide for two other forms of enhanced foster care: therapeutic foster care and adolescent foster care. Doc. 277-2 at 15 n.38; see also DCYF Policy 1603; DCYF Policy 1605. Therapeutic foster care provides intensive clinical and therapeutic services to children with chronic mental or behavioral health problems who require a higher level of care and supervision than that offered by ISO foster care. DCYF Policy 1605. Adolescent foster care supports foster children between 14 and 21 years of age with "specialized needs[.]" N.H. Admin. R. He-C 6347.03(a).

Regardless of the placement type, children in community-based placements are eligible to receive an array of community-based mental health services provided through DHHS. Doc. 175-2 at 12-14. These services include in-home therapeutic interventions, "wraparound" services, and crisis support, as well as counseling and skills training. Id.

Although community-based placements are preferred, DCYF may place a child in a congregate care setting under certain circumstances. Congregate care placements are placements with "qualified residential treatment program[s]," which offer residential mental and behavioral health treatment to children with "serious emotional or behavioral disorders or disturbances." 42 U.S.C. § 672(k)(4); see also N.H. Rev. Stat. Ann. § 169-C:19-f. These placements differ significantly from community-based placements in that they are in an institution, rather than a family setting, and typically require

children to comply with stringent rules and restrictions. Doc. 154-3 at 7. An independent clinician must assess each child placed in residential care to determine whether such a placement is warranted, and a state district court judge must approve the placement. N.H. Rev. Stat. Ann. § 169-C:19-f.

Once a child has been placed, a DCYF case worker must develop a written case plan for that child. DCYF Policy 1550. DCYF uses a standard case plan template that collects information on the child's background and history, planned placement, and permanency goals (family reunification, adoption, etc.). Doc. 207-11 at 1-7. The case worker must append to the case plan a Youth Information Sheet, which provides detailed information regarding the child's family, medical, and educational history. DCYF Policy 1550; see also DCYF Form 1522. DCYF policy requires the case worker to complete these forms within 60 days of the child's removal from the home. DCYF Policy 1550. Case plans must be updated every 6 months, as well as following certain changes in circumstances, such as a change in the child's placement, permanency goal, or needs. Id.

For foster children aged 14 or older, the case worker must also complete a transition plan, which identifies the child's achievements and needs in various aspects of adult living, such as employment, budgeting, and self-care. DCYF Policy 1695; see also DCYF Form 1695. This plan must be

completed within 60 days of the children turning 14, and must be updated at least annually and following a change in placement. DCYF Policy 1695.

A child's case plan and transition plan together provide a "critical 'Roadmap'" that helps to "facilitat[e] the provision of timely, appropriate, and coordinated services and supports that promote positive outcomes for youth and families." Doc. 154-1 at 5. Transition plans, in particular, ensure that children who "age out" of the foster care system upon turning 18 are adequately "prepared to live as independent young adults," despite lacking many of the ongoing support systems that benefit other children. Id. at 6.

## B.   Statutory Requirements

As a federally funded program, New Hampshire's foster care program must comply with a number of federal statutes, including Title II of the Americans with Disabilities Act (ADA), section 504 of the Rehabilitation Act, and the Adoption Assistance and Child Welfare Act (CWA). The ADA and the Rehabilitation Act each prohibit public entities from discriminating on the basis of disability in the administration of certain programs.[3] 42 U.S.C. §

---

[3]    The ADA applies to public entities, including state agencies, whereas the Rehabilitation Act applies to programs receiving federal funds. 42 U.S.C. § 12131; 29 U.S.C. § 794. Nonetheless, "[g]iven the textual similarities between [the two statutes], the same standards govern claims under both, and [courts] rely on cases construing [both statutes] interchangeably." Ingram v. Kubik, 30 F.4th 1241, 1256 (11th Cir. 2022) (cleaned up); accord Kiman v. N.H. Dep't of Corrs., 451 F.3d 274, 285 n.10 (1st Cir. 2006). Because

12132; 29 U.S.C. § 794. One form of prohibited discrimination is the "unjustified institutional isolation of persons with disabilities[.]" Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 600 (1999).

This prohibition is largely implemented through two regulations: the integration mandate and the methods of administration regulation. The integration mandate requires states to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); see also 28 C.F.R. § 41.51(d). "The most integrated setting is defined as a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." Parent/Pro. Advoc. League v. City of Springfield, 934 F.3d 13, 18 (1st Cir. 2019) (hereinafter PPAL) (cleaned up). Nonetheless, the state's obligation to provide services in the most integrated setting "is not boundless." Olmstead, 527 U.S. at 603. While a state is required to "make reasonable modifications in policies, practices, or procedures" where "necessary to avoid discrimination on the basis of disability," it need not make modifications that would "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Thus, the integration

the parties do not distinguish between the plaintiff's ADA and Rehabilitation Act claims, I refer to both claims collectively as ADA claims for ease of reference.

mandate requires states to provide services in the community, rather than in an institutionalized setting, if (1) "the State's treatment professionals determine that [community] placement is appropriate;" (2) "the affected persons do not oppose such treatment;" and (3) community "placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [disabilities]." Olmstead, 527 U.S. at 607.

The methods of administration regulation, in turn, prohibits entities from "utiliz[ing] criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(3)(i); see also 28 C.F.R. § 41.51(b)(3)(i). Under this regulation, states may not rely on methods of administration that subject individuals to unjustified institutionalization. Day v. District of Columbia, 894 F. Supp. 2d 1, 22 (D.D.C. 2012).

The CWA is a federal statute embedded in the Social Security Act that provides "federal funding for expenses associated with operating a foster care system." Connor B. ex rel. Vigurs v. Patrick, 774 F.3d 45, 61 (1st Cir. 2014). The CWA amended Title IV-B of the Social Security Act, which provides funding for state child welfare services, and created Title IV-E of the Act, which provides reimbursement to states for foster care maintenance payments made on behalf of certain eligible foster children. Vt. Dep't of Soc. & Rehab. Servs. v. U.S. Dep't of Health & Hum. Servs., 798 F.2d 57, 59 (2d

Cir. 1986). To receive federal funds under either Title IV-B or Title IV-E, a state must submit a "State plan" to the Secretary of Health and Human Services detailing its foster care system and compliance with various statutory requirements. Connor B., 774 F.3d at 61.

State plans under both Title IV-B and Title IV-E must provide for the development of a "case review system." 42 U.S.C. § 622(b)(8)(A)(ii) (Title IV-B); 42 U.S.C. § 671(a)(16) (Title IV-E). A case review system must, among other things, ensure that "each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child[.]" 42 U.S.C. § 675(5). That case plan must be a written document that includes certain information about the child, such as a description of the child's placement and an explanation of why that placement is appropriate, a plan for ensuring that the child receives required care and services, up-to-date health and education records, and, for children 14 years of age or older, a description of the services needed to help the child transition to adulthood. 42 U.S.C. § 675(1); see also 42 U.S.C. § 675a.

**C.    Factual and Procedural History[4]**

The named plaintiff, B.D., is a 15-year-old foster child who suffers from post-traumatic stress disorder, attention-deficit/hyperactivity disorder, and depression.[5] Doc. 310-1 at 5. B.D. was removed from their parent's home at the age of 13 and placed in the legal custody of DCYF after a finding of parental neglect. Doc. 310-4 at 4. B.D. spent three days in an emergency foster home immediately following their removal but was then moved to a congregate care facility, where they have remained ever since. Id. B.D. has expressed frustration with their placement in congregate care and would prefer to live with a foster family. Doc. 310-1 at 7. Based on the opinion of their child psychology expert witness, B.D. contends that they could remain in the community if provided with an appropriate placement and accompanying supports. Id. at 6.

Although B.D. was provided with a case plan shortly after their removal from the home, it was lacking several required components, including the Youth Information Sheet that details B.D.'s family, medical,

---

[4]    I focus here on the procedural history most relevant to the plaintiff's motion for class certification but incorporate the more detailed account of this litigation's history outlined in my prior orders. See Doc. 303; Doc. 315.

