# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

B.D., by their next friend,
Christine Wellington, et al.

              Case No. 21-cv-00004-PB

  v.             Opinion No. 2025 DNH 037

Kelly Ayotte, in her official
capacity as the Governor
of New Hampshire[1], et al.

## MEMORANDUM OF DECISION

  In this class action, plaintiffs allege that defendants have violated Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by unnecessarily placing older foster youth with mental impairments in congregate care, rather than community-based foster homes. Plaintiffs further allege that defendants have violated the Adoption Assistance and Child Welfare Act ("CWA"), 42 U.S.C. §§ 671 et seq., by failing to comply with federal case planning requirements.

---

[1] This case was filed on January 5, 2021, against the governor of New Hampshire in his official capacity. At that time, Christopher Sununu held the office. Kelly Ayotte was officially sworn in as governor of New Hampshire on January 9, 2025.

On March 23, 2023, plaintiffs moved to certify a class consisting of all children, ages 14 through 17, who: (1) are, or will be, in the legal custody or under the protective supervision of New Hampshire's Division of Children, Youth, and Families (DCYF); (2) have a mental impairment that substantially limits a major life activity (or with a record of such impairment); and (3) currently are, or are at serious risk of being, unnecessarily placed in congregate care settings. In support of that motion, plaintiffs submitted the reports of four experts: Dr. Bryan Victor, Tracey Feild, Daryl Chansuthus, and Dr. Theodore Cross. Following defendants' production of a corrected data set to replace the data upon which Feild had originally relied, Feild submitted a supplemental declaration in August, 2023, updating her earlier calculations to reflect the new data set. Feild did not otherwise alter her conclusions. Along with their objection to plaintiffs' motion for class certification, defendants promptly filed a motion to exclude plaintiffs' expert opinions, pursuant to Federal Rule of Evidence 702.

On May 1, 2024, the plaintiffs moved for leave to file supplemental expert declarations in further support of their class certification motion. Plaintiffs sought to supplement the reports of all four of their experts: Dr. Victor, Feild, Chansuthus, and Dr. Cross. After considering defendants' objections, I granted plaintiffs' motion on June 14, 2024. Then, on July 29, 2024, I granted plaintiffs' motion for leave to amend their complaint to add

B.D. as a named plaintiff, along with a motion to supplement their expert reports with an analysis of B.D.'s ability to serve as a class representative.

On August 1, 2024, defendants moved, pursuant to Federal Rule of Evidence 702, to exclude the seven additional expert reports that were submitted by plaintiffs' experts after August, 2023. Plaintiffs again objected.

In my September 18, 2024 Memorandum and Order granting plaintiffs' motion for class certification, I relied on certain testimony submitted by the plaintiffs' experts. See Doc. 342. At the same time, I denied defendants' motions to exclude plaintiffs' experts' testimony and noted that I would explain my reasoning in a separate memorandum. This is the promised memorandum.

## I.    STANDARD OF REVIEW

### A.    Federal Rule of Evidence 702

The admissibility of expert opinion testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> a.  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b.  the testimony is based on sufficient facts or data;

      c.  the testimony is the product of reliable principles and methods; and

      d.  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (amended 2023). A party offering expert testimony must prove those requirements by a preponderance of evidence. Fed. R. Evid. advisory committee's note to 2023 amendment.

Thus, the text of Rule 702 imposes three principal requirements upon a party seeking to introduce an expert witness's testimony: (1) that the proposed expert is qualified "by knowledge, skill, experience, training or education;" (2) that the testimony is helpful to the trier of fact "to understand the evidence or to determine a fact in issue;" and (3) that the expert's testimony is reliable. As the Supreme Court explained in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 597 (1993), these requirements assign a "gatekeeping role for the judge" to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

To determine whether a proffered witness is qualified, the court must consider whether a "proposed expert is qualified by 'knowledge, skill, experience, training, or education,'" <u>Carrozza v. CVS Pharmacy, Inc.</u>, 992 F.3d 44, 56 (1st Cir. 2021) (quoting Fed. R. Evid. 702), in the field for which the testimony is offered. "An expert need not be a 'blue-ribbon practitioner

with optimal qualifications' or be hyper-specialized in the field to satisfy Rule 702(a)." <u>Hunt v. Covidien LP</u>, No. CV 22-10697-RGS, 2024 WL 2724144, at *3 (D. Mass. May 28, 2024) (cleaned up) (quoting <u>United States v. Vargas</u>, 471 F.3d 255, 262 (1st Cir. 2006) (further quotations and citations omitted). However, "a testifying expert should have achieved a meaningful threshold of expertise in the given area." <u>Levin v. Dalva Bros., Inc.</u>, 459 F.3d 68, 78 (1st Cir. 2006) (quotations omitted).

Rule 702's "helpfulness" prong requires an evaluation of whether the expert's testimony will be helpful to the trier of fact. That evaluation "goes primarily to relevance" as "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." <u>Daubert</u>, 509 U.S. at 591 (internal quotations omitted). Our court of appeals has characterized the helpfulness prong as a "special relevancy requirement," explaining: "[t]o be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, <u>see</u> Fed. R. Evid. 402, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." <u>Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.</u>, 161 F.3d 77, 81 (1st Cir. 1998). <u>See also</u> 4 Weinstein's Federal Evidence § 702.03 (2024) ("[T]he [helpfulness] requirement goes beyond mere relevance. It is a more stringent standard of

admissibility, because it also requires expert testimony to have a valid connection to the pertinent inquiry.").

Finally, Rule 702's reliability prong requires that I consider whether "the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." Ruiz-Troche, 161 F.3d at 85. The reliability inquiry itself encompasses three requirements: (1) that the testimony is based on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the testimony reflects a reliable application of those principles and methods to the facts of the case. See Fed. R. Evid. 702. The reliability evaluation is "a flexible inquiry, allowing for consideration of factors like whether the expert's methodology has been objectively tested; whether it has been subjected to peer review and publication; the technique's known or potential error rate; and whether the expert's technique has been generally accepted within the relevant industry." Lawes v. CSA Architects & Engrs. LLP, 963 F.3d 72, 98 (1st Cir. 2020).

As noted supra, a party seeking to introduce expert testimony must demonstrate its compliance with Federal Rule of Evidence 104(a)'s preponderance standard. However, as the rule's advisory committee notes explain, "[s]ome challenges to expert testimony will raise matters of weight rather than admissibility even under the Rule 104(a) standard." Fed. R. Evid. 702 advisory committee's notes to the 2023 amendment. While "arguments

about the sufficiency of an expert's basis" will not "<u>always</u> go to weight and not admissibility," "once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." <u>Id.</u> (emphasis added). So, as the advisory committee notes explain further, Rule 104(a) "does not necessarily require exclusion of either side's experts" where "experts come to different conclusions based on contested sets of facts:"

> "[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable ... The evidentiary requirement of reliability is lower than the merits standard of correctness." Advisory Committee Note to the 2000 amendment to Rule 702, quoting <u>In re Paoli R.R. Yard PCB Litigation</u>, 35 F.3d 717, 744 (3d Cir. 1994).

Fed. R. Evid. 702 Advisory Committee Notes to the 2023 amendment.

## B.  <u>Rule 702 and Class Certification</u>

The parties disagree as to whether a "full <u>Daubert</u> analysis" is necessary in the context of a class certification motion. Plaintiffs argue that I should apply a "less stringent" analysis, because "an exhaustive and conclusive <u>Daubert</u> inquiry" cannot be reconciled with the "inherently preliminary nature" of class certification rulings. Doc. 204 at 9 (quoting <u>In re Zurn Pex Plumbing Prod. Liab. Litig.</u>, 644 F.3d 604, 613 (8th Cir. 2011)).

Whether a court must undertake a <u>Daubert</u> analysis at the class certification stage is somewhat unsettled. <u>See</u> <u>Hicks v. State Farm Fire & Cas. Co.</u>, 965 F.3d 452, 465 (6th Cir. 2000) (collecting cases). However, the majority of courts of appeals that have considered the question have concluded that, if "challenged expert testimony is material to a class certification motion, the district court must demonstrate the expert's credibility under <u>Daubert</u>." <u>In re Nissan N. Am., Inc. Litig.</u>, 122 F.4th 239, 253 (6th Cir. 2024). <u>See</u> <u>also</u> <u>Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.</u>, 99 F.4th 770, 774 (5th Cir. 2024); <u>In re Blood Reagents Antitrust Litigation</u>, 783 F.3d 183, 187 (3d Cir. 2015); <u>Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.</u>, 762 F.3d 1248, 1258 n.7 (11th Cir. 2014); <u>Am. Honda Motor Co. v. Allen</u>, 600 F.3d 813, 816 (7th Cir. 2010). <u>But</u> <u>see</u> <u>Sali v. Corona Reg'l Med. Ctr.</u>, 909 F.3d 996, 1005 (9th Cir. 2018) ("[A] district court is not limited to considering only admissible evidence in evaluating whether Rule 23's requirements are met."); <u>In re Zurn Pex Plumbing Prods. Liab. Litig.</u>, 644 F.3d at 612 (reaffirming prior ruling that "explicitly rejected a request for a full <u>Daubert</u> inquiry at the class certification stage" (internal citations omitted)).

