**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

B.D.,

              Plaintiff

v.

                                    Case No. 21-cv-4-PB

KELLY AYOTTE *et al.*,

              Defendants.                     CLASS ACTION

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**</u>

### TABLE OF CONTENTS

I.   **INTRODUCTION** ................................................................................................ 5

II.  **STANDARD FOR SUMMARY JUDGMENT** ............................................... 7

III. **ARGUMENT** ................................................................................................... 8

   A.  **The Court Should Grant Plaintiff's Summary Judgment on their ADA and Section 504 Claims.** ................................................................................................................ 8

     (i)   *Olmstead*'s Entitlement to Community-Based Living ................................... 9

     (ii)  Defendants' System Design and Funding Structures Result in Discriminatory Reliance on Congregate Facilities. ............................................................................ 11

     (iii) Defendants' Unnecessary Institutionalization of Class Members Violates Their Entitlement to Community-Based Living. ................................................................... 12

     (iv)  The Undisputed Facts Show that Plaintiff's Proposed Reasonable Accommodations Would Not Fundamentally Alter Defendants' Programs. ..................................... 32

     iv.   The Undisputed Facts Show that Defendants Lack an "Effectively Working" *Olmstead* Plan. 37

   B.  **The Court Should Grant Plaintiff Summary Judgement on their Child Welfare Act Claim.** ........................................................................................................................ 41

     (i)   The CWA Requires Class Members to be Given Timely and Substantive Initial and Updated Written Case Plans. ..................................................................................... 41

     (ii)  The Undisputed Facts Show that Defendants Have Failed to Develop and Update CWA-Compliant Case Plans for Class Members. .................................................... 47

     (iii) Plaintiff's Proposed Remedies Are Likely to Redress Defendants' CWA Violations and Lead to the Delivery of Compliant Case Plans. ................................................ 54

IV.  **CONCLUSION** ............................................................................................... 56

**TABLE OF AUTHORITIES**

**Cases**

*3137, LLC v. Town of Harwich*, 126 F.4th 1 (1st Cir. 2025) ....................................................... 41

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) ............................................................... 8, 9

*Ayala Gerena v. Bristol Myers-Squibb Co*., 95 F.3d 86 (1st Cir. 1996) ........................................ 8

*B.K. v. Faust*, 411 F. Supp. 3d 462 (D. Ariz. 2019) ................................................................... 47

*Barrows v. Becerra*, 24 F.4th 116 (2d Cir. 2022) ...................................................................... 54

*Benjamin v. Dep't of Pub. Welfare of Penn*, 768 F. Supp. 2d 747 (M.D. Pa. 2011) .. 15, 32, 37, 39

*Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131 (2d Cir. 1995) ................................................. 19

*Brown v. District of Columbia*, 761 F. Supp. 3d 34 (D.D.C. 2024) ................................. 32, 36, 37

*Brown v. District of Columbia*, 928 F.3d 1070 (D.C. Cir. 2019) ........................................... passim

*Cal. Alliance of Child & Fam. Servs. v. Allenby*, 589 F.3d 1017 (9th Cir. 2009) ....................... 46

*Connor B. v. Patrick*, 985 F. Supp. 2d 166 (D. Mass. 2013) ................................................. 42, 51

*Crabtree v. Goetz*, No. Civ.A. 3:08-0939, 2008 WL 5330506, at *29 (M.D. Tenn. Dec. 19, 2008) ................................................................................................................................................ 39

*Day v. District of Columbia*, 894 F. Supp. 2d 1 (D.D.C. 2012) ................................. 14, 37, 38, 39

*Disability Advocs. v. Paterson*, 653 F. Supp. 2d 184 (E.D.N.Y. 2009) ................................ passim

*Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012) ............................................................................................................................................. 14

*Doe v. Leavitt*, 552 F.3d 75 (1st Cir. 2009) ............................................................................... 44

*Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175 (10th Cir. 2003) ........................................... 33

*Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*, 692 F.2d 790 (1st Cir. 1982) ....................... 46

*Frederick L. v. Dep't of Pub. Welfare of Pa*., 422 F.3d 151 (3d Cir. 2005) ................................. 37

*Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509 (E.D. Pa. 2001) ............................. 14

*Garnett v. Zeilinger*, 313 F. Supp. 3d 147 (D.D.C. 2018) ........................................................... 45

*Haddad v. Arnold*, 784 F. Supp. 2nd 1286 (M.D. Fla. 2010) ..................................................... 38

*Hampe v. Hamos*, 917 F. Supp. 2d 805 (N.D. Ill. 2013) ............................................................ 33

*Harrison v. Young*, 103 F4th 1132 (5th Cir. 2024) ..................................................................... 14

*Helen L. v. DiDario*, 46 F.3d 325 (3d Cir. 1995) ....................................................................... 11

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) ..................................................... 19, 36

*Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181 (E.D.N.Y. 2000) ................................................. 36

*Kenneth R. v. Hassan*, 293 F.R.D. 254 (D.N.H. 2013) .................................................. 18

*Lane v. Kitzhaber*, 283 F.R.D. 587 (D. Or. 2012) ........................................................ 17

*Lewis v. Governor of Ala.*, 944 F.3d 1287 (11th Cir. 2019) ........................................ 20

*Loc. 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024)............. 8

*Long v. Benson*, No. 4:08cv26-RH/WCS, 2008 WL 4571904 (N.D. Fla. Oct. 14, 2008)........... 14

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ....................................... 11, 44

*Lynch v. Dukakis*, 719 F.2d 504 (1st Cir. 1983) ............................................................ 42

*Lynch v. King*, 550 F. Supp. 325 (D. Mass. 1982).................................................. 42, 51

*M.R. v. Dreyfus*, 697 F. 3d 706 (9th Cir. 2012) ............................................................ 34

*Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294 (D. Conn. 2008) ......... 34, 36

*Murphy v. Harpstead*, 421 F Supp. 3d 695 (D. Minn. 2019)..................................... 19, 20

*Olmstead v. L.C.*, 527 U.S. 581 (1999)................................................................ passim

*Pa. Protection & Advocacy, Inc. v. Pennsylvania*, 402 F.3d 374 (3rd Cir. 2005)......... 38, 39

*Perea v. Ed. Cultural, Inc.*, 13 F.4th 43 (1st Cir. 2021) ................................................ 8

*Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1 (1st Cir. 2025)................................. 9

*Robidoux v. Kitchel*, 876 F. Supp. 575 (D. Vt. 1995) ................................................. 46

*Rosado v. Wyman*, 397 U.S. 397 (1970) ........................................................................ 46

*Rosie D. v. Romney*, 410 F. Supp. 2d 18 (D. Mass. 2006).......................... 46, 47, 51, 54

*Sam M. v. Chafee*, 800 F. Supp. 2d 363 (D.R.I. 2011) ............................................ 41, 48

*Shotz v. City of Plantation*, 344 F.3d 1161 (11th Cir. 2003) ..................................... 11

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ........................................................ 11, 44

*Steimel v. Wernert*, 823 F.3d 902 (7th Cir. 2016).......................................................... 33

*Sullivan v. City of Springfield*, 561 F.3d 7 (1st Cir. 2009) ........................................ 8

*United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110 (1978) ................... 11

*United States v. Georgia*, 461 F. Supp. 3d 1315 (N.D. Ga. 2020) ........................... 14

*United States v. One Parcel of Real Prop.*, 960 F.2d 200 (1st Cir. 1992)..................... 8

*Withrow v. Concannon*, 942 F.2d 1385 (9th Cir. 1991) .............................................. 45

**Statutes**

29 U.S.C. § 705................................................................................................................. 15

29 U.S.C. § 794........................................................................................................ 9, 11, 14

42 U.S.C. § 12102............................................................................................................. 15

42 U.S.C. § 12132 .................................................................................................... 9, 14

42 U.S.C. § 12201 .......................................................................................................... 11

42 U.S.C. § 622 ........................................................................................................ 41, 46

42 U.S.C. § 671 .............................................................................................................. 46

42 U.S.C. § 675 ............................................................................................ 41, 43, 44, 48

42 U.S.C. § 675a ...................................................................................... 26, 41, 43

Bipartisan Budget Act of 2018, Pub. L. No. 115-123, 132 Stat. 64 (2018) ................................. 44

Child and Fam. Svcs. Improvement Act of 2006, Pub. L. No. 109-288, 120 Stat. 1233 (2006). 44,

51

Preventing Sex Trafficking and Strengthening Fams. Act, Pub. L. No. 113-183, 128 Stat. 1919

(2014) .................................................................................................................. 44

## Rules

Federal Rule of Civil Procedure 23 ............................................................................. 54

Federal Rule of Civil Procedure 56 ............................................................................... 8

## Regulations

28 C.F.R. § 35.130 ............................................................................ 10, 11, 14, 19

28 C.F.R. § 41.51 .......................................................................................................... 11

28 C.F.R. pt. 35, app. B (2011) ................................................................................... 10

45 C.F.R. § 1355.34 ...................................................................................................... 46

45 C.F.R. § 1355.44 ...................................................................................................... 46

45 C.F.R. § 1355.46 ...................................................................................................... 46

45 C.F.R. § 1356.21 ................................................................................................ 42, 45

45 C.F.R. § 84.68 .......................................................................................................... 11

45 C.F.R. § 84.76 .......................................................................................................... 10

Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal

Financial Assistance, 89 Fed. Reg. 40066, 40106 (May 9, 2024) ...................................... 10, 16

## I.    INTRODUCTION

On paper, New Hampshire claims to maintain a broad array of community-based care for its Older Foster Youth with mental disabilities.[1] In practice, however, the evidence shows that this assertion is illusory. Instead, Defendants—each of whom is responsible for administering or overseeing the administration of New Hampshire's child welfare program and ensuring compliance with state and federal laws, Ex. 1 (Pl.'s Statement of Undisputed Facts ¶¶ 3–21 ("SUF"))—maintain a system that defaults to placement and retention of these youth in segregated institutions[2] to provide them with mental- and behavioral-health treatment. Defendants' maintenance of such a system results in discriminatory isolation of Class Members in institutional settings and violates the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"). The evidence further shows that New Hampshire pervasively fails to comply with case plan requirements under the Child Welfare Act ("CWA"), denying children their federal entitlement to current and updated written roadmaps identifying their needs and the services required to meet those needs, further compromising their welfare while in state custody. Thus, as explained below, Plaintiff B.D. and the Class they represent are entitled to summary judgment on their claims.

As shown by public records, Plaintiff's expert reports, the testimony of Defendants and their own documents, and Defendants' expert reports and testimony, the material facts in this case are not in dispute. New Hampshire leads the nation with the highest percentage of youth in State custody warehoused in congregate facilities. Once in these isolating facilities, Class Members

---

[1] All capitalized terms used herein carry the same meaning as in Plaintiff's Motion for Class Certification. *See* Pl.'s Mot. for Class Cert., ECF No. 152 (Mar. 31, 2023).

[2] "Institution," "congregate care," "residential treatment," and "facility" are used interchangeably to mean child care institutions and group homes as defined by N.H. Rev. Stat. Ann. § 170-E:25(II).

languish there for not just weeks or even months, but for years of their young lives. Yet, these Class Members are appropriate for and not opposed to living in the community. Plaintiff's proposed modifications to end their unjustified institutionalization—all of which are targeted at expanding access to existing community-based placements and services—are reasonable as a matter of law and will not require a fundamental alteration of Defendants' system of care for those with disabilities. And to the extent Defendants claim to be working on system improvements that amount to an "*Olmstead* plan," the record fails to establish that they are effectively moving Class Members out of facilities.

None of Plaintiff's requested modifications demand new services, and each will redress the underlying systemic deficiencies that existed when this Court granted class certification and that persist in full force to this day: (1) Defendants' failure to develop a sufficient supply of community-based placements and services; (2) Defendants' delayed assessment practices that ratify unnecessary placement in congregate facilities; (3) Defendants' disproportionate investments in facilities over community-based treatment options; and (4) Defendants' failure to put in place effective quality assurance and accountability measures.

The public records, Plaintiff's expert reports, the testimony of Defendants and their own documents, and Defendants' expert reports and testimony also show that Older Foster Youth with mental disabilities do not receive case plans that are initially developed and updated in accordance with the CWA. This denies them the "guiding light" plans to which they are entitled, exacerbating Defendants' failures to address their mental- and behavioral-health needs, and contributing to the unnecessary placement and retention of Older Foster Youth in congregate facilities. The pervasive federal case plan violations are driven by Defendants' ongoing failure to (1) administer a standardized mental- and behavioral-health needs assessment to Older Foster Youth; (2) assign

Older Foster Youth to caseworkers trained in meeting their complex needs; and (3) track and monitor CWA compliance. The proposed remedies—that is, the universal administration of Child and Adolescent Strengths and Needs Assessments ("CANS"), assignment of Older Foster Youth to caseworkers with specialized training and knowledge in the supports needed by this population, and implementation of continuous quality improvement mechanisms—are aimed at addressing those deficiencies and are reasonably targeted to deliver CWA-compliant plans.

Accordingly, as explained below, the Court should grant Plaintiff's motion for summary judgment for the Class on their ADA and Section 504 claims and their CWA claims.

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is warranted when there can be no "genuine dispute" of "material fact" on the claim or defense on which summary judgment is sought. Fed. R. Civ. P. 56(a); *Local 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 WL 2722254, at *5 (D.N.H. May 28, 2024) (Barbadoro, J.) (citing *Perea v. Ed. Cultural, Inc.*, 13 F.4th 43, 50 (1st Cir. 2021)). A dispute is "genuine" when "a reasonable factfinder" could resolve the point in favor of the nonmoving party. *See Sullivan v. City of Springfield*, 561 F.3d 7, 15 (1st Cir. 2009). A fact is "material" when it "might affect the outcome of the suit under the governing law." *Local 8027*, 2024 WL 2722254, at *5 (second quoting *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir. 1992)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .") (emphasis in original)).

Once the movant makes the requisite showing, the non-moving party must then "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." *Ayala-*

*Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 94 (1st Cir. 1996) (citations omitted). To meet their burden, though, the nonmoving party cannot rest on "conclusory allegations, improbable inferences, or unsupported speculation," *Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 7 (1st Cir. 2025) (cleaned up), or on evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249 (citations omitted).

