**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

B.D.,

        Plaintiff

v.

KELLY AYOTTE *et al.*,

        Defendants.

Case No. 21-CV-4-PB

CLASS ACTION

**Defendants' Response to Plaintiff's Statement of
Undisputed Material Facts and Statement of
Additional Material Facts**

1

Defendants (also referred to herein as the "State") respectfully submit the below Response to Plaintiff's Statement of Undisputed Material Facts submitted in support of Plaintiff's Motion for Summary Judgment. As set forth in the State's Objection to Plaintiff's Motion for Summary Judgment and Cross-Motion, the State contends that many of the "facts" asserted by Plaintiff are not relevant and have no bearing on the merits (or lack thereof) of Plaintiff's motion. Nonetheless, the State will address the accuracy of these asserted facts in case the Court finds these facts material and/or rejects the State's legal arguments. In the below table, citations to "Plaintiff's Ex. [X]" refer to the exhibits submitted by Plaintiff in connection with the motion for summary judgment and available at ECF Nos. 362-2 through 368-29.

Following Defendants' responses to Plaintiff's claimed undisputed facts are additional facts and evidence nos. 142-171.

| Fact No. | Plaintiff's Undisputed Material Fact and Supporting Evidence | The State's Response and Supporting Evidence |
|---|---|---|
| 1. | On September 18, 2024, this Court certified a class of:<br><br>All children, aged 14 through 17, who:<br>　(1) are, or will be, in the legal custody or under the protective supervision of DCYF under N.H. Rev. Stat. Ann § 169; C:3 (XVII) and/or (XXV);<br>　(2) have a mental impairment that substantially limits a major life activity, or have a record of such an impairment; and<br>　(3) currently are, or are at serious risk of being, unnecessarily placed in congregate care settings.<br><br>Mem. & Order Granting Class Cert., ECF No. 342, at 55 (Sept. 18, 2024) ("Class Cert. Order"). | Undisputed for purposes of this motion. |
| 2. | Plaintiff B.D. was appointed as class representative. | Undisputed for purposes of this motion. |

| | *Id.* | |
|---|---|---|
| 3. | Defendant Kelly Ayotte is the Governor of New Hampshire and sued in her official capacity. | Undisputed for purposes of this motion. |
| 4. | The executive power of the State is vested in the Governor, who shall be responsible for the faithful execution of laws.<br><br>N.H. Const. pt. 2, Art. 41. | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion. |
| 5. | The Governor is responsible for seeking funds from the legislature to implement New Hampshire's Medicaid and child welfare programs and meet statutory requirements.<br><br>*See, e.g.*, N.H. Rev. Stat. Ann. §§ 9:2, 9:4. | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). The State does not dispute this item to the extent that the Governor is tasked with seeking appropriations from the legislature, but does dispute that the cited laws specifically refer to (or require) the Governor to make any specific requests, such as for Medicaid or child welfare spending, neither of which are mentioned in the cited statutes. |
| 6. | The Governor exercises authority over the administrative agency budget setting process, staffing levels, and public communication.<br><br>Ex. 54 (Nathan White, Chief Fin. Off., DHHS, Rule 30(b)(6) Dep. Tr. 18:17–23 (Feb. 25, 2025)) (power of the Governor within the contract and procurement process "lies in the fact that they have the choice to include items on the agenda"); *id.* at 23:5–24:24, 96:12–97:9 (discussing an Executive Order issued by the Governor demanding a hiring freeze and the de-funding of more than 400 personnel positions in DHHS's 2026-2027 budget); *id.* at 206:12–207:3 (Governor's communicated budget target was "intentionally not sufficient to . . . meet all of [DHHS's] needs"); Ex. 23 (Joseph Ribsam, Former Dir., DCYF, Dep. Tr. 80:9–81:7 (Feb. 21, 2025)) (admitting that the | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion, despite its vagueness as to what exactly Plaintiffs mean by "[t]he Governor exercises authority" when numerous executive branch officials, other governmental stakeholders, and outside input, including voter sentiment, all play a role in agency budget setting, staffing priorities, and public communications. |

| | | |
|---|---|---|
| | Governor is a key ally in the DCYF budget development process and is directly involved in creating the budget, including policy related to budget priorities); Ex. 18 (Kara Buxton, Assoc. Comm'r, Bureau of Cmty., Fam., & Program Supps., DCYF, Dep. Tr. 154:9–17 (Feb. 18, 2025)) (Governor declined DCYF request to publicly communicate the need for more foster families). | |
| 7. | The Governor is responsible for appointing the Commissioner of DHHS and overseeing the responsibilities and activities of the agency, including "barriers and service gaps in the array of children's behavioral health services, along with a description of efforts and plans to fill those gaps." <br><br> N.H. Rev. Stat. Ann. § 126-A:5. | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion, despite its vagueness and misrepresentation of the statute in question, where the quoted section appears as part of an annual report by the Commissioner to an oversight committee, various members of the legislative branch and the Governor and does not otherwise refer to the Governor "overseeing" the Commissioner. *See* N.H. Rev. Stat. Ann. § 126-A:5, XXXIII(a). |
| 8. | The Governor is an official of a public entity under Title II of the ADA and Section 504 of the Rehabilitation Act. | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion. |
| 9. | Defendant Weaver is the Commissioner of DHHS and is sued in her official capacity. | Undisputed. |
| 10. | The Commissioner is responsible for providing administrative and executive direction to the agency, including administering New Hampshire's federal Medicaid program and developing a plan for full establishment and maintenance of a system of care for children's behavioral health services. | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion. |

| | | |
|---|---|---|
| | N.H. Rev. Stat. Ann. §§ 126-A:4, 126-A:5, 135-F:4. | |
| 11. | The Commissioner is responsible for appointing and supervising administrators of each bureau providing services to children, youth, and families, each of whom is responsible for administering their respective bureaus in conformance with state and federal law, including Title II of the ADA and Section 504 of the Rehabilitation Act.<br><br>N.H. Rev. Stat. Ann §§ 170-G:2, 170-G:3. | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion. |
| 12. | In 2016, the New Hampshire General Court required DHHS to develop a system of care for the express purpose of "reduc[ing] the cost of providing services by leveraging funding sources other than general funds, reducing the need for costly out-of-home placements, and reducing duplication across agencies."<br><br>N.H. Rev. Stat. Ann. § 135-F:1, II. | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion. |
| 13. | DHHS is a public entity under Title II of the ADA and Section 504 of the Rehabilitation Act.<br><br>Ex. 55 (Defs.' Resp. & Obj. to Pl.'s Req. for Admis. at 4). | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion. |
| 14. | Marie Noonan is the Director of DCYF and is sued in her official capacity. | Undisputed for purposes of this motion. |
| 15. | DCYF is a division of DHHS. | Undisputed for purposes of this motion. |
| 16. | DCYF assumes and administers all of the responsibilities and duties relative to child welfare services, including services provided to Class Members.<br><br>N.H. Rev. Stat. Ann § 170-G:4(XIII). | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion. |
| 17. | DCYF assumes and administers all responsibilities and duties of DHHS for child welfare services funded through the social services block grant and provided under Titles IV-B and IV-E of the Social Security Act. | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion. |

| | | |
|---|---|---|
| | *Id.*; *see also* Ex. 56 (N.H. DCYF, Title IV-E Prevention Plan at DHHS-150848–50, 150874 (July 2021)). | |
| 18. | Title IV-B of the Social Security Act provides federal financial support for all children in state supervised foster care.<br><br>Mem. & Order Den. Defs.' Second Mot. to Dismiss, ECF No. 341, at 7 (Sept. 18, 2024) ("Second MTD M&O"); Class Cert. Order, ECF No. 342, at 8. | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion. |
| 19. | Title IV-E of the Social Security Act provides federal financial reimbursement for foster care maintenance foster payments paid on behalf of eligible foster children.<br><br>Second MTD M&O, ECF No. 341, at 7. | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion. |
| 20. | Henry Lipman is the Director of the Medicaid Agency and is sued in his official capacity. | Undisputed for purposes of this motion. |
| 21. | The Medicaid Agency is responsible for developing and administering a state plan for providing medical or other remedial assistance to dependent children.<br><br>N.H. Rev. Stat. Ann § 161:2 (I, VI). | Objection: legal assertions, such as that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Nevertheless, the State does not dispute this item for purposes of responding to Plaintiff's motion. |
| 22. | At the time B.D. was appointed class representative, ███████████████████ ████████████████████████ ████████████████<br><br>Class Cert. Order, ECF No. 342, at 10; Ex. 14 (Sec. Suppl. Decl. of Pl.'s Expert Dr. Theodore Cross, ECF No. 306-1, ¶¶ 18–20 (June 17, 2024) ("Sec. Suppl. Cross Decl.")). | Undisputed for purposes of this motion. |
| 23. | B.D.'s mental impairments substantially limit a major life activity.<br><br>Ex. 14 (Sec. Suppl. Cross Decl., ECF No. 306-1, ¶ 20). | Undisputed for purposes of this motion. |
| 24. | Like B.D., a statistically representative sample of Class Members have mental impairments that substantially limit a major life activity. | Undisputed as to the definition of the Class specifically requires that Class Members "have a mental impairment |

| | | |
|---|---|---|
| | Ex. 9 (Report of Pl.'s Expert Dr. Theodore Cross ¶¶ 20–22 (Mar. 12, 2025) ("Cross Rep.")); Ex. 6 (Report of Pl.'s Expert Dr. Todd MacKenzie ¶¶ 23–29) (Mar. 9, 2025) ("MacKenzie Rep.") (providing 95% confidence intervals to extrapolate Dr. Cross's findings to the entire Class). | that substantially limits a major life activity, or have a record of such an impairment."  Mem. & Order Granting Class Cert., ECF No. 342, at 55 (Sept. 18, 2024) ("Class Cert. Order").  The statistical analysis performed by Plaintiff's expert is **DISPUTED.**  *See* Plaintiff's Ex. 7 (Report of Def.'s Expert Alan Salzberg (April 11, 2025) ("Salzberg Report")) at pp. 5-7 (criticizing analysis by Plaintiff's expert MacKenzie). |
| 25. |    Class Cert. Order, ECF No. 342, at 10; Ex. 14 (Sec. Suppl. Cross Decl., ECF No. 306-1, ¶¶ 10–11). | **DISPUTED.**   *See* Declaration of Marie Noonan, filed concurrently ("Noonan Decl.") at ¶¶ 63-65.  *See also* additional fact nos. 142-144. |
| 26. | Class Cert. Order, ECF No. 342, at 10; Ex. 14 (Sec. Suppl. Cross Decl., ECF No. 306-1, ¶¶ 21–23). | **DISPUTED.**   Noonan Decl. at ¶ 65. |
| 27. | Like B.D., Class Members currently are appropriate for community-based placement.  Ex. 9 (Cross Rep. ¶¶ 16, 23–31); *see* Ex. 6 (MacKenzie Rep. ¶¶ 23–29); Ex. 37 (Report of Defs.' Expert Uma Ahluwalia at 9 (Apr. 12, 2025) ("Ahluwalia Rep.")) (acknowledging that New Hampshire has historically "depende[d] on residential treatment facilities for youth in foster care"); Ex. 23 (Ribsam Dep. Tr. 105:18–106:12) ("[M]any high-need children are being placed in expensive residential facilities who would be more | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, it is a tautology, as the Court explicitly limited the plaintiff class to those who are ***unnecessarily*** in residential care settings.  *See* Mem. & Order Granting Class Cert., ECF No. 342, at 55 (Sept. 18, 2024) ("Class Cert. Order"). |

| | | |
|---|---|---|
| | appropriately cared for in therapeutic foster care."); *see also* Ex. 57 (Jeffrey Fleischer, Former Dir., DCYF, Dep. Tr. 65:5–66:2 (Feb. 28, 2025)) (during his time as Director of DCYF in 2024, requesting a residential placement was "normal" due to "not having enough foster homes or community services due to staff shortages"). | |
| 28. | Like B.D., all sampled Class Members were appropriate for community-based placement during prior periods of institutionalization.<br><br>Ex. 9 (Cross Rep. ¶¶ 16, 23–31); *see* Ex. 6 (MacKenzie Rep. ¶ 23); *see also* Ex. 18 (Buxton Dep. Tr. 79:11–20) (admitting that sometimes youth are retained in congregate facilities only because a family home is unavailable); ▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 24 (Sec. Suppl. Decl. of Pl.'s Expert Tracey Feild, ECF No. 291-2, ¶ 21 (Apr. 29. 2024) ("Sec. Suppl. Feild Decl.")) (the mean cumulative time of Class Members with *per se* mental disabilities in DCYF custody on April 26, 2022 who spent time in congregate care—77% of such youth—was 906 days; the median cumulative time was 705 days; the mean congregate placement spell was 624 days; the median congregate placement spell was 487 days). | Undisputed for purposes of this motion that a selection of Class Members sampled by Plaintiff's experts had some period in which they may have been able to be served with community-based placements, but the statement as a whole and its relevance is **DISPUTED.** Notably, even Plaintiff's own expert concedes that this was not universally true, nor was it true across the entire period reviewed. *See, e.g.,* Plaintiff's Ex. 9 (Plaintiff's Expert Cross Report at ¶ 29 (discussing youth that Plaintiff's expert concluded "were not appropriate for community-based placement with supportive services" for a period of time); ¶ 32 ("The twenty-three youth who spent time in congregate care could have spent *less time* in congregate care, and *most* could have avoided it all together…") (emphasis added); ¶ 34 ("In my review of the case files, *nearly all* the youth's initial entry into congregate care was inappropriate") (emphasis added). |
| 29. | B.D. is not opposed to living in a community-based placement.<br><br>Class Cert. Order, ECF No. 342, at 10; Ex. 14 (Sec. Suppl. Cross Decl., ECF No. 306-1, ¶ 24). | Although Defendants cannot confirm this fact, it is undisputed for purposes of this motion. Defendants note that Plaintiff's supporting evidence is vague as to when the purported intent was expressed, and makes no mention of B.D.'s current views. |
| 30. | Like B.D., sampled Class Members are not opposed to community-based placement. | **DISPUTED.** Plaintiff's own expert admits that several of the youth |

