# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

B.D.,

        Plaintiff,

v.

KELLY AYOTTE *et al.*,

        Defendants.

Case No. 21-cv-4-PB

CLASS ACTION

## PLAINTIFF'S OBJECTION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................. 1

II. ARGUMENT ...................................................................................... 1

    A.  Plaintiff Has Viable Claims Under the ADA. .......................................... 1

        1.  *The Plaintiff Class Includes Older Foster Youth with Mental Disabilities Who Are Unnecessarily Institutionalized.* ........................................ 1

        2.  *Class Members Solely "At Risk" of Placement in Congregate Facilities Have Viable Claims Under the ADA and Section 504.* ............................ 2

    B.  Plaintiff Has Constitutional Standing to Maintain Their ADA and Section 504 Claims. ............................................................................. 4

        1.  *Defendants' Reliance Upon Routine, Unnecessary Institutionalization of Older Foster Youth with Mental Disabilities Causes Concrete, Real Injuries to All Class Members.* ........................................................ 5

        2.  *Plaintiff's Motion and Supporting Evidence Establish Redressability.* ............ 7

    C.  Plaintiff Maintains a Private Right of Action to Enforce Their CWA Right to Case Plans in This Action. ............................................................... 11

    D.  Defendants Do Not Genuinely Dispute Any Material Fact Needed for the Court to Grant Summary Judgment to Plaintiff. ............................................ 16

        1.  *The Material Facts Supporting Plaintiff's ADA and Section 504 Claims Are Not Genuinely Disputed.* ...................................................... 17

        2.  *The Material Facts Supporting Plaintiff's CWA Claim Are Not Genuinely Disputed.* ...................................................................... 23

    E.  Defendants Do Not Oppose Plaintiffs' Motion for Summary Judgment on their Fundamental Alteration Defense. .................................................... 26

    F.  Defendants Fail to Raise Triable Issues on their *Olmstead* Plan Defense. ........... 26

III. CONCLUSION ................................................................................. 29

*i*

# **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 16

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................... 4

*Ayala Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86 (1st Cir. 1996)....................... 16

*B.D. v. Ayotte*, No. 21-CV-00004-PB, 2025 WL 815200 (D.N.H. Mar. 14, 2025)....................... 6

*B.D. v. Sununu*, No. 21-CV-4-PB, 2024 WL 4227544 (D.N.H. Sept. 18, 2024) .................. 1, 2, 4

*Benjamin v. Dep't of Pub. Welfare of Pa.*, 768 F. Supp. 2d 747 (2011) ...................................... 29

*Blessing v. Freestone*, 520 U.S. 329 (1997) ................................................................. 12

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).................................................... 6

*Concord Hosp., Inc. v. N.H. Dep't of Health & Hum. Servs.*, 770 F. Supp. 3d 400 (D.N.H. 2025)
.................................................................................................................................... 4

*Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121 (2025) .............................. 7, 9

*Disability Advocs., Inc. v. Paterson*, 653 F. Supp. 2d 184 (E.D.N.Y. 2009).............................. 28

*Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175 (10th Cir. 2003).............................. 4

*Frederick L. v. Dep't of Pub. Welfare of Pa.*, 364 F.3d 487 (3d Cir. 2004)................................ 29

*G.K. v. Sununu*, No. 21-CV-4-PB, 2021 WL 4122517 (D.N.H. Sept. 9, 2021) .................. *passim*

*G.K. v. Sununu*, No. 21-CV-4-PB, 2024 WL 4226913 (D.N.H. Sept. 18, 2024) ................. 2, 5, 12

*Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307 (1st Cir. 2016)......................................... 17

*Gatlin v. Contra Costa Cnty.*, No. 21-CV-00370-SI, 2025 WL 2459354 (N.D. Cal. Aug. 26,
2025)........................................................................................................................... 13

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) ................................................... 11, 12, 13

*Griggs-Ryan v. Smith*, 904 F.2d 112 (1st Cir. 1990) ........................................... 16, 23

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023) ........................... *passim*

*Henry A. v. Willden*, 678 F.3d 991 (9th Cir. 2012).................................................. 14, 15

*Higgins v. New Balance Athletic Shoe, Inc.*, 194 F. 3d 252 (1st Cir. 1999) ............................ 27

*Horne v. Flores*, 557 U.S. 433 (2009) ........................................................................ 11

*In re Navy Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012)................................................ 6

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ............................................. 5

*In re PHC, Inc. Shareholder Litigation*, 894 F.3d 419 (1st Cir. 2018)....................................... 20

*ii*

*Johnson v. Becerra*, 111 F.4th 1237 (D.C. Cir. 2024) ................................................... 10

*Katz v. Pershing, LLC*, 672 F.3d 64 (1st Cir. 2012) ....................................................... 8

*Kia America, Inc. v. DMO Auto Acquisitions, LLC*, 775 F. Supp. 3d 607 (D.N.H. 2025) ............ 2

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ............................................................................. 4

*Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) ............................................................. 6

*Loc. 8027 v. Edelblut*, No. 21-cv-1088-PB, 2024 WL 2722254 (D.N.H. May 28, 2024)........... 17

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................... 3, 4

*Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197 (4th Cir. 2025)................................. 10

*Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219 (2025) ........................... *passim*

*Meuser v. Fed. Express Corp.*, 564 F.3d 507 (1st Cir. 2009) ..................................... 26

*Murthy v. Missouri*, 603 U.S. 43 (2024) ............................................................... 5, 8

*Olmstead v. Zimring*, 527 U.S. 581 (1999) ............................................................. 3, 5

*Roe v. Healey*, 78 F.4th 11 (1st Cir. 2023) ............................................................... 6

*Shakman v. Pritzker*, 43 F.4th 723 (7th Cir. 2022) ................................................. 11

*Sheppherd v. Morrisey*, 143 F.4th 232 (4th Cir. 2025)............................................. 10

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)............................................ 4

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ..................................................... 6

*U.S. v. 6 Fox Street*, 480 F.3d 38 (1st Cir. 2007)..................................................... 17

*Vertex Tower Assets, LLC v. Town of Wakefield*, 771 F. Supp. 3d 80 (D.N.H. 2025) .......... 8

*Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365 (1st Cir. 2023) ...................... 6

**Statutes**

29 U.S.C. § 794.............................................................................................. 3

42 U.S.C. § 12132 .......................................................................................... 3

42 U.S.C. § 12134............................................................................................ 3

42 U.S.C. § 1396-1 ......................................................................................... 15

42 U.S.C. § 1396r .......................................................................................... 14

42 U.S.C. § 621.............................................................................................. 15

42 U.S.C. § 622.......................................................................................... *passim*

42 U.S.C. § 671 ............................................................................ 11, 13, 14, 15

42 U.S.C. § 675.............................................................................................. 11

42 U.S.C. § 675a............................................................................................ 11, 14

Adoption Assistance and Child Welfare Act, Pub. L. No. 96-272, 94 Stat. 500 (1980) .............. 14

Preventing Sex Trafficking and Strengthening Families Act, Pub. L. No. 113-183, 128 Stat. 1919 (2014) ................................................................................................................................ 14

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................... 16

**Regulations**

28 C.F.R. § 35.130 .................................................................................................................. 3

## I.    INTRODUCTION[1]

In their opening brief, the Plaintiff Class produced undisputed evidence showing that Defendants maintain a discriminatory system, in violation of the ADA and Section 504, by unnecessarily placing and retaining Class Members in institutional settings. Pl.'s Mem. of Law in Supp. of Mot. for Summ. J., ECF No. 362-1, at 8-41 (July 9, 2025) ("Pl.'s SJ MOL"). The undisputed evidence further shows that Defendants systematically fail to comply with the CWA's case-plan right, denying youth critical roadmaps to meet their needs. Id. at 41-56. Nothing in Defendants' objection and cross-motion, ECF No. 384 (Sept. 18, 2025) ("Defs.' SJ MOL"), shows otherwise. Nor does it show that Defendants are entitled to summary judgment.

The Court should grant Plaintiff's motion for summary judgment and deny Defendants' cross-motion.

