**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**B.D., by their next friend,**
**Christine Wellington**

v.

Case No. 1:21-cv-4-PB
Opinion No. 2026 DNH 124

**Kelly Ayotte, Governor of**
**New Hampshire, et al.**

## MEMORANDUM AND ORDER

B.D., by their next friend, is the class representative for a certified class of mentally disabled adolescent children in the custody of New Hampshire's Division of Children, Youth and Families ("DCYF"). The plaintiffs have sued New Hampshire's governor and several state officials involved in the state's foster care system. They contend that the defendants are violating the Adoption Assistance and Child Welfare Act ("CWA") by failing to comply with that law's case-planning requirements. They also assert that the defendants are unnecessarily institutionalizing some members of the class and placing others at unjustified risk of institutionalization in violation of Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act.

The parties have filed cross-motions for summary judgment. The plaintiffs argue that they are entitled to prevail on all of their claims because

undisputed material facts entitle them to judgment as a matter of law. The defendants argue that the plaintiffs' CWA claim is no longer viable in light of the Supreme Court's recent decision in Medina v. Planned Parenthood South Atlantic, 606 U.S. 357 (2025). They also assert that all of the plaintiffs' claims fail for lack of standing and that their Title II and § 504 claims are not cognizable for members of the class who are not presently institutionalized. In the event that their own motion fails, the defendants ask me to deny the plaintiffs' motion because they contend that facts material to its resolution remain in genuine dispute.

## I. BACKGROUND[1]

### A. Federal Standards

Because New Hampshire's foster care system is federally funded, it must comply with numerous federal statutes and regulations. These include, as relevant to this case, the CWA, 42 U.S.C. §§ 621-23, 670 et seq., as well as Title II of the ADA, 42 U.S.C. § 12131 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

[1] As in my prior orders in this case, see Doc. 342 at 10 n.4, I recount the facts and travel of the case to the extent they bear on the resolution of the motions before me. My prior orders further summarize this litigation's background. See Doc. 49; Doc. 303; Doc. 341; Doc. 342; Doc. 356.

Of these statutes, the most germane to this lawsuit's subject matter is the CWA, a 1980 amendment to the Social Security Act. 42 U.S.C. §§ 621-23, 670 et seq. The CWA grants federal funding to states "for expenses associated with operating a foster care system." Connor B. ex rel. Vigurs v. Patrick, 774 F.3d 45, 61 (1st Cir. 2014). In exchange for that funding, states must comply with certain statutory directives. See id. Should a state "fail[] to comply substantially with the statutory requirements and fail[] to implement a corrective plan," the federal secretary of health and human services "is empowered to withhold" its federal funding. Id. (citing 42 U.S.C. § 1320a-2a).

One such requirement conditions a state's foster-care funding on its development of a "State plan for foster care and adoption assistance." See 42 U.S.C. § 671(a). Among its components, a state's foster care plan must "provide[] for the development of a case plan" for each child in the state's foster care system. Id. § 671(a)(16). As defined in the CWA, a child's case plan must include a wide range of information about the child, including a description of and justification for the child's placement, his or her required care and services, and his or her health and education records. Id. § 675(1). For adolescent[2] children, the case plan must also contain "a document that

[2] Consistent with the age distinctions drawn by the CWA and the definition of the certified class in this case, I use the term "adolescent" to refer to children of ages fourteen through seventeen.

describes the rights of the child with respect to education, health, visitation, and court participation, the right to be provided with" certain identifying documents, "and the right to stay safe and avoid exploitation." Id. § 675a(b)(1). An adolescent child must also sign an acknowledgment that he or she has been "provided with a copy of th[is] document and that the rights contained in th[is] document have been explained to the child in an age-appropriate way." Id. § 675a(b)(2). For all children, a case plan must be completed within sixty days of removal from their home. 45 C.F.R. § 1356.21(g)(2). Significantly, neither federal statute nor regulation dictates the specifics exhaustively; instead, so long as they comply with these and related requirements, each state otherwise "determine[s]" the "format" of its case plans and "promulgate[s] policy materials and instructions for use" in implementing them. Id. § 1356.21(g)(1).

Title II and § 504, meanwhile, apply more broadly. Each provision generally prohibits public entities from discriminating on the basis of disability in the administration of certain public programs.[3] 42 U.S.C. § 12132; 29 U.S.C. § 794(a). Three pertinent regulations promulgated

[3] Title II was modeled after § 504 and "contains very similar language" to its predecessor, leading courts to "interpret[] the relevant parts of the two statutes consistently." Pollack v. Reg'l Sch. Unit 75, 886 F.3d 75, 80 n.2 (1st Cir. 2018). The plaintiffs assert the same set of claims under both provisions, and following the First Circuit's lead, I evaluate them in tandem.

pursuant to these statutes elaborate on this prohibition. First, under the "integration mandate," public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of" disabled individuals. 28 C.F.R. § 35.130(d); see also id. § 41.51(d). Second, under the "methods of administration" regulation, public entities are prohibited from "utiliz[ing] criteria or methods of administration . . . [t]hat have the effect of subjecting" disabled individuals "to discrimination on the basis of disability." Id. § 35.130(b)(3); see also id. § 41.51(b)(3). Finally, under the "reasonable modifications" regulation, public entities must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability" unless the modification would "fundamentally alter" the public program. Id. § 35.130(b)(7)(i); see also id. § 41.53.

In 1999, the Supreme Court held in Olmstead v. L.C. ex rel. Zimring that "unjustified institutional isolation of persons with disabilities is a form of discrimination" that violates Title II. 527 U.S. 581, 600 (1999). Delineating the elements of what we now call an "Olmstead claim," the Court held that "placement of persons with mental disabilities in community settings rather than in institutions" is required when (1) "the State's treatment professionals have determined that community placement is appropriate"; (2) "the transfer from institutional care to a less restrictive setting is not opposed by the

affected individual"; and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." Id. at 587.

In the decades since, courts of appeals in seven circuits have held that a plaintiff can bring an Olmstead claim if a state program places them at risk of institutionalization, even while he or she remains in the community. See Fisher v. Okla. Health Care Auth., 335 F.3d 1175, 1181-82 (10th Cir. 2003); Radaszewski ex rel. Radaszewski v. Maram, 383 F.3d 599, 600, 609 (7th Cir. 2004); M.R. v. Dreyfus, 663 F.3d 1100, 1116-18 (9th Cir. 2011), amended by 697 F.3d 706 (9th Cir. 2012); Pashby v. Delia, 709 F.3d 307, 322 (4th Cir. 2013); Davis v. Shah, 821 F.3d 231, 261-64 (2d Cir. 2016); Waskul v. Washtenaw Cnty. Cmty. Mental Health, 979 F.3d 426, 460-61 (6th Cir. 2020); United States v. Florida, 172 F.4th 1201, 1224-29 (11th Cir. 2026); but see United States v. Mississippi, 82 F.4th 387, 392 (5th Cir. 2023) (holding that Olmstead only applies to "actual institutionalization," not "risk of institutionalization").[4] Though the First Circuit has yet to address the

[4] Some circuits have reached this conclusion in part out of deference to guidance from the Department of Justice ("DOJ") that "the ADA and the Olmstead decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings." U.S. Dep't of Just., Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C., available at

question, I previously explained my agreement with the majority position in Fitzmorris v. Weaver, another Title II class action pending in this Court. See 2026 DNH 039, 2026 WL 1045606, at *5-7 (D.N.H. Apr. 17, 2026).