[5]    B.D. is pursuing this action pseudonymously. In an effort to further protect B.D.'s identity, the parties refer to B.D. using gender-neutral pronouns. I follow suit here.

and educational background. Doc. 310-4 at 7. B.D. received a transition plan

after turning 14, but the plan is "formulaic, lacking any meaningful

description of B.D.'s individual needs and goals" and fails to outline a

concrete plan for achieving the few goals that are described. Id. at 8. Neither

the case plan nor the transition plan have been updated over the course of

B.D.'s nearly two years in DCYF custody. Id. at 7-8.

B.D., acting through their next friend, filed a complaint on behalf of

themselves and a putative class of similarly situated individuals challenging

perceived deficiencies in New Hampshire's operation of its foster care

program.[6] The putative class claims fall into two categories.[7] First, B.D.

alleges that the defendants are violating the ADA's integration mandate and

methods of administration regulation by systematically placing and retaining

adolescent foster children (that is, foster children between 14 and 17 years of

age) with mental and behavioral disabilities in congregate care facilities,

even where those children could be appropriately placed in community-based

settings. Second, B.D. alleges that the defendants violate the CWA by failing

---

[6]    The complaint initially included five other named plaintiffs, all of
whom have since exited DCYF custody. Doc. 324-1 at 2-3. For the reasons
outlined in my order on the defendants' motion to dismiss, those plaintiffs
have been dismissed from the case.

[7]    The complaint also asserted a due process claim under the Fourteenth
Amendment, which I dismissed in a prior order. See Doc. 49.

to ensure that adolescent foster children receive required case planning

services, including the provision of timely, up-to-date case and transition

plans that meet the substantive requirements outlined in the statute.

B.D. filed a motion for class certification pursuant to Federal Rule of

Civil Procedure 23(b)(2), seeking to certify a class of:

> All children, ages 14 through 17, who:
>
> (1) are, or will be, in the legal custody or under the protective supervision of DCYF under N.H. Rev. Stat. Ann. § 169-C:3 (XVII) and/or (XXV);
>
> (2) have a mental impairment that substantially limits a major life activity, or have a record of such an impairment; and
>
> (3) currently are, or are at serious risk of being, unnecessarily placed in congregate care settings.

Doc. 152 at 2. The defendants object, arguing that neither B.D.'s disability

discrimination claims nor their case planning claim are appropriate for class

resolution.

## II.   STANDARD OF REVIEW

A class action is "an exception to the usual rule that litigation is

conducted by and on behalf of the individual named parties only." Califano v.

Yamasaki, 442 U.S. 682, 700-701 (1979). To warrant class action treatment,

the party seeking class certification must demonstrate that certification is

proper under Rule 23 of the Federal Rules of Civil Procedure. Smilow v. Sw.

Bell Mobile Sys., 323 F.3d 32, 38 (1st Cir. 2003). The four prerequisites to the

certification of any class are numerosity, commonality, typicality, and adequacy of representation. Id. A moving party must also demonstrate that their claims fall within one or more of the circumstances listed in Rule 23(b). Id. Where, as here, the moving party seeks certification pursuant to Rule 23(b)(2), they must establish that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"

"Rule 23 does not set forth a mere pleading standard." Wal-Mart v. Dukes, 564 U.S. 338, 350 (2011). Instead, parties seeking to certify a class must prove by a preponderance of the evidence that the requirements of Rule 23 are satisfied. In re Nexium Antitrust Litig., 777 F.3d 9, 27 (1st Cir. 2015). "Once plaintiffs have made their initial showing, defendants have the burden of producing sufficient evidence to rebut the plaintiff's showing." Id.

Although the court may need to touch on the merits of a plaintiff's claims to determine whether the proposed class should be certified, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013).

### III.   ANALYSIS

B.D. argues that their claims are appropriate for class treatment because they raise common questions regarding the legal sufficiency of the defendants' administration of its foster care system. The defendants disagree and assert that B.D.'s claims turn on individualized considerations that cannot be resolved or remediated on a class-wide basis. The defendants further take issue with the proposed class definition and argue that B.D. has failed to establish the required elements of numerosity, typicality, and adequacy. I first consider the defendants' arguments as to B.D.'s proposed class definition before turning to the requirements of Rule 23.

### A.   Class Definition

The defendants argue that the proposed class definition is inappropriate for two reasons. First, the defendants assert that whether an individual is "unnecessarily" placed in congregate care or "at risk" of such an unnecessary placement requires individualized fact finding and litigation. In this way, the defendants contend, the proposed definition runs afoul of what courts have referred to as the "implied requirement of 'ascertainability[.]'" See Shelton v. Bledsoe, 775 F.3d 554, 559-560 (3d Cir. 2015). Second, the defendants argue that the class cannot be defined to include individuals who are merely "at risk" of unnecessary placement in congregate care because an ADA claim can only be premised on instances of actual institutionalization.

Although not an explicit prerequisite to class certification, the class definition remains a relevant consideration insofar as its contours inform the Rule 23 analysis. <u>See</u> <u>Jackson v. Se. Pa. Transp. Auth.</u>, 260 F.R.D. 168, 182 (E.D. Pa. 2009); <u>O'Neill v. The Home Depot U.S.A., Inc.</u>, 243 F.R.D. 469, 477 (S.D. Fla. 2006). Accordingly, I consider each of the defendants' arguments before proceeding to the elements of Rule 23.

1.    <u>Ascertainability</u>

In addition to the enumerated requirements of Rule 23, some courts have found that the rule contains an "implicit threshold requirement" that the class be sufficiently ascertainable. <u>See</u> <u>Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.</u>, 821 F.3d 992, 995 (8th Cir 2016) (collecting cases). Ascertainability requires, at a minimum, that the class members be capable of identification by reference to objective criteria without the need for individualized fact finding and litigation. <u>See</u> William B. Rubenstein, <u>Newberg & Rubenstein on Class Actions</u> § 3:3 (6th ed.) (hereinafter "Newberg") (noting that, despite "linguistic variations" among courts in explaining the ascertainability requirement, "[a]ll courts essentially focus on the question of whether the class can be ascertained by objective criteria"). Among those courts that have recognized the implied requirement of ascertainability, there is a circuit split as to whether classes proceeding under Rule 23(b)(2) must meet the ascertainability requirement. <u>See</u> <u>Cole v.</u>

City of Memphis, 839 F.3d 530, 541 (6th Cir. 2016) (collecting cases). While some circuits require all class actions to satisfy the ascertainability requirement, the First Circuit is not among them. See Fitzmorris v. N.H. Dep't of Health & Hum. Servs., 2023 DNH 144, 2023 WL 8188770, at *7-8 (D.N.H. Nov. 27, 2023) (rejecting a similar argument).

The First Circuit has squarely held that ascertainability is a "standard[] applicable to a subdivision (b)(3) class rather than to a subdivision (b)(2) class." Yaffe v. Powers, 454 F.2d 1362, 1366 (1st Cir. 1972). Although the court subsequently recognized that ascertainability may be required in (b)(2) classes where the class's requested relief would require the identification of class members, this is not such a case. See Crosby v. Soc. Sec. Admin., 796 F.2d 576, 580 (1st Cir. 1986). B.D. seeks changes to the state's operation of its foster system as a whole, which can be implemented without the need to identify or provide notice to individual class members. Accordingly, even if the defendants are correct that individualized inquiries are required to determine which adolescent foster children are unnecessarily placed in congregate care facilities or at risk thereof, it would provide no basis for denying class certification.

2.   "At Risk" Claims

The defendants next contend that the class cannot be defined to include individuals who are at risk of unnecessary placement in a congregate care

facility because those individuals would fail to state a claim under <u>Olmstead</u>. In the defendants' view, placing an individual at risk of unnecessary institutionalization, without actual institutionalization, does not violate the ADA.