The Court of Appeals for the First Circuit has yet to directly confront the issue in the context of Rule 702. However, recent dicta suggest our circuit would likely join the majority of circuits in concluding that expert testimony

must be admissible to be relied upon in the class certification context. In <u>In re Asacol Antitrust Litig.</u>, 907 F.3d 42, 53 (1st Cir. 2018), the court rejected the use of inadmissible hearsay evidence to prove injury-in-fact at the class certification stage, reasoning that "[t]he fact that plaintiffs seek class certification provides no occasion for jettisoning the rules of evidence and procedure, the Seventh Amendment, or the dictate of the Rules Enabling Act, 28 U.S.C. § 2072(b)." (citing <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 557 U.S. 442, 458 (2016) (Evidence may not be used in a class action to give "plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action.")). While <u>Asacol</u> does not directly confront the applicability of Rule 702 in the class certification context, it does imply that expert testimony must satisfy Rule 702's requirements to be admissible at class certification. Accordingly, I find that a full <u>Daubert</u> assessment is appropriate here.

## II.    <u>ANALYSIS</u>

In their motion for class certification, plaintiffs rely upon the testimony of four individuals: Dr. Bryan Victor, Tracey Feild, Daryl Chansuthus, and Dr. Theodore Cross, all of whom have submitted multiple expert reports outlining their backgrounds and opinions. Defendants challenge their testimony on multiple grounds. I evaluate in turn plaintiffs' experts for

compliance with Rule 702, address defendants' challenges to their testimony, and explain why those challenges are ultimately unpersuasive.

## A.    **Dr. Bryan Victor**

Defendants have moved to exclude the opinion and testimony of Dr. Bryan Victor, plaintiffs' data analysis expert. Dr. Victor is an assistant professor at the School of Social Work at Wayne State University, previously served on the faculty of the School of Social Work at Indiana University, and was a postdoctoral research fellow at University of Michigan. Dr. Victor specializes in the utilization of data science methods and administrative records research to inform decision-making in child welfare practices. He has led multiple research projects in the child welfare field, and authored several peer-reviewed and published articles, including on data science and research methods relating to foster care. Dr. Victor has a doctorate in social work from Wayne State University, and received a master's degree in social work from University of Michigan.

Again, I address only those arguments by defendants concerning the opinions of Dr. Victor upon which I relied in granting plaintiffs' class certification motion. Those opinions are as follows:

- 135 adolescent foster children suffer from a per se disability. Doc. 342 at 19.

- 104 adolescent foster children with a per se disability (77 percent) experienced at least one congregate care placement. Id.

- The median length of time spent by adolescent foster children in congregate care is 16 months. Id. at 32.

- The average cumulative time spent by adolescent foster children in congregate care is two and a half years. Id.

- Over half of adolescent foster children lacked a case plan dated within the 15-month Period Under Review. Id. at 26.

- Approximately three quarters of adolescent foster children lacked a transition plan dated within the 15-month Period Under Review. Id.

- Of those adolescent foster children who had initial case or transition plans developed:

  o Three percent had an update made to their case plan every seven months;

  o Twelve percent had updates made to their transition plans every 13 months;

  o Twenty-seven percent had an update made to their case plan following a change in placement; and

  o Seven percent had an update made to their transition plan following a change in placement.

Doc. 342 at 26-27.

The opinions upon which I relied are set forth in Dr. Victor's first and supplemental declarations. Accordingly, a brief summary of Dr. Victor's methodologies with respect to those declarations follows.

For purposes of his first supplemental declaration, Dr. Victor analyzed data produced by the defendants in June, 2023,[2] which reflects the placement and custodial histories of youth aged 14 through 17 who are in the legal custody, or under the protective supervision of DCYF (collectively, "Older Foster Youth"). Dr. Victor attached as an exhibit to his declaration several pages of the computer code he utilized to generate his analyses, written in the programming language R. Doc. 281-10. In an early declaration, Dr. Victor explains that R is "an open-source statistical software program commonly used by social science researchers." Doc. 152-15, at ¶ 11.

For purposes of his second supplemental declaration, Dr. Victor analyzed the case files of approximately 184 Older Foster Youth who were identified by defendants as potential class members in December, 2022. Dr. Victor's case planning analysis was focused within a counsel-specified time period, from September 10, 2021, to December 1, 2022 ("Period Under Review" or "PUR").[3] Using a set of structured search terms provided by

---

[2]    The data was produced by the defendants following Dr. Victor's submission of his original declaration in support of plaintiff's motion for class certification.

[3]    The 15-month Period Under Review spanned from September 2021, when the defendants began using their current case planning template, to December 2022, when the defendants began production of the putative class members' case files. Doc. 279 at 27 n.52.

plaintiffs' counsel, Dr. Victor conducted searches within the case file management system, and then reviewed files returned by each search to determine whether the document identified was, in fact, a case planning form. Dr. Victor cross-referenced those results with the custody and placement data provided by defendants in June, 2023, to determine each Older Foster Youth's length of time in DCYF custody during the Period Under Review, as well as the number of changes in placement that youth had experienced during the relevant time period. See Doc. 281-12 at ¶¶ 6-8. From that analysis, Dr. Victor was able to determine the percentage of Older Foster Youth who had received case planning forms and case planning updates within the Period Under Review. See id., at ¶ 1.

Defendants do not contest Dr. Victor's qualifications to opine as a child welfare data expert. Instead, they argue that several of his opinions should be stricken either because they are not helpful (although defendants argue that those opinions are not relevant), or because the opinions rest on faulty assumptions and are unreliable. However, I find that plaintiffs have demonstrated by a preponderance of the evidence that Dr. Victor's testimony is helpful, and that his opinions are the product of a reliable methodology. As set forth herein, defendants' challenges to the testimony of Dr. Victor do not warrant exclusion.

13

1.    <u>Helpfulness</u>

Defendants' arguments concerning the "helpfulness" of Dr. Victor's opinion are directed to his placement data analysis. Defendants admit that they "do not quarrel" with Dr. Victor's math. Doc. 326 at 18. Instead, they argue that Dr. Victor's testimony should be excluded, because it "provides no narrative discussion of the data, but simply presents the results of his math." Doc. 326 at 10. According to defendants, Dr. Victor's testimony concerning placement data is neither helpful nor relevant because it does not "explain the utility (or lack thereof) of any particular analysis." <u>Id.</u> at 18.

"[E]xpert testimony is admissible if it will simply assist the trier of fact to understand the facts already in the record." <u>Total Control, Inc. v. Danaher Corp.</u>, 338 F. Supp. 2d 566, 570 (E.D. Pa. 2004). And, Dr. Victor's testimony easily clears that hurdle. He analyzed DCYF child welfare records and data concerning youth placement and custodial histories that had been produced by defendants in at least four separate data sets, and which ultimately comprised thousands of data points. <u>See</u> Doc. 336 at 8. The records and data that Dr. Victor reviewed and synthesized reflect class members' various lengths of stay in custodial care, the frequency of their stays in custodial care, and a panoply of other information concerning class members' experiences in DCYF custody. Thus, the utility of Dr. Victor's analysis is plain: he presents "a vast quantity of calculations derived from disparate sources in an

understandable format." <u>Total Control, Inc.</u>, 338 F. Supp. 2d at 569. <u>See also</u>

<u>Gen. Elec. Cap. Bus. Asset Funding Corp. v. S.A.S.E. Mil. Ltd.</u>, No. CIV. SA-

03-CA-189-RF, 2004 WL 5495588, at *5 (W.D. Tex. Oct. 6, 2004) (Given

"complexity and cumbersome nature" of data and documentation, expert's

"compilation of this information and documentation into a presentable format

is helpful in that it will assist the trier of fact to understand the evidence")

(internal quotations omitted). Defendants' arguments that Dr. Victor's

testimony is not helpful are unpersuasive.

  2. <u>Reliability: Placement Data</u>

  Defendants complain that Dr. Victor's methodology is not reliable

because he failed to consider certain factors in his analysis, such as whether

residential stays for Older Foster Youth were correlated with factors other

than mental impairment, or the existence of meaningful variations between

DCYF district offices in average duration of residential stays. But, as our

court of appeals has explained:

> Rule 702 does not demand that experts rely on all data that could
> be deemed relevant. It does not even require the expert to seek out
> the best possible source of relevant information. "Sufficien[cy]" is
> the benchmark for an expert's data under the Rule. Fed. R. Evid.
> 702(b); <u>see</u> 29 Charles Alan Wright & Arthur R. Miller, <u>Federal
> Practice and Procedure</u> § 6268 (2d ed. 2017) (explaining that "the
> word 'sufficient' in Rule 702 signifies that the expert may properly
> base her opinion on something less than all the pertinent facts or
> data" and, as a result, "sufficiency is not a matter of whether the
> judge believes in the facts or data on which the expert relies").

Lawes, 963 F.3d at 101 (finding that district court erred by holding expert's data to a "more stringent standard" than required). Because I find that plaintiffs have established that Dr. Victor's testimony on placement data is sufficiently reliable to be admitted, defendants' objections to Dr. Victor's testimony in this regard go to weight, not admissibility. See id., at 102 ("Even if the factual underpinnings of [the expert's] opinions could be viewed as weaker than they would have been had he considered the data the court focused on, 'that was a matter affecting the weight and credibility of [his] testimony,' not its admissibility."(quoting Payton v. Abbott Labs, 780 F.2d 147, 156 (1st Cir. 1985) (further citations omitted)); see also Currier v. United Techs. Corp., 213 F.R.D. 87, 88 (D. Me. 2003) ("Defendant has not challenged the algorithms themselves, but only [expert's] apparent failure to consider factors other than age or how such factors may correlate to termination. This concern goes to weight, not admissibility."). Defendants are, of course, free to ask their own data expert to consider the factors that they contend Dr. Victor's analysis omitted.