## III.    ARGUMENT

### A.  The Court Should Grant Plaintiff's Summary Judgment on their ADA and Section 504 Claims.

The ADA and Section 504 each prohibit public entities receiving federal funding from discriminating against individuals with disabilities by excluding them from participation in, or denying them the benefits of, the entity's services, programs, or activities. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). But by creating a child welfare system that is reliant upon an increasingly large network of institutional facilities to place and retain Older Foster Youth with mental health disabilities, and deprioritizing development and maintenance of community-based mental- and behavioral-health placements and services, including therapeutically supported foster homes,[3] Defendants are doing just that.

---

[3] "Therapeutically supported homes" and "enhanced support homes" are used interchangeably throughout this brief. They are defined as foster homes that are trained and credentialed to offer a heightened level of care for children with specific needs, such as Individualized Service Option ("ISO") Foster Care and Therapeutic Foster Care. *See* M&O Granting Pls.' Mot. for Class Cert., ECF No. 342, at 3 (Sept. 18, 2024). ISO Foster Care is defined as a type of foster home providing care to "children with chronic mental health, emotional, physical, or behavioral needs" who require "intensive supervision and consistent structure." Ex. 2 (DCYF Policy 1600.2 at 1 (Feb. 2025)). Therapeutic Foster Care is defined as a type of foster home providing intensive clinical and therapeutic services to children with "chronic mental, emotional, physical or behavioral problems" who require a higher level of care and supervision than is offered by ISO Foster Care. Ex. 3 (DCYF Policy 1605 at 1 (Feb. 2002)).

### (i)    *Olmstead*'s Entitlement to Community-Based Living.

Nearly three decades ago, the Supreme Court found "[u]njustified isolation" to be disability-based discrimination under the ADA and Section 504. *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999). The Court's decision "reflects two evident judgments." *Id.* First, unnecessary institutionalization "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* at 600–01 (citations omitted). Second, "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.*; Mem. & Order Denying Defs.' First Mot. to Dismiss, ECF No. 49, at 29 (Sept. 9, 2021).

To avoid this type of discrimination, states are "required to make reasonable modifications in policies, practices, or procedures where necessary to avoid discrimination on the basis of disability." Mem & Order Granting Pls.' Mot. for Class Cert., ECF No. 342, at 7 (Sept. 18, 2024) (cleaned up).[4] To the extent Defendants argue that community integration claims under the ADA

---

[4] Following passage of the ADA and Section 504, the Department of Justice ("DOJ") issued regulations—known as the "integration mandate"—requiring local and state governments to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also* 45 C.F.R. § 84.76. The "most integrated setting appropriate," in turn, is the "setting that enables individuals to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, app. B (2011); *see also* Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 40066, 40106 (May 9, 2024) ("[A]ll children with disabilities in foster care are entitled to receive services in the most integrated settings appropriate to their needs, and congregate care is virtually never the most appropriate long-term setting for children." (footnotes omitted)). A public entity must make "reasonable modifications in policies, practices, or procedures" to bring itself into compliance with the integration mandate. 28 C.F.R. § 35.130(b)(7)(i); *see also* 45 C.F.R. § 84.76(d)(4) ("service system design, funding, or service implementation practices that result in institutionalization or serious risk of institutionalization" violate the integration mandate).

are foreclosed by the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), such argument is misplaced.[5] *Olmstead*'s central holding—that unnecessary isolation constitutes discrimination—is based on the ADA's statutory text, not its implementing regulations, and does not rely upon the former *Chevron* deference doctrine. *Olmstead*, 527 U.S. at 598 ("We need not inquire whether the degree of deference described in [*Chevron*] is in order" because "the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" (citing *Skidmore v. Swift & Co*., 323 U.S. 134, 139–40 (1944)) (additional citations omitted)).

---

Separate from the integration mandate, public entities are prohibited from using "criteria or methods of administration" that subject qualified individuals with disabilities to discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(3); *id.* § 41.51(b)(3); 45 C.F.R. § 84.68(b)(3). Because the integration mandate "encompasses methods of administration that fail to achieve the most integrated setting appropriate to [Class Members'] needs," this memorandum treats the claims interchangeably. First MTD M&O, ECF No. 49, at 34.

[5] The Supreme Court's *Loper Bright* decision addressed only the deference due to agency regulations when Congress has *not* spoken directly to the precise question at issue. Thus, it does not impact the ADA's integration mandate because Congress, in enacting the ADA, unambiguously instructed federal agencies to promulgate regulations implementing Title II of the ADA and Section 504. 29 U.S.C. § 794(a); 42 U.S.C. § 12134(a), (b); *see also Olmstead*, 527 U.S. at 588-93 (describing the ADA's purpose and its implementing regulations). Regulations addressing disability discrimination thus respond to Congress's express instruction and carry the force of law. 42 U.S.C. § 12201(a); *Helen L. v. DiDario*, 46 F.3d 325, 332 (3d Cir. 1995) ("[B]ecause Congress mandated that the ADA regulations be patterned after the [S]ection 504 coordination regulations, the former regulations have the force of law."); *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1179 (11th Cir. 2003) ("Congress expressly authorized the Attorney General to make rules with the force of law interpreting and implementing [Title II of the ADA]." (citation omitted)); *see also United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 134 (1978) ("When a Congress that re-enacts a statute voices its approval of an administrative or other interpretation thereof, Congress is treated as having adopted that interpretation, and this Court is bound thereby." (citations omitted)).

**(ii)    Defendants' System Design and Funding Structures Result in Discriminatory Reliance on Congregate Facilities.**

Despite these federal obligations, the record unequivocally shows that New Hampshire has historically depended, and continues to depend, on restrictive institutions to meet the mental- and behavioral-health needs of Class Members, leading the nation in reliance on congregate facilities to treat foster youth. SUF ¶¶ 31–37. While recognition of New Hampshire's high rates of institutionalization led to some reforms in New Hampshire beginning in 2016, the beneficiaries of those reforms have been limited to youth outside of the foster care system and to youth in the delinquency system who have a statutory right to an attorney. SUF ¶¶ 53, 55, 58–60, 123–25. Reforms targeted toward integration of Class Members—teenagers with mental or behavioral health disabilities in state care due to alleged abuse or neglect by their parents—have been marred by failed implementation, chronic delays, or plans that were outright abandoned. *See, e.g.,* SUF ¶¶ 53, 55, 58–59, 68–70, 86, 125. And nearly a decade after reforms began, New Hampshire's continued high use of institutions to serve Older Foster Youth with mental- and behavioral-health needs remains, with DCYF leadership considering unneeded institutionalization of foster youth to be "normal." SUF ¶¶ 31–37.

Even as other states around the nation have pivoted toward services and programs designed to meet the unique mental- and behavioral-health treatment needs of older foster youth in community settings—dramatically *decreasing* rates of institutionalization even through nationwide workforce shortages and a global pandemic—Defendants continue to pour hundreds of millions of general fund dollars into sustaining and *expanding* its array of institutional settings. SUF ¶¶ 89–96. Simultaneously, Defendants continue to: (1) deprioritize steps needed to increase the supply of community-based placements and services, including under-supporting kinship caregivers, failing to identify provider needs, failing to effectively market and procure a

Therapeutic Foster Care contract, and under-utilizing interventions known to prevent foster home disruptions and minimize lengths of stay in residential treatment; (2) delay meaningful assessment of Class Member needs while relying on a flawed placement matching tool that routinely rubberstamps unnecessary congregate stays (known as the Comprehensive Assessment for Treatment or "CAT"); (3) disproportionately invest in maintenance and expansion of congregate facilities; (4) fail to implement effective quality assurance and accountability measures; and (5) disregard federal case plan mandates. SUF ¶¶ 38–97, 102–118.

The result is a system that is ill equipped to treat any but the mildest impairments in community placements. *See* SUF ¶¶ 38–121. And a system that continues to routinely place Class Members in segregated, restrictive institutions, often retaining these youth in those institutions for years of their adolescence. SUF ¶¶ 32–37. This is the hallmark of a system in crisis. *See* Ex. 4 (Report of Pl.'s Expert Tracey Feild ¶¶ 12, 102 (Mar. 11, 2025) ("Feild Rep.").

> **(iii)    Defendants' Unnecessary Institutionalization of Class Members Violates Their Entitlement to Community-Based Living.**

To establish Plaintiff's' asserted ADA violation, Plaintiff need only show that Defendants are not administering their foster care services "in a manner that enables [Class Members] to live in [the most integrated setting appropriate to their needs]." First MTD Mem. & Order, ECF No. 49, at 31; *see also Brown v. District of Columbia*, 928 F.3d 1070, 1087 (D.C. Cir. 2019) (proof of a "concrete systemic deficiency" is unnecessary—"treating individuals in institutions when they wish to and could be treated in the community *is* discrimination *because of* disability" (emphasis in original)). To the extent Class Members are placed and retained in congregate facilities that are "not the most integrated setting appropriate to [their] needs, such placement[s] run[] afoul of the integration mandate." First MTD Mem. & Order, ECF No. 49, at 31.

Under *Olmstead*, Plaintiff meets their *prima facie* burden by showing: (a) plaintiffs are qualified individuals with disabilities; (b) "treatment professionals have determined that community placement is appropriate";[6] (c) "transfer from institutional care to a less restrictive setting is not opposed by the affected individual"; and (d) community "placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead*, 527 U.S. at 587; 42 U.S.C. § 12132; 29 U.S.C. § 794(a).

If Plaintiff establishes these four elements, Defendants must undertake "reasonable modifications" to their programs to accommodate Class Members' living in community-based settings. 28 C.F.R. § 35.130(b)(7)(i); *see also Olmstead*, 527 U.S. at 592 (once plaintiffs establish the *prima facie* elements, defendants must modify their program unless they can show that plaintiffs' proposed modifications would "fundamentally alter the nature of the service, program, or activity"); *Brown*, 928 F.3d at 1077 (once plaintiffs show that community placement is appropriate and not opposed by the affected individuals, the burden shifts to defendants to "prov[e] the unreasonableness of a requested accommodation").

---

[6] Although this element references "State's treatment professionals," determinations by the State's treatment professionals are not necessary to prevail on an *Olmstead* claim. *See, e.g.*, *United States v. Georgia*, 461 F. Supp. 3d 1315, 1323–24 (N.D. Ga. 2020); *Day v. District of Columbia*, 894 F. Supp. 2d 1, 23-24 (D.D.C. 2012); *Disability Advocs. v. Paterson*, 653 F. Supp. 2d 184, 258-59 (E.D.N.Y. 2009), *vacated on other grounds sub nom. Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012); *Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 540 (E.D. Pa. 2001); *Long v. Benson*, No. 4:08cv26-RH/WCS, 2008 WL 4571904, at *2 (N.D. Fla. Oct. 14, 2008); *Harrison v. Young*, 103 F.4th 1132, 1138–39 (5th Cir. 2024); *see also* Ex. 5 (U.S. Dep't of Just., *Statement on the Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead* at 6–7, Q.4 (2020) (hereinafter, "DOJ Statement")).

### a. *Class Members Are Qualified Individuals with Disabilities Under the ADA and Section 504.*

A person is a qualified individual with a mental disability under the ADA and Section 504 when they (1) have a "mental impairment that substantially limits one or more major life activities"; or (2) have "a record of such an impairment." 42 U.S.C. § 12102(1); 29 U.S.C. § 705(9)(B). Defendants do not dispute that the Class comprises individuals with qualifying mental disabilities under the ADA and Section 504. Nor could they, given that the Class is defined to only include youth who have "a mental impairment that substantially limits a major life activity, or have a record of such an impairment." *See* Class Cert. Mem. & Order, ECF No. 342, at 55; *see also Benjamin v. Dep't of Pub. Welfare of Penn.*, 768 F. Supp. 2d 747, 754 (M.D. Pa. 2011) ("[T]he definition of the class itself satisfies the first two elements articulated in *Olmstead*.").

But Plaintiff does not rest on the class definition alone. Plaintiff had Dr. Theodore Cross analyze a statistically representative sample[7] of 41 Older Foster Youth case files using a methodology that this Court has already deemed reliable. *See* Ex. 9 (Report of Pl.'s Expert Dr. Theodore Cross ¶¶ 10–18) (Mar. 12, 2025) ("Cross Rep.")); Mem. & Order Denying Defs.' Mot. to Exclude, ECF No. 356, at 31–36 (Mar. 14, 2025). After applying his clinical judgment and decades of experience, Dr. Cross found that all 41 sampled youth had a mental impairment that substantially limited a major life activity. Ex. 9 (Cross Rep. ¶ 20); *see also* SUF ¶ 24.

---

[7] *See* Ex. 6 (Report of Pl.'s Expert Dr. Todd MacKenzie ¶ 21) (Mar. 8, 2025)). While Defendants' expert, Alan Salzberg, takes issue with the confidence intervals in Dr. MacKenzie's report, Dr. Salzberg does not dispute the statistical validity of the sample. *See* Ex. 7 (Report of Defs.' Expert Dr. Alan Salzberg at 5–6 (April 11, 2025)); Ex. 8 (Rebuttal Report of Pl.'s Expert Dr. Todd MacKenzie ¶¶ 16–20 (May 14, 2025) ("MacKenzie Rebuttal")). Nor does Dr. Salzberg, or any other evidence provided by Defendants, counter Dr. Cross's findings.

### b. Class Members Are Appropriate for Community-Based Placement.

The Court must next determine whether community placement is "appropriate." Here too, the Class definition—that is, all youth who "currently are, or are at risk of being, *unnecessarily* placed in congregate"—satisfies that element. *See* Class Cert. M&O, ECF No. 342, at 55 (emphasis added); *Benjamin*, 768 F. Supp. 2d at 754.

Beyond that, the undisputed evidence supports this factor. Dr. Cross's analysis, and Defendants' own admissions, reinforce that community placement is appropriate for many Older Foster Youth with mental health disabilities residing in residential facilities. SUF at ¶¶ 25–28, 34. Dr. Cross sets forth a well-established standard of care governing placement of youth with mental health disabilities: (1) "community-based placements are appropriate settings for the vast majority of youth, including youth in foster care"; and (2) "[c]ongregate care placement should be reserved for short, stabilizing treatment episodes in acute situations only after interventions such a trauma-focused cognitive behavior therapy, dialectical behavior therapy, multisystemic therapy, wraparound services, Therapeutic Foster Care, respite services, and crisis intervention have been utilized in the community." Ex. 9 (Cross Rep. ¶¶ 16–18); *see also* Ex. 10 (Decl. of Pl.'s Expert Tracey Feild, ECF No. 152-11, ¶ 24 (March 28, 2023) ("Feild Decl.")) ("[C]hild welfare and medical professionals alike view congregate care facilities as targeted emergency interventions that offer short-term stabilization reserved for a small subset of children with the most serious and acute mental impairments."). This Court previously found Dr. Cross's standard to be "sufficiently reliable" for purposes of class certification, and Defendants have not produced any evidence to the contrary. *See* Mot. to Exclude Mem. & Order, ECF No. 356, at 33–34; *see also* Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 40066, 40106 (May 9, 2024) ("[A]ll children with disabilities in foster care are entitled

to receive services in the most integrated settings appropriate to their needs, and congregate care is virtually never the most appropriate long-term setting for children.").