| | | |
|---|---|---|
| | Ex. 9 (Cross Rep. ¶¶ 45-50); *see* Ex. 6 (MacKenzie Rep. ¶¶ 23–29). | preferred residential facilities to community-based placements, as the very evidence cited by Plaintiff to support this fact shows. *See, e.g.,* Plaintiff Ex. 9 (Cross Report at ¶ 50). Plaintiff's only response is to attempt to downplay and minimize these preferences. *See, e.g.,* Plaintiff's Memorandum ISO MSJ, ECF No. 362-01, at 17 n.9. |
| 31. | Residential interventions should be used only for brief periods of stabilization and only when a youth's needs cannot be met through responsive, timely, and intensive services in the community.<br><br>Ex. 58 (2025 Assessment of New Hampshire's Children's Behavioral Health System of Care at PTF00026592 ("SOC Assessment")); Ex. 9 (Cross Rep. ¶¶ 16–18); Ex. 10 (Decl. of Pl.'s Expert Tracey Feild, ECF No. 152-11, ¶ 24 (Mar. 28, 2023)). | **DISPUTED.** "Stabilization" is a term of art that refers to efforts to ensure that a youth (or other individual) is no longer a danger to themselves or others and, in the context of DCYF's child protection efforts, refers specifically to hospitalizations. In contrast, residential treatment is designed to achieve certain specific goals for a youth. In other words, the difference is one where "stabilization" is aimed at ***negating*** a specific danger to the youth or others, while residential treatment is instead aimed at ***creating*** the conditions necessary for the youth to succeed in a community setting. Noonan Decl. at ¶ 43.<br><br>In addition, the only evidence cited other than testimony from Plaintiff's expert witnesses, the "SOC Assessment," does not support the claim that Plaintiff makes in this supposedly "undisputed" fact, but instead collectively addresses a wide array of different treatment services, with different goals and results, including "***hospitals,*** PRTFs [psychiatric residential treatment facilities], and other residential facilities" Plaintiff's Exhibit 58 at PTF00026592 (emphasis added). |
| 32. | New Hampshire's rate of reliance on congregate care placements to house Older | **DISPUTED.** While it is true that New Hampshire's rate of reliance on |

| | | |
|---|---|---|
| | Foster Youth is higher than expected for the population served.<br><br>Ex. 37 (Ahluwalia Rep. at 29) (recognizing "New Hampshire faces a challenge with higher than the national average of residential treatment placements"); Ex. 24 (Sec. Suppl. Feild Decl., ECF No. 291-2, ¶¶ 20–25) (77% of youth with per-se disabilities experienced at least one congregate placement); Ex. 4 (Report of Pl.'s Expert Tracey Feild ¶¶ 9–12 (Mar. 11, 2025) ("Feild Rep.")) ("New Hampshire has the highest percentage of foster youth in congregate facilities of all the fifty states.") (citing Ex. 59 (*State Level Data for Understanding Child Welfare in U.S.: Older Youth in Care FY2021 - New Hampshire,* Child Trends (Feb. 22, 2024), https://www.childtrends.org/publications/state-level-data-for-understanding-child-welfare-in-the-united-states) (55 percent of New Hampshire foster youth aged 13 to 15, and 68 percent of youth aged 16 to 21, were placed in congregate facilities—more than double the national average, which is 25 percent for youth aged 13 to 15 and 26 percent for youth aged 16 to 21)). | residential care placements is higher than the national average, it does not mean that this higher-than-average rate is "higher than expected" or that any particular Older Foster Youth is not placed in the most appropriate setting for that Older Foster Youth's needs. Noonan Decl. at ¶¶ 46-47. |
| 33. | New Hampshire has the highest percentage of youth in state custody placed in congregate facilities of all the fifty states.<br><br>Ex. 4 (Feild Rep. ¶ 9) (citing Ex. 66 (*Children in Foster Care by Placement Type (Group Home or Institution Only) in United States,* Annie E. Casey Foundation: Kids Count Data Center (last updated Apr. 2023)). | Undisputed for purposes of this motion, but irrelevant. The use of "percentage" as a metric is of limited utility; the same data set used by Plaintiff, the Annie E. Casey Foundation Data Center, also demonstrates that New Hampshire has a lower per capita rate of youth in a group home or institution than numerous other states, including both Massachusetts and Rhode Island in New England alone. Noonan Decl. at ¶ 47. |
| 34. | Defendants rely on residential facilities to meet the mental and behavioral health needs of Class Members due to a shortage of less restrictive options. | Undisputed for purposes of this motion that residential facilities represent a critical component of a full child welfare system ensuring that care is as appropriate as possible |

| | |
|---|---|
| Ex. 4 (Feild Rep. ¶¶ 18–98); Ex. 37 (Ahluwalia Rep. at 9); Ex. 23 (Ribsam Dep. Tr. 105:18–106:12) ("[M]any high-need children are being placed in expensive residential facilities who would be more appropriately cared for in therapeutic foster care."); Ex. 57 (Fleischer Dep. Tr. 65:5–66:2) (describing residential placement requests due to "not having enough foster homes or community services due to staff shortages" as "normal"); Ex. 18 (Buxton Dep. Tr. 79:11–20) (sometimes youth are retained in congregate facilities only because a family home is unavailable); ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ Ex. 29 (Defs.' Expert Heidi Arthur Dep. Tr. 92:12–19, 94:8–12 (May 29, 2025)) ("I think based on the proportionate numbers of kids in New Hampshire who were in residential treatment versus adolescents who were in community placements, I think it can be assumed that [some youth] could have been retained in the community. I don't think anybody would argue with that."); *see also* Ex. 9 (Cross Rep. ¶¶ 32–40) (100% of sampled Class Members placed in congregate could have spent less or no time in congregate had community placements or services been available); *id*. ¶ 43 (lack of community-based placements and services places foster youth who are in the community but have certain risk factors at serious risk of unnecessary institutionalization). | and that, as part of this comprehensive system, residential facilities are the best available means to meet a youth's needs. |
| 35. | Of the 77 Older Foster Youth with *per se* mental disabilities in DCYF custody on April | Undisputed for purposes of this motion. |

| | | |
|---|---|---|
| | 26, 2022, and who had spent time in congregate care, the mean cumulative time spent in such placements through May 12, 2023 was 906 days/30.2 months/2.5 years and the median cumulative time spent in such placements was 705 days/23.5 months/1.9 years. The median individual congregate placement spell for those same youth was 487 days/16 months and the mean individual congregate placement spell was 624 days/21 months.<br><br>Ex. 24 (Sec. Suppl. Feild Decl., ECF No. 291-2, ¶¶ 9, 21–22); *see also* Ex. 61 (First Suppl. Decl. of Pl.'s Expert Dr. Bryan Victor Regarding Placement Data, ECF No. 281-3, at 38, tbls. 26–27 (May 1, 2024) ("First Suppl. Victor Decl. re: Placement Data")). | |
| 36. | The median individual congregate placement spell for those same youth was 487 days/16 months and the mean individual congregate placement spell was 624 days/21 months.<br><br>Ex. 24 (Sec. Suppl. Feild Decl., ECF No. 291-2, ¶¶ 9, 22); *see also* Ex. 61 (First Suppl. Victor Decl. re: Placement Data, ECF No. 281-3 at 38 tbls.26–27). | Undisputed for purposes of this motion. |
| 37. | While the percentage of youth in congregate facilities continues to decline across the country, to 8 percent in Fiscal Year 2022, the percentage of New Hampshire youth in congregate facilities has remained stable with a slight increase since 2017.<br><br>Ex. 4 (Feild Rep. 11) (citing Ex. 62 (*The AFCARS Report: Preliminary FY22 Estimates as of May 9, 2023, No. 30, Children's Bureau, U.S. Dep't Health & Hum. Servs.*); Ex. 63 (DHHS, Operating Statistics Dashboard, Fiscal Meeting November 2024, SY25 at PTF00017732 (Oct. 22, 2024))). | **DISPUTED.** The percentage of older foster youth in residential care facilities has trended downward from 2017 to the present. The percentage of older foster youth in residential care reached as high as 50% in 2017, and has declined to 41% of the total as of September 1, 2025. The downward trend remains evident even were the Court to ignore the last three years of continuous declines in this number. Noonan Decl. at ¶ 44 & Exhibit 4. |
| 38. | DHHS contracts with Maximus to provide comprehensive assessments for treatment ("CATs") to determine whether Older Foster Youth need behavioral health residential | Undisputed for purposes of this motion. |

| | | |
|---|---|---|
| | treatment services and, if so, the appropriate level of residential care.<br><br>Ex. 64 (DHHS, Requested Action re: Contract with Maximus US Services, at DHHS-2512953 (Mar. 31, 2023); Ex. 65 (Decl. of Daryll Tenney, Admin., Bureau of Child.'s Behav. Health, DHHS, <u>ECF No. 317-20</u>, ¶¶ 8–9, 18–19 (July 31, 2024)). | |
| 39. | There are no specified criteria upon which a Class Member may be referred for a CAT.<br><br>Ex. 4 (Feild Rep. ¶¶ 67–69); Ex. 28 (Report of Defs.' Expert Heidi Arthur at 32 (Apr. 10, 2025) ("Arthur Rep.")); Ex. 26 (Daryll Tenney, Bureau Chief, Bureau of Child.'s Behav. Health, DHHS, Dep. Tr. 153:13–163:14, 175:2–180:22, 270:11–271:15, 272:7–13 (Feb. 27, 2025)) (there are no clear criteria for when youth should be referred for a CAT); *id.* at 183:22–184:16 (requiring exhaustion of community-based services, including FAST Forward, and youth and parent consent for Bureau of Children's Behavioral Health ("BCBH") voluntary placements, but not for DCYF youth); Ex. 52 (Jennifer Ross-Ferguson, Deputy Dir., DCYF, Dep. Tr. 145:12– 18 (Feb. 24, 2025)) (there is no screening system to decide whether a CAT referral should be made and no specific training for when referrals should be made). | **DISPUTED.** The current DCYF policy, being implemented in stages across the population served by DCYF, is to administer a CANS assessment to all youth for case planning purposes.  The outcome of the CANS assessment assists in determining whether a CAT referral is appropriate depending on the nature of the youth's needs and whether out-of-home care is being contemplated.  Noonan Decl. at ¶¶ 54-56.  Prior DCYF practice, still in use where the CANS implementation has not yet occurred, relied on the experience and training of a youth's caseworker and supporting DCYF staff to examine whether there were appropriate kinship or other community placements able to serve a youth; if not, a CAT referral would be made. *Id.* at ¶¶ 53 & 56. |
| 40. | Defendants contractually require Maximus to use the DHHS CANS 2.0 Algorithm (the "CAT Algorithm") to determine a recommended level of care.<br><br>Ex. 9 (Cross Rep. ¶ 52); Ex. 64 (DHHS, Requested Action re: Contract with Maximus US Services, Exhibit B Amendment #1 §§ 1.9, 1.26.2., 1.26.2.5, 1.27.3 (Mar. 31, 2023)) ("The Contractor shall use the Department's Child and Adolescent Needs and Strengths (CANS) system, hosted by RCR technologies, to enter in the data required by CAN; . . . ensure [that the] Assessors conduct interviews | Undisputed for purposes of this motion. |

| | | |
|---|---|---|
| | to collect information that includes . . . [i]ndividual needs and strengths using the Department's CANS; [and] . . . enter the CANS scores into the Department's CANS system, hosted by RCR Technologies, to apply the Department's CANS algorithms to determine a level of care."). | |
| 41. | DHHS helped develop and refine the CAT Algorithm that Maximus relies upon to inform its level of care recommendation.<br><br>Ex. 9 (Cross Rep. ¶¶ 52, 58); Ex. 26 (Tenney Feb. 2025 Dep. Tr. 73:7–78:10, 81:7–88:3). | Undisputed for purposes of this motion. |
| 42. | DHHS "tested" the CAT Algorithm by running the CANS ratings of a non-random, non-representative sample of youth contemporaneously in residential treatment settings through the CAT Algorithm to confirm that the output matched the youth's then-current level of residential treatment.<br><br>Ex. 9 (Cross Rep. ¶¶ 52, 58); Ex. 26 (Tenney Feb. 2025 Dep. Tr. 73:7–78:10, 81:7–88:3). | Undisputed for purposes of this motion. |
| 43. | Between October 1, 2021 and November 13, 2022, Maximus recommended congregate treatment for Older Foster Youth with *per se* mental disabilities 94% of the time.<br><br>Ex. 24 (Sec. Suppl. Feild Decl., ECF No. 291-2, ¶ 76 tbl.6); Ex. 61 (First Suppl. Victor Decl. re: Placement Data, ECF No. 281-3, ¶ 17 tbl.2). | Undisputed for purposes of this motion that this was the recommendation for Older Foster Youth who received a CAT assessment from Maximus. *But see* additional fact nos. 146-147. |
| 44. | The CAT Algorithm will only recommend a family setting when a youth has "mild behavioral and emotional needs."<br><br>*See* Ex. 9 (Cross Rep. ¶¶ 56–59); Ex. 30 (Child and Adolescent Needs and Strengths - New Hampshire: 2017 Reference Guide at DHHS-1620354, 1620376–77 (Feb. 28, 2018)); Ex. 31 (DHHS CANS 2.0 Decision Tool at DHHS-1620395–97); Ex. 67 (Maximus, New Hampshire CAT Monthly Report at DHHS-2987074 (July 2024)); *see also* Ex. 68 | Objection: this statement is argumentative and thus not a "fact" under Rule 56, particularly in its use of the qualifier "only." |

| | | |
|---|---|---|
| | (Maximus Clinical Workplan at DHHS-2713624 (Aug. 10, 2021)); Ex. 24 (Sec. Suppl. Feild Decl., <u>ECF No. 291-2</u>, ¶ 73) (citing Ex. 69 (Maximus, New Hampshire CAT Monthly Report, <u>ECF No. 278-25</u> (Dec. 2021)); Ex. 70 (NH CAT Algorithm)). | █████████aintiff's Ex. 67 at DHHS-2987074 (emphasis added). |
| 45. | The CAT Algorithm will recommend a congregate treatment setting for youth who have "intermediate" or "intensive" behavioral and emotional needs.<br><br>Ex. 24 (Sec. Suppl. Feild Decl., <u>ECF No. 291-2</u>, ¶ 73) (citing Ex. 69 (Maximus, New Hampshire CAT Monthly Report, <u>ECF No. 278-25</u> (Dec. 2021)); Ex. 70 (NH CAT Algorithm)). | Objection: this statement is argumentative and thus not a "fact" under Rule 56. ████████████<br><br>*See, e.g.,* Plaintiff's Ex. 67 at DHHS-2987074; Plaintiff's Ex. 69 at DHHS-1832063. |
| 46. | The CAT Algorithm is not a valid tool to determine whether a youth can live in a family setting with community-based treatment and supports.<br><br>Ex. 9 (Cross Rep. ¶¶ 51–61) ("In my professional opinion, the process of designing and testing the DHHS CANS 2.0 Algorithm, and therefore the CAT itself, was so fundamentally flawed as to render the entire CAT invalid as a tool for determining the least-restrictive, and most-integrated, setting appropriate for treating an Older Foster Youth's mental- and behavioral-health needs."); Ex. 28 (Arthur Rep. at 34) (acknowledging that there are at least "some youth for whom a CAT has recommended residential treatment where community placement might have been feasible"); Ex. 26 | Objection: this statement is argumentative and thus not a "fact" under Rule 56.  Regardless, this is **DISPUTED.**  Both the CANS ("Child and Adolescent Needs and Strengths") assessment and the CAT ("Comprehensive Assessment for Treatment") are evidence-based programs developed by Ph.D. holders at the University of Chicago in conjunction with the New Hampshire DHHS, among numerous others.  *See* Plaintiff's Ex. 30 at DHHS-16203338; *see also, generally,* Plaintiff's Ex. 9 (Plaintiff's expert Cross Report) at ¶ 52 (summarizing Plaintiff's expert's understanding of the development of the CAT).  Plaintiff's expert's disagreement with |