## II.    ARGUMENT

### A.  Plaintiff Has Viable Claims Under the ADA.

#### 1.    *The Plaintiff Class Includes Older Foster Youth with Mental Disabilities Who Are Unnecessarily Institutionalized.*

Defendants' claim that Plaintiff's case "hinge[s] on the legal assertion" that Class Members are "at risk of placement in congregate care," Defs.' SJ MOL at 9, fails for a very simple reason: as this Court has already recognized, Plaintiff's core claim is that Defendants "are violating the ADA by systematically and unnecessarily *placing and retaining* adolescent foster children with mental impairments in congregate care." *B.D. v. Sununu*, No. 21-CV-4-PB, 2024 WL 4227544, at *11 (D.N.H. Sept. 18, 2024) ("*B.D. Class Cert.*") (emphasis added). The Court accordingly certified a class of youth who "*currently are*, or are at serious risk of being,

---

[1] All capitalized terms carry the same meanings as in Plaintiff's prior submissions.

unnecessarily placed in congregate care" (emphasis added).[2] *Id.* at *19.

### 2. Class Members Solely "At Risk" of Placement in Congregate Facilities Have Viable Claims Under the ADA and Section 504.

Even if the Plaintiff Class included only Older Foster Youth ("OFY") at serious risk of unnecessary institutionalization, Plaintiff would still have viable ADA and Section 504 claims.[3] As this Court has already explained, statutory standing "is matter of statutory interpretation." *G.K. v. Sununu*, No. 21-CV-4-PB, 2024 WL 4226913, at *2 (D.N.H. Sept. 18, 2024) ("*G.K. MTD II*") (cleaned up). The question is not whether a plaintiff's harm exactly mirrors that of other class members, but "whether Congress has accorded this injured plaintiff the right to sue the defendant under the particular statute to redress his injury." *Id.*

In the context of case plans, B.D. has statutory standing under the CWA because, as this Court noted, "the question is not whether B.D. can state a claim under each and every provision of the CWA, but whether they can state a claim under § 1983." *Id.* at *4. So too may B.D. pursue claims under the ADA and Section 504, on behalf of both currently institutionalized youth and those at risk thereof. The fact that B.D.—like many Class Members—has cycled in and out of unnecessary institutionalization only underscores that the claims of the at-risk and currently-institutionalized youth are, for standing purposes, one and the same. Requiring B.D. to advance

---

[2] To the extent Defendants attempt to argue in future filings or oral argument that the *unnecessarily institutionalized* portion of Class Members lacks standing, or that their claims otherwise are not viable, "[a]rguments raised for the first time in a reply brief . . . are waived." *Kia America, Inc. v. DMO Auto Acquisitions, LLC*, 775 F. Supp. 3d 607, 622 n.6 (D.N.H. 2025).

[3] Defendants already challenged the "at risk" portion of the Class during the class certification phase. *See* Defs.' Suppl. Mem. of Law in Opp'n to Pl.'s Mot. for Class Cert., ECF No. 317, at 33-34 (Aug. 1, 2024). Plaintiff incorporates by reference all of their prior arguments in opposition. *See* Pl.'s Suppl. Reply in Further Supp. of Class Cert., ECF No. 332, at 23-25 (Aug. 15, 2024). Defendants also have raised the same arguments regarding the post-*Loper Bright* viability of at-risk claims in *Fitzmorris v. NH DHHS,* also before this Court, and the attached amicus brief filed in that case further supports the ongoing viability of *Olmstead* at-risk claims. *See* Pl.'s Ex. 156 ("*Fitzmorris* Amicus").

only one version of this claim would be inefficient and nonsensical.

To the extent Defendants argue that the scope of the statutes themselves preclude an at-risk cause of action, they are wrong. The plain language of both statutes broadly prohibits disability-based discrimination. 42 U.S.C. § 12132; 29 U.S.C. § 794(a); *Olmstead v. Zimring*, 527 U.S. 581, 601 (1999); *see also* Pl.'s Ex. 156 (*Fitzmorris* Amicus at 3-4) (discussing the interplay between the ADA and Section 504). And, contrary to Defendants' claims, Defs.' SJ MOL at 13, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) does not apply here. *Loper Bright* explicitly recognized that some statutes authorize agencies "to give meaning to a particular statutory term." *Id.* at 394. Because Congress expressly delegated to the Attorney General the authority to promulgate regulations to implement Title II of the ADA, 42 U.S.C. § 12134(a), "courts must respect the delegation," *Loper Bright*, 603 U.S. at 413; *see also* Pl.'s SJ MOL at 10 n.5.

The methods-of-administration and integration regulations unambiguously support Class Members' claims. The methods-of-administration regulation prohibits states from:

> directly or through contractual or other arrangements, utiliz[ing] criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or (iii) [t]hat perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same [s]tate.

28 C.F.R. § 35.130(b)(3). And the integration regulation requires states to proactively administer their systems "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).[4] Consistent with this Court's recognition, the

---

[4] Since adopting these regulations, the DOJ has reinforced that "the ADA and *Olmstead* decision extend to persons at serious risk of institutionalization." *See* Pl.'s Ex. 5 (DOJ Statement, ECF No. 362-6, at 8 (July 9, 2025)). Although *Loper Bright* directs courts to exercise independent

"overwhelming majority of circuit courts to have considered the issue have concluded that an ADA claim may be based on a risk of unnecessary institutionalization." *See B.D. Class Cert.*, 2024 WL 4227544, at *7 (collecting cases). As courts have observed, the ADA's protections "would be meaningless" if plaintiffs were required to enter an institution before challenging a discriminatory policy. *See*, *e.g.*, *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003).[5] Such concern is particularly acute here, where DCYF caseworkers—not the children themselves—choose whether OFY receive needed mental health services in community or institutional settings.

### B.  Plaintiff Has Constitutional Standing to Maintain Their ADA and Section 504 Claims.

Defendants' claim that Plaintiff lacks constitutional standing also fails. "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (citation omitted). "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"; rather, courts "accept as valid the merits of plaintiff's legal claims." *Concord Hosp., Inc. v. N.H. Dep't of Health & Hum. Servs.*, 770 F. Supp. 3d 400, 405 (D.N.H. 2025) (citation omitted).

---

judgment in *statutory* interpretation, *Loper Bright*, 603 U.S. at 412, the DOJ Statement interprets its own *regulation*—as Defendants acknowledge, Defs.' SJ MOL at 15—and therefore is entitled to deference under *Auer v. Robbins*, 519 U.S. 452, 462 (1997), which applies when the regulation is "genuinely ambiguous," *see Kisor v. Wilkie*, 588 U.S. 558, 573 (2019). As explained above, the relevant regulations are not ambiguous, but if the Court finds otherwise, the DOJ Statement merits deference.

[5] And, as Defendants themselves admit, HHS recently amended its regulations implementing the Rehabilitation Act to explicitly prohibit "serious risk" of unjustified institutionalization to "promote consistency" with the ADA and DOJ's regulations. *See* Defs.' SJ MOL at 12.

### 1. Defendants' Reliance Upon Routine, Unnecessary Institutionalization of Older Foster Youth with Mental Disabilities Causes Concrete, Real Injuries to All Class Members.

Defendants first argue that Plaintiff lacks standing because a serious risk of unnecessary institutionalization is not a concrete injury. Defs.' SJ MOL at 16. But, again, the Class comprises OFY who are both at risk of, *and presently*, institutionalized. *See G.K. v. Sununu*, No. 21-CV-4-PB, 2021 WL 4122517, at *3, *10 (D.N.H. Sept. 9, 2021) ("*G.K. MTD I*") (quoting *Olmstead*, 527 U.S. at 601) (recognizing the concrete harms of unnecessary institutionalization); *see also* Pl.'s Ex. 4 (Feild Report, ECF No. 362-5, ¶¶ 13-17) (discussing the harms specific to unnecessary institutionalization of OFY); Pl.'s Ex. 9 (Cross Rep., ECF No. 362-10, ¶¶ 29, 33, 35, 41, 48) (same). Named Plaintiff B.D. indisputably was institutionalized and had live claims at the time the Class was certified (and, in any event, is presently institutionalized). *See generally GK MTD II*, 2024 WL 4226913, at *5-*6 ("[O]nce a class is certified, it acquires a separate legal status that survives the dissipation of the named plaintiff's claim." (cleaned up)); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 31-32 (1st Cir. 2015). B.D. thus maintains constitutional standing to advance the Class claims under the ADA and Section 504.[6]

Although B.D.'s standing at the time of class certification ends the inquiry on behalf of the Class, long-standing, basic precepts of constitutional standing further permit injunctive relief on behalf of at-risk Class Members, specifically, because there is "a substantial risk of future injury that is traceable to the Government defendants and likely to be redressed by an injunction against them."[7] *Murthy v. Missouri*, 603 U.S. 43, 69 (2024); *see also TransUnion LLC v.*

---

[6] For the same reasons discussed in section II.A.2 *supra*, B.D. may seek relief on behalf of Class Members both currently institutionalized and those at risk thereof.