## B. New Hampshire's Foster Care System

When the State of New Hampshire removes a child from the home of an abusive or neglectful parent, that child is placed in the custody of DCYF. See generally N.H. Rev. Stat. Ann. ("RSA") § 169-C. With that custody comes significant responsibility for the child's welfare. See id. § 170-G:4, II, III (citing id.; 42 U.S.C. § 670 et seq.). Among other things, DCYF is responsible for identifying and facilitating a residential placement for the child while in the state's custody, see DCYF Policy 1600; DCYF Policy 1615, as well as

---

www.ada.gov/olmstead/q&a_olmstead.htm (last updated Feb. 25, 2020) [https://perma.cc/R8SJ-TP4P]; see Davis, 821 F.3d at 262-63; Pashby, 709 F.3d at 322; M.R., 663 F.3d at 1116-17. Others independently drew the same conclusion years before the DOJ weighed in. See Fisher, 335 F.3d at 1181-82; Radaszewski, 383 F.3d at 600. And the Sixth and Eleventh Circuits have made clear that Title II and the integration mandate require this interpretation, irrespective of the DOJ's view. See Waskul, 979 F.3d at 461 ("[A] contrary interpretation is unreasonable because the integration mandate's 'protections would be meaningless if plaintiffs were required to segregate themselves . . . before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation.'" (quoting Fisher, 335 F.3d at 1181)); Florida, 172 F.4th at 1226 ("[T]he statutory and regulatory innerworkings of Title II impose an obligation to at-risk children . . . .").

drafting and executing a case plan that lays out the services that the child will require during that time, see DCYF Policy 1550.[5]

DCYF must place a child in "the most appropriate, least restrictive setting available to meet their identified needs." DCYF Policy 1600, II; see also RSA § 169-C:19-h (defining the "order of preference" for out-of-home placements). A child's first—and preferred—placement is a community setting. RSA § 169-C:19-h, I. A child's ideal community placement is a "kinship" placement, in which the child lives with a relative (licensed or unlicensed) or another individual with whom the child has a preexisting relationship (who must be licensed). DCYF SOP 1600.2, I; RSA § 169-C:19-h, I(a); see also RSA § 170-E:25 (defining "kin").

Alternatively, a child may be placed in a licensed foster home in the community. DCYF SOP 1600.2, II; RSA § 169-C:19-h, I(b)-(c). Depending on the child's needs, he or she may be placed in either a general or enhanced support foster home. DCYF SOP 1600.2, II; RSA § 169-C:19-h, I(b)-(c).

---

[5] As in my prior order, see Doc. 342 at 2 n.2, I take judicial notice of DCYF's policy manual. See DCYF Policy Manual, https://www.dhhs.nh.gov/programs-services/child-protection-juvenile-justice/dcyf-policy-manual (last visited Sept. 2, 2026) [https://perma.cc/JA4R-ZPMU]. The policy manual consists of DCYF's policies and standard operating procedures ("SOPs"). DCYF has updated certain policies and SOPs since the parties completed briefing on their cross-motions; I draw on the updated versions. E.g., DCYF Policy 1550; DCYF Policy 1615.

Presently, the only kind of enhanced support foster care in New Hampshire is Individual Service Option ("ISO") foster care, which provides "intensive supervision and consistent structure" to children who "[c]an participate in a local education program" but have "chronic mental health, emotional, physical, or behavioral needs." DCYF SOP 1600.2, II(C). DCYF policy also provides for both "therapeutic foster care" ("TFC"), in which caregivers would provide "intensive services" to children who "exhibit chronic mental, emotional, physical or behavioral problems that require intensive supervision and consistent programmatic structure," DCYF Policy 1605, and "adolescent foster homes" ("AFH"), which would help "adolescents, ages 14-21 years with specialized needs," "develop the skills needed to live independently" as they "transition out of placement and into adulthood," DCYF Policy 1603. To the extent that TFC and AFH differ from ISO foster care, they are not presently offered, in part because DCYF deems its "intensive ISO foster care," a "component of ISO foster care" which provides "a higher level of services and supports," as "clinically equivalent" to TFC. Doc. 384-2 at 8.

"Only if" community placements "are not appropriate for the child due to an inability to maintain safety in the community," the child may be placed in congregate care. RSA § 169-C:19-h, II. As "guided by" the child's Comprehensive Assessment for Treatment ("CAT"), he or she may be placed in a "Qualified Residential Treatment Program" or a "Psychiatric Residential

Treatment Facility." DCYF Policy 1600, III(B)-(E). In these settings, the child is housed in a state-run institution rather than a family environment. See id.

For every child removed from his or her home, DCYF policy requires the child's case plan to include several documents. Principal among them is Form 1550, DCYF's standard template for case plans, which must be completed no later than sixty days from removal and documents the child's background, placement, and "permanency goals" (i.e., their intended future exit from DCYF custody). DCYF Policy 1550, I; see also DCYF SOP 1550.3, I; Doc. 368-27. Another is Form 1552, titled the Child/Youth Information Sheet, which details the child's family, medical, and educational history. DCYF Policy 1550, XIII(B)(1); see also Doc. 367-24. The case plan must be updated every six months. DCYF Policy 1550, VI(A).

For adolescent children in its custody, DCYF policy separately requires completion of three additional forms. First is Form 1690, a "Needs Assessment" which must be completed within thirty days of the later of the child's fourteenth birthday or entry into DCYF custody. DCYF Policy 1695, I(A)(1). Second, within the same timeframe, the child must complete the Casey Life Skills Assessment. Id., I(A)(2). Third, within sixty days of the same, Form 1695 must be completed. Id., I(A)(3); see also Doc. 367-25. Form 1695, entitled the "Adult Living Preparation Plan," is intended to "explain[] what the youth's needs are who are making the transition from foster care" to

adulthood by collating information ranging from the youth's "behavior [and] social skills" to his or her "future income needs" and "personal needs." Doc. 367-25 at 2, 4. All information from these forms "is transferred to the case plan (as applicable)." DCYF Policy 1695, I(C)(2).

## C. Factual and Procedural History

B.D., now seventeen years old, suffers from post-traumatic stress disorder, attention-deficit/hyperactivity disorder, and depression. See Doc. 310-1 at 3, 5. B.D. entered DCYF's custody more than four years ago. Id. at 3. Upon entering DCYF's custody, B.D. spent three days in a "community-based, family-like" foster home. Doc. 310-3 at 5. Since then, against B.D.'s wishes and save for a short community placement in 2025, DCYF has housed B.D. in a state-run congregate facility. Doc. 310-1 at 3-4; Doc. 310-2 at 5; Doc. 385-1 at 13. About a month after arriving in congregate care, the state issued a CAT report for B.D., which recommended congregate care as "the most appropriate setting instead of a family setting or less restrictive setting." Doc. 310-2 at 9. The report provided two reasons for this conclusion: first, that B.D. "would be best served where [B.D.] can receive ongoing supervision and therapeutic services to treat behavioral and emotional needs"; and second, that B.D. "has functional needs that require significant supervision and guidance" with certain "daily living skills." Id.

Although DCYF generated a case plan for B.D. about seven weeks after B.D. entered its custody, the case plan is facially deficient in several respects. See Doc. 310-3 at 5-7. For instance, B.D.'s case plan lacks a Form 1552, the required Child/Youth Information Sheet. Id. at 7; see DCYF Policy 1550, XIII(B)(1). After creating B.D.'s case plan, moreover, DCYF did not update it for at least seventeen months, missing at least two required semiannual check-ins. Doc. 310-3 at 7; DCYF Policy 1550, VI(A). Likewise, while DCYF generated an Adult Living Preparation Plan for B.D. upon B.D.'s fourteenth birthday, B.D. contends that it is "formulaic" and lacks "any meaningful description of B.D.'s individual needs and goals." Doc. 310-3 at 8. As of June 2024, the transition plan had also never been updated. Id.