The defendants' argument consists of only a single paragraph and fails to grapple with the fact that the overwhelming majority of circuit courts to have considered the issue have concluded that an ADA claim may be based on a risk of unnecessary institutionalization. <u>Compare</u> <u>Waskul v. Washtenaw Cnty. Cmty. Mental Health,</u> 979 F.3d 426, 460 (6th Cir. 2020), <u>Steimel v. Wernert,</u> 823 F.3d 902, 911 (7th Cir. 2016), <u>Davis v. Shah,</u> 821 F.3d 231, 262 (2d Cir. 2016), <u>Pashby v. Delia,</u> 709 F.3d 307, 322 (4th Cir. 2013), <u>M.R. v. Dreyfus,</u> 697 F.3d 706, 734 (9th Cir. 2012), and <u>Fisher v. Okla. Health Care Auth.,</u> 335 F.3d 1175, 1180-1181 (10th Cir. 2003), <u>with</u> <u>United States v. Mississippi,</u> 82 F.4th 387, 392 (5th Cir. 2023). Moreover, the defendants do not explain why the alleged legal defects in B.D.'s theory of the case would preclude certification.

It would be premature to weigh in on the defendants' arguments now, which fundamentally go to the merits of the case and, in any event, are underdeveloped. <u>See</u> Fed. R. Civ. P. 23 advisory committee notes (2003) ("an evaluation of the probable outcome on the merits is not properly part of the certification decision[.]"); <u>Gooch v. Life Invs. Ins. Co. of Am.,</u> 672 F.3d 402,

432 (6th Cir. 2012) ("the relative merits of the underlying dispute are to have no impact upon the determination of the propriety of the class action.") (quoting Thompson v. Cnty. of Medina, 29 F.3d 238, 241 (6th Cir. 1994)); see also Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed . . . ."). B.D.'s proposed class definition tracks their theory of the case, the viability of which can be determined at a later stage of the proceedings following appropriate briefing and argument. Should the defendants' argument succeed on the merits, the class can be redefined accordingly. See Fed. R. Civ. P. 23(c)(1)(C).

**B.     Numerosity**

Rule 23(a)(1) requires the plaintiff to establish that the proposed class is "so numerous that joinder of all members is impracticable[.]" Although commonly referred to as the "numerosity" requirement, the inquiry under Rule 23(a)(1) turns not on "the number of class members alone but the practicability of joinder." Anderson v. Weinert Enters. Inc., 986 F.3d 773, 777 (7th Cir. 2021); accord Andrews v. Bechtel Power Corp., 780 F.2d 124, 131 (1st Cir. 1985). Thus, while a "class of 40 or more members raises a presumption of impracticability of joinder," courts may consider a variety of other factors as well. Newberg § 3:12; see also Garcia-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009). Relevant factors include "judicial economy,

the claimants' ability and motivation to litigate as joined plaintiffs, the

financial resources of class members, the geographic dispersion of class

members, the ability to identify future claimants, and whether the claims are

for injunctive relief or for damages." In re Modafinil Antitrust Litig., 837 F.3d

238, 253 (3d Cir. 2016).

To support their demonstration of numerosity, B.D. has provided

evidence that there are approximately 135 adolescent foster children in

DCYF custody who suffer from a "per se mental disability."[8] Doc. 277-2 at 8.

Out of those 135 individuals, 104 experienced at least one congregate care

placement. Id. Tracey Feild, a child welfare expert with years of experience in

the field, opined that this rate of congregate care placements was "higher

than expected or appropriate" and that, in her experience, most adolescent

foster children with mental impairments can remain in the community with

appropriate supports. Doc. 154-3 at 9. Feild explained that it is widely

accepted that congregate care placements are appropriate only for "a small

subset of children with the most serious and acute mental impairments," and

---

[8]     A "per se disability," as used here, means an impairment that generally
limits a major life activity and will therefore be regarded as a disability
under the ADA "in virtually all cases." See 28 C.F.R. § 35.108(d)(2)(ii)-(iii).
Such impairments include, for example, "[m]ajor depressive disorder, bipolar
disorder, post-traumatic stress disorder, traumatic brain injury, obsessive
compulsive disorder, and schizophrenia[.]" Id.; see also Doc. 277-2 at 8 n.13.

found it highly unlikely that such a significant percentage of adolescent foster children in New Hampshire would fit within this "small subset." Doc. 154-3 at 9; see also Doc. 178-5 at 24.

Feild's view received further support from Dr. Theodore Cross, a child psychologist and professor of social work, who explained that the "standard of care for kids with mental impairment[s] is to provide care in a community-based setting" and that this standard "can be applied to the vast majority of youth." Doc. 180-1 at 28-29. Cross explained that residential treatment should be used only in "very rare" circumstances where the "child's safety and the safety of others are in question." Doc. 322-8 at 13. Cross further explained that children not currently in congregate care are at serious risk of unnecessary placement in congregate care if:

> (1) the child has clinically significant emotional or behavioral problems; (2) the child's behavior was a factor for initial placement in out-of-home care; (3) the child's behavior resulted in a placement disruption after 50 days in foster care; (4) the child returned to foster care after exit; or (5) the child was previously placed in congregate care or an inpatient psychiatric care facility.

Doc. 154-2 at 6.

This evidence, viewed collectively, demonstrates a sufficient likelihood that there are at least 40 members of the proposed class. Although the defendants are correct that B.D.'s evidence does not establish the precise number of adolescent foster children who are unnecessarily placed in

congregate care or at risk of unnecessary placement in congregate care, no such showing is required. See Newberg § 3:13 (collecting cases and noting that "it is well settled that a plaintiff need not allege the exact number or specific identity of proposed class members"); see also Gomes v. U.S. Dep't of Homeland Sec., 561 F. Supp. 3d 93, 99 (D.N.H. 2021). Rather, the court "may draw reasonable inferences from the facts presented to find the requisite numerosity." McCuin v. Sec'y of Health & Hum. Servs., 817 F.2d 161, 167 (1st Cir. 1987); see also Marcus v. BMW of North Am., LLC, 687 F.3d 583, 596-597 (3d Cir. 2012) (noting that, although "[m]ere speculation is insufficient," courts can find numerosity using "inferences" supported by "circumstantial evidence").

Considering B.D.'s data on the prevalence of congregate care placements alongside the experts' opinion that congregate care placements are warranted only rarely gives rise to an inference that at least some subset of adolescent foster children in congregate care were placed there unnecessarily. Furthermore, the evidence indicates that a significant portion of foster children have a "clinically significant emotional or behavioral problem"—that is, a mental health problem that affects the child's "quality of life, well-being, and functioning"—and that a large number of foster children have been placed in congregate care. Doc. 180-1 at 50, 57-58 (noting that the "vast majority" of foster children with a mental health diagnosis are likely to

have a mental health diagnosis that impacts "a major life activity"); Doc. 216 at 2 (acknowledging that "[n]early 95 percent of Older Foster Youth had at least one DSM diagnosis"); Doc. 153-16 at 2 (finding that 293 foster children in New Hampshire were in congregate care placements on a given day in 2021). This evidence, viewed alongside Cross' opinion that children with such characteristics are at serious risk of unnecessary institutionalization, supports an inference that an even greater number of adolescent foster children are at risk of unnecessary placement in congregate care.

Aside from the sheer number of individuals in the putative class, several characteristics of the proposed class members render joinder impracticable. First, because children are constantly entering and exiting DCYF custody, the class is inherently fluid such that it would be "not merely impracticable but effectively impossible" to identify and join all class members. Gomes, 561 F. Supp. 3d at 99 (cleaned up); see also Reid v. Donelan, 297 F.R.D. 187, 189 (D. Mass. 2014). Second, the class is geographically diffuse: it spans across the entire state and may even include some New Hampshire children in out-of-state residential treatment programs. See Risinger ex rel. Risinger v. Concannon, 201 F.R.D. 16, 19 (D. Me. 2001). Finally, the class members are all children who suffer from disabilities, many of whom are segregated from the greater community in congregate care placements. Identifying, contacting, and bringing individual

litigation on behalf of each of these individuals would present significant challenges that are only compounded by the fact that the putative class members are under the defendants' custody. See J.N. v. Or. Dep't of Educ., 338 F.R.D. 256, 264 (D. Or. 2021). These considerations, combined with the likely number of putative class members, demonstrate that joinder would be impracticable.