Defendants' contention that Dr. Victor's analysis is unreliable because the data he considered does not reflect DCYF's current practices also does not require that his testimony be stricken. See, e.g., SonicSolutions Algae Control, LLC v. Diversified Power Int'l, LLC, 722 F. Supp. 3d 16, 47–48 (D. Mass. 2024) ("Defendants' disagreements with [expert's] methodology focus

16

on his use of certain underlying data without considering other potentially relevant data. These are arguments for the jury to consider when deliberating on the weight due [expert]'s opinion.") (citations omitted). As plaintiffs correctly point out, Dr. Victor utilized the most recent data that defendants have provided. And, defendants have not submitted compelling data or analysis by their own expert that suggests Dr. Victor's analyses are no longer reliable.

3.    <u>Reliability: Case Planning Analysis</u>

Defendants argue that the methodology utilized by Dr. Victor in his case planning analysis is unreliable for several different reasons. First, they contend that Dr. Victor's analysis was dictated entirely by counsel, with Dr. Victor providing limited-to-no input. Defendants say that Dr. Victor's counsel-driven analysis is "premised entirely on assumptions about when case plans must be developed and updated under federal law," assumptions that are "generally wrong." Doc. 326 at 11.

Dr. Victor's declaration is transparent concerning his reliance on the assumptions that plaintiffs' counsel provided, and, as several courts have stated, "reliance on assumptions provided by counsel or other experts is not a bar to testimony." <u>United States ex rel. Jordan v. Northrop Grumman Corp.</u>, No. CV 95-2985 ABC (EX), 2003 WL 27366224, at *6 (C.D. Cal. Jan. 6, 2003) (stating same) (citing <u>United States v. Soulard</u>, 730 F.2d 1292, 1299 (9th Cir.

1984)); accord Raab v. Wendel, No. 16-cv-1396, 2017 WL 7371180, at *3 (E.D. Wis. Dec. 18, 2017) ("The use of counsel-provided assumptions is generally an appropriate and efficient means of narrowing the scope of the expert's analysis."); ORP Surgical, LLP v. Howmedica Osteonics Corp., No. 20-cv-01450, 2021 WL 5280192, at *6 (D. Colo. Nov. 12, 2021) ("It is neither surprising nor a ground for exclusion of [an expert's testimony] testimony that [she] relied on or assumed the truth of information provided by [...] counsel."); SiteLock LLC v. GoDaddy.com LLC, 562 F. Supp. 3d 283, 329 (D. Ariz. 2022) ("[R]eliance on assumptions provided by counsel ... is not a bar to [his] testimony. As [expert] is serving as a damages expert for [plaintiff], it would be incongruous for [expert] to assume a set of facts in conflict with [plaintiff's] case." (quoting United States v. Pac. Health Corp., CV 12-00960-RSWL-AJWx, 2018 WL 1026361, *4 (C.D. Cal. 2018)).

Dr. Victor does not purport to be an expert on case planning requirements. Nor does Dr. Victor purport to opine on case planning requirements. Instead, Dr. Victor analyzed data contained in DCYF case files to determine when and how frequently case plans were developed and updated during a specific time period. His declaration does not render an opinion as to when case plans must be developed, or how frequently they must be updated. As Dr. Victor succinctly explained, "I am not representing

anything other than the numbers that would be achieved by using the

methodology" described in his declaration. Doc. 326-1 at 218:24-219:3.

Dr. Victor further testified that he did rely on the assumptions and

instructions plaintiffs' counsel provided to shape his methodology, but had he

designed the study himself, he would be "very likely" to utilize the same

methodology. Id. at 226:12-23. He stated:

> Well, you have asked me . . . about what my strategy would be for
> identifying files across thousands and thousands and thousands
> and thousands of pages. And so, in that case it would be fairly
> standard within social science research to use a text-based
> detection approach and within our profession to, of course, note all
> the limitations that may come with that. But if I was tasked with
> a similar – if I was to do something similarly in a research study,
> I would use a text-based approach and have done that as I noted
> in other studies.

Id. at 227:5-18.[4] For all those reasons, defendants' argument that Dr.

Victor's opinions are merely a conduit for the opinions of counsel is not

persuasive.

Defendants also argue that Dr. Victor's opinions are unreliable because

the case planning assumptions upon which his analysis relies are, in their

view, wrong. But defendants' disagreements with the case planning

---

[4]    Plaintiffs' case-planning expert, Daryl Chansuthus, also testified that
Dr. Victor's methodology was "consistent with the methodology [she] would
use," and that she had no concerns with "the methodology that Dr. Victor
used in terms of its reliability to identify case plans." Doc. 326-15 at 93:17-23,
96:11-15.

assumptions that underlie Dr. Victor's analysis do not render his testimony inadmissible. "Experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence." Richman v. Sheahan, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006); accord ActiveVideo Networks, Inc. v. Verizon Comm., Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("At their core, however, [defendant's] disagreements are with the conclusions reached by [plaintiff's] expert and the factual assumptions and considerations underlying those conclusions, not his methodology. These disagreements go to the weight to be afforded the testimony and not its admissibility.") (internal citation omitted)); see also Synergetics, Inc. v. Hurst, 477 F.3d 949, 956 (8th Cir. 2007) ("Appellants' mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony.") (internal citations omitted)); cf., Toucet v. Mar. Overseas Corp., 991 F.2d 5, 10 (1st Cir. 1993) ("Federal Rules of Evidence 703 and 705 place the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination.") (internal quotations omitted).

Defendants next object to what they characterize as a "significant error rate" in Dr. Victor's analysis, which, they argue, renders his methodology unreliable. They submit evidence that Dr. Victor's search of the case files failed to identify at least twelve case plans dated within the Period Under

Review. They also contend that, as a result of an oversight by plaintiffs' counsel, an additional thirteen case files were not searched by Dr. Victor at all. In response, plaintiffs argue that defendants fail to sufficiently explain how those errors would materially bias the results Dr. Victor reached with respect to the 184 case files that <u>were</u> searched, or how the twelve omitted case plans undermine Dr. Victor's overall conclusions that the majority of Older Foster Youth lacked a case plan dated during the PUR.

First, defendants have not conducted their own independent analysis into the case planning data, and so it is unclear whether the errors they have identified in Dr. Victor's analysis are a function of the multiple discovery issues that have arisen in this action; a result of the parties' failure to adequately communicate concerning the case files at issue; or an issue that does relate to the reliability of Dr. Victor's methodology. Assuming the latter for purposes of the present motion, the "general rule is that an expert's minor computational errors go to the weight of his testimony, rather than to its admissibility." <u>Bartlett v. Mut. Pharm. Co.</u>, 742 F. Supp. 2d 182, 196 (D.N.H. 2010) (citing <u>In re Scrap Metal Antitrust Litig.</u>, 527 F.3d 517, 530 (6th Cir. 2008) and <u>In re Pharm. Indus. Avg. Wholesale Price Litig.</u>, 582 F.3d 156, 198 (1st Cir. 2009) (affirming admission of expert's testimony, even if he made "small" errors, because they did not affect "the reliability of his damages calculation")).

I previously addressed defendants' arguments concerning Dr. Victor's error rate in my class certification order. I explained the weight that I gave Dr. Victor's testimony, noting that, even assuming that Dr. Victor's calculation was off by a few percentage points, the evidence was sufficient to demonstrate that more than half of adolescent foster youth lacked a case plan dated within the 15-month Period Under Review. Thus, I took into account defendants' argument concerning Dr. Victor's error rate when considering his case planning opinion and weighted it accordingly. Nothing more need be said.

Finally, defendants argue that Dr. Victor's analysis is unreliable because he did not take into account certain information defendants say he ought to have considered. For example, defendants complain that Dr. Victor should have distinguished between youth based on the amount of time spent in DCYF's care. They further contend that Dr. Victor's analysis does not account for children with case plans in place prior to September, 2021, or take into account improvements in defendants' case planning practices over time. But, as discussed above, none of those objections undermine the reliability of the methodology utilized by Dr. Victor, nor do they warrant striking his declaration in its entirety. See Collision Comms., Inc. v. Nokia Sols. & Networks OY, 691 F. Supp. 3d 360, 367 (D.N.H. 2023) ("To the extent [defendant] wishes to argue that [plaintiff's expert] incorrectly weighed

certain sources of information over others in reaching his opinion, it is a matter for cross-examination and presentation of contrary evidence, not exclusion."). Defendants, of course, are free to ask their own data expert to conduct an analysis of any data that they claim was omitted by Dr. Victor.

In sum, plaintiffs have sufficiently established the reliability of Dr. Victor's methodology, and the helpfulness of his testimony. Defendants' criticisms of Dr. Victor's testimony are appropriate subjects for cross-examination, but they do not convince me that his opinions are so unreliable that they must be stricken from evidence.