Applying his undisputed standard of care, Dr. Cross found that *all* sampled youth were qualified to live in the community for all or substantial portions of the time they resided in institutions. Ex. 9 (Cross Rep. ¶¶ 19, 23–30). Dr. Cross specifically found that most sampled youth, including those who spent time in congregate facilities, were appropriate for ISO Foster Care and that the few remaining youth with particularly intensive needs "were largely clinically appropriate for Therapeutic Foster Care with supportive community-based mental and behavioral health services." *Id.* (Cross Rep. ¶¶ 26–27). And he found that all 23 youth who spent time in congregate facilities experienced at least one unnecessary placement in a congregate setting, with some cycling through as many as thirteen unnecessary congregate placements and/or residing in such settings for up to *eight years*. *Id.* (Cross Rep. ¶ 38) (youth were kept in congregate care for "unfathomable lengths of time, far beyond clinical necessity"); *see also id.* (Cross Rep. ¶¶ 32–42).

Defendants have produced no evidence disputing these findings or creating any genuine dispute on this issue.

### c. Class Members Are Not Opposed to Community-Based Placement.

The third *Olmstead* element asks whether an individual, presented with "accurate information and a meaningful choice," opposes community integration. *Disability Advocs. v. Paterson*, 653 F. Supp. 2d 184, 267 (E.D.N.Y. 2009), *vacated on other grounds sub nom. Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012);

*see also United States v. Florida*, 682 F. Supp. 3d 1172, 1232 (S.D. Fla. 2023) (relevant inquiry is whether "service recipients with disabilities would choose community-based services if they were actually available and accessible").[8] Here too, the evidence shows that Class Members, if provided a meaningful choice, do not oppose community integration. SUF ¶¶ 29–30.

Dr. Cross found that all 41 sampled youth were not opposed to community placement, with 31 of the 41 youth in the sample expressing an affirmative desire for community-based placements. Ex. 9 (Cross Rep. ¶¶ 45–47). Of the remaining ten—eight of whom were never in congregate care—all indirectly indicated a desire for community placement. *Id.* (Cross Rep. ¶¶ 47–50). *None* of the 41 sampled youth expressed any significant opposition to community-based placement.[9]

Defendants' inability to rebut Dr. Cross's findings on the desire for community placement is unsurprising given his and Ms. Feild's observations of the pervasive and profound harms of institutionalization. *See id.* (Cross Rep. ¶¶ 45–48); Ex. 4 (Feild Rep. ¶¶ 13–17). In New Hampshire's congregate facilities, restraints and restrictions are rampant, normalcy and privacy are elusive, and effective mental health treatment is scarce. *See, e.g.*, Ex. 9 (Cross Rep. ¶¶ 17, 48) (concluding that "[c]ongregate settings are generally not effective treatment settings" and

---

[8] Evidence of a knowing and voluntary choice is critical because "many individuals with [disabilities] . . . are not aware that they have any choices as to services that they are entitled to receive." *Lane v. Kitzhaber*, 283 F.R.D. 587, 600 (D. Or. 2012); *see also Kenneth R. v. Hassan*, 293 F.R.D. 254, 269 n.6 (D.N.H. 2013) ("[T]he meaningful exercise of a preference will be possible only if an adequate array of community services are available to those who do not need institutionalization . . . [because] preferences may be conditioned by availability, limited by information, and are likely to evolve in a system that complies with the ADA." (cleaned up)).

[9] Although a few youth expressed one-off preferences to live in a congregate facility, Dr. Cross found that these remarks were in response to limited or untenable alternatives presented to youth. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Accordingly, Dr. Cross found that "these children—if given the full range of options with informed choice—would not oppose placement in the community." *See id.*

chronicling the common use of forcible restraints,  Ex. 4 (Feild Rep. ¶ 14) (discussing

how activities that are "a part of normal childhood" are treated as "privileges" that are "quickly

revoked as punishment or behavioral management");[10] Ex. 13 (First Suppl. Decl. of Pl.'s Expert

Theodore Cross, ECF No. 281, ¶ 16 (April 29, 2024))

; Ex. 14 (Sec. Suppl. Decl. of Pl.'s Expert

Theodore Cross, ECF No. 306-1, ¶ 16 (June 17, 2024))

#### d. *Defendants Can Reasonably Accommodate Class Members in Community-Based Placements, and Plaintiff's Proposed Remedies Are Likely to Redress Defendants' Olmstead Violations.*

Finally, to prove an *Olmstead* violation, Plaintiff must show that the Defendants can make

"reasonable modifications" to avoid discriminating against Class Members. *See* 28 C.F.R. §

---

[10] Ms. Feild elaborates on the highly regulated nature of congregate settings, including "little to no access" to normal teenage activities such as driver's education and school events, restrictions on "owning personal belongings," and invasive privacy restrictions on basic teenage independence like "stepping outdoors unmonitored" and using the bathroom unmonitored. Ex. 4 (Feild Rep. ¶¶ 14–15). These prolonged restrictions limit Class Members' access to "normalcy" over the course of their teenage years, "inhibit[] their ability to learn and practice critical executive functioning skills essential to their development," and "set[] them up to fail when they reach adulthood, creating a dangerous cycle for these youth." *Id.* (Feild Rep. ¶ 17 (citing Ex. 12 (Think of Us, Away from Home at 101–02 (Jun. 17, 2021))); *see also* Ex. 10 (Feild Decl., ECF No. 152-11, ¶ 23) ("It is currently well-understood in the child welfare systems management field that congregate care facilities—including group homes geographically located in the youth's hometown—do not represent normal settings for youth. These facilities are intensely regimented; they impose arbitrary restrictions on youth and frequently resort to severe punishments such as restraints and seclusion. The highly rigid structure isolates youth from their communities, hinders their developmental growth, deprives them of the opportunity to form an attachment to a parent figure, weakens their ability to navigate the critical development tasks that come with adolescence, and increases the likelihood of antisocial and risky behavior.").

35.130(b)(7)(i). "[Plaintiff's *prima facie* burden of identifying a reasonable modification is not a 'heavy one.'" *Florida*, 682 F. Supp. 3d at 1237 (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003)). "It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Henrietta D.*, 331 F. 3d at 280 (cleaned up) (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)). "Plaintiffs need not show that their requested accommodation[s] will overcome every single barrier [p]laintiffs face." *Murphy v. Harpstead*, 421 F. Supp. 3d 695, 716 (D. Minn. 2019). Rather, a plaintiff need only show that their requested accommodation will lead to an "increased opportunity" for community placement. *Id.* at 17; *see also Florida*, 682 F. Supp. 3d at 1194 ("[T]he United States does not have to demonstrate that increasing nurses' pay would solve the national nursing shortage, only that it would 'significantly increase the likelihood' of more available PDN to children with medical complexity." (quoting *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019)).

During the class certification proceedings, this Court found that the evidence showed that Defendants are (1) "offering an insufficient array of community-based services"; (2) "failing to take certain steps to increase the supply of community-placements," including failing to offer certain types of enhanced foster care despite the regulatory authority to do so, providing less financial support to most kinship caregivers than licensed foster families, and failing to recruit a sufficient number of licensed foster families, including ISO foster families; and (3) "disproportionately investing in residential treatment facilities" over community-based services and placement. Class Cert. M&O, ECF No. 342, at 34–40.

Since the record before the Court supporting its class certification decision, Defendants have not produced any evidence showing that they have resolved these deficiencies, despite their

public facing aspirations of system change.[11] Indeed, since 2024 Defendants have cycled through and abandoned the kinship and Therapeutic Foster Care initiatives they touted to this Court, *see Defs.' Suppl. Mem. of Law in Opp. to Pl.'s Mot. for Class Cert., ECF No. 317, at 6–7, 8–9 (Aug. 1, 2024);* continued to under-utilize community-based services to support and maintain Older Foster Youth in community-based settings and promote timely discharges from episodes of treatment in residential facilities; continued to prioritize financial support for expensive institutional placements; perpetuated an assessment process that does little more than ratify and prolong the unnecessary institutionalization of Class Members; and failed to implement meaningful quality assurance and accountability measures. SUF ¶¶ 38–99, 124–25, 135–41.

As explained below, each of Plaintiff's requested modifications, Ex. 154 (Pl.'s Third Supp. Resp. & Obj. to Defs.' First Set of Interrogs. (Mar. 21, 2025)), is reasonably targeted to redress these and additional critical systemic deficiencies and will "provide each member of the class an increased opportunity to achieve," or "improve [their] likelihood of achieving," the "legally mandated outcome" of community-based living. *See Brown*, 928 F.3d at 1082–83 (citations omitted).

1. Expansion of Therapeutically Supported Foster Care, Including a Livable Wage to Enable Caregivers to Provide Consistent Supervision and Structure

There is no genuine dispute that therapeutically supported foster care would enable additional Class Members to live in community-based settings. SUF ¶¶ 71, 82. Nor is there a

---

[11] Defendants have proposed a goal of reducing reliance on congregate care by a meager ten percent—still well above the national average. *See* Ex. 15 (DHHS, DCYF's Strategic Priorities 2025-2026 at DHHS-3112667). Yet, they include no goal specific to Class Members or Older Foster Youth generally. As such, if Defendants were to terminate the use of congregate care for a substantial portion of *young* children, Defendants could achieve the ten percent reduction in the use of congregate care without any meaningful impact on Class Members.

genuine dispute that such programming is largely unavailable to Class Members. SUF ¶¶ 71–77, 81–82.

Indeed, following the filing of this lawsuit DHHS issued a Therapeutic Foster Care ("TFC") Request for Proposals and a TFC Request for Applications in 2022 and 2024, respectively. In its 2022 Request for Proposals, DHHS acknowledged that youth who are recommended for level 2 congregate placements are appropriate for TFC referrals, with levels 3 and 4 considered. Ex. 16 (DHHS, Therapeutic Foster Care Request for Proposals, ECF No. 153-5, at DHHS-2299818 (June 15, 2022)). Similarly, in 2024, DHHS admitted that the "goal of [TFC] is to allow youth, even those with the highest of needs, to stay out of congregate care . . . ." Ex. 17 (DHHS, 2024 Tiered Therapeutic Foster Care Request for Applications, ECF No. 317-4 at 4 (June 19, 2024)).

But due to little investigation into the needs of providers to establish this service, and Defendants' failure to market the requests and solicit qualified applicants, neither the 2022 nor the 2024 request resulted in a contract. SUF ¶¶ 83–85. On the heels of these failed attempts, DCYF abandoned this initiative in early 2025. SUF ¶ 86. DCYF now hopes to cobble together a hodgepodge of uncontracted "intensive" ISO Foster Care homes and up to eight "assessment homes" designed for stays of 60 days or less. Ex. 18 (Kara Buxton, Assoc. Comm'r, Bureau of Cmty., Fam., & Program Supps., DCYF, Dep. Tr. 41:10–47:7 (Feb. 18, 2025)). Neither option, though, "replace[s] or meet[s] the need for enhanced support homes equipped to stably serve youth with often significant trauma histories and complex needs over longer terms." Ex. 4 (Feild Rep. ¶ 57). And while development and implementation of a TFC program has been included in DCYF's strategic priorities since at least 2020, *see, e.g.*, Ex. 19 (DHHS, DCYF Strategic Priorities SFY 20 & 21 at DHHS-1491721); Ex. 20 (DHHS, DCYF Strategic Priorities SFY 22 & 23 at DHHS-

184828), development and/or expansion of *any* sort of enhanced support foster home is absent from DCYF's 2025-2026 Strategic Priorities, Ex. 15 (DHHS, DCYF's Strategic Priorities 2025-2026 at DHHS-3112678).

Given the widespread consensus that a sufficient array of therapeutically supported foster homes is a critical modification that will increase the opportunity for Class Members to reside and receive treatment in community-based settings, relief requiring DCYF to fund and take all reasonable steps to recruit at least 50 such beds[12] is a reasonable modification likely to increase the opportunity of Class Members to reside and receive treatment in community-based settings. *See* Ex. 4 (Feild Rep. ¶¶ 59, 60, 99); Ex. 9 (Cross Rep. ¶ 42); *see also* Ex. 22 (Tracey Field, Pl.'s Expert, Dep. Tr. at 52:21–53:6 (June 6, 2025)) (describing need for 50 therapeutically supported foster beds).

2.  Increased financial support to kinship caregivers

The parties agree that maximizing placement of Class Members in kinship homes is a critical step to reducing unnecessary placements in congregate facilities. SUF ¶ 62. Similarly, the parties agree that adequate financial support impacts a kin's ability and willingness to care for Class Members. SUF ¶ 65. Yet, while foster care reimbursement rates for licensed homes are designed to "cover customary care of children/youth . . . , including the cost of providing food, shelter, daily supervision, school supplies, and a child/youth's personal incidentals," Ex. 83 (DCFY Policy 2701 at DHHS-0000006142 (June 2017)), most kinship caregivers in New

---

[12] DHHS residential statistics are not reliably broken down by system. However, of the 327 youth in residential facilities on May 1, 2025, 191 youth—or 58%—were foster youth. Ex. 21 (DHHS, Report to the Oversight Commission on Children's Services at PTF00026647, PTF00026656 (May 17, 2025)). Assuming equal distribution of residential placement levels across systems, of the 80 youth in level 2 placements on May 1, 2025, *id.* at PTF00026647, at least 46 are likely to be foster youth (46/80=0.575). And, as acknowledged by Defendants, many higher-level youth, too, could reside in enhanced support foster homes. SUF ¶ 82.

Hampshire receive far less—particularly kinship families caring for multiple children. SUF ¶¶ 64, 66–67. Without adequate financial assistance, kinship placements are more likely to disrupt and Class Members are more likely to be placed and languish in congregate facilities. *See* SUF ¶¶ 34, 65.