| | | |
|---|---|---|
| | (Tenney Feb. 2025 Dep. Tr. 55:16–60:21, 61:2–63:3, 78:2–8, 80:24–81:6) (discussing the design of the CAT Algorithm); Ex. 23 (Ribsam Dep. Tr. 116:4–120:13) (testifying that in his experience as Director of DCYF, at least some children in all levels of residential care could be served in family homes if given appropriate and timely supports and services, specifically including respite providers); *see also* Ex. 4 (Feild Rep. ¶¶ 68–69); Ex. 24 (Sec. Suppl. Feild Decl., <u>ECF No. 291-2</u>, ¶¶ 69–78). | the work of these other, independent experts is not sufficient to declare their work "not valid," let alone undisputably so. |
| 47. | This qualifying language is found in every CAT: "Although this is the recommended level of care, if the youth's family or team determines that there are current or available community resources that can meet the identified needs, this would be considered appropriate."<br><br>*See* Ex. 24 (Sec. Suppl. Feild Dec., <u>ECF No. 291-2</u>, ¶ 74); *see, e.g.*, Ex. 27 ([Youth] CAT Report, <u>ECF No. 175-27</u>, at 2 (June 13, 2023)). | Undisputed for purposes of this motion. |
| 48. | DCYF Policy 1604, governing Individual Service Option Foster Care, provides that the target service population includes, *inter alia*, Older Foster Youth who have challenging and provocative behaviors, including those with chronic mental, emotional, physical, or behavioral handicaps, and who require intensive supervision and consistent structure.<br><br>Ex. 32 (DCYF Policy 1604 at DHHS-0000005964 (Dec. 2010)). | Undisputed for purposes of this motion. |
| 49. | DCYF Policy 1605, governing Therapeutic Foster Care, provides that characteristics of children served in therapeutic foster care include, *inter alia*, Older Foster Youth who currently exhibit chronic mental, emotional, physical, or behavioral problems that require intensive supervision and consistent programmatic structure.<br><br>Ex. 3 (DCYF Policy 1605 at 1 (Feb. 2002)). | Undisputed for purposes of this motion. |
| 50. | State courts are legally required to rely on the | Objection: legal assertions, such as |

| | | |
|---|---|---|
| | CAT to justify placing a youth in a congregate facility or in a family home.<br><br>N.H. Rev. Stat. Ann. § 169-C:19-f. | that contained in this item, are not properly "facts" under Fed. R. Civ. P. 56(c)(1). Additionally, this purported "fact" misrepresents the statute, which only requires that the court "review" the assessment. The court is specifically **not** required to "rely" on the assessment, as the statute itself empowers the court to "approv[e] the placement or chang[e] the placement." N.H. Rev. Stat. Ann. § 169-C:19-f, II. |
| 51. | Early administration of evidence-based strengths and needs assessments helps children avoid persistent, more serious conditions and crises and reduce the number of youth placed in congregate facilities.<br><br>Ex. 28 (Arthur Rep. at 34); Ex. 37 (Ahluwalia Rep. at 26); Ex. 23 (Ribsam Dep. Tr. 222:12–223:9); Ex. 58 (SOC Assessment at PTF00026611–12) (identifying the following system of care recommendation: "In child protection, where primary issue is behavioral health, introducing CANS and [system of care] team-based approach from the outset would be critical."). | Undisputed for purposes of this motion. |
| 52. | Early implementation of evidence-based strengths and needs assessments can identify a youth's strengths and treatment needs and facilitate more effective case planning to avoid unnecessary use of institutions.<br><br>Ex. 4 (Feild Rep. ¶¶ 65–67); Ex. 44 (Report of Pl.'s Expert Daryl Chansuthus ¶¶ 111–15 (Mar. 12, 2025) ("Chansuthus Rep.")); Ex. 28 (Arthur Rep. at 5–7) ("I agree, and it is my opinion that states are taking appropriate steps to avoid unnecessary institutionalization of children in the foster care system when they . . . [p]rovide access to screening and comprehensive mental health assessment to all children entering foster care."); Ex. 71 (Tracey Gubbins, District Off. Supervisor, Caregiver Coord. Unit, DCYF, Dep. Tr. 110:2– 111:12 | Undisputed for purposes of this motion. |

|   | | |
|---|---|---|
| | (Feb. 25, 2025)). | |
| 53. | The CANS assessment is available to New Hampshire's entire juvenile justice population and to youth placed in residential facilities through the system of care but is not yet available to all foster youth in New Hampshire.<br><br>Ex. 23 (Ribsam Dep. Tr. 219:7–223:22); Ex. 51 (Marie Noonan, Dir., DCYF, Dep. Tr. 57:12–19 (Feb. 27, 2025)); Ex. 26 (Tenney Feb. 2025 Dep. Tr. 224:15–226:1, 229:18–239:22); Ex. 52 (Ross-Ferguson Dep. Tr. 139:11–19, 141:8–13); Ex. 50 (Sherry Ermel, Bureau Chief, Bureau of Field Servs., DCYF, Rule 30(b)(6) Dep. Tr. 156:11–20 (July 19, 2022)). | Undisputed for purposes of this motion that, as of the date of this objection, the roll-out of CANS to the entirety of the youth population served by DCYF is not yet complete. DCYF has fully trained the entirety of its Child Protective Social Worker staff on administering CANS and has begun to roll out CANS across the population served by DCYF. Noonan Decl. at ¶ 55. |
| 54. | Defendants do not have a sufficient array of community-based services accessible by and provided to Class Members.<br><br>Ex. 4 (Feild Rep. ¶¶ 70–79); Ex. 9 (Cross Rep. ¶¶ 36–37); Ex. 58 (SOC Assessment at PTF00026598–602, PTF00026611–12); Ex. 23 (Ribsam Dep. Tr. 229:15–233:14, 244:15–251:9) (Cognitive Behavioral Therapy was "not an easy service to find"; substance abuse counseling was "similarly challenging to find"; there were "pockets" of therapeutic behavioral health services, but probably accessible by less than half of foster youth; Home Based Therapeutic Services were theoretically available, but "there was often a challenge with many of our providers with willingness to serve some kids"; and there were "very few" remaining Therapeutic Day Treatment programs); | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, it is **DISPUTED.** DCYF offers a comprehensive array of services to Class Members, from pre-removal intervention and support services, through foster and residential facilities, family reunification and kin placement services, and, where necessary, acute interventions including hospitalization. Noonan Decl. at ¶¶ 16-29 (discussing DCYF's kinship placement program); 30-40 (discussing DCYF's foster care program); 41-50 (discussing DCYF's residential programs; *see also* Plaintiff's Ex. 37 (Report of Def.'s Expert Uma Ahluwalia (April 12, 2025) ("Ahluwalia Report")) at pp. 10-11; 17; Plaintiff's Ex. 28 (Report of Def.'s Expert Heidi Arthur (April 10, 2025) ("Arthur Report")) at pp. 11-23. |

| | | |
|---|---|---|
| | ████████████████████ Ex. 73 (*Email from Debra Kavanagh, Asst. Bureau Chief, Field Servs., DCYF, to Sherry Ermel, Bureau Chief, Bureau of Field Servs., DCYF, re: Youth Needing Placement* at DHHS-29847–48 (Aug. 28, 2023)) ("We need intensive supports that go out often and are trained and experienced to assist the caregivers with establishing boundaries and structure, not getting into power struggles, being creative and open, expanding their natural supports and leaning on their community for support. We need mental health and substance treatment available to the children and youth we serve immediately not after sitting for weeks or months on a waiting list. We need the option of paying a caregiver to not work outside the home. We need crisis homes ready, willing and able — being well compensated for signing up for a shift and being supported with services as needed and appropriate. The funding has to shift to being immediate and enough to entice beyond just their desire to help.")). | |
| 55. | Multi-systemic therapy, an evidence-based practice designed to service youth aged 12 through 17 with significant mental and behavioral health challenges, is not available to youth in foster or kinship placements.<br><br>Ex. 74 (Defs.' Am. Resp. & Obj. to Pl.'s Second Set of Interrogs. at 5); Ex. 75 (Michael Donati, Bureau Chief, Bureau of Cmty., Fam., & Program Supps., DCYF, Rule 30(b)(6) Dep. Tr. 55:18–58:2, 95:14–96:5 (Sep. 15, 2022)). | Undisputed for purposes of this motion that DCYF has eliminated the use of multi-systemic therapy for its child protection population due to the contracted provider failing to meet its contractual obligations to DCYF's expectations, including failing to provide sufficient coverage across the state and not having outcomes matched to contractual expectations. DCYF has repurposed the funds previously used for multi-systemic therapy for child protection to providing additional Intercept slots. Multi-systemic therapy was designed for, and intended to be used solely by, the juvenile justice population. Noonan Decl. at ¶ 33. |

| 56. | Intercept, an evidence-based program that focuses on family therapy in order to preserve family attachment and increase problem solving skills to support youth in their care, is unavailable to foster youth unless reunification is imminent.<br><br>Ex. 51 (Noonan Dep. Tr. 40:7–19); Ex. 75 (Donati Rule 30(b)(6) Dep. Tr. 58:17–60:13, 69:8–70:6). | **DISPUTED.** As written, this fact suggests that Intercept is only deployed on the eve of family reunification. That is not correct. DCYF deploys Intercept services in a number of different contexts, including in pre-removal situations to keep a child in the home, in preparation for reunification (which may not be as closely linked in time to be "imminent"), and post-reunification in order to maintain a child in the home. Noonan Decl. at ¶ 32. |
|-----|------|------|
| 57. | Providing child-centered wrap around care planning, on-going care coordination, and care monitoring for children identified to require mental health or behavioral interventions is an important measure to reduce reliance on congregate facilities.<br><br>*See* Ex. 28 (Arthur Rep. at 5, 7– 11); Ex. 23 (Ribsam Dep. Tr. 46:1–21, 50:1–54:7); Ex. 4 (Feild Rep. ¶¶ 33, 70–80); Ex. 9 (Cross Rep. ¶¶ 17, 66); Ex. 44 (Chansuthus Rep. ¶¶ 65-68) (discussing value of a specific evidence-based case planning model); *see also* Ex. 26 (Tenney Feb. 2025 Dep. Tr. 229:18–239:22); Ex. 57 (Fleischer Dep. Tr. 18:9–13, 22:3–23:8; 24:15–25:19) | Undisputed for purposes of this motion. |
| 58. | New Hampshire has implemented FAST Forward, a high-fidelity wrap around program, as a DCYF prevention service for children accessing the system of care *outside* of DCYF, but it has not made the program sufficiently available to Class Members.<br><br>*See* Ex. 4 (Feild Rep. ¶ 73) (citing Ex. 26 (Tenney Feb. 2025 Dep. Tr. 271:9–15)); Ex. 38 (Report of Pl.'s Expert Dr. Bryan Victor Regarding Older Foster Youth Placement and Medicaid Data ¶ 32, tbl.6 (Mar. 9, 2025) ("Victor Placement and Medicaid Rep.")); Ex. 9 (Cross Rep. ¶ 63); Ex. 26 (Tenney Feb. 2025 Dep. Tr. 175:2–180:22, 183:22–184:16, | **DISPUTED** but also irrelevant. FAST Forward is provided by the Bureau of Children's Behavioral Health ("BCBH"), a separate component of the Department of Health and Human Services from DCYF. Undisputed, but irrelevant. Through BCBH, FAST Forward services are available to anyone under the age of 18. However, as Plaintiff's own "fact" phrasing shows, FAST Forward is ***preventative*** care designed and intended to intervene prior to a child becoming involved in DCYF |

| | | |
|---|---|---|
| | 270:11–271:15, 272:7–13); Ex. 23 (Ribsam Dep. Tr. 228:11–229:13, 238:5–12) (as of June 2023, FAST Forward lacked capacity to serve all of the kids in the foster care population, and there was insufficient capacity in the community mental health centers to fill that gap). | programs (whether child protection or juvenile justice), so to assert that it is "not sufficiently available to Class Members" is both inaccurate and misconstrues FAST Forward's purpose and use. Noonan Decl. at ¶ 11. |
| 59. | DHHS's Transitional Enhanced Care Coordination ("TrECC") program is available to children placed in congregate care through DHHS's system of care, but it is not available to all Class Members in congregate care.<br><br>Ex. 9 (Cross Rep. ¶ 66); Ex. 26 (Tenney Feb. 2025 Dep. Tr. 240:2–13, 241:20–23, 242:9–14, 243:11–21, 245:5–249:11); Ex. 77 (*Email from Robert Rodler, Admin., Adolescent Programs, DCYF, to Amorett Back, DHHS, et al., re: TRECC* (Apr. 28, 2022)) (confirming prioritization of TrECC referrals from the Sununu Youth Services Center ("SYSC")* and the community over DCYF referrals due to lack of capacity); Ex. 78 (*Email from Daryll Tenney, Admin., Bureau of Child.'s Behav. Health, DHHS, to Jacqueline Davis, NFI North, Care Management Entity Admin., re: TrECC Funding* at DHHS-3059188 (Feb. 27, 2024)) (TrECC is "vastly underfunded" and in short supply);<br><br>[redacted]<br><br>*SYSC is New Hampshire's locked juvenile detention and commitment facility available only to youth awaiting adjudication for a delinquency offense or committed to the facility through a delinquency proceeding. | Undisputed, but irrelevant.  TrECC is a set of services primarily aimed at youth involved in the juvenile justice portion of DCYF's services (as opposed to child protection, which serves the Class Members). This is because TrECC resources are aimed at youth at the "deepest" end of the system (*i.e.* in custody) and is aimed at preventing further justice-involvement, particularly after a youth turns 18.  Noonan Decl. at ¶ 59. |
| 60. | For youth voluntarily placed in residential treatment outside of DCYF, care management entities administer a CANS assessment at least quarterly to monitor the needs of youth. | Undisputed for purposes of this motion. |