[7] Indeed, Defendants do not cite a single case where a court has found that the plaintiffs are at serious risk of unjustified isolation and yet lack Article III standing.

*Ramirez*, 594 U.S. 413, 435 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of the harm is sufficiently imminent and substantial."); *Kosilek v. Spencer*, 774 F.3d 63, 85-86 (1st Cir. 2014) (finding actionable a significant risk of future harm that state officials fail to mitigate (collecting cases)); *In re Navy Chaplaincy*, 697 F.3d 1171, 1176-77 (D.C. Cir. 2012) ("The prospect of future injury becomes significantly less speculative where, as here, plaintiffs have identified concrete and consistently-implemented policies claimed to produce such injury.").[8] Such a risk exists here.

As Plaintiff's expert, Dr. Cross, explained: "The lack of appropriate clinically necessary community-based placements and services . . . places foster youth who *are* in the community but have certain [enumerated] risk factors at serious risk of clinically unnecessary placement in congregate care." Cross Rep. ¶ 43 (alteration in original); *see also B.D. v. Ayotte*, No. 21-CV-00004-PB, 2025 WL 815200, at *12-13 (D.N.H. Mar. 14, 2025) ("*B.D. Daubert Order*"). Defendants offer no evidence contradicting this opinion. In fact, they *admit* that they rely on residential facilities to meet Class Members' mental- and behavioral-health needs due to a shortage of less restrictive options. Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 34) ("Pl.'s Resp. to Defs.' SUF"). This undisputed evidence alone establishes

---

[8] Even *Clapper v. Amnesty International USA*, cited by Defendants, acknowledges that plaintiffs need not "demonstrate that it is *literally* certain that the harms they identify will come about." 568 U.S. 398, 414 n.5 (2013) (emphasis added). And unlike in *Clapper*, as explained above, here the Court need not rely on an "attenuated chain of inferences" to find harm. *Id*.; *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023) (risk of future injury too attenuated when the executive order catalyzing the chain of events leading to past harm had expired); *see also Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 375-76 (1st Cir. 2023) (whether risk of future harm is sufficiently imminent and substantial is a fact specific inquiry).

Defendants' liability as to "at-risk" Class Members.[9]

Further, Defendants' inadequate service and placement array is *currently injuring* at-risk Class Members. Defendants routinely place OFY with mental health disabilities in under-resourced community-based settings that are significantly likely to disrupt. *See* Feild Rep. ¶¶ 18 n.17, 25, 59 n.76; *id.* ¶ 57 n.73 (short-term homes undermine school and family connections and "do not offer the kind of stability youth with mental disabilities need"); Pl.'s Ex. 44 (Chansuthus Rep., ECF No. 364-19, ¶ 93) (placement disruptions compound OFY's existing mental- and behavioral-health struggles and worsen mental health outcomes). When such disruption occurs, institutional placement is all but certain. *See* Decl. of Pl.'s Expert Theodore Cross, Ph.D., ECF No. 152-6, ¶ 19 (Mar. 28, 2023) (discussing factors placing youth at serious risk of unnecessary institutionalization, including prior placement disruptions); Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶¶ 34, 142-44); Pl.'s Suppl. Reply in Further Supp. of Class Cert., ECF No. 332, at 24-25 (Aug. 15, 2024).

### 2.  *Plaintiff's Motion and Supporting Evidence Establish Redressability.*

Defendants' redressability arguments are untethered to Plaintiff's arguments and evidence and likewise fail. As the Supreme Court has recognized, redressability is not a particularly high bar, and when "a plaintiff is an object of the action (or forgone action) at issue, . . . there is ordinarily little question . . . that a judgment preventing or requiring the action will redress it." *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2134-35 (2025) (citation omitted); *see also id.* at 2135 ("Even one dollar of additional revenue . . . would satisfy

---

[9]

the redressability component of Article III standing." (citation omitted)).

Plaintiff's evidence[10] shows both the link between Defendants' practices and Class Members' harms (unnecessary placement and retention in institutions), as well as the efficacy and reasonableness of each proposed modification.[11] *See* Pl.'s SJ MOL at 18-31, 54-56. For example, Plaintiff's evidence demonstrates: (1) Defendants admit that therapeutically-supported foster homes[12] are inaccessible for Class Members who need them; (2) expanding these homes would enable Class Members currently in institutional settings to reside in their communities; (3) at least two child placing agencies declined to bid on Defendants' 2024 Tiered TFC Request for Applications, at least in part because the offered rate was too low; and (4) Class Members' request for 50 TFC (or equivalent) beds is narrowly tailored to the number of youth Defendants acknowledge likely could be served in TFC rather than institutions. *Id.* at 20-23; *see also infra* section II.D.1.c. Thus, requiring Defendants to expand therapeutically-supported foster homes

---

[10] Defendants' suggestion that Plaintiff was dilatory in refining their requested relief, Defs.' SJ MOL at 19, is not supported by the record. The evidence required to maintain standing looks different at "successive stages of the litigation." *Murthy*, 603 U.S. at 58 (cleaned up). It is only once "the parties *have taken discovery*" that "plaintiffs cannot rest on mere allegations, but must instead point to factual evidence." *Id.* (emphasis added) (cleaned up). Fact discovery closed on February 28, 2025, and Plaintiff's expert disclosures were due on March 12, 2025. Plaintiff updated their requested relief less than two weeks later, on March 21, 2025. Each proposed modification was grounded in evidence, much of which was obtained through deposition testimony and documents received as late as March 2025. *See* Pl.'s SJ MOL at 22-32, 54-56; Pl.'s Obj. to Defs.' Mot. to Compel Resps. to Interrogs., ECF No. 353, at 4-8 (Mar. 7, 2025).

[11] Article III standing is met if the Court finds that "favorable resolution of [Plaintiff's] claim would likely redress the professed injury." *Vertex Tower Assets, LLC v. Town of Wakefield*, 771 F. Supp. 3d 80, 88 (D.N.H. 2025) (cleaned up); *see also Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012) ("Redressability is a matter of degree. To satisfy this requirement, the plaintiff need not definitively demonstrate that a victory would completely remedy the harm.") (cleaned up)). The Court need not, at this stage, wade into the precise remedial order if it finds that some form of Plaintiff's requested relief is likely to redress Class Members' injuries.

[12] The term "therapeutically-supported foster care," as used in Plaintiff's summary judgment filings, means TFC, ISO, or its reasonable equivalent. *See* Pl.'s SJ MOL at 8 n.3.

instead of maintaining level funding for institutional facilities more than satisfies the

redressability threshold. *See*, *e.g.*, *Diamond Alt. Energy*, 145 S. Ct. at 2136 (commonsense

economic principles support Article III redressability).

Similarly, Plaintiff's evidence shows: (1) Defendants rely upon the CAT to determine the

most integrated setting in which to treat Class Members; (2) DHHS itself calibrated the CAT

Algorithm to recommend institutional placement for youth with "intermediate" or "intensive"

needs; and (3) validating the tool for its intended purpose would reduce the number of Class

Members sent into unnecessary institutional placements. Pl.'s SJ MOL at 26-29.

Plaintiff has made similar, evidence-based arguments for each proposed modification:

- Increased Financial Support to Kinship Caregivers (unlicensed kinship caregivers receive less than the customary cost of caring for children; without adequate financial assistance, kinship placements are more likely to disrupt), *id.* at 22-23;

- Evidence-Based Kinship Finding and Direct Supportive Services to Kinship Caregivers (kinship finding and a sufficient array of non-monetary resources for kinship families are critical to find and properly support and retain kinship homes, but High Fidelity Wrap-Around and other services for kinship homes are often unavailable), *id.* at 23-25;

- Expanded Discharge- and Transition-Planning Services (targeted discharge- and transition-planning services can facilitate returning youth to their communities as appropriately and quickly as possible, but Defendants' wrap-around program is rarely available to Class Members), *id.* at 25;

- Case Plans Informed by the CANS (comprehensive needs assessments increase the quality of case plans, improve outcomes for Class Members, and reduce the unnecessary use of congregate care, but are not yet routinely administered), *id.* at 26, 54-55;

- DCYF Director-Level Approval (requiring high-level approval prior to placing or retaining youth in congregate care has reduced such placements in other states), *id.* at 29;

- Freeze on the Number of DHHS-Contracted Residential Facility Beds, Followed by Planned Reductions (a forced, but planned, reduction in the number of facility beds is likely to hold Defendants accountable for implementation of reforms), *id.* at 29-30;

- Data Dashboard (data collection and public data sharing will enable the public to hold Defendants accountable for system performance over the long term), *id.* at 31;

- Specialized Caseworkers (DCYF staff recognize that specialized caseworkers are likely

to improve case-planning practices but employ an insufficient number for Class Members), *id.* at 55; and

- Continuous Quality Improvement (data is the foundation for identifying areas for improvement, measuring progress, and making informed decisions), *id.* at 55-56.