Several months before B.D. entered DCYF's custody, the next friends for four other foster children filed this class action challenging deficiencies in New Hampshire's foster care system. Doc. 1. They alleged that the system's institutionalization-prone policies discriminate against disabled children in violation of Title II's and § 504's integration mandates and methods-of-administration regulations. Doc. 1 at 52-57; accord Doc. 316 at 50-54. They also brought a claim asserting a categorical right to counsel for foster children in dependency proceedings, Doc. 1 at 51, which I dismissed on the defendants' motion, Doc. 49 at 11-19, and a claim attacking the defendants' case-planning procedures under the CWA, Doc. 1 at 51-52, which I allowed to

proceed, Doc. 49 at 19-26. The plaintiffs named as defendants New Hampshire's governor; the commissioner of its Department of Health and Human Services ("DHHS"); the director of DCYF; the director of New Hampshire Medicaid Servies; and the director of New Hampshire's Administrative Office of the Courts. Doc. 1 at 1; accord Doc. 316 at 1.

As the litigation unfolded, circumstances changed for the named plaintiffs. Three years in, with the class yet to be certified, the four named plaintiffs had either reunified with their parents or reached their eighteenth birthday, prompting the plaintiffs to amend their complaint to add a fifth foster child, D.M., as a proposed class representative. See Doc. 264; Doc. 273. Six months later, D.M. also turned eighteen and was replaced by B.D. in the plaintiffs' second amended complaint. Doc. 297; Doc. 316.

Following B.D.'s identification, I certified the following class:

> All children, ages 14 through 17, who:
> (1) are, or will be, in the legal custody or under the protective supervision of DCYF under N.H. Rev. Stat. Ann. § 169-C:3 (XVII) and/or (XXV);
> (2) have a mental impairment that substantially limits a major life activity, or have a record of such an impairment; and
> (3) currently are, or are at serious risk of being, unnecessarily placed in congregate care settings.

Doc. 342 at 55.

The relief requested by the class has also evolved over this case's five-and-a-half-year history. In their original complaint, the plaintiffs sought

declaratory and equitable relief, with broad injunctive demands that the defendants "ensure" development of timely and adequate case plans, "community-based services and placements . . . in the least restrictive, integrated environment," and administration of services "in the most integrated setting appropriate," with a court-appointed monitor to oversee implementation of those sweeping objectives. Doc. 1 at 58-59. Since then, the plaintiffs have limited their proposed relief to eleven concrete modifications to the foster care system, which are reproduced as an appendix to this order. Doc. 368-29. With that scope of relief in mind, the parties have each moved for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a reasonable factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

Where the movant does not bear the burden of proof on a dispositive issue, it may satisfy its initial burden of production either by "affirmatively produc[ing] evidence that negates an essential element of the non-moving party's claim" or by pointing to "evidentiary materials already on file" that "demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000). Once this initial burden is met, the non-movant must respond with evidence sufficient to "demonstrate that a trier of fact could reasonably resolve that issue in [its] favor." Alam & Sarker, LLC v. United States, 113 F.4th 153, 162 (1st Cir. 2024) (alteration in original). In contrast, a movant with the burden of proof at trial is not entitled to summary judgment unless it can "demonstrate every element of [its] case such that 'no reasonable trier of fact could find'" otherwise. Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 411 (1st Cir. 2015) (quoting Lopez v. Corporación Azucarera de P.R., 938 F.2d 1510, 1516 (1st Cir. 1991)). In either case, the court must construe the record in "the light most favorable to the nonmoving party." Friedman v. Cent. Me. Power Co., 174 F.4th 233, 240 (1st Cir. 2026) (quoting Appleton v. Nat'l Union Fire Ins. Co. of Pittsburgh, 145 F.4th 177, 184 (1st Cir. 2025)).

When the parties cross-move for summary judgment, this standard is applied to "each motion separately, drawing all inferences in favor of each non-moving party in turn." AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3

(1st Cir. 2015) (quoting D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011)); see also Mandel v. Bos. Phx., Inc., 456 F.3d 198, 205 (1st Cir. 2006) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review."). Thus, I must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Grp. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

## III. ANALYSIS

While both sides seek summary judgment, they do not merely disagree about whether the evidence compels or precludes the plaintiffs' claims. The plaintiffs, for their part, argue that the evidence supporting their claims is unassailable and entitles them to judgment as a matter of law. The defendants, on the other hand, base their motion on several discrete legal arguments. The defendants contend that they are entitled to summary judgment on the plaintiffs' CWA claim because the Supreme Court's recent decision in Medina compels the conclusion that the CWA does not provide the plaintiff with an enforceable private right. They also argue that the plaintiffs' claims fail for lack of standing to sue and that the plaintiffs cannot maintain Title II and § 504 claims on behalf of class members who are merely at risk of institutionalization. In the alternative, the defendants assert that I must

deny the plaintiffs' motion for summary judgment because facts material to its resolution remain in genuine dispute.

Because the defendants present legal arguments that will dispose of the case if they are born out, I turn to them first, beginning with the defendants' renewed attack on the plaintiffs' CWA claim. I then assess any relevant evidentiary disputes that remain.

## A. Child Welfare Act Claim

In opposition to the plaintiffs' CWA claim, the defendants revisit a previous argument: that the CWA does not grant the plaintiffs a privately enforceable right to a case plan. The defendants first raised this argument more than five years ago in their initial motion to dismiss. See Doc. 29-1 at 10-17. The argument failed to persuade at the time, as I concluded that the CWA contained such a right under First Circuit precedent. See Doc. 49 at 19-26 (citing Lynch v. Dukakis, 719 F.2d 504 (1st Cir. 1983)). The defendants now urge me to reconsider that conclusion in light of the Supreme Court's intervening decision in Medina, in which the Court held that Medicaid's any-qualified-provider provision does not confer a private right that can be enforced pursuant to 42 U.S.C. § 1983. See 606 U.S. at 385 (citing 42 U.S.C. § 1396a(a)(23)(A)).

At issue here is 42 U.S.C. § 671(a), which sets out the "[r]equisite features" of a state's "plan for foster care and adoption assistance." 42 U.S.C.

§ 671(a). As discussed, a state must develop such a plan in order to receive federal funding for its foster care system under the CWA. See id. § 670. The plaintiffs maintain—and in 2021 I agreed—that § 671(a)(16) confers a right to a case plan that can be enforced through a § 1983 claim. That subsection requires a state's foster care plan to

> provide[] for the development of a case plan (as defined in section 675(1) of this title and in accordance with the requirements of section 675a of this title) for each child receiving foster care maintenance payments under the State plan and provide[] for a case review system which meets the requirements described in sections 675(5) and 675a of this title with respect to each such child.

Id. § 671(a)(16). As previewed above, a "case plan" is defined as "a written document" that identifies a child's placement, the reasons for that placement, how the child will receive necessary services, his or her health and education records, the steps taken to find the child an adoptive family, and a plan for ensuring the child's educational stability in the interim. Id. § 675(1). For adolescent children, the CWA additionally requires that a case plan document the programs and services that will facilitate the child's transition to adulthood, id. § 675(1)(D), and contain a "[l]ist of rights," id. § 675a(b). That list must

> describe[] the rights of the child with respect to education, health, visitation, and court participation, the right to be provided with the documents specified in section 675(5)(I) of this title in accordance with that section, and the right to stay safe and avoid exploitation.

Id. § 675a(b)(1). The CWA requires that the child receive "a copy of the document" and that these rights be "explained to the child in an age-appropriate way." Id. § 675a(b)(2).

In 2021, I concluded that § 671(a)(16) afforded foster children an actionable right to a case plan and rejected the defendants' arguments to the contrary. Doc. 49 at 19-26. In reaching this conclusion, I relied heavily on the First Circuit's decision in Lynch, see id., which upheld a district court's determination that the CWA's case-planning requirement was enforceable through a private right of action under § 1983, 719 F.2d at 512.