## C.    Commonality

Commonality under Rule 23(a)(2) requires the plaintiff to demonstrate that there is at least one "question[] of law or fact common to the class." To satisfy this requirement, the plaintiff must prove that each of the class claims "depend upon a common contention," the "truth or falsity" of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350. Thus, "[w]hat matters to class certification is not the raising of common questions—even in droves—but rather the capacity of class-wide proceedings to generate common answers apt to drive the resolution of the litigation." Id. (cleaned up). As the First Circuit has recognized, such "common answers typically come in the form of a particular and sufficiently well-defined set of allegedly illegal policies or practices that work similar harm on the class plaintiffs." PPAL, 934 F.3d at 28 (cleaned up).

"Mere allegations of systemic violations of the law" will not suffice. D.G. ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1195 (10th Cir. 2010). Rather, in cases challenging systemic deficiencies, commonality generally requires proof of uniformly applicable policies or practices that allegedly drive the class harm and give rise to common questions capable of yielding common answers. See Parsons v. Ryan, 754 F.3d 657, 679 (9th Cir. 2014); see also Fitzmorris v. N.H. Dep't of Health & Hum. Servs., 2023 DNH 036, 2023 WL 2974245, at *5 (D.N.H. Apr. 17, 2023).

B.D. claims to have made such a showing here. B.D. alleges that the defendants' systematic failure to provide adolescent foster children with legally sufficient case plans and appropriate community-based placements is a result, not of discretionary decisions by individual case workers, but rather of deficiencies in the defendants' administration of the foster care program writ large. Specifically, B.D. contends that the defendants fail to fund, develop, and maintain an adequate array of community-based placements and services and, furthermore, engage in inadequate case planning practices by failing to regularly update case plans, inadequately training and supervising their caseworkers, and utilizing an outdated IT system.[9]

---

[9]    B.D. identifies other common practices that allegedly drive the class harm. Because I find that B.D. has proven the existence of several common practices, each of which gives rise to common questions that satisfy the

The defendants argue that B.D. has not demonstrated that these practices are occurring but that, regardless, the allegedly common practices do not give rise to common questions. In the defendants' view, given the inherently individualized and discretionary nature of foster care placements and the plaintiff-specific inquiries that inform each of the class claims, there is no common question that could resolve the claims of all class members in a single stroke.

I begin by analyzing B.D.'s showing of commonality with respect to their CWA claim before turning to their ADA claims.

1.    CWA Claim

B.D.'s case planning claim is premised on the assertion that the defendants systematically fail to provide adolescent foster children with case plans that meet the substantive requirements of the CWA. Although there is some evidence that the majority of foster children receive an initial case plan, see Doc. 153-6 at 54; Doc. 326-30 at 3; the record indicates that the defendants do not regularly update case or transition plans for adolescent

---

requirements of Rule 23(a)(2), I need not consider at the present time whether the other alleged practices are occurring in a way that is common to the class. See Immigr. & Naturalization Serv. v. Bagamasbad, 429 U.S. 24, 25 (1976) ("As a general rule courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach."); see also Wal-Mart, 564 U.S. at 359 (noting that "even a single common question" will satisfy commonality) (cleaned up).

foster children. Dr. Bryan Victor, an expert in data analysis, analyzed the case files of approximately 184 adolescent foster children to determine how many case and transition plans were provided to each child over the course of a 15-month period.[10] Doc. 281-12 at 2. Victor found that over half of adolescent foster children lacked a single case plan dated within the 15-month period, and approximately three-quarters lacked a transition plan dated within that same period.[11] Id. at 10. Out of those children who had an initial case or transition plan developed, approximately 3% had updates made to their case plan every seven months, and only 12% had updates made to their transition plans every 13 months. Id. at 12-13. Furthermore, case and transition plans were not regularly updated following a change in placement:

---

[10]    The 15-month period spanned from September 2021, when the defendants began using their current case planning template, to December 2022, when the defendants began production of the putative class members' case files. Doc. 279 at 27 n.52.

[11]    The defendants submit evidence that Victor's search of the case files failed to identify at least 12 case plans that were dated within the 15-month period under review. See Docs. 326-6 through 326-13; Doc. 326-22; Doc. 326-23. Considering the additional 12 case plans would mean that 110 out of 184 foster children (59.7%) lacked a case plan dated during the period under review, calling into question Victor's assertion that 122 out of 184 foster children (66.3%) lacked such a case plan. See Doc. 281-12 at 10. Regardless, even if Victor's calculation was off by a few percentage points, the evidence demonstrates that more than half of adolescent foster youth lacked a case plan dated within the 15-month period under review.

Approximately 27% of children's case plans and 8% of children's transition plans were updated within 60 days of a change in placement. Id. at 15.

The defendants argue that this evidence falls short of demonstrating the existence of class-wide case planning deficiencies because, contrary to B.D.'s contentions, the CWA does not require case or transition plans to be updated on a regular basis. Rather, in the defendants' view, all the law requires is that foster children be provided with a case plan shortly after removal and a transition plan sometime after turning 14. The defendants contend that Victor's analysis is therefore irrelevant because it speaks only to whether "the youth's case plan was updated during the [period under review]" and "does not mean that the youth did not have a case plan or that the case plan was not updated before or after the [period under review]." Doc. 322 at 30 (emphasis in original).

To be sure, Victor's analysis does not demonstrate that the defendants fail to provide adolescent foster children with initial case or transition plans. But B.D.'s theory of the case is not so limited. B.D. contends that the defendants violate the CWA, not only by failing to provide legally sufficient initial plans, but also by failing to regularly update foster children's case and transition plans. See Doc. 316 at 34. Victor's analysis is entirely relevant to this theory and demonstrates that a substantial portion of the putative class have suffered an alleged CWA violation. Whether B.D.'s theory of liability is

correct is an issue that can be determined at a later point in the proceedings. What matters for class certification is that B.D. has demonstrated, through Victor's analysis, that the defendants do not regularly update case or transition plans, either on a set basis or in response to changes in placements. Accordingly, B.D.'s claims raise common questions regarding whether the defendants' failure to update case and transition plans violates the CWA.

Beyond the failure to update case plans, B.D. has proven that the defendants are engaging in a number of other common practices that are allegedly insufficient to meet the defendants' obligations under the CWA.[12] For example, although DCYF has some "adolescent case workers" that receive specialized training on the needs of adolescents and the case planning requirements that attach once children turn 14, not all adolescent foster

---

[12]     The defendants argue that B.D. previously framed these practices only as "potential remedies," rather than "drivers of the alleged case planning harm," and that they have had no opportunity to respond to this new theory. Doc. 340 at 1. Contrary to the defendants' assertions, B.D. and their predecessors as named plaintiffs have consistently argued that the identified practices cause the defendants' failure to provide adequate case plans. See, e.g., Doc. 154 at 16-18. Although B.D. has not explicitly used the term "drivers" when doing so, the defendants were clearly aware of the substance of B.D.'s theory because they responded to it. See, e.g., Doc. 195 at 27; Doc. 322 at 33. While it is true that B.D.'s expert witness stated at a deposition that the identified practices were simply "actions that DCYF could take . . . to enhance the case planning . . . process" and not necessarily violations of federal law, it is the plaintiff, and not their expert, who dictates the theory of the case. Doc. 322-15 at 30.

children are assigned to adolescent case workers, leaving many with case workers who lack such qualifications. Doc. 280-2 at 2-3; Doc. 154-7 at 3. And, although the CWA requires children over 14 and their families to be involved in the case planning process, see 42 U.S.C. § 675(1)(B); 45 C.F.R. § 1356.21(g)(1), DCYF does not require its case workers to engage in formal discussions or hold meetings with a child and their family when developing a case plan. Doc. 279 at 36. Rather, DCYF policy allows for the required involvement to be achieved through "informal" discussions during "regular interactions with the family leading up to the formalized plan development." DCYF Policy 1551.2; see also Doc. 279-14 at 2 (noting that "[c]ase plans are not co-developed with parents" and that there is "[i]nconsistency statewide in child's involvement with case planning"). Furthermore, there is no formal process for supervisors to monitor case worker's case planning activities on an ongoing basis. Doc. 280-7 at 4; Doc. 279 at 38. Finally, DCYF's case planning occurs through Bridges, an "aging legacy system which is over 23 years old" and in need of "replacement modernization." Doc. 279-11 at 5; see also Doc. 279-15 at 7. Bridges suffers from a number of deficiencies that can make case planning more difficult, including usability issues, Doc. 279-11 at 5-6; Doc. 279-14 at 2, and lack of interoperability with other DHHS systems, Doc. 153-7 at 39; Doc. 279-25 at 2. Although the defendants have plans to

replace Bridges with a new system, the system is not expected to be implemented until the end of 2025. Doc. 279-24 at 9.