## B.    Dr. Theodore Cross

Defendants have moved to exclude the opinion and testimony of Dr. Theodore Cross, a child psychologist and professor of social work. Dr. Cross is a senior research specialist and research professor at the University of Illinois at Urbana-Champaign, School of the Social Work. He is a licensed psychologist, who holds a Ph.D. and M.A. in Clinical Psychology from Boston University and an A.B. in Psychology from Harvard College. Dr. Cross provided clinical services for nearly thirty years, and child and adult psychotherapy for twenty-seven years. He has written extensively in the field of children's mental health systems of care, regarding, inter alia, access to mental health services for children in out-of-home care, the instability of

placements for children in out-of-home care; and the frequency and severity of emotional and behavioral problems in out-of-home care.

Dr. Cross was asked by plaintiffs to assess whether the named plaintiffs in this action: (1) have a mental impairment that substantially limits a major life activity; (2) are appropriate for community-based living; (3) could have spent less time in, or avoided, congregate care if they had had access to needed community-based placements and services; (4) have an interest in community living; and (5) when not in congregate care, were at serious risk of being placed unnecessarily therein.

I relied on the following opinions of Dr. Cross in granting plaintiffs' motion for class certification:

- The "standard of care for kids with mental impairment[s] is to provide care in a community-based setting" which can be applied for "the vast majority of youth." Doc. 342 at 20 (quoting Doc. 180-1 at 28-29).

- Residential treatment should be used for "very rare" circumstances where the "child's safety and the safety of others are in question." Id. at 20 (quoting Doc. 322-8 at 13).

- Children are at serious risk of unnecessary placement in congregate care if they meet one of five criteria:

  > (1) the child has clinically significant emotional or behavioral problems; (2) the child's behavior was a factor for initial placement in out-of-home care; (3) the child's behavior resulted in a placement disruption after 50 days in foster care; (4) the child returned to foster care after exit; or (5) the child was previously placed in congregate care or an inpatient psychiatric care facility.

24

Id. at 20 (quoting Doc. 154-2 at 6).

- The "vast majority" of foster children are likely to have a mental health diagnosis that impacts "a major life activity." Id. at 21-22 (quoting Doc. 180-1 at 50, 57-58).

Defendants argue that: (1) Dr. Cross is not qualified to offer the opinions he provides; and (2) the opinions he provides are unreliable. They do not contest his testimony's helpfulness to the trier of fact.

    1.    <u>Dr. Cross's Qualifications</u>

Defendants argue that Cross is not qualified to testify concerning New Hampshire's use of residential treatment programs because he is not experienced in treating older youth with mental health diagnoses, children placed in foster care, or children placed in congregate care. They also note that Dr. Cross struggled during his deposition to identify and describe prior research he had conducted that assessed mental and behavioral health services for children in foster care. Plaintiffs respond that Dr. Cross has three decades of clinical experience treating individuals with mental and behavioral health needs. They also point out that he has accumulated extensive knowledge of youth psychology (particularly as it relates to child-welfare systems) through his research, including several co-authored articles addressing issues that are directly relevant to the case.

I find that Dr. Cross is well-qualified to render the opinions I relied on in certifying the plaintiffs' class. While Dr. Cross is an experienced clinician,

<u>see</u> Doc.180-1 at 223:7-225:15, his academic and research experience are particularly important. For example, Dr. Cross is currently engaged in a multi-year evaluation of an Illinois-based pilot project that concerns community-based mental health care for children. In the past, he worked on several projects regarding the evaluation of and response to the effects of trauma on children, and conducted research that examined subsidized guardianships as an alternative for finding permanent homes for children in foster care. <u>See</u> Doc. 152-7. Notably, Dr. Cross was the principal investigator in a 2017 court-mandated study funded by the Illinois Department of Children and Family Services (DCFS), that examined the well-being of children involved with that system, collecting data on the physical health, behavioral health, and cognitive development of 700 children in DCFS care. <u>Id.</u> Finally, Dr. Cross has published extensively on child welfare, including research on access to mental health services for children in foster care, reasons for instability of foster care placements, outcomes in specialized foster care, and the frequency and severity of emotional and behavioral problems associated with youth in out-of-home care. <u>Id.</u>

　　To the extent that defendants contend that Dr. Cross is unqualified to serve as an expert because he has not treated Older Foster Youth in clinical practice, our court of appeals has stated that "expert witnesses need not have overly specialized knowledge to offer opinions." <u>Levin</u>, 459 F.3d at 78.

Because I find that plaintiffs have sufficiently established that Dr. Cross is qualified to testify, defendants' criticisms concerning the depth of his expertise in this specialized area go to the weight of his testimony, not admissibility. See, e.g., United States v. Wen Chyu Liu, 716 F.3d 159, 168 (5th Cir. 2013) ("[A] lack of specialization does not affect the admissibility of the opinion, but only its weight.").[5]

Defendants also argue that Dr. Cross is unqualified to opine because he did not substantially participate in the preparation of his reports. In support of that argument, defendants contend that, during deposition, Dr. Cross refused to confirm that he drafted his expert report, and would only state that it was based on his "judgment," and "reflect[s]" his opinion and "input." Doc. 221 at 9.

"Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing reports," and, in some complex cases, "this assistance

---

[5]     For similar reasons, defendants' argument that Dr. Cross's opinion should be excluded because he is not well-versed in New Hampshire's residential treatment programs, specifically, is unpersuasive. See Cohen v. Bos. Sci. Corp., No. 20-cv-00943-PB, 2024 WL 1287648, at *7 (D.N.H. Mar. 26, 2024) ("While [expert's] lack of experience with similar lasers may impact the weight a jury ultimately assigns to his opinion, it does not render his opinion inadmissible in light of his academic credentials and other relevant experience.") (citing Anderson v. Raymond Corp., 61 F.4th 505, 509 (7th Cir. 2023) (noting that "[a]n expert's specialization or lack thereof typically goes to the weight to be placed on her opinion, not its admissibility") (cleaned up)).

may be needed." <u>Bartlett</u>, 742 F. Supp. 2d at 197 (quoting Fed. R. Civ. P.

26(a)(2)(B) advisory committee's notes to the 1993 amendment). However, an

expert's report "must be based on the expert's prior substantive input, must

reflect the testimony to be given by the witness, and must be signed by the

witness." <u>Id.</u> (internal citations omitted).

Dr. Cross's report satisfies those requirements. Cross testified that,

while his report was prepared "in collaboration with counsel," he was

"responsible for the information" in his declarations, that the report "entirely

reflects [his opinion]," and that counsel only "helped [him] organize and put

together the document." Doc. 180-1 at 50:11-24, 59:6-9. Dr. Cross further

testified that, in preparing his reports, he personally reviewed the named

plaintiffs' case files, each comprising hundreds of pages, and consulted

several reports and articles that discuss characteristics or experiences likely

to increase a youth's risk of being unnecessarily placed in congregate care.

<u>See</u> Doc. 154-2 at n. 5. Thus, the record sufficiently establishes that Dr. Cross

was involved in the drafting of his report, and that the conclusions he states

are his own, based on his personal knowledge.

Defendants are, of course, free to pursue their theory that Dr. Cross did

not substantially participate in the drafting of his report on cross-

examination, but their challenge does not justify exclusion of his report at

this juncture.

2.    <u>Reliability</u>

As I noted above, Dr. Cross was asked to assess: (1) whether each named plaintiff suffered from a mental impairment that substantially limits a major life activity; (2) the suitability of the named plaintiff for community-based placements and service; and (3) whether the named plaintiff was at risk of being unnecessarily placed in congregate care. To complete that assessment, Dr. Cross and Daryl Chansuthus, in her capacity as plaintiffs' expert witness regarding case planning requirements and practices, developed and followed a three-part protocol to guide their review of plaintiffs' voluminous case files, each of which numbered hundreds of pages.

Chansuthus completed the first and second parts of the protocol, pursuant to which she gathered general information from the case files relating to, inter alia, treatment plans, placement history, and mental and behavioral health diagnosis. Dr. Cross completed the third part of the protocol: reviewing the information Chansuthus had compiled to evaluate the named plaintiffs' behavioral and mental health. To assist in his review, plaintiffs' counsel provided Dr. Cross with information regarding community-based services and placements available to New Hampshire youth in DCYF custody. Defendants challenge the reliability of these opinions on several grounds.

### a.    Memory at Deposition

Defendants question the reliability of Dr. Cross's methodology because, at deposition, he could not remember basic details about the process he used to review the case files, about the individual named plaintiffs, or about the conclusions he reached with respect to those plaintiffs. Doc. 326 at 42. However, courts addressing similar arguments have reasoned that an expert's inability to recall "from memory" certain details relating to their analysis "does not undermine the reliability" of that analysis. Medina v. United Christian Evangelistic Assn., No. 08-22111-CIV, 2009 WL 4030454, at *4 (S.D. Fla. Nov. 20, 2009). See also Natl. Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC, No. 13-CIV-80371, 2015 WL 11251759, at *14 (S.D. Fla. July 6, 2015) ("[Plaintiff] appears to operate under the assumption that, in order to be deemed reliable, an expert must possess copious notes and/or a flawless memory. No such standard exists under Daubert, and the argument that [the expert's] 'failing memory' renders him unreliable lacks merit and improperly invades the province of the jury."); Brown v. China Integrated Energy Inc., No. CV1102559BROPLAX, 2015 WL 12720322, at *5 (C.D. Cal. Feb. 17, 2015) (Expert's "years of experience in both consulting and academics on the issues" "far overshadow the importance of his ability to remember specific details during his deposition."). I see no reason to conclude

differently here, and find that Dr. Cross's inability to remember certain details does not necessarily render his methodology unreliable.