While streamlining the kinship licensure process and equalizing financial support to kin has been a DCYF goal since at least 2019, that goal has been mired in a delay now spanning *six* years. Ex. 23 (Joseph Ribsam, Former Dir., DCYF, Dep. Tr. 170:2–172:20 (Feb. 21, 2025)); SUF ¶ 68. Requiring DHHS to provide kinship caregivers at least the reimbursement rate the State provides licensed foster homes, whether through the yet-to-be-complete streamlined licensure process or through State general fund supplements, is a reasonable modification likely to increase the opportunity of Class Members to reside in community-based settings. SUF ¶¶ 62–68; *see also* Ex. 4 (Feild Rep. ¶¶ 26, 99); Ex. 24 (Sec. Suppl. Decl. of Pl.'s Expert Tracey Feild, ECF No. 291-2, ¶ 33–37 (Apr. 29, 2024) ("Sec. Suppl. Feild Decl.")).

3.  Evidence-Based Kinship Finding and Direct Supportive Services to Kinship Caregivers

There is no dispute that universal kinship finding, along with a sufficient array of non-monetary resources for kinship caregivers, is essential to maximize the number and duration of kinship placements. *See* SUF ¶¶ 57, 62; Ex. 4 (Feild Rep. ¶¶ 28–33). There is also no dispute that direct supportive services, such as Mobile Crisis Services, family supports, and intensive care coordination, are not available to all licensed and unlicensed kinship caregivers caring for Older Foster Youth. SUF ¶¶ 54–56, 58. Nor have Defendants disputed Dr. Cross's finding that for most Older Foster Youth in congregate care, "DCYF failed to earnestly seek out community-based placements." *See* Ex. 9 (Cross Rep. ¶ 39).

In 2023, after the initiation of this lawsuit, Defendants took steps to contract with A Second Chance, Inc. ("ASCI"), a "nationally-recognized organization that provides extensive kinship

finding, outreach, and support to foster youth." Ex. 25 (Decl. of Michael Donati, Bureau Chief, Bureau of Cmty., Fam., & Program Supps., DYCF, ECF No. 317-1, ¶ 31 (Aug 1, 2024)) (ACSI functions include (1) "[s]earching for viable kinship placements when a child first enters DCYF custody"; (2) "[s]upporting kin through the licensure process"; and (3) "[s]upporting kin for up to 12 months after referral"). Yet, while the former DCYF director who initiated the ASCI contract recognized that roll out of a program with an out-of-state vendor like ASCI takes time, Defendants terminated the ASCI contract as of July 2025. Ex. 23 (Ribsam Dep. Tr. 296:10–297:22); SUF ¶¶ 69–70. Instead, Defendants are returning to a prior model, historically plagued by insufficient staffing and untethered to any form of evidence-based kinship finding or support model. Ex. 18 (Buxton Dep. Tr. 90:2–96:21); Ex. 23 (Ribsam Dep. Tr. 292:8–296:9) (returning to an in-house model would require "substantial [additional] staffing" and would not be "the best model"); *see also* Ex. 4 (Feild Rep. ¶ 31) ("[Termination of] the ASCI contract, rather than working through expected challenges, reflects a significant step backwards in Defendants' efforts to identify and support [kinship] caregivers.").

Given this history, requiring DCYF to develop or contract for an evidence-based[13] kinship finding model to ensure kinship finding is performed universally for Older Foster Youth with mental disabilities, and to expand accessibility of direct supportive services for kinship caregivers,

---

[13] As is commonly used throughout the child welfare system, evidence-based means a tool or practice that has demonstrated reliability and validity through peer reviewed research. *See*, *e.g.*, *Welcome to the CEBC*, THE CAL. EVIDENCE-BASED CLEARINGHOUSE FOR CHILD WELFARE (last accessed Jun. 30, 2025), https://www.cebc4cw.org/ (providing a clearinghouse of evidence-based, well-supported, and promising approaches to child welfare programs and services); *see also NH Children's Behavioral Health Resource Ctr.*, NH DHHS (last accessed Jun. 30, 2025), https://childrensbehavioralhealthresources.nh.gov/families-youth/treatments-supports/evidence-based-practices (confirming DHHS's adoption of the California Evidence-Based Clearinghouse for Child Welfare as a reliable database).

is a reasonable modification likely to increase the opportunity of Class Members to reside in community-based settings. *See* Ex. 4 (Feild Rep. ¶ 99(c–d, g–i)).

4.   Expanded Discharge- and Transition-Planning Services

There is no genuine dispute that Class Members routinely spend *years* of their adolescence in congregate facilities. SUF ¶ 35. And the parties agree that targeted discharge- and transition-planning services can facilitate "transition[ing] . . . youth back home as appropriately and as quickly as possible." SUF ¶ 57; Ex. 26 (Daryll Tenney Dep. Tr., Bureau Chief, Bureau of Child.'s Behav. Health, DHHS, 235:3–7 (Feb. 27, 2025)). Yet, while Defendants already provide this service, known as Transitional Residential Enhanced Care Coordination ("TrECC"), to youth "voluntarily" placed into residential treatment settings by their parents or guardians, it is available to Older Foster Youth in residential settings only in very limited circumstances. SUF ¶ 59.

In voluntary cases, TrECC coordinators automatically administer the NH CANS 2.0 at least quarterly to youth placed in residential treatment programs. SUF ¶ 60; *see also infra* section (III)(A)(iii)(d)(5). CANS administration at regular intervals allows TrECC coordinators to track youth's progress and the ongoing appropriateness of residential treatment; use standardized templates, including transition plans, to prepare "highly individual" plans for the provision of community-based services upon discharge; and work with youth for up to six months after discharge to stabilize them in community-based placements. *See* Ex. 26 (Tenney Feb. 27, 2025 Dep. Tr. 239:21–22). Requiring Defendants to expand this existing service to provide the Class specialized discharge- and transition-planning services is a reasonable modification that is likely to increase Class Members' opportunity for community-based treatment. SUF ¶ 57.

5. <u>Case Plans Informed by the CANS</u>

As explained below, Defendants' pervasive failure to provide CWA-compliant written case plans to Class Members jeopardizes their mental health and overall wellbeing. And, as admitted by Defendants' own expert, the unnecessary use of congregate care is a bad outcome and reveals inadequate case planning. *See infra* section (III)(B.c). Injunctive relief requiring Defendants to provide timely initial and updated Case Plans that are informed by a comprehensive assessment of needs such as the CANS is a reasonable accommodation that would improve Class Members' likelihood of accessing appropriate community-based placement options. *See infra* section (III)(B)(iii)(1).

6. <u>Validation of the Assessment Tool Driving DCYF's Placement Recommendations</u>

New Hampshire's "CAT" process was developed to comply with the CWA's requirement that an independent party assess the strengths and needs of the child to determine whether the child's needs can be met with family members or through placement in a foster family home. [42 U.S.C. § 675a(c)]. But rather than identifying what services are needed to serve a youth in a foster home, the CAT perpetuates the unnecessary use of congregate facilities for Older Foster Youth by bypassing that determination and qualifying youth for placement in residential facilities to meet all but the mildest mental- and behavioral-health needs. SUF ¶¶ 38–45; Ex. 24 (Sec. Suppl. Feild Decl., [ECF No. 291-2], ¶¶ 69–78). Not only is the CAT, contracted to be administered through Maximus, the primary tool guiding DCYF's institutional placement decisions, SUF ¶¶ 38, 40, but it is the tool that state courts are legally required to rely on to ratify DCYF's institutional placement decisions, SUF ¶ 50. Yet, DHHS's Director of the Bureau of Children's Behavioral Health admits that neither the CAT nor the CAT algorithm has been validated to determine whether a youth's needs can be met in a family setting. Ex. 26 (Tenney Dep. Tr. 55:16–60:21, 61:2–63:3, 78:2–8, 80:24–81:6); *see also* SUF ¶ 46. Even Defendants' own purported expert admitted that DCYF's

independent assessment process is not a reliable tool for determining whether a child is appropriate for a family setting.[14] Ex. 28 (Report of Defs.' Expert Heidi Arthur at 34 (April 10, 2025) ("Arthur Rep.")) (agreeing that there are at least "some youth for whom a CAT has recommended residential treatment where community placement might have been feasible").[15] And Dr. Cross explained how "the process of designing and testing the DHHS CANS 2.0 Algorithm, and therefore the CAT itself, was so fundamentally flawed as to render the entire CAT invalid as a tool for determining the least-restrictive, and most-integrated, setting appropriate for treating an Older Foster Youth's mental- and behavioral-health needs." Ex. 9 (Cross Rep. ¶ 61).

The CAT process rarely finds referred youth appropriate for family settings. SUF ¶ 43. This is by design. Defendants admit that not only did they have a heavy hand in developing their federally mandated "independent" CAT tool, but also that DHHS "tested" the tool to "align" its

---

[14] The language on page two of every CAT performed by Maximus even assumes its level of care recommendations are unreliable: "Although this is the recommended level of care, if the youth's family or team determines that there are current or available community resources that can meet the identified needs, this would be considered appropriate." Ex. 24 (Sec. Suppl. Feild Decl., ECF No. 291-2, ¶¶ 70–71); *see also*, *e.g.*, Ex. 27 ([Youth] CAT Report, ECF No. 175-27, at 2 (June 13, 2023)).

[15] Although Plaintiff has not moved to exclude the opinions of Ms. Arthur simultaneous to this Motion for Summary Judgment, they reserve the right to so move prior to trial and in accordance with applicable case deadlines. *See* Order Granting J. Mot. to Extend Deadlines, ECF No. 360 (June 23, 2025). Plaintiff references Ms. Arthur's report throughout this Memorandum to the extent she endorses Plaintiff's conclusions. But Ms. Arthur's report and deposition testimony make clear that, rather than providing expert testimony based on sound methodology, she merely parroted information from DHHS employees. For example, although the *only* opinion Ms. Arthur reached with respect to Plaintiff's requested relief related to validation of the CAT, *see* Ex. 29 (Heidi Arthur, Defs.' Expert, Dep. Tr. 47:1–23 (May 29, 2025)), Ms. Arthur admitted that she never requested to review the algorithm underlying the assessment tool, she is "not a statistician or a person who has expertise in how algorithms are developed," and she did not review any information regarding refinement of the algorithm over time. *Id.* at 72:18–73:19, 77:23-78:11. To the extent she opined that Defendants monitor the timeliness and quality of CAT assessments, she reached such conclusions based exclusively on the say-so of DHHS employees without employing *any* methodology to confirm the truth of DHHS's self-serving assertions. *Id.* at 86:25–87:20. Plaintiff therefore requests that this Court give little weight to any of Ms. Arthur's purported opinions. *See*, *e.g.*, Mot. to Exclude M&O, ECF No. 356, at 44–48.

underlying algorithm to a youth's *pre-existing placement*. Ex. 9 (Cross Rep. ¶ 58); SUF ¶¶ 41–42. Given New Hampshire's historically high usage of congregate care, it is no surprise that this "align[ment]" now results in congregate care recommendations for youth with any number of "common teenage needs." Ex. 9 (Cross Rep. ¶ 55). For instance, the algorithm is designed to recommend a Level 2 congregate facility for a youth with anxiety and sleep problems that require any level of intervention. Ex. 9 (Cross Rep. ¶ 55) (citing Ex. 30 (Child and Adolescent Needs and Strengths - New Hampshire: 2017 Reference Guide (Feb. 28, 2018)); Ex. 31 (DHHS CANS 2.0 Decision Tool)). And it is designed to recommend a Level 3 facility for a youth with the same anxiety and sleep problems, but whose caregiver also has needs requiring intervention. *Id*. (Cross Rep. ¶ 56). Neither of these combinations of common teenage problems, according to Dr. Cross, are indicative of the need for congregate care. *Id.* (Cross Rep. ¶¶ 55–56); *see also* Ex. 32 (DCYF Policy 1604 at DHHS-0000005964 (Dec. 2010)) (describing the population of youth intended to be served by ISO Foster Care); Ex. 3 (DCYF Policy 1605 at 1 (Feb. 2002)) (describing the characteristics of children intended to be served by Therapeutic Foster Care).

Rather, as Ms. Feild points out, New Hampshire's approach bypasses an analysis of whether a youth's "intermediate" or "intensive" needs can be met in a foster family before recommending a residential level of care. Ex. 24 (Sec. Suppl. Feild Decl., ECF No. 291-2, ¶¶ 69–75). Even Defendants' own expert, who is not an expert on CAT and did not review the underlying algorithm, admitted that among the few CATs Defendants cherry picked for her review, there were cases where, with the right foster family, a child recommended for an institutional setting could have been maintained in the community. Ex. 29 (Heidi Arthur, Defs.' Expert, Dep. Tr. 96:15–97:8, 100:9–101:2 (May 29, 2025)).

Given the serious flaws in the design and validity of the CAT algorithm—the dominant tool driving ratification of institutional placement decisions—injunctive relief requiring clinical validation to ensure reliable identification of the most-integrated setting, supports, and services appropriate for Older Foster Youth's mental- and behavioral-health treatment needs is an essential modification needed to increase the opportunity of Class Members to receive treatment in community-based settings. *See* Ex. 9 (Cross Rep. ¶ 67); Ex. 4 (Feild Rep. ¶ 99).

7.  <u>DCYF Director-level Approval</u>

There is no genuine dispute that requiring Director-level review of *all* recommendations for institutional placement reduces reliance on unnecessary institutionalization. SUF ¶ 99 (citing Ex. 153 (Annie E. Casey Foundation, Rightsizing Congregate Care at 2 (2009))). Thus, injunctive relief requiring Director-level administrative review and approval of congregate care stays over six months—and requiring, prior to any such approval, wraparound meetings with the youth and their family to discuss stepdown options and discharge plans—will ensure that (1) lower-level staff engage in a robust process prior to seeking lengthy stays in congregate placements; (2) ongoing treatment in congregate facilities is not defaulted to as the most convenient placement *available*, but because it is the least restrictive placement *necessary* to meet the child's needs; and (3) there is a concrete plan for the child's discharge from congregate care. It is a reasonable modification likely to increase the opportunity of Class Members to reside in community-based settings.