| | | |
|---|---|---|
| | Ex. 26 (Tenney Feb. 2025 Dep. Tr. 224:9–20). | |
| 61. | Defendants do not maintain waitlists or otherwise systematically track the number of youth who are awaiting community-based services.<br><br>Ex. 80 (Defs.' Suppl. Resp. & Obj. to Pl.'s Fourth Set of Interrogs. at 2 (Dec. 9, 2024)) ("Based upon a reasonable investigation, Defendants have not identified waitlists for community-based mental and/or behavioral health services identified in response to Second Set of Interrogatories to DHHS No. 1(b), as of April 1, 2022."). | **DISPUTED.** DCYF employs three "service array specialists" who are assigned to the various DCYF offices. DCYF's service array specialists are responsible for overseeing community-based services and for supporting front line DCYF staff with matching services to the youth served by the offices that each service array specialist oversees. These service array specialists are available for consultation regarding the community-based needs for all youth served by the offices to which they are assigned.  Noonan Decl. at ¶ 31. |
| 62. | Maximizing placement of Class Members in kinship homes is an important measure to reduce unnecessary placements in congregate facilities.<br><br>*See* Ex. 36 (Defs.' Resp. & Obj. to Pl.'s Fifth Set of Interrogs. at 16–17 (Jan. 3, 2025)); Ex. 4 (Feild Rep. ¶¶ 33, 99); Ex. 24 (Sec. Suppl. Feild Decl. ¶¶ 26–37); Ex. 9 (Cross Rep. ¶ 39); Ex. 37 (Ahluwalia Rep. at 11-14); Ex 28 (Arthur Rep. at 26–27). | Undisputed for purposes of this motion, but incomplete, as "kinship homes" need to be safe and appropriate for any given child's needs, and, while are to be preferred, are not universally superior to residential treatment options for youth.  Noonan Decl. at ¶¶ 23 & 41. |
| 63. | Older Foster Youth in New Hampshire are placed with kinship caregivers at below established rates.<br><br>*See* Ex. 4 (Feild Rep. ¶¶ 19–20); Ex. 24 (Sec. Suppl. Feild Decl., ECF No. 291-2, ¶¶ 28–31); Ex. 81 (Off. of Joseph Ribsam Jr., Dir., DCYF, Request for Reclassification/Reallocation Authorization, ECF No. 277-5 (Aug. 18, 2021)) (reclassification request acknowledging "needed expansion" of relative and kin care); Ex. 61 (First Suppl. Victor Decl. re: Placement Data, ECF No. 281-3, at 15 tbl.9); Ex. 82 (Relative and Fictive Home Study Process, ECF No. 277-6 (June 10, 2021) (PowerPoint presentation admitting "a need to improve the | **DISPUTED.** While it is true that New Hampshire continues to seek to expand the number of youth, including Older Foster Youth, that are in placements with kinship caregivers, it is not accurate to state that there are any so-called "established rates" or any particular target rate of kinship placement, as a successful, safe and healthy placement for a youth, including Older Foster Youth, depends on the nature and quality of the proposed kin caregiver, not just the existence of said potential caregiver.  Noonan Decl. at ¶ 23. *See also* additional fact |

| | | |
|---|---|---|
| | identification, assessment and engagement of relative caregivers")). | no. 156. |
| 64. | Foster care reimbursement rates are proposed based on a comparison with the United States Department of Agriculture (USDA) cost of living and comparable regional rates, and they are designed to reimburse families for the customary costs of caring for foster children, including the cost of providing food, shelter, daily supervision, school supplies, and personal incidentals.<br><br>Ex. 83 (DCYF Policy 2701 (July 2017)); Ex. 84 (DCYF Policy 2672 (Mar. 2019)). | Undisputed for purposes of this motion. |
| 65. | The foster care reimbursement rate will impact a family's ability and willingness to serve as a foster parent.<br><br>Ex. 4 (Feild Rep. ¶¶ 21–25, 28–32); Ex. 24 (Sec. Suppl. Feild Decl. ¶¶ 32–37); Ex. 85 (Michael Donati, Bureau Chief, Bureau of Cmty., Fam., & Program Supps., DCYF, Dep. Tr. 31:7–17 (Feb. 26, 2025)) (financial impact of serving as a placement affects family's willingness to do so); *see* Ex. 18 (Buxton Dep Tr. 95:15–96:3); Ex. 23 (Ribsam Dep. Tr. 31:11–17); ███████████████████████████ | Undisputed for purposes of this motion. *See also* additional fact nos. 160-163. |
| 66. | Unlicensed kin comprise the vast majority of kinship placements in New Hampshire.<br><br>Ex. 4 (Feild Rep. ¶¶ 23–24) (citing Ex. 87 (A Second Chance, Inc., *New Hampshire Kinship Services Data Report* at DHHS-3115233 (Dec. 2024)) (only 46 out of the 179 kinship caregivers who have been referred to A Second | Undisputed for purposes of this motion. |

| | | |
|---|---|---|
| | Chance Inc. (ASCI) have become licensed since ASCI became operational in New Hampshire in October 2023)); Ex. 18 (Buxton Dep. Tr. 110:9– 12) (confirming same). | |
| 67. | Unlicensed kinship caregivers receive lower reimbursement rates than licensed foster families.<br><br>Ex. 25 (Decl. of Michael Donati, Bureau Chief, Bureau of Cmty., Fam., & Program Supps., DCYF, ECF No. 317-1, ¶¶ 36–37 (Aug 1, 2024)) (unlicensed kin only receive the TANF grant whereas "[r]elative kin who choose to become licensed and licensed fictive kin are entitled to the full foster care maintenance payment rate paid to other licensed foster parents"); *compare id.* (daily TANF benefit per child—calculated as the monthly payment divided by 30—is $25.10/day for a family caring for one child, $17.03/day for a family caring for two children, $14.34/day for a family caring for three children, and $13/day for a family caring for four children) *with Current DCYF Foster Care Daily Rates*, NH DHHS (July 1, 2024), https://www.dhhs.nh.gov/programs-services/child-protection-juvenile-justice/current-foster-care-daily-rates (daily base rate for general licensed foster families per child aged 14 to 17 is $40.78). | Undisputed for purposes of this motion. |
| 68. | Defendants' plan to abbreviate and streamline kinship licensing standards is not currently in effect.<br><br>Ex. 18 (Buxton Dep. Tr. 111:5–7, 124:4–7) (abbreviated kinship licensing standards not currently in effect; expected to roll out in next 6 to 8 months); Ex. 36 (Defs.' Resp. & Obj. to Pl.'s Fifth Set of Interrogs. at 17). | **DISPUTED.** The streamlined kinship licensing rule was approved by the New Hampshire Joint Legislative Committee on Administrative Rules ("JLCAR") on September 18, 2025. Noonan Decl. at ¶ 24. |
| 69. | Defendants contracted with ASCI to provide kinship searching and support services, beginning in October 2023.<br><br>Ex. 25 (Decl. of Michael Donati ¶¶ 30–31). | Undisputed for purposes of this motion. |

| 70. | Defendants are terminating their contract with ASCI as of July 2025.<br><br>Ex. 88 (*Email from Melissa Wardner, DHHS, to DHHS-Everyone-DCYF re: A Second Chance Program* (Jan. 30, 2025)); Ex. 37 (Ahluwalia Rep. at 13). | Undisputed for purposes of this motion. *See also* Defendants' additional fact nos. 164-167. |
|---|---|---|
| 71. | Defendants do not have a sufficient array of therapeutically supported foster homes.<br><br>Ex. 4 (Feild Rep. ¶¶ 34–60); Ex. 24 (Sec. Suppl. Feild Dec., <u>ECF No. 291-2</u>, ¶¶ 39–57) (only 9% of all care days of Older Foster Youth with *per se* mental disabilities were in a therapeutically supported foster home); Ex. 9 (Cross Rep. ¶ 42); *see* Ex. 18 (Buxton Dep. Tr. 78:12–18) (there are sometimes youth in need of an ISO home but one is not available); Ex. 17 (DHHS, 2024 Tiered Therapeutic Foster Care Request for Applications, <u>ECF No. 317-4</u>, at 4–5 (June 19, 2024) ("TTFC RFA")) ("The goal of [TTFC] is to allow youth, even those with the highest needs, to stay out of congregate care . . . . TTFC will reduce the number of residential placements."); Ex. 16 (DHHS, Therapeutic Foster Care Request for Proposals at DHHS-2299815 (June 15, 2022) ("TFC RFP")) ("Because NH does not currently provide a TFC option, there is a gap in intensive programming . . . . This results in youth being placed in under skilled foster homes or continuing in more restrictive placements, both of which are scenarios that may not meet the youth's needs."); Ex. 89 (*Email from Shawnasey Madison, DCYF Foster Care Manager, to Renee Touhey-Childress, Dover Children's Home Executive Director, re: Dover Children's Home – Question Regarding Foster Care* at DHHS-3049827 (May 31, 2023)) ("The need for ISO is a fairly constant . . . [T]here are no shortages of children for these homes. We are also working on exploring how we can utilize ISO for children who are ready to graduate out of residential programs. As I am sure you can appreciate how large that population is as | **DISPUTED.** It is unclear from the phrasing of this "fact" and the evidence cited to support it what, exactly, Plaintiff contends here. DCYF does not currently employ "therapeutic foster care" (TFC) as a services class. Rather, DCYF employs individual services option (ISO) foster care. A component of ISO foster care is a higher level of services and supports for a youth known as "intensive ISO" or "IISO" foster care. Intensive ISO foster care is clinically equivalent to therapeutic foster care, and when considered in combination with the range of options from in-home/community placements, to ISO foster care, to intensive ISO foster care, to residential care in various forms, constitutes a spectrum of services that meet the widely varying needs of youth in New Hampshire. Noonan Decl. at ¶¶ 37-38 (regarding intensive ISO specifically); *see generally* Noonan Decl. at ¶¶ 16-29 (discussing DCYF's kinship placement program); 30-40 (discussing DCYF's foster care program); 41-50 (discussing DCYF's residential programs; *see also* Plaintiff's Ex. 37 (Report of Def.'s Expert Uma Ahluwalia (April 12, 2025) ("Ahluwalia Report")) at pp. 10-11; 17; Plaintiff's Ex. 28 (Report of Def.'s Expert Heidi Arthur (April 10, 2025) ("Arthur Report")) at pp. 11-23. |

| | | |
|---|---|---|
| | well."); <br><br> [text redacted] <br><br> Ex. 91 (*State of New Hampshire Child and Family Services Plan SFY 2025-2029*, ECF No. 317-2, at 89 (June 30, 2024)) ("There continues to be hardship to identify an appropriate family foster setting specifically for youth with high needs or complex behaviors and mental health issue[s].")). | |
| 72. | DCYF previously terminated its Therapeutic Foster Care program because they believed ISO Foster Care was providing similar services. <br><br> Ex. 18 (Buxton Dep. Tr. 20:11–20:16). | **DISPUTED.** ISO foster care is not clinically equivalent to therapeutic foster care; intensive ISO foster care *is,* and is available in DCYF's array of services. Noonan Decl. at ¶¶ 37-38. |
| 73. | DCYF staff recognize that ISO Foster Care as currently implemented is not an adequate substitute for Therapeutic Foster Care. <br><br> *See* Ex. 4 (Feild Rep. ¶¶ 47-57); *see, e.g.,* Ex. 92 (Carol Healey, Admin., Foster Care Program, DCYF, Rule 30(b)(6) Dep. Tr. 81:23–85:18 (June 24, 2022)) ("[W]e recognize there's a gap in . . . the [therapeutic foster care] level of service . . .."); Ex. 23 (Ribsam Dep. Tr. 74:18–75:16) (ISO Foster Care was intended, at least initially, to be a Therapeutic Foster Care type model, "but when the system became overwhelmed, it just became a really expensive ordinary foster care system where we paid therapeutic foster care type rates to access ordinary foster care"); Ex. 18 (Buxton Dep. Tr. 48:14–21) (admitting ISO Foster Care "provides a lower level of care than what therapeutic foster care would have offered"). | **DISPUTED.** ISO foster care is not clinically equivalent to therapeutic foster care; intensive ISO foster care *is,* and is available in DCYF's array of services. Noonan Decl. at ¶¶ 36-38. |
| 74. | The number of ISO Foster Care homes available in New Hampshire has decreased from 82 homes in 2022 to 67 homes as of | **DISPUTED.** As of April 2025, there were 69 families available to provide ISO foster care, with a total of 152 |

| | | |
|---|---|---|
| | April 2025.<br><br>*See* Ex. 93 (Defs.' Suppl. Resp. & Obj. to Pl.'s Fourth Set of Interrogs. at 2 (Mar. 3, 2023)); Ex. 37 (Ahluwalia Rep. at 21); *see also* Ex. 18 (Buxton Dep. Tr. 48:6–24). ISO Foster Care homes can only house one ISO child at a time with limited exceptions. Ex. 24 (Sec. Suppl. Feild Decl. ¶ 49 n.46). | ISO and intensive ISO beds available. Noonan Decl. at ¶ 40. |
| 75. | While New Hampshire maintains approximately 468 contracted congregate care beds, as of April 2025 there were only 97 ISO Foster Care beds.<br><br>Ex. 24 (Sec. Suppl. Feild Decl. ¶ 63); Ex. 37 (Ahluwalia Rep. at 21).<br><br>Further, the number of available ISO Foster Care beds has been more than halved from 203 in April 2022. *See* Ex. 93 (Defs.' Suppl. Resp. & Obj. to Pl.'s Fourth Set of Interrogs. at 2 (Mar. 3, 2023)). | **DISPUTED.** As of April 2025, there were 69 families available to provide ISO foster care, with a total of 152 ISO and intensive ISO beds available. Noonan Decl. at ¶ 40. |
| 76. | The number of ISO Foster Care agencies in New Hampshire has decreased over the past five years.<br><br>Ex. 18 (Buxton Dep. Tr. 55:13–56:1). | Undisputed for purposes of this motion. |
| 77. | Not all of New Hampshire's ISO Foster Care homes are accepting placements, and those homes are regularly filled by youth who only need General Foster Care.<br><br>Ex. 18 (Buxton Dep. Tr. 48:6–24, 51:25–52:4); ████████████████████████████████████████████████████████████████ | Undisputed for purposes of this motion, but irrelevant. ISO Foster Care homes often are utilized to house youth who only need General Foster Care; however, *intensive* ISO Foster Care beds are not regularly used in a similar manner, but remain available for use by youth, including Class Members, with more acute needs than youth served by General Foster Care. Noonan Decl. at ¶ 39. |
| 78. | DHHS has rejected multiple agencies that expressed interest in providing ISO Foster Care. | Undisputed for purposes of this motion, but irrelevant, as this "fact" does not refer to any actual foster homes/beds, but rather agencies that |