None of the cases cited by Defendants undercut this evidentiary showing. For example, *Maryland* involved a state government seeking to vindicate the individual rights of federal employees whom federal employment law foreclosed from seeking the same relief. *See Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 211-13 (4th Cir. 2025). This case, however, involves a class of foster youth seeking to vindicate their own rights. And *Shepperd* rejected constitutional standing because the alleged injuries were not traceable to the named defendants, but, notably, acknowledged that the plaintiffs might have prevailed had they brought their claims against "the Commissioner . . . or some other official." *Shepperd v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025) (cleaned up). In contrast, Class Members have alleged facts demonstrating (1) each Defendant's specific responsibility for Class Members' ADA, Section 504, and CWA injuries; and (2) that each requested remedy—all of which could be implemented by one or more Defendants—would redress these injuries. *See* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶¶ 3-21, 34, 38, 40-42, 46, 51-59, 61-71, 89-94, 96-100, 122-26, 133-41).[13]

Additionally, *Johnson* faulted the plaintiffs for "never identify[ing] what reforms [were] necessary to fix the problem" and failing to "demonstrate that their proposed injunction would redress their injuries." *Johnson v. Becerra*, 111 F.4th 1237, 1246-47 (D.C. Cir. 2024). Here, Plaintiff has produced ample evidence that Class Members' requested relief is narrowly tailored

---

[13] *Cf. Allen v. Wright*, 468 U.S. 737, 757-58 (1984) (rejecting constitutional standing because the plaintiffs did not allege facts sufficient to trace their injury to the challenged government conduct, such that it was "entirely speculative" that the relief requested would redress the harm).

to Defendants' unlawful practices and would likely redress Class Members' injuries.[14] Finally, unlike the posture of this case, *Horne* involved state officials' Rule 60(b)(5) motion seeking to discharge their responsibilities under a consent decree. *See Horne v. Flores*, 557 U.S. 433 (2009).[15] Pertinent, however, *Horne* observed that "[i]t goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief" as long as such injunctions are tailored to conditions that "violate federal law" or "flow from such a violation." *Id.* at 450. So too here.

### C.  Plaintiff Maintains a Private Right of Action to Enforce Their CWA Right to Case Plans in This Action.

Defendants misread both the Supreme Court's recent decision in *Medina*, as well as this Court's prior order denying Defendants' motion to dismiss, in arguing that Plaintiff is foreclosed from enforcing their CWA right to timely, complete, and current case plans via section 1983. *See* 42 U.S.C. §§ 622(b)(8)(A)(ii), 671(a)(16), 675, 675a.

*First,* there is no reason to disturb this Court's prior order. *Medina* did not rewrite the governing analytical framework and instead reiterated that "'*Gonzaga* sets forth our established method' for determining whether a spending-power statute confers individual rights." *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2234 (2025) (quoting *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023)) (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002)). This Court properly applied *Gonzaga* in denying Defendants' first motion to dismiss. *See G.K. MTD I*, 2021 WL 4122517, at *7-9 (citing *Gonzaga*'s "three-pronged test"); *id.* at *8

---

[14] *See also infra* note 21.

[15] *See also Shakman v. Pritzker*, 43 F.4th 723, 725 (7th Cir. 2022) (vacating 50-year-long consent decree that did not require implementation of any specific durable remedy, but instead required the court, in effect, to indeterminately supervise the defendants' compliance with the law itself).

("Applying the *Gonzaga* test demonstrates . . . that § 671(a)(16) is privately enforceable."). Indeed, consistent with the Supreme Court's instruction in *Medina*, this Court's denial of Defendants' motion to dismiss explicitly did not rest on *Blessing v. Freestone*, 520 U.S. 329 (1997), or any other precedent criticized by *Medina*. *See id.* at *7 n.6 (acknowledging that *Blessing* had been "revised" by *Gonzaga*); *see also G.K. MTD II*, 2024 WL 4226913, at *4 (rejecting related argument that Plaintiff lacked statutory standing under section 622(b)(8)(A)(ii) because "all foster children . . . have an enforceable right to a case plan under § 622").

*Second*, even if this Court were to revisit its prior analysis to explicitly apply *Medina*, the CWA's case-planning provisions "clearly and unambiguously" use "rights-creating terms" and "display an unmistakable focus on individuals like the plaintiff." *See Medina*, 145 S. Ct. at 2229 (cleaned up). Contrary to Defendants' characterization, the word "right" is not the *sine qua non* of an individually enforceable statute. Rather, courts employ the full panoply of the "traditional tools of statutory construction," *Talevski*, 599 U.S. at 183, to discern whether a state "voluntarily and knowingly consented to answer private claims as part of its bargain with the federal government," *Medina*, 145 S. Ct. at 2232 (citation omitted); *see also G.K. MTD I*, 2021 WL 4122517, at *8 ("[T]he key question in determining whether a statute creates a federal right was—and remains—one of congressional intent.").

To this end, various sources can evince "clear and unambiguous notice," and no single factor is determinative. *Medina*, 145 S. Ct. at 2235. For example, courts look broadly to whether Congress used rights-creating "terms" or "language." *Id.* at 2229, 2233 (cleaned up); *see also id.* at 2234 (explaining that the statutes at issue in *Talevski* supply a "reliable yardstick against which to measure whether spending-power legislation confers a privately enforceable right," but nowhere limiting courts to those statutes' precise verbiage); *Gonzaga*, 536 U.S. at 287

("individual *entitlement*[*s*]" are enforceable under section 1983 (emphasis added)). Courts also consider whether "the surrounding statutory context," beyond the specific provision at issue, "help[s] alert grantees that accepting federal funds comes with a duty to answer private suits." *Medina*, 145 S. Ct. at 2235, 2236; *see also Gonzaga*, 536 U.S. at 286 (instructing courts to examine "the text *and structure* of a statute" (emphasis added)); *Talevski*, 599 U.S. at 184 ("[S]tatutory provisions must be read in their context and with a view to their place in the overall statutory scheme." (cleaned up)). "[A] title," for instance, "may underscore that the statutory text creates a right," as might Congress's choice to "set its rights-creating provisions apart from others." *Medina*, 145 S. Ct. at 2236, 2237. Finally, although Congress's decision to require "substantial compliance" with a statute might weigh against private enforcement, it is not determinative. The provisions in *Talevski*, for instance, conferred individual rights "even though" they "sp[oke] of 'substantial compliance.'" *Id.* at 2235-36.

With this guidance from *Medina*, *Gonzaga*, and *Talevski* in mind, several features of the CWA put states on notice that individuals privately may enforce its case-planning right.

*First*, the plain language of sections 622(b)(8)(A)(ii) and 671(a)(16) create individual rights. "Rights-creating language is readily discernible" from not only their use of the term "shall" but also their "discuss[ions of] how the state must distribute benefits to *each child*." *G.K. MTD I*, 2021 WL 4122517, at *8 (cleaned up) (emphasis in original). Similarly, these provisions have the required "individualized emphasis" because of their "focus[] on the needs of 'each child' who has been removed from the family home, as opposed to systemwide goals." *Id.* at *9 (cleaned up); *see also Gatlin v. Contra Costa Cnty.*, No. 21-CV-00370-SI, 2025 WL 2459354, at *2 (N.D. Cal. Aug. 26, 2025) (rejecting argument that *Medina* "effectively overruled" Ninth Circuit precedent that section 671(a)(16) creates a privately-enforceable right to case plans

(citing *Henry A. v. Willden*, 678 F.3d 991, 1005 (9th Cir. 2012))).[16]

*Second*, portions of the CWA's case-planning provisions even include Defendants' allegedly talismanic term "rights." Section 675a, a 2014 amendment to the CWA, includes a subsection titled "List of rights" that references "the case plan for any child in foster care":

> The case plan for any child in foster care . . . who has attained 14 years of age shall include (1) a document that describes the rights of the child with respect to education, health, visitation, and court participation, the right to be provided with the documents specified in section 675(5)(I) . . . , and the right to stay safe and avoid exploitation; and (2) a signed acknowledgment by the child that the child has been provided with a copy of the document and that the rights contained in the document have been explained to the child in an age-appropriate way.