Lynch was informed by the Supreme Court's decision in Maine v. Thiboutot, 448 U.S. 1 (1980), which recognized a general rule that § 1983 was available to address violations of federal statutes by state officials, id. at 4-8, and Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1 (1981), which identified two "exceptions" to that general rule, id. at 19. See 719 F.2d at 509-10. Those exceptions, which the Court drew from its decision earlier the same year in Pennhurst State School and Hospital v. Halderman, foreclosed that right of enforcement where a statute either fails to create "rights, privileges, or immunities" within the meaning of § 1983 or contains alternative "remedial devices" that are "sufficiently comprehensive" to demonstrate Congress's intent to supplant

parallel private remedies. See 453 U.S. at 19-20 (citing 451 U.S. 1, 28 (1981)); see also Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 508 n.9 (1990) (citing Sea Clammers and "recogniz[ing] an exception to the general rule that § 1983 provides a remedy for violation of federal statutory rights only when Congress has affirmatively withdrawn the remedy").

In affirming the district court's determination that the CWA's case-planning requirement could be enforced through a § 1983 action in Lynch, the First Circuit considered and rejected an argument based on the second exception above: that "the Secretary's power to withhold federal funds from states" under the CWA "precludes individual enforcement of rights against the states." 719 F.2d at 511. At no point, however, was the court asked to determine whether the first exception applied, because the defendants do not appear to have argued for its application on appeal. See id. at 509-12. The First Circuit thus affirmed the district court's decision without directly examining whether the case-planning requirement creates an enforceable private right, as it could assume its enforceability by way of § 1983 under Thiboutot and its progeny. See id. at 510 (citing 448 U.S. at 6).

Of course, as I acknowledged in my prior decision, the analytical framework developed in Thiboutot, Sea Clammers, and Wilder has not stood the test of time. Lynch predated significant Supreme Court decisions on enforceable private rights in Blessing v. Freestone, 520 U.S. 329 (1997), and

Gonzaga University v. Doe, 536 U.S. 273 (2002). In Blessing, the Court set forth three "factors" to consider in determining whether a statute gives rise to an individual right, those being (1) whether Congress "intended that the provision in question benefit the plaintiff"; (2) whether the plaintiff can "demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) whether the statute "unambiguously impose[s] a binding obligation" using "mandatory, rather than precatory, terms." 520 U.S. at 340-41 (quoting Wright v. City of Roanoke Redevelopment & Housing Auth., 479 U.S. 418, 431 (1987); and citing Wilder, 496 U.S. at 510-11). And in Gonzaga, without seeming to overrule Blessing, the Court made clear that a federal statute only creates a privately enforceable right—under § 1983 or otherwise—when Congress uses "clear and unambiguous terms" evincing its intent to do so. 536 U.S. at 282-83, 290. To assess Congress's intent, Gonzaga set forth a three-factor test, seemingly built on the Blessing factors. See Connor B. ex rel. Vigurs v. Patrick, 771 F. Supp. 2d at 167-68 & n.8 (D. Mass. 2011) ("Gonzaga refined the earlier three-part test set forth in Blessing . . . ."). Under Gonzaga, courts were to consider "(1) whether the provision contains 'rights-creating language'; (2) whether the provision had an aggregate as opposed to an individualized focus; and (3) whether the statute contains another enforcement mechanism through which an

aggrieved individual can obtain review." Id. at 167-68 (citing Gonzaga, 536 U.S. at 287-90). Nearly two decades after the First Circuit's decision in Lynch, the increasingly stringent language of these cases heralded a meaningful shift away from courts implying private rights of action.

This doctrinal shift notwithstanding, I concluded in 2021 that the First Circuit's essential holding in Lynch remained good law. Indeed, in our system of vertical stare decisis, it is incumbent on me to adhere to the First Circuit's decisions to the maximum extent possible. See Eulitt ex rel. Eulitt v. Me., Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004) ("Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority."). Moreover, I agreed with the Ninth Circuit and my colleagues within this circuit that the CWA's case-planning requirement satisfied the tests for an enforceable right as modified by Blessing and Gonzaga. See Doc. 49 at 23 (citing Henry A. v. Willden, 678 F.3d 991, 1006 (9th Cir. 2012); Sam M. ex rel. Elliott v. Chafee, 800 F. Supp. 2d 363, 385, 388 (D.R.I. 2011); and Connor B., 771 F. Supp. 2d at 168, 170). I concluded that § 671(a)(16)'s use of mandatory and beneficiary-targeted terminology constituted "rights-creating language"; that its focus on the needs of "each child" betrayed an individualized emphasis; and that children entitled to a case plan lacked other means of recourse for the benefit it supplied. See id. at

23-26 (citing Gonzaga, 536 U.S. at 284 & n.4, 288-90). In sum, I read Gonzaga's three-factor test to vindicate what I saw as the First Circuit's conclusion that § 671(a)(16) created a private right to a case plan enforceable through § 1983. See id. at 26.

Since then, as the defendants have called to my attention, the Supreme Court's jurisprudence on private rights of action has shifted further still. After careful consideration, I am persuaded that these intervening shifts, Medina especially, have inescapably upended my original analysis of § 671(a)(16). As a result, the plaintiffs' CWA claim is no longer viable. Why I must reverse my prior decision requires some unpacking.

In Medina, the Supreme Court considered whether Medicaid's any-qualified-provider provision supplies a private right enforceable through § 1983. See 606 U.S. at 364. That statute, in relevant part, requires a state receiving Medicaid funds to ensure that "any individual eligible for medical assistance . . . may obtain" that assistance "from any [provider] qualified to perform the service . . . who undertakes to provide it." 42 U.S.C. § 1396a(a)(23)(A). Invoking that provision, Planned Parenthood and one of its patients sued the director of South Carolina's Department of Health and Human Services, claiming that the any-qualified provider provision precluded the state from excluding Planned Parenthood from its Medicaid program. 606 U.S. at 364-65. They premised their suit on the argument that

the provision conferred an actionable individual right on Medicaid beneficiaries to choose their providers, a view with which the District of South Carolina and the Fourth Circuit agreed. Id. at 366. The Supreme Court granted certiorari to assess the Fourth Circuit's decision. See 145 S.Ct. 1000 (Dec. 18, 2024).

In an opinion authored by Justice Gorsuch, the Supreme Court first traced the history of legislation enacted pursuant to Congress's spending power, focusing on the Court's historic treatment of suits brought by private citizens pursuant to those enactments. See 606 U.S. at 369-76. Conceptualizing spending-power legislation as a contractual relationship between the state and federal sovereigns, the Court cast this history as largely requiring conditions on grants of federal funds to be "clear[]" and "unambiguous[]" when they expose states to private enforcement. See id. at 372-73 (quoting Pennhurst, 451 U.S. at 17). For the modern era, the Court identified two of its decisions as lodestars for courts' analysis of these conditions: Gonzaga, the 2002 decision in which the Court found certain provisions of the Family Educational Rights and Privacy Act ("FERPA") devoid of a § 1983-enforceable cause of action, 536 U.S. at 276, and Health and Hospital Corporation of Marion County v. Talevski, 599 U.S. 166 (2023), a newer case in which the Court held the opposite for provisions of the Federal Nursing Home Reform Act ("FNHRA"), id. at 180. 606 U.S. at 374-75.

In synthesizing the two, the Court focused on the notice each provision afforded grantees of federal funds, contrasting the failure of FERPA to "clearly and unambiguously" confer a right with FNHRA, which "'expressly' employed the sort of clear and unambiguous 'rights-creating language' Gonzaga demands." Id. (quoting 599 U.S. at 184, 186).