The defendants do not appear to contest that these practices are, in fact, occurring, but nonetheless assert that they do not give rise to common questions. In the defendants' view, B.D.'s claims seek to challenge the substantive sufficiency of adolescent foster children's case plans, which can only be determined by looking to each individual plaintiff's case plan and therefore cannot be litigated on a class-wide basis.

The defendants' argument misconstrues B.D.'s theory of the case. B.D.'s claim is premised on the assertion that the defendants' practices fall short of what is required to ensure that adolescent foster children are provided with CWA-complaint case plans. See 42 U.S.C. §§ 622(b)(8)(A)(ii); 675(5) (requiring states to provide a "case review system" that "assur[es] that . . . each child has a case plan" containing certain content). Thus, B.D. does not seek to litigate the substantive sufficiency of any given class member's case plan but rather the capacity of the defendants' case planning processes to deliver substantively sufficient case plans. Resolving this claim will turn, not on the contents of any individual case plan, but on the adequacy of the defendants' processes for producing that case plan. "If [the defendants' practices] are so pervasively deficient as to be unlawful, there would not appear to be any

impediment to addressing [those] unlawful practice[s] in one stroke." Elisa W. v. City of New York, 82 F.4th 115, 125 (2d Cir. 2023).

All told, B.D. has demonstrated that the defendants are failing to regularly update class members' case and transition plans and, furthermore, are engaging in several allegedly deficient case planning practices. B.D.'s CWA claims therefore raise common questions regarding (1) whether the alleged practices are, in fact, occurring; (2) whether those practices fail to satisfy the state's obligations under the CWA; and (3) whether the CWA requires the defendants to update case plans on a set basis and/or following a change in placement. Because each of these questions can be answered in reference to common proof that will determine the viability of each class member's CWA claim in a single stroke, commonality is satisfied.

2.    ADA Claims

B.D. asserts that the defendants are violating the ADA by systematically and unnecessarily placing and retaining adolescent foster children with mental impairments in congregate care. In support of their claim, B.D. supplies evidence that New Hampshire's use of congregate care far exceeds the national average. A 2022 federal report found that 27% of all foster children in New Hampshire are in congregate care placements, compared to 9% of foster children nationally. Doc. 153-15 at 2; Doc. 153-16 at 2. The problem is even more pronounced for adolescent foster children with

31

mental impairments: According to Victor, B.D.'s data analysis expert, 77% of adolescent foster children with mental impairments have experienced at least one congregate care placement, with many experiencing two or more such placements.[13] Doc. 277-2 at 8; see also Doc. 281-3 at 38.

Once adolescent foster children are placed in congregate care, they tend to remain there for several months. The median length of congregate care placements for adolescent foster children with mental impairments in New Hampshire is 16 months. Doc. 277-2 at 9. By way of comparison, one study of congregate care placements across 15 other states found that the median length of a congregate care placement for adolescent foster children was between 72 and 84 days. Id. And, because children are frequently returned to congregate care after exiting, their cumulative time spent in congregate care is even longer. On average, adolescent foster children with mental impairments in New Hampshire spent 2.5 years in congregate care settings. Id. at 8-9. B.D.'s child welfare expert opined that these statistics represent an overreliance on congregate care—a concern that has been raised previously

---

[13]    Although the defendants criticize Victor's data as stale and therefore not representative of the current state of affairs, they do not dispute that he utilized the most recent data available to him nor do they submit evidence that circumstances have changed.

by multiple third parties charged with analyzing New Hampshire's foster care system. Doc. 277-2 at 9-10; Doc. 153-1 at 19; Doc. 207-10 at 4.

B.D. contends that this overreliance on congregate care is the result of the defendants' deficient practices, which leave decisionmakers with virtually no choice but to place and retain adolescent foster children in congregate care. Specifically, B.D. contends that the defendants' failure to fund and maintain a sufficient array of community-based placements and services, as well as their failure to ensure that foster children have adequate case plans, systematically funnels adolescent foster children into congregate care.[14]

The defendants deny that these common practices are occurring, but they also contend that, even if they were, they fail to give rise to common questions capable of yielding common answers. I begin by evaluating B.D.'s evidence of the alleged practices before considering whether they satisfy the requirements of commonality.

---

[14] The defendants assert that B.D. and their predecessors first raised the theory that case planning failures are linked to the claimed ADA violation in their supplemental reply. Not so. Although B.D. did not previously label the defendants' case planning failures as "drivers" of their ADA claim, they have asserted from the beginning that the lack of sufficient case plans results in unnecessary institutionalization. See, e.g., Doc. 154 at 5; Doc. 207 at 16. And, contrary to the defendants' contentions, B.D.'s supplemental expert reports continued to press this claim. Doc. 310-4 at 2. The defendants therefore had adequate notice of this aspect of B.D.'s claims and the opportunity to respond accordingly.

### a. Evidence of Practices

For the reasons I have explained, B.D. has adequately proved that the defendants are engaging in certain allegedly deficient case planning practices. B.D. has also demonstrated that the defendants are (1) failing to take certain actions to develop the array of community-based placements, (2) disproportionately investing in residential treatment facilities, and (3) offering an insufficient array of community-based services.

#### i. Community-Based Placements

The evidence supports B.D.'s claim that the defendants are failing to take certain steps to increase the supply of community-based placements. For example, there is no dispute that the defendants do not currently offer therapeutic foster care or adolescent foster care, despite having the regulatory authority to do so. Doc. 277-29 at 3; Doc. 153-25 at 5. Although the defendants are in the process of developing a therapeutic foster care program, the project has been pending since at least 2019 yet remains in its early stages. Doc. 277-29 at 3; Doc. 277-27 at 3.

Furthermore, there is no dispute that most kinship caregivers are paid less than licensed foster families. Unlicensed kin are ineligible to receive the foster care maintenance payments provided to licensed foster families and, instead, are only eligible for a "TANF child-only grant." Doc. 277-2 at 12. The TANF grant pays $753 per month to a caregiver caring for one child, whereas

licensed families receive approximately $1,223 per month in foster care maintenance payments per child. Doc. 317-1 at 12; Doc. 317-13 at 2. Although kinship caregivers could receive foster care maintenance payments by obtaining a foster family license, the vast majority—approximately 90%— have not done so. Doc. 277-2 at 12; Doc. 277-9 at 2.

Feild, B.D.'s child welfare expert, opined that the TANF grant rates are insufficient to cover the rising costs of raising a child and hinder kin's ability to serve as placements. Doc. 277-2 at 11-13; Doc. 322-1 at 32. Despite this, the defendants have not increased payments to unlicensed kin by, for example, supplementing the TANF payments, nor have they instituted a process to ensure that all kin become licensed. Doc. 277-2 at 13; Doc 322-1 at 30; see also Doc. 277-13 at 2 (indicating that several states in the region license all kinship caregivers); Doc. 317-14 at 8 (noting that 13 states provide unlicensed kinship caregivers with foster care maintenance payments).

Additionally, the defendants have failed to recruit a sufficient number of licensed foster homes. The defendants have regularly acknowledged that they are in need of more foster homes to serve the state's population of foster children. See, e.g., Doc. 277-21 at 2; Doc. 277-22 at 2; Doc. 277-27 at 5. This need is particularly urgent for adolescent foster children, as only a small percentage of foster families are willing to serve as placements for teenagers. Doc. 277-2 at 21; Doc. 278-31 at 40. Although the defendants have taken

some additional steps to recruit more foster families and, in particular, foster families willing to serve teenagers, the total number of foster homes in the state has fallen by 31% in recent years. Doc. 317-19 at 2.