### b. Case File Review

Defendants argue that Dr. Cross's methodology is unreliable because he only considered information contained within the named plaintiffs' case files in forming his opinion, instead of, for example, speaking directly with the named plaintiffs. Defendants' argument is unpersuasive, however, because several courts have found there is nothing inherently unreliable about a methodology comprised of case file review. See, e.g., Geyer v. NCL (Bahamas) Ltd., 203 F. Supp. 3d 1212, 1217 (S.D. Fla. 2016) (collecting cases) ("Relevant case law states the fact that a physician has not examined the plaintiff does not necessitate a finding that any such expert report or testimony offered by the physician is inadmissible under Daubert.") (cleaned up); see also Koen v. Monsanto Co., No. 1:22-CV-209-RP, 2024 WL 2948652, at *16 (W.D. Tex. June 11, 2024) ("It is the role of a retained expert physician to examine a patient's medical files and reach a conclusion about the diagnosis. There is nothing inherently unreliable about this method. To hold otherwise would be to exclude retained expert physicians as a category."); Russell v. Big V Feeds, Inc., No. 4:23-CV-622, 2024 WL 3848527, at *3 (E.D. Tex. Aug. 16, 2024) ("a retained expert physician's role is to examine a patient's medical files and reach a conclusion about the diagnosis. This

method is not inherently unreliable.") (cleaned up). Defendants' arguments to the contrary are not convincing, and are fodder for their cross-examination of Dr. Cross, not a basis for striking his testimony.

### c.    Applicable Standards of Care

Defendants argue for exclusion of Dr. Cross's testimony because they disagree with the standards of care he utilized. Specifically, defendants take issue with Dr. Cross's opinions as to: (1) when congregate care placements are appropriate for Older Foster Youth; and (2) which criteria place Older Foster Youth at risk for unnecessary placement in congregate care.

#### i.    Appropriate Placement in Congregate Care

Dr. Cross opines that the standard of care for Older Foster Youth with mental impairments is that care should be provided in a community-based setting (or, as he testified at deposition, that "youth should be served in community-based placements with community-based services," Doc. 180-1 at 226:9-11). According to Dr. Cross, Older Foster Youth should be placed in congregate care only in very limited circumstances.

Defendants argue that Dr. Cross's position is extreme and inconsistent with the perspective of the majority of policymakers and other stakeholders in the field. Their argument, though, is largely premised on a mischaracterization of Dr. Cross's opinion: contrary to defendants' assertions, Dr. Cross did not opine that placement in congregate care was "never"

appropriate. Doc. 176-1 at 6, 8. Instead, he testified that congregate care <u>was</u> appropriate in instances where "a child's safety and the safety of others are in question," Doc. 326-21 at 40:25-41:4, and he conceded that "[i]n rare cases" residential placements "could be an appropriate intervention for brief periods." <u>Id.</u> at 44:3-4.

More critically, however, defendants do not demonstrate that Dr. Cross reached his conclusions regarding the standard he utilized in an unsound or unreliable manner. Dr. Cross explained his reasoning underlying utilization of the community-based standard of care at deposition, stating:

> [S]ubstantial information in the field [ . . .] indicates that there are a range of interventions that could be helpful for kids that are alternatives to placement in congregate care and provide for their needs; and, in doing so, place them in less restrictive settings that allow them more rights, that allow them a greater ability to develop as normal adolescents, and promote their well-being.

Doc. 180-1 at 226:14-22. Dr. Cross was able to list three researchers "off the top of [his] head" who have expressed a similar standard, which suggests that the standard he applied is not so far outside the mainstream as defendants suggest.[6] Doc. 180-1 at 227:7-13. Taking into account Dr. Cross's years of

---

[6]    Moreover, the standard of care that Dr. Cross utilized is substantially similar to the view espoused by plaintiffs' child welfare systems management expert, Tracey Feild. She opines: "child welfare and medical professionals alike view congregate care facilities as targeted emergency interventions that offer short-term stabilization reserved for a small subset of children with the most serious and acute mental impairments." Doc. 154-3 at ¶ 24.

practice, his familiarity with and experience in the child welfare field, and his extensive academic and research background relating to child welfare, I am satisfied that his opinions were reached in a sufficiently reliable manner.

ii.    Standard of Care: Risk of Unnecessary Placement

Defendants also argue that Dr. Cross's opinions regarding the five criteria that place Older Foster Youth at serious risk of unnecessary placement in congregate care are not reliable. They say his opinions are based on outdated information that is not specific to New Hampshire. They also point out that the research upon which Dr. Cross relied does not necessarily suggest that future congregate care placements are unnecessary, but only supports a statistical correlation between the identified criteria and future congregate care placements.

Defendants' argument is unpersuasive because "Daubert does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." Ruiz-Troche, 161 F.3d at 85. "As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." Id. (cleaned up).

34

In reaching his opinion, Dr. Cross testified that he relied on his own extensive expertise in the field, and the secondary sources he cites in his report. He stated that he conducted a "literature review," or a "search for relevant studies in the body of research literature that – regarding research that has been done on this topic" that was "as exhaustive as I could make it [. . .] [using] multiple different search engines connected to the University of Illinois at Urbana-Champaign, as well as Google Scholar; and I may – I don't remember the specifics – I may have used other sources outside of that as well. For example, government sites that include references to literature." Doc. 180-1 at 182:23 -183:12. Dr. Cross testified that he relied only upon studies that he believed "were using sound methods." Id. at 215:18-19.

With respect to defendants' complaints that the criteria enumerated by Dr. Cross are not New Hampshire-specific, Dr. Cross directly and persuasively addressed that point during deposition:

> [The] studies [cited in footnote five of Dr. Cross's first declaration] were conducted in different communities in different settings. I think one of them actually used nation-wide data. So this would be a general inference that youth in general with these risk – I mean, what I'm inferring from these studies in multiple locations, one of them a national study, others in multiple locations across the U.S. – what I'm inferring is that these are general risk factors that would apply generally. And I – I think it's reasonable to interpret they would apply across the United States.

Doc. 180-1 at 189:8-19.

Dr. Cross's testimony sufficiently establishes that he relied on his knowledge and experience, as well as a panoply of peer-reviewed articles, in reaching his conclusion. While defendants' concerns regarding the conclusions reached by Dr. Cross are reasonable, those concerns do not sufficiently undermine the methodologically reliable manner by which Dr. Cross reached his conclusions.

As set forth herein, plaintiffs have sufficiently established the requirements for admissibility for the opinions of Dr. Cross upon which I relied in granting plaintiffs' class certification motion.

## C.   **Tracey Feild**

Defendants have moved to exclude the opinions and testimony of Tracey Feild, who was asked by plaintiffs to opine from a "child welfare systems management perspective" regarding New Hampshire's use of congregate care placements for children ages fourteen through seventeen in the custody or supervision of DCYF. Feild is well qualified to serve in that regard, with over thirty-six years of experience in the field.[7] She served as

---

[7]   Defendants do not meaningfully argue that Feild is unqualified to opine as an expert, beyond an offhand remark that Feild has no educational background in social work, psychology, psychiatry, or data analysis. To the extent that defendants are contesting Feild's qualifications, that argument is not persuasive, as Feild's decades of experience in the child welfare field render her well-qualified to opine in this matter.

the deputy director for program development for the Ohio Department of Human Resources, and as executive director for the Maryland Department of Human Resources Social Services Administration. She also served as vice president of East Coast Operations at the Institute for Human Services Management, where she "helped states across the country improve services for children and families, including child welfare services, through system reform initiatives, assessment processes, [and] program quality assurance and evaluation." Doc. 152-11 at ¶ 6.

Most recently, Feild was the director and manager of the Child Welfare Strategy Group for the Anne E. Casey Foundation, overseeing the Foundation's child welfare work in over twenty states. The Anne E. Casey Foundation is a philanthropic organization that works to improve child welfare systems through research, consulting, funding, and advocacy. In her capacity as director and manager of the Child Welfare Strategy Group, Feild "led initiatives to reduce and prevent the unnecessary use of congregate care facilities for older foster youth who could be served in family-based placements with supportive services, including mental health and behavioral health services." Doc. 152-11 at ¶ 4.

---

Defendants also do not contest that Feild's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

Feild submitted three declarations in support of plaintiffs' motion for class certification. In granting plaintiffs' motion for class certification, I relied only on information and conclusions set forth in her first and third declarations, and herein, I only address defendants' arguments concerning her testimony upon which I relied. That testimony is as follows:

- New Hampshire's use of congregate care is "higher than expected or appropriate" and most adolescent foster children with mental impairments can remain in the community with appropriate supports. Doc. 342 at 19 (quoting Doc. 154-3 at 9).

- Dr. Victor's statistical analysis of adolescent foster children placement data indicates an overreliance on congregate care. Id. at 32.

- Congregate care placements are appropriate only for "a small subset of children with the most serious and acute mental impairments," and it is highly unlikely that such a significant percentage of adolescent foster children in New Hampshire would fit within this "small subset." Id. at 19-20 (quoting Doc. 154-3 at 9).