8.  <u>Freeze on the number of DHHS-contracted residential facility beds, followed by planned reductions</u>

As the former Director of DCYF testified, if the State is meeting the needs of Older Foster Youth, a reduction in congregate facility beds should "[one] [h]undred percent" follow. Ex. 23 (Ribsam Dep Tr. 137:1–4). And as Defendants' own consultant recognized, "one of [the Annie E. Casey Foundation's] core insights is that the best way to reduce group care placements is to reduce

group care contracted slots and force the system to respond."[16] Ex. 33 (*Email from Jess Lanney, NH Project Leader – Government Performance Lab, to Kimberly Crowe, Bureau Chief, Bureau of Pro. & Strategic Dev., DHHS, re: A few ideas re: strategies around residential placements, leveraging admin/support staff* at DHHS-158182 (Mar. 24, 2020)). Nevertheless, Defendants "maintain[] an explicit goal to sustain and expand the contracted residential treatment provider network in NH." Ex. 4 (Feild Rep. ¶ 96) (citations omitted). Given Defendants' recognition that there are youth currently placed in congregate facilities who do not require that level of care, injunctive relief requiring Defendants to simply *freeze* the number of congregate care beds over the next biennium, followed by a measured and planned reduction, is a reasonable modification likely to increase the opportunity of Class Members to reside and receive treatment in community-based settings. *See* SUF ¶¶ 99–100; Ex. 4 (Feild Rep. ¶¶ 99(f), 103) (citing Ex. 34 (*Email from Rebecca Ross, Dir. Bureau for Child.'s Behav. Health, to Morissa Henn, Assoc. Comm'r, DHHS, re: Residential Workforce Stabilization Funds - request for retroactive sole source approval* at DHHS-1983650 (Sept. 13, 2022)) ("The majority of these youth [in residential] are DCYF involved."); Ex. 35 (*Email from Amy McCormack, Assoc. Bureau Chief, DCYF Field Servs., to Sherry Ermel, Bureau Chief, Bureau of Field Servs., DCFY, et al. re: NCH Site review* at DHHS-2969547 (Nov. 21, 2024)) (Nashua Children's Home indicating that 95% of the youth placed are foster youth).

---

[16] The Annie E. Casey Foundation is a private philanthropy "focuse[d] on strengthening families, building stronger communities[,] and ensuring access to opportunity" by "advanc[ing] research and solutions to overcome the barriers to success, help communities demonstrate what works[,] and influence decision makers to invest in strategies based on solid evidence." *About Us*, The Annie E. Casey Foundation (last accessed Jun. 10, 2025), https://www.aecf.org/about; *see also* Ex. 23 (Ribsam Dep. Tr. 25:18–26:1) (describing the Annie E. Casey Foundation as a "philanthropic foundation that supports a host of issues related to trying to improve conditions for young people and their families.").

9. <u>Data Dashboard</u>

It is undisputed that DCYF's public data dashboard does not present critical data points relating to its foster system. SOF ¶¶ 61, 97. Plaintiff's request for a public facing data dashboard is therefore a concrete, achievable accountability tool that will enable Defendants and the public to evaluate progress toward specific outcome measures related to the claims asserted in this lawsuit.[17] Indeed, former Director Ribsam testified that not only is data collection and analysis in child welfare systems important, but "a core value for me is the data needs to be shared and understood so that the public can hold the system accountable, so the public can also hold the legislature and other people accountable to make sure the system gets what it [needs]." Ex. 23 (Ribsam Dep. Tr. 148:21–149:17). Plaintiff's requested data dashboard will allow the public to do just that.

***

For all the reasons shown above, then, there are no genuine disputes with regard to whether (a) Class Members are qualified individuals with disabilities; (b) Class Members are appropriate to live in community placements; (c) Class Members are not opposed to living in community-based settings; and (d) Defendants reasonably can accommodate Class Members in community-based settings, so Plaintiff is entitled to summary judgment on their ADA and Section 504 claims. And because each of Plaintiff's proposed accommodations (remedies) is systemic, such that they

---

[17] A number of states have developed comprehensive, public facing data dashboards similar to that which Plaintiff is requesting. *See, e.g.*, Mass. Dep't of Child. & Fams., *Child Protective Services Overview & Dashboard*, MASS.GOV (last accessed Jun. 30, 2025), https://www.mass.gov/info-details/child-protective-services-overview-dashboard; *Office of Child and Family Well-Being Dashboard*, FLA. DEP'T OF CHILD. & FAMS. (last accessed Jun. 30, 2025), https://www.myflfamilies.com/ocfw-dashboard; Inst. for Fams., Rutgers Univ. Sch. of Soc. Work *NJ Child Welfare Data Hub*, RUTGERS UNIVERSITY (last accessed Jun. 30, 2025), https://njchilddata.rutgers.edu/.

are within Defendants' control, the Court can, and should, order them "in one stroke." *Elisa W. v. City of New York*, 82 F.4th 115, 125 (2d Cir. 2023).

### (iv)    The Undisputed Facts Show that Plaintiff's Proposed Reasonable Accommodations Would Not Fundamentally Alter Defendants' Programs.

Once the plaintiffs establish their *prima facie* case under *Olmstead*, the burden of proof shifts to the defendants to establish that the plaintiffs' proposed modifications "would fundamentally alter the nature of the service, program, or activity." *Olmstead*, 527 U.S. at 597 (citation omitted); *Brown*, 928 F.3d at 1077–78 (citations omitted). But as shown below, Defendants cannot meet that burden.

In defining the contours of the fundamental alteration defense, the *Olmstead* Court recognized the "States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand." *See Olmstead*, 527 U.S. at 597. Balancing that consideration against a State's obligation to avoid unjust isolation, the Court instructed lower courts to consider whether, "in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility [a State] has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." *Id.* at 604.

Applying that guidance, lower courts have focused their analysis on whether the requested modifications would compel an "unreasonable transfer of . . . resources" from other disabled populations to the plaintiffs. *See Brown v. District of Columbia*, 761 F. Supp. 3d 34, 45 (D.D.C. 2024) (citing *Brown*, 928 F.3d at 1078); *see also Benjamin*, 768 F. Supp. 2d at 756–57 (granting summary judgment to the plaintiffs on the fundamental alteration defense when they "are not seeking any impermissible form of 'queue-jumping' and demanding they receive services to the detriment of other individuals"); *Townsend v. Qasim*, 328 F.3d 511, 520 (9th Cir. 2003) (analyzing

"whether [the asserted] extra costs [of the plaintiffs' relief] would, in fact, compel cutbacks in services to other Medicaid recipients"); *Disability Advocs.*, 653 F. Supp. 2d at 299 (rejecting fundamental alteration defense when the defendants put forth no evidence to demonstrate that the relief "would force them to cut back on services to other needy populations").

To support their fundamental alteration defense, Defendants have claimed, without any support, that the requested relief would compel Defendants to "increase spending" by "at least millions of dollars annually." *See* Ex. 36 (Defs.' Resp. & Obj. to Pl.'s Fifth Set of Interrogs. at 11 (Jan. 3, 2025)).[18] But this is nothing more than "vague speculation[]" and falls short of the specific factual analysis required to prove a fundamental alteration defense. *See, e.g.*, *Hampe v. Hamos*, 917 F. Supp. 2d 805, 822 (N.D. Ill. 2013) (denying defendants' motion for summary judgment where defendants speculated that relief sought would impose "massive funding obligations" without any supporting evidence).

Defendants and their experts do not point to any evidence showing that Plaintiff's requested modifications are inequitable to other populations or otherwise amount to a fundamental alteration of their programs or services. That is fatal to their defense. *See, e.g.*, *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016) (affirming denial of defendants' motion for summary judgment where they did not provide any evidence to show that plaintiffs' requested relief would fundamentally alter the state's programs); *Townsend*, 328 F.3d at 520 (rejecting fundamental alteration defense where defendants argued generally that the relief sought would burden the state fiscally); *Fisher*

---

[18] Rather than providing any support for Defendants' claim that requested modifications would cost the state "millions of dollars," Defendants' experts summarily argue that a court order requiring them to make changes, many of which they claim to want to make anyway, will be a "distract[ion]" or, essentially, an inconvenience. Ex. 28 (Arthur Rep. at 34); Ex. 37 (Report of Defs.' Expert Uma Ahluwalia at 10 (Apr. 12, 2025) ("Ahluwalia Rep.")). As discussed below, such unfounded assertions cannot support a fundamental alteration defense.

*v. Okla. Health Care Auth.*, 335 F.3d 1175, 1182–83 (10th Cir. 2003) (rejecting fundamental alteration defense absent specific evidence that the costs of providing the requested relief would "in fact, compel cutbacks in services to other Medicaid recipients" or be inequitable to others with disabilities (citation omitted)); *M.R. v. Dreyfus*, 697 F.3d 706, 737 (9th Cir. 2012) (rejecting fundamental alteration defense where a state official submitted a declaration predicting various outcomes of plaintiffs' requested relief, finding that "[t]he state must make a more particularized showing of harm to others in the disabled community in order to eliminate serious questions on the merits concerning the validity of the fundamental alteration defense" (citation omitted)).

Moreover, Plaintiff's requested modifications are reasonable as a matter of law. None demand new services; they contemplate modifications to the administration of *existing* services, programs, and frameworks to ensure Class Members are given meaningful access. *See, e.g.*, *Florida*, 682 F. Supp. 3d at 1241 ("Proposed modifications that expand existing services are a plausible reasonable accommodation."); *United States v. Mississippi*, 400 F. Supp. 3d 546, 576 (S.D. Miss. 2019) (expansion of community-based services was reasonable where United States showed that the State "already has the framework for providing the[] services, and can more fully utilize and expand that framework to make the services truly accessible"), *vacated on other grounds by* 82 F.4th 387 (5th Cir. 2023); *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 345 (D. Conn. 2008) (modifications were reasonable when "community placement could be achieved through existing programs"); *Disability Advocs.*, 653 F. Supp. 2d at 269 ("[W]here individuals with disabilities seek to receive services in a more integrated setting—and the state already provides services to others with disabilities in that setting—assessing and moving the particular plaintiffs to that setting, in and of itself, is not a fundamental alteration." (citation omitted)).

For example, several requested modifications require Defendants to expand access to enhanced support foster homes, CANS, TrECC, and direct supportive services such as Mobile Crisis Services, family supports, and intensive care coordination, for licensed and unlicensed kinship caregivers. All of those services already exist in the State but remain largely inaccessible to Class Members. *See, e.g.*, SUF ¶¶ 71, 74–78 (ISO Foster Care is available to foster youth but mostly out of reach for Class Members); SUF ¶ 53 (CANS assessments are available only to the juvenile justice population); SUF ¶¶ 59 (TrECC not widely administered); SUF ¶ 58 (Fast Forward, New Hampshire's intensive care coordination program, is only available when there is participation by biological or adoptive parents); SUF ¶ 56 (Intercept unavailable to Class Members unless reunification is imminent); *see also* Ex. 4 (Feild Rep. ¶ 78); Ex. 38 (Report of Pls.' Expert Bryan Victor re: Placement Data ¶¶ 31–33 & tlbs.5–8 (Mar. 9, 2025)) (Mobile Crisis exists but has limited reach among Class Members).

Other requested modifications would just require Defendants to leverage existing tools to expand access to community placements that New Hampshire already provides, such as equal payment rates for non-licensed kinship caregivers and universal kinship finding, which is required under State policy but seldom followed for Class Members. *See* SUF ¶ 66–67 (New Hampshire offers lower rates to unlicensed kin, and majority of kin are unlicensed); Ex. 39 (DCYF SOP 1600.3: Kinship Care Placement at 3 (Feb. 2025)) ("Ongoing efforts to identify potential kin for placement are necessary.")); Ex. 9 (Cross Rep. ¶ 39) ("For most of these children who languished in congregate care, DCYF failed to earnestly seek out community-based placements. Months to years would pass with multiple CPSW reports being written that lacked any evidence that DCYF had made efforts to find families."). Such modifications are likewise reasonable as a matter of law. *See, e.g.*, *Florida*, 682 F. Supp. 3d at 1238-41 (raising reimbursement rates for private duty nursing

was reasonable); *id.* at 1241 ("Modifications that align with the jurisdiction's own stated plans and obligations are reasonable"); *Henrietta D.*, 331 F.3d at 280-81 (modifications were reasonable when they were already required under law).

The remaining modifications—requiring Director-level approval prior to congregate placements, freezing the number of congregate beds available, validating the CAT, adding certain metrics to DCYF's data dashboard, and addressing case planning compliance (discussed *infra* at (III)(B)(ii)—are all "fundamentally procedural in nature" and, again, reasonable as a matter of law. *See Henrietta D.*, 331 F.3d at 281 (remedies seeking intensive case management, low caseworker ratios, and imposition of clear deadlines were reasonable); *see also Brown*, 761 F. Supp. 3d at 95 (remedy seeking public reporting on a number of metrics was reasonable); *Florida*, 682 F. Supp. 3d at 1237-41 (remedy seeking "more robust data collection and analysis" was reasonable).[19]

Any argument that Plaintiff's requested modifications amount to a fundamental alteration also cannot be reconciled with the fact that serving Class Members in the community *would cost Defendants less than warehousing them in facilities*. SUF ¶ 88; *Disability Advocs.*, 653 F. Supp. 2d at 308 ("Because the relief requested here would actually save the State money, it will not interfere with Defendants' ability to serve other individuals with mental illness."). As Ms. Feild explained, "community placements and services are significantly more cost-effective than congregate facilities," and "most of the costs associated with expanding community based services

---

[19] Defendants' expert, Uma Ahluwalia, claims that Defendants have "committed to the improvements suggested in the Plaintiff's [interrogatory response setting forth their requested relief]." Ex. 37 (Ahluwalia Rep. at 29). This further compels a finding of reasonableness. *See Florida*, 682 F. Supp. 3d at 1238-41; Messier, 562 F. Supp. 2d at 344–45 (plaintiffs' requested service expansion, which was consistent with defendants' publicly stated plans, was reasonable); *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 208 n.17 (E.D.N.Y. 2000) ("The reasonableness of the modifications that plaintiffs seek, moreover, is evidenced by the fact that virtually all are modifications that defendants have long purported—but failed—to provide, and that they are now required by local law to provide."), *aff'd sub nom. Henrietta D.*, 331 F.3d 281.

or enhanced support foster homes are reimbursable by the federal government." *See* Ex. 4 (Feild Rep. ¶¶ 105, 108); *see also* SUF ¶¶ 88, 93–94.