| | | |
|---|---|---|
| | Ex. 95 (Carol Healey, Admin., Foster Care Program, DCYF, Fact Dep. Tr. 62:1–9 (Feb. 26, 2025)); Ex. 96 (*Emails from Carol Healey, Admin., Foster Care Program, DCYF, to Kathleen Companion, Manager, Foster Care, DCYF, re: Northeast Family Services* at DHHS- 1656382 (Sept. 27, 2021)) (directing Ms. Companion to reject Home for Little Wanderers as an ISO Foster Care provider due to "not accepting ISO applications at this time")); Ex. 97 (*Letter from Kathleen Companion, Manager, Foster Care, DCYF, to Helene Murphy, Sen. Vice President, Northeast Family Services, re: Application* at DHHS-1659010 (Oct. 7, 2021)) (rejecting Northeast Family Services as an ISO Foster Care provider and explaining that "[a]decision was made to not accept any new daily rate providers for ISO FC services at this time"). | recruit and broker foster homes. |
| 79. | DHHS does not set a minimum amount of the ISO Foster Care rate that must be passed through to the ISO foster parent.<br><br>Ex. 18 (Buxton Dep. Tr. 57:15–58:7). | Undisputed for purposes of this motion, but see additional fact no. 168. |
| 80. | DHHS oversight of ISO Foster Care agencies consists of site reviews every two years.<br><br>Ex 18 (Buxton Dep. Tr. 70:1–7). | **DISPUTED.** DHHS oversight of ISO Foster Care agencies is significantly more extensive than "site reviews" every two years, and includes, among other things, rate oversight, collaborative development of written recruitment policies during ***monthly*** meetings with the ISO Foster Care agencies, conferences and other events to promote DHHS/DCYF programs, and other regular contacts with the agencies individually and as a group. *See generally* Plaintiff's Ex. 18, Buxton Dep. Tr. at 58:23-72:13 (discussing the work done by Heather Hall and Shawnasey Madison). |
| 81. | Therapeutic Foster Care remains unavailable in New Hampshire.<br><br>Ex. 18 (Buxton Dep. Tr. 19:16–20:3). | Undisputed, but irrelevant. Intensive ISO foster care, which is clinically equivalent to therapeutic foster care, is available and utilized in New |

| | | Hampshire. Noonan Decl. at ¶¶ 37-38. |
|---|---|---|
| 82. | An insufficient number of therapeutically supported foster homes in New Hampshire results in some youth who could be served by such homes being placed and retained in congregate facilities.<br><br>*See* Ex. 4 (Feild Rep. ¶¶ 18–60); Ex. 9 (Cross Rep. ¶ 42); Ex. 16 (TFC RFP at 7) ("Because NH does not currently provide a TFC option, there is a gap in intensive programming . . . This results in youth being placed in under skilled foster homes or continuing in more restrictive placements, both of which are scenarios that may not meet the youth's needs."); Ex. 23 (Ribsam Dep. Tr. 105:18–106:12, 115:20–119:14) (youth in all levels of residential care could be served in family homes if appropriate and timely supports and services were available); Ex. 85 (Donati Feb. 26, 2025 Dep. Tr. 51:25–52:6) (same); Ex. 98 (*Email from Jeffrey Fleischer, Former Dir., DCYF, to Jeffrey Fleischer, Former Dir., DCYF, re: confidential* at DHHS-2995934 (Sept. 7, 2023)) ("[S]eeking residential placement is a normalized option for caseworkers. 70% of our kids who are placed in residential care are only assessed to be CAT 3."). | **DISPUTED.** Plaintiff's evidence cited in support of this assertion focuses on the fact that New Hampshire does not presently employ therapeutic foster care, and ignores the fact that New Hampshire provides intensive ISO foster care, which is clinically equivalent to therapeutic foster care. Noonan Decl. at ¶¶ 37-38. |
| 83. | DHHS took few, if any, steps to promote or circulate their 2022 Therapeutic Foster Care Request for Proposals, and did not notify providers when the Request for Proposals was published.<br><br>Ex. 95 (Healey Feb. 2025 Dep. Tr. 25:3–27:9); Ex. 4 (Feild Rep. ¶ 50) (citing Ex. 99 (*Email from Shawnasey Madison, DCYF Foster Care Manager, to Carol Healey, Admin., Foster Care Program, DCYF, re: TFC* (July 13, 2022)) ("Ascentria [ISO provider] is scrambling to work on the [RFP] for TFC. They were never notified it went live.")). | **DISPUTED.** DHHS followed the appropriate steps for issuing and advertising a request for proposal as it does for any other request for proposal. Noonan Decl. at ¶ 38. |
| 84. | In 2024, DHHS issued a Tiered Therapeutic | Undisputed for purposes of this |

| | | |
|---|---|---|
| | Foster Care Request for Applications, with the expectation that implementation would "reduce the number of residential placements and [could] be utilized for youth who are ready to step down from congregate care."<br><br>Ex. 17 (TTFC RFA, ECF No. 317-4, at 4–5). | motion. |
| 85. | At least two child placing agencies declined to bid on DHHS's 2024 Tiered Therapeutic Foster Care Request for Applications at least in part because the offered rate was too low.<br><br>Ex. 18 (Buxton Dep. Tr. 40:9–21). | Undisputed for purposes of this motion. |
| 86. | Defendants are no longer pursing a Therapeutic Foster Care program.<br><br>Ex. 51 (Noonan Dep. Tr. 15:10–23). | Undisputed, but irrelevant. Intensive ISO foster care, which is clinically equivalent to therapeutic foster care, is available and utilized in New Hampshire. Noonan Decl. at ¶¶ 37-38. |
| 87. | Defendants do not maintain waitlists or otherwise systematically track the number of youth in congregate facilities who are awaiting placement in a family home.<br><br>Ex. 18 (Buxton Dep. Tr at 82:25–83:3, 183:16–184:1) (no waitlists that track number of youth in congregate facilities who are awaiting placement in family home); *id.* at 83:4-83:23 (has not seen aggregate data tracking whether or when foster youth who are awaiting placement in family home are in fact placed in family home); Ex. 100 (Kathleen Talbot, Cmty. Programs Specialist, Bureau of Child.'s Behav. Health, DHHS, 30(b)(6) Dep. Tr. 110:4–112:19; 115:14–18 (July 29, 2022)) (unaware of a standard process outlining what to do when a recommended level of care is unavailable or a list that tracks children who are placed in a level of care different than what has been "determined by the CAT"). | **DISPUTED.** This information is presently tracked as part of the ongoing work of DCYF's SURGE teams.  Noonan Decl. at ¶ 45. |
| 88. | Serving Class Members in community-based placements costs less than serving them in residential facilities. | **DISPUTED.** This blanket statement is not universally true.  As but one example, "enhanced foster care" services from DCYF, when coupled |

| | | |
|---|---|---|
| | Ex. 4 (Feild Rep. ¶¶ 105–08) (explaining that "community placements and services are significantly more cost-effective than congregate care facilities" and "most of the costs associated with expanding community based services or enhanced support foster homes are reimbursable by the federal government"); Ex. 57 (Fleischer Dep. Tr. 69:21– 70:18) (residential placements are "draining resources" that could be "redirect[ed]" to a "community-based continuum of care"); Ex. 101 (DHHS, Foster Care Transformation Proposal at DHHS-1512257, DHHS-1512260 (Jan. 2019)) ("Although more expensive than general foster homes, therapeutic foster homes will save the State money in the long-run by providing a cost- efficient alternative to more expensive residential care for a subset of children."); Ex. 102 (Ctr. for Health Care Strategies & Innovations Inst., Sch. of Soc. Work, Univ. of Conn., 2025 System of Care Assessment Initial Recommendations at DHHS-3253531 (2025)) ("When a system is able to support youth in their homes and communities, the reduced costs from residential treatment can be significant and repurposed to support more preventative and home- and community-based services."). | with other therapeutic services, may cost more than a residential treatment option for that same youth.  Noonan Decl. at ¶ 48. |
| 89. | DHHS's 2026-2027 biennium budget request reflects an assumption of continued usage of residential treatment at the same or higher rate as the 2024-2025 biennium budget. Ex. 54 (White 30(b)(6) Dep. Tr. 242:24–243:6). | **DISPUTED.**  The cited testimony does not support Plaintiff's purported "fact" as it discusses how funding levels were set, and the witness simply observed that there were no assumptions about rate of use as part of that funding. Rather, the funding assumptions were based on increases in various rate payments, loss of Medicaid dollars, and other factors. *See* Plaintiff's Ex. 54, White 30(b)(6) Dep. Tr. at 241:18-243:18. |
| 90. | New Hampshire's current budget anticipates sustaining and expanding the contracted residential treatment provider network in New Hampshire. | **DISPUTED.** The "fact" as stated by Plaintiff conflates multiple things, resulting in inaccuracies and disputes. Specifically, it improperly |

| | | |
|---|---|---|
| | Ex. 4 (Feild Rep. ¶¶ 87– 98); Ex. 24 (Sec. Suppl. Feild Decl., ECF No. 291-2, ¶¶ 61–68); Ex. 54 (White 30(b)(6) Dep. Tr. 253:14–254:12) ("[I]n the current biennium we've had to move money . . . into DCYF to cover residential costs because of an increase in general fund expenditures. So . . . I think it's important to recognize the current budget globally within DCYF has not necessarily been sufficient to meet all of their needs, both within the residential dollars as well as SYSC, and last year alone I think we . . . moved millions and millions of dollars during the year."); Ex. 103 (State of New Hampshire Biennium Budget Request 2022-2023 at DHHS-3080409); Ex. 40 (State of New Hampshire Biennium Budget Request 2026-2027 at DHHS-3089145); Ex. 104 (Off. of Comm'r, DHHS, Requested Action at 9 (Feb. 3, 2025)); Ex. 105 (DHHS, 10-Year Mental Health Plan: Priorities for State Fiscal Years 2024-2205 at DHHS-2072785 (Sept. 2022)) (anticipating a $12.37 million per fiscal year increase in residential rates to sustain residential programming for children). | blurs discussions of funding for juvenile justice programs such as at SYSC with funding for DCYF child protection services that are at issue in this lawsuit.  Furthermore, it incorrectly suggests that New Hampshire is "expanding" its residential treatment program, which it is not under the current budget. Noonan Decl. at ¶ 49. |
| 91. | For the 2026-2027 budget biennium, DHHS sought an increase of $6.5 million in state general funds for congregate placement for fiscal year 2026 and an increase of $24.6 million for fiscal year 2027, in part to compensate for an $18 million loss in Medicaid reimbursement for congregate facilities with 16 or more beds.<br><br>Ex. 54 (White 30(b)(6) Dep. Tr. 143:13–144:14); Ex. 40 (State of New Hampshire Biennium Budget Request 2026-2027 at DHHS-3089145) (line 643, *see also* Estimated Source of Funds: Federal Fund, General Fund). | Undisputed for purposes of this motion, but irrelevant as these budget requests are not the actual budget adopted by the Legislature. Notably, these amounts are for all residential placements, not only those for Older Foster Youth at issue in this case. |
| 92. | In fiscal years 2024 and 2025, DCYF overspent its residential placement line item (643, "State General Funds for Placement") by $4.6 million and $7.3 million respectively. | Undisputed for purposes of this motion that residential placement needs exceeded those budged for fiscal years 2024 and 2025 and required supplemental |

| | | |
|---|---|---|
| | *Compare* Ex. 54 (White 30(b)(6) Dep. Tr. 139:11–140:10) *and* Ex. 40 (excerpt from State of New Hampshire Biennium Budget Request 2026-2027 at DHHS-3089145) *with* Ex. 106 (excerpt from An Act Making Appropriations for the Expenses of Certain Departments of the State for Fiscal Years Ending June 30, 2024 and June 30, 2025, H.B. 1-A at 528 (June 7, 2023)). | appropriations.  Notably, these amounts are for all residential placements, not only those for Older Foster Youth at issue in this case. |
| 93. | "The overwhelming majority of children in foster care are eligible for and enrolled in Medicaid, which covers a full range of mental and behavioral health benefits."<br><br>Ex. 36 (Defs.' Resp. & Obj. to Pl.'s Fifth Set of Interrogs. at 22). | Undisputed for purposes of this motion. |
| 94. | Community-based Medicaid services in DCYF's current service array include, but are not limited to, Home-Based Therapeutic Services, Child Health Support, Individual Service Option In-Home Service, Therapeutic Day Treatment, Adolescent Community Therapy Services, FAST Forward, Intercept, and Mobile Crisis and Stabilization Teams.<br><br>Ex. 36 (Defs.' Resp. & Obj. to Pl.'s Fifth Set of Interrogs. at 22–23). | Undisputed for purposes of this motion. |
| 95. | When Medicaid-funded services are provided to Class Members at all, they are not provided at recommended levels and frequencies prior to Class Members' entry into congregate facilities.<br><br>*See* Ex. 4 (Feild Rep. ¶¶ 71–74) (citing Ex. 51 (Noonan Dep. Tr. 40:7–19)); Ex. 107 (Behavioral Health Improvement Institute, 2021 Children's Behavioral Health SOC Assessment at DHHS-2508362 (Aug. 13, 2022)); Ex. 38 (Victor Placement and Medicaid Rep. ¶¶ 29–33); Ex. 74 (Def's Am. Resp. & Obj. to Pl.'s Second Set of Interrogs. at 5); Ex. 75 (Donati Rule 30(b)(6) Dep. Tr. 58:17–60:13, 69:8–70:6, 95:14–96:5); Ex. 108 (*CME Workgroup Meeting Notes* at DHHS-911149 (June 1, 2022)) ("Many high-need | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, it is **DISPUTED.** Stripped of its argument, the statement is an assertion that there is some level of "recommended" service of various programs and interventions offered by DCYF.  As described in other responses, that is inaccurate. The evidence cited by Plaintiff further demonstrates this. For example, the citation to the Noonan deposition transcript (Plaintiff's Exhibit 51) is a discussion regarding *which* youth qualify for services from the Intercept program, not a suggestion |