42 U.S.C. § 675a(b). This language is similar to that found sufficient in *Talevski*, which required nursing-home facilities to "protect and promote" residents' "right to be free from" unnecessary "physical or chemical restraints" and similarly sat in a subsection titled "[r]equirements relating to residents' rights." *See Talevski*, 599 U.S. at 181-82 (quoting 42 U.S.C. § 1396r(c)). Although, as explained above, Congress's use of the exact term "right" is not determinative by itself, Congress's recent use of that very term "manifests an unambiguous intent" to confer a privately enforceable right to case plans. *See Medina*, 145 S. Ct. at 2232-33 (cleaned up).[17]

*Third*, the statutory language surrounding the case-planning right is uniquely detailed and

---

[16] *Cf. Gonzaga*, 536 U.S. at 287-88 (provision did not create privately enforceable right because it "sp[oke] only to the Secretary of Education, directing that '[n]o funds shall be made available,'" and "only in terms of institutional 'policy and practice,' not individual instances of disclosure"—a "focus . . . two steps removed from the interests of" the complaining individuals (quoting 20 U.S.C. § 1232g(b)(1))).

[17] Sections 622 and 671 were first enacted in 1980, long before the Supreme Court ever suggested in 2002 in *Gonzaga* that the term "right" might carry special force. *See* Adoption Assistance and Child Welfare Act, Pub. L. No. 96-272, §§ 101(a)(1), 103(a), 94 Stat. 500 (1980). For this reason, Congress's use of the term "right" in its recent 2014 amendment to the CWA's case-planning provisions is especially probative of its intent. *See Empowering Foster Children Age 14 and Older in the Development of Their Own Case Plan and Transition Planning for a Successful Adulthood,* Preventing Sex Trafficking and Strengthening Families Act, Pub. L. No. 113-183, § 113(d), 128 Stat. 1919, 1929 (2014) (current 42 U.S.C. § 675a(b)).

prescriptive and "further sustain[s] the focus on individual" children, making it *precisely* the type of "atypical" exception that overcomes the presumption against private enforceability. *See Talevski*, 599 U.S. at 183-84. In addition to the rights-creating language in sections 622(b)(8)(A)(ii) and 671(a)(16), Congress devoted two additional sections—sections 675 and 675a, "set . . . apart from other[]" general case plan requirements, *see Medina*, 145 S. Ct. at 2236, and collectively numbering over 5,800 words—to enumerate the content of each individual child's case plan and to describe the corresponding review processes. Like sections 622(b)(8)(A)(ii) and 671(a)(16), these additional sections *repeatedly* use "individual-centric language," *see Talevski*, 599 U.S. at 183, requiring information and actions specific to "the child" entitled to the plan. *See generally* Pl.'s SJ MOL at 41-45 & tbl.1; *see also G.K. MTD I*, 2021 WL 4122517, at *9 ("[T]he commands of § 671(a)(16) are written in clear and specific terms, *including the case plan definition in § 675(1) that precisely describes the required contents of each child's case plan*. Thus, 'there is no ambiguity as to what the state is required to do.'" (quoting *Henry A.*, 678 F.3d at 1007) (emphasis added)).

What is more, the purpose of the *entire* CWA is to protect the rights of vulnerable *children* involuntarily in state custody. *See* 42 U.S.C. § 621 ("The purpose of this subpart is to . . . promot[e] the safety, permanence, and well-being of *children in foster care* . . . ." (emphasis added)); 670 (appropriating funds "[f]or the purpose of enabling each State to provide . . . foster care and transitional independent living programs *for children*" (emphasis added)). This unmistakable match between the CWA's focus on protecting *children* and the corresponding right to a case plan for *children* mirrors that in *Talevski—patients'* rights under a statute designed to protect *patients*. *See* 42 U.S.C. § 1396-1.

Accordingly, whether under this Court's prior, correct application of *Gonzaga*, *G.K.*

*MTD I*, 2021 WL 4122517, at *7-8, or under a (redundant but) explicit application of *Medina*,

Plaintiff has a privately enforceable right to case plans under the CWA.

### D.  Defendants Do Not Genuinely Dispute Any Material Fact Needed for the Court to Grant Summary Judgment to Plaintiff.

Summary judgment is appropriate when the moving party shows that there is no genuine

dispute of material facts supporting the claim or defense upon which judgment is sought. Pl.'s SJ

MOL at 7. Although Defendants claim that "disputes exist," Defs.' SJ MOL at 23, they fail to

"produce evidence upon which a reasonable finder of fact, under the appropriate proof burden,

could base a verdict" in their favor, *Ayala Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 94

(1st Cir. 1996). "A genuine issue of material fact does not spring into being simply because a

litigant claims that one exists." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990).

"Rather, the opponent must pull the laboring oar and set forth specific facts showing there is a

genuine issue for trial." *Id.* (cleaned up); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

249 (1986) ("If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted.").

After years of discovery and more than "2.4 million pages of documents" exchanged,

Class Cert. Hr'g Tr., ECF No. 258, 63:1 (Nov. 14, 2023), Defendants' "disputes" rest almost

entirely upon Defendant Noonan's unsupported statements, at least some unspecified number of

which are not even based on her personal knowledge or otherwise are inadmissible under the

Federal Rules of Evidence. *See, e.g.*, Noonan Decl. ¶ 1 (some unspecified facts are based on

"communications" with unnamed staff); Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶¶ 26, 31-33,

37, 100, 142-147, 163-66, 170). *Cf.* Fed. R. Civ. P. 56(e) ("An affidavit or declaration used to

support or oppose a motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the

matters stated."). *See also Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 315 (1st Cir. 2016) (to the extent affidavits opposing a motion for summary judgment do not provide "specific factual information made on the basis of personal knowledge, they are insufficient"). Defendant Noonan's declaration is devoid of the "hard evidence" required to create *genuine* disputes of fact and fails to defeat Plaintiff's motion. *See U.S. v. 6 Fox Street*, 480 F.3d 38, 42 (1st Cir. 2007) (cleaned up).

### 1. The Material Facts Supporting Plaintiff's ADA and Section 504 Claims Are Not Genuinely Disputed.

To grant Plaintiff summary judgment on their ADA and Section 504 claims, the Court need find only that there is no genuine dispute as to the following core set of facts:

  a.  Class Members are qualified individuals with disabilities;

  b.  Class Members are appropriate for community placement (*i.e.*, they are unnecessarily institutionalized, or at serious risk thereof);

  c.  Class Members are not opposed to community-based placement; and

  d.  Defendants can make reasonable modifications to their programs to avoid discriminating against Class Members.

Pl.'s SJ MOL at 8-20.[18] Defendants do not place any of these elements into genuine dispute.

*First*, Defendants do not genuinely dispute that Class Members are qualified individuals with disabilities. Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶ 24). The closest they come is their expert's criticism of the sample analyzed by Dr. Cross. But Plaintiff's statistical expert, Dr. Todd MacKenzie, verified that the sample is representative of youth in custody on a particular date and within the specified confidence intervals. *See* Pl.'s Ex. 8 (MacKenzie Rebuttal, ECF No. 362-09, ¶¶ 8-13). In any case, Class Members, by definition, include only those with qualifying

---

[18] Any fact the Court deems unnecessary to these core findings may be treated as immaterial. *See Loc. 8027 v. Edelblut*, No. 21-cv-1088-PB, 2024 WL 2722254, at *5 (D.N.H. May 28, 2024) (Barbadoro, *J.*).

disabilities.

Defendants' "disputes" that Class Members, including B.D., are not appropriate for community-based placement ring hollow. *See* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶¶ 26-27).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ [19] ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ [20]

And although Defendants claim that their response to Plaintiff's proposed SUF ¶ 28 identifies "[f]oundational factual disputes . . . about whether Class Members were, in fact, appropriate for community passed placements during periods of residential treatment," Defs.' SJ MOL at 25, they do not actually dispute a nearly identical fact, *see* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶ 27). Indeed, Defendants *admit* that they "rely on residential facilities to meet the mental and behavioral health needs of Class members due to a shortage of less restrictive options." *Id.* ¶ 34.