From there, the Court turned back to discuss its earlier decisions on which Lynch had relied where, in the Court's words, it "briefly experimented with a different approach." Id. at 375. In doing so, the Court noted that it once "took a broad view of its authority to confer new rights under spending-power statutes that did not expressly provide them." Id. Observing that its doctrinal detour "has given rise to some confusion in the lower courts," the Court took the opportunity to specify which of its private-right precedents remain operative. Id. Speaking unequivocally, the Court directed that lower courts "should not," henceforth, "consult Wilder, Wright, and Blessing when asking whether a spending-power statute creates an enforceable individual right." Id. at 376. Rather, according to the Court, "Gonzaga rejected any reading of" those cases which could be at odds with Gonzaga and Talevski. Id. (citation modified).

Applying these principles to Medicaid, the Court held that the any-qualified-provider provision did not evince clear and unambiguous congressional intent to create privately enforceable rights. Id. at 376-80.

Treating the FNHRA provisions at issue in Talevski as "the only reliable yardstick against which to measure" language in spending-power statutes, the Court concluded that the any-qualified-provider provision "could not have been more different." Id. at 377-78. Specifically, the Court keyed in on FNHRA's explicit use of the term "rights" in one of the provisions at issue in Talevski, highlighting each instance of the word in the statute's text. Id. at 378. In the Court's view, "this language shows" that if Congress wanted to embed similar private rights into § 1396a(a)(23)(A) (which was amended contemporaneously with the relevant FNHRA provision), Congress knew "how to give a grantee clear and unambiguous notice" of them. Id. Because Congress did not do so in the any-qualified-provider provision, the Court held that it lacked an actionable right. Id.

Returning to the plaintiffs' claim in this case, my previous interpretation of the CWA, a spending-power statute, Connor B., 771 F. Supp. 2d at 168, cannot withstand the intervening jurisprudential shift effected by Medina. As I explained in my first order, I read Gonzaga to merely "revise[] the test announced in Blessing" as, like many of my colleagues, I understood Gonzaga to restate the three coequal "factors" used to analyze a statute's provision of federal rights originally laid out in Blessing. Doc. 49 at 20-21 & n.6. My analysis of § 671(a)(16), and Lynch's continued viability, accordingly relied on the two decisions in tandem. See id.

at 22-23 ("[T]he holding in Lynch does not rest on an analytical foundation that is [inconsistent] with the framework set forth in Blessing and Gonzaga."). The Supreme Court has now made clear, however, that this understanding was wrong. While Gonzaga itself remains good law, the Court in Medina expressly rejected any continued reliance on Blessing, 606 U.S. at 376, instead limiting courts to the interpretive principles embedded in its analyses in Gonzaga and Talevski, id. at 374-75, 377. And as the Court demonstrated in deploying FNHRA as "the only reliable yardstick" against which to assess Medicaid's any-qualified-provider provision, id. at 377, Congress's explicit statement (or lack thereof) that a third party will receive "rights" as a funding condition is paramount when determining whether it intended to include those rights in the funding statute, id. at 378. To the extent that the other factors discussed in Gonzaga continue to bear relevance, they are now secondary, non-dispositive considerations. See id. at 378-79 (addressing other aspects of the any-qualified-provider provision as "clues" which "only serve[] to confirm [the Court's] conclusion" based on the provision's failure to use the language of FNHRA); see also id. at 411 (Jackson, J., dissenting) ("In short, the majority construes our requirement that Congress manifest an unambiguous intent to confer individual rights as a requirement that Congress manifest an unambiguous intent to imitate FNHRA." (citation modified)).

Revisiting the CWA within that reweighted paradigm, it is now apparent that § 671(a)(16) does not establish the enforceable right to a case plan that I identified in 2021. The text of that provision lacks any language that explicitly refers to an entitlement, much less describes its directives as "rights" akin to FNHRA in Talevski. See 42 U.S.C. § 671(a)(16). Rather, in listing two case-planning procedures that a state's foster care plan must "provide[] for" ("the development of a case plan" and "a case review system"), id., the provision "speaks to what a State must do to participate in" the CWA's funding scheme. Medina, 606 U.S. at 377; see also 42 U.S.C. § 622(b)(8)(A)(ii) (similarly requiring a state's foster plan to "provide assurances that" the state "is operating" "a case review system"). And while the CWA describes both required elements of a state's plan with reference to "each child," 42 U.S.C. §§ 622(b)(8)(A)(ii), 671(a)(16), suggesting an "individual," not "aggregate . . . focus," Gonzaga, 536 U.S. at 290, it only does so while defining the scope of those two "[r]equisite features of [a] State plan." 42 U.S.C. § 671(a); see also id. § 622(b)(8)(A)(ii) (same). In this way, the benefit created through this provision of the CWA is analogous to the individual benefit in Medina, where the beneficiary was similarly identified as one item amidst Medicaid's list of required "[c]ontents" of a state plan. See 606 U.S. at 364; 42 U.S.C. § 1396a(a)(23)(A) ("A State plan for medical assistance must . . . provide that . . . any individual eligible for medical

assistance . . . may obtain such assistance . . . ."). The Court noted in Medina that the fact that this provision of Medicaid "seeks to benefit" the "individual" it references is simply not enough, as it is "missing" the "clear and unambiguous 'rights-creating language'" of FNHRA. 606 U.S. at 377-78 (quoting Talevski, 599 U.S. at 186). So too, here.[6]

The plaintiffs respond by pointing to other provisions of the CWA that are incorporated into § 671(a)(16) by reference that do allude to "rights" of foster children, namely, § 675a(b). That provision, which describes one of the CWA's "[a]dditional case plan and case review system requirements," provides that any adolescent foster child's case plan "shall include . . . a document that describes the rights of the child with respect to education, health, visitation, and court participation, the right to be provided with" certain identifying documents, and "the right to stay safe and avoid exploitation." 42 U.S.C. § 675a(b)(1) (emphasis added). Despite § 675a(b)'s

[6] Most district courts across the country to analyze the CWA's case-planning requirement post-Medina have likewise found it devoid of an enforceable private right. See Keira M. v. Quin, 2026 WL 937311, at *29-32 (M.D. Tenn. Apr. 7, 2026); B.F. v. López, 2026 WL 696753, at *25-29 (D. Md. Mar. 12, 2026); Elisa W. v. City of New York, 2026 WL 890582, at *6-7 (S.D.N.Y. Mar. 31, 2026); see also Jonathan R. v. Justice, 2023 WL 184960, at *13-17 (W.D. W. Va. Jan. 13, 2023) (pre-Medina); but see Gatlin v. Contra Costa County, 796 F. Supp. 3d 622, 626 (N.D. Cal. 2025) (holding that a Ninth Circuit decision recognizing an enforceable right to a case plan remains good law because it relied as much on Gonzaga as Blessing).

repeated use of the word "right" like FNHRA, however, the word's context robs it of the talismanic value afforded to it in Talevski and Medina in three ways. First, the focus of § 675a(b) is plainly not the foster child—it is the case plan itself. Just as § 671(a) lists the "[r]equisite features" of a state's foster care plan, § 675a(b) identifies this "[l]ist of rights" in subsection (b) among several "case plan and case review system requirements." See 42 U.S.C. §§ 671(a), 675a. In this way, like § 671(a), § 675a is similarly structured to the "[c]ontents" list in Medicaid that failed to "set its rights-creating provisions apart from others" to "alert grantees" to enforceable rights in Medina. See 606 U.S. at 379-80 (citing 42 U.S.C. § 1396a). Second, even if their buried placement among the state's administrative obligations gave sufficient notice of their enforceability, the rights described in § 675a(b) are not to a case plan; rather, they allude to the entirely separate entitlements described above. See 42 U.S.C. § 675a(b)(1). And third, even if the rights listed were clearly noticed and somehow encompassed such a right, their highly generalized description (e.g., "the rights of the child with respect to education, health, visitation, and court participation," id.) is far from "clear and unambiguous notice" of their substance. Medina, 606 U.S. at 378; cf. Talevski, 599 U.S. at 184-86. In sum, to the extent that § 675, and to an even lesser extent the neighboring definitional list in the CWA, see 42 U.S.C. § 675(1), sound in mandatory benefits to individual foster children, they do so

without language unequivocally imbuing them with the right to enforce those benefits. See Medina, 606 U.S. at 383.