A similar problem exists with regard to ISO foster care. There are approximately 82 ISO foster homes in the state, which the defendants have recognized is too few to meet the needs of all foster children. Doc. 277-2 at 17; see also Doc. 153-5 at 8; Doc. 277-27 at 5. Despite recent efforts to increase oversight of the child placing agencies contracted to recruit and train ISO foster homes, there is no evidence that the defendants have meaningfully increased the supply of ISO foster care.

Although the defendants do not dispute that they lack a sufficient number of foster homes to serve the needs of adolescent foster children, they contend that this shortage is due to factors outside their control and therefore cannot constitute a uniform practice giving rise to common questions. The defendants' argument, however, goes to the merits rather than the existence of a common practice. See Jonathan R. v. Justice, 344 F.R.D. 294, 308 (S.D. W. Va. 2023). Because all class members are affected by what the defendants do and do not do to increase the supply of available foster homes, the legal sufficiency of the defendants' efforts raises common questions capable of class-wide resolution. Cf. Baby Neal v. Casey, 43 F.3d 48, 53 (3d Cir. 1994) (finding commonality where a class of foster children challenged the

defendants' failure to provide a sufficient number of appropriate placements); Jonathan R., 344 F.R.D. at 305-306 (same); Wyatt B. v. Brown, No. 6:19-cv-005556-AA, 2022 WL 3445767, at *25 (D. Or. 2022) (same); Connor B. ex rel. Vigurs v. Patrick, 278 F.R.D. 30, 31 (D. Mass. 2011) (same); see also S.R. v. Pa. Dep't of Hum. Servs., 325 F.R.D. 103, 110 (M.D. Pa. 2018) (noting that "systemic deficiencies in the availability of placements" are "exactly the type of 'common mode' or practice predicating each alleged violation that was noticeably absent from [Wal-Mart]").

### ii. Disproportionate Funding of Residential Treatment

B.D. asserts that the defendants invest a disproportionate amount of funds into the development of residential treatment facilities, to the detriment of congregate care placements. In 2022, DCYF spent 92% of its placement funds on congregate care, expending only $1.5 million on community-based placements for adolescent foster children compared to $16.6 million on congregate care placements. Doc. 277-2 at 23-24. On average, DCYF paid $7,317 per child in community-based placements, compared to $119,763 per child in congregate care placements. Id. Feild acknowledged that congregate care placements are generally more expensive than community-based placements but nonetheless opined that the defendants' ratio of spending reflected a disproportionate investment in congregate care. Doc. 322-1 at 22.

The defendants have also invested in the development of residential treatment facilities. In 2021, DHHS contracted to add approximately 100 new residential treatment beds and instituted a rate increase for residential providers. Doc. 277-2 at 21; Doc. 278-17 at 3; Doc. 317-20 at 15-16. That same year, DHHS requested approximately $232 million in funds to invest in residential treatment programs over the course of three years. Doc. 317-20 at 15-16.

The defendants do not appear to dispute these underlying facts but argue that their disproportionate investment in residential treatment programs cannot constitute a common practice for at least two reasons. First, the defendants note that investments in residential treatment programs are overseen by the Bureau of Children's Behavioral Health (BCBH), a separate a division of DHHS, and are therefore unrelated to DCYF's operation of its foster care program. But BCBH and DCYF both fall under the purview of the Commissioner of DHHS and, ultimately, the governor, both of whom are named defendants in this case. Doc. 317-20 at 2. Even if the defendants are correct that some of the funding was specifically earmarked for BCBH, the decision to push other funding toward BCBH instead of DCYF is a common practice attributable to the defendants.

Second, the defendants assert that the investments in residential care were necessitated by a change in law that made residential treatment

available to all children, rather than just children in DCYF custody. But that the investments were intended to benefit children outside of DCYF's care does not mean that it did not have an impact on children within DCYF's care. Feild explained that, in her experience, "if more congregate care beds become available, they are likely to be filled" by adolescent foster children. Doc. 154-3 at 13. Furthermore, funds put toward residential treatment programs are necessarily funds that did not go toward expanding community-based placements. Thus, the defendants' decision to invest in residential treatment programs rather than community placements is a practice that is common to the class, regardless of whether or not that decision was justified. Cf. Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan, 293 F.R.D. 254, 261 (D.N.H. 2013) (finding commonality based, in part, on "practices relating to the funding and provision of community-based services").

### iii. Community-Based Services

Finally, the evidence indicates that, although the state offers a broad range of services to foster children in community placements, it lacks the capacity to serve all foster children who might benefit from those services. As early as 2018, a third-party consultant hired by the state observed that the "current level of DCYF community based and residential services are not sufficient to meet the needs of DCYF involved children, youth, and families." Doc. 153-7 at 36. These concerns were echoed in a 2018 federal audit of New

Hampshire's foster care system, which noted that DCYF's "ability to generally meet the mental health needs of children and youth" was negatively impacted by "a lack of quality mental health resources." Doc. 153-6 at 42; see also Doc. 153-10 at 22 (noting that "[s]ervice availability was a challenge across the state"). Then again in 2021, the New Hampshire Office of the Child Advocate—an independent watchdog agency, see N.H. Rev. Stat. Ann. § 21-V:2—raised concerns about the state's "limited community-based services array for alternatives to congregate care" for children in DCYF custody. Doc. 153-1 at 19.

Although the defendants criticize B.D.'s evidence as stale, they have not provided any evidence of their own suggesting that circumstances have meaningfully changed. Accordingly, the evidence supports B.D.'s contention that the defendants have failed to maintain a sufficient array of community-based services. See Baby Neal, 43 F.3d at 53 (certifying a class of foster children challenging an insufficient array of services); S.R., 325 F.R.D. at 109 (same); Connor B., 278 F.R.D. at 31 (same); see also Jonathan R., 344 F.R.D. at 312 (collecting cases and noting that "several district courts have certified classes of disabled individuals challenging a public entity's failure to provide community services to them"); cf. M.D., 675 F.3d at 847-848 (recognizing that "a failure to correct a structural deficiency" could constitute a common practice that gives rise to commonality).

### b. Whether the alleged practices support commonality

The defendants argue that these common practices, even if adequately proved, fail to establish commonality. The defendants contend that commonality requires the plaintiff to prove not only the existence of common practices but also that the common practices "cause the alleged classwide harm or legal violation," which B.D. has failed to do here. Doc. 195 at 23. The defendants' argument is principally based on PPAL, where the First Circuit discussed the need for plaintiffs seeking class certification to identify a "uniformly applied, official policy of the [defendant], or an unofficial yet well-defined practice, that drives the alleged violation." 934 F.3d at 29. In the defendants' view, a practice cannot "drive[] the alleged violation" absent proof of a causal link. Id.

But the question of whether class action plaintiffs are required to demonstrate a causal link between their challenged practices and alleged harm was not at issue in PPAL, which turned entirely on the plaintiffs' failure to prove the existence of a common practice. See id. at 30. Moreover, as I recently explained in Fitzmorris, the language employed by both the First Circuit in PPAL and the Supreme Court in Wal-Mart implies that it is sufficient for plaintiffs to demonstrate that there are common practices that allegedly cause their class harm. 2023 WL 8188770, at *21. The question of causation is one for the merits, and therefore need not be resolved at the class

certification stage. See Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 811 (7th Cir. 2012) ("the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits."); Sullivan v. DB Inv., Inc., 667 F.3d 273, 306 (3d Cir. 2011) ("the Rules and our case law have consistently made clear that the plaintiffs need not actually establish the validity of claims at the class certification stage.").