- New Hampshire's unlicensed kin caregivers are ineligible to receive the foster care maintenance payments provided to licensed foster families and, instead, are only eligible for a "TANF child-only grant." Id. at 34 (quoting Doc. 277-2 at 12). TANF grant rates are too low to cover the cost of raising a child, which hinders kin's ability to serve as placements. Id. at 35. The State could remedy this problem by supplementing TANF rates or ensuring that all kin are licensed, but has not done so. Id.

- With regard to ISO foster care, there are approximately 82 ISO foster homes in the state, which is too few to meet the needs of all foster children. Doc. 342 at 36. Despite recent efforts to increase oversight of the child placing agencies contracted to recruit and train ISO foster homes, defendants have not meaningfully increased the supply of ISO foster care. Id.

- DCYF spent 92 percent of placement funds on congregate care. <u>Id.</u> at 37.

- DCYF paid an average of $7,317 per child in community-based placements, compared to $19,763 per child in congregate care placements. <u>Id.</u> at 37.

- Although congregate care is more expensive than community based placements, defendants' ratio of spending reflects disproportionate investment in congregate care. <u>Id.</u> at 37.

- Funding congregate care impacts adolescent foster children because, if more beds become available, they are likely to be filed by adolescent foster children. <u>Id.</u> at 39.

1.    <u>Reliability</u>

Because Feild's testimony is based on her knowledge and experience, its reliability – unlike scientific or technical testimony – does not depend upon a particular method or framework. <u>See</u> <u>Ji v. Bose Corp.</u>, 538 F. Supp. 2d 354, 357 (D. Mass. 2008) (<u>Daubert</u> factors for "evaluation of scientific experts" "do not always apply cleanly to non-scientific experts and the trial court's discretion in such matters is broad.") (citing <u>United States v. Mooney</u>, 315 F.3d 54, 62 (1st Cir. 2002)). Instead, the relevant inquiry "depends heavily" on Feild's "knowledge and experience," "rather than the methodology or theory behind it." <u>Hangarter v. Provident Life & Acc. Ins. Co.</u>, 373 F.3d 998, 1017 (9th Cir. 2004) (internal quotations omitted). <u>See also Ji</u>, 538 F. Supp.2d at 358 ("Within the realm of specialized knowledge, an expert's testimony is only admissible if the Court finds that it is reliable. In non-technical areas, long experience in a field can confer expertise upon a

witness.") (citing <u>Den Norske Bank AS v. First Nat'l Bank of Boston</u>, 75 F.3d 49, 57 (1st Cir. 1996)).

To render her opinions in this action, Feild reviewed thousands of documents and data relating to this case and to New Hampshire's child welfare system generally that she either requested from plaintiffs' counsel or located herself. The documents she reviewed include case filings, deposition testimony from DCYF employees and administrators, DCYF internal emails, DCYF's contracts with providers, defendants' interrogatory responses, and other documents produced by defendants concerning placements and services available for Older Foster Youth. Feild also reviewed state regulations, federal law and regulatory guidance, DCYF's official reports, operating procedure guidelines, and policy directives, and multiple academic publications. In short, Feild's review of background materials and information was wide-ranging and comprehensive.

Feild then relied on her several decades of experience in the child welfare field to opine on the practices that plaintiffs challenge here. <u>See, e.g.</u>, Doc. 277-2 at ¶ 6 ("During my 14 years at the Annie E. Casey Foundation, I managed a group of about 40 staff and consultants who worked with over 20 state and local child welfare agencies to, just as I have in this case, utilize data to diagnose problems in agency systems and design improved outcomes for children and families involved with those systems."). And, Feild's

testimony at deposition suggests that her experience while directing the

Annie E. Casey Foundation was substantially similar to her role as an

expert in this action. Feild testified that the Foundation provided free

assistance to state and local agencies and would deploy teams of staff and

consultants to assess state child welfare systems and "improve outcomes."

Doc. 178-5 at 17:16-18:16. As director, Feild participated in the Foundation's

"analytic activities," "reviewed the overall conclusions of [the Foundation's]

assessment processes, and helped staff think through how the data might be

used to – to basically identify what the most important catalytic mechanisms

might be for improving outcomes." <u>Id.</u> at 19:8-21. Feild stated that the

following were areas of focus for the Foundation, several of which are

directly relevant to the issues plaintiffs raise in this suit:

> [w]hat types of placements are you using; what levels of
> permanency are you achieving; are there populations you're
> serving poorly that can be identified; are there enough foster
> families; how are you doing with kinship care; are you overusing
> congregate care placements; how are your numbers regarding
> stability, placements with siblings, timely reviews, timely visits to
> families.

<u>Id.</u> at 18:17-19:7.

Feild's reliance on her experience in shaping her testimony is evident

throughout her declarations and deposition testimony. For example,

defendants argue that Feild improperly concluded that congregate care

placements exceeding a certain duration are unnecessary. But, in her first

declaration, Feild describes the history surrounding the use of congregate care facilities in the child welfare field, and discusses the harms that have come to be associated with those facilities, both of which support her utilization of that standard, And, at deposition, Feild testified that her utilization of that standard was based on her thirty-six years of experience "with providers, with state agencies, with clinicians, with child psychiatrist, with child development researchers, and specialists, and they all agree that at some point not only does a child not benefit more from more congregate care, it's actually detrimental to them." Doc. 178-5 at 97:23-98:6.

Indeed, throughout her deposition and in her declaration, Feild repeatedly explains that her conclusions are rooted in her experience. See, e.g., Doc. 277-2 at ¶ 6; Doc. 154-3 ("Based on published literature and my thirty-six years of experience working in the child welfare system, it is my opinion that most youth with mental impairments can and should remain in family-based placements with appropriate supports."); Doc. 178-5 at 109:24-110:23 (in response to question asking how her thirty-six years of experience has informed her opinion: "I've seen it work. I've seen systems develop-home based services. I've seen systems with lots of kids in congregate care do a review of the kids they have in congregate care and been able to immediately send home large portions of kids who have been in care. I've been a party to many meetings where public child welfare administrators have talked about

reducing the use of congregate care by, in fact, developing community-based services. . . . New Jersey has very few kids in congregate care settings. There's a county in Colorado who has no kids in congregate care settings. It's not because they don't have any kids with behavior problems, it's because they have made a commitment to keep kids out of congregate care and they figured out how to do it with home-based services. So there are amazing examples of kids who are being kept out of congregate care through the addition of home and family-based services. I've seen this across the country."); id. at 88:13-20 ("What I look at is children across the system. And having been involved in the system for 36 years, I can, sort of predict what kinds of percentages of kids are likely to be in residential and for how long. And I can see huge differences between New Hampshire and other states in terms of how long kids stay and the number of kids there."). See also Doc. 178-5 at 149:5-150:13, 153:1-9, 155:10-22, 156:21-157:10, 163:15-24, 167:21-168:9.

I am satisfied that Feild's knowledge of and experience in the child welfare provide a sufficient foundation of reliability for the opinions she proffers, and that Feild has sufficiently grounded those opinions upon which I rely in her specialized experience. As discussed below, defendants' arguments to the contrary are not persuasive.

### a.   Defendants' Objections Go to Weight, not Admissibility

Defendants make several arguments in support of their motion to exclude Feild's testimony. Primarily, they argue that Feild cherry-picks the data upon which she relies in reaching her conclusions, and that she failed to take into account certain information which, defendants say, she ought to have considered. For example, defendants say that Feild failed to analyze reasons why some Older Foster Youth might remain in congregate care for an extended period of time, or to account for variations in duration of their residential treatment stays. Similarly, defendants' object to Feild's conclusions regarding kinship placements and the state's disproportionate funding of congregate care because they contend Feild should have considered, inter alia, the state's recent efforts to increase kindship payments, increased kin-recruiting, and recent increased pay rates for community-based placements and services. But, as discussed, such an objection is not sufficient grounds for striking Feild's testimony in its entirety. It bears repeating that "Rule 702 does not demand that experts rely on all data that could be deemed relevant." <u>Lawes</u>, 963 F.3d at 101.

Defendants also object to Feild's conclusions that are based on her comparison of the duration of New Hampshire congregate care placements with the duration of placements of children in other states. According to defendants, Feild failed to provide a sufficient basis for using those other

states as comparators. I disagree and find that Feild sufficiently grounded

that comparison in her considerable experience in the child welfare field. She

testified:

> [A:]  I look across the system. I look at the pattern for all the kids,
> not for individual youth. But I know, having been in the field for
> many years and looked at this statistic across many states, that
> the length of stay in New Hampshire far surpasses what the
> average would be, what the good performers would be, and it
> doesn't make any sense to me. It's a red flag.
>
> Q:  So is your assessment of the length of stay in New
> Hampshire based solely on your comparison to the length of stay
> in other states?
>
> A:    And on my 36 years of experience in the field, yes.

Doc. 178-5 at 97:7-19. <u>See also</u> <u>id.</u> at 88:21-89:1 ("Kids don't vary that much

from state to state. So looking at the system as a whole and looking at the

percentage of kids who end up in residential, I think that it's clear to me that

New Hampshire places too many youth with mental impairments in

congregate care and for too long."). Because Feild applied her experience and

explained how she reached her conclusions, defendants' argument is

unpersuasive. <u>See</u> <u>United States v. Martinez-Armestica</u>, 846 F.3d 436, 444

(1st Cir. 2017) ("Often in fields based upon specialized knowledge rather than

scientific expertise, the expert's experience and training bear a strong

correlation to the reliability of the expert's testimony. Indeed, the Advisory

Committee on the 2000 amendments to the Federal Rules of Evidence noted

that in certain fields, <u>experience is the predominant, if not sole, basis for a great deal of reliable expert testimony</u>.") (cleaned up).