Thus, because Defendants have failed to produce *any* specific evidence that Plaintiff's requested modifications would fundamentally alter their services or programs, the Court should grant Plaintiff summary judgment on Defendants' fundamental alteration defense.

### iv.   The Undisputed Facts Show that Defendants Lack an "Effectively Working" *Olmstead* Plan.

The State may also establish a fundamental alteration defense by proving it has "a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep it's institutions populated." *Olmstead*, 527 U.S. at 605-06. The undisputed evidence shows, though, that Defendants have no such plan.

A "written document purporting a commitment to deinstitutionalization," without more, cannot suffice to create an *Olmstead* plan. *Benjamin*, 768 F. Supp. 2d at 755. Instead, "there is wide-spread agreement that one essential component of an 'effectively working' plan is a measurable commitment to deinstitutionalization." *Day v. District of Columbia*, 894 F. Supp. 2d 1 (D.D.C. 2012); *see, e.g., Frederick L. v. Dep't of Pub. Welfare of Pa.*, 422 F.3d 151, 157, 160 (3d Cir. 2005) (plan must "demonstrate[] a reasonably specific and measurable commitment to deinstitutionalization for which [the State] may be held accountable"); *Disability Advocs.*, 653 F. Supp. 2d at 305 ("[A]n *Olmstead* plan requires a reasonably specific and measurable commitment to deinstitutionalization for which the State may be held accountable." (citation omitted)); *Brown*, 761 F. Supp. 3d at 85 ("The issue is not whether there is a piece of paper that reflects that there will be ongoing progress toward community placement, but whether the Plan going forward is

workable and is being implemented effectively to assure that individuals are actually being moved to integrated setting." (cleaned up)).

In deciding whether a state's *Olmstead* plan reflects a "measurable commitment to deinstitutionalization," courts assess whether the programs undergirding the plan have successfully transitioned the plaintiffs to the community. *See, e.g.*, *Disability Advocs.*, 653 F. Supp. 2d at 270–82, 302–05 (rejecting *Olmstead* plan defense when the state could not demonstrate how its programs effectively assisted the plaintiffs in moving to more integrated settings); *Day*, 894 F. Supp. 2d at 28–29 (rejecting *Olmstead* plan defense when only three of the plaintiffs had transitioned to the community under the plan and there was no "baseline from which to measure that number"); *Haddad v. Arnold*, 784 F. Supp. 2nd 1286, 1306 (M.D. Fla. 2010) (rejecting *Olmstead* plan defense when Defendants failed to show the effectiveness of the waiver program at issue); *Pa. Protection & Advocacy, Inc. v. Pennsylvania*, 402 F.3d 374, 384 (3rd Cir. 2005) (vacating grant of summary judgment to the defendants because "no plan exist[ed] for the integration of [plaintiffs] into community treatment programs"). The DOJ's guidance is the same:

> To be effective, the plan must have demonstrated success in actually moving individuals to integrated settings in accordance with the plan. A public entity cannot rely on its *Olmstead* plan as part of its defense unless it can prove that its plan comprehensively and effectively addresses the needless segregation of the group at issue in the case. Any plan should be evaluated in light of the length of time that has passed since the Supreme Court's decision in *Olmstead*, including a fact-specific inquiry into what the public entity could have accomplished in the past and what it could accomplish in the future.

*See* Ex. 5 (DOJ Statement at 10–11, Q. 12).

Far from presenting anything specific, measurable, workable, and comprehensive, Defendants do not, and cannot, point to any evidence showing that any past, current, or planned initiatives have successfully moved a substantial number of Older Foster Youth with mental disabilities to community settings. Instead, the undisputed facts show that such youth are excluded

from the community placements and services Defendants and their experts tout. *See* Ex. 36 (Defs.'

Resp. & Obj. to Pl.'s Fifth Set of Interrogs. at 16–25); SUF ¶¶ 53–61, 71, 82; *see also* Ex. 4 (Feild

Rep. ¶¶ 71–79). Any reliance on those programs as part of an *Olmstead* plan is therefore misplaced.

*See Disability Advocs.*, 653 F. Supp.  2d at 275 (expanded community housing did not support

*Olmstead* plan when plaintiffs were "still largely denied access because supported housing

resources are scarce"); *Day*, 894 F. Supp. at 31 (screening and review process not available to

majority of plaintiffs did "little, if anything" to establish an *Olmstead* plan).

And, even though nearly three decades have passed since *Olmstead* was decided, the

community placements and services most likely to deinstitutionalize Class Members are not yet

operational, remain in the nascent stages of implementation, or have been outright abandoned.[20]

*See* Ex. 36 (Defs.' Resp. & Obj. to Pl.'s Fifth Set of Interrogs. at 16–25); SUF ¶¶ 53, 55, 58–59,

68–70, 86, 125. The lack of implementation further forecloses any argument that those programs

have successfully deinstitutionalized Older Foster Youth with mental disabilities. *See Benjamin*,

768 F. Supp. 2d at 756 ("The absence of implementation, or even any demonstrated step *toward*

implementation, is insufficient for Defendants to assert a fundamental alteration defense."

(emphasis in original)); *Pa. Prot. & Advocacy, Inc.*, 402 F.3d at 380-81 ("[T]he only sensible

reading of the integration mandate consistent with the Court's *Olmstead* opinion allows for a

fundamental alteration defense only if the accused agency has developed and *implemented* a plan

to come into compliance with the ADA and [Rehabilitation Act]." (citation omitted)); *Crabtree v.*

*Goetz*, No. 3:08-0939, 2008 WL 5330506, at *29 (M.D. Tenn. Dec. 19, 2008) (rejecting *Olmstead*

---

[20] In fact, most of the ineffective programs Defendants present were developed during the litigation of this action. *See* Ex. 36 (Defs.' Resp. & Obj. to Pl.'s Fifth Set of Interrogs. at 16–25).

plan defense because the court was "not persuaded that [the plan] w[ould] be effectively implemented").

Defendants have also failed to marshal data sufficient to prove that *any* of their programs substantiate their *Olmstead* plan defense. They have not cited any data reflecting (1) the number of Older Foster Youth with mental disabilities unnecessarily in or at-risk of placement in a residential facility; (2) the community placements and/or services for which such youth are eligible to avoid such placement; and (3) the length of time spent awaiting those placements and/or services. *See* SUF ¶ 61.

At bottom, Defendants' use of the term "*Olmstead* plan" is a moniker, and they ask this Court to blindly trust that they will (1) implement newly created strategic plans[21] notwithstanding DHHS's continued insistence on level funding for institutional care; and (2) implement such plans with sufficient fidelity and reach to successfully deinstitutionalize Older Foster Youth with mental disabilities. Those promises amount to nothing more than "vague assurances" that fall far short of an effectively working *Olmstead* plan and cannot withstand scrutiny against the backdrop of Defendants' chronic delays and abandonment of other integration initiatives. *See* SUF ¶¶ 53, 55, 58–59, 68–70, 86, 125. To hold otherwise would render the *Olmstead* mandate meaningless. The

---

[21] And while DCYF has a generic strategic priority goal of "[r]educ[ing] percentage of youth in residential treatment from 27% to 17% by December 2026," such a reduction is far higher than the national average, is not class specific, and DCYF does not define how this statistic will be measured. As written, it could mean first placements, point-in-time placements, or youth *ever* placed in residential facilities. Further, there is stark evidence in DHHS's 2026-2027 budget request that DHHS intends to shift 30% of youth in residential facilities from the child protection system to the children's behavioral health system. Ex. 40 (excerpt from State of New Hampshire Biennium Budget Request 2026-2027 at DHHS-3089576–77). Given DCYF's recognition that many Class Members are unnecessarily institutionalized, such a shift does not resolve the issues at the heart of this lawsuit—it just results in continued discrimination through a different DHHS system.

Court should reject Defendants' arguments and grant Plaintiff summary judgment on Defendants' *Olmstead* plan defense.

**B. The Court Should Grant Plaintiff Summary Judgment on their Child Welfare Act Claim.**

As shown below, the undisputed facts show that Defendants violate section 1983 by denying Class Members, "under color of state law," the "very specific" substantive and procedural case-plan entitlements "secured by the [CWA]." *3137, LLC v. Town of Harwich*, 126 F.4th 1, 8 (1st Cir. 2025) (citations omitted); *Sam M. v. Chafee*, 800 F. Supp. 2d 363, 388 (D.R.I. 2011).

**(i)    The CWA Requires Class Members to Be Given Timely and Substantive Initial and Updated Written Case Plans.**

The CWA requires DHHS to provide Class Members with (1) initial written child welfare case plans within 60 days of entry into DCYF custody; and (2) ongoing updates to those plans at least every 6 months and upon any change in placement. *See* 42 U.S.C. §§ 622, 675, 675a. And it requires case plans to be "designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child." *See* Class Cert. M&O, ECF No. 342, at 9 (quoting 42 U.S.C. § 675(5))).

The CWA mandates "very specific requirements for an individualized case plan," *Sam M.*, 800 F. Supp. 2d at 388 (citing 42 U.S.C. § 675(1)), including documenting certain "substantive" elements and adhering to certain "procedural" requirements. The former category comprises descriptions of the youth's placement; documentation of the youth's health and educational records; and plans for facilitating the youth's permanency, safety, placement and educational stability, and successful transition into adulthood. *See* 42 U.S.C. §§ 675(1), 675(5), 675a. The latter requires that the case plan be a "discrete" "written document," developed "jointly" with the

parent(s) and in "consult[ation] with the child" within 60 days of the child's removal, and reviewed "every six months." 45 C.F.R. § 1356.21(g)(1)–(2); 42 U.S.C. § 675(5)(B); *see also* id. § 675(1)(B), (5)(C), (H) (transition-planning); SUF ¶¶ 102-10 (DCYF Policies).

As courts in this circuit long have recognized, "[t]he case plan is the *very foundation* of the system of protection for a foster child. It is a blueprint of the steps that must be taken, and services that must be provided, to ensure the safety and welfare of the child." *Lynch v. King*, 550 F. Supp. 325, 338 (D. Mass. 1982) (emphasis added), *aff'd sub nom. Lynch v. Dukakis*, 719 F.2d 504 (1st Cir. 1983). Thus, Defendants' pervasive failures to develop and maintain case plans constitute far more than the "mere gaps in record keeping," *Connor B. v. Patrick*, 985 F. Supp. 2d 129, 166 (D. Mass. 2013), that Defendants would have the Court believe them to be; instead, they jeopardize adolescents' mental health, placement stability, and transitions into independent adulthood. *See also* section (III)(B)(ii)(c), *infra*. Indeed, Defendants' own case planning expert admitted that unnecessary placements in congregate settings—of the type repeatedly identified by Dr. Cross— are precisely the type of poor wellbeing markers indicative of inadequate case planning. Ex. 41 (Cynthia Richter-Jackson, Defs.' Expert, Dep. Tr. 220:2–14 (Jun. 4, 2025)).[22]

Although states must comply with the CWA's requirements, they can design their own case plan "format" and accompanying "policy materials and instructions." *See* 45 C.F.R. § 1356.21(g)(1). As shown in Table 1, below, Defendants have chosen to allocate the CWA's written case-plan requirements across three separate forms. *See* SUF ¶¶ 102–03, 111. A fourth form, DCYF Form 1978 (90-Day Plan), is required as a youth approaches their eighteenth birthday. SUF ¶¶ 104, 112. Thus, no Class Member's "discrete" "written" "case plan" is complete

---

[22] As discussed elsewhere, *see* section (III)(III.B)(ii)(c) (citing n.25), *Connor B.* not only was wrongly decided but is also distinguishable from Plaintiff's undisputed facts in this case.

unless *all three* forms are present. *See also* SUF ¶ 111 (citing Ex. 42 (Rebuttal Report of Pl.'s Expert Daryl Chansuthus ¶¶ 2–8 (May 13, 2025) ("Chansuthus Rebuttal")) (explaining importance of information contained in Forms 1552 and 1695 to sound social work practice; widespread reliance by Defendants' caseworkers on health and education information in Form 1552 to secure and support appropriate placements, mental- and behavioral-health services, medications, etc.).

*Table 1: Case Plan Content Requirements*

| Relevant Form | CWA Requirement |
|---|---|
| **DCYF Form 1550** | • A description of the youth's placement, including a "discussion of [its] safety and appropriateness." 42 U.S.C. § 675(1)(A).<br><br>• A "plan for assuring that the [youth] receives safe and proper care." *Id.* § 675(1)(B).<br><br>• A "plan for assuring that . . . services are provided . . . [to] facilitate return of the [youth] to his own safe home or [another] permanent placement." *Id.* §§ 675(1)(B), (E), (F).<br><br>• A "plan for ensuring . . . educational stability." *Id.* § 675(1)(G).<br><br>• A signed "document that describes the rights of the [youth if 14 years or older]" while in foster care. *Id.* § 675a(b)(1).<br><br>• Requirements related to the permanency goal of Another Planned Permanent Living Arrangement (APPLA), including "[d]ocumentation of intensive, ongoing, unsuccessful efforts for family placement." *Id.* § 675a(a)(1).<br><br>• Requirements related to placement in a Qualified Residential Treatment Program (QRTP), including "the reasons why the needs of the child cannot be met by the family of the child or in a foster family home" and why a QRTP is "the most effective and appropriate level of care in the least restrictive environment." *Id.* § 675a(c)(1)(C). |
| **DCYF Form 1552** | • The youth's "health and education records." *Id.* § 675(1)(C).<br><br>• Requirements related to placement in a QRTP, including "all contact information for members of the family and permanency team, . . . other family members[,] and fictive kin." *Id.* § 675a(c)(B)(iii)(II). |
| **DCYF Form 1695** | • A "description of the programs and services which will help [the youth] prepare for the transition from foster care to a successful adulthood." *Id.* § 675(1)(D). |

| Relevant Form | CWA Requirement |
|---|---|
| **DCYF Form 1978** | • A "90-Day" plan," including "specific options on housing, health insurance, education, . . . and employment" and plans to provide the youth with important documents, including their birth certificate, driver's license or identification card, social security card, and medical records. *Id.* §§ 675(5)(H), (I). |

Case plans must reflect the child's current conditions, *see, e.g.*, 42 U.S.C. § 675(1); therefore, they must be updated at least every six months and following significant life events. As the federal Department of Health and Human Services ("HHS") has explained, the CWA's requirement to "review" each adolescent's case plan every six months contemplates updating the case plans themselves "after each six-month periodic review," or sooner if "a new placement is made." *See 8.3C.1 Title IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Case Plans Q. 2*, Child Welfare Policy Manual (2024), https://www.acf.hhs.gov/cwpm/public_html/programs/cb/laws_policies/laws/cwpm/policy_dsp.jsp?citID=60.[23]

Indeed, a state would violate the plain language of the CWA's substantive requirements if, as Defendants urge, it created only an "initial" case plan and then never updated that plan. *See, e.g.*, 42 U.S.C. § 675(1) (requiring that case plans describe "the safety and appropriateness of *the [youth's] placement*," the "*most recent* information available regarding" the child's health and education, "the appropriateness of the *current* educational setting," and "documentation of the

---

[23] HHS's interpretation has the "power to persuade" if not the "power to control." *See Loper Bright*, 603 U.S. at 402 (citing *Skidmore*, 323 U.S. at 140); *see also id.* (agency's interpretation is "especially informative to the extent it rests on factual premises within the agency's expertise" (citation omitted)). At minimum, the "well-reasoned" and "thorough" ACF Child Welfare Policy Manual is entitled to respect. *See Doe v. Leavitt*, 552 F.3d 75, 80, 81–82, 86 (1st Cir. 2009) (citing *Skidmore*, 323 U.S. at 140).

steps the agency *is taking*" related to permanency (emphases added)).[24] And Defendants' own policies for achieving CWA compliance, *see* 45 C.F.R. § 1356.21(g), confirm the reasonableness of HHS's interpretation. SUF ¶¶ 103-06; *see also* SUF ¶ 111.