| | | |
|---|---|---|
| | cases from DCYF/JJ could benefit from MST, but there is lack [*sic*] statewide capacity.")); *cf.* Ex. 26 (Tenney Feb. 2025 Dep. Tr. 270:24–272:13). | that some were excluded for funding or other Medicaid related reasons. Likewise, the reference to "MST" in Plaintiff's Exhibit 108 refers to a program that is not presently part of DCYF's child protection array of services. |
| 96. | DHHS does not meet federal requirements for Medicaid reimbursement for Class Member placements in residential facilities.<br><br>Ex. 4 (Feild Rep. ¶¶ 91–95); Ex. 109 (*Email from Jay Nagy, Sen. Dir., Alvarez & Marsal, to Katja Fox, Dir., Div. for Beh. Health, DHHS, re: QRTP Working Group* (May 3, 2024)) (attaching Ex. 110 (comments on DHHS's draft plan to implement QRTP Medicaid requirements for SMI/SED demonstration)); Ex. 111 (*Email from Jay Nagy, Sen. Dir., Alvarez & Marsal, to Katja Fox, Dir., Div. for Beh. Health, DHHS, re: QRTP Working Group* (Nov. 26, 2024)) (attaching Ex. 112 (comments on DHHS's SOC 2.0 excerpt re: QRTP Implementation)); Ex. 54 (White 30(b)(6) Dep. Tr. 143:8–177:20). | Undisputed for purposes of this motion that not all facilities in DHHS's service array qualify for Medicaid reimbursement.  *See also* additional fact nos. 169-171. |
| 97. | New Hampshire's public facing child welfare data dashboard does not contain data points including: service waitlists, placement waitlists, service utilization, foster home availability, level-of-care assessments, disaggregated placement data, length of stay data, or case planning.<br><br>*See DCYF Data*, NH DHHS (last accessed July 2, 2025), https://www.dhhsnh.gov/reports-regulations-statistics/dcyf-data; *see also* Ex. 4 (Feild Rep. ¶¶ 81–86). | Undisputed for purposes of this motion, but irrelevant. |
| 98. | Public facing data dashboards provide transparency and allow the public to hold Defendants and state lawmakers accountable for decisions that perpetuate ongoing discrimination of Class Members.<br><br>Ex. 23 (Ribsam Dep. Tr. 148:21–149:17) | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56, insofar as it assumes that there is any "ongoing discrimination" of Class Members, which Defendants dispute. This "fact" is also irrelevant for |

| | | |
|---|---|---|
| | ("[D]ata needs to be shared and understood so that the public can hold the system accountable, so the public can also hold the legislature and other people accountable to make sure the system gets what it [needs]."); Ex. 33 (*Email from Jess Lanney, NH Project Leader – Government Performance Lab, to Kimberly Crowe, Bureau Chief, Bureau of Pro. & Strategic Dev., DHHS, re: A few ideas re: strategies around residential placements, leveraging admin/support staff* at DHHS-1581851 (Mar. 24, 2020)) (identifying "real-time data monitoring" as a promising approach to reducing unnecessary residential placements and transition children out of residential placements). | purposes of this motion. |
| 99. | Current research recommends creating administrative barriers to group care placement, including high-level review of all recommendations for such placements, to reduce unnecessary residential treatment placements.<br><br>*See, e.g.*, Ex. 4 (Feild Rep. at 42–43); Ex. 113 at 2 (Casey Family Programs, Safe Strong Supportive: Creating Administrative Barriers Discussion Guide (May 2023)); Ex. 153 (Annie E. Casey Foundation, Rightsizing Congregate Care at 2 (2009)); *see also* Ex. 23 (Ribsam Dep. Tr. 135:2–22) (identifying "Ending the Need for Group Care" as the most current model for reducing the use of congregate care); Ex. 33 (*Email from Jess Lanney, NH Project Leader – Government Performance Lab, to Kimberly Crowe, Bureau Chief, Bureau of Pro. & Strategic Dev., DHHS, re: A few ideas re: strategies around residential placements, leveraging admin/support staff* at DHHS-158185 (Mar. 24, 2020)) (identifying high-level approval for residential placement as an approach that has been "very effective" in other states). | Undisputed for purposes of this motion. |
| 100. | A reduction in the number of congregate care beds available to Class Members will help force the system to fund and develop | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. |

| | | |
|---|---|---|
| | community-based alternatives.<br><br>Ex. 4 (Feild Rep. ¶ 103 & n.141). | Regardless, it is **DISPUTED.** The effect of unilaterally forcing a reduction in the number of beds available for residential treatment will almost certainly result in "hoteling" youth without the necessary supports and structure (whether residential or community-based), and is a highly irresponsible suggestion by Plaintiff. Noonan Decl. at ¶ 50. |
| 101. | Defendants receive federal funding for the operation of their child welfare system under both Titles IV-B and IV-E of the Social Security Act.<br><br>Ex. 114 (excerpt from Gov.'s Operating Budget for Fiscal Years Ending June 30, 2024-2025 at DHHS-3076239, 3076615, 3076234 (Feb. 14, 2023)). | Undisputed for purposes of this motion. |
| 102. | Defendants' policies require Defendants to develop a written Case Plan for each Class Member within 60 calendar days from the date of their initial placement.<br><br>Ex. 115 (DCYF Policy 1550 at DHHS-061962 (Sept. 2021) (subsection III)). | Undisputed for purposes of this motion. |
| 103. | Defendants' policies require that Class Members' Case Plans include a plan for transitioning into adulthood within 60 days of the Class Member turning 14 years of age, or within 60 days of entering placement if placement occurred after their 14th birthday.<br><br>Ex. 116 (DCYF Policy 1695 at DHHS-044687 (June 2018) (subsection I(A)(3))). | Disputed but immaterial. Form 1695, which is what the cited evidence refers to, is not a part of the case plan or the case plan appendix, even if it is used in case planning practice. *See, e.g.,* Plaintiff's Ex. 116 (DCYF Policy 1695) (describing the use of Form 1695 but specifically defining "case plan" as "includes all forms with the prefix 1550 such as [list omitted]"). |
| 104. | Defendants' policies require that Class Members' Case Plans include a "90-Day Transition Plan" developed at the "90-Day Youth Transition Meeting" that occurs within 80 to 100 days of a Class Member's 18th birthday. | Disputed but immaterial. Form 1978 is not part of the case plan, but rather an addendum to the case plan. *See* Plaintiff's Ex. 117 (DCYF Policy 1972) at subsection VII (describing Form 1978 as something separate |

| | | |
|---|---|---|
| | Ex. 117 (DCYF Policy 1972 at DHHS-0000006100, 04 (2018)). | that must be "attached to the current case plan"). |
| 105. | Defendants' policies require Defendants to update each Class Member's Case Plan at least every 6 months and within 30 calendar days from a change in primary or concurrent permanency goal; placement; or identified need.<br><br>Ex. 115 (DCYF Policy 1550 at DHHS-061964 (Sept. 2021) (subsection X)). | Undisputed for purposes of this motion. |
| 106. | Defendants' policies require that Class Members' written plans for transitioning into adulthood be updated "at least annually and within 30 days of any change of placement."<br><br>Ex. 116 (DCYF Policy 1695 at DHHS-044687 (June 2018) (subsection I(A)(3)(a))). | Disputed but immaterial. Form 1695, which is what the cited evidence refers to, is not a part of the case plan or the case plan appendix, even if it is used in case planning practice. *See, e.g.,* Plaintiff's Ex. 116 (DCYF Policy 1695) (describing the use of Form 1695 but specifically defining "case plan" as "includes all forms with the prefix 1550 such as [list omitted]"). |
| 107. | Defendants' policies require that Class Members' Case Plans be saved to the DCYF electronic information system (Bridges).<br><br>Ex. 115 (DCYF Policy 1550 at DHHS-061964 (Sept. 2021) (subsection II(A))); Ex. 116 (DCYF Policy 1695 at DHHS-044687 (June 2018)(subsection I(C)(2))). | Undisputed for purposes of this motion. |
| 108. | Defendants' policies require Defendants to collaborate with the Class Member and their family in developing a Case Plan.<br><br>Ex. 115 (DCYF Policy 1550 at DHHS-061962 (Sept. 2021) (subsection III)). | Undisputed for purposes of this motion. |
| 109. | Defendants' policies require caseworkers to ask Class Members' parents or guardians to sign a copy of the Case Plan or otherwise note their refusal in the Case Plan.<br><br>Ex. 118 (DCYF Policy 1551 at DHHS-0000011669 (Sept. 2021) (subsection V(A))). | Undisputed for purposes of this motion. |

| 110. | Defendants' policies prohibit caseworkers from relying on a treatment plan to substitute for a Case Plan.<br><br>Ex. 118 (DCYF Policy 1551 at DHHS-0000011670 (Sept. 2021) (subsection VI(A))). | Undisputed for purposes of this motion. |
|---|---|---|
| 111. | Under DCYF's policies, a Class Member's written "Case Plan" must include DCYF Forms 1550, 1552, and 1695.<br><br>Ex. 115 (DCYF Policy 1550 at DHHS-061963 (Sept. 2021) (subsections I, VII)); Ex. 152 (DCYF Form 1550 at DHHS-049213, 16 (2021) (subsections "Supplemental Documents," "Adult Living Preparation")); Ex. 119 (DCYF Form 1552 (June 2020)); Ex. 116 (DCYF Policy 1695 at DHHS-044684, 85 (June 2018)); Ex. 120 (DCYF Form 1695 at DHHS-051288 (Jan. 2015)); *see also* Ex. 44 (Chansuthus Rep. ¶¶ 44–49 & tbls.1–2); Ex. 42 (Rebuttal Report of Pl.'s Expert Daryl Chansuthus ¶¶ 2-8 (May 13, 2025) ("Chansuthus Rebuttal")) (citing Ex. 39 (DCYF SOP 1600.3: Kinship Care Placement (Feb. 2025)); Ex. 121 (DCYF SOP 1600.4: Foster Home Placement (Feb. 2025)); Ex. 122 (DCYF SOP 1600.5: Residential Treatment Program Placement (Feb. 2025)); Ex. 123 (DCYF Policy 1615: Placement (Oct. 2021)); Ex. 124 (DCYF SOP 1784.1: Matching Process (Dec. 2021)); Ex. 125 (DCYF Form 1907: Referral to Community-Based In-Home Services (Mar. 2022)); Ex 126 (DCYF Policy 1690 at DHHS-0000006010 (June 2018)))). | Disputed but immaterial.  Form 1552 is not part of the case plan, but rather an addendum to the case plan.  *See* Plaintiff's Ex. 115 (DCYF Policy 1550) at subsection VII (describing Form 1552 as a "case plan appendi[x]").  Form 1695 is not a part of the case plan or the case plan appendix, even if it is used in case planning practice.  *See, e.g.,* Plaintiff's Ex. 116 (DCYF Policy 1695) (describing the use of Form 1695 but specifically defining "case plan" as "includes all forms with the prefix 1550 such as [list omitted]"). |
| 112. | Under DCYF's policies, a Class Member's written Case Plan must include a fourth form, DCYF Form 1978 ("90-Day Youth Transition Plan"), for youth approaching their 18[th] birthdays.<br><br>Ex. 117 (DCYF Policy 1972 at DHHS-0000006100, 01 (Sept. 2018) (subsections I, VII(A))); Ex. 127 (DCYF Form 1978 (July 2016)); *see also* Ex. 44 (Chansuthus Rep. ¶¶ 44–46, 49 & tbls.1–2). | Disputed but immaterial.  Form 1978 is not part of the case plan, but rather an addendum to the case plan.  *See* Plaintiff's Ex. 117 (DCYF Policy 1972) at subsection VII (describing Form 1978 as something separate that must be "attached to the current case plan"). |

| 113. | Defendants do not develop compliant initial Case Plans for Class Members.<br><br>*See* Ex. 44 (Chansuthus Rep. ¶ 73 tbl.3) (Defendants documented the appropriateness of Older Foster Youths' placements in only 2% of cases, health and education records in 0%, and transition services in 6%); *id.* ¶ 71 (39% of Older Foster Youth had required pairing of DCYF Forms 1550 and 1552 within 180 days of entry into state custody); Ex. 6 (MacKenzie Rep. ¶ 25 tbl.1) (providing 95% confidence intervals to extrapolate Ms. Chansuthus's findings to the entire Class); Ex. 44 (Chansuthus Rep. ¶ 123 tbl.8) (citing Ex. 128 (Tab 1: CPS, *2025-01-03AWSR.xlsx*) (33% of Older Foster Youth had a DCYF Form 1695 dated within the past fourteen months; 42% of those imminently aging out of DCYF custody had a DCYF Form 1978)). | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, it is **DISPUTED.**  In a random sample, 90% of Older Foster Youth were found to have timely case plans.  Plaintiff's Ex. 47 (Report of Def.'s Expert Cynthia Richter-Jackson (April 12, 2025) ("Richter-Jackson Report")) at pp. 7-8 (reporting findings) & 15-16 (responding to Ms. Chansuthus); *see also* Plaintiff's Ex. 7 (Salzberg Report) at pp. 4-5 (discussing creation of random sample used by Richter-Jackson). |
|---|---|---|
| 114. | Defendants do not timely (within 60 days of entry into DCYF custody) develop Class Members' initial Case Plans.<br><br>*See* Ex. 44 (Chansuthus Rep. ¶¶ 71–73 tbl.3) (27% of Older Foster Youths' Cases Plans were timely and discrete, 7% with parental involvement, and 0% with youth consultation); Ex. 6 (MacKenzie Rep. ¶ 25 tbl.1); Ex. 42 (Chansuthus Rebuttal ¶¶ 12–15 & tbl.1) (0% of Older Foster Youth had required combination of DCYF Forms 1550, 1552, and 1695 within 180 days of entering DCYF custody; 8% of Class Members entering care had DCYF Forms 1550 *and* 1552 within 60 days (19% within 180 days) (citing Ex. 129 (Rebuttal Report of Pl.'s Expert Dr. Bryan Victor ¶ 7 tbl.1 (May 7, 2025))). | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, it is **DISPUTED.**  In a random sample, 90% of Older Foster Youth were found to have timely case plans.  Plaintiff's Ex. 47 (Richter-Jackson Report) at pp. 7-8 (reporting findings); *see also* Plaintiff's Ex. 7 (Salzberg Report) at pp. 4-5 (discussing creation of random sample). |
| 115. | Defendants do not collaborate with Class Members and their families to develop initial Case Plans.<br><br>*See* Ex. 44 (Chansuthus Rep. ¶ 73 tbl.3) (7% of Older Foster Youths' Case Plans developed jointly with parent(s); 0% in consultation with | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, it is **DISPUTED.**  In a random sample, 72% of Older Foster Youth case plans documented collaboration between DCYF staff |