Nor do Defendants dispute that a sample of OFY whose case files Dr. Cross reviewed

---

[19] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

[20] At any rate, B.D.'s current eligibility for community placement is immaterial. *See* supra section II.B.1.

"had some period [of institutionalization] in which they may have been able to be served with community-based placements." *Id.* ¶ 28. Instead, Defendants base their "foundational factual disputes" on Dr. Cross's acknowledgement that, out of the sampled youth's 114 episodes in congregate facilities, portions of 19 episodes may have been appropriate but, even then, likely due only to the effects of those youth's prior unnecessarily institutionalizations. Cross Rep. ¶ 24 figs. 1, 2; *see also Olmstead*, 527 U.S. at 605 (acknowledging that two named plaintiffs previously required institutional care "to stabilize acute psychiatric symptoms"). Defendants otherwise fail to show that the remaining 95 episodes were appropriate or that OFY with mental disabilities currently in institutional placements could not be served in community settings.

*Third*, Defendants do not genuinely dispute that Class Members would not be opposed to community placement if presented with accurate information and a meaningful choice. *See* Pl.'s SJ MOL at 16-18. Of the 41 OFY whose case files Dr. Cross reviewed, only two with congregate placements lacked an explicit expression of desire for community placement, and even those two indirectly indicated a preference for community placement and would not oppose it if given the full, informed choice of options. Cross Rep. ¶¶ 47, 50. Rather than challenge these findings with contradictory evidence, Defendants claim Plaintiff "downplay[s]" isolated expressions of preferences for congregate care when, for example, a youth "chose" a facility over placement with physically abusive family members. Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶ 30); *see also* Pl.'s SJ MOL at 17. Such an argument is not only insulting to the youth in Defendants' custody but is a far cry from a genuine dispute under prevailing law. *See* Pl.'s SJ MOL at 16-18.

*Fourth*, Defendants' "disputes" with the evidence showing that Plaintiff's proposed

reasonable accommodations plausibly would redress Class Members' injuries also fail.[21] *See* Pl.'s SJ MOL at 18-20. Below are just three examples:[22]

> a.  Validation of the CAT

Defendants do not dispute that DHHS (1) contracts with Maximus to administer the CAT—a tool designed to assess the necessity of institutional placement; (2) contractually requires Maximus to administer the CAT Algorithm, *see* Pl.'s Ex. 31 (DHHS CANS 2.0 Decision Tool, ECF No. 364-6) (alternatively, "CANS 2.0 Decision Tool" or "DHHS CANS 2.0 Algorithm"), to determine the recommended level of care; (3) helped develop and refine the CAT Algorithm; and (4) "tested" the CAT Algorithm by confirming that its recommendations for a non-random, nonrepresentative sample of youth contemporaneously in residential treatment matched their *then-current* levels of residential treatment. *See* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶¶ 38, 40, 41, 42). Yet they "dispute" that the CAT Algorithm is an invalid tool for determining whether Class Members can live in family-like, community-based settings. *Id.* ¶ 46. Rather than offering any evidence supporting the *CAT Algorithm*'s validity, or even attacking Dr. Cross's opinion to the contrary, Defendants cite evidence showing that the *CANS 2.0* is a tool developed by "independent experts." *Id.* But Plaintiff does not claim that the CANS 2.0—a separate, generalist tool that helps child welfare workers identify children's needs, *see* Pl.'s Ex.

---

[21] To find for Class Members on *liability* under the ADA, the Court need conclude only that Plaintiff has proposed plausible modifications that Defendants can make to avoid discriminating against Class Members—*i.e.*, modifications that give Class Members an increased opportunity to access community-based placements and services. *See* Pl.'s SJ MOL at 18-19. The precise final relief, in contrast, lies within the Court's wide discretion to tailor remedies to the circumstances of a particular case. *See In re PHC, Inc. Shareholder Litigation*, 894 F.3d 419, 435 (1st Cir. 2018). Thus, any determination that a specific type of relief requested, though plausibly ameliorative, is unnecessary here does not defeat a liability finding under the ADA, but would rather inform any subsequent remedial order.

[22] *See also supra* at 9-10.

30 (CANS-NH: 2017 Reference Guide (Feb. 28, 2018), ECF No. 364-5)—is invalid. Rather, Plaintiff's undisputed evidence shows the CAT Algorithm, devoid of the markings of the "Ph.D. holders" listed on the CANS 2.0, lacks validity and fuels Defendants' unnecessary institutionalization of Class Members. *See* Pl.'s SJ MOL at 26-29 (citing Pl.'s Ex. 31 (DHHS CANS 2.0 Decision Tool, ECF No. 364-6)); *see also* Cross Rep. ¶ 58 (discussing lack of any independent validation of the CAT Algorithm).

b. <u>Expansion of Discharge- and Transition-Planning Services</u>

Similarly, Defendants do not dispute that: (1) "[p]roviding child-centered wrap around care planning, on-going care coordination, and care monitoring for children identified to require mental health or behavioral interventions is an important measure to reduce reliance on congregate facilities"; or (2) the two wrap-around programs within their service array, FAST Forward and TrECC, are largely unavailable to Class Members. Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶¶ 57 59).[23] Yet, they dismiss their failure to provide either of these programs to Class Members as "irrelevant," *id.* ¶ 59, falsely claiming that TrECC is primarily aimed at youth in the juvenile justice system because such youth are in the "deepest end" of the system, *id.*

First, a youth living in a restrictive institution due to their parents' alleged abuse or neglect, potentially for *years* at a time, is, by definition, in the "deepest end" of the system. Second, the Director of BCBH testified at length about the critical importance of TrECC in *voluntary* institutional placements to, *inter alia*, monitor youth's length of stay; assist with treatment planning through regular, unconflicted re-administration of the CANS; and develop transition plans to prepare for a youth's reintegration into the community. *See* Pl.'s Ex. 158

---

[23] Defendants indicate that Plaintiff's proposed SUF No. 58 is both disputed and undisputed. Plaintiff agrees with Defendant's clarification that TrECC is offered through BCBH, rather than DCYF. Regardless, Defendants do not dispute that TrECC is unavailable to Class Members.

(Daryll Tenney Dep. Tr., Bureau Chief, BCBH, DHHS, 167:24-169:8; 224:9-226:1; 232:3-233:1; 234:18-237:21 (Feb. 27, 2025)); *see also id.* (Tenny Dep. Tr. 238:24-239:22) (distinguishing between TrECC transition plans and residential treatment discharge plans). Mr. Tenney's testimony belies Defendants' claims of "irrelevan[cy]."

c.  <u>Expansion of Therapeutically-Supported Foster Care</u>

Finally, Defendants repeatedly dispute facts regarding therapeutically-supported foster care orthogonal to those Plaintiff submitted. For example, Defendants "dispute[]" that they "do not have a sufficient array of therapeutically supported foster homes" but then cite documents offering only conclusory statements about the *types* of foster homes "employ[ed]" by DCYF. *See* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶ 71). And Defendant Noonan's declaration addresses what DCYF "provides" or "offer[s]," but says nothing about the *actual* supply, sufficiency, availability, or utilization of therapeutically-supported foster homes for Class Members, including IISO homes.[24] Noonan Decl. ¶¶ 35-40. Similarly, Defendants "dispute[]" that "[a]n insufficient number of therapeutically supported foster homes . . . results in some [Class Members] who could be served by such homes being placed and retained in congregate facilities" but then respond to the wholly different question of whether DCYF "offers" some form of supported foster care. *See* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶ 82); Noonan Decl. ¶¶ 37, 38.[25] These responses do not even facially, let alone *genuinely*, dispute the facts produced

---

[24] Moreover, Defendants admit: (1) TFC remains unavailable, Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶ 81); (2) the number of ISO home has decreased from 82 homes in 2022 to 69 homes as of April 2025, whereas the number of contracted congregate beds remains steady at 468, *id*. ¶¶ 74, 75; (3) ISO homes are "often . . . utilized to house youth who only need General Foster Care," *id*. ¶ 77; and (4) the number of ISO agencies has declined over the past 5 years, *id*. ¶ 75.

[25] Plaintiff specified 50 therapeutically-supported foster homes as the minimum to remedy their *Olmstead* injuries based on substantial evidence that such settings likely are appropriate for youth currently served in Level 2 institutions, among others. *See* Pl.'s SJ MOL at 22 n.12; Feild Rep. ¶ 69. Neither Defendants' brief nor Ms. Noonan's declaration disputes this figure.

by Plaintiff.