In search of other indicia of congressional intent, the plaintiffs also point to the CWA's overarching purposes: to "promot[e] the welfare of all children," "prevent[] the neglect, abuse, or exploitation of children," "promot[e] the safety, permanence, and well-being of children in foster care," and so on. 42 U.S.C. § 621(1), (2), (4). In the plaintiffs' view, these goals of the CWA ring similar to certain objectives written into the appropriations provision of FNHRA, warranting the same interpretation of the CWA here as FNHRA in Talevski. See 42 U.S.C. § 1396-1. But the Supreme Court in Talevski nowhere relied on the appropriations provision that the plaintiffs cite in identifying an enforceable right. See 599 U.S. at 180-82 (omitting any reference to § 1396-1 in noting "[t]he FNHRA provisions at issue in this case"). Moreover, in Medina, the Court disavowed statutes' broad statements of purpose as sources of enforceable rights, emphasizing Congress's discretion to elucidate the specific means by which a statute's purpose is vindicated, as "Congress may 'not wish to pursue [a] provision's purpose to the extent of authorizing private suits.'" 606 U.S. at 368-69 (alteration in original) (quoting Hernandez v. Mesa, 589 U.S. 93, 100 (2020)). In other words, Congress's aspirational statements in § 621 alone cannot give rise to a cause of action that it otherwise neglected to mention throughout the rest of the CWA.

At bottom, the Supreme Court made clear in Medina that for spending-power statutes like the CWA, barring explicit language to the contrary, the remedial mechanism for noncompliance is a simple, albeit extreme, one: withdrawing or reducing federal funding. See 606 U.S. at 384 ("[T]his Court has specifically rejected the notion that 'the cut-off of funding' is 'too massive' a remedy 'to be a realistic source of relief'" for violations of other provisions in the Social Security Act. (quoting Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 331 (2015))). Indeed, here, the CWA theoretically provides for that avenue of relief. See 42 U.S.C. § 1320a-2a. While that approach smacks of killing an ant with a sledgehammer, it is one that the Court identifies in Medina as sufficient to supplant a privately enforceable remedy for the plaintiffs here.

For these reasons, I am persuaded that my earlier interpretation of § 671(a)(16) cannot stand when viewed through a post-Medina lens. Contrary to my conclusion five years ago, the CWA cannot be read to supply foster children with a private, enforceable right to a case plan. I accordingly grant summary judgment to the defendants on Count I.

## B. Risk of Institutionalization Claims

The plaintiffs divide their remaining claims into four counts. Counts II and IV—the plaintiffs' Olmstead claims—allege that New Hampshire's foster care system segregates disabled children in contravention of the integration

mandate, violating Title II and § 504, respectively. See Doc. 316 at 49-53. Counts III and V, meanwhile, allege that the program utilizes discriminatory methods of administration, violating the same. See id. at 50-51, 53-54. As I noted in a prior order, however, the plaintiffs' Olmstead claims necessarily encompass their methods-of-administration claims, allowing me to analyze them as a single claim. See Doc. 49 at 33-34. The plaintiffs appear to support that approach. See Doc. 362-1 at 10 n.4.

As to their Olmstead claim, then, the plaintiffs assert that the uncontroverted evidence entitles them to judgment as a matter of law. That is, they believe their evidence shows, and the defendants' evidence does not refute, that (1) community placement is appropriate for class members; (2) the class members support community placement; and (3) their proposed modifications to the program are facially reasonable measures to accomplish that placement. See Olmstead, 527 U.S. at 587.

In response, the defendants lodge legal and factual objections. They first argue that the plaintiffs lack Article III standing. They then argue that no class member can have an Olmstead claim unless he or she is institutionalized. In the alternative, the defendants argue that the plaintiffs' motion for summary judgment must be denied because facts material to its resolution remain in genuine dispute. Analysis of each contention follows.

1. Standing

To establish Article III standing, a plaintiff must demonstrate that he or she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992); and Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc., 528 U.S. 167, 180-81 (2000)). The defendants contend that plaintiffs cannot establish either the first or the third standing requirement. To qualify as an injury in fact, a claimed injury must be "concrete and particularized" and "actual or imminent." Conservation Law Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 86 (1st Cir. 2025) (quoting Friends of the Earth, 528 U.S. at 180). To be redressable, it must be more than "merely speculative" that the requested relief will ameliorate the injury. In re Fin. Oversight & Mgmt. Bd. for P.R., 995 F.3d 18, 22 (1st Cir. 2021) (quoting Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 47 (1st Cir. 2020)). The defendants argue that the plaintiffs lack standing because "'serious risk of' unjustified institutionalization" is too uncertain to constitute injury in fact; because this Court lacks the power to order the relief sought by the plaintiffs; and because necessary involvement of third parties in facilitating some of the plaintiffs' proposed modifications renders redress of their injuries uncertain.

Beginning with the injury at issue, the defendants appear to confuse an argument regarding the appropriate definition of the plaintiff class with one regarding the named plaintiff's standing to sue. It is well-established that in a class action, only the "named plaintiffs need to satisfy" the actual-injury requirement "throughout the stages of the litigation." AstraZeneca AB v. United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund (In re Nexium Antitrust Litig.), 777 F.3d 9, 31-32 (1st Cir. 2015) (collecting cases); see also 1 Newberg and Rubenstein on Class Actions § 2:4 (6th ed.) ("The actual injury requirement can be easily met in most types of class suits so long as the class representative has alleged such an injury[.]"). Here, there is no dispute that B.D. was institutionalized upon joining this litigation and remains institutionalized today. See Doc. 390 at 10; Doc. 385-1 at 13. The defendants' argument regarding the definitiveness of the injuries to plaintiffs who are not presently institutionalized does not affect B.D.'s standing to sue on behalf of the class.

As for redressability, the defendants argue that the injunctive relief sought "would require the court to act beyond its proper role in our system of separated powers and dual sovereignty with the states." Doc. 393 at 15. In essence, the defendants' argument on this score is that the requested modifications, if ordered, would encroach on discretionary policy decisions appropriately left to the political process. In other words, the defendants

question the Court's authority to order the relief to begin with, setting aside whether that relief would redress the plaintiffs' injuries if carried out.

But of course, state agencies plainly do not have discretion to violate federal law, and the defendants point to no authority that would shield unlawful agency action from judicial redress where there exists a cognizable cause of action to challenge it. In the principal case cited by the defendants in support of this argument, Sheppheard v. Morrisey, the Fourth Circuit largely rejected the plaintiffs' theories of redressability with respect to a defendant governor because the governor lacked the authority to directly effect the relief requested, and the workarounds that the plaintiffs proposed would require the governor to exercise his purely discretionary powers in their favor. See 143 F.4th 232, 245-47 (4th Cir. 2025). The decisions of the Supreme Court that the defendants cite likewise involve the discretionary functions of state or local officials. See Dep't of Educ. v. Brown, 600 U.S. 551, 564 (2023) ("Nor have we ever accepted that an injury is redressable when the prospect of redress turns on the Government's wholly discretionary decision . . . ."); Horne v. Flores, 557 U.S. 433, 448 (2009) ("Federalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities."); Rizzo v. Goode, 423 U.S. 362, 366 (1976) ("[T]he judgment of the District Court represents an unwarranted intrusion by the federal judiciary into the discretionary authority committed to [local

officials] . . . ."). Federalism concerns do not require the same result when a state agency's action exceeds the lawful bounds of its discretion. See Brown, 600 U.S. at 564 & n.1 (distinguishing a "claim of unlawful exclusion from an existing benefits program" from a claim of injury based on "the Government's wholly discretionary decision to create a new regulatory or benefits program"); Horne, 557 U.S. at 450 (approving institutional-reform decrees which "vigilantly enforce federal law and . . . award[] necessary relief" to that end while disapproving such decrees that "are aimed at eliminating a condition that does not violate federal law or does not flow from such violation" (citation modified)). Indeed, contra Sheppheard, the Fourth Circuit has more recently and specifically endorsed injunctive relief in exactly this context. See Jonathan R. ex rel. Dixon v. Morrisey, 178 F.4th 139, 154-55 (4th Cir. 2026) (citing Doe 4 ex rel. Lopez v. Shenandoah Valley Juv. Ctr. Comm'n, 985 F.3d 327, 334 (4th Cir. 2021)).