The defendants next contend that B.D.'s claims turn on highly individualized inquiries regarding the "legality of hundreds of placement decisions" that defeat commonality. Doc. 195 at 25. This argument, however, rests on a misunderstanding of B.D.'s claims. B.D. does not challenge any particular placement decision, nor do they seek the sort of individualized relief that would necessitate an inquiry into the propriety of any given class member's placement. See S.R., 325 F.R.D. at 109 (distinguishing between claims that "seek review and determination of each individual class member's placement" and those that seek "system wide change"). Rather, B.D.'s claims challenge specific acts and omissions in the defendants' operation of its foster care program that allegedly expose all class members to an ADA violation. Accordingly, the focus of B.D.'s claims will be on the defendants' actions, each of which are common to the class, rather than any individual plaintiff's placement. These are precisely the sort of claims that have been broadly recognized as appropriate for class treatment because they give rise to

common questions regarding the legal sufficiency of the defendants' practices. See PPAL, 934 F.3d at 28 n.14 (collecting cases that challenged "a definable policy or practice imposed by a single entity or a small group of actors" which "facilitated the formulation of questions apt for class resolution"); Elisa W., 82 F.4th at 123 ("Where the same conduct or practice by the same defendant give rise to the same kind of claims from all class members, there is a common question.") (quoting Johnson v. Nextel Commc'ns, Inc., 780 F.3d 128, 137 (2d Cir. 2015)); see also Newberg § 3:20 ("When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.").

The defendants nonetheless assert that Olmstead claims based on a systemic failure to provide appropriate mental health care are fundamentally incompatible with class treatment. In support of their contention, the defendants rely on the Fifth Circuit's recent decision in United States v. Mississippi. 82 F.4th 387 (5th Cir. 2023). In that case, the Department of Justice (DOJ) brought suit against the state of Mississippi on the theory that "systemic deficiencies in the state's operation of mental health programs" placed "every person in Mississippi suffering from a serious mental illness . . . at risk of improper institutionalization." Id. at 389 (emphasis omitted). The Fifth Circuit reversed the district court's finding in favor of the DOJ, noting

that a "claim of system-wide risk of institutionalizing some unspecified group of patients" was incompatible with Olmstead, which required an inquiry into "patient-specific" factors such as whether community placement is appropriate and desired. Id. at 394. Although the court recognized that "a number of circuits" had held that Olmstead claims could be litigated on a systemwide basis, it nonetheless found those cases distinguishable because they were brought by individual plaintiffs or classes challenging the failure to provide certain "personal care services or medically necessary items[.]" Id. at 396. In the court's view, although the consequences of failing to provide medically necessary services or items were "susceptible of quantification and, indeed, generalization," the failure to provide "'[a]pproriate' treatment for those with serious mental illness" could not be litigated on a system-wide basis. Id.

    As an initial matter, Mississippi is distinguishable from the present case. The claims at issue in Mississippi were brought by the federal government on the theory that a multifaceted, statewide system exposed a diverse group of nearly 4,000 individuals to a uniform risk of institutionalization. This case, in contrast, has been brought by a putative class of less than 200 adolescents within the state's care and custody against a discrete set of state actors with authority over the children's placements and mental health care. The Fifth Circuit's conclusions regarding the DOJ's

ability to prove that Mississippi subjected thousands of unidentified

individuals across the state to an unnecessary risk of institutionalization

says little about this plaintiff's ability to prove that the defendants subject a

narrow class of children within their care to an unnecessary risk of

institutionalization. Cf. D.G., 594 F.3d at 1197 (distinguishing a prior case

denying class certification on the basis that the "class of plaintiffs in [the

prior case] was far broader" and shared less in common than proposed class

at issue).

To the extent Mississippi stands for the proposition that Olmstead

claims based on the failure to provide appropriate mental health care can

never be litigated on a class-wide basis, it is unpersuasive. I am instead

persuaded by the long line of cases finding that such claims are appropriate

for class treatment precisely because they are susceptible to common proof

regarding the aggregate effect and legal sufficiency of identified state

practices.[15]

---

[15]     See, e.g., Jonathan R., 344 F.R.D. at 313; Wyatt B., 2022 WL 3445767,
at *27; J.N., 338 F.R.D. at 266; S.R., 325 F.R.D. at 109; N.B. v. Hamos, 26 F.
Supp. 3d 756, 773-774 (N.D. Ill. 2014); Kenneth R., 293 F.R.D. at 267; see
also Lane v. Kitzhaber, 283 F.R.D. 587, 595 (D. Or. 2012) (noting that class
certification has been granted "in almost every case" involving an alleged
"violation of the integration mandate of the ADA"); Steven Schwartz &
Kathryn Rucker, The Commonality of Difference: A Framework for Obtaining
Class Certification in ADA Cases After Wal-Mart, 71 Syracuse L. Rev. 841,
872 (2021) (noting that the theory that Olmstead cases cannot be litigated on

B.D.'s claims are no exception and raise a host of common questions amenable to common answers. In order to succeed on their ADA claims, B.D. will need to demonstrate that the defendants' operation of its foster care program subjects class members to unnecessary institutionalization or risk thereof. M.R., 697 F.3d at 734; see also Shah, 821 F.3d at 263. B.D. will also need to demonstrate that the defendants' practices could be reasonably modified, considering the states resources and obligations to others with disabilities. Olmstead, 527 U.S. at 587. And the court will need to consider the defendants' argument that ADA claims cannot be based on a risk of institutionalization, as well as its affirmative defenses that the integration mandate is ultra vires and the proposed modifications would constitute a fundamental alteration. Doc. 57 at 36. See In re Checking Account Overdraft Litig., 307 F.R.D. 630, 650-651 (S.D. Fla. 2015) (noting that affirmative defenses may "raise common questions" where they can be addressed "through the use of common evidence"); cf. Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 295 (1st Cir. 2000) ("affirmative defenses should be considered in making class certification decisions"). Accordingly, B.D.'s claims give rise to common questions regarding (1) whether the challenged practices

---

a class-wide basis "has received little, if any, support, primarily because it runs contrary to, and would effectively upend, two decades of ADA class certification precedent").

are, in fact, occurring; (2) whether those practices subject class members to unnecessary institutionalization or a risk thereof; (3) whether those practices can be reasonably modified; (4) whether instituting the requested modifications would require the state to fundamentally alter its program; (5) whether the integration mandate is ultra vires; and (6) whether ADA claims can be based on a risk of unnecessary institutionalization. Because each of these questions turn on common proof and give rise to common answers, commonality is satisfied.

## D.     Typicality

Typicality under Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" "The logic behind the typicality requirement 'is that a class representative will adequately pursue her own claims, and if those claims are typical of those of the rest of the class, then her pursuit of her own interest will necessarily benefit the class as well.'" Howard v. Cook Cnty. Sheriff's Off., 989 F.3d 587, 605 (7th Cir. 2021) (quoting Newberg § 3:28). Typicality is satisfied where the named plaintiff's claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and are based on the same legal theory." Garcia-Rubiera, 570 F.3d at 460 (cleaned up). The named plaintiff's claims "need not be identical" to those of absent class members so long as they "share the same essential

47

characteristics." Wright v. S. N.H. Univ., 565 F. Supp. 3d 193, 203 (D.N.H. 2021) (quoting Rapuano v. Tr. of Dartmouth Coll., 334 F.R.D. 637, 648 (D.N.H. 2020)).

The defendants do not assert that anything about B.D.'s claims in particular render them atypical. Instead, they argue that, because the ADA and CWA claims turn on fundamentally individualized inquiries, litigating B.D.'s claims will do little to advance the claims of absent class members. This argument largely tracks the defendants' arguments on commonality and is unpersuasive for similar reasons. See Postawko v. Mo. Dep't of Corrs., 910 F.3d 1030, 1039 (8th Cir. 2018); see also Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982) (noting that the "commonality and typicality requirements of Rule 23(a) tend to merge"). Like the other members of the class, B.D. alleges that they were unnecessarily placed in congregate care and given an inadequate case plan as a result of systemic deficiencies in the defendants' operation of its foster care program. Both B.D.'s claims and those of absent class members challenge these systemic deficiencies under the same legal theory which, for the reasons I explained, can be litigated through common proof. Therefore, B.D.'s claims are typical of the class such that advancing their claims will necessarily advance the interests of other class members. See Jonathan R., 344 F.R.D. at 314-315; see also Rapuano, 334 F.R.D. at 648 (collecting cases and noting that "[c]ourts have found typicality

satisfied where a group of putative class members are exposed to the systemic failures of an institution")

### E.    Adequacy

Rule 23(a)(4), referred to as the "adequacy" requirement, requires class plaintiffs to demonstrate that "the representative parties will fairly and adequately protect the interests of the class." To satisfy this requirement, the plaintiff "must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation." Andrews, 780 F.2d at 130.