Finally, defendants quarrel with the data analysis that Feild utilized. But, in her second supplemental declaration, Feild explains that she is relying on what she contends is the "most reliable and valuable" of the data sets provided to the court during the class certification briefing process, the data set "representing youth aged 14-17 who were in DCYF custody through abuse or neglect proceedings as of April 26, 2022," which Feild refers to as "Updated Interrogatory 1.2 Longitudinal Data." Doc. 277-2 at ¶ 1. That data analysis was prepared by Dr. Victor. <u>Id.</u> at n.1.

Defendants argue that longitudinal data is "highly disfavored in child welfare reviews" because it "distorts and overstates measures such as the length of time in custody or residential care." Doc. 326 at 41.[8] However, Feild's declaration carefully and thoughtfully explains her rationale for relying on the Updated Interrogatory 1.2 Longitudinal Data, and why she chose to utilize longitudinal data instead of other data sets made available to her (specifically, the Clark Annual Count Dataset, and the Interrogatory 3.1 Exit Cohort Data). She states that the Updated Interrogatory 1.2

---

[8]    Defendants do not contend that the data upon which Feild relies is inaccurate.

Longitudinal Data best reflects the experience of children as they move through the foster care system. See Doc. 277-2 at ¶¶ 2-6, 10. According to Feild, Updated Interrogatory 1.2 Longitudinal Data is a "point in time" sample, which provides a "full chronology of placements for each youth [in DCYF custody] and represents their full experience within the foster care system up until May 12, 2023." Id. at ¶ 10.

Thus, Feild plausibly and reasonably explains her decision to utilize the Interrogatory 1.2 Longitudinal Data, and, as plaintiffs point out, Feild's decision to "elevate one data set over another is not grounds for exclusion." Doc. 204 at 26. "[P]roponents 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . The evidentiary requirement of reliability is lower than the merits standard of correctness.'" Fed. R. Evid. 702 advisory committee's notes on 2000 amendment (internal quotations omitted). Defendants' arguments for exclusion on this basis go toward weight, not admissibility, and their motion to exclude Feild's testimony on this basis is denied. See Lawes, 963 F.3d at 102 ("Even if the factual underpinnings of [expert's] opinions could be viewed as weaker than they would have been had he considered the data the [district] court focused on, that was a matter

affecting the weight and credibility of his testimony, not its admissibility.")
(cleaned up).

As set forth herein, plaintiffs have demonstrated by a preponderance of
the evidence that the opinions of Feild upon which I relied in granting
plaintiffs' class certification motion meet Rule 702's admissibility
requirements. Defendants' motion to exclude the testimony of Feild upon
which I relied has therefore been denied.

**D.    <u>Daryl Chansuthus</u>**

Defendants have moved to exclude the opinion and testimony of Daryl
Chansuthus, who was asked by plaintiffs to opine on defendants' child
welfare case management practices, including case planning and related
services, for child-welfare-involved children and families. <u>See</u> Doc. 154-1.
Chansuthus was also asked to review the files and Case Plans of each of the
named plaintiffs, and opine on compliance with federal mandates. <u>Id.</u>

Chansuthus has an M.S. in social work from the University of
Tennessee, and is currently the director of the College of Social Work Office of
Research and Public Service at the University of Tennessee, Knoxville. She
has held several positions with the Tennessee Department of Children's
Services, where she developed protocols to assess the agency's compliance
with federal case planning requirements. She has also served as the
executive director of the state-funded Tennessee Center for Child Welfare at

Tennessee State University, where she developed training for caseworkers on creating federally compliant case plans and practices. See Doc. 154-1, at ¶ 4.

In granting plaintiffs' motion for class certification, I relied on Chansuthus's opinions concerning the importance of case and transition plans for children in the foster care system; her identification of deficiencies in B.D.'s case plan, specifically; and her identification of deficiencies in defendants' case planning practices, generally, and address only defendants' arguments concerning that testimony. More specifically, I relied on the following opinions of Chansuthus in granting plaintiffs' motion for class certification:

- A child's case plan and transition plan together provide a "critical 'Roadmap'" that helps to "facilitat[e] the provision of timely, appropriate, and coordinated services and supports that promote positive outcomes for youth and families." Doc. 342 at 6 (quoting Doc. 154-1 at 5).

- Transition plans ensure that children who "age out" of the foster care system upon turning eighteen are adequately "prepared to live as independent young adults," despite lacking many of the ongoing support systems that benefit other children. Id. at 6 (quoting Doc. 154-1 at 6).

- B.D.'s case plan lacks several required components, and has not been updated over the course of B.D.'s time in DCYF custody. Id. at 10.

- The transition plan that B.D. received after turning fourteen is "formulaic, lacking any meaningful description of B.D.'s individual needs and goals" and fails to outline a concrete plan for achieving the goals described. Id. at 11 (quoting Doc. 310-4 at 8).

- Although DCYF has some "adolescent case workers" that receive specialized training on the needs of adolescents and the case planning requirements that attach once children turn fourteen, not all adolescent foster children are assigned to adolescent case workers, leaving many with case workers who lack such qualifications. Id. at 28-29 (quoting Doc. 280-2 at 2-3).

- DCYF does not require its case workers to engage in formal discussions or hold meetings with a child and their family when developing a case plan. Id. at 29.

- DCYF's case planning occurs through Bridges, an "aging legacy system which is over 23 years old" and in need of "replacement modernization." Id. at 29 (quoting Doc. 279-11 at 5). Bridges suffers from a number of deficiencies that can make case planning more difficult. Id. at 29.

Defendants have moved to exclude Chansuthus's testimony, arguing that (1) she is unqualified to render the opinions she offers, (2) her testimony is not helpful because it consists of largely impermissible legal conclusions; and (3) her testimony is unreliable. As set forth herein, none of those arguments are persuasive.

1.    Qualifications

Defendants' objection to Chansuthus's qualifications is premised on her purported lack of experience, as they argue she has never drafted a Title IV-E case plan for a foster child, or reviewed a case plan from any state other than Tennessee. Defendants concede that Chansuthus has "extensive experience in social work and child welfare, generally," but they argue that her experience has "largely not included" work specifically related to Title IV-E requirements for written case plans. Doc. 326 at 25.

Defendants' argument is unpersuasive. Chansuthus's qualifications in the child welfare system are extensive, with well over a decade of experience in the field. See Doc. 152-3. And, Chansuthus's deposition testimony sets forth her considerable experience as it specifically relates to case plans and federal case planning requirements. See Doc. 326-15, at 118-127, 128:20-129:25. For example, Chansuthus testified that she has received training on federal case planning requirements, see id., at 131:23-132:10, and, in her capacity as "the executive director for the Office of Performance Management Quality Improvement and as director for the Tennessee Center for Child Welfare," she drafted exemplary Title IV-E case plans. Id. at 132:24-133:21. In sum, plaintiffs have demonstrated by a preponderance of the evidence that Chansuthus is qualified on the basis of her experience and training to render opinions concerning case plans and case planning requirements. "Whether [Chansuthus's] credibility is affected by the extent or recency of [her] experience in a particular professional subfield is a matter properly reserved for the jury." Collision Comms., 691 F. Supp. 3d at 367.

2.    Helpfulness

Defendants argue that Chansuthus's opinions should be stricken as legal opinions regarding federal case planning requirements. Such opinions are generally not admissible, defendants say, and the "significant legal errors in Ms. Chansuthus's opinion" demonstrate that her conclusions are

unreliable. Doc. 326 at 22. Plaintiffs respond that Chansuthus's opinions

"concern Defendants' <u>factual compliance</u> with federal case planning

requirements," and that Chansuthus does not analyze federal law itself. Doc.

336 at 24 (emphasis in original).

      While Federal Rule of Evidence 704 provides that an expert's opinion is

"not objectionable just because it embraces an ultimate issue," expert

testimony on "purely legal issues is rarely admissible." <u>Nieves-Villanueva v.</u>

<u>Soto-Rivera</u>, 133 F.3d 92, 99 (1st Cir. 1997). Courts have reasoned that such

testimony is "not helpful to the jury and so does not fall within the literal

terms of [Rule] 702, which allows expert testimony '[i]f scientific, technical or

other specialized knowledge will assist the trier of fact to understand the

evidence or to determine a fact in issue....'" <u>Id.</u> at 100 (quoting Fed. R. Evid.

702).

      Our court of appeals has acknowledged that "it is often difficult to draw

the line between what are questions of law, what are questions of fact, and

what are mixed questions." <u>Id.</u> (internal citations omitted). "This may be

particularly so when [as here], the issues involve not only a statute and

formally promulgated regulations, but also guidelines, handbooks, advisory

rulings, interpretive bulletins, general counsel's letter opinions, informational

notices and similar accoutrements of the modern bureaucratic state." <u>Id.</u> And,

in <u>Nieves-Villanueva v. Soto-Rivera</u>, our court of appeals observed that it

could "hypothesize instances in rare, highly complex and technical matters where a trial judge, utilizing limited and controlled mechanisms . . . permits some testimony seemingly at variance with the general rule." Id. at 100-101.