Therefore, Defendants violate the CWA when they do not (i) provide each Class Member with initial case plans, comprising Forms 1550, 1552, *and* 1695, within 60 days of entering DCYF custody; and (ii) update those same forms, at least every 6 months or upon a change in the youth's placement.

As for the *extent* of noncompliance required to successfully challenge, via private enforcement, a state's failure to provide a statutory welfare entitlement, courts require "full," "absolute," or "strict" compliance. *See, e.g.*, Garnett v. Zeilinger, 313 F. Supp. 3d 147, 155–56 (D.D.C. 2018) (collecting cases), *vacated on other grounds by* 485 F. Supp. 3d 206, 232 (D.D.C. 2020). That is true *notwithstanding* a statute's tethering federal funding to "substantial compliance" with state plans. As the Ninth Circuit has explained, "[t]he funding standard is not intended to be the measure of what the regulations require; it is intended to measure how great a failure to meet those requirements should cause funds to be cut off." Withrow v. Concannon, 942 F.2d 1385, 1387 (9th Cir. 1991); *see also* Fortin v. Comm'r of Mass. Dep't of Pub. Welfare, 692 F.2d 790, 796 (1st Cir. 1982) ("HHS might be reluctant to exercise [its] power [to withhold

---

[24] *See also* Child and Fam. Servs. Improvement Act of 2006, Pub. L. No. 109-288, § 7(3), 120 Stat. 1233, 1248 (2006) (requiring that "*monthly* . . . caseworker visits . . . focus[] on issues pertinent to case planning" (emphasis added)); Preventing Sex Trafficking and Strengthening Fams. Act, § 112, Pub. L. No. 113-183, 128 Stat. 1919, 1926 (2014) (in amending CWA to "improv[e] another planned permanent living arrangement as a permanency option," requiring "documentation of intensive, *ongoing*, unsuccessful efforts for family placement" (emphasis added)); Bipartisan Budget Act of 2018, Pub. L. No. 115-123, §§ 50741-50742, 132 Stat. 64, 253-59 (2018) (in amending CWA to "limit[] . . . federal financial participation for placements that are not in foster family homes," requiring that case plans document the appropriateness of the child's *current* placement).

funding] . . . because the remedy is drastic; in any case its failure to withhold does not insulate the [defendant state agency's] actions from federal judicial review." (citing *Rosado v. Wyman*, 397 U.S. 397, 420 (1970)).[25]

Defendants have chosen to accept CWA funds, under both Titles IV-B and IV-E, and so "must abide by [the CWA's] laws and regulations . . . ." *Rosie D. v. Romney*, 410 F. Supp. 2d 18, 24 (D. Mass. 2006) (citations omitted); SUF ¶ 101; *see also* M&O Denying Defs.' Second Mot. to Dismiss, ECF No. 341, at 7-12 (Sept. 18, 2024) (case plan entitlement derives from 42 U.S.C. §§ 622(b)(8)(A)(ii) (Title IV-B) and 671(a)(16) (Title IV-E)).

---

[25] Plaintiff should prevail on their CWA claim regardless of whether this Court applies a "full" or "substantial" compliance standard. "Substantiality," for purposes of judicial review, depends on the circumstances of each case, including "the nature of the interest at stake and the degree to which noncompliance affects that interest." *Fortin*, 692 F.2d at 795. The interests at stake here—adolescents' basic safety and welfare—is great, "making the consequences of failure to comply quite serious." *See id.* Accordingly, even "substantial" compliance requires, at minimum, 90% population-wide compliance with the CWA's procedural and substantive requirements. *See, e.g.*, id. at 794–95 (agency's 88% to 96% compliance with statutory and regulatory timelines warranted contempt order against state); *Cal. Alliance of Child & Fam. Servs. v. Allenby*, 589 F.3d 1017, 1022-23 (9th Cir. 2009) (agency's "80 percent" compliance with CWA wasn't "even close" to substantial compliance); *Robidoux v. Kitchel*, 876 F. Supp. 575, 578 (D. Vt. 1995) (agency's 90% to 92% compliance with regulatory timelines warranted summary judgment to plaintiffs); *see also* 45 C.F.R. § 1355.46(d)(1), (f) ("compliance" with CWA's data-reporting requirements, which include listing the case plan goal for every child in foster care, *id.* § 1355.44(f), requires "a data file that has no more than 10 percent total of missing, invalid, or internally inconsistent data, or tardy transactions" across the *entire population* of such children); *id.* § 1355.34(b)(3)(ii) (defining "substantial conformity" as achieving, for each enumerated indicator, a rating of "'substantially achieved' in 95 percent" of *sampled* cases); Ex. 43 (*Email from Mary Corbin, AFCARS Data Systems Analyst, to Sherry Ermel, Bureau Chief, Bureau of Field Servs., DCYF, et al. re: Overdue/Missing Case Plans for AFCARS* at DHHS-2499546 (June 13, 2022)) ("[A]ttached are the missing/overdue case plans for youths removed from home for 60 days or more and who do not yet have Case Plans . . . . Currently we are over the 10% noncompliance allowed percentage for this element in today's AFCARS test run.")).

(ii)    **The Undisputed Facts Show that Defendants Have Failed to Develop and Update CWA-Compliant Case Plans for Class Members.**

a.    *Defendants Have Failed to Develop Compliant Initial Case Plans for Class Members.*

As Ms. Chansuthus explained in her analysis of a representative sample of Older Foster Youth's case plans, Defendants do not create even the required set of case plans forms for Class Members, let alone complete such forms in substantively and procedurally compliant manners. Ex. 44 (Report of Pl.'s Expert Daryl Chansuthus ¶¶ 71–73 & tbl.3 (March 12, 2025) ("Chansuthus Rep.")). Setting aside content entirely, and tripling the 60-day timeliness window, she found that Defendants created the required pairing of Forms 1550 and 1552 within 180 days of the youth's entry into state custody for only 39% of Older Foster Youth in her sample. *See* SUF ¶ 113.[26] Class Members' initial case plans also were substantively noncompliant, rarely documenting *basic* information needed to promote youth wellbeing—*e.g.*, the appropriateness of the youth's placement (2%), health and education records (0%), and transition services (6%). SUF ¶ 113. And the initial case plans rarely were procedurally compliant—only 27% were developed timely, 7% with parental involvement, and 0% with youth consultation. SUF ¶¶ 114–15. Ms. Chansuthus's sampled findings can be extrapolated to all Class Members in custody on April 26, 2022, within an outer margin of error of +/- 15%. *See* SUF ¶¶ 113–14.[27] Defendants have not produced any evidence refuting these findings.

---

[26] *See also* Ex. 44 (Chansuthus Rep. ¶ 75 tbl.4) (regardless of content, 49% of Class Members had Forms 1550 within 60 days of entry; 83% had Forms 1550 within 180 days); *cf.* n. 25, *supra* ("substantial" compliance requires greater than 90% compliance).

[27] *See also B.K. v. Faust*, 411 F. Supp. 3d 462, 483 (D. Ariz. 2019) (finding that "every member of the Medicaid Subclass [was] exposed to a significant risk of an imminent future Medicaid violation" where only 83.74% received at least one of the statutorily required examinations, and only 68.48% received at least half such examinations); *Rosie D.*, 410 F. Supp. 2d at 29, 51, 52–53 (finding state defendants liable for class-wide violations of the Medicaid Act

Available population-wide data also confirms Ms. Chansuthus's findings. As Dr. Victor found in his analysis of the presence or absence of case plan documents from September 10, 2021, to December 1, 2022 (the most-recent 15-month period of case-planning information to which Plaintiff had access) for the *entire population* of Older Foster Youth in custody on April 26, 2022, only 33.7% of Class Members had *any* copy of Form 1550 in their DCYF Case Files; even fewer, 17.3%, had *any* copy of Form 1695. SUF ¶ 116.[28]

Defendants do not dispute (and certainly cannot genuinely dispute) that they have failed to develop *CWA-compliant* initial case plans—that is, the three required written documents, DCYF Forms 1550, 1552, *and* 1695—for Class Members. Rather, their expert, Cynthia Richter-Jackson, claims that all the CWA demands is Form 1550 (but not Forms 1552 and 1695), developed within 120, or even 180, days of the youth's entering DCYF custody (not 60 days), which apparently can be devoid of any required content. Ex. 47 (Report of Defs.' Expert Cynthia Richter-Jackson at 7–8 (April 14, 2025) ("Richter-Jackson Rep.")); *see also* Ex. 41 (Richter-Jackson Dep. Tr. 142:21–143:5, 143:21–144:3, 102:05–14, 174:17–175:12, 191:4–9). As explained above, though, the CWA mandates "very specific requirements for an individualized case plan." *Sam M.*, 800 F. Supp.

---

where evidence, including plaintiffs' experts' reviews of 35 class members selected randomly from defendants' point in time identification of 3,226 class members, showed that "a great number" of class members were not receiving "adequate case management services" and "majority" of class members did not receive adequate assessments).

[28] *See also* Ex. 45 (*Family Service Workgroup* at DHHS-3247100 (Jan. 15, 2025)) ("We MUST get a current case plan for every open case into the case library RIGHT NOW. Deb will be asking DO's to come up with a plan to remedy the backlog of missing case plans."); Ex. 43 (*Email from Mary Corbin, AFCARS Data Systems Analyst, to Sherry Ermel, Bureau Chief, Feild Servs., DCYF, et al. re: Overdue/Missing Case Plans for AFCARS* at DHHS-2499546 (June 13, 2022)) ("Currently we are over the 10% noncompliance allowed percentage for [missing/overdue case plans] in today's AFCARS test run."); Ex. 46 (*Email from Mary Corbin, AFCARS Data Systems Analyst, to Sherry Ermel, Bureau Chief, Field Servs., DCYF, et al. re: AFCARS Missing Case Plan Indication* at DHHS-2295695 (Feb. 28, 2022)) ("Today AFCARS is showing approximately 100 youths with missing case/permanency plans.").

2d at 388 (citing 42 U.S.C. § 675(1)). Ms. Richter-Jackson's opinion that ███████████ ████████████████████████████████████████████████████████████ *see* Ex. 47 (Richter-Jackson Rep. at 16), not only constitutes impermissible legal opinion but is *immaterial*. Defendants' expert no sooner can re-write federal law than Defendants can be heard to complain of the apparently inconvenient consequences of assuming the care and custody of vulnerable youth. *See, e.g.*, *id.* (Richter-Jackson Rep. at 4–15) (██████████████████████████████ ████████████████████████████████████████).

To the extent Ms. Richter-Jackson's analysis of the presence or absence of Forms 1550 might be more "recent" than Ms. Chansuthus's, it does not create a genuine dispute of *material* fact, for the reasons described above.[29] In fact, Dr. Victor's analysis of "recent" *complete* initial case plans for youth entering care, summarized in Table 2 below, found, among an *entire point-in-time population* (rather than using a sample, as did Ms. Richter-Jackson), that only 8% of Class Members entering care had DCYF Forms 1550 *and* 1552 within 60 days (19% within 180 days); and 0% had Forms 1550, 1552, *and* 1695 within 60 days (0% within 180 days). SUF ¶ 114.

---

[29] But even accepting Ms. Richter-Jackson's findings at face value and analyzing them within her flawed reading of the CWA, Defendants cannot show "substantial" compliance with the CWA. *See* Ex. 8 (MacKenzie Rebuttal ¶ 11 tbl.1) (applying standard statistical tools to Ms. Richter-Jackson's data and calculating that rate of Forms 1550 created within 180 days of youth entering custody, from October 1, 2021, to October 31, 2024, as 78% to 95%; the rate of timely Forms 1550 was 46% to 73%—in either case, not exceeding, at a statistically representative level, the 88% to 96% *population-wide* compliance rate found insufficient by the First Circuit in *Fortin, see* n. 25, *supra*). Ms. Richter-Jackson's case review methodology was so fundamentally flawed as to not only warrant, but compel, striking any opinions based on those data, or at minimum, affording them so little weight as to destroy any *genuine* dispute as to the rate of Defendants' creation of initial case plans. *See* Mem. of Law in Supp. of Pl.'s Mot. to Exclude Defs.' Expert, Cynthia Richter-Jackson, at 6–11; Ex. 48 (*Letter from M. Wangerin, Pl.'s Counsel, to Julia Siegenberg, Defs.' Counsel, re: Preservation of Case Plans and Data Regarding Case-Planning* (Mar. 31, 2025)) (un-responded-to request for confirmation that Defendants were not altering or amending case-planning data).