| | | |
|---|---|---|
| | youth); Ex. 6 (MacKenzie Rep. ¶ 25 tbl.1). | and the parent, and 60% documented collaboration between the youth and DCYF staff.  Plaintiff's Ex. 47 (Richter-Jackson Report) at pp. 8 & 12-13; *see also* Plaintiff's Ex. 7 (Salzberg Report) at pp. 4-5 (discussion creation of random sample). |
| 116. | Defendants do not update Class Members' Case Plans every six months.<br><br>*See* Ex.44 (Chansuthus Rep. ¶¶ 84, 86) (only 3% of Older Foster Youths' DCYF Forms 1550, 1% of their Forms 1552, and 14% of their Forms 1695 were updated in a timely manner (citing Ex. 130 (Report of Pl.'s Expert Dr. Bryan Victor Regarding Case-Planning Data ¶¶ 26 tbl.4, 27 tbl.5, 31 tbl.8, 33 tbl.9) (Mar. 9, 2025) ("Victor Case-Planning Rep."))); *see also* Ex. 130 (Victor Case-Planning Rep. ¶¶ 26 tbl.4, 27 tbl.5) (during 15-month period of review, only 33.7% of Class Members had at least one Form 1550 in their DCYF Case Files; 17.3%, had at least one Form 1695); Ex. 44 (Chansuthus Rep. ¶ 123 tbl.8) (only 33% of Class Members had Forms 1695 dated within past fourteen months (citing Ex. 128 (Tab 1: CPS, *2025-01-03AWSR.xlsx*))). | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, it is **DISPUTED.** Plaintiff's Ex. 47 (Richter-Jackson Report) at p. 12. |
| 117. | Defendants do not update Class Members' Case Plans within 30 days of a change in placement.<br><br>*See* Ex. 44 (Chansuthus Rep. ¶ 88) (in three-quarters of placement changes, "Defendants failed to update Older Foster Youths' DCYF Forms 1552" (citing Ex. 130 (Victor Case-Planning Rep. ¶ 38 tbl.10))). | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, it is **DISPUTED.** Plaintiff's Ex. 47 (Richter-Jackson Report) at pp. 12-17. |
| 118. | Defendants do not timely (80 to 100 days before their 18th birthdays) create 90- Day Transition Plans for Class Members.<br><br>*See* Ex. 44 (Chansuthus Rep. ¶ 87) (only 17% of Older Foster Youth had DCYF Forms 1978 within 70 to 100 days of their 18th birthdays | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, it is **DISPUTED.** Plaintiff's Ex. 47 (Richter-Jackson Report) at pp. 12-17. |

| | | |
|---|---|---|
| | (citing Ex. 130 (Victor Case-Planning Rep. ¶ 42 tbl.11))); Ex. 44 (Chansuthus Rep. ¶ 123 (citing Ex. 128 (Tab 1: CPS, *2025-01-03AWSR.xlsx*))). | |
| 119. | Defendants' failures to develop and update Class Members' Case Plans jeopardize their mental health, placement stability, and successful transitions into independent adulthood.<br><br>*See* Ex. 44 (Chansuthus Rep. ¶¶ 51–63, 76–77, 81, 89–108); Ex. 50 (Ermel Rule 30(b)(6) Dep. Tr. 116:17–117:3); Ex. 51 (Noonan Dep. Tr. 57:6–18); Ex. 52 (Ross-Ferguson Dep. Tr. 55:18–20, 186:18–187:6); *see generally* Ex. 9 (Cross Rep.) (analyzing sample of Older Foster Youth and finding unnecessary placement and retention in congregate-based settings). | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. |
| 120. | Unnecessary placement in institutional facilities is indicative of inadequate case planning.<br><br>Ex. 41 (Cynthia Richter-Jackson, Defs.' Expert, Dep. Tr. 220:2–14 (June 3, 2025). | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, it is undisputed for purposes of this motion that ***unnecessary*** placements in residential settings may indicate inadequate case planning. |
| 121. | Older Foster Youth who age out of foster care without achieving permanency face greater, lifelong risks of "unemployment, homelessness, lack of educational attainment, and potential involvement in the criminal legal system."<br><br>Ex. 44 (Chansuthus Rep. ¶ 57). | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. |
| 122. | Assessing Class Members' and their families' strengths and needs using an evidence-based tool will increase the likelihood of Class Members receiving timely, compliant written Case Plans.<br><br>*See* Ex. 44 (Chansuthus Rep. ¶¶ 78, 111–15); Ex. 131 (DCYF Policy 1560 at DHHS-0000011682 (2022) (subsection IX)); Ex. 28 | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, it is undisputed for purposes of this motion. *See also* additional fact nos. 148-150. |

| | | |
|---|---|---|
| | (Arthur Rep. at 6–7); *see also* Ex. 132 (DCYF SOP 1551.1 at DHHS-0000012060 (2021) (subsection I)); DCYF Ex. 118 (DCYF Policy 1551 at DHHS-0000011669 (Sept. 2021)); *see also* Ex. 23 (Ribsam Dep. Tr. 222:12–223:6). | |
| 123. | Defendants' policies require that caseworkers use the Child and Adolescent Needs and Strengths (CANS) Assessment (an evidence-based assessment tool), updated at least every three to six months, to guide case planning for all youth involved with Defendants' juvenile justice services ("JJS"). <br><br> Ex. 131 (DCYF Policy 1560 at DHHS-0000011682 (2022) (subsections V-VI)). | Undisputed for purposes of this motion, but irrelevant. |
| 124. | Defendants do not utilize the CANS or other evidence-based assessment tool to identify the strengths and needs of Class Members upon entry into DCYF custody due to abuse or neglect. <br><br> *See* Ex. 44 (Chansuthus Rep. ¶ 78 & tbl.6); Ex. 133 (*Mental Health and Trauma Screening*, DCYF Policy Directive 20-27 at DHHS-047854 (May 20, 2020)); Ex. 55 (Defs.' Resp. & Obj. to Pl.'s Request for Admis. No. 35 (Feb. 27, 2025)); Ex. 134 (Debra Kavanagh, Asst. Bureau Chief, Field Servs., DCYF, Dep. Tr. 34:5–16, 35:21–25, 37:22–25, 40:16–20 (Feb. 20, 2025)). | **DISPUTED.** DCYF has completed fully training all its Child Protective Social Workers in administering the CANS, and is in the process of deploying CANS across the entirety of its child protection population. A phased roll-out as being used by DCYF ensures that the CANS implementation will be successful. Noonan Decl. at ¶¶ 54-55; *see also* Plaintiff's Ex. 28 (Arthur Report) at p. 7. |
| 125. | Despite creating a plan in 2020 to assess all Class Members using the CANS, *see* Ex. 135 (*Email from Alysia Nelson, DHHS, to Sherry Ermel, Bureau Chief, Bureau of Field Servs., DCYF, re: CANS Update* (May 20, 2020)), Defendants have not done so, *see* Ex. 52 (Ross-Ferguson Dep. Tr. 139:23–141:7, 141:16–18). | **DISPUTED.** DCYF has completed fully training all its Child Protective Social Workers in administering the CANS, and is in the process of deploying CANS across the entirety of its child protection population. A phased roll-out as being used by DCYF ensures that the CANS implementation will be successful. Noonan Decl. at ¶ 54-55. |
| 126. | Assigning Class Members to caseworkers with specialized knowledge of Class Members' permanency, transition, and mental/behavioral-health needs would increase the rate of their | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, this "fact" is |

| | | |
|---|---|---|
| | receiving complete and current Case Plans.<br><br>*See* Ex. 44 (Chansuthus Rep. ¶¶ 78, 125–30, 139–40) (citing Ex. 136 (*Email from Michael Donati, Bureau Chief, Bureau of Cmty., Fam., & Program Supps., DCYF, to Jessica Kessinger, Child Protection Field Adm'r, re: HOPE cases* at DHHS-1625052–53 (July 13, 2021)) ("[Y]outh served by traditional [caseworkers] do not get the same supports and services as the youth served by Adolescent [Workers] or other [caseworkers] who focus on adolescent practice.")); Ex. 137 (*Email from Michael Donati, Bureau Chief, Bureau of Cmty., Fam., & Program Supps., DCYF, to Marie Noonan, Dir. DCYF, and Sherry Ermel, Bureau Chief, Bureau of Field Servs., DCYF, re: Crisis Placement Support Meeting-Monday* (July 23, 2024)) (recommending expansion of Adolescent Worker program); *see also* Ex. 9 (Cross Rep. ¶ 66) (opining as to the critical importance of standardized discharge- and transition-planning in reducing Defendants' unnecessary use of congregate care); Ex. 26 (Tenney Feb. 2025 Dep. Tr. 236:21–237:2, 231:14–239:22, 235:3–7, 241:9–19, 245:5–248:7) (explaining critical, specialized function of TReCC coordinators in "oversight of . . . episode[s] of residential treatment, working with the treatment plan, working with the family to ensure that . . . they're receiving the right type of treatment and that they're effectively seeing positive outcomes" and ensuring youth "transition . . . back home as appropriately and as quickly as possible"). | **DISPUTED.** All DCYF Child Protective Social Workers are qualified and trained to work with all youth, including Older Foster Youth. DCYF engages in internal communications with all Child Protective Social Workers to ensure that they are aware of the full scope of DCYF's services and programs for Older Foster Youth and can, in turn, make those available where appropriate. Noonan Decl. at ¶¶ 6-8. |
| 127. | No caseworkers receive training on meeting children's and youths' mental health needs.<br><br>Ex. 138 (Christine Morrissey, CPSW Supervisor, DCYF, Dep. Tr. 71:19–72:5 (Aug. 30, 2022)). | Objection: the sole cited evidence for this purported "fact" does not support the contention. The questions asked (and answered) concerned *"identification"* of mental disabilities, and Ms. Morrisey responded correctly that Child Protective Social Workers are not *diagnosing* youth in DCYF care. *See* Plaintiff's Ex. 138 (Morrisey Dep. |

|  |  | Tr. 72:3-5). Regardless, this "fact" is **DISPUTED**. In addition to the fact that many DCYF Child Protective Social Workers have education and training in meeting the needs of youth with mental health issues prior to being hired by DCYF, DCYF also requires every newly hired Child Protective Social Worker to receive comprehensive training program that includes addressing such issues. Noonan Decl. at ¶ 7; Plaintiff's Ex. 28 (Arthur Report) at pp. 28-30 (listing and describing the multiple trainings DCYF requires related to children and youth mental health). |
| 128. | There is no requirement that Adolescent Workers, or other caseworkers with specialized training regarding the needs of Older Foster Youth, be involved in creating their Case Plans.<br><br>*See* Ex. 139 (Robert Rodler, Admin., Adolescent Programs, Rule 30(b)(6) Dep. Tr. 52:4– 24 (July 22, 2022)). | Undisputed for purposes of this motion, but irrelevant. All DCYF Child Protective Social Workers are qualified and trained to work with all youth, including Older Foster Youth. |
| 129. | Adolescent Workers are specialized caseworkers who receive additional training on resources available to meet the unique needs of Older Foster Youth.<br><br>*See* Ex. 139 (Rodler Rule 30(b)(6) Dep. Tr. 49:22–50:10). | Undisputed for purposes of this motion. |
| 130. | DCYF currently has too few Adolescent Workers to ensure that every Older Foster Youth is assigned an Adolescent Worker as their primary caseworker.<br><br>*See* Ex. 141 (*DCYF Adolescent Workers and Supervisors* at DHHS-2969014 (Oct. 30, 2024)); Ex. 139 (Rodler Rule 30(b)(6) Dep. Tr. 48:13-21); Ex. 142 (*CP_Placement_Breakdown_June_2024*) (attachment to Ex. 137 (*Email from Michael Donati, Bureau Chief, Bureau of Cmty., Fam., & Program Supps., DCYF, to Marie Noonan,* | Undisputed for purposes of this motion, but irrelevant. All DCYF Child Protective Social Workers are qualified and trained to work with all youth, including Older Foster Youth. |

| | | |
|---|---|---|
| | *Dir. DCYF, & Sherry Ermel, Bureau Chief, Bureau of Field Servs., DCYF, re: Crisis Placement Support Meeting-Monday* (July 23, 2024))). | |
| 131. | DCYF has no formal policy or processes for determining, or prioritizing, which Older Foster Youth receive direct support from Adolescent Workers.<br><br>*See* Ex. 139 (Rodler Rule 30(b)(6) Dep. Tr. 48:23–49:5). | **DISPUTED.** Adolescent Child Protective Social Workers are assigned based on a determination by the supervisor responsible for the office serving a given youth as to a particular child's needs, both in isolation and in comparison to the other youth served by a given office. Plaintiff's Ex. 139 (Rodler Dep. Tr. 48:23-49:5). |
| 132. | When an Older Foster Youth is not assigned to an Adolescent Worker as their primary case worker, Defendants expect that generalist caseworkers "consult" with Adolescent Workers, *see* Ex. 139 (Rodler Rule 30(b)(6) Dep. Tr. 48:11–12), but Defendants have no policies requiring these consultations, guidelines on how often they should occur, or requirements to document or otherwise track communications between Adolescent Workers and generalist caseworkers, *see* Ex. 139 (Rodler Rule 30(b)(6) Dep. Tr. 52:4–14); Ex. 149 (Robert Rodler, Admin., Adolescent Programs, Dep. Tr. 85:19–86:10, 141:12–14 (Mar. 4, 2025)). | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, undisputed for purposes of this motion, but irrelevant. All DCYF Child Protective Social Workers are qualified and trained to work with all youth, including Older Foster Youth. |
| 133. | Older Foster Youth who are not directly served by Adolescent Workers are less likely to receive the support and services necessary to facilitate their safe transitions into adulthood.<br><br>Ex. 44 (Chansuthus Rep. ¶¶ 125–140); ██████████ (attachment to Ex. 137 (*Email from Michael Donati, Bureau Chief, Bureau of Cmty., Fam., & Program Supps., DCYF, to Marie Noonan, Dir. DCYF, & Sherry Ermel, Bureau Chief, Bureau of Field Servs., DCYF, re: Crisis Placement Support Meeting-* | Objection: this statement is argumentative and speculative and thus not a "fact" under Rule 56. Regardless, this "fact" is **DISPUTED.** All DCYF Child Protective Social Workers are qualified and trained to work with all youth, including Older Foster Youth. DCYF engages in internal communications with all Child Protective Social Workers to ensure that they are aware of the full scope of DCYF's services and programs for Older Foster Youth and can, in turn, make those available where appropriate. Noonan Decl. at ¶ 8. |