As shown in Plaintiffs' Response to Defendants' SUF, Pl.'s Ex. 155, the same is true with respect to each fact showing the plausibility of Plaintiff's other requested relief: (1) increased financial support to kin, *id.* ¶¶ 34, 62-68; (2) evidence-based kinship finding and direct supportive services to kinship caregivers, *id.* ¶¶ 54-58, 62, 69-70; (3) DCYF Director-level approval, *id.* ¶ 99; (4) freezing of DHHS-contracted residential facility beds, followed by planned reductions, *id.* ¶¶ 99-100; (5) development of a data dashboard, *id.* ¶¶ 61, 97-98; (6) comprehensive assessments that inform case planning, *id.* ¶¶ 122-25; (7) specialized case workers, *id.* ¶¶ 126-33; and (8) continuous quality improvement, *id.* ¶¶ 134-41; *see also* Pl.'s SJ MOL at 22-26, 29-31, 54-56; *Griggs-Ryan*, 904 F.2d at 115 ("Neither wishful thinking nor mere promises to produce admissible evidence at trial nor conclusory responses unsupported by evidence will serve to defeat a properly focused Rule 56 motion." (cleaned up)). In short, and far from "pull[ing] the laboring oar," *Griggs-Ryan*, 904 F.2d at 115, Defendants present no evidence upon which the Court could base a judgment in their favor.

### 2. The Material Facts Supporting Plaintiff's CWA Claim Are Not Genuinely Disputed.

Because Defendants have allocated the CWA's various content requirements for OFY across three separate forms, as permitted under the CWA's grant of discretion to state agencies, Defendants' compliance with the CWA *requires* timely completion and updating of *all three forms*. *See* Pl.'s SJ MOL at 41-43 (citing 45 C.F.R. § 1356.21(g)(1)); *see also id.* at 43-44 & tbl.1 (citing Pl.'s SUF ¶ 111 (citing Pl.'s Ex 42 (Chansuthus Rebuttal, ECF No. 364-17, ¶¶ 2-8))). Nowhere do Defendants factually dispute that the CWA's content requirements are spread across these three forms, or that they fail to timely complete and update these three forms for the Class. Instead, Defendants just claim that DCYF does not have a stand-alone policy demanding

completion of all three forms. *See* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶¶ 111-12). To the

extent that is true, it only supports Plaintiff's case. Because all three forms are needed to satisfy

the CWA's explicit content requirements, Defendants' failure to promulgate and enforce policies

correspondingly requiring completion of *all three* forms (and, instead, apparently, to require

completion of only a single, facially deficient form) constitutes, if anything, an explicit written

policy violative of the CWA.

For the same reason, Defendants' reliance on data analyzing the presence of a *single* of

those three required case-planning forms does not, and cannot, create a "battle of the experts" or

otherwise create a dispute as to a *material* fact. *See* Pl.'s SJ MOL at 48-50 & n.29; *see also*

Mem. of Law in Supp. of Pl.'s Mot. to Exclude Defs.' Expert, Cynthia Richter-Jackson, ECF No.

369-1, at 7 (July 9, 2025) ("Pl.'s ME Richter-Jackson").[26] Rather, Plaintiff's expert Ms.

Chansuthus's analyses are the only *material* evidence in the record, and they show pervasive

violations both as to sampled data regarding the content of initial case plans, Pl.'s SJ MOL at 47-

54 & tbl.2; and as to the most-recently available, population-level data regarding the simple

presence *of the three required forms*. *See id.* at 48-50 & tbl.2 (not a single youth had all three

forms, and less than one in ten had even two of the forms within 60 days of entry into custody

(citing Pl.'s SUF ¶ 114 (citing Chansuthus Rebuttal ¶ 14 & tbl.1))).[27] In sum, aside from

---

[26] Ms. Richter-Jackson's methodology is also so fundamentally flawed as to warrant exclusion of her opinions, or, at minimum, affording them so little weight as to destroy any *genuine* dispute as to the rate of Defendants' timely creation of initial case plans. *See* Pl.'s SJ MOL at 49 n.29 (citing Pl.'s ME Richter-Jackson at 6-11). Ms. Richter-Jackson did not opine on whether Defendants provide Class Members with their CWA right to a *discrete written case plan*, and so her opinion is of little-to-no value.

[27] Defendants also fail to offer *any* evidence disputing the finding of Plaintiff's expert, Dr. Todd MacKenzie, that, *at best*, Ms. Richter-Jackson found that 46-73% of OFY had a timely copy of a single case-planning document, DCYF Form 1550. *Compare* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶¶ 113-14), *with* MacKenzie Rebuttal ¶ 11 tbl.1. The same is true of Defendants' conclusory

Plaintiff's evidence of pervasive noncompliance, there is no evidence before the Court that Defendants complete all three forms or otherwise provide Class Members with all CWA-required content.

As to remedies, Defendants *do not dispute* that comprehensive assessments, Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶ 122), and continuous quality improvement ("CQI"), *id.* ¶ 134, would improve Class Members' likelihood of receiving CWA-compliant case plans. Regarding assessments, Defendants concede that administration of the CANS can improve case-plan compliance but admit that it is not yet implemented due to a recently initiated "phased roll-out." *See id.* ¶¶ 122, 124-25. On CQI, Defendants do not dispute that they fail to collect and generate in reviewable form aggregate data on timely case plan completion and updates, *id.* ¶¶ 135-36, and that they lack an automated notification system for overdue case plans or updates, *id.* ¶ 141. And although they quibble with certain aspects of case worker supervision, they admit that supervisors receive no training on case plan oversight and supervision. *See id.* ¶ 138.

Regarding Plaintiff's third proposed remedy of specialized caseworkers, Defendants do not dispute Plaintiff's material facts and evidence. For example, Defendants do not dispute: that Adolescent Workers are specialized caseworkers who receive additional training on meeting OFY's unique needs and that there are not enough Adolescent Workers for every OFY, *id.* ¶¶

---

allegations that Ms. Richter-Jackson identified (a) timely case plans, *compare* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶ 114), *with* Chansuthus Rebuttal ¶ 10 & n.3, *and* Mackenzie Rebuttal ¶ 11 tbl.1; (b) collaboration in case plan development, *compare* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶ 115), *with* Pl.'s Ex. 47 (Richter-Jackson Rep., ECF No. 365-01, at 12) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (c) updates, *compare* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶¶ 116-117), *with* Richter-Jackson Rep. at 12 (no quantitative data regarding case plan updates), *and* Pl.'s Ex. 159 (Richter-Jackson Dep. Tr. 209:24-211:12); or (d) 90-Day Plans Transition Plans, *compare* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶ 118), *with* Richter-Jackson Rep. at 12-17 (no quantitative data regarding creation of DCYF Form 1978, 90-Day Transition Plans).

129-30; that there is no requirement that Adolescent Workers, or other caseworkers with specialized training on OFY, participate in OFY's case plan development, *id.* ¶ 128; that, for those OFY who are not assigned an Adolescent Worker, there are no policies requiring consultations with, or documentation of communications between, generalist caseworkers serving OFY and Adolescent Workers, *id.* ¶ 132; or that DCYF staff, including Bureau Chief Michael Donati and Adolescent Program Administrator Rob Rodler, have recognized the need for an expanded Adolescent Worker program, *see id.* ¶¶ 126, 133. Instead, Defendants claim that all these facts are irrelevant because, supposedly, and without submitting any evidence in support, generalist caseworkers are "qualified" and "trained" to work with youth of all ages. *See id.* ¶¶ 126, 128, 130, 132-33) (Defendants citing only Noonan Decl. ¶¶ 6-8). Unsupported claims like these are insufficient to defeat summary judgment.

### E. Defendants Do Not Oppose Plaintiffs' Motion for Summary Judgment on their Fundamental Alteration Defense.

Although the burden of proving fundamental alteration lies with Defendants, nowhere in their opposition do Defendants dispute Plaintiff's arguments or otherwise marshal any evidence supporting this defense.[28] Any challenge therefore has been waived, and this Court should grant summary judgment to Plaintiff on Defendants' fundamental alteration defense.