Separately, the defendants appear to contend that the plaintiffs' requested relief is too uncertain to ameliorate their risk of institutionalization. The defendants primarily rely on the D.C. Circuit's decision in Johnson v. Becerra, 111 F.4th 1237 (D.C. Cir. 2024), which involved a lawsuit seeking to compel the federal secretary of health and human services to "meaningfully enforce[]" conditions for certain healthcare providers' participation in a Medicare program in response to those providers'

sporadic willingness to accept the plaintiffs as patients, id. at 1242, 1245. There, the court affirmed dismissal of the suit because the plaintiffs had failed to plausibly allege a connection between the secretary's enforcement efforts and the plaintiffs' injury, as service of all eligible beneficiaries was not a condition of the providers' participation. Id. at 1245-46. Thus, the court concluded that the plaintiffs' injury was not redressable by way of the requested order compelling that enforcement. Id. at 1246.

The defendants contend that the same problem exists in this case; namely, that there is no guarantee that various third parties who affect a child's likelihood of institutionalization will respond to the plaintiffs' proposed modifications if ordered. Insofar as the defendants dispute the plaintiffs' evidence as to each proposed modification's potential effectiveness in reducing institutionalization, however, that inquiry is coextensive with the individualized reasonableness of each modification. As I explain further below, to merit implementation by court order, a proposed modification must be reasonable, which necessarily requires it to be effective. See Fitzmorris, 2026 WL 1045606, at *17. Thus, in a way that is peculiar to an Olmstead claim, to the extent that some facet of the plaintiffs' proposed injunction would not redress their asserted injury, it would necessarily fail on the merits as well. In other words, for any proposed modification for which the plaintiffs' Olmstead claim is viable, their injury is redressable.

Having concluded that the plaintiff class can demonstrate both injury in fact and redressability, the defendants' standing challenge fails.

2. Risk of Institutionalization

The defendants separately argue that Olmstead does not authorize claims premised on serious, but prospective, risk of institutionalization. Mirroring the same arguments which they made on this point in Fitzmorris, the defendants invoke the Supreme Court's decisions in Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024), and Kisor v. Wilkie, 588 U.S. 558 (2019), for the view that I should disregard longstanding guidance by the Department of Justice ("DOJ") endorsing risk-based Olmstead claims.[7] See 2026 WL 1045606, at *5-7. As I explained in Fitzmorris, however, neither

[7] In June, the DOJ's Office of Legal Counsel ("OLC") reversed course, releasing a memorandum which concludes that neither Title II nor § 504 impose or authorize an integration mandate, much less one giving rise to risk-based claims, and that a majority of the Supreme Court did not reach such a conclusion in Olmstead. See Application of the Rehabilitation Act and ADA to State Institutionalization of Patients with Severe Mental Ilness or Disabilities, 50 Op. O.L.C. slip op. 1 (2026), available at https://www.justice.gov/olc/media/1446701/dl [https://perma.cc/S7ZN-WH29]. It bears emphasis, however, that Kisor counsels deference only to agencies' readings of their regulations that "fall 'within the bounds of reasonable interpretation.'" 588 U.S. at 576 (quoting City of Arlington v. FCC, 569 U.S. 290, 296 (2013)). Moreover, even if the OLC's analysis were persuasive, I am not free to ignore the First Circuit's reading of Olmstead and Title II in favor of an alternative interpretation. See Parent/Pro. Advoc. League v. City of Springfield, 934 F.3d 13, 18-19 (1st Cir. 2019) (endorsing the conventional reading of Olmstead, Title II, and the integration mandate).

authority supports that proposition: Loper Bright did not reach agencies' interpretations of their own regulations, and Kisor in fact counsels deference to reasonable interpretations where a regulation is ambiguous, as here. See id. Moreover, the DOJ's view is arguably beside the point; as noted above, at least three circuits have held that Olmstead and Title II require risk-based claims irrespective of the DOJ's subregulatory guidance. See Fisher, 335 F.3d at 1181-82; Radaszewski, 383 F.3d at 600; Florida, 172 F.4th at 1240 n.17; cf. Waskul, 979 F.3d at 461 (deriving the same directly from the integration mandate). Lacking contrary direction from the First Circuit, I am persuaded by those courts' opinions.

At oral argument, while preserving their disagreement with my decision in Fitzmorris, the defendants largely conceded that my reasoning there applies here. See Doc. 396 at 3, 37. And after carefully reviewing the defendants' renewed presentations of their arguments against the at-risk Olmstead claims in this case, my view is unchanged.

3. Factual Disputes

The defendants' legal objections aside, I proceed to consider which elements of the plaintiffs' Olmstead claims present material disputes of fact. To reiterate, to make out an Olmstead claim, the plaintiffs must establish that (1) New Hampshire's "treatment professionals have determined that community placement is appropriate" for the class; (2) "transfer from

institutional care to a less restrictive setting is not opposed by" the class; and (3) that community placement "can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."[8] 527 U.S. at 587. As explained, the plaintiffs move for summary judgment on their claims, contending that their evidence satisfies their burden as to all three elements. The defendants, meanwhile, do not move for summary judgment on the evidence and only purport to identify disputed facts material to each. Construing the evidence in the defendants' favor, Friedman, 174 F.4th at 240, I examine each element in turn.

#### a. Appropriateness of Community Placement

The first element of an Olmstead claim requires the plaintiffs to show that community placement is appropriate for class members. 527 U.S. at 587. The defendants purport to "hotly dispute[]" whether this element of the plaintiffs' Olmstead claim is satisfied, Doc. 384 at 25, yet they agree with the plaintiffs that the certified class excludes adolescent foster children for whom institutionalization is not necessary. See Doc. 362-1 at 16 (plaintiffs,

[8] Naturally, to attain relief, an Olmstead plaintiff must also be a "qualified individual with a disability" such that he or she falls within the Title II and § 504's ambit. See 527 U.S. at 587; 42 U.S.C. § 12132; 29 U.S.C. § 794(a). That much is a foregone conclusion in this case, as the class only encompasses those adolescents who have or have a record of "a mental impairment that substantially limits a major life activity." Doc. 342 at 55; see 42 U.S.C. § 12102(1); 29 U.S.C. § 705(9)(B).

asserting that "the Class definition . . . satisfies" the first element); Doc. 384-1 at 7 (defendants, describing it as "a tautology" that "Class members currently are appropriate for community-based placement" because the class is "explicitly limited" to "those who are unnecessarily in residential care settings"). Given the parties' agreement, I need not discuss this element further. The plaintiffs satisfy the first Olmstead element.

**b. Class Support for Community Placement**

The second element of an Olmstead claim implicates the wishes of the class, requiring that a "transfer from institutional care to a less restrictive setting is not opposed by the affected individual[s]." 527 U.S. at 587. To satisfy this element, the plaintiffs point to an expert report prepared by Dr. Theodore Cross, Ph.D., who opined that out of a forty-one-person sample of class members, "all forty-one youth in the sample were not opposed to placement in the community." Doc. 362-10 at 20. Of those, "thirty-one directly verbally expressed desire for a community placement," while the case files for the other ten "indirectly indicate their desire for community-based placement" through their positive responses to participation in community activities like public school and driver's education. Id.

The defendants purport to dispute Dr. Cross's characterization by calling attention to his report's acknowledgment that "[s]ome youth did express a preference for congregate care at a given point in time." Id. at 21.

However, in so doing, the defendants take Dr. Cross's statement out of context. In the same statement, he goes on to explain his belief that those youth, "if given the full range of options with informed choice," would also prefer community placement. Id. Specifically, Dr. Cross explains that several of the foster children who supposedly chose congregate care did so in the context of apparent Hobson's choices—electing for congregate care over, for instance, housing with physically abusive family members. See Doc. 373-4 at 20. A balanced reading of Dr. Cross's analysis simply does not give rise to a true dispute of fact. The plaintiffs also satisfy the second Olmstead element.

**c. Proposed Modifications**

The third element of an Olmstead claim requires the plaintiffs to show that class members' placement in the community can be reasonably accommodated. 527 U.S. at 587. In the Title II context, a defendant's duty to accommodate or modify is expressed through the reasonable-modifications regulation. See 28 C.F.R. § 35.130(b)(7)(i). Under that regulation, a plaintiff's proposed modification must satisfy two requirements: it must be both a "reasonable modification[]," and "necessary to avoid discrimination on the basis of disability." Id. (emphases added). The regulation further provides for an affirmative defense, noting that a defendant may avoid implementing a reasonable and necessary modification so long the defendant "can

demonstrate that making the modification[] would fundamentally alter the nature of the service, program, or activity" at issue. Id.

As I noted in Fitzmorris, although the regulation straightforwardly identifies the defendant as bearing the burden of any fundamental-alteration defense, it is not so clear from the regulation's text how its reasonableness and necessity elements ought to be established. See 2026 WL 1045606, at *16 (citing id.). While other circuits have reached various formulations of the latter burden, the First Circuit has yet to weigh in directly. See id. (collecting cases). Confronted with this quandary in Fitzmorris, I relied on the First Circuit's decisions in Reed v. LePage Bakeries, Inc., 244 F.3d 254 (1st Cir. 2001), and Pollack v. Regional School Unit 75, 886 F.3d 75 (1st Cir. 2018), neither of which involved Olmstead claims, but each of which offered constructions of an ADA plaintiff's burden when proposing a modification or accommodation.[9] See id. at *17. Read together, these decisions explain that the reasonable-modifications regulation charges the plaintiff with the "initial burden" to propose any desired modifications and "demonstrate that those

[9] Pollack, among other First Circuit cases, also explains that in the ADA context, "modification" and "accommodation" are synonymous. See 886 F.3d at 80 n.3 ("[T]here is no material difference between the terms[.]"); see also Sosa v. Mass. Dep't of Corr., 80 F.4th 15, 31 n.14 (1st Cir. 2023) ("[W]hile Title II of the ADA uses the term 'reasonable modifications' and Title I uses the more familiar term 'reasonable accommodation,' these terms are often used interchangeably.").

proposed modifications are facially reasonable and necessary."[10] Id. As I noted in Fitzmorris, "this burden is 'not a heavy one,'" 2016 WL 1045606, at *17 (quoting Henrietta D. v. Bloomberg, 331 F.3d 261, 280 (2d Cir. 2003)), as the plaintiff need only show that a proposed modification is reasonable and necessary "on its face, i.e., ordinarily or in the run of cases," id. (quoting U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401 (2002)). Once the plaintiff meets that prima facie burden, "the burden shifts to the defendant to demonstrate that the modification is otherwise unreasonable or unnecessary" to mitigate discrimination. Id. This option to rebut the plaintiff's showing is separate and apartment from the defendant's initial burden to assert any affirmative defense, such as a fundamental-alteration defense. See id.

Here, the plaintiffs have set forth a detailed, eleven-point list of modifications to New Hampshire's foster care system which they propose would reduce class members' institutionalization. See Doc. 368-29. The plaintiffs further back these proposals with evidence which generally supports many of the proposals' prospective effectiveness and apparent reasonableness. See Doc. 362-1 at 21-32. In response, the defendants make a

---

10 In Pollack, the court further identified the "'effectiveness' of the proposed accommodation" among the "several showings" required of the plaintiff. 866 F.3d at 81. Logically, however, this requirement is subsumed by the "reasonableness" element, as a modification that works no mitigation of the challenged discrimination is necessarily an unreasonable one.

blanket argument that material disputes of fact "are numerous," yet they develop that claim as to only a handful of the plaintiffs' proposals. See Doc. 384 at 23-26; Doc. 393 at 22-24.

Unfortunately, because briefing on the instant cross-motions preceded my decision in Fitzmorris, neither party had the opportunity to tailor their presentation of the evidence to their respective burdens in showing or disputing each modification's reasonableness and necessity. While both sides make reference to these concepts in their briefs, they understandably fall short of developing arguments that fully adhere to the framework I laid out for the first time in Fitzmorris. This misfit is evident, for example, in the defendants' apparent conflation of the evidence and arguments that bear on the proposed modifications' prima facie reasonableness and those that relate to a fundamental-alteration defense. See, e.g., Doc. 393 at 22-24. Likewise, the plaintiffs' briefing does not meaningfully engage with the modifications' necessity, ostensibly because the plaintiffs conceived of their prima facie burden to exclude it. See Doc. 362-1 at 20.

For their part, the plaintiffs nonetheless ask the Court to award summary judgment on the question of reasonableness, even if I cannot address necessity at this stage. See Doc. 390 at 25 n.21. And given the paucity of developed briefing by the defendants to support their assertions of disputed facts, I am sympathetic to that request. However, because neither

party had notice of the burden-shifting framework adduced in Fitzmorris, neither party's briefing is sufficiently tailored to allow the Court to issue a sound decision at this juncture on the reasonableness and necessity of the plaintiffs' proposed modifications or whether they would fundamentally alter New Hampshire's foster care system. I accordingly must deny the plaintiffs' motion for summary judgment as to the third Olmstead element.

That said, as to this element only, I deny summary judgment without prejudice, leaving the plaintiffs with two options. The plaintiffs may, if they choose, file a new motion seeking summary judgment on the reasonableness and necessity of their proposed modifications as well as the defendants' fundamental-alteration defense. If as to one or more of their proposed modifications the plaintiffs meet their burden, properly construed, and the defendants fail to place their evidence in meaningful dispute, I will grant judgment on those modifications as a matter of law. Alternatively, the plaintiffs may elect to proceed to trial, at which the Court will resolve any factual disputes and order those modifications supported by those findings.

* * *

Altogether, in view of the plaintiffs' unrebutted showings, partial summary judgment on their Olmstead claims is appropriate. As to the first two Olmstead elements, the defendants neglect to meaningfully rebut the plaintiffs' evidence. Accordingly, even drawing inferences in the defendants'

favor, Friedman, 174 F.4th at 240, the plaintiffs have met their burden as to those elements. See Harley-Davidson Credit Corp., 807 F.3d at 411. Because of the timing of the parties' briefing, however, I am unable to conclude the same with respect to the third Olmstead element. That element will require subsequent briefing or resolution at trial.

## IV. CONCLUSION

Per the foregoing, the defendants' motion is granted as to Count I of the plaintiffs' second amended complaint, Doc. 316, and otherwise denied. Doc. 384. The plaintiffs' motion is granted in part and denied in part, without prejudice to the additional motion practice described above. Doc. 362.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

September 3, 2026

cc: Counsel of Record