The defendants do not argue that B.D.'s counsel and next friend lack the capacity to represent the class.[16] The defendants argue, however, that B.D. is nonetheless an inadequate class representative for two reasons.

First, the defendants assert that B.D.'s interest in enforcing their ADA rights is in conflict with other members of the class who might prefer to be placed in congregate care. As an initial matter, "[m]ere speculation as to conflicts that may develop at the remedy stage is insufficient to support

---

[16]    The defendants filed a motion to disqualify three of the other named plaintiffs' next friends, which I denied as moot after dismissing those plaintiffs from the action. The defendants have not sought to disqualify B.D.'s next friend, nor is there any indication that the concerns raised in the defendants' motion to disqualify apply to B.D.'s next friend.

denial of initial class certification." Cummings v. Connell, 316 F.3d 886, 896 (9th Cir. 2003) (quoting Soc. Servs. Union Local 535 v. Cnty. of Santa Clara, 609 F.2d 944, 948 (9th Cir. 1979)); see also Gunnells v. HealthPlan Servs., Inc., 348 F.3d 417, 431 n.7 (4th Cir. 2003). Regardless, while it is certainly possible that same members of the class may desire residential treatment now or in the future, this is not the sort of discrepancy that "go[es] to the heart of the litigation" and "renders a putative class action untenable." Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012) (noting that Rule 23 does not require "perfect symmetry of interests"). B.D.'s interest is in preventing unnecessary institutionalization, not all residential treatment, and there is no reason to think that remedies aimed at preventing unnecessary institutionalization will negatively impact those who want or need residential treatment. Moreover, because institutionalization is necessarily temporary, developing the array of community services and placements will benefit class members who desire residential treatment upon their return to the community.

The defendants next assert that, because B.D. does not receive foster care maintenance payments under Title IV-E, they cannot adequately represent class members seeking to invoke the case planning requirements of Title IV-E. Again, I disagree. The CWA's case planning requirements appear in both Title IV-B, which applies to all members of the proposed class, and

Title IV-E, which applies to foster children receiving foster care maintenance payments. As I explained in my order on the defendants' motion to dismiss, there is no meaningful difference between the case planning requirements of Title IV-B and those of Title IV-E. Therefore, even though B.D.'s case planning claims are rooted in Title IV-B, they do not "implicate a significantly different set of concerns" than those of absent class members proceeding under Title IV-E. See Gratz v. Bollinger, 539 U.S. 244, 265 (2003). Accordingly, B.D. is an adequate representative.

**F.      Rule 23(b)(2)**

In addition to satisfying each of the prerequisites of Rule 23(a), parties seeking class certification must also demonstrate that their class fits within one or more of the circumstances outlined in Rule 23(b). B.D. seeks certification pursuant to Rule 23(b)(2), which allows for class treatment where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" This requirement consists of two parts. "The class must sue over a uniform action or inaction by the defendant, and it must request a uniform injunction or declaratory judgment from the court." Doster v. Kendall, 54 F.4th 398, 439 (6th Cir. 2022). A class may proceed under Rule 23(b)(2) "only when a single

injunction or declaratory judgment would provide relief to each member of the class." Wal-Mart, 564 U.S. at 360.

The first requirement of Rule 23(b)(2) is satisfied for largely the same reasons that commonality is satisfied. That is, by demonstrating that the defendants engage in certain common practices, B.D. has established that the defendants' contested actions "apply generally" to the class. See Rodriguez v. Hayes, 591 F.3d. 1105, 1125 (9th Cir. 2010); M.D., 675 F.3d at 847-848.

As to the second requirement, B.D. has proposed injunctive relief that they contend would provide relief to all class members. For example, B.D. argues that the court could order the defendants to (1) undertake additional recruiting efforts to "expand the pool" of qualified foster homes, (2) require community-based service providers to "reserve a set number of slots" for adolescent foster children, (3) implement a process for case workers to receive "regular and timely feedback" on their case planning activities, or (4) ensure that adolescent foster children are assigned to case workers with specialized training and knowledge on the needs of those children. Doc. 154 at 32-33.

The defendants nevertheless argue that the proposed class-wide relief does not satisfy the requirements of Rule 23(b)(2) for at least three reasons. First, the defendants assert that, because placement needs vary from child to child, requiring the defendants to increase the supply of any given placement

type would not benefit members of the class who do not qualify for that placement type.

This argument, however, ignores the reality of foster care. Foster care placements are a zero-sum game in that, when one child occupies a bed, it necessarily denies another child the opportunity to occupy that bed. In this way, all foster children are affected by the overall number of available beds, regardless of their individual placement needs. Requiring the defendants to, for example, increase the supply of enhanced support foster homes would benefit not only those children who qualify for enhanced support foster homes but also those children who can occupy the beds made vacant by moving other children into enhanced support foster care. An injunction requiring the defendants to take certain steps to increase the supply of available foster care beds would therefore benefit all class members without regard their specific needs. See S.R., 325 F.R.D. at 112 (certifying a (b)(2) class even though the class members had different placement and service needs); Kenneth R., 293 F.R.D. at 271 (similar).

The defendants next argue that B.D.'s claims cannot yield any meaningful injunctive relief because the defendants "have already (of their own accord) accomplished or begun undertaking nearly every step Plaintiffs have requested[.]" Doc. 322 at 36 (emphasis omitted). The key word in the defendants' argument is "nearly." To be sure, in the intervening years since

this case was first filed, the defendants have undertaken laudable efforts to address many of the concerns raised in the complaint. But there is no evidence that the defendants have abated or modified the common practices identified in this order. These practices could provide the basis for meaningful injunctive relief should B.D. succeed in demonstrating that they are unlawful.

Finally, the defendants assert that B.D. has failed to demonstrate that the relief they request would definitively resolve the class members' injuries. But, as I recently explained in rejecting a similar argument, Rule 23(b)(2) does not require such a showing. See Fitzmorris, 2023 WL 8188770, at *26 n.20. All that is required is that an appropriate injunction "is conceivable." Shook v. Cnty. of El Paso, 543 F.3d 597, 608 (10th Cir. 2008). Of course, an injunction will only issue if B.D. succeeds on the merits by demonstrating that the challenged practices violate class members' rights under the ADA or the CWA. Should this occur, it is certainly conceivable that the court could craft an appropriate and effective injunction, similar to the one proposed by B.D., ordering the defendants to modify those practices. Because that injunction would modify the way in which the defendants administer the foster care system writ large, it would benefit each member of the class regardless of their individual needs or circumstances. See Rodriguez, 591 F.3d at 1125 (noting that Rule 23(b)(2) "does not require [the court] to

examine the viability or bases of class members' claims or declaratory judgment, but only to look to whether class members seek uniform relief from a practice applicable to all of them"). Accordingly, the requirements of Rule 23(b)(2) are satisfied.

## IV.   CONCLUSION

For the foregoing reasons, B.D.'s motion for class certification (Doc. 152) is granted. The court certifies a class of:

All children, ages 14 through 17, who:

(1) are, or will be, in the legal custody or under the protective supervision of DCYF under N.H. Rev. Stat. Ann. § 169-C:3 (XVII) and/or (XXV);

(2) have a mental impairment that substantially limits a major life activity, or have a record of such an impairment; and

(3) currently are, or are at serious risk of being, unnecessarily placed in congregate care settings.

B.D., by and through their next friend, Christine Wellington, is appointed as class representative. B.D.'s counsel of record is appointed as class counsel pursuant to Rule 23(g).

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

September 18, 2024

cc:   Counsel of record