The district court in Adams v. New England Scaffolding, Inc., No. CV 13-12629-FDS, 2015 WL 9412518, at *5-6 (D. Mass. Dec. 22, 2015), expounded on that point, noting:

> We live in a highly complex and often bureaucratic society with a multitude of legal and regulatory requirements; it is frequently the case that the acts or omissions of the parties, or their legal or contractual obligations, can only be fully understood in the context of a particular regulatory environment. Such a regulatory environment often needs to be explained to lay persons, and therefore expert testimony may be helpful to the jury to understand the issues in the case. [ . . . ]
>
> Where a regulatory requirement is ambiguous or unclear, expert testimony must be considered with some care. An expert's opinion that a particular action violated a regulation may be strict application of facts to law, or it may be, in form or in substance, an interpretation of an ambiguous or unclear law. The former, as a general matter, ought to be permitted; the latter is not. But the distinction between the two may be muddied or imprecise.

(citing Nieves-Villanueva, 133 F.3d at 100).

The law is clear, however, that an expert may opine about industry standards and practices. Pelletier v. Main St. Textiles, LP, 470 F.3d 48, 55 (1st Cir. 2006). See also Levin, 459 F.3d at 79 ("Expert testimony on industry standards is common fare in civil litigation.") (citations omitted). "Testimony from an expert that describes industry practices may incorporate the expert's

'understanding of the law,' but 'the expert cannot testify as to what the law requires.'" <u>Meadows at Mainstone Farm Condo. Tr. v. Strathmore Ins. Co.</u>, No. CV 16-12546-MBB, 2018 WL 4696745, at *15 (D. Mass. Sept. 28, 2018) (quoting <u>Bacchi v. Mass. Mut. Life Ins. Co.</u>, 2016 WL 1170958, at *3) (further citations omitted). <u>See also</u> <u>Adams</u>, 2015 WL 9412518, at *6 ("An expert cannot simply opine as to his or her view of a disputed point of law") (citation omitted). Thus, Chansuthus may testify concerning child welfare practice standards for case plans, but not as to what federal law requires.

The line between what constitutes testimony concerning industry practices and what constitutes testimony concerning what the law requires is somewhat murky, but on this point <u>Pelletier v. Main Street Textiles, LP</u>, 470 F.3d at 54-55, is instructive. In <u>Pelletier</u>, our court of appeals considered, <u>inter alia</u>, whether an expert should have been allowed to testify about the applicability of OSHA regulations to the defendants' conduct. <u>Id.</u> at 54. After noting the general rule "that it is the judge's role, not a witness's, to instruct the jury on the law, the court ruled that the district court had "acted well within its discretion in excluding expert testimony about the applicability of OSHA regulations" to defendants. <u>Id.</u> at 54. The court further explained that, because plaintiff had offered the testimony "to show what the regulations meant, not to show what he thought they meant," the testimony was properly excluded. <u>Id.</u> at 55.

Applying the law to the facts here, the majority of Chansuthus's testimony relates to whether the case files and documents she reviewed meet the standards of practice in her field, based on her considerable professional experience and training. For example, when asked the basis for her opinion that the disorganized and deficient case files she reviewed suggested a lack of effective supervision, Chansuthus testified: "It's based on good social work practice, standard social work practice. There are – the National Association of Social Work has standards for case management, standards for supervision. [. . .] And the workers at DCYF refer to themselves as child protection social workers. I would hold them to those standards of practice." Doc. 178-12 at 79:23-80:5. See also Doc. 326-15 at 26:8-13 (Q: So the federal regulations require that a case plan be jointly developed with a parent; is that correct? A: Yes, my understanding – my understanding of federal regulations, yes, and just generally child welfare practice.") (emphasis supplied); Id. at 38:2-20 ("Q: Is documentation of the child's involvement in developing the case plan an express federal requirement? . . . A: I would expect to see evidence of involvement in the plan itself. Q: You would expect to see that based on your experience? . . . A: I would expect to see it based on my experience, based on my understanding of the federal statute and based on my understanding of DCYF policy for case planning."). Chansuthus's testimony demonstrates that her opinions concerning the substantive

deficiencies she identifies in B.D.'s case and transition plans fall within this category, including her identification of missing Form 1552, as well as her observations concerning the lack of formal family involvement throughout the case planning process, and the supervisory deficiencies she identifies.

Other opinions Chansuthus renders are probably a closer call, especially because Chansuthus writes in her first declaration that she was asked to "review the files and Case Plans of the four Named Plaintiffs and opine on the compliance of these Case Plans with federal mandates." Doc. 154-1 at ¶ 1 (emphasis added). In other words, plaintiffs asked Chansuthus what federal law requires of case plans, and Chansuthus responded to that request. And, Chansuthus does opine as to what federal law requires. For example, in each of her declarations, she states that the CWA requires that case plans be updated every six months.[9] See Doc. 152-1 at ¶ 61; Doc. 279 at ¶ 24; Doc. 310-3 at ¶ 5. Defendants zealously (and repeatedly) dispute that federal law so requires. See, e.g., Doc. 326 at 18, Doc. 322 at 26-27. Again, "[e]xpert testimony proffered solely to establish the meaning of a law is

---

[9]    At deposition, Chansuthus modified her opinion slightly, clarifying that the CWA requires that case plans be "reviewed" every six months, and if, at that review "if things have changed significantly for a family, if things are not going well, if something is not working well, even if things are working well, but there is something else that could be included in the [case] plan that would make it go even better, the plan should be updated to reflect those changes." Doc. 326-15 at 59:4-62:9.

presumptively improper." <u>United States v. Mikutowicz</u>, 365 F.3d 65, 73 (1st Cir. 2004). However, given the complexity of the statutory and regulatory scheme at issue, an argument could be made that Chansuthus's testimony falls within the "rare, highly complex and technical" category described by the First Circuit in <u>Nieves-Villanueva</u>, 133 F.3d at 100-101.

Fortunately, I need not resolve the admissibility of the entirety of Chansuthus's testimony at this time. As discussed multiple times herein, this order addresses only those opinions of plaintiffs' experts upon which I relied in granting class certification. And, Chansuthus's testimony on these matters is based on her experience in the social work field, and constitutes her opinion regarding standard custom and practices in the industry, not her legal analysis of the relevant statutes and regulations. Furthermore, as I noted in my class certification order, for certification, B.D. only need demonstrate that defendants fail to regularly update case or transition plans, and engage in allegedly deficient case planning practices, consistent with plaintiffs' theory of the case. What the CWA legally requires is a question I will determine at a later point in the proceedings based upon my own understanding of what the law requires.

3.    <u>Reliability</u>

Finally, defendants argue that Chansuthus did not employ a reliable methodology in evaluating the plaintiffs' case files because she reviewed only

case files, and failed to look "beyond the four corners of the file." Doc. 176 at

34. That argument is not supported by the record.

Chansuthus reviewed planning requirements set forth in the CWA, and

its accompanying regulations, the policies and regulations of New

Hampshire's Department of Health and Human Services, and DCYF, as well

as several case-related documents provided by plaintiffs' attorneys, the

websites for DCYF and DHHS, and multiple articles relating to "assessment

in child welfare practice, case planning, trauma, child welfare system-

involved families, and planning for transition-aged youth." Doc. 154-1 at ¶¶

9-11; see also Doc. 152-4 (listing documents considered). In short, her review

of background materials was extensive. In forming her opinions, Chansuthus

also relied on DCYF emails, memoranda, assessments, and reports, as well as

Dr. Victor's data analysis regarding case planning, and she conducted a

"limited review of the existence and rate of case plans in the DCYF case files

of the 184 Older Foster Youth" who had been identified by DCYF as potential

class members. Doc. 279 at ¶ 8.

Based on her review, and her experience "working on Case Plans,"

Chansuthus developed a case file review instrument consisting of two parts:

(1) a questionnaire gathering descriptive information about the child, and

their time in DCYF care to be completed based on information contained

within the voluminous case files of the plaintiffs; and (2) a questionnaire

assessing compliance with federal requirements. Chansuthus testified that her case file instrument was developed based on her over twenty years of experience. Doc. 154-1 at ¶ 13. And, as plaintiffs point out, in "the child welfare context, courts have admitted expert testimony based on review of the named plaintiffs' case files for purposes of comparison against accepted professional standards." Doc. 204 at 36 (quoting Wyatt B. v. Kate Brown, No. 6:19-CV-00556-AA, 2022 WL 3445767, at *3 (D. Or. Aug. 17, 2022)). In sum, I find that the methodology employed by Chansuthus, which is based on her professional experience and training, sufficiently reliable for purposes of Federal Rule of Evidence 702.

Having so determined, defendants' remaining objections concerning Chansuthus's methodology, which relate to its applicability to class actions and Chansuthus's reliance on Dr. Victor's analysis, bear on weight, not admissibility. See Currier v. United Techs. Corp., 393 F.3d 246, 252 (1st Cir. 2004) ("[W]eakness in [an expert's] analysis [is] a matter of weight rather than admissibility and thus properly a subject of argument and jury judgment.").

### III.   CONCLUSION

For the reasons stated herein, I denied defendants' motions to exclude the testimony of plaintiffs' experts to the extent that I relied on that testimony in granting plaintiffs' motion for class certification. In all other

respects, the motion was denied without prejudice. To the extent defendants'
motions to exclude pertain to testimony upon which I did not rely in granting
plaintiffs' motion, defendants' motions were denied without prejudice.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

March 14, 2025

cc:    Counsel of Record