**Table 2: Percentage of Complete Initial Case Plans Among Older Foster Youth Who Entered DCYF Custody September 10, 2021, to April 26, 2022**

| Case Plan Documents | Completed within 60 days | Completed within 180 days |
|---|---|---|
| **DCYF Forms 1550 *and* 1552** (All Older Foster Youth) | **8.3%** (3/36) | **19.4%** (7/36) |
| **DCYF Form 1550, 1552, *and* 1695** (Older Foster Youth Aged 14+ at Time of Entry) | **0%** (0/35) | **0%** (0/35) |

Thus, the record contains no contrary evidence on the existence of all required case plan components (Forms 1550, 1552, and 1695) for Class Members, leaving no genuine dispute that Defendants fail to comply, even substantially, with the CWA's initial case plan requirements.

### b. *Defendants Fail to Update Class Members' Case Plans to Reflect Youths' Current Circumstances.*

It also is undisputed that Defendants fail to update Class Members' case plans to reflect current circumstances. Building in month-long buffers to the CWA's update requirements, Dr. Victor found in his population-wide analysis that only 3% of Class Members had updates made to their Forms 1550 every seven months, 1% to their Forms 1552 every seven months, and 14% to their Forms 1695 every 13 months. SUF ¶ 116. Defendants updated youth's Case Plans within 30 days of a change in placement in only 27% (Form 1550), 20.3% (Form 1552), and 8% (Form 1695) of such changes. SUF ¶ 117.[30] Defendants do not even try to rebut Dr. Victor's findings with any of their own data regarding the rate of Case Plan updates. In fact, Ms. Richter-Jackson's admits that ███████████████████████ Ex. 47 (Richter-Jackson Rep. at 16).

---

[30] Only a third of Class Members approaching their eighteenth birthdays had Forms 1978, just two (8.3%) of which were timely. SUF ¶ 118.

### c. *Plaintiff Has Proven Class-Wide CWA Violations.*

Plaintiff's undisputed evidence more than suffices to prove class-wide violations of the CWA's requirements to (i) create and (ii) update CWA-compliant case plans. Defendants previously have cited, and likely will again cite, *Connor B.*, 985 F. Supp. 2d at 155–56, 166, which granted judgment to Defendants after finding, under Massachusetts's case plan scheme, that only 64.9% to 86.4% of children in a sampled review had case plans. But here, even on the mere existence of initial plans, the undisputed evidence shows only 39% of Older Foster Youth in a sampled review had even two of the three required forms comprising "an initial case plan." *See supra* section (III)(B)(ii)(a). Additionally, and unlike in *Connor B.*, Plaintiff has presented undisputed and unrebutted evidence of Defendants' failure to include required content within, and to update, those case plans. *See supra* section (III)(B)(ii)(b). Thus, even applying the *Connor B.* standard (which Plaintiff submits is incompatible with the First Circuit's standard for substantial compliance, *see* footnote 25, *supra*), *Connor B.* is factually distinguishable.

To the extent Defendants suggest that Plaintiff must demonstrate individualized harms resulting from each of Defendants' unlawful CWA practices, they are wrong as a matter of law. As courts in this circuit long have acknowledged, "[t]he case plan is the *very foundation* of the system of protection for a foster child. It is a blueprint of the steps that must be taken, and services that must be provided, to ensure the safety and welfare of the child." *Lynch*, 550 F. Supp. at 338; *see also* 120 Stat. at 1233 § 2 (Congressional finding that "strengthen[ing]" child welfare casework practices, including case planning, likely to "promote better outcomes" for children); *cf. Rosie D.*, 410 F. Supp. 2d at 31 ("[C]entralized, knowledgeable, and painstaking service coordination [for children with serious emotional disturbances] is essential; without it, a child's life becomes a chaos

of ineffective, overlapping plans and goals."). For this reason, harm is presumed upon the violation, analogous to a theory of strict liability.[31]

Even were evidence of harm required, the undisputed facts show that Defendants' unlawful practices harm Class Members. Far from "mere gaps in record keeping," *Connor B.*, 985 F. Supp. 2d at 166, Defendants' widespread failures to develop and maintain case plans for Class Members jeopardize adolescents' mental health, placement stability, and transitions into independent adulthood. *See* SUF ¶ 119–21. Indeed, one need look no further than Dr. Cross's opinions about Defendants' chronic and pervasive unnecessary placement and retention of Class Members in segregated congregate facilities. SUF ¶ 119. In his report, he detailed the consequences of Defendants' failures to document, in a single, discrete location, Defendants' plans to provide coordinated *custodial* care—that is, a joining together, as the parents and guardians of non-foster youth do in the normal course of life, of the otherwise siloed realms of child welfare, education, physical healthcare, social and emotional wellbeing, mental- and behavioral-health care, and preparation for independent adulthood.

Defendants similarly ██████████████████████████ Ex. 47 at 12 (Richter-Jackson Rep.), including, as Ms. Richter-Jackson herself acknowledges, to ████████████████████████████ Ex. 47 (Richter-Jackson Rep. at 16).[32] Indeed, Ms. Richter Jackson admitted in her deposition that

---

[31] Although but-for causation in terms of harm is not required to establish class-wide violations of the CWA, Plaintiff's proposed remedies must, as discussed *infra* in section (III)(B)(iii), be "likel[y]" to improve the rate of compliance. *See Brown*, 928 F.3d at 1083. Plaintiff's evidence amply meets this separate standard.

[32] *See also* Ex. 49 (*Management Interviews* at 6 (Mar. 4, 2025)) (attached as Ex. 8 to Ex. 47 (Richter-Jackson Rep.)) ("Believe in case plan – setting a road map, making sure they have their services is 100% believe in this. When CW finally learns how to use a case plan to move a family forward, it is great."); Ex. 44 (Chansuthus Rep. ¶¶ 59–61); *cf.* Mem. of Law in Supp. of

unnecessary institutionalization—of the type identified by Dr. Cross—is causally connected to a state's failure to provide adequate case planning. Ex. 41 (Richter-Jackson Dep. Tr. 220:2–14); *see also id.* at 200:23–201:24 (admitting that neither residential mental health treatment plans nor special education plans are substitutes for child-welfare case plans). DCYF Administrators echoed Ms. Richter-Jackson in their deposition testimony. For example, DHHS Bureau Chief of Field Services Sherry Ermel admitted that "case planning's important" because it is "a living, breathing, workable document[, a] plan that helps to provide clarity . . . around what items, tasks that they need to focus on, who's responsible to accomplish certain tasks, [and] the time frame with which individuals need to complete those tasks." Ex. 50 (Sherry Ermel, Bureau Chief, Bureau of Field Servs., DCYF, Rule 30(b)(6) Dep. Tr. 116:17–117:12 (July 19, 2022)); *see also* Ex. 51 (Marie Noonan, Dir., DCYF, Dep. Tr. 57:6–18 (Feb. 27, 2025)) (DCYF assesses youth's needs and matches youth to services "through our case planning process"); Ex. 52 (Jennifer Ross-Ferguson, Deputy Dir., DCYF, Dep. Tr. 55:18–20, 186:18–187:6 (Feb. 24, 2025)) (case plans are "the roadmap" for "the family," "the case," and "what should be happening and who should be responsible for what")); SUF ¶¶ 102–10.

In short, there is no genuine issue of material fact that Defendants have failed to (i) create timely CWA-compliant initial case plans for Class Members—even on the most basic level of

---

Pl.'s Mot. to Exclude Defs.' Expert, Cynthia Richter-Jackson, at 10–11 (explaining that Ms. Richter-Jackson's statement ███████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████ is not even minimally credible, given her failure to review the entire DCYF Case File and failure to disclose any concrete data supporting her sweeping statements; and explaining that Ms. Richter-Jackson's data regarding permanency outcomes for *all* youth cannot support her finding as to *Older Foster Youth's* wellbeing).

creating the three required components, DCYF Forms 1550, 1552, and 1695; and (ii) update those initial case plans with current information.

### (iii)    Plaintiff's Proposed Remedies Are Likely to Redress Defendants' CWA Violations and Lead to the Delivery of Compliant Case Plans.

An injunction satisfies Rule 23(b)(2) of the Federal Rules of Civil Procedure when it "provides each member of the class *an increased opportunity* to achieve" or "improve[s] [their] likelihood of achieving" a "legally mandated outcome." *Brown*, 928 F.3d at 1082–83 (emphasis added); *see also Barrows v. Becerra*, 24 F.4th 116, 132 (2d Cir. 2022) ("Rule 23(b)(2) does not require that the relief to each member of the class be identical, only that it be beneficial. That means that different class members can benefit differently from an injunction." (citation omitted)). In this case, there can be no genuine dispute of material fact that the Court's ordering of the following measures would "improve" Class Members' "likelihood" of receiving, and otherwise help Defendants deliver, CWA-compliant case plans.

1. Comprehensive Assessment

Assessing youths' strengths and needs upon entry into state custody, or at least upon turning fourteen (as it pertains to the Class), is vital to the development of CWA-compliant case plans. *See* SUF ¶¶ 122–23; Ex. 28 (Arthur Rep. at 34) (CANS will "help some children to avoid persistent, more serious conditions and crises" and, ultimately, reduce the number of youth placed in congregate facilities); *see also Rosie D.*, 410 F. Supp. 2d at 52 ("It is self-evident that 'early and periodic screening, diagnostic and treatment' services are impossible without a competent analysis of a child's clinical needs."). Yet in 2020, Defendants stopped any standardized assessment of Class Members' mental- and behavioral-health needs; the only remaining tool is insufficient to support creation of CWA-compliant case plans, and Class Members otherwise are not

comprehensively assessed;[33] and, over five years later, Defendants have not implemented their intended replacement tool. *See* SUF ¶¶ 124–25; Ex. 53 (First Suppl. Decl. of Pl.'s Expert Daryl Chansuthus, ECF No. 279, ¶ 81 n.90 (May 1, 2024)). Defendants' own staff agree that implementing this remedy would improve outcomes for Class Members. *See, e.g.*, SUF ¶ 122.

### 2. Specialized Caseworkers

Class Members have unique case-planning entitlements under the CWA related to their risks of aging out of state custody without permanency and their intensive mental- and behavioral-health needs. SUF ¶ 126. However, they often are not assigned caseworkers trained and supported in meeting these needs. *See* SUF ¶ 127–32. Defendants' staff agree that implementing this remedy would improve outcomes for Class Members. *See, e.g.*, SUF ¶¶ 126, 133.

### 3. Continuous Quality Improvement (CQI)

As Defendants' expert explained, ████████████████████████████

████████████████████████████████████████████████████████████

████████████ *See* Ex. 47 (Richter-Jackson Rep. at 18). Yet Defendants cannot report even basic information regarding their CWA compliance due to their lack of *any* tracking and alert mechanisms or other supervisory review policies. SUF ¶ 134–41; *see also* Ex. 49 (*Management Interviews* at 6 (Mar. 4, 2025)) (attached as Ex. 8 to Ex. 47 (Richter-Jackson Rep.)) ("How are you tracking case and prevention plans? Not tracking case planning . . . ."). Defendants can and should track the timely creation of, and periodic updating to, all applicable case plan components (DCYF Forms 1550, 1552, 1695, and 1978), and implement CQI, including requiring supervisors to timely

---

[33] Any "conclusions" that Ms. Richter-Jackson draws as to whether Class Members appropriately were assessed suffers from profound methodological flaws and cannot create a genuine dispute as to whether comprehensively assessing Class Members would "improve" their "likelihood" of receiving and help deliver CWA-compliance case plans. Mem. of Law in Support of Pl.'s Mot. to Exclude Defs.' Expert, Cynthia Richter-Jackson, at 10–11.

identify and address missing or incomplete Case Plans, to improve Class Members' likelihood of receiving CWA-compliant case plans.

Each of these proposed measures is systemic and within Defendants' control, such that the Court can, and should, order them "in one stroke." *Elisa W.*, 82 F.4th at 125. Thus, for all the above reasons, this Court should grant summary judgment to Plaintiff on their CWA claim.

## IV.    CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's motion for summary judgment on their ADA and Section 504 claims and CWA claims. This Court should further grant summary judgment for Plaintiff with respect to Defendants' fundamental alteration and *Olmstead* plan defenses. And the Court should grant any further relief it deems just and necessary.

Dated: July 9, 2025               Respectfully submitted,

PLAINTIFF, B.D.

By their attorneys,

/s/ Michelle Wangerin, Esq.
**NEW HAMPSHIRE LEGAL ASSISTANCE**
Michelle Wangerin
N.H. Bar No. 17769
Kay E. Drought
N.H. Bar No. 12851
154 High Street
Portsmouth, NH 03801
P: (603) 431-7411
F: (603) 431-8025
mwangerin@nhla.org
kdrought@nhla.org


**DISABILITY RIGHTS CENTER-NH, INC.**
Jennifer A. Eber
N.H. Bar No. 8775
Kayla J. Turner
N.H. Bar No. 270167
Justin Littlefield
N.H. Bar No. 21182
64 North Main Street, Suite 2
Concord, NH 03301-4913
P: (603) 228-0432
F: (603) 225-2077
jennifere@drcnh.org
kaylat@drcnh.org


**AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE**
Gilles R. Bissonnette
N.H. Bar No. 265393
Henry R. Klementowicz
N.H. Bar No. 21177
18 Low Avenue
Concord, NH 03301
T: (603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org

/s/ Carolyn Hite, Esq.
**CHILDREN'S RIGHTS, INC.**
Ira Lustbader
NY Bar No. 2516946
Kathleen Simon
NY Bar No. 5682810
Carolyn Hite
NY Bar No. 5677422
Aarti Iyer
NY Bar No. 5367578
Rebecca Ritchin
NY Bar No. 6015069
Madeleine Kinney
NY Bar No. 5312426, MA Bar No. 690939
88 Pine Street, 8th Floor
New York, NY 10005
P: (212) 683-2210
F: (212) 683-4015
ilustbader@childrensrights.org
ksimon@childrensrights.org
chite@childrensrights.org
aiyer@childrensrights.org
ritchin@childrensrights.org
mkinney@childrensrights.org


**WEIL, GOTSHAL & MANGES LLP**
Konrad L. Cailteux
NY Bar No. 2056505
Katheryn Maldonado
NY Bar No. 5926027
Kathleen Stanaro
NY Bar No. 5900410
Sarah Ryu
NY Bar No. 5405642
767 Fifth Avenue
New York, NY 10153
P: (212) 310-8000
F: (212) 310-8007
Konrad.Cailteux@weil.com
Katheryn.Maldonado@weil.com
Kathleen.Stanaro@weil.com
Sarah.Ryu@weil.com