| | | |
|---|---|---|
| | *Monday* (July 23, 2024))); Ex. 136 (*Email from Michael Donati, Bureau Chief, Bureau of Cmty., Fam., & Program Supps., DCYF, to Jessica Kessinger, Child Protection Field Adm'r, DCYF, re: HOPE cases* at DHHS-1625052–53 (July 13, 2021)) ("[W]e are seeing that the youth served by traditional [caseworkers] do not get the same supports and services as the youth served by [Adolescent Workers] and other[caseworkers] who focus on adolescent practice."); *see also* Ex. 143 (*Email from Robert Rodler, Adm'r, Adolescent Programs, to Kimberly Crowe, Bureau Chief, Bureau of Pro. & Strategic Dev., DHHS, re: Strategic Priorities for your review* at DHHS-3052816 (June 19, 2024)); Ex. 139 (Rodler Rule 30(b)(6) Dep. Tr. 49:15–19); Ex. 140 (*Permanency Supervisor Meeting, 3/13/24* at DHHS-3052951–52 (Mar. 13, 2024)); Ex. 144 (*Chat from Michael Donati, Bureau of Cmty., Fam., & Program Supps., DCYF, to Marie Noonan, Dir., DCYF Operations* at DHHS- 2225867 (July 14, 2022)); Ex. 145 (*Email from Kristin Booth, Sen. Planner, DCYF, to Robert Rodler, Adm'r, Adolescent Programs, re: Update Request: Adolescent worker redesign* at DHHS-2114488 (Jan. 1, 2023)). | |
| 134. | Continuous Quality Improvement measures, including data collection and analyses, would increase the rate of Older Foster Youth receiving complete and current Case Plans Data.<br><br>*See* Ex. 44 (Chansuthus Rep. ¶¶ 116, 124); *see also* Ex. 47 (Report of Defs.' Expert Cynthia Richter-Jackson at 18 (Apr. 14, 2025) ("Richter-Jackson Rep.")). | Undisputed for purposes of this motion. |
| 135. | Defendants do not collect aggregate data on whether the Form 1550 ("Case Plan – Placement") and Form 1552 ("Child/Youth Information Sheet") portions of Class Members' Case Plans are created or updated on time. | Undisputed for purposes of this motion, although the use of the term "collect" is misleading, as Defendants do, in fact, have all of the relevant data, and Plaintiff is actually complaining that it is not affirmatively compiled manually, as |

| | | |
|---|---|---|
| | Ex. 49 (*Management Interviews* at 6 (Mar. 4, 2025)) (attached as Ex. 8 to Ex. 47 (Richter-Jackson Rep.)) ("How are you tracking case and prevention plans? Not tracking case planning        "); *see also* Ex. 146 (Defs.' Resp. & Obj. to Pl.'s Sixth Set of Interrogs. at 4–7); Ex. 51 (Noonan Dep. Tr. 102:5–19, 103:16–104:12); Ex. 52 (Ross-Ferguson Dep. Tr. 60:20–61:23, 68:20–70:5, 199:1–200:15); Ex. 147 (*Email from Julia Siegenberg, Defs.' Counsel, to Michelle Wangerin, Pl.'s Counsel, re: Production Deficiencies* (Aug. 25, 2023)) (response to Ex. 148 (*Letter from Michelle Wangerin, Pl.'s Counsel, to Julia Siegenberg, Defs.' Counsel, re: Production Deficiencies* at 3 (Aug. 21, 2023))). | is the case for the Form 1695 information discussed in response to item 136 below. |
| 136. | Defendants do generate an Excel spreadsheet every month that tracks completion of the DCYF Form 1695 ("Adult Living Preparation Plan") portion of Class Members' Case Plans, using data stored in Bridges.

*See* Ex. 44 (Chansuthus Rep. ¶ 123 (citing Ex. 128 (Tab 1: CPS, *2025-01-03AWSR.xlsx*))); Ex. 149 (Rodler Mar. 2025 Dep. Tr. 98:20–101:17)). | Undisputed for purposes of this motion. |
| 137. | Defendants' policies require that supervisors approve or disapprove of Case Plans.

Ex. 150 (DCYF SOP 1551.2 at DHHS-0000012063 (Sept. 2021) (subsection IV)). | Disputed but immaterial.  The cited material is a "standard operating procedure" that sets forth how DCYF will implement a particular policy (in this instance, DCYF Policy 1551), but is not, itself, formally a DCYF "policy." |
| 138. | Defendants provide no training for supervisors on how to review case plans for accuracy, completeness, or compliance with federal law and DCYF policy.

*See* Ex. 52 (Ross- Ferguson Dep. Tr. 58:4–6). | **DISPUTED.**  While DCYF may not provide training that is explicitly on "reviewing" case plans, all DCYF supervisors are themselves trained CPSWs who have completed the relevant DCYF trainings regarding case planning.  As such, they are formally trained in the creation of a case plan, including its components and DCYF requirements. Noonan Decl. at ¶ 9. |

| | | |
|---|---|---|
| 139. | Defendants have no policies or procedures mandating that supervisors conduct substantive reviews of case plans completed by caseworkers.<br><br>Ex. 52 (Ross-Ferguson Dep. Tr. 56:6-9; 57:8–12; 60:3–19). | **DISPUTED.** DCYF Standard Operating Procedure 1551.2 (Plaintiff's Ex. 50) at subsection IV specifically requires the supervisors to review and either "approve[] or disapprove[] the plan," which can only occur after a substantive review. Ms. Ross-Ferguson makes this clear in the testimony following that cited by Plaintiff, and Plaintiff's counsel indicates that her response cleared up her prior answers that were cited in support of this fact. *See* Plaintiff's Ex. 52 (Ross-Ferguson Dep. Tr.) at 60:13-19. |
| 140. | Defendants have no policies or procedures for documenting whether supervision of caseworkers' development and updating and of Case Plans occurs.<br><br>Ex. 52 (Ross-Ferguson Dep. Tr. 58:11–59:16). | **DISPUTED.** DCYF Standard Operating Procedure 1551.2 (Plaintiff's Ex. 50) at subsection IV specifically requires the supervisors to review and either "approve[] or disapprove[] the plan," which can only occur after a substantive review. Ms. Ross-Ferguson makes this clear in the testimony following that cited by Plaintiff, and Plaintiff's counsel indicates that her response cleared up her prior answers that were cited in support of this fact. *See* Plaintiff's Ex. 52 (Ross-Ferguson Dep. Tr.) at 60:13-19. Ms. Ross-Ferguson specifically detailed the tracking practices that she used in her role as a supervisor in the Manchester District Office. *See id.* at 61:1-15. |
| 141. | Defendants have no system, procedures, or mechanisms to automatically notify or alert caseworkers or their supervisors of overdue initial and updated Case Plans.<br><br>Ex. 151 (Michael McGeehan, Bus. Sys. Analyst, DHHS, Rule 30(b)(6) Dep. Tr. 42:11–43:6, 129:4–13, 139:5–19, 157:2–9, 184:3–14 (May 25, 2022)). | Undisputed for purposes of this motion that no ***automatic*** system presently exists. |

In addition to the response to Plaintiff's statement of undisputed facts set forth above,

Defendants offer the additional material undisputed facts:



145.    Expenditures from the General Fund for residential placements have ranged from a low of $4,768,300.70 in fiscal year 2020 to a high of $10,260,844.76 in fiscal year 2023, which was the only year in which such expenditures exceeded $10 million.  Noonan Decl. at ¶ 49.

146.    Older Foster Youth are referred by DCYF for a Comprehensive Assessment for Treatment ("CAT") only done after an initial conclusion that a child likely cannot have needs met in community and may require residential treatment.  Noonan Decl. at ¶ 56.

147.    Because of this pre-screening that removes most youth for whom community placement is appropriate before administration of the CAT, youth receiving a CAT are expected to have a residential referral at a much higher rate than the total population of Older Foster Youth served by DCYF. Noonan Decl. at ¶ 57; *see also* Plaintiff's Ex. 28 (Arthur Report) at p. 34 ("I did not see evidence that the CAT systematically recommends inappropriate residential stays, particularly with respect to those referred to higher levels of care.").

148.    DCYF intends for this pre-screening to be done through, among other steps, the administration of a Child and Adolescent Needs and Strengths ("CANS") assessment.  Noonan Decl. at ¶ 54.

149.    As of May 31, 2025, every DCYF child protective social workers has been trained

to administer the CANS. Noonan Decl. at ¶ 55.

150.     DCYF is in a phased roll-out of the CANS assessment across all the youth, including Older Foster Youth, it serves.  This phased roll-out is necessary to ensure that the implementation of CANS is done correctly and uniformly across the State of New Hampshire, and draws on lessons DCYF learned from the implementation of CANS assessments in its juvenile justice programs.  Noonan Decl. at ¶ 55.; *see also* Plaintiff's Ex. 28 (Arthur Report) at p. 7.

151.     The CAT is not designed to evaluate the various community options, just whether a youth's situation necessitates a residential placement and, if so, the level of intensity of care for that residential placement. Noonan Decl. at ¶ 52.

152.     DCYF Policy Directive 24-10, issued and effective February 15, 2025, consists of a revised DCYF Policy 1600 governing placement of youth, including Older Foster Youth, and a series of DCYF Standard Operating Procedures governing the implementation of DCYF Policy 1600.  Noonan Decl. at ¶ 13.

153.     DCYF requires that "[a]ll efforts to place a child in the least restrictive placement ***must*** be exhausted before considering more restrictive placement options."  Noonan Decl. at Exhibit 2 (DCYF Standard Operating Procedure 1600.1, part V) (emphasis added).

154.     The order of placements, from least to most restrictive, defined by DCYF is (a) kinship placement; (b) licensed foster care; then (c) residential treatment programs.  Plaintiff's Ex. 2 (DCYF Standard Operating Procedure 1600.2).

155.     DCYF has increased the percentage of Older Foster Youth going to a kinship placement as their first placement from approximately 25% in 2018 to nearly 70% currently. Noonan Decl. at ¶ 19.

156.    At present, DCYF has been able to place Older Foster Youth in kinship placements at rates significantly above kinship placements for the entirety of DCYF's child protection population.  This is a change from 2018, when Older Foster Youth were less likely than the DCYF child protection population as a whole to receive a kinship placement as their first placement.  Noonan Decl. at ¶ 20.

157.    DCYF requires that "[w]hen considering a foster home placement for a child, CPSWs/JPPOs[1] must… seek the least restrictive type of placement to meet those needs." Plaintiff's Ex. 121 (DCYF Standard Operating Procedure 1600.4) at part I.

158.    DCYF only makes a referral for a CAT—the predicate for residential treatment— "[w]hen a CPSW/JPPO, in consultation with a Supervisor, believes that a child requires a more intensive placement than kinship or foster care to meet their needs."  Plaintiff's Ex. 122 (DCYF Standard Operating Procedure 1600.5) at part I.

159.    A successful, safe and healthy kinship placement for a youth, including Older Foster Youth, depends on the nature and quality of the proposed kin caregiver, not just the existence of said potential caregiver.  Noonan Decl. at ¶ 17.

160.    Relative kinship caregivers that are not licensed foster parents may receive the "child only" Temporary Assistance for Needy Families ("TANF") rate.  Plaintiff's Ex. 37 (Ahluwalia Report) at p.13.

161.    Based on an analysis done in 2022, New Hampshire had the highest TANF subsidy rate for a family of three with a minor child, and New Hampshire's rate was 25% higher than the next highest rate of California. Plaintiff's Ex. 37 (Ahluwalia Report) at p.13.

---

[1] JPPOs are Juvenile Probation and Parole Officers, and are the front-line DCYF staff for its juvenile justice component, similar to how Child Protective Social Workers (CPSWs) are for DCYF's child protection programs.

162.    TANF rates for other New England states were significantly lower than New Hampshire's.  Plaintiff's Ex. 37 (Ahluwalia Report) at p.13.

163.    Not all kinship placements are motivated by financial incentives.  A number of kinship placement relatives have explicitly declined the opportunity to become licensed by DCYF and receive payments for foster care.  The foster care reimbursement rate does not impact these individuals' ability and willingness to serve as kinship caregivers.  Noonan Decl. at ¶ 18.

164.    The State of New Hampshire elected to terminate its contract with A Second Chance, Inc. ("ASCI") after it determined that ASCI was failing to perform key tasks it was contracted for, such as kinship searching and approval.  Despite the ASCI contract, DCYF's own staff were handling the majority of all kinship searching and vetting. Noonan Decl. at ¶ 26.

165.    DCYF already had a licensing unit in place prior to and during the ASCI contract that was equally, if not more, capable than ASCI at licensing and approving kinship and other foster placements.  Noonan Decl. at ¶ 28.

166.    DCYF's in-house staff could perform the same functions as were provided for in the ASCI contract to a higher standard and in a more cost-efficient manner than ASCI as a third party contractor. Noonan Decl. at ¶ 27.

167.    The termination of the ASCI contract freed up funds that are now available to be used for other DCYF services.  Noonan Decl. at ¶ 29.

168.    Although DHHS does not set a minimum amount of the ISO Foster Care rate that must be passed through to the ISO foster parent, DHHS has worked to equalize payment rates across the various ISO Foster Care providers.  *See* Plaintiff's Ex. 18, Buxton Dep. Tr. at 58:10-59:6.

169.    New Hampshire has not received the Families First reimbursements for DCYF

services and programs that it has expected, but continues its efforts to secure these reimbursements.  Noonan Decl. at ¶ 60.

170.    The federal government has recognized that its current processes for Families First reimbursements for youth services like those provided by DCYF is too cumbersome, and admitted on a July 3, 2025 nationwide call that the total reimbursements under the Families First program are only about $28 million nationwide.  Noonan Decl. at ¶ 61.

171.    The federal government has determined that New Hampshire's foster care program under Title IV-E of the Social Security Act is in substantial compliance with federal eligibility requirements.  Noonan Decl. at ¶ 62.


*[Signature page follows]*