### F. Defendants Fail to Raise Triable Issues on their *Olmstead* Plan Defense.

Defendants profess to "hotly dispute" whether "New Hampshire's efforts to reduce

---

[28] Defendants' suggestion that Plaintiff bears the burden here is misleading. When the non-moving party has the burden of proof on the claim on which summary judgment is sought, the moving party must "aver an absence of evidence to support the non-moving party's case." *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009) (cleaned up). Plaintiff made this requisite showing in their moving papers, *see* Pl.'s SJ MOL at 32-37, and the burden therefore shifted to Defendants.

residential placements have been effective" but devote only a clause within a single sentence to wage that argument. Defs.' SJ MOL at 25. Their insufficient briefing, alone, warrants granting Plaintiff summary judgment on the *Olmstead* plan defense. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F. 3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed . . . .").

Even if the Court addresses the merits, the undisputed facts show that Defendants lack a "comprehensive, effectively working plan" to integrate Class Members. As a threshold matter, Defendants' opposition does not identify which "efforts" currently comprise their *Olmstead* plan. That omission is glaring, especially given their admissions that they have yet again moved the goalposts—abandoning initiatives they previously touted to this Court and introducing others assembled on the eve of their filing.[29]

Nor have Defendants introduced any evidence demonstrating, as required, that their current programs are "actually moving individuals to integrated settings in accordance with the [*Olmstead*] plan." *See* Pl.'s SJ MOL at 38-39. Defendants principally rely on two cherry-picked, ill-defined, and poorly sourced data points to advance their defense: (1) that the percentage of foster youth in residential facilities "reached as high as 50%" at some point in 2017 and

---

[29] For instance, Defendants admit that they no longer are pursuing TFC and have cancelled their contract with ASCI—two initiatives they highlighted in their most recent response to Plaintiff's *Olmstead* plan contention interrogatory. *Compare* Pl.'s Ex. 36 (Defs.' R&O to Pls.' 5th Set of Interrogs., ECF No. 364-11, at 16-20 (Jan. 3, 2025)) (discussing contract with ASCI and development of a TFC program), *with* Noonan Decl. ¶ 29 (admitting ASCI contract was terminated), *and id.* ¶ 38 (admitting TFC program no longer being pursued). Although Defendants now point to several new programs, such as some *unknown* number of uncontracted IISO homes, they nowhere demonstrate the sufficiency of this indeterminate supply, *cf.* Feild Rep. ¶¶ 47-60 69, and they also report that they have terminated other programs in their service array, such as multi-systemic therapy, *see* Noonan Decl. ¶ 33, and they have failed to update their interrogatory responses accordingly.

"declined to 41% of the total as of September 1, 2025";[30] and (2) that the percentage of youth "going to a kinship placement as their first placement increased from approximately 25%" at some point in 2018 to "nearly 70% currently." *See* Defs.' SJ MOL at 25; *see also* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶¶ 37, 155).[31] But Defendants neither offer evidence showing that *Class Members* have left institutions, nor cite any case law finding an effectively working *Olmstead* plan on their cited grounds, alone.

Defendants' reliance on these two statistics—drawn from their own unvetted data—is especially misguided because they include youth *who are not Class Members*. Neither data point is limited to foster youth with mental disabilities, and the former includes foster youth who are 18 years old. *Cf.* DOJ Statement at 12 ("A public entity cannot rely on its Olmstead plan as part of its defense unless it can prove that its plan comprehensively and effectively addresses the needless segregation *of the group at issue in the case*.") (emphasis added)). *See also* Pl.'s SJ MOL at 38.[32]

---

[30] As written, these data points could mean, *inter alia,* (a) the percentage of youth in a congregate facility at a given point in time or (b) the percentage of youth in custody at a particular point in time who ever were in a congregate facility.

[31] Defendants offer no explanation as to how the remaining three facts they cite as support create a genuine dispute that any purported *Olmstead* plan is working effectively. *See* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶¶ 89, 90, 156). Indeed, although Defendants summarily deny that they are "expanding" the residential provider network under New Hampshire's current budget, *see id.* ¶ 90, *maintaining* their institutional funding and network—which they do not deny—is equally fatal to their defense. *See Disability Advocs., Inc. v. Paterson*, 653 F. Supp. 2d 184, 270 (E.D.N.Y. 2009) (denying *Olmstead* plan defense because the record evinced that Defendants were "committed to maintaining the *status quo*"), *vacated sub nom. Disability Advocs., Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012) (vacating on standing grounds unrelated to *Olmstead* plan defense).

[32] Defendants now also claim to maintain waitlists tracking the number of youth in residential facilities awaiting community placements, despite producing no such documents during the three years of discovery. *See* Pl.'s Ex. 155 (Pl.'s Resp. to Defs.' SUF ¶ 61). Defendants, however, fail to provide any factual information regarding formalization of the "DCYF SURGE teams" into DCYF's policies and procedures, or any other factual information regarding the waitlists they

Even assuming those trends show some Class Members have left institutions, Defendants provide no evidence attributing that change to any *Olmstead* plan, or even any of their programs. *See Benjamin v. Dep't of Pub. Welfare of Pa.*, 768 F. Supp. 2d 747, 755 (2011) (declining state-institution census was insufficient to establish *Olmstead* plan when there was no "indicator of *why* it had decreased, and no assurances that it was because of [the defendant's] commitment to action rather than because of deaths or similar occurrences"); *see also* Pl.'s SJ MOL at 38. Nor have they cited any evidence supporting how such progress is attributable to their *ongoing* initiatives rather than the ones they have since abandoned. *See* DOJ Statement at 11 (an *Olmstead* plan "must do more than provide vague assurances of future integrated options"); *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 364 F.3d 487, 500 (3d Cir. 2004) ("It was unrealistic (or unduly optimistic) in assuming past progress [was] a reliable prediction of future programs.").

## III.    CONCLUSION

For the above reasons, and those in Plaintiff's opening brief, the Court should grant Plaintiff's Motion for Summary Judgment, deny Defendants' Cross Motion for Summary Judgment, and grant such other relief as justice requires.

Dated: October 17, 2025                      Respectfully submitted,

                                             PLAINTIFF, B.D., *et al.*

                                             By their attorneys,

                                             /s/ Michelle Wangerin, Esq.
                                             **NEW HAMPSHIRE LEGAL ASSISTANCE**
                                             Michelle Wangerin

---

claim to now keep, such as (1) the number of Class Members on those waitlists; (2) the community placements or services for which those Class Members are eligible; or (3) the length of time spent awaiting those placements and/or services. *See* Pl.'s SJ MOL at 40.

N.H. Bar No. 17769
Kay E. Drought
N.H. Bar No. 12851
154 High Street
Portsmouth, NH 03801
P: (603) 431-7411
F: (603) 431-8025
mwangerin@nhla.org
kdrought@nhla.org


**DISABILITY RIGHTS CENTER-NH, INC.**
Jennifer A. Eber
N.H. Bar No. 8775
Kayla J. Turner
N.H. Bar No. 270167
Justin Littlefield
N.H. Bar No. 21182
64 North Main Street, Suite 2
Concord, NH 03301-4913
P: (603) 228-0432
F: (603) 225-2077
jennifere@drcnh.org
kaylat@drcnh.org


**AMERICAN CIVIL LIBERTIES UNION OF
NEW HAMPSHIRE**
Gilles R. Bissonnette
N.H. Bar No. 265393
Henry R. Klementowicz
N.H. Bar No. 21177
18 Low Avenue
Concord, NH 03301
T: (603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org


/s/ Carolyn Hite, Esq.
**CHILDREN'S RIGHTS, INC.**
Ira Lustbader
NY Bar No. 2516946
Kathleen Simon
NY Bar No. 5682810
Carolyn Hite

NY Bar No. 5677422
Rebecca Ritchin
NY Bar No. 6015069
Madeleine Kinney
NY Bar No. 5312426, MA Bar No. 690939
88 Pine Street, 8th Floor
New York, NY 10005
P: (212) 683-2210
F: (212) 683-4015
ilustbader@childrensrights.org
ksimon@childrensrights.org
chite@childrensrights.org
aiyer@childrensrights.org
ritchin@childrensrights.org
mkinney@childrensrights.org


**WEIL, GOTSHAL & MANGES LLP**
Konrad L. Cailteux
NY Bar No. 2056505
Katheryn Maldonado
NY Bar No. 5926027
Kathleen Stanaro
NY Bar No. 5900410
Sarah Ryu
NY Bar No. 5405642
767 Fifth Avenue
New York, NY 10153
P: (212) 310-8000
F: (212) 310-8007
Konrad.Cailteux@weil.com
Katheryn.Maldonado@weil.com
Kathleen.Stanaro@weil.com
Sarah.Ryu